## EXHIBIT A

**OFFERING MEMORANDUM AND CONSENT SOLICITATION STATEMENT**                    **CONFIDENTIAL**



## Maxcom Telecomunicaciones, S.A.B. de C.V.

### Offer to Exchange any and all of its outstanding Step-Up Senior Notes due 2020 for its 8% Senior Secured Notes due 2024, its Junior Payment-in-Kind Notes and Cash

### Solicitation of Consents to Proposed Amendments to Related Indenture

### Disclosure Statement for Solicitation of Votes on a Prepackaged Plan of Reorganization

> The exchange offer, the consent solicitation and the plan solicitation will expire at 12:00 midnight (New York City time) on July 15, 2019 unless extended by us (such date and time, as they may be extended, the "expiration date"). In order to be eligible to receive the total exchange consideration, which includes the early participation consideration, holders of old notes must validly tender and must not validly withdraw their old notes (as defined below) and must submit their ballot in favor of the Plan (as defined below) prior to or at 5:00 p.m. (New York City time) on June 28, 2019 unless extended by us (such date and time, as they may be extended, the "early participation date"). Votes to accept or reject the Joint Prepackaged Chapter 11 Plan in the form set forth in Annex B hereto (as same may be modified, amended or supplemented from time to time) (the "Plan") must be received no later than 12:00 midnight, New York City time, on July 15, 2019 (the "Voting Deadline"). If the exchange offer and consent solicitation are successful, any votes to accept or reject the Plan will be of no effect.

### The Exchange Offer

We are making an offer (the "exchange offer") to eligible holders (as defined below), upon the terms and subject to the conditions set forth in this offering memorandum and consent solicitation statement (this "statement"), to exchange all of our outstanding Step-Up Senior Notes due 2020 (the "old notes") for our 8% senior secured notes due 2024 (the "Senior Notes"), our junior payment-in-kind notes (the "Junior PIK Notes" and, together with the Senior Notes, the "New Notes") and cash, for the consideration set forth in the table below.

| CUSIP / ISIN of Old Notes | Aggregate Principal Amount Outstanding of Old Notes | Title of Old Notes | Title of New Notes | Consideration per US$1,000 Principal Amount of Old Notes Tendered | |
|---|---|---|---|---|---|
| | | | | Total Exchange Consideration if Tendered on or before the Early Participation Date (1) | Exchange Consideration if Tendered after the Early Participation Date and on or before the Expiration Date |
| 57773A AL6 / US57773AAL61 | US$103,378,674 | Step-Up Senior Notes due 2020 | 8% Senior Secured Notes due 2024 Junior Payment-in-Kind Notes - | US$550 of Senior Notes US$100 of Junior PIK Notes (2) US$110 in cash | US$550 of Senior Notes US$100 of Junior PIK Notes (2) US$100 in cash |

_____
(1)  The cash portion of the total exchange consideration for holders tendering their old notes prior to or on the early participation date is US$110 for each US$1,000 of old notes validly tendered, not validly withdrawn and accepted in the exchange offer, which includes early participation consideration of US$10 for each US$1,000 of old notes validly tendered, not validly withdrawn and accepted in the exchange offer.
(2)  The Junior PIK Notes will be denominated in Mexican pesos. Peso equivalent of US$100 to be determined using an exchange rate of Ps.19.1645 per US$1.00, which is the exchange rate published by the Bank of Mexico (*Banco de México*) in the Official Gazette (*Diario Oficial de la Federación*) on June 14, 2019.

### The Consent Solicitation

In connection with the exchange offer, we are soliciting consents (the "consent solicitation"), upon the terms and subject to the conditions set forth in this statement from all eligible holders of the old notes to the proposed amendments to the indenture governing the old notes (the "old notes indenture") that would eliminate the majority of the restrictive covenants and certain events of default (the "proposed amendments"), as more fully described under "The Proposed Amendments." If the proposed amendments become operative, all holders who do not validly tender their old notes in the exchange offer will be bound by the proposed amendments even though they did not consent to the proposed amendments. By tendering old notes for exchange, holders will also be delivering their consent to the proposed amendments. Eligible holders may not tender their old notes without consenting to the proposed amendments and may not deliver consents to the proposed amendments without tendering the related old notes. Tendering holders may not withdraw their validly tendered old notes without revoking their consents and may not revoke their consents without withdrawing any validly tendered old notes. We can provide no assurance that the conditions to the exchange offer will be satisfied.

### The Plan Solicitation

As described more fully in this statement, the consummation of the exchange offer is conditioned upon, among other things, the valid tender, without subsequent withdrawal, of at least 90% (including any old notes which are owned by us or our affiliates) in aggregate principal amount of the outstanding old notes on or prior to the expiration date (the "minimum tender condition"); provided however that the proposed amendments will only be operative if at least a majority (not including any old notes which are owned by us or our affiliates) in aggregate amount of the old notes is validly tendered and not validly withdrawn on or prior to the expiration date. If the minimum tender condition is not satisfied on or before the expiration date, we intend to terminate the exchange offer; however, we reserve the right to waive the minimum tender condition if old notes representing 80% or more of the outstanding old notes aggregate principal amount are tendered for exchange.

In the event that the exchange offer is terminated, but holders of the old notes submit votes in favor of the Plan in an amount and number that satisfy the Bankruptcy Threshold (as defined herein), we currently intend to file a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which will commence a chapter 11 case (the "Chapter 11 Case"), and seek prompt confirmation of the Plan in order to accomplish the financial restructuring contemplated by the exchange offer.  Concurrently with the exchange offer and consent solicitation, we are commencing the solicitation of your vote to approve the Plan (the "plan solicitation").  Accordingly, an applicable Ballot and Master Ballot will be provided to you under separate cover.

Holders that tender their old notes into the exchange offer and consent solicitation through ATOP on or before the early participation date will be entitled to receive the early participation consideration subject to the occurrence of the Effective Date of the Plan. Because the early participation consideration is only payable in the event that the Plan is confirmed by the Bankruptcy Court and we are able to achieve the Effective Date under the Plan, holders of the old notes who wish to receive the early participation consideration are, in addition to being required to tender their old notes prior to or on the early participation date, also encouraged to timely submit their Ballot in favor of the Plan.

Because the Chapter 11 Case has not yet been commenced, this statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of Section 1125(a) of the Bankruptcy Code.  If we file the Chapter 11 Case, we will promptly seek an order of the Bankruptcy Court (a) approving this statement as having contained "adequate information," (b) approving the solicitation of votes as having been in compliance with Section 1126(b) of the Bankruptcy Code and (c) confirming the Plan.  The Bankruptcy Court may order additional disclosures.

-----

**Participating in the exchange offer, the consent solicitation or the plan solicitation involves risks.
See "Risk Factors" beginning on page 22 and on page A-7.**

-----

**The exchange offer and the consent solicitation are directed only to holders of the old notes who are persons other than U.S. Persons (as defined in Regulation S under the U.S. Securities Act of 1933, as amended (the "Securities Act")) outside the United States.  Holders of old notes that are eligible to participate in the exchange offer and the consent solicitation pursuant to the foregoing condition are referred to in this statement as "eligible holders."  Only eligible holders are authorized to participate in the exchange offer and the consent solicitation. Neither the New Notes nor the guarantees have been registered and will not be registered under the Securities Act.  Accordingly, we are offering the New Notes only to eligible holders.  For certain restrictions on transfer of the New Notes, see "Transfer Restrictions."**

**Neither this statement nor the Plan have been filed with or reviewed by the Bankruptcy Court, and the securities to be issued in the exchange offer or, if the exchange offer is not consummated, on or after the effective date (as defined in the Plan) will not have been the subject of a registration statement filed with the U.S. Securities and Exchange Commission (the "SEC") under the Securities Act, or any securities regulatory authority of any state under any state securities laws.  We are relying on Section 4(a)(2) and Regulation S under the Securities Act, and similar provisions of state securities laws, to exempt from registration under the Securities Act the offer of New Notes to holders of old notes before the filing of the Chapter 11 Case, including, without limitation, in connection with the plan solicitation.**

**In order to consummate the Plan, we will rely on Section 1145 of the Bankruptcy Code to exempt the offering, issuance and distribution of the New Notes from the registration requirements of the Securities Act and of any state securities laws.  Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of us or a successor to us under a chapter 11 plan, if such securities are offered or sold in exchange for a claim against us, an equity interest in us, or a claim for an administrative expense in the case concerning us.**

**The Plan has not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein.  In addition, the New Notes have not been approved or disapproved by the SEC, any state securities commission or any other regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of the Plan or the accuracy or adequacy of this statement.  Any representation to the contrary is a criminal offense.  This statement does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.**

**The terms and conditions of any offer of securities will be notified to the Mexican National Banking and Securities Commission (*Comisión Nacional Bancaria y de Valores*, or "CNBV") for informational purposes only and such notice does not constitute a certification as to the investment quality of the securities, our solvency or the accuracy or completeness of this statement.  The New Notes have not been registered with the National Securities Registry (*Registro Nacional de Valores*) maintained by the CNBV and may not be publicly offered or sold in Mexico, except that the New Notes may be offered to Mexican institutional and qualified investors solely pursuant to the private placement exemption set forth in Article 8 of the Mexican Securities Market Law (*Ley del Mercado de Valores*). This statement is solely our responsibility and has not been reviewed or authorized by the CNBV.**

*Exclusive Dealer Manager and Solicitation Agent*
**BCP Securities, LLC**

June 17, 2019

## TABLE OF CONTENTS

Page

Important Information About the Exchange Offer, the Consent Solicitation and the Plan Solicitation ...................... ii

Notice to Holders ........................................................................................................................................... v

Service of Process and Enforcement of Civil Liabilities ........................................................................... vii

Reasons for the Exchange Offer, Consent Solicitation and Plan Solicitation ............................................ 1

Questions and Answers About the Restructuring ........................................................................................ 2

Summary of the Exchange Offer and the Consent Solicitation .................................................................. 9

Summary of the Senior Notes ..................................................................................................................... 13

Summary of the Junior PIK Notes .............................................................................................................. 17

Summary of the Plan .................................................................................................................................... 20

Risk Factors ................................................................................................................................................. 22

Description of the Exchange Offer and the Consent Solicitation ............................................................... 35

The Proposed Amendments ......................................................................................................................... 44

Description of the Senior Notes .................................................................................................................. 47

Description of the Junior PIK Notes ........................................................................................................... 102

Description of the Plan ................................................................................................................................ 123

Anticipated Events in a Chapter 11 Case ................................................................................................... 142

Transfer Restrictions ................................................................................................................................... 144

Taxation ....................................................................................................................................................... 147

Legal Matters ............................................................................................................................................... 157

General Information ..................................................................................................................................... 158

Annex A – Information About the Company

Annex B – Chapter 11 Plan of Reorganization

**IMPORTANT INFORMATION ABOUT THE EXCHANGE OFFER, THE CONSENT SOLICITATION
AND THE PLAN SOLICITATION**

**The Exchange Offer and the Consent Solicitation**

The total exchange consideration of US$550 principal amount of the Senior Notes, US$100 of Junior PIK Notes and US$110 in cash for each US$1,000 principal amount of old notes includes early participation consideration of US$10 for such old notes validly tendered through the Automated Tender Offer Program ("ATOP") maintained by The Depository Trust Company ("DTC"), not validly withdrawn and accepted. Only eligible holders that validly tender and do not validly withdraw their old notes on or before the early participation date will be eligible to receive the total exchange consideration, which includes the early participation consideration. Eligible holders that validly tender and do not validly withdraw old notes after the early participation date and on or before the expiration date will be eligible to receive only the exchange consideration of US$550 principal amount of the Senior Notes, US$100 of Junior PIK Notes and US$100 in cash, and no early participation consideration for each US$1,000 principal amount of old notes validly tendered, not validly withdrawn and accepted.

The Senior Notes will be issued in minimum denominations of US$1,000 and integral multiples of US$1.00 in excess thereof. The Junior PIK Notes will be issued in minimum denominations of Ps.20,000 and integral multiples of Ps.20.00. An eligible holder must tender old notes in a principal amount sufficient to receive at least US$1,000 principal amount of Senior Notes and Ps.20,000 principal amount of Junior PIK Notes in exchange for such old notes, based on the applicable exchange consideration. Any holder that tenders less than such amount will not be able to participate in the exchange offer and the consent solicitation.

The amount of Senior Notes and Junior PIK Notes to be issued to any holder will be rounded down to the nearest US$1.00 and Ps.20.00, respectively. No additional cash will be paid in lieu of any principal amount of Senior Notes not received as a result of rounding down. If the exchange offer and consent solicitation are successful, the New Notes will be allocated on a per-tender basis with rounding calculated at each "voluntary offering instruction" generated by DTC's ATOP. Alternatively, if the exchange offer and consent solicitation are not successful, the Senior Notes will likely be allocated on a mandatory basis with DTC treated as one holder for rounding purposes.

The acceptance date is expected to be on or promptly following the expiration date with respect to old notes that are validly tendered and are not validly withdrawn on or before the expiration date. The settlement date is expected to be on or promptly following the acceptance date with respect to old notes accepted on the acceptance date.

On the settlement date, all eligible holders whose old notes are validly tendered, not validly withdrawn and accepted for exchange will also receive a cash payment equal to the accrued and unpaid interest on their old notes validly tendered, not validly withdrawn and accepted for exchange through but excluding the settlement date.

The exchange offer is not being made to, and any offers to exchange will not be accepted from, or on behalf of, eligible holders of the old notes in any jurisdiction in which the making of such offer would not be in compliance with the laws and regulations of such jurisdiction. See "Transfer Restrictions."

**The Senior Notes and the Junior PIK Notes have not been, and will not be, registered under the Securities Act. The exchange offer and the consent solicitation will only be made to non-U.S. persons outside the United States in offshore transactions in reliance on Regulation S under the Securities Act. Only eligible holders are authorized to participate in the exchange offer and the consent solicitation. The Senior Notes and the Junior PIK Notes to be issued in the exchange offer are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and other applicable securities laws. Investors should be aware that they may be required to bear the financial risks of this investment for an indefinite period of time. See "Transfer Restrictions."**

**Withdrawal Rights**

Tenders of old notes may be validly withdrawn at any time prior to 5:00 p.m. (New York City time) on June 28, 2019, unless extended by us (such date and time, as it may be extended, the "withdrawal date"), but will

thereafter be irrevocable, except in certain limited circumstances where we determine additional withdrawal rights are necessary and to the extent required by law.

**Conditions to the Exchange Offer and the Consent Solicitation**

The exchange offer and the consent solicitation are subject to certain conditions, as described under "Description of the Exchange Offer and the Consent Solicitation—Conditions to the Exchange Offer and the Consent Solicitation," which may be asserted or waived by us in full or in part in our sole discretion (other than the capital contribution condition, which may not be waived). For example, as more fully described herein, (i) we will only accept old notes for exchange if at least 90% (including any old notes which are owned by us or our affiliates) in aggregate principal amount of the outstanding old notes is validly tendered and not validly withdrawn on or prior to the expiration date (the "minimum tender condition"), and (ii) we will only proceed to the settlement date if Maxcom's shareholders contribute Ps.300 million of new equity capital (the "capital contribution condition").

Although we have no present intention to do so, we expressly reserve the right to amend or terminate, at any time, the exchange offer and the consent solicitation and not accept for exchange any old notes not theretofore accepted for exchange. We may extend the exchange offer and the consent solicitation from time to time until the conditions are satisfied or waived (other than the capital contribution condition, which may not be waived). We will give you notice of any amendment, termination or extension if required by applicable law.

**The Senior Notes**

We would issue a maximum aggregate principal amount of US$56,858,270 of Senior Notes in the exchange offer if all old notes are tendered on or before the early participation date and we do not round down the amount to be issued to any tendering holder. We will pay interest on the Senior Notes on June 15 and December 15 of each year, beginning on December 15, 2019. The Senior Notes will mature on the fifth anniversary of their issue date.

The Senior Notes will be unconditionally guaranteed by certain of our subsidiaries. The Senior Notes and the related guarantees will be our and our subsidiary guarantors' senior secured obligations. The Senior Notes and the related guarantees will rank equally with all of our and our subsidiary guarantors' respective existing and future senior secured indebtedness, subject to statutory priorities. The Senior Notes will rank senior in right of payment with all of our and our subsidiary guarantors' respective existing future subordinated indebtedness. The Senior Notes will be structurally subordinated to liabilities of our non-guarantor subsidiaries, including trade payables.

As described under "Description of the Senior Notes," the Senior Notes will be secured by the Collateral (as defined herein) securing the old notes on a *pari passu* basis. Holders of the Senior Notes will be entitled to foreclose on the Collateral subject to the terms of a Senior Notes intercreditor agreement to the extent applicable. The Collateral consists of most of the Company's telephone network systems and equipment assets.

We may redeem the Senior Notes, in whole or in part, at any time at a redemption price of 100% of their principal amount, plus accrued and unpaid interest and Additional Amounts, if any, with the net proceeds from certain equity offerings. Additionally, if a change of control as described in this statement under the heading "Description of the Senior Notes— Repurchase at the Option of Holders—Change of Control" occurs, we may be required to offer to purchase the Senior Notes from the holders.

**The Junior PIK Notes**

We would issue a maximum aggregate principal amount of the Mexican peso equivalent of US$10,337,867 of Junior PIK Notes in the exchange offer if all old notes are tendered on or before the early participation date and we do not round down the amount to be issued to any tendering holder. The Junior PIK Notes are perpetual notes with no fixed final maturity date. There will be no interest paid on the Junior PIK Notes. The principal amount of the Junior PIK Notes will increase by 15% per annum on each anniversary of their issue date.

The payment by the Issuer of the principal of, and premium, if any, on the Junior PIK Notes will be subordinated in right of payment to the prior payment in full of all existing and future senior indebtedness of the Issuer. The Junior PIK Notes will not be guaranteed by any subsidiaries or other affiliates of the Company. The

Junior PIK Notes, therefore, are effectively subordinated to creditors (including trade creditors) and preferred stockholders (if any) of subsidiaries of the Issuer.

We will be required to redeem the Junior PIK Notes (i) if a change of control as described in this statement under the heading "Description of the Junior PIK Notes—Mandatory Redemption—Change of Control" occurs, or (ii) if the Issuer makes a payment of any dividend or makes any other payment or distribution on account of the Issuer's equity interests. In addition, in the event of certain changes in the withholding tax treatment relating to payments on Senior Notes in Mexico or certain other relevant jurisdictions, we may redeem the Senior Notes in whole, but not in part, at 100% of their principal amount, plus accrued and unpaid interest and Additional Amounts, if any.

**The Plan**

We are also soliciting from all holders of the old notes votes on the Plan, pursuant to which, among other things, the old notes would be exchanged for the Senior Notes, Junior PIK Notes and other consideration provided for under the exchange offer. If the exchange offer is not consummated, but holders of the old notes have submitted votes in an amount and number in favor of the Plan as of the Voting Deadline that satisfy the Bankruptcy Threshold, we reserve the right to commence the Chapter 11 Case for the purpose of seeking confirmation of the Plan from the Bankruptcy Court.

Only holders of the old notes as of the voting record date (as defined herein) will be entitled to vote to accept or reject the Plan. Holders of the old notes that do not vote to accept or reject the Plan will be deemed to have abstained from voting on the Plan. Votes received from persons that are not holders as of the voting record date, and holders who abstain from voting, will not be counted for purposes of determining whether the Bankruptcy Threshold has been satisfied for the class of claims consisting of the old notes. That is, they will not be counted as voting to accept or reject the Plan, nor will they be included in the denominator when determining the percentage in amount and fraction of holders that have voted to accept the Plan. Holders of our old notes (or a banker, dealer, custodian, or nominee with authority to act on behalf of such holder) are the only class of claims or interests impaired under the Plan and are thus the only class entitled to vote on the Plan.

For the Plan to be confirmed by the Bankruptcy Court without invoking the "cram-down" provisions of the Bankruptcy Code, each class of claims or interests that is impaired must vote to accept the Plan. An impaired class of claims is presumed to accept a plan of reorganization if the holders of at least two-thirds in amount and more than one-half in number of the claims in such class who actually cast votes to accept the plan. We refer to the foregoing thresholds collectively as the "Bankruptcy Threshold".

Because the early participation consideration is only payable in the event that the Plan is confirmed by the Bankruptcy Court and we are able to achieve the Effective Date under the Plan, holders of the old notes who wish to receive the early participation consideration are, in addition to being required to tender their old notes prior to or on the early participation date, also encouraged to timely submit their Ballot in favor of the Plan.

If the Plan is confirmed by the Bankruptcy Court and the effective date (as defined in the Plan) occurs, all holders of the old notes (including, without limitation, those holders of the old notes who do not submit ballots to accept or reject the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby. For a description of the Plan and the procedures for submitting ballots (each, a "Ballot" and, collectively, the "Ballots") to vote to accept or reject the Plan, see the section titled "Description of the Plan."

For the avoidance of doubt, with regards to the plan solicitation, in the event of a discrepancy between this statement and the Plan, the terms of the Plan shall control.

**NOTICE TO HOLDERS**

Maxcom Telecomunicaciones, S.A.B. de C.V. is a publicly traded variable capital corporation *(sociedad anonima bursatil de capital variable)* organized under the laws of the United Mexican States ("Mexico"). Unless otherwise indicated or except as the context otherwise may require, references in this statement to the "Company," "we," "us" or "our" are to Maxcom Telecomunicaciones, S.A.B. de C.V. and its subsidiaries. References to "Maxcom" or the "Issuer" in this statement are to Maxcom Telecomunicaciones, S.A.B. de C.V. on an individual basis. References to the "subsidiary guarantors" as of the date of this statement are to Outsourcing Operadora de Personal, S.A. de C.V., TECBTC Estrategias de Promocion, S.A. de C.V., Maxcom SF, S.A. de C.V., Maxcom TV, S.A. de C.V., Maxcom USA, Inc., Telereunión, S.A. de C.V., Telscape de Mexico, S.A. de C.V., Sierra Comunicaciones Globales, S.A. de C.V., Sierra USA Communications, Inc., Asesores Telcoop, S.A. de C.V. and Maxcom USA Telecom, Inc., the initial guarantors of the Senior Notes. See "Annex A—Business—Merger of Subsidiaries" for a description of certain changes we intend to make to the subsidiary guarantors.

You should read this entire statement carefully before you decide whether to tender your old notes in the exchange offer. You should rely only on the information contained in this statement. We have not, and the dealer manager and solicitation agent has not, authorized any other person to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely on it. We are not, and the dealer manager and solicitation agent is not, making an offer to sell, or seeking offers to buy, the New Notes in any jurisdiction where the offer or sale is not permitted. This statement does not constitute an offer to sell, or a solicitation of an offer to buy, any New Notes by any person in any jurisdiction in which it is unlawful for such person to make such an offer or solicitation. You should assume that the information contained in this statement is accurate only as of the date on the front cover of this statement. Our business, financial condition, results of operations and prospects may have changed since that date.

This statement has been prepared by us solely for use in connection with the exchange offer, the consent solicitation and the plan solicitation. We reserve the right to reject any tender offer for any reason.

**Neither the SEC, any state securities commission nor any other regulatory authority, has approved or disapproved the New Notes; nor have any of the foregoing authorities passed upon or endorsed the merits of the exchange offer and the consent solicitation or the accuracy or adequacy of this statement. Any representation to the contrary is a criminal offense.**

You must:

- comply with all applicable laws and regulations in force in any jurisdiction in connection with the possession or distribution of this statement and the purchase, offer or sale of the Senior Notes; and

- obtain any consent, approval or permission required to be obtained by you for the purchase, offer or sale by you of the New Notes under the laws and regulations applicable to you in force in any jurisdiction to which you are subject or in which you make such purchases, offers or sales; and none of we, the subsidiary guarantors and the dealer manager and solicitation agent shall have any responsibility therefor.

The New Notes are subject to restrictions on transfer. See "Transfer Restrictions."

You acknowledge that:

- you have been afforded an opportunity to request from us, and to review, all additional information considered by you to be necessary to verify the accuracy of, or to supplement, the information contained in this statement;

- you have not relied on the dealer manager and solicitation agent or any person affiliated with the dealer manager and solicitation agent in connection with your investigation of the accuracy of such information or your investment decision; and

- no person has been authorized to give any information or to make any representation concerning us, the subsidiary guarantors or the New Notes, other than as contained in this statement and, if given or made, any such other information or representation should not be relied upon as having been authorized by us, the subsidiary guarantors or the dealer manager and solicitation agent.

In making an investment decision, you must rely on your own examination of us and the subsidiary guarantors and the terms of this exchange offer and the consent solicitation, including the merits and risks involved.

We are responsible for ensuring that the information contained in this statement is true and correct in all material respects and is not misleading in any material respect as of the date of this statement, and that there has been no omission of information which, in the context of the exchange offer and the consent solicitation, would make any statement of material fact herein misleading in any material respect, in light of the circumstances existing as of the date of this statement.  We accept responsibility accordingly.

The dealer manager and solicitation agent is not making any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this statement.  The dealer manager and solicitation agent assumes no responsibility for the accuracy or completeness of any such information.  You should not rely upon the information contained in this statement, as a promise or representation, whether as to the past or the future.

None of us, the subsidiary guarantors and the dealer manager and solicitation agent, nor any of our and their respective representatives, is making any representation to you regarding the legality of an investment in the New Notes.  You should consult with your own advisors as to legal, tax, business, financial and related aspects of an investment in the New Notes.  You must comply with all laws applicable in any place in which you buy, offer or sell the New Notes or possess or distribute this statement, and you must obtain all applicable consents and approvals. None of us, the subsidiary guarantors and the dealer manager and solicitation agent shall have any responsibility for any of the foregoing legal requirements.

## SERVICE OF PROCESS AND ENFORCEMENT OF CIVIL LIABILITIES

We are a *sociedad anonima bursatil de capital variable* (a publicly traded variable capital corporation) organized under the laws of Mexico. Almost all of our directors, executive officers and major shareholders reside outside of the United States and most of the directors and executive officers of our subsidiary guarantors (except for Maxcom USA, Inc., Sierra USA Communications, Inc. and Maxcom USA Telecom, Inc.), are Mexican residents. Substantially all of the assets of our directors, executive officers and controlling persons and substantially all of our assets and the assets of certain of our subsidiaries are located outside of the United States. As a result, it may not be possible for you to effect service of process within the United States upon these persons or to enforce against any of them or us in United States courts judgments predicated upon the civil liability provisions of the federal securities laws of the United States. We have been advised by our Mexican counsel, Ayala SV Abogados, that there is doubt as to the enforceability, in original actions in Mexican courts, of liabilities predicated solely on United States federal securities laws and as to the enforceability in Mexican courts of judgments of United States courts obtained in actions predicated upon the civil liability provisions of United States federal securities laws. See "Risk Factors—Risks Related to the Senior Notes and Our Indebtedness—You may not be able to effect service of process on us or to enforce judgments against us in Mexican courts." in the first part of the statement regarding the terms of the exchange offer and consent solicitation.

**REASONS FOR THE EXCHANGE OFFER, CONSENT SOLICITATION AND PLAN SOLICITATION**

We do not anticipate being able to raise the necessary funds in order to repay the old notes at maturity. In addition, we need to maximize free cash flow to invest in capital expenditures in order to implement our business strategy, and the interest expense on our high debt burden is competing with these capital expenditures. Our management has already executed several non-strategic asset sales (e.g., sales of select residential clients, 72 transmission towers, a six-year indefeasible right of use ("IRU") over our 15 and 23 frequency spectrum, a 10-year IRU over two of our long distance backbone routes and a sale of excess capacity in our fiber optic network) in order to raise cash. Nevertheless, our high debt burden (reflected in our net debt to LTM (last twelve months) EBITDA ratio of 7.5x and our gross debt to LTM EBITDA ratio of 9.0x as of March 31, 2019) is unsustainable and puts at risk our ability to continue operating as a going concern. For example, our 2018 EBITDA of Ps.248 million was insufficient to cover interest expense of approximately Ps.179 million and capital expenditures of approximately Ps.205 million, meaning our company is draining cash and, without reducing interest expense, would not be able to fund necessary capital expenditures or continue to operate as a going concern.

Through the exchange offer and consent solicitation, we intend to achieve the following goals:

- extend the maturity of the old notes;

- reduce our overall debt burden; and

- reduce our overall interest expense burden.

## QUESTIONS AND ANSWERS ABOUT THE RESTRUCTURING

*The following are some questions and answers regarding our financial restructuring, whether accomplished through the exchange offer or through confirmation of the Plan by the Bankruptcy Court. It does not contain all of the information that may be important to you. You should carefully read this statement to fully understand the terms of the restructuring, which includes the exchange offer and the Plan, as well as the other considerations that are important to you in making your investment decision. You should pay special attention to the "Risk Factors."*

**General**

Q:   What is the purpose of the restructuring?

A:   The restructuring consists of the transactions described in the introductory section of this statement. We believe the restructuring will provide us with a tenable long-term capital structure and sufficient liquidity to conduct our operations. The purpose of the restructuring is to extend the maturity of the old notes, reduce our overall debt burden; and reduce our overall interest expense burden, thereby allowing us to fund necessary capital expenditures and continue operations. The Junior PIK Notes being offered as part of the restructuring are intended to provide an "equity upside" to holders and Maxcom will be required to redeem them in the event of a change of control of Maxcom, at a redemption price of the lesser of (i) their face value or (ii) a percentage of the Company's equity value (as described elsewhere in this statement).

The restructuring may be accomplished through either the out-of-court exchange offer or, in the alternative, the in-court Plan.

Q:   What is the exchange offer?

A:   The exchange offer is one of two possible methods to accomplish the restructuring. Through the exchange offer, the retirement of the old notes tendered in the exchange offer would be effected, with the holders of old notes tendering their old notes in exchange for Senior Notes, Junior PIK Notes and cash upon the terms and conditions set forth herein. The closing of the exchange offer is conditioned upon, among other things, (i) the valid tender, without subsequent withdrawal, of at least 90% (including any old notes which are owned by us or our affiliates) in aggregate principal amount of the outstanding old notes on or prior to the expiration date (the "minimum tender condition") and (ii) the contribution of Ps.300 million of new equity capital by Maxcom's shareholders (the "capital contribution condition"). If the minimum tender condition is not satisfied on or before the expiration date, we intend to terminate the exchange offer; however, we reserve the right to waive the minimum tender condition if old notes representing 80% or more of the outstanding old notes aggregate principal amount are tendered for exchange. In the event that the conditions to the closing of the exchange offer are not satisfied and the exchange offer is terminated, we reserve the right to implement an in-court financial restructuring, through which we would seek to accomplish the results contemplated by the exchange offer through consummation of the Plan under chapter 11 of the Bankruptcy Code if the Bankruptcy Threshold is satisfied.

Q:   What is the Plan?

A:   The Plan is the second alternative for accomplishing the restructuring. We may seek confirmation of the Plan in the Chapter 11 Case in the event that the minimum tender condition to the exchange offer is not satisfied (or waived as described above) but we receive votes in favor of the Plan from a sufficient number of holders and amounts of old notes to allow the Plan to satisfy the Bankruptcy Threshold. Under the Plan, we expect that the holders of the old notes will receive the same treatment with respect to their claims as they would in the exchange offer. See "Description of the Plan."

Q:   In what circumstances will we file the Plan instead of closing the exchange offer?

A:   We may commence the Chapter 11 Case and seek confirmation of the Plan instead of closing the exchange offer if (i) certain conditions are not satisfied or waived including, among other conditions, the minimum tender condition, and (ii) the Bankruptcy Threshold is satisfied as to the class of claims consisting of

holders of the old notes. In such circumstances, we may seek to accomplish the restructuring on substantially the same terms as the exchange offer, by way of the Plan.

For the Plan to be confirmed by the Bankruptcy Court without invoking the "cram-down" provisions of the Bankruptcy Code, each class of claims or interests that is impaired must vote to accept the Plan. An impaired class of claims is deemed to accept a plan of reorganization if the holders of at least two-thirds in amount and more than one-half in number of the claims in such class who actually cast Ballots vote to accept the plan. An impaired class of interests is deemed to accept a plan of reorganization if the holders of at least two-thirds in amount of such interests who actually cast Ballots vote to accept the plan. To be confirmed, at least one class of impaired claims must accept the plan, determined without including any acceptance of the plan by any insider.

The confirmation and effectiveness of the Plan are subject to certain conditions that may not be satisfied and are different from those under the exchange offer. We cannot assure you that all requirements for confirmation and effectiveness of the Plan will be satisfied or that the Bankruptcy Court will conclude that the requirements for confirmation and effectiveness of the Plan have been satisfied.

The effective date of the Plan will not occur until the confirmation order has been entered, no stay of such order is in effect and certain other conditions have been satisfied.

Q:   What are the costs and benefits of consummating the restructuring through the exchange offer rather than the Plan?

A:   Consummating the restructuring through the exchange offer provides several benefits, including the ability to effectuate the restructuring in a shorter period of time without the extra costs and potential uncertainties inherent to the process of a bankruptcy. The costs associated with a bankruptcy could be material and could include both direct costs, including fees paid to a trustee and to attorneys and professionals, and indirect costs. In addition, there can be no assurance that the Bankruptcy Court will confirm the Plan. See "Risk Factors—Risks Related to the Plan."

Q:   What are the expected results of the restructuring, whether accomplished through the exchange offer or the Plan?

A:   We expect that the restructuring, if successful, will delever our balance sheet and improve our capital structure. Specifically, upon the completion of the restructuring, we expect our indebtedness corresponding to the principal amount of the old notes to be reduced from an estimated US$103.4 million as of March 31, 2019 to an estimated US$56.9 million at the closing of the restructuring (assuming full participation in the exchange offer and no bankruptcy filing).

Assuming we are able to complete the restructuring, we expect that, for the foreseeable future, cash generated from operations will be sufficient to allow us to fund our operations and to increase working capital as necessary to support our long-term business plan, though there can be no assurance that such cash generated will be sufficient for such purposes.

**The Exchange Offer**

Q:   Who is making the exchange offer?

A:   Maxcom is making the exchange offer and delivering the Senior Notes, the Junior PIK Notes and cash.

Q:   What amount of old notes are you seeking in the exchange offer?

A:   We are seeking to exchange any and all of the old notes for Senior Notes, Junior PIK Notes and cash.

Q:   What will I receive in the exchange offer if I tender my old notes and they are accepted?

A:   If you tender and do not withdraw your old notes prior to or on the early participation date, for each US$1,000 principal amount of old notes, you will, upon the terms and subject to the conditions set forth in

this statement, receive the total exchange consideration of US$550 principal amount of Senior Notes, US$100 of Junior PIK Notes and US$110 in cash. Eligible holders that validly tender and do not validly withdraw old notes after the early participation date and on or before the expiration date will be eligible to receive only the exchange consideration of US$550 principal amount of the Senior Notes, US$100 of Junior PIK Notes, US$100 in cash and no early participation consideration for each US$1,000 principal amount of old notes validly tendered, not validly withdrawn and accepted.

In addition, on the settlement date of the exchange offer, all eligible holders whose old notes are validly tendered, not validly withdrawn and accepted for exchange will also receive a cash payment equal to the accrued and unpaid interest on their old notes validly tendered, not validly withdrawn and accepted for exchange through but excluding the settlement date.

Q: Who may participate in the exchange offer?

A: Any and all eligible holders of old notes may participate in the exchange offer. The Company reserves the right to terminate, withdraw, amend or extend the terms of the exchange offer and consent solicitation for any reason prior to the expiration date, subject to applicable law.

Q: Does the success of the exchange offer depend on the participation of any minimum number of holders of old notes?

A: Yes. The exchange offer and consent solicitation is subject to, among other things, the valid tender, without subsequent withdrawal, of at least of at least 90% (including any old notes which are owned by us or our affiliates) in aggregate principal amount of the outstanding old notes on or prior to the expiration date.

Maxcom has had discussions with several holders of old notes who assisted in developing the proposal and who believe that the restructuring is fair and reasonable in light of the current market environment and given Maxcom's circumstances. Holders of over 30% of the old notes have already indicated that they will vote in favor of the exchange offer.

Q: How do I tender my old notes in the exchange offer?

A: Please follow the procedures for tendering your old notes in the exchange offer described in "Description of the Exchange Offer and Consent Solicitation—Procedures for Tendering." For further information, contact the Information Agent and Exchange Agent for the exchange offer at the address or telephone number on the back cover of this statement or consult your broker, dealer, commercial bank, trust company or other nominee for assistance.

Q: How long will the exchange offer remain open?

A: The exchange offer will expire at 12:00 midnight (New York City time) on July 15, 2019 unless extended by us.

Subject to applicable law and the terms set forth in this statement, we may extend the expiration date or amend any of the terms or conditions of the exchange offer. The last date on which tenders and consents will be accepted, whether on July 15, 2019, or any subsequent time or date to which the exchange offer may be extended, is referred to as the expiration date.

If we extend the expiration date, any extension will be followed as promptly as practicable by announcement thereof, such announcement in the case of an extension of the exchange offer to be issued no later than 9:00 a.m. (New York City time) on the first business day after the previously scheduled expiration date. Subject to applicable law, if we extend the expiration date, holders of old notes may not withdraw any notes validly tendered into the exchange offer or revoke any consent provided to the proposed amendments.

Q: When will I receive Senior Notes, Junior PIK Notes and cash if I tender my old notes in the exchange offer?

A: Upon satisfaction or waiver of all of the conditions to the exchange offer, all old notes validly tendered by the expiration date will be accepted for exchange. The exchange of Senior Notes and Junior PIK Notes will be promptly settled with respect to any and all old notes validly tendered promptly following the expiration date for any notes validly tendered.

Q: Who will be issuing Senior Notes and Junior PIK Notes?

A: Maxcom will be the issuer of Senior Notes and Junior PIK Notes.

Q: Can I withdraw my tender of old notes?

A: Tenders of old notes may be validly withdrawn at any time prior to 5:00 p.m. (New York City time) on June 28, 2019, unless extended by us, but will thereafter be irrevocable, except in certain limited circumstances where we determine additional withdrawal rights are necessary and to the extent required by law.

Q: What risks should I consider in deciding whether or not to participate in the exchange offer?

A: In deciding whether to participate in the exchange offer, you should carefully consider the discussion of risks and uncertainties described under "Risk Factors," which do not represent the only risks that we face. Additional risks and uncertainties not currently known to us, or that we currently deem immaterial, may also affect your investment decision and/or impair our business operations. You should carefully consider the other information and data included in this statement and information and data contained in our reports provided to the trustee and noteholders pursuant to the old notes indenture for other risks that may affect you.

Q: If the exchange offer is consummated, but I do not tender my old notes, how will my rights be affected?

A: If the Proposed Amendments are adopted, holders of old notes will no longer be entitled to the benefit of substantially all of the restrictive covenants, defaults, and certain other provisions presently contained in the old notes indenture. If we consummate the exchange offer, the applicable trading market, if any, for your outstanding old notes may be significantly more limited. See "The Proposed Amendments."

Q: What happens if my old notes are not accepted in the exchange offer?

A: During any extension and irrespective of any amendment to the exchange offer or consent solicitation, all old notes previously tendered and not accepted for purchase will remain subject to the exchange offer or consent solicitation and may be accepted thereafter, subject to compliance with applicable law. In addition, we may waive conditions without extending the exchange offer or consent solicitation in accordance with applicable law (other than the capital contribution condition, which may not be waived).

Q: Has the board of directors adopted a position on the exchange offer?

A: Our board of directors has authorized the exchange offer, but has not made any recommendation as to whether you should tender your old notes pursuant to the exchange offer.

Q: Whom do I call if I have any questions about how to tender my old notes, deliver my consents or any other questions relating to the exchange offer?

A: Questions and requests for assistance with respect to the procedures for tendering old notes and delivering consents pursuant to the exchange offer may be directed to the Information Agent and Exchange Agent at its address and telephone number set forth on the back cover of this statement.

**The Plan**

Q:  Who is soliciting votes on the Plan?

A:  Maxcom and the other companies that may commence the Chapter 11 Case are soliciting votes from all holders of the old notes on the Plan.

Q:  Why are we soliciting votes on the Plan if the restructuring can be accomplished through the exchange offer?

A:  We have prepared the Plan as an alternative to the exchange offer for accomplishing the restructuring, if the conditions to completion of the exchange offer are not met or waived, but we receive acceptances from a sufficient number of holders of the old notes to allow the Plan to be confirmed under the Bankruptcy Code, including confirmation through the nonconsensual "cram-down" provisions of section 1129(b) of the Bankruptcy Code with respect to non-accepting impaired classes of claims or interests. The Plan consists of a plan of reorganization under chapter 11 of the Bankruptcy Code that would effect the same transactions contemplated by the exchange offer, including, among other things, the issuance of the Senior Notes, the Junior PIK Notes and cash in exchange for all of the old notes.

For the Plan to be confirmed by the Bankruptcy Court without invoking the "cram-down" provisions of the Bankruptcy Code, each class of claims or interests that is impaired must vote to accept the Plan. An impaired class of claims is deemed to accept a plan of reorganization if the holders of at least two-thirds in amount and more than one-half in number of the claims in such class who actually cast Ballots vote to accept the plan. An impaired class of interests is deemed to accept a plan of reorganization if the holders of at least two-thirds in amount of the interests in such class who actually cast Ballots vote to accept the plan. If the Plan is confirmed by the Bankruptcy Court, it will bind all holders of claims and equity interests, including all holders of old notes, in the Company regardless of whether they voted for, against, or did not vote at all on, the Plan.

Therefore, assuming the Plan satisfies the other requirements of the Bankruptcy Code, a significantly smaller number of claim holders can bind other claim holders to the terms of the Plan to accomplish the restructuring than is required to effect the exchange offer and the other transactions contemplated thereby.

The confirmation and effectiveness of the Plan are subject to certain conditions that may not be satisfied and are different from those under the exchange offer. We cannot assure you that all requirements for confirmation and effectiveness of the Plan will be satisfied or that the Bankruptcy Court will conclude that the requirements for confirmation and effectiveness of the Plan have been satisfied.

Because the early participation consideration is only payable in the event that the Plan is confirmed by the Bankruptcy Court and we are able to achieve the Effective Date under the Plan, holders of the old notes who wish to receive the early participation consideration are, in addition to being required to tender their old notes prior to or on the early participation date, also encouraged to timely submit their Ballot in favor of the Plan.

Q:  Who is eligible to vote for the Plan?

A:  Generally, holders of claims or interests in classes that are impaired (other than classes that receive no distribution under the Plan and are, therefore, deemed to reject the Plan) are eligible to vote on the Plan. As more fully explained in this statement, a claim or equity interest is impaired, generally speaking, if its treatment under a plan of reorganization alters the terms of, or rights associated with, that claim or interest. The holders of the old notes are impaired under and consequently may vote on, the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| A | old notes Claims | Impaired | Entitled To Vote |
| B | Other Secured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |

6

| C | General Unsecured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| D | Intercompany Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| E | Interests | Unimpaired | Deemed To Accept; Not Entitled To Vote |

The holders of Class A old notes claims are impaired and are eligible to vote on the Plan. The holders of all other claims and interests are unimpaired and presumed to accept the Plan under section 1126(f) of the Bankruptcy Code.

Q:   What vote is needed to confirm the Plan?

A:   The Bankruptcy Code provides that only holders of claims and interests entitled to vote and who actually cast a Ballot will be counted for purposes of determining whether acceptances from a sufficient number of holders of impaired claims in an impaired class of claims have been received to allow the Plan to be confirmed under the Bankruptcy Code, including confirmation through the nonconsensual "cram-down" provisions of section 1129(b) of the Bankruptcy Code with respect to non-accepting impaired classes. Failure by a holder to deliver an original, duly completed and signed Ballot will not be counted as a vote to accept or reject the Plan.

For the Plan to be confirmed by the Bankruptcy Court without invoking the "cram-down" provisions of the Bankruptcy Code, each class of claims or interests that is impaired must vote to accept the Plan. An impaired class of claims is deemed to accept a plan of reorganization if the holders of at least two-thirds in amount and more than one-half in number of the claims in such class who actually cast ballots vote to accept the Plan. An impaired class of interests is deemed to accept a plan of reorganization if the holders of at least two-thirds in amount of the interests in such class who actually cast Ballots vote to accept the Plan. Under the Plan, holders of old notes claims are separately classified and constitute the only impaired class of claims. In addition, under the Plan, other classes of claims against and interests in the Company are unimpaired and conclusively presumed to accept the Plan.

The Bankruptcy Court may disagree with our classification of claims and interests and any party in interest may challenge our classification of claims and interests. If the Bankruptcy Court concludes that the classification of claims and interests under the Plan does not comply with the requirements of the Bankruptcy Code, the Plan may not be confirmed.

If the Plan is confirmed by the Bankruptcy Court, it will bind all holders of claims and interests in the Company regardless of whether they voted for, against, or did not vote at all on, the Plan. Therefore, assuming the Plan satisfies the other requirements of the Bankruptcy Code, a significantly smaller number of claim holders can bind other claim holders to the terms of the Plan than is required to effect the exchange offer and the other transactions contemplated by the exchange offer. Additionally, since claims and interests are grouped in classes for the purpose of voting on the Plan, holders of claims and interests may be bound by the decisions of other claim or interest holders in a way that they otherwise would not outside of bankruptcy.

If we do not receive acceptances from a sufficient number of holders of claims or interests in an impaired class of claims or interests to allow the Plan to be confirmed under the Bankruptcy Code, including confirmation through the nonconsensual "cram-down" provisions of section 1129(b) of the Bankruptcy Code with respect to non-accepting impaired classes, we reserve the right not to commence the Chapter 11 Case.

Q:   What are the effects of the Plan?

A:   Holders of the old notes will receive substantially the same treatment with respect to their claims as they would in the exchange offer.

We will only proceed to the confirmation and effectiveness of the Plan if Maxcom's shareholders contribute Ps.300 million of new equity capital (the "capital contribution condition")

Q:  When is the deadline for submitting Ballots?

A:  The Ballots must be received by the Information Agent and Exchange Agent by the Voting Deadline. If the voting deadline is extended, then the Ballots must be received by the Information Agent and Exchange Agent by any such extended voting deadline. In order to be counted for purposes of determining the amount of acceptances and rejections of the Plan, Ballots must be sent by mail, hand delivery or overnight courier to the Information Agent and Exchange Agent, so as to be actually received on or prior to the Voting Deadline. Master Ballots from nominees will also be accepted by e-mail; however, pre-validated Ballots from beneficial owners will not be accepted. Facsimile Ballots will not be accepted.  However, Holders that tender their old notes into the exchange offer and consent solicitation through ATOP on or before the early participation date will be entitled to receive the early participation consideration subject to the occurrence of the Effective Date of the Plan.

The early participation consideration is only available in the event that Maxcom can either successfully complete the exchange offer (which is subject to the conditions described herein) or confirm the Plan. In order to receive the early participation consideration, eligible holders are strongly encouraged to both tender their old notes and complete and submit their vote in favor of the Plan.

Q:  How do I vote on the Plan?

A:  Please follow the procedures for voting on the Plan described in the section titled "Description of the Plan—Voting and Revocation Instructions." For further information, contact the Information Agent and Exchange Agent at its address and telephone number on the Ballot or consult your broker, dealer, commercial bank, trust company or other nominee for assistance.

Only the holders of old notes as of June 14, 2019 (the "voting record date") are eligible to vote on the Plan.

Q:  Can I revoke my vote?

A:  Any party that has previously submitted to the Information Agent and Exchange Agent before the Voting Deadline a properly completed Ballot may revoke such Ballot by submitting to the Information Agent and Exchange Agent, before the Voting Deadline, a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the event the Company does not close the exchange offer, Ballots remain binding until the Bankruptcy Court enters an order confirming the Plan.

Q:  Whom do I call if I have any questions about how to submit Ballots or any other questions relating to the Plan?

A:  Questions and requests for assistance with respect to the procedures for voting on the Plan, as well as requests for additional copies of this statement and the Ballot, may be directed to the Information Agent and Exchange Agent at its address and telephone number set forth on the Ballot.

Q:  What risks should I consider in deciding whether to accept or reject the Plan?

A:  In deciding whether to vote to accept or reject the Plan, you should carefully consider the discussion of risks and uncertainties described under "Risk Factors," which do not represent the only risks that we face. Additional risks and uncertainties not currently known to us, or that we currently deem immaterial, may also affect your investment decision and/or impair our business operations. You should carefully consider the other information and data included in this statement and information and data contained in our reports provided to the trustee and noteholders pursuant to the old notes indenture for other risks that may affect you.

### SUMMARY OF THE EXCHANGE OFFER AND THE CONSENT SOLICITATION

*The following is a brief summary of some of the terms of the exchange offer and the consent solicitation. For a more complete description of the exchange offer and the consent solicitation, see "Description of the Exchange Offer and the Consent Solicitation."*

**The Exchange Offer** ....................................... We are making an offer to eligible holders to exchange each US$1,000 principal amount of old notes for (a) the total exchange consideration of US$550 principal amount of Senior Notes, US$100 principal amount of Junior PIK Notes and US$110 in cash if the old notes are tendered and not validly withdrawn on or before the early participation date or (b) US$550 principal amount of Senior Notes, US$100 principal amount of Junior PIK Notes and US$100 in cash if the old notes are tendered and not validly withdrawn after the early participation date and on or before the expiration date.

**The Consent Solicitation**................................. In connection with the exchange offer, we are soliciting consents to the proposed amendments from eligible holders of old notes. See "Proposed Amendments."

By tendering old notes, holders will also be delivering their consent to the proposed amendments. Eligible holders may not tender their old notes without consenting to the proposed amendments and may not deliver consents to the proposed amendments without tendering the related old notes. Tendering holders may not withdraw their validly tendered old notes without revoking their consents and may not revoke their consents without withdrawing any validly tendered old notes.

**Total Exchange Consideration** ....................... The cash portion of the total exchange consideration for holders tendering their old notes prior to or on the early participation date is US$110 for each US$1,000 of old notes validly tendered, not validly withdrawn and accepted in the exchange offer, which includes early participation consideration of US$10 for each US$1,000 of old notes validly tendered, not validly withdrawn and accepted in the exchange offer. Only eligible holders that validly tender their old notes and do not validly withdraw their tenders on or before the early participation date will be eligible to receive the total exchange consideration, which includes the early participation consideration. Eligible holders that validly tender and do not withdraw old notes after the early participation date and on or before the expiration date will be eligible to receive only the exchange consideration of US$550 principal amount of Senior Notes, US$100 principal amount of Junior PIK Notes and US$100 in cash and no early participation consideration for each US$1,000 principal amount of old notes validly tendered, not validly withdrawn and accepted.

The Senior Notes will be issued in minimum denominations of US$1,000 and integral multiples of US$1.00 in excess thereof. The Junior PIK Notes will be issued in minimum denominations of Ps.20,000 and integral multiples of Ps.20.00. An eligible holder must tender old notes in a principal amount sufficient to receive at least US$1,000 principal amount of Senior Notes and Ps.20,000 principal amount of Junior PIK Notes in exchange for

such old notes, based on the applicable exchange consideration. Any holder that tenders less than such amount will not be able to participate in the exchange offer and the consent solicitation.

The amount of Senior Notes and Junior PIK Notes to be issued to any holder will be rounded down to the nearest US$1.00 and Ps.20.00, respectively. No additional cash will be paid in lieu of any principal amount of Senior Notes or Junior PIK Notes not received as a result of rounding down.

**Accrued Interest** .............................................. On the settlement date, all eligible holders whose old notes are validly tendered, not validly withdrawn and accepted will also receive a cash payment equal to the applicable accrued and unpaid interest and Additional Amounts, if any, on their old notes validly tendered, not validly withdrawn and accepted for exchange through but excluding the settlement date.

**Holders Eligible to Participate in the Exchange Offer and the Consent Solicitation** ...................................... The exchange offer and the consent solicitation is directed only to holders that hold old notes who are persons other than U.S. Persons (as defined in Regulation S under the Securities Act) outside the United States.

Only eligible holders are authorized to participate in the exchange offer and the consent solicitation.

**Additional Information** .................................. Any questions concerning the terms of the exchange offer and the consent solicitation should be directed to the dealer manager and solicitation agent, at the telephone numbers listed on the back cover page of this statement.

**Early Participation Date** ................................ June 28, 2019, at 5:00 p.m. (New York City time) unless extended by us.

**Withdrawal Date** ........................................... June 28, 2019, at 5:00 p.m. (New York City time) unless extended by us.

**Expiration Date** ............................................. July 15, 2019, at 12:00 midnight (New York City time) unless extended by us.

**Acceptance Date** ........................................... The acceptance date is expected to be on or promptly following the expiration date with respect to old notes that are validly tendered and are not validly withdrawn on or before the expiration date.

**Settlement Date** .............................................. The settlement date is expected to be on or promptly following the acceptance date with respect to old notes accepted on the acceptance date.

**Withdrawal Rights** ......................................... Tenders of old notes may be validly withdrawn at any time prior to the withdrawal date. Thereafter, tenders become irrevocable except in certain limited circumstances where additional withdrawal rights are required by law (as determined by us).

|  | Tenders submitted after the withdrawal date will be irrevocable except in the limited circumstances referred to in the preceding sentence.  See "Description of the Exchange Offer and the Consent Solicitation—Withdrawal of Tenders." |
|---|---|
| **Conditions to the Exchange Offer and the Consent Solicitation**........................................ | The exchange offer and the consent solicitation are subject to certain conditions, which we may assert or waive in full or in part in our sole discretion (other than the capital contribution condition, which may not be waived), including (i) the valid tender, without subsequent withdrawal, of at least 90% (including any old notes which are owned by us or our affiliates) in aggregate principal amount of the outstanding old notes on or prior to the expiration date (the "minimum tender condition") and (ii) the contribution of Ps.300 million of new equity capital by Maxcom's shareholders (the "capital contribution condition"); provided however that the proposed amendments will only be operative if at least a majority (not including any old notes which are owned by us or our affiliates) in aggregate amount of the old notes is validly tendered and not validly withdrawn on or prior to the expiration date.

Although we have no present intention to do so, we expressly reserve the right to amend or terminate, at any time, the exchange offer and the consent solicitation and not accept for exchange any old notes not theretofore accepted for exchange.  We may extend the exchange offer and the consent solicitation from time to time until the conditions are satisfied or waived (other than the capital contribution condition, which may not be waived).  We will give you notice of any amendment, termination or extension if required by applicable law.  See "Description of the Exchange Offer and the Consent Solicitation—Conditions to the Exchange Offer and the Consent Solicitation." |
| **Procedures for Tendering** ............................. | If you wish to participate in the exchange offer and the consent solicitation and your old notes are held by a custodial entity, such as a bank, broker, dealer, trust company or other nominee, you must instruct that custodial entity to tender your old notes on your behalf pursuant to the procedures of that custodial entity.

To participate in the exchange offer and the consent solicitation, you must either:

• Comply with the ATOP (defined below) procedures for book-entry transfer described below on or before the expiration date or, in order to receive the total exchange consideration, which includes the early participation consideration, on or before the early participation date; or

• If you are a beneficial owner that holds old notes through Euroclear Bank S.A./N.V. ("Euroclear") or Clearstream Banking, *société anonyme* ("Clearstream") and wish to tender your old notes, you must contact Euroclear or Clearstream directly to ascertain their procedure for tendering old notes and comply with such procedure; or |

- Custodial entities that are participants in DTC must tender old notes through the Automated Tender Offer Program maintained by DTC, known as "ATOP," by which the custodial entity and the beneficial owner on whose behalf the custodial entity is acting agree to be bound by the consent. A consent letter does not need to accompany tenders effected through ATOP; rather, a valid tender into ATOP will be deemed an acceptance of the consent solicitation.

**Consequences of Failure to Tender**............... For a description of the consequences of failing to tender your old notes in the exchange offer, see "Risk Factors" and "Description of the Exchange Offer and the Consent Solicitation—Certain Consequences to Holders of old notes Not Tendering in the Exchange Offer and the Consent Solicitation."

**Taxation**......................................................... For a summary of certain Mexican federal and U.S. federal income tax consequences of the exchange offer and the consent solicitation, see "Taxation."

**Information Agent and Exchange Agent** ....... Prime Clerk, LLC has been appointed as the information agent and exchange agent for the exchange offer and the consent solicitation.  The address and telephone numbers of the information agent and exchange agent are listed on the back cover page of this statement.

**Dealer Manager and Solicitation Agent**......... BCP Securities, LLC is acting as exclusive dealer manager for the exchange offer and solicitation agent for the consent solicitation.  Its address and telephone number are listed on the back cover page of this statement.

## SUMMARY OF THE SENIOR NOTES

*The summary below describes the principal terms of the Senior Notes. Certain terms and conditions described below are subject to important limitations and exceptions. The "Description of the Senior Notes" section of this statement contains a more detailed description of the terms and conditions of the Senior Notes.*

**Issuer** ............................................................. Maxcom Telecomunicaciones, S.A.B. de C.V.

**Subsidiary Guarantors** .................................. Outsourcing Operadora de Personal, S.A. de C.V.
TECBTC Estrategias de Promocion, S.A. de C.V.
Maxcom SF, S.A. de C.V.
Maxcom TV, S.A. de C.V.
Maxcom USA, Inc.
Telereunión, S.A. de C.V.
Telscape de Mexico, S.A. de C.V.
Sierra Comunicaciones Globales, S.A. de C.V.
Sierra USA Communications, Inc.
Asesores Telcoop, S.A. de C.V.
Maxcom USA Telecom, Inc.

See "Annex A—Business—Merger of Subsidiaries" for a description of certain changes we intend to make to the subsidiary guarantors.

**Notes Offered** ................................................ Up to a maximum of US$56,858,270 aggregate principal amount of 8% Senior Secured Notes due 2024.

**Maturity Date** ................................................ The fifth anniversary of the issue date.

**Interest** ............................................................ Interest on the Senior Notes will accrue at a rate of 8% per annum.

**Interest Payment Dates** ................................. June 15 and December 15 of each year, commencing on December 15, 2019; provided that if the Senior Notes are issued under the Plan, the interest payment dates will be set on a semi-annual basis according to the issue date.

**Guarantees** ..................................................... The subsidiary guarantors will unconditionally guarantee, jointly and severally, on a senior basis, all of the Issuer's obligations under the Senior Notes.

**Security** .......................................................... To the extent described herein, the Senior Notes will be secured by the Collateral (as defined herein) securing the old notes on a *pari passu* basis. Such Collateral consists of most of our telephone network systems and equipment assets.

**Ranking** .......................................................... The Senior Notes will be senior secured obligations of the Issuer and will rank:

- senior in right of payment to all of our existing and future subordinated indebtedness;

- equally in right of payment with any of our existing and future senior secured indebtedness that is secured by the Collateral, and junior to certain obligations preferred by statute, such as tax and labor obligations;

and

- structurally junior to all of the obligations, including trade payables, of any subsidiaries that do not guarantee the Senior Notes.

Similarly, the guarantee of each guarantor of the Senior Notes will rank:

- senior in right of payment to all of such guarantor's existing and future subordinated indebtedness; and

- equally in right of payment with any existing and future senior secured indebtedness of such guarantor that is secured by the Collateral.

As of March 31, 2019:

- the Issuer and the subsidiary guarantors had approximately US$134 million in senior indebtedness outstanding;

- the Issuer and the subsidiary guarantors had no subordinated indebtedness; and

- our subsidiaries that do not guarantee the Senior Notes did not have any other liabilities, including trade payables, but excluding intercompany liabilities.

Holders of the Senior Notes will not have any claim whatsoever against the Issuer's or the Guarantor's non-guarantor subsidiaries.

**Optional Redemption** ..................................... At any time the Issuer may redeem all or a part of the Senior Notes upon not less than 30 nor more than 60 days' notice, at a redemption price equal to 100% of the principal amount of Senior Notes redeemed, plus accrued and unpaid interest and Additional Amounts, if any, on the Senior Notes redeemed, to the applicable redemption date. See "Description of the Senior Notes—Optional Redemption."

**Change of Control Offer** ............................... If a change of control occurs, the Issuer must, with certain exceptions, give holders of the Senior Notes the opportunity to sell their Senior Notes to us at 101% of their face amount, plus accrued and unpaid interest and Additional Amounts, if any.

We might not be able to pay you the required price for the Senior Notes you present to us at the time of a change of control, because:

- we might not have enough funds at that time; or

- the terms of our senior debt may prevent us from paying.

**Asset Sale Offer** ................................................. If we or our Restricted Subsidiaries engage in asset sales and we do not apply the proceeds as required under the indenture under which the Senior Notes are issued (the "Senior Notes indenture"), we may be required to make an offer to repurchase the Senior Notes.

**Certain Indenture Provisions** ......................... The Senior Notes indenture will contain covenants that, among other things, limit our ability and the ability of our Restricted Subsidiaries to:

- pay dividends on, redeem or repurchase our capital stock;

- make investments;

- incur additional debt;

- guarantee other debt;

- create certain liens;

- enter into sale and leaseback transactions;

- issue or sell stock of certain subsidiaries;

- merge or consolidate with another company;

- transfer and sell assets; and

- enter into transactions with affiliates.

**Form and Denomination; Settlement** ............. The Senior Notes will be in fully registered form without interest coupons attached, only in denominations of US$1,000 and in integral multiples of US$1.00 in excess thereof.

The Senior Notes will be issued in book-entry form through the facilities of DTC, for the accounts of the participants, including Euroclear and Clearstream, and will trade in DTC's same-day funds settlement system. Beneficial interests in Senior Notes held in book-entry form will not be entitled to receive physical delivery of certificated Senior Notes, except in certain limited circumstances. For a description of certain factors relating to clearance and settlement, see "Description of the Senior Notes— Book-Entry System; Delivery and Form" and "Description of the Senior Notes —Depositary Procedures."

**Transfer Restrictions** ...................................... The Senior Notes have not been registered under the Securities Act. If the Senior Notes are issued under the exchange offer, they will be subject to certain restrictions on transfer. If the Senior Notes are issued under the Plan instead of the exchange offer, they will be issued pursuant to section 1145(a) of the Bankruptcy Code, and therefore will not be deemed restricted securities. Accordingly, upon issuance, such Senior Notes issued under the Plan will be freely tradable by any holder not deemed an underwriter in the public market without restriction or further registration under the Securities Act, subject to applicable law.

|  | See "Transfer Restrictions." |
|---|---|
| **Listing**............................................... | Application will be made to list the Senior Notes on the Luxembourg Stock Exchange (Euro MTF). The Issuer cannot assure you, however, that this application will be accepted, or if accepted, that the Senior Notes will remain listed. |
| **Governing Law**............................... | The Senior Notes indenture, the guarantees and the Senior Notes will be governed by the laws of the State of New York.  The Collateral Documents will be governed by the laws of Mexico. |
| **Taxation**......................................... | For a summary of certain Mexican federal and U.S. federal income tax consequences of the exchange offer and the consent solicitation, see "Taxation." |
| **Trustee, Transfer Agent and Registrar**.......... | U.S. Bank N.A. |
| **Principal Paying Agent**................................. | U.S. Bank N.A. |

## SUMMARY OF THE JUNIOR PIK NOTES

*The summary below describes the principal terms of the Junior PIK Notes. Certain terms and conditions described below are subject to important limitations and exceptions. The "Description of the Junior PIK Notes" section of this statement contains a more detailed description of the terms and conditions of the Junior PIK Notes.*

| | |
|---|---|
| **Issuer** ............................................. | Maxcom Telecomunicaciones, S.A.B. de C.V. |
| **Notes Offered** .................................. | Up to a maximum of the Mexican peso equivalent of US$10,337,867 aggregate principal amount of junior payment-in-kind notes. |
| **Maturity** ......................................... | The Junior PIK Notes are perpetual notes with no fixed final maturity date. |
| **Interest** .......................................... | There will be no interest paid on the Junior PIK Notes. The principal amount of the Junior PIK Notes will increase by 15% per annum on each anniversary of their issue date (referred to herein as "PIK Interest"). |
| **Ranking** ......................................... | The Junior PIK Notes will be general unsecured obligations of the Issuer and will be junior in right of payment with all other existing and future Senior Indebtedness (as defined under "Description of the Junior PIK Notes") of the Company. |
| **Subordination** ................................. | The payment by the Issuer of the principal of, and premium, if any, on the Junior PIK Notes will be subordinated in right of payment to the prior payment in full of all existing and future Senior Indebtedness of the Company. The Junior PIK Notes will not be guaranteed by any Subsidiaries or other Affiliates of the Company. The Junior PIK Notes, therefore, are effectively subordinated to creditors and preferred stockholders (if any) of our subsidiaries. |
| **Optional Redemption** ...................... | Only if no Senior Notes are outstanding, on each PIK Interest payment date, the Issuer may redeem the Junior PIK Notes, in whole and not in part, upon not less than 30 nor more than 60 days' notice, at a redemption price equal to 100% of the principal amount of Junior PIK Notes redeemed, plus Additional Amounts, if any, on the Junior PIK Notes redeemed, to the applicable redemption date. See "Description of the Junior PIK Notes— Optional Redemption." |
| **Redemption upon Change of Control** .......... | If a change of control occurs, the Issuer must redeem all outstanding Junior PIK Notes at an aggregate redemption price of the lesser of (i) the principal amount of the outstanding Junior PIK Notes and (ii) the Applicable Percentage of the Equity Value (as such terms are defined under "Description of the Junior PIK Notes—Mandatory Redemption—Change of Control"). |
| | We might not be able to pay you the required redemption price for the Junior PIK Notes at the time of a change of control, because we might not have enough funds at that time, or the terms of our senior debt may prevent us from paying. |

| | |
|---|---|
| **Redemption upon Payment of Dividends**..... | If the Issuer makes a payment of any dividend or makes any other payment or distribution on account of the Issuer's capital stock, the Issuer will be required to redeem all outstanding Junior PIK Notes at a redemption price equal to 100% of the principal amount of Junior PIK Notes redeemed and Additional Amounts, if any, to the date of redemption. See "Description of the Junior PIK Notes—Mandatory Redemption—Payment of Dividends." |
| **Redemption for Tax Reasons** ....................... | Upon the occurrence of certain events relating to the tax laws of Mexico or other relevant jurisdictions, we may redeem the Junior PIK Notes in whole but not in part upon not less than 30 and no more than 60 days prior notice at a price equal to 100% of the principal amount thereof, together with accrued and unpaid interest and Additional Amounts, if any, to the date fixed for redemption.  See "Description of the Junior PIK Notes—Optional Tax Redemption." |
| **Limited Events of Default**............................ | Each of the following will be an "Event of Default" with respect to the Junior PIK Notes: (i) the Issuer defaults in the payment when due (upon redemption or otherwise) of the principal of, or premium, if any, on the Junior PIK Notes, or (ii) certain events of bankruptcy, reorganization, *concurso mercantil*, *quiebra*, insolvency or similar laws of Mexico, the U.S. or any other jurisdiction (clause (ii) only, a "Bankruptcy Event of Default"). Upon the occurrence of a Bankruptcy Event of Default, the entire principal amount of all the Junior PIK Notes and any Additional Amounts will be automatically accelerated as provided under the Junior PIK Notes indenture and by Mexican insolvency laws and statutes. See "Description of the Junior PIK Notes—Events of Default and Remedies." |
| **Form and Denomination; Settlement**........... | The Junior PIK Notes will be in fully registered form, only in denominations of Ps.20,000 and in integral multiples of Ps.20.00 in excess thereof. |
| | The Global Notes will be deposited with a common depositary for, and registered in the name of a common nominee of, Euroclear and Clearstream.  Beneficial interests in Junior PIK Notes held in book-entry form will not be entitled to receive physical delivery of certificated Junior PIK Notes, except in certain limited circumstances.  For a description of certain factors relating to clearance and settlement, see "Description of the Junior PIK Notes—Book-Entry System; Delivery and Form." |
| **Transfer Restrictions**.................................... | The Junior PIK Notes have not been registered under the Securities Act. If the Senior Notes are issued under the exchange offer, they will be subject to certain restrictions on transfer.  If the Junior PIK Notes are issued under the Plan instead of the exchange offer, they will be issued pursuant to section 1145(a) of the Bankruptcy Code, and therefore will not be deemed restricted securities. Accordingly, upon issuance, such Junior PIK Notes issued under the Plan will be freely tradable by any holder not deemed an underwriter in the public market without restriction or further registration under the Securities Act, subject to applicable law. |

| | |
|---|---|
| **Listing**................................................... | Application will be made to list the Junior PIK Notes on the Luxembourg Stock Exchange (Euro MTF). The Issuer cannot assure you, however, that this application will be accepted, or if accepted, that the Junior PIK Notes will remain listed. |
| **Governing Law**................................................... | The indenture under which the Junior PIK Notes are issued (the "Junior PIK Notes indenture") and the Junior PIK Notes will be governed by the laws of the State of New York. |
| **Taxation**................................................... | For a summary of certain Mexican federal and U.S. federal income tax consequences of the exchange offer and the consent solicitation, see "Taxation." |
| **Trustee, Transfer Agent and Registrar**........ | U.S. Bank N.A. |
| **Principal Paying Agent**................................ | U.S. Bank N.A. |

## SUMMARY OF THE PLAN

*This section is intended to only provide a summary of the key terms, structure, classification, treatment and implementation of the Plan, and is qualified in its entirety by reference to the Plan and exhibits thereto. Although this statement includes summaries of the provisions contained in the Plan and in documents referred to therein, this statement does not purport to be a precise or complete statement of all such terms and provisions, and should not be relied on for a comprehensive discussion of the Plan. Instead, reference is made to the Plan and all such documents should be reviewed for the full and complete statements of such terms and provisions. The Plan itself (including attachments) will control the treatment of creditors and equity holders under the Plan. To the extent there is any inconsistency between this statement and the Plan, the Plan shall govern. For a more complete description of the Plan, see "Description of the Plan."*

**Chapter 11 Plan**.........................................    We have prepared the Plan as an alternative to the exchange offer for accomplishing the restructuring if the conditions to complete the exchange offer are not satisfied, but we receive acceptances from a sufficient number of holders of claims or interests in impaired classes of claims or interests to satisfy the Bankruptcy Threshold. By relying on the provisions of the Bankruptcy Code that permit us to solicit acceptances on the Plan prior to commencing a chapter 11 case, we believe that we can successfully manage any impact on our business from the Chapter 11 Case by permitting us to quickly enter and exit chapter 11, as well as be able to communicate to our customers, vendors, employees and other key constituents the positive financial impact the restructuring will have on our business and operations.

    The Plan consists of a plan of reorganization under Chapter 11 of the Bankruptcy Code that would result in the same transactions contemplated by the exchange offer, including the issuance of New Notes and payment of cash in exchange for all of the old notes. If confirmed, the Plan would be binding on all of the holders of old notes, regardless of whether a holder voted to accept or reject the Plan.

    Under the Plan, we expect that the holders of the old notes will receive substantially the same treatment with respect to their claims as they would in the Exchange Offer. Holders that tender their old notes into the exchange offer and consent solicitation through ATOP on or before the early participation date will be entitled to receive the early participation consideration subject to the occurrence of the Effective Date of the Plan.

    Other than the restructuring of the old notes, the Plan proposes to render all other claims against us unimpaired. Specifically, under the Plan, we intend to have all other claims against us ride through the Chapter 11 Case and Plan unaffected and/or satisfied in the ordinary course of business. In addition, under the Plan, all of our equity interests will be left unaltered.

    If we do not receive acceptances from a sufficient number of holders of impaired claims in an impaired class to satisfy the Bankruptcy Threshold, the Plan will not be confirmed or become effective, and we anticipate that we would face problems with respect to our liquidity in the near future.

**Voting Record Date**.................................    The voting record date for determining the holders of claims entitled to vote on the Plan is June 14, 2019.

| | |
|---|---|
| **Conditions to the Effectiveness of the Plan**............................................ | The effectiveness of the Plan is contingent upon the satisfaction or waiver of each of the following conditions: |

- the Bankruptcy Court shall have approved this statement as containing adequate information with respect to the Plan within the meaning of Section 1125 of the Bankruptcy Code;

- the confirmation order shall have been entered and shall be a final order (as described in the Plan);

- all documents and agreements necessary to implement the Plan shall have been executed and tendered for delivery, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the effective date of the Plan);

- all actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental authorities in accordance with applicable law; and

- all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the transactions contemplated herein shall have been obtained.

The conditions to the effectiveness of the Plan may be waived by us, without any notice to parties in interest and without any further notice to or action, order or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm the Plan.

In addition, we will only proceed to the confirmation and effectiveness of the Plan if Maxcom's shareholders contribute Ps.300 million of new equity capital (the "capital contribution condition").

| | |
|---|---|
| **Transfer Restrictions**................................ | If our restructuring is accomplished through the Plan, we expect that the confirmation order of the Bankruptcy Court will provide that the issuance of the New Notes distributed under the Plan would be exempt from the registration requirements of the Securities Act in accordance with section 1145 of the Bankruptcy Code and therefore will be freely transferable by most recipients thereof. |
| **Information Agent**..................................... | Prime Clerk, LLC |
| **Governing Law**.......................................... | Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument or agreement entered into expressly in connection with the Plan, the right and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the state of New York, without giving effect to conflict of laws principles. |

## RISK FACTORS

*We have set forth below certain risk factors that are related specifically to the New Notes or the exchange offer and the consent solicitation. These factors are not the only factors that could affect us, the New Notes, the old notes or the exchange offer and solicitation. Additional risks not presently known to us or that we currently deem immaterial may also impair our business. You should carefully consider all these risk factors in addition to the business and other information presented in this statement, including, in particular, the information set forth in "Annex A—Information About the Company—Risk Factors."*

**Risks Related to the Exchange Offer, the Consent Solicitation and the Old Notes**

***The exchange offer may result in reduced liquidity for any old notes that are not exchanged.***

The trading market for old notes that are not exchanged could become more limited than the existing trading market for the old notes and could cease to exist altogether due to the reduction in the principal amount of the old notes outstanding upon consummation of the exchange offer and the consent solicitation. A more limited trading market might adversely affect the liquidity and market price of the old notes, and may result in price volatility of the old notes. If a market for the old notes that are not exchanged exists or develops, the old notes may trade at a discount to the price at which they were issued or would trade if the principal amount outstanding were not reduced had the exchange offer and consent solicitation not occurred. There can, however, be no assurance that an active market in the old notes will exist, develop or be maintained, or as to the prices and discounts at which the old notes may trade, after the exchange offer and the consent solicitation is consummated.

***We cannot assure you that the credit ratings for the notes will not be lowered, suspended or withdrawn by the rating agencies.***

The credit ratings of the notes may change after the proposed amendments become operative and the New Notes are issued. Such ratings are limited in scope, and do not address all material risks relating to an investment in the notes, but rather reflect only the views of the rating agencies at the time the ratings are issued. An explanation of the significance of such ratings may be obtained from the rating agencies. We cannot assure you that such credit ratings will remain in effect for any given period of time or that such ratings will not be lowered, suspended or withdrawn entirely by the rating agencies, if, in the judgment of such rating agencies, circumstances so warrant. Any lowering, suspension or withdrawal of such ratings may have an adverse effect on the market price and marketability of the notes.

***Your decision to tender old notes for Senior Notes exposes you to the risk of nonpayment for a longer period of time.***

The old notes will mature on June 15, 2020. The Senior Notes will mature five years after issuance. If, following the maturity date of the old notes but prior to the maturity date of the Senior Notes, we were to become subject to a bankruptcy, *concurso mercantil* (reorganization), *quiebra* (bankruptcy), or similar proceeding, the holders of old notes who did not exchange their old notes for Senior Notes could have been paid in full and there would exist a risk that holders of old notes who exchanged their old notes for Senior Notes would not be paid in full, if at all, or would be paid after substantial time had elapsed. Your decision to tender your old notes should be made with the understanding that the lengthened maturity of the Senior Notes exposes you to the risk of nonpayment for a longer period of time.

***You may not receive New Notes in the exchange offer and the consent solicitation if you do not follow the procedure for the exchange offer and the consent solicitation.***

We will issue the New Notes in exchange for your old notes only if you tender your old notes pursuant to an agent's message before the expiration of the exchange offer and the consent solicitation. You should allow sufficient time to ensure timely delivery of the necessary documents. Furthermore, you should carefully follow the procedures for tendering the old notes. Neither the exchange agent nor we are under any duty to give notification of defects or irregularities with respect to the tenders of old notes for exchange. If you are the beneficial owner of old notes that are registered in the name of your broker, dealer, commercial bank, trust company or other nominee, and

you wish to tender in the exchange offer and the consent solicitation, you should promptly contact the person in whose name your old notes are registered, follow the procedures specified herein and instruct that person to tender on your behalf.

***The consummation of the exchange offer and the consent solicitation may be delayed or may not occur.***

We are not obligated to complete the exchange offer and the consent solicitation under certain circumstances and unless and until certain conditions are satisfied, as described more fully under "Description of the Exchange Offer and the Consent Solicitation—Conditions to the Exchange Offer and the Consent Solicitation." For example, we will only consummate this exchange offer if at least 90% (including any old notes which are owned by us or our affiliates) in aggregate principal amount of the outstanding old notes is validly tendered and not validly withdrawn on or prior to the expiration date (the "minimum tender condition"), and we will only proceed to the settlement date if Maxcom's shareholders contribute Ps.300 million of new equity capital (the "capital contribution condition"), unless we waive such conditions (other than the capital contribution condition, which may not be waived); provided however that the proposed amendments will only be operative if at least a majority (not including any old notes which are owned by us or our affiliates) in aggregate amount of the old notes is validly tendered and not validly withdrawn on or prior to the expiration date.

Even if the exchange offer and the consent solicitation is completed, it may not be completed on the schedule described in this statement. Accordingly, holders participating in the exchange offer and the consent solicitation may have to wait longer than expected to receive their New Notes, during which time those holders of old notes will not be able to effect transfers of their old notes tendered in the exchange offer and the consent solicitation.

***The consideration to be received in the exchange offer and the consent solicitation does not reflect any valuation of the old notes or the New Notes.***

Neither our board of directors nor any of our principal officers have made any determination that the consideration to be received in the exchange offer and the consent solicitation represents a fair valuation of either the old notes or the New Notes. We have not obtained a fairness opinion from any financial advisor about the fairness to us or to you of the consideration to be received by holders of old notes. Accordingly, none of us, our board of directors, our principal officers, the subsidiary guarantors, the dealer manager and solicitation agent, the information agent, the exchange agent, the trustee or any other person is making any recommendation regarding the exchange offer and the consent solicitation, including the consideration to be received in connection therewith, and you have to make your own decision as to whether to tender old notes.

***If the proposed amendments become operative, holders of old notes that are not tendered will no longer benefit from all the restrictive covenants and events of default of the old notes indenture.***

If the exchange offer and the consent solicitation is consummated and the proposed amendments become operative as to the old notes indenture, old notes that are not exchanged pursuant to the exchange offer will remain outstanding and will be subject to the terms of the old notes indenture as modified by a supplemental indenture reflecting the proposed amendments. Holders of old notes that are not exchanged pursuant to the exchange offer for any reason will no longer be entitled to the benefits of all of the covenants and events of default of the old notes indenture after such provisions have been modified with respect to the old notes by the proposed amendments. The proposed amendments will eliminate certain provisions, including the majority of the restrictive covenants and certain events of default under the old notes indenture. The proposed amendments would permit us to take actions previously prohibited under the old notes indenture that could increase the credit risks faced by the holders of any remaining old notes, adversely affect the market price and credit rating of such old notes or otherwise be materially adverse to the interests of the holders of such remaining old notes.

The proposed amendments, however, will not relieve us or the subsidiary guarantors from our respective obligations to make scheduled payments of principal and interest on the old notes not exchanged pursuant to the exchange offer in accordance with the terms of the old notes indenture as currently in effect.

**Risks Related to the New Notes and Our Indebtedness**

*If we or our subsidiary guarantors were declared bankrupt, holders of Senior Notes may find it difficult to collect payment on the Senior Notes.*

Under the Mexican Commercial Reorganization Law *(Ley de Concursos Mercantiles),* if we or any of the subsidiary guarantors were declared bankrupt (*en quiebra*) or became subject to a reorganization proceeding *(concurso mercantil),* our obligations under the New Notes (i) would be converted into pesos and then from pesos into UDIs (*Unidades de Inversion*), which are inflation-pegged units adjusted by, and in accordance with the calculations of, the Mexican Central Bank ("Banco de Mexico") and would not be adjusted to take into account any devaluation of the peso relative to the U.S. dollar occurring after such conversion, (ii) would be satisfied at the time claims of all our creditors are satisfied, to the extent funds are sufficient, (iii) would be subject to the outcome of, and priorities recognized in, the relevant proceedings, (iv) would cease to accrue interest from the date the *concurso mercantil* is declared, and (v) would be subject to certain statutory preferences, including tax, social security and labor claims.

The application of the Mexican Commercial Reorganization Law by Mexican courts may differ from principles governing insolvency or bankruptcy proceedings in the United States, principally with respect to the treatment of intercompany loans.

*Our indebtedness could have a material adverse effect on our financial condition, including our ability to fulfill our obligations under the New Notes and our ability to operate our business and implement our business plan.*

We are a highly leveraged company. As of March 31, 2019, we had total outstanding indebtedness of Ps.2,583 million (US$134 million), which consists primarily of US$103.4 million aggregate principal amount of the old notes. Despite our current level of indebtedness, we may be able to incur additional indebtedness in the future. Although the terms of the Senior Notes indenture will restrict us and our restricted subsidiaries from incurring additional indebtedness, these restrictions are subject to important exceptions and qualifications including with respect to our ability to incur additional senior indebtedness. If we or our subsidiaries incur additional indebtedness to finance working capital, capital expenditures, investments or acquisitions or for other purposes, the risks related to our business associated with our high level of indebtedness could be intensified. Specifically, our high level of indebtedness could have important consequences to our business, including consequences that could:

- make it more difficult for us to satisfy our obligations with respect to our indebtedness;

- require us to dedicate a substantial portion of our cash flow from operations to debt service payments, reducing the funds available for working capital, capital expenditures (which is an integral part of our business), acquisitions and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in the telecommunications industry;

- limit our ability to take advantage of opportunities for acquisitions (including the acquisition of assets) and other business combinations;

- place us at a competitive disadvantage compared to our less leveraged competitors;

- increase our vulnerability to general, region–specific and industry–specific adverse economic conditions; and

- limit our ability to obtain additional financing or obtain it on commercially reasonable terms, to fund future working capital, capital expenditures, acquisitions or other general corporate requirements and increasing our cost of borrowing.

If we and our subsidiaries incur additional indebtedness in the future, the leverage-related risks that we now face could intensify and have a material adverse effect on our business, results of operation and financial condition.

***Because we have a history of losses and may continue to incur significant expenses, we may not be able to generate sufficient cash flows to meet our debt service obligations.***

We have had a history of negative operating cash flows and could face difficulties in meeting our debt service obligations. We incurred losses of Ps.9.1 million (US$0.5 million) for the three months ended March 31, 2019 as compared to gains of Ps.17.2 million (US$0.9 million) for the three months ended March 31, 2018, and losses of Ps.315.3 million (US$16 million) for the year ended December 31, 2018 as compared to losses of Ps.15.9 million (US$0.8 million) for the year ended December 31, 2017 and losses of Ps.2,118.2 million (US$102.7 million) recorded in 2016. The losses for the three months ended March 31, 2019 are mainly related to are mainly related to lower operating income primarily due to a decrease in our revenue stream from our residential and wholesale business units when compared to the three months ended March 31, 2018, a decline which we expect to continue as we conclude our intended divestiture of our residential business unit.

Our ability to fund our debt service obligations will depend on our ability to retain our existing customer base, develop a larger customer base and increase our operating cash flows. However, we may not succeed in retaining existing customers and attracting more customers and as a result our business may not generate sufficient operating cash flows to meet our existing debt service obligations.

In the event we continue to incur significant losses, we may not be able to service all of our debt obligations. If we cannot service our debt obligations, we may have to take actions such as selling assets, seeking additional equity investments, reducing or delaying capital expenditures, strategic acquisitions, investments and alliances, or restructuring our indebtedness pursuant to in court or out of court procedures, any of which could materially harm our business, results of operations and financial condition.

***We are experiencing low and declining cash balances and increases in our trade accounts payable and other current liabilities, which may result in our not meeting our debt service obligations.***

We have low cash balances that have been declining. As of December 31, 2018 and March 31, 2019, our cash and temporary investment balance was Ps.457 million (US$23 million) and Ps.386 million (US$20 million), respectively. In addition, our trade accounts payable and other current liabilities have increased significantly since December 31, 2018. If our trade accounts payable and other current liabilities continue to increase and our cash balances continue to decline, and if we are not able to increase our cash reserves through capital contributions, through asset sales or through the generation of increased operating cash flows, we may not be able to meet our debt service obligations under the old notes, the New Notes and our other liabilities and operating expenses. Unless we are able to increase our cash balances, our business, financial condition and results of operations may be materially adversely affected.

***The old notes indenture contains, and the Senior Notes indenture will contain, restrictions on our ability to operate our business and to pursue our business strategies. Our failure to comply with these covenants could result in an acceleration of our indebtedness.***

The old notes indenture contains, and the Senior Notes indenture will contain, covenants that may restrict our ability to finance future operations or capital needs, to respond to changing business and economic conditions or to engage in certain transactions or business activities that may be important to our growth strategy, necessary to remain competitive or otherwise important to us. The indentures restrict, among others, our ability to:

- pay dividends on, redeem or repurchase our capital stock;

- make investments;

- incur additional debt;

- guarantee other debt;

- create certain liens;

- enter into sale and leaseback transactions;

- issue or sell stock of certain subsidiaries;

- merge or consolidate with another company;

- transfer and sell assets; and

- enter into transactions with affiliates.

If we do not comply with these restrictions, we could be in default despite our ability to service our indebtedness. If there were an event of default under the old notes indenture or the Senior Notes indenture, holders of such old notes or Senior Notes could demand immediate payment of the aggregate principal amount and accrued interest on such old notes and Senior Notes outstanding. This could lead to our inability to pay our obligations or to our reorganization or bankruptcy for the benefit of our creditors. Any additional financings we obtain in the future would most likely contain similar or more restrictive covenants.

The terms of the indentures governing the old notes and the Senior Notes that will restrict us and our restricted subsidiaries from incurring additional indebtedness are subject to certain exceptions and qualifications, including exceptions allowing us to incur capital lease, financing and purchase money obligations and additional indebtedness, subject to certain limitations. If we or our subsidiaries incur additional indebtedness to finance working capital, capital expenditures, investments or acquisitions or for other purposes, the risks related to our business associated with our high level of indebtedness could be intensified and such additional indebtedness could increase the risk of insolvency or bankruptcy.

***Exchange rate control rules enacted in the future could make it more difficult for us to service our U.S. dollar-denominated debt, raise capital outside of Mexico and make capital expenditures.***

In the past, the Mexican government has issued exchange control rules that, although not in effect today, may be enacted in the future. If so enacted, exchange control rules could make it more difficult to service our U.S. dollar denominated debt, raise capital outside of Mexico and make capital expenditures.

***Our securities prices could decrease in response to the international backdrop, particularly as a result of developments in the United States and emerging markets.***

We cannot assure you that the price of our securities will not be adversely affected by events elsewhere, especially in the United States and in emerging markets. Mexican financial and securities markets are, to varying degrees, influenced by economic and market conditions in other countries. Although economic conditions are different in each country, investor reaction to developments in one country has had and can have significant effects on the prices of securities of issuers in other countries, including Mexico. For example, the economic recession or changes in the tax policies in the United States, the departure of the United Kingdom from the European Union, the economic slowdown in China, trade conflicts between the United States, Mexico and China, concerns about the levels of corporate debt in emerging economies, as well as the threat of terrorism, have had a significant adverse impact on financial markets and stock exchanges in many emerging markets, including Mexico.

***Certain of our subsidiaries are not guarantors and our obligations with respect to the Senior Notes and the obligations of the subsidiary guarantors under the related guarantees will be effectively subordinated to all liabilities of these non-guarantor subsidiaries.***

The guarantors of the Senior Notes will not include all of our subsidiaries and holders of the Senior Notes will not have any claim against those subsidiaries that are not guarantors of the Senior Notes. However, our financial information is presented on a consolidated basis. Our non-guarantor subsidiaries did not account for any of our net revenues or our EBITDA for the three months ended March 31, 2019 and the year ended December 31, 2018, other

than our joint venture Celmax Móvil, S.A. de C.V., which accounts for approximately 1% of our net revenue but has a negative impact on our EBITDA (see "Annex A—Business—Deconsolidation of Celmax").  As of March 31, 2019, after giving pro forma effect to the exchange offer and the issuance of the Senior Notes, we would have had consolidated total indebtedness of US$90 million, assuming that all old notes are tendered on or before the early participation date and we do not round down the amount to be issued to any tendering holder, none of which would have been indebtedness of our non-guarantor subsidiaries (excluding guarantees and intercompany loans).  Any right that we or the subsidiary guarantors have to receive assets of any of the non-guarantor subsidiaries upon the liquidation or reorganization of those subsidiaries, and the consequent rights of holders of Senior Notes to realize proceeds from the sale of any of those subsidiaries' assets, will be effectively subordinated to the claims of any such subsidiary's creditors, including trade creditors, holders of debt issued by those subsidiaries and certain statutory preferences.

***We may not be able to raise the funds necessary to repurchase the Senior Notes in the event of a change of control.***

If a there is a Change of Control (as defined in the Senior Notes indenture), we may be required to refinance substantially all of our debt, including the Senior Notes and the Junior PIK Notes.  Under the Senior Notes indenture, in the event of a change of control, we must offer to buy back the Senior Notes for a price equal to 101% of the principal amount of the Senior Notes, plus any accrued and unpaid interest to the date of repurchase.  Under the Junior PIK Notes indenture, in the event of a change of control, we must redeem all outstanding Junior PIK Notes at an aggregate redemption price of the lesser of (i) the principal amount of the outstanding Junior PIK Notes and (ii) the Applicable Percentage of the Equity Value (as such terms are defined under "Description of the Junior PIK Notes—Mandatory Redemption—Change of Control").  We may not have sufficient funds available to us to make any required repurchases of the Senior Notes or the Junior PIK Notes upon a change of control.  If we fail to repurchase the Senior Notes or the Junior PIK Notes in those circumstances, we will be in default under the Senior Notes indenture and the Junior PIK Notes indenture, which may, in turn, trigger cross-default provisions in our other debt instruments.

Any future debt we incur may also contain requirements to repurchase notes upon a change of control.

***Payments of judgments against us or the subsidiary guarantors on the Senior Notes would be in pesos.***

In the event that proceedings are brought against us or the subsidiary guarantors in Mexico, either to enforce a judgment or as a result of an original action brought in Mexico, we and the subsidiary guarantors would not be required to discharge those obligations in a currency other than Mexican pesos.  Under the Monetary Law of the United Mexican States *(Ley Monetaria de los Estados Unidos Mexicanos)*, an obligation, whether resulting from a judgment or by agreement, denominated in a currency other than Mexican pesos, which is payable in Mexico, may be satisfied in Mexico, in Mexican pesos, at the rate of exchange in effect on the date on which payments are made.  Such rate is currently determined by Banco de Mexico and published every banking day in the Federal Official Gazette *(Diario Oficial de la Federacion)*.  As a result, you may suffer a U.S. dollar shortfall if you enforce a judgment, or obtain a judgment in respect of an action initiated, in Mexico, because payments received in Mexican peso-denominated funds may not be sufficient to repay the U.S. dollar amount then due.  You should be aware that no separate action exists or is enforceable in Mexico for compensation for any such shortfall.

***The guarantees of our subsidiaries under the Senior Notes may not be enforceable.***

The Senior Notes will be fully and unconditionally guaranteed, on a joint and several basis, by certain of our subsidiaries and provide a basis for a direct claim against the subsidiary guarantors; however, it is possible that the guarantees may not be enforceable under Mexican law.  While Mexican law does not prohibit the giving of guarantees and, as a result, does not prevent guarantees by Mexican entities from being valid, binding and enforceable against Mexican entities, in the event that a subsidiary guarantor in Mexico becomes subject to a reorganization proceeding (*concurso mercantil*) or to bankruptcy (*quiebra*), the relevant guarantee may be deemed to have been a fraudulent transfer and declared void, based upon the Mexican subsidiary guarantor being deemed not to have received fair consideration in exchange for the giving of such guarantee.

***We may not be able to make payments in U.S. Dollars.***

In the past, the Mexican economy has experienced balance of payments deficits and shortages in foreign exchange reserves. While the Mexican government does not currently restrict the ability of Mexican or foreign persons or entities to convert Mexican pesos to foreign currencies, including U.S. dollars, it has done so in the past and could in the future enact restrictions related to the exchange of currencies, including the rate at which the Mexican peso may be converted into foreign currencies. We cannot assure you that the Mexican government will not implement a restrictive exchange control policy in the future. Any such restrictive exchange control policy could prevent or restrict our access to U.S. dollars to meet our U.S. dollar obligations and could also have a material adverse effect on our business, financial condition and results of operations. We cannot predict the impact of any such measures on the Mexican economy.

***You may not be able to effect service of process on us or to enforce judgments against us in Mexican courts.***

We and all of our subsidiary guarantors (except for Maxcom USA, Inc. and Sierra USA Communications, Inc.) are companies organized under the laws of Mexico. Almost all of our directors and executive officers, and most of the directors and executive officers of our subsidiary guarantors (except for Maxcom USA, Inc. and Sierra USA Communications, Inc.), are Mexican residents. Substantially all of our assets and the assets of certain of our subsidiary guarantors are located in Mexico and outside of the United States. As a result, it may not be possible for investors to effect service of process outside Mexico on us or our directors or executive officers or on those subsidiary guarantors, or to enforce against such parties judgments of courts located outside Mexico predicated on civil liabilities under the laws of jurisdictions other than Mexico, including judgments predicated on the civil liability provisions of the U.S. federal securities laws or other laws of the United States. See "Service of Process and Enforcement of Civil Liabilities."

***Minority shareholders may be unable to enforce their rights against us, our directors, or our controlling shareholders in Mexico.***

Under Mexican law and our bylaws which are governed by Mexican law, the protections afforded to minority shareholders are different from those afforded to minority shareholders in the United States. For example, because provisions concerning fiduciary duties of directors have only recently been incorporated into the Mexican Securities Market Law (*Ley del Mercado de Valores*) and are not as developed as in the United States, it may be difficult for shareholders to bring an action against directors for breach of their fiduciary duties and achieve the same results as in most jurisdictions in the United States. Procedures for class action lawsuits do not exist under applicable Mexican law.

***There are restrictions on your ability to transfer the New Notes.***

The New Notes have not been, and will not be, registered under the Securities Act or any state securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws. Such exemptions include offers and sales that occur outside the United States in compliance with Regulation S under the Securities Act and in accordance with any applicable securities laws of any other jurisdiction. For a discussion of certain restrictions on resale and transfer, see "Transfer Restrictions."

***An active trading market for the New Notes may not develop.***

There is no market for the New Notes. If a market for the New Notes were to develop, the New Notes may trade at a discount, depending upon many factors, including prevailing interest rates, the market for similar securities, general economic conditions, the ratings assigned to our debt by credit rating agencies, the liquidity of the New Notes, and our operating performance and financial condition. We cannot assure you that trading markets will develop or be maintained. We cannot assure you as to the development or liquidity of any trading market for the New Notes. If an active market for the New Notes does not develop or is interrupted, the market price and liquidity of the New Notes may be adversely affected.

**Risks Related to the Collateral**

***The proceeds from the sale of the Collateral securing the Senior Notes may not be sufficient to satisfy our obligations under the Senior Notes.***

The old notes are, and indirectly the Senior Notes will be, secured by first-priority liens on the Collateral (as defined in "Description of the Senior Notes"). The Collateral subject to liens constitutes most of our telephone network systems and equipment assets. In the event of a foreclosure on the Collateral, we would be required to pay certain fees and other amounts prior to distribution of any proceeds from foreclosure in respect of the Senior Notes or the old notes, which proceeds would then be shared on an equal and ratable basis among the Senior Notes (indirectly through their interest in the Collateral to be shared with respect to the exchanged old notes) and the old notes remaining outstanding. We can provide no assurance as to the amount that would be distributed in respect of the Senior Notes upon any foreclosure or otherwise, or that the proceeds from the sale of the Collateral would be sufficient to satisfy our obligations under the Senior Notes.

The value of the Collateral and any amount to be received at foreclosure will depend upon many factors including, among others, the condition of the Collateral, changes in our industry, the age and obsolescence of the Collateral, the ability to sell the Collateral in an orderly sale, the availability of buyers, the condition of the Mexican economy, the condition of our competitors in Mexico and exchange rates. No appraisal of any of the Collateral has been prepared by us or on our behalf in connection with this exchange offer and consent solicitation. Given the limited number of participants in the Mexican telecommunications market, and because a telecommunications concession title is required to operate some of the assets that comprise the Collateral, there may not be any buyer willing and able to purchase a significant portion of our assets or the Collateral in the event of foreclosure. In addition, since we are not pledging all of our assets, it may not be possible to sell our business as a going concern upon foreclosure. Each of these factors could reduce the likelihood of a foreclosure as well as reduce the amount of any proceeds in the event of foreclosure.

In addition, if less than 100% of the old notes are tendered in the exchange offer and consent solicitation, the Collateral securing the old notes will not be fully available to secure the Senior Notes but rather will be effectively shared on an equal and ratable basis between the old notes and the Senior Notes, and subject to a senior notes intercreditor agreement that will govern voting and foreclosure procedures with respect to the Collateral. In the event of a foreclosure, if the Collateral proceeds are not sufficient to pay in full the unpaid obligations on all of the old notes and the Senior Notes, any old notes that are not acquired in the exchange offer will share in the available proceeds with the Senior Notes. The sharing of limited available proceeds with non-tendered old notes would have the effect of increasing the portion of the new note obligations that is effectively unsecured.

***Impediments exist to any foreclosure on the Collateral, which may adversely affect the proceeds of any foreclosure.***

Substantially all of the Collateral Documents (as defined in "Description of the Senior Notes—Security") are governed by the laws of Mexico, and substantially all of the Collateral is located in Mexico. Any foreclosure with respect to the Collateral (including a foreclosure initiated by holders of the Senior Notes) would therefore be required to comply with Mexican legal and procedural requirements, which differ substantially from procedural requirements in the United States. In particular, Mexican law does not allow for self-executing liens, foreclosure without judicial action or expedited foreclosure proceedings. Any proceeding related to the foreclosure of the Collateral in Mexico would be required to be initiated in a Mexican court and could involve significant delays. A Mexican court may require a judgment regarding the existence of an event of default under the Senior Notes indenture, and a cross-acceleration under the old notes indenture, from a U.S. court prior to any foreclosure. We may also have available to us defenses under Mexican law not available under U.S. law to any foreclosure proceeding, which may result in a delay in foreclosure proceedings. All of the foregoing factors, and other factors relating to judicial proceedings in Mexico, may result in significant delays in connection with any foreclosure of the Collateral. These delays could result in a deterioration of the Collateral and a decrease in the value that would otherwise be realizable upon foreclosure.

***Third parties' rights may affect the ability of the Collateral Agent to foreclose on the Collateral and the priority of the Senior Notes and old notes with respect to the Collateral.***

Third parties may have rights and be entitled to remedies that diminish the ability of the Collateral Agent to foreclose upon the Collateral or that affect the priority of the old notes (and the indirect priority of the Senior Notes) with respect to the Collateral, or amounts available after foreclosure of the Collateral for repayment. Under Mexican law, amounts owed to employees or, with some limited exceptions, to tax authorities (including social security and retirement fund liabilities), must be paid by a debtor prior to the satisfaction of any other claims, including secured claims. In addition, under the terms of the Senior Notes, certain third-party Collateral Permitted Liens may be senior to the liens securing the Senior Notes. See "Description of the Senior Notes—Certain Definitions—Collateral Permitted Liens." The rights and remedies to which these and other third party creditors are entitled may limit the ability of foreclosure on the Collateral or may otherwise reduce the proceeds available to satisfy our obligations under the Senior Notes.

***We may incur additional secured indebtedness, which would dilute the value of the Collateral securing the Senior Notes.***

Under the Senior Notes indenture, we will be permitted in the future to incur specified additional obligations that may share in the liens on the Collateral securing the Senior Notes. If we incur any additional debt that is secured on an equal and ratable basis with the Senior Notes, the holders of that debt will be entitled to share ratably with the holders of the Senior Notes and the value of the Collateral (or the proceeds from the sale of the Collateral in a foreclosure proceeding) securing indirectly and, upon payment in full at maturity or early redemption of the old notes, directly, the Senior Notes will be diluted. Any such dilution will increase the risk of the proceeds from the sale of the Collateral not being sufficient to satisfy the amounts outstanding under the Senior Notes and all other obligations secured by such Collateral. If such proceeds were not sufficient to repay amounts due on the Senior Notes, then holders of the Senior Notes (to the extent the Senior Notes are not repaid from the proceeds of the sale of the Collateral) would have an unsecured claim against our remaining assets.

***Since not all of our assets are included in the Collateral, the ability to sell the Collateral as a going concern may be limited.***

The Collateral pledged as security for our obligations under the Senior Notes is limited. The Collateral consists of a significant portion, but not all, of our tangible assets. The Collateral subject to liens constitutes most of our telephone network systems and equipment assets. In light of the fact that the Collateral is closely related to assets that are not pledged as Collateral, the ability of the Collateral Agent to sell the Collateral as a going concern may be limited and may affect the attractiveness of the assets constituting the Collateral for a third party purchaser.

Moreover, the Collateral does not include our concession or any rights related to our concession. Because a telecommunications concession title is required to operate some of the assets that comprise the Collateral, the holders of Senior Notes would not be able to continue operating the telecommunications network upon any foreclosure of the Collateral and there may not be any buyer that holds a telecommunications concession that is willing and/or able to purchase a significant portion of the Collateral in the event of foreclosure.

***A Mexican or U.S. bankruptcy may limit the ability to realize value from the Collateral.***

The rights of the Collateral Agent upon a foreclosure on the Collateral upon the occurrence of an event of default under the Senior Notes indenture is likely to be significantly impaired by applicable bankruptcy law if a bankruptcy proceeding were to be commenced by or against us before the foreclosure on the Collateral.

Under Mexico's Reorganization Proceeding Law, the foreclosure or sale of all or any part of the Collateral will not be possible prior to our liquidation. In addition, during the pendency of insolvency proceedings, Mexican law does not require a debtor to provide adequate protection or assurances to secured creditors, although the bankruptcy court could adopt precautionary measures to such effect.

Significant uncertainties are inherent in bankruptcy proceedings, including bankruptcy proceedings in Mexico, that may result in delays that could adversely impact the value of the Collateral or that may prevent foreclosure with

respect to the Collateral. There have been a limited number of final judicial decisions relating to critical bankruptcy issues such as the relative treatment and priority of debts, the role of the creditors in overseeing business operations during insolvency proceedings, criteria and voting majorities required (and how such votes are counted) for court approval of a reorganization plan and the effect of the process on subsidiaries (including the possible cancellation of bankruptcy proceedings). Secured creditors' rights in a bankruptcy proceeding are therefore not well-established in Mexico, and this may result in substantial delays beyond those contemplated by Mexico's Reorganization Proceeding Law as well as the inability of the mediator to exercise the remedies and powers granted to creditors. Delays in proceedings, the inadequacy of available remedies and the inability of the mediator to exercise available remedies could result in a substantial deterioration of the Collateral during the pendency of any such proceeding and may affect your ability to foreclose on the Collateral and thus receive payment in respect of the Senior Notes.

***The value of the Collateral may decrease because of obsolescence, impairment or certain casualty events.***

We can provide no assurances that the value of the Collateral will not be adversely affected by obsolescence, changes in the technology in our industry, other changes in equipment or certain casualty events. The Collateral Documents do not require us to improve the Collateral. In addition, our existing equipment may become obsolete or be replaced by new equipment that may not be part of the Collateral. Although we are obligated under the Collateral Documents to maintain insurance with respect to the Collateral, we can provide no assurances that the proceeds of such insurance will be sufficient to repurchase adequate replacement Collateral or will equal the fair market value of the damaged Collateral. Our insurance policies also do not cover all events that may result in damage to the Collateral. Additionally, a loss arising from a title defect with respect to the Collateral may adversely affect the value of the Collateral.

***Rights of holders of the Senior Notes to the Collateral may be adversely affected by our failure to perfect security interests in certain Collateral acquired in the future.***

The security interests in the Collateral securing the Senior Notes includes specified classes of assets whether now owned or acquired or arising in the future. Applicable law requires that certain property and rights acquired after the grant of a general security interest can only be perfected at the time such property and rights are acquired and identified. There can be no assurance that the trustee or the Collateral Agent will monitor, or that we will inform the trustee or the Collateral Agent of, the future acquisition of property and rights that constitute Collateral, and that the necessary actions will be taken to properly perfect the security interest in such after-acquired Collateral. Such failure may result in the loss of the security interest therein or the priority of the security interest in favor of the Senior Notes against third parties.

***We will in most cases have control over the Collateral securing the Senior Notes, and the sale of particular assets by us or the subsidiary guarantors could reduce the pool of assets securing the Senior Notes and the guarantees.***

The Collateral Documents allow us and the subsidiary guarantors to remain in possession of, to retain exclusive control over, to freely operate and to collect, invest and dispose of any income from the Collateral securing the Senior Notes. To the extent we sell any assets that constitute such Collateral, the proceeds from such sale will be subject to the liens securing the Senior Notes only to the extent such proceeds would otherwise constitute Collateral securing the Senior Notes and the guarantees under the Collateral Documents. To the extent the proceeds from any such sale of Collateral do not constitute Collateral under the Collateral Documents, the pool of assets securing the Senior Notes and the subsidiary guarantees would be reduced and the Senior Notes and the subsidiary guarantees would not be secured by such proceeds.

**Risks Related to the Plan**

***If the exchange offer is not consummated, we intend to commence a case under chapter 11 of the Bankruptcy Code and seek confirmation of the Plan.***

If the exchange offer is not consummated, we may not be able to meet certain financial obligations as they come due. If this occurs, holders of the old notes and our other creditors could commence involuntary bankruptcy proceedings against us in Mexico or in the United States.

As a result, if the exchange offer is not consummated, we may commence a voluntary case under chapter 11 of the Bankruptcy Code. Such a restructuring may be protracted, contentious and disruptive to our business and could materially adversely affect our relationships with our customers, suppliers and employees who may terminate their relationships with us. A restructuring would also cause us to incur significant legal, administrative and other professional expenses. Moreover, no assurances can be given that any such restructuring would be successful or that holders of our debt obligations would not have their claims significantly reduced, converted into equity or eliminated. If a restructuring is not successful, we may be forced to liquidate our business and assets.

If we receive votes in number and amount sufficient to satisfy the Bankruptcy Threshold, we may seek confirmation of the Plan. If confirmed, the Plan would be binding on all of the holders regardless of whether a holder voted to accept or reject the Plan. If the Plan does not receive the required support from holders, we may elect to seek confirmation regardless of the rejection by amending the Plan or seeking to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders as those proposed in the Plan.

In addition, a restructuring under chapter 11 (other than the Plan) may result in holders of the old notes receiving notes with terms that may be materially less favorable than the Senior Notes being offered pursuant to the exchange offer.

**We may fail to satisfy vote requirements to confirm the Plan.**

If votes are received in number and amount sufficient satisfy the Bankruptcy Threshold, we may commence the Chapter 11 Case for the purpose of seeking confirmation of the Plan thereafter as promptly as practicable. If the Plan does not receive the required support from holders of claims, we may elect to seek confirmation regardless of the rejection, by amending the Plan or seeking to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of allowed claims and allowed interests as those proposed in the Plan.

If we are not able to confirm the Plan or an alternative chapter 11 plan, there is substantial doubt that we will be able to generate the necessary cash to continue operations. As a result, we may be required to file for liquidation in Mexico.

**We may fail to satisfy solicitation requirements.**

The solicitation of votes by the Company to accept the Plan is subject to several requirements under applicable bankruptcy law. If the Bankruptcy Court does not find that our solicitation complied with such requirements, confirmation of the Plan could be denied.

Section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote;

- the time prescribed for voting is not unreasonably short; and

- the solicitation of votes is in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in such solicitation or, if no such law, rule or regulation exists, votes be solicited only after the disclosure of "adequate information". Section 1125(a)(1) of the U.S. Bankruptcy Code describes adequate information as information of a kind and in sufficient detail as would enable a hypothetical reasonable investor typical of holders of claims and interests to make an informed judgment about the plan.

To satisfy the requirements of Section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), we intend to deliver this consent solicitation to all holders of allowed notes claims as of the voting record date. In that regard, we believe that the solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations. However, we cannot be certain that the solicitation of acceptances or

rejections will be approved by the Bankruptcy Court. If such approval is not obtained, confirmation of the Plan could be denied.

***The Bankruptcy Court may not confirm the Plan.***

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to satisfy the Bankruptcy Threshold, we may commence the Chapter 11 Case for the purpose of seeking confirmation of the Plan by the Bankruptcy Court. However, even if the requisite votes are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed. In addition, a dissenting holder of a claim against the Company could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the balloting results may be invalid. Even if the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of sections 1122, 1123, 1129 and the other applicable provisions of the Bankruptcy Code have been met with respect to the Plan. In addition, the Bankruptcy Court may decline to accept the Company's petition based on jurisdictional or venue grounds, which would also result in the Company not being able to obtain confirmation of the Plan.

If the Plan is not confirmed by the Bankruptcy Court, (a) we may not be able to reorganize our businesses, (b) the distributions that holders of claims ultimately would receive, if any, with respect to their claims is uncertain, (c) there is no assurance that we will be able to successfully develop, prosecute, confirm and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the holders of claims, (d) there can be no assurance that the Chapter 11 Case would continue rather than be converted into liquidation cases under chapter 7 of the Bankruptcy Code and (e) we may be required to liquidate our entire operations through a liquidation process in Mexico. It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only we may propose and confirm a plan of reorganization. If a liquidation or protracted reorganization of our estate were to occur, there is a substantial risk that our going concern value would be substantially eroded to the detriment of all stakeholders.

***Commencing the Chapter 11 Case may have a material adverse effect on our operations.***

The Plan Solicitation or any subsequent commencement of the Chapter 11 Case could adversely affect the relationships between us and our customers, employees, vendors, lenders, partners and others. There is a risk, due to uncertainty about our future, that:

- customers could seek alternate service providers;

- the commencement of the Chapter 11 Case could erode our customers' confidence in our ability to provide our services and, as a result, there could be a significant and precipitous decline in our revenues, profitability and cash flow;

- employees could seek other career opportunities;

- it may be more difficult to attract or replace key employees; and

- our suppliers, vendors, and service providers, many of whom may not be subject to the jurisdiction of the Bankruptcy Court, could seek to terminate their relationships with us or require financial assurances or enhanced performance.

***We may not be successful in obtaining first day orders to permit us to pay our key customers, vendors and employees in the ordinary course of business.***

In the event that we commence the Chapter 11 Case, it is our intention to seek authorization from the Bankruptcy Court on an emergency basis to pay our accounts payable to key parties in interest in the ordinary course of business and in the case of those key vendors that have agreed to continue to extend normal business terms to us during the Chapter 11 Case. However, there can be no guarantee that we would be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest we may seek to treat in this matter, and as a result, our business might suffer.

***We cannot predict the amount of time the Chapter 11 Case will take to complete for purposes of implementing the Plan, and a lengthy Chapter 11 Case could disrupt our business.***

While we intend to seek confirmation of the Plan in 30 to 45 days from the commencement of the Chapter 11 Case, we cannot be certain that this will be the case. Although the Plan and the Plan Solicitation are both designed to minimize the length of time that we may need to spend in chapter 11, it is impossible to predict with certainty the exact amount of time that it may take to obtain confirmation of the Plan.

## DESCRIPTION OF THE EXCHANGE OFFER AND THE CONSENT SOLICITATION

**The Exchange Offer**

We are making an offer to eligible holders, upon the terms and subject to the conditions set forth in this statement, to exchange each US$1,000 principal amount of the old notes for (a) the total exchange consideration of US$550 principal amount of Senior Notes, US$100 principal amount of Junior PIK Notes and US$110 in cash if the old notes are tendered and not validly withdrawn on or before the early participation date, or (b) US$550 principal amount of Senior Notes, US$100 principal amount of Junior PIK Notes and US$100 in cash if the old notes are tendered and not validly withdrawn after the early participation date and on or before the expiration date.

The cash portion of the total exchange consideration for holders tendering their old notes prior to or on the early participation date is US$110 for each US$1,000 of old notes validly tendered, not validly withdrawn and accepted in the exchange offer, which includes early participation consideration of US$10 for each US$1,000 of old notes validly tendered, not validly withdrawn and accepted in the exchange offer.

Only eligible holders that validly tender their old notes and do not validly withdraw their tenders on or before the early participation date will be eligible to receive the total exchange consideration, which includes the early participation consideration. Eligible holders that validly tender and do not withdraw old notes after the early participation date and on or before the expiration date will be eligible to receive only the exchange consideration of US$550 principal amount of Senior Notes, US$100 principal amount of Junior PIK Notes and US$100 in cash and no early participation consideration for each US$1,000 principal amount of old notes validly tendered, not validly withdrawn and accepted.

The Senior Notes will be issued in minimum denominations of US$1,000 and integral multiples of US$1.00 in excess thereof. The Junior PIK Notes will be issued in minimum denominations of Ps.20,000 and integral multiples of Ps.20.00. An eligible holder must tender old notes in a principal amount sufficient to receive at least US$1,000 principal amount of Senior Notes and Ps.20,000 principal amount of Junior PIK Notes in exchange for such old notes, based on the applicable exchange consideration. Any holder that tenders less than such amount will not be able to participate in the exchange offer and the consent solicitation.

The amount of Senior Notes and Junior PIK Notes to be issued to any holder will be rounded down to the nearest US$1.00 and Ps.20.00, respectively. No additional cash will be paid in lieu of any principal amount of Senior Notes or Junior PIK Notes not received as a result of rounding down.

On the settlement date all eligible holders whose old notes are validly tendered, not validly withdrawn and accepted for exchange will also receive a cash payment equal to the applicable accrued and unpaid interest on their old notes validly tendered, not validly withdrawn and accepted for exchange through but excluding the settlement date.

On the settlement date, the old notes validly tendered, not validly withdrawn and accepted for exchange will be cancelled.

Tenders of old notes may be validly withdrawn at any time prior to 5:00 p.m. (New York City time) on June 28, 2019, but will thereafter be irrevocable, except in certain limited circumstances where we determine additional withdrawal rights are necessary and to the extent required by law.

From February 2015 to March 2019, we acquired and canceled US$72,299,184 million in aggregate principal amount of the old notes.

**Any eligible holder who exchanges old notes for Senior Notes pursuant to the exchange offer must also deliver its consent to the proposed amendments. Eligible holders may not deliver consents in the consent solicitation without exchanging their old notes for the Senior Notes in the exchange offer.**

**The Consent Solicitation**

In connection with the exchange offer, we are soliciting consents to the proposed amendments with respect to the old notes indenture, upon the terms and subject to the conditions set forth in this statement. If the proposed amendments to the old notes indenture become operative, certain provisions, including the majority of the restrictive covenants and certain events of default will be eliminated. See "The Proposed Amendments." Any corresponding provisions of the old notes will also be amended in conformity with the proposed amendments to the old notes indenture. If the proposed amendments become operative, only a failure to comply with the restrictive covenants as modified by the supplemental indenture reflecting the proposed amendments would be a default or an event of default under the old notes indenture.

If we receive consents from at least a majority of the outstanding aggregate principal amount of the old notes (not including any old notes which are owned by us or our affiliates), we, the subsidiary guarantors and the trustee will enter into a supplement to the old notes indenture (the "supplemental indenture"). Except as set forth in this statement, the old notes indenture will not be supplemented or amended in connection with the proposed amendments, and all other provisions of the old notes indenture will remain in full force and effect. The supplemental indenture may be executed and delivered prior to the expiration date.

**Expiration Date; Early Participation Date; Extensions; Amendments; Termination**

The expiration date of the exchange offer and the consent solicitation will be 12:00 midnight (New York City time) on July 15, 2019 subject to our right to extend that time and date in our absolute discretion, in which case the expiration date means the latest time and date to which the exchange offer and the consent solicitation is extended.

The early participation date of the exchange offer and the consent solicitation will be 5:00 p.m. (New York City time) on June 28, 2019 unless extended by us.

We reserve the right, in our absolute discretion, by giving oral or written notice to the exchange agent, to:

- extend the exchange offer and the consent solicitation;

- terminate the exchange offer and the consent solicitation if a condition to our obligation to exchange old notes for Senior Notes is not satisfied or waived on or before the expiration date;

- amend the exchange offer and the consent solicitation; and

- terminate and withdraw the exchange offer and consent solicitation.

If the exchange offer and the consent solicitation is amended in a manner that we determine constitutes a material change, we will extend the exchange offer and the consent solicitation for a period of two to 10 business days, depending upon the significance of the amendment and the manner of disclosure to the eligible holders, if the exchange offer and the consent solicitation would otherwise have expired during that two to 10 business day period. Any change in the consideration offered to holders of old notes pursuant to the exchange offer and the consent solicitation will be paid to all holders whose old notes have been previously tendered and not validly withdrawn.

Although we have no present plans or arrangements to do so, we reserve the right to amend, at any time, the terms and conditions of the exchange offer and the consent solicitation. We will promptly announce any extension, amendment or termination of the exchange offer and the consent solicitation by issuing a press release. We will announce any extension of the expiration date no later than 9:00 a.m. (New York City time) on the first business day after the previously scheduled expiration date.

**Settlement Date**

We will deliver the New Notes on the settlement date. We will not be obligated to deliver Senior Notes unless the exchange offer and the consent solicitation is consummated.

**Conditions to the Exchange Offer and the Consent Solicitation**

The exchange offer and the consent solicitation are subject to certain conditions, which we may assert or waive in full or in part in our sole discretion (other than the capital contribution condition, which may not be waived). We may extend the exchange offer and the consent solicitation from time to time until the conditions are satisfied or waived. Although we have no present intention to do so, we reserve the right to amend, at any time, the terms and conditions of the exchange offer and the consent solicitation. We will give you notice of any amendment or extension if required by applicable law.

Notwithstanding any other provisions of the exchange offer and the consent solicitation or any extension of the exchange offer and the consent solicitation, we will not be required to issue Senior Notes, and we may terminate the exchange offer and the consent solicitation or, at our option, modify, extend or otherwise amend the exchange offer and the consent solicitation, if any of the following events occur or exist on or before the expiration date:

(1)   any action or event shall have occurred or been threatened, or action shall have been taken, or any statute, rule, regulation, judgment, order, stay, decree or injunction shall have been promulgated, enacted, entered, enforced or deemed to be applicable to the exchange offer and the consent solicitation or the exchange of old notes for Senior Notes in the exchange offer by or before any court or governmental regulatory or administrative agency, authority or tribunal, including, without limitation, taxing authorities, that either:

(a)   challenges the making of the exchange offer and the consent solicitation or the exchange of old notes for New Notes in the exchange offer or might, directly or indirectly, prohibit, prevent, restrict or delay consummation of, or might otherwise adversely affect in any material manner, the exchange offer and the consent solicitation or the exchange of old notes for Senior Notes in the exchange offer and the consent solicitation; or

(b)   in our reasonable judgment, could materially adversely affect our business, condition (financial or otherwise), income, operations, properties, assets, liabilities or prospects or materially impair the contemplated benefits to us of the exchange offer and the consent solicitation or the exchange of old notes for Senior Notes in the exchange offer;

(2)   there shall have occurred (a) any general suspension of or material limitation on trading in securities on the New York Stock Exchange ("NYSE"), the NASDAQ Stock Market, the Mexican Stock Exchange or any other exchange or over-the-counter market in the United States or Mexico or any establishment of minimum prices on any of such exchanges or such market by such exchange or by any regulatory body having jurisdiction over such exchange or market; (b) any suspension of trading of any securities issued or guaranteed by us or our subsidiary guarantors on any exchange or the over-the-counter market in the United States or Mexico; (c) a declaration of a general moratorium on commercial banking activities by U.S. federal or New York state authorities or by Mexican authorities; (d) any outbreak or escalation of national or international hostilities or any change in financial markets or any calamity or crisis; (e) any material adverse change or development involving a prospective material adverse change in taxation, exchange controls or other applicable law or regulation in the United States or Mexico directly affecting the Senior Notes or the imposition of restrictions on repatriation of remittances or interest payments or dividends from Mexico; or (f) a material adverse change in Mexican, U.S. or international monetary, general economic, political or financial conditions; or

(3)   the trustee with respect to the old notes indenture shall have objected in any respect to, or taken any action that could, in our reasonable judgment, adversely affect the consummation of the exchange offer and the consent solicitation or the exchange of old notes for Senior Notes in the exchange offer, or the trustee shall have taken any action that challenges the validity or effectiveness of the procedures used by us in making the exchange offer and the consent solicitation or the exchange of old notes for Senior Notes in the exchange offer.

In addition, the exchange offer and consent solicitation are subject to (i) the valid tender, without subsequent withdrawal, of at least 90% (including any old notes which are owned by us or our affiliates) in aggregate principal

amount of the outstanding old notes on or prior to the expiration date (the "minimum tender condition") and (ii) the contribution of Ps.300 million of new equity capital by Maxcom's shareholders (the "capital contribution condition"); provided however that the proposed amendments will only be operative if at least a majority (not including any old notes which are owned by us or our affiliates) in aggregate amount of the old notes is validly tendered and not validly withdrawn on or prior to the expiration date.

The foregoing conditions are for our sole benefit and may be waived by us, in whole or in part, at our absolute discretion (other than the capital contribution condition, which may not be waived). Any determination made by us concerning an event, development or circumstance described or referred to above will be conclusive and binding. Our failure at any time to exercise any of our rights will not be deemed a waiver of any other right, and each right will be deemed an ongoing right which may be asserted at any time and from time to time.

If any of the foregoing conditions are not satisfied, we may, at any time on or before the expiration date:

- terminate the exchange offer and the consent solicitation and return all tendered old notes to the respective tendering holders;

- modify, extend or otherwise amend the exchange offer and the consent solicitation and retain all tendered old notes until the expiration date, as extended, subject, however, to the withdrawal rights of holders;

- waive the unsatisfied conditions with respect to the exchange offer and the consent solicitation and accept all old notes tendered and not previously validly withdrawn; or

- terminate and withdraw the exchange offer and consent solicitation.

**Purchases of Old Notes by Us**

We reserve the right, in our absolute discretion, to purchase or make offers to purchase any old notes that remain outstanding subsequent to the expiration date and, to the extent permitted by applicable law, to purchase old notes in the open market, in privately negotiated transactions, tender offers, exchange offers, redemptions or otherwise. The terms of any such purchases or offers could differ from the terms of the exchange offer and the consent solicitation. Any purchase or offer to purchase will not be made except in accordance with applicable law.

**Certain Consequences to Holders of old notes Not Tendering in the Exchange Offer and the Consent Solicitation**

Consummation of the exchange offer and the consent solicitation may have adverse consequences to holders of old notes who elect not to tender their old notes in the exchange offer. In particular, the trading market for old notes that are not exchanged could become more limited than the existing trading market for the old notes and could cease to exist altogether due to the reduction in the amount of the old notes outstanding upon consummation of the exchange offer and the consent solicitation. A more limited trading market might adversely affect the liquidity, market price and price volatility of the old notes. In addition, if the proposed amendments become operative, holders of the Senior Notes will have the ability to control the outcome of enforcement decisions with respect to the Collateral upon the occurrence and during the continuation of an Event of Default. Furthermore, we cannot assure you that ratings on the old notes will be maintained. See "Risk Factors—Risks Related to the Exchange Offer, the Consent Solicitation and the Old Notes."

**Effect of Tender**

Any tender of old notes by a holder, and our subsequent acceptance of that tender, will constitute a binding agreement between that holder and us upon the terms and subject to the conditions of the exchange offer and the consent solicitation described in this statement. The acceptance of the exchange offer and the consent solicitation by a tendering holder of old notes will constitute the agreement by that holder to deliver to us good and marketable title to the tendered old notes, free and clear of any and all liens, restrictions, charges, pledges, security interests, encumbrances or rights of any kind of third parties.

**Representations, Warranties and Covenants of Holders of Old Notes**

Pursuant to an agent's message (as defined below under "—Book-Entry Delivery Procedures for Tendering Old Notes Held with DTC"), a holder, or the beneficial owner of old notes on behalf of which the holder has tendered, will, subject to that holder's ability to withdraw its tender, and subject to the terms and conditions of the exchange offer and the consent solicitation generally, be deemed, among other things, to:

(1)    irrevocably sell, assign and transfer to us all right, title and interest in and to, and any and all claims in respect of or arising or having arisen as a result of the holder's status as a holder of, all old notes tendered thereby, such that thereafter the holder shall have no contractual or other rights or claims in law or equity against us or any fiduciary, trustee, agent or other person connected with the old notes arising under, from or in connection with those old notes;

(2)    waive any and all rights with respect to the old notes tendered thereby, including, without limitation, any existing or past defaults and their consequences in respect of those old notes; and

(3)    release and discharge us, the subsidiary guarantors and the trustee for the old notes from any and all claims that the holder may have, now or in the future, arising out of or related to the old notes tendered thereby, including, without limitation, any claims that the holder is entitled to receive additional principal or interest payments with respect to the old notes tendered thereby, other than accrued and unpaid interest on the old notes or as otherwise expressly provided in this statement, or to participate in any redemption or defeasance of the old notes tendered thereby.

In addition, each holder of old notes will be deemed to represent, warrant and agree that:

(4)    it has received and reviewed this statement;

(5)    it is the beneficial owner of, or a duly authorized representative of one or more beneficial owners of, the old notes tendered thereby, and it has full power and authority to consent;

(6)    the old notes being tendered thereby were owned as of the date of tender, free and clear of any liens, charges, claims, encumbrances, interests and restrictions of any kind, and we will acquire good, indefeasible and unencumbered title to those old notes, free and clear of all liens, charges, claims, encumbrances, interests and restrictions of any kind, when we accept the same;

(7)    it will not sell, pledge, hypothecate or otherwise encumber or transfer any old notes tendered thereby from the date of the consent, and any purported sale, pledge, hypothecation or other encumbrance or transfer will be void and of no effect;

(8)    it is, or, in the event that it is acting on behalf of a beneficial owner of the old notes tendered thereby, it has received a written certification from that beneficial owner, dated as of a specific date on or since the close of that beneficial owner's most recent fiscal year, to the effect that that beneficial owner is not a U.S. person or acquiring for the account or benefit of one or more U.S. persons (other than as a distributor) and is acquiring Senior Notes outside the United States in accordance with Regulation S under the Securities Act;

(9)    in evaluating the exchange offer and the consent solicitation and in making its decision whether to participate in the exchange offer and the consent solicitation by tendering its old notes, it has made its own independent appraisal of the matters referred to in this statement in any related communications and it is not relying on any statement, representation or warranty, express or implied, made to it by us, the exchange agent, the trustee or the dealer manager and solicitation agent, other than those contained in this statement, as amended or supplemented through the expiration date;

(10)    the execution and delivery of the consent shall constitute an undertaking to execute any further documents and give any further assurances that may be required in connection with any of the foregoing, in each case on and subject to the terms and conditions described or referred to in this statement;

(11)  the submission of the consent to the exchange agent shall, subject to a holder's ability to withdraw its tender prior to the withdrawal date, and subject to the terms and conditions of the exchange offer and the consent solicitation, constitute the irrevocable appointment of the exchange agent as its attorney and agent and an irrevocable instruction to that attorney and agent to complete and execute all or any forms of transfer and other documents at the discretion of that attorney and agent in relation to the old notes tendered thereby in favor of us and to deliver those forms of transfer and other documents in the attorney's and agent's discretion and the certificates and other documents of title relating to the registration of old notes and to execute all other documents and to do all other acts and things as may be in the opinion of that attorney or agent necessary or expedient for the purpose of, or in connection with, the acceptance of the exchange offer and the consent solicitation, and to vest in us those old notes;

(12)  if the old notes are assets of (i) an "employee benefit plan" as defined in the U.S. Employee Retirement Income Security Act of 1974, as amended, ("ERISA") that is subject to Title I of ERISA; (ii) a "plan" as defined in Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"); (iii) a "governmental plan" as defined in Section 3(32) of ERISA or any other plan that is subject to a law substantially similar to Title I of ERISA or Section 4975 of the Code; or (iv) an entity deemed to hold plan assets of any of the foregoing, the exchange of the old notes and the acquisition, holding and disposition of the New Notes will not result in a non-exempt prohibited transaction under ERISA, Section 4975 of the Code or any substantially similar applicable law; and

(13)  the terms and conditions of the exchange offer and the consent solicitation shall be deemed to be incorporated in, and form a part of, the consent, which shall be read and construed accordingly.

Each holder of old notes that submits a consent, or agrees to the terms of a consent pursuant to an agent's message, will also be deemed to represent, warrant and agree to the terms described under "Transfer Restrictions."

The representations, warranties and agreements of a holder tendering old notes will be deemed to be repeated and reconfirmed on and as of the expiration date and the settlement date.  For purposes of this statement, the "beneficial owner" of any old notes means any holder that exercises investment discretion with respect to those old notes.

**Absence of Dissenters' Rights**

Holders of the old notes do not have any appraisal or dissenters' rights in connection with the exchange offer and the consent solicitation.

**Acceptance of Old Notes for Exchange and Delivery of New Notes**

On the settlement date, New Notes to be issued in partial or full exchange for old notes in the exchange offer and the consent solicitation, if consummated, will be delivered in book-entry form, and payment of any cash amounts will be made by deposit of funds with DTC, which will transmit those New Notes and payments to tendering holders.

We will be deemed to accept validly tendered old notes that have not been validly withdrawn as provided in this statement when, and if, we give oral or written notice of acceptance to the exchange agent.  Subject to the terms and conditions of the exchange offer and the consent solicitation, delivery of the New Notes and any cash amounts will be made at the direction of the exchange agent on the settlement date upon receipt of that notice.  If any tendered old notes are not accepted for any reason described in the terms and conditions of the exchange offer and the consent solicitation, such unaccepted old notes will be returned without expense to the tendering holders as promptly as practicable after the expiration or termination of the exchange offer and the consent solicitation.

**Procedures for Tendering**

**In order to meet the deadlines set forth in this statement, custodians and clearing systems may require you to act on a date prior to the early participation date or the expiration date, as applicable.  Additionally, they may require further information in order to process all requests to tender.  Holders are urged to contact**

**their custodians and clearing systems as soon as possible to ensure compliance with their procedures and deadlines.**

If you wish to participate in the exchange offer and the consent solicitation and your old notes are held by a custodial entity such as a bank, broker, dealer, trust company or other nominee, you must instruct that custodial entity to tender your old notes on your behalf pursuant to the procedures of that custodial entity.

To participate in the exchange offer and the consent solicitation, you must either:

- comply with the ATOP procedures for book-entry transfer described below on or before the expiration date or, in order to receive the total exchange consideration, which includes the early participation consideration, on or before the early participation date; or

- if you are a beneficial owner that holds old notes through Euroclear or Clearstream and wish to tender your old notes, you must contact Euroclear or Clearstream directly to ascertain their procedure for tendering old notes and comply with such procedure;

The procedures by which you may tender or cause to be tendered old notes will depend upon the manner in which the old notes are held, as described below.

The exchange agent and DTC have confirmed that the exchange offer and the consent solicitation is eligible for ATOP with respect to book-entry old notes held through DTC. An agent's message in lieu of a consent, and any other required documents, must be transmitted to and received by the exchange agent on or before the expiration date or, in order to receive the total exchange consideration, which includes the early participation consideration, on or prior to the early participation date, at its address listed on the back cover page of this statement. Old notes will not be deemed to have been tendered until the consent and signature guarantees, if any, or agent's message, is received by the exchange agent.

If you are a beneficial owner which holds old notes through Euroclear or Clearstream and wish to tender your old notes, you must instruct Euroclear or Clearstream, as the case may be, to block the account in respect of the tendered old notes in accordance with the procedures established by Euroclear or Clearstream. You are encouraged to contact Euroclear and Clearstream directly to ascertain their procedure for tendering old notes.

No guaranteed delivery procedures are provided in order to tender your old notes in the exchange offer and the consent solicitation. To validly tender your old notes, an agent's message must be received by the exchange agent on or before the expiration date.

**Book-Entry Delivery Procedures for Tendering Old Notes Held with DTC**

If you wish to tender old notes held on your behalf by a nominee with DTC, you must:

- inform your nominee of your interest in tendering your old notes pursuant to the exchange offer and the consent solicitation; and

- instruct your nominee to tender all old notes you wish to be tendered in the exchange offer and the consent solicitation into the exchange agent's account at DTC prior to the expiration date or, in order to receive the total exchange consideration, which includes the early participation consideration, prior to the early participation date.

Any financial institution that is a nominee in DTC, including Euroclear and Clearstream, must tender old notes that are held through DTC by effecting a book-entry transfer of old notes to be tendered in the exchange offer and the consent solicitation into the account of the exchange agent at DTC by electronically transmitting its acceptance of the exchange offer and the consent solicitation through the ATOP procedures for transfer. DTC will then verify the acceptance, execute a book-entry delivery to the exchange agent's account at DTC and send an agent's message to the exchange agent. An "agent's message" is a message, transmitted by DTC to, and received by, the exchange agent and forming part of a book-entry confirmation, which states that DTC has received an express acknowledgement from an organization that participates in DTC, which we refer to as a "participant," tendering old

41

notes that the participant has received and agrees to be bound by the terms of the consent and that we may enforce the agreement against the participant. A consent need not accompany tenders effected through ATOP.

All questions as to the validity, form, eligibility, including time of receipt, and acceptance and withdrawal of tendered old notes will be determined by us in our absolute discretion, which determination will be final and binding. We reserve the absolute right to reject any and all tendered old notes determined by us not to be in proper form or not to be tendered properly or any tendered old notes our acceptance of which would, in the opinion of our counsel, be unlawful. We also reserve the right to waive, in our absolute discretion, any defects, irregularities or conditions of tender as to particular old notes, whether or not waived in the case of other old notes. Our interpretation of the terms and conditions of the exchange offer and the consent solicitation, including the terms and instructions in the consent, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with tenders of old notes must be cured within the time we determine. Although we intend to notify holders of defects or irregularities with respect to tenders of old notes, none of us, the exchange agent, the dealer manager and solicitation agent or any other person will be under any duty to give that notification or shall incur any liability for failure to give that notification. Tenders of old notes will not be deemed to have been made until any defects or irregularities therein have been cured or waived.

Any holder whose old notes have been mutilated, lost, stolen or destroyed will be responsible for obtaining replacement securities or for arranging for indemnification with the trustee for the old notes. Holders may contact the exchange agent for assistance with these matters.

**Withdrawal of Tenders**

Tenders of old notes may be validly withdrawn at any time prior to 5:00 p.m. (New York City time) on the withdrawal date, but thereafter are irrevocable, except in certain limited circumstances where additional withdrawal rights are required by law (as determined by us).

For a withdrawal of a tender to be effective, a properly transmitted "request message" through ATOP, must be received by the exchange agent prior to the withdrawal date.

Withdrawal of tenders of old notes may not be rescinded, and any old notes validly withdrawn will thereafter be deemed not to have been validly tendered for purposes of the exchange offer and the consent solicitation. Tendering holders may not withdraw their validly tendered old notes without revoking their consents and may not revoke their consents without withdrawing any validly tendered old notes. Validly withdrawn old notes may, however, be tendered again by following one of the procedures described under "—Procedures for Tendering" on or before the expiration date or, in order to receive the total exchange consideration, which includes the early participation consideration, on or before the early participation date.

**Information Related to the Agents**

*Exchange Agent*

Prime Clerk, LLC has been appointed as the exchange agent for the exchange offer and the consent solicitation. All correspondence in connection with the exchange offer and the consent solicitation should be sent or delivered by each holder of old notes, or a beneficial owner's commercial bank, broker, dealer, trust company or other nominee, to the exchange agent at the address listed on the back cover page of this statement. We have agreed to pay the exchange agent reasonable and customary fees for its services and will reimburse it for its reasonable out-of-pocket expenses in connection with the exchange offer and the consent solicitation.

*Information Agent*

Prime Clerk, LLC has also been appointed as the information agent for the exchange offer and the consent solicitation. Questions concerning tender procedures and requests for additional copies of this statement should be directed to the information agent at the address and telephone numbers listed on the back cover page of this statement. Holders of old notes may also contact their commercial bank, broker, dealer, trust company or other nominee for assistance concerning the exchange offer and the consent solicitation. We will pay the information

agent reasonable and customary fees for its services and will reimburse it for its reasonable out-of-pocket expenses in connection with the exchange offer and the consent solicitation.

### *Dealer Manager and Solicitation Agent*

We have retained BCP Securities, LLC to act as exclusive dealer manager for the exchange offer and as solicitation agent for the consent solicitation. We will pay a fee to the dealer manager and solicitation agent for soliciting acceptances of the exchange offer and the consent solicitation. We will also reimburse the dealer manager and solicitation agent for certain of its reasonable out-of-pocket expenses. The obligations of the dealer manager and solicitation agent to perform its functions are subject to various conditions. We have agreed to indemnify the dealer manager and solicitation agent against various liabilities, including various liabilities under the federal securities laws. Questions regarding the terms of the exchange offer may be directed to the dealer manager at the address and telephone numbers listed on the back cover page of this statement.

The dealer manager and solicitation agent and its affiliates may in the future provide investment banking and other commercial services in the ordinary course of business to us and our affiliates, for which they will receive customary fees and commissions.

At any given time and in compliance with applicable laws and regulations, the dealer manager and solicitation agent or its affiliates may trade the old notes, the New Notes or our other securities for their respective accounts or for the accounts of their respective customers and, accordingly, may hold a long or short position in the old notes or the New Notes.

### Announcements

We may make any announcement required pursuant to the terms of this statement or required or permitted by the U.S. Securities Exchange Act of 1934, as amended, (the "Exchange Act") or the rules promulgated thereunder through a reasonable press release or other public announcement in our sole discretion.

### Other Fees and Expenses

We will pay brokerage houses and other custodians, nominees and fiduciaries the reasonable out-of-pocket expenses incurred by them in forwarding copies of this statement and related documents to the beneficial owners of old notes, and in handling or tendering for their customers. We will not make any payment to brokers, dealers or others soliciting acceptances of the exchange offer and the consent solicitation other than the dealer manager and solicitation agent, as described above.

Tendering holders of old notes will not be required to pay any fee or commission to the dealer manager and solicitation agent. If, however, a tendering holder handles the transaction through its broker, dealer, commercial bank, trust company or other institution, that holder may be required to pay brokerage fees or commissions.

## THE PROPOSED AMENDMENTS

The old notes were issued pursuant to the indenture, dated as of October 11, 2013, among Maxcom, the guarantors named therein, the trustee and Deutsche Bank Luxembourg, S.A., as Luxembourg sub-paying agent and transfer agent (the "old notes indenture"). The proposed amendments would delete the covenants, events of default and other provisions listed below and references thereto in their entirety from the old notes indenture, and delete the defined terms and other references related to any such deleted covenants, events of default and other provisions made irrelevant as a result of the deletion of such covenants, events of default and other provisions.

*Amendments to Restrictive Covenants in the Old Notes Indenture.* The proposed amendments would eliminate the following restrictive covenants contained in the old notes indenture by deleting each section referenced below in its entirety:

| **Section Reference** | **Description of Provision** |
|---|---|
| 4.03 | Reports |
| 4.04 | Compliance Certificate |
| 4.05 | Taxes |
| 4.06 | Stay, Extension and Usury Laws |
| 4.07 | Restricted Payments |
| 4.08 | Dividend and Other Payment Restrictions Affecting Subsidiaries |
| 4.09 | Incurrence of Indebtedness and Issuance of Preferred Stock |
| 4.10 | Asset Sales |
| 4.11 | Transactions with Affiliates |
| 4.12 | Liens |
| 4.13 | Business Activities |
| 4.14 | Corporate Existence |
| 4.15 | Offer to Repurchase Upon Change of Control |
| 4.16 | Additional Note Guarantees; Additional Security |
| 4.17 | Designation of Restricted and Unrestricted Subsidiaries |
| 4.18 | Listing |
| 4.20 | Sale and Leaseback Transactions |
| 4.21 | Limitation on the Sale or Issuance of Capital Stock of Restricted Subsidiaries |
| 4.22 | No Impairment of Security Interests |
| 4.23 | Limitation on Intercompany Indebtedness |
| 4.24 | Excess Capital Contribution Offer |
| 5.01 | Merger, Consolidation, or Sale of Assets |
| 5.02 | Successor Corporation Substituted |

*Amendments to Events of Default in the Old Notes Indenture.* The proposed amendments would eliminate all of the provisions of Section 6.01 of the old notes indenture governing events of default as they apply to the covenants referred to above.

In addition, the proposed amendments would eliminate the following events of default by deleting each clause referenced below in its entirety:

| **Section Reference** | **Description of Provision** |
|---|---|
| 6.01(e) | Failure to pay any indebtedness, or acceleration of any indebtedness in excess of US$10.0 million |
| 6.01(f) | Judgments in excess of US$10.0 million that are not paid or discharged within 60 days of being entered |

*Amendments to Legal Defeasance and Covenant Defeasance in the Old Notes Indenture.*  The proposed amendments would eliminate the following provisions of Section 8.04 contained in the old notes indenture governing legal defeasance and covenant defeasance by deleting each provision referenced below in its entirety:

| **Section Reference** | **Description of Provision** |
|---|---|
| 8.04(b) ........................ | The Company must deliver an opinion of counsel to the trustee to the effect that holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of legal defeasance and will be subject to U.S. federal income tax in the same manner had such legal defeasance not occurred |
| 8.04(c) ........................ | The Company must deliver an opinion of counsel to the trustee to the effect that holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of covenant defeasance and will be subject to U.S. federal income tax in the same manner had such covenant defeasance not occurred |
| 8.04(d) ........................ | The Company must deliver an opinion of counsel to the effect that holders will not recognize income, gain or loss for Mexican federal income tax purposes as a result of legal or covenant defeasance and will be subject to Mexican federal income tax in the same manner had such defeasance not occurred |
| 8.04(d) ........................ | No default or event of default shall have occurred and be continuing on the date of the deposit required in connection with such defeasance and the deposit will not result in a breach or violation of any other instrument of the Company or Guarantor |
| 8.04(e) ........................ | 123 days pass after the deposit is made and during the 123-day period no event of default under section 6.01(h) or (i) occurs |
| 8.04(f) ........................ | Such defeasance will not result in a breach or violation or constitute a default under any material agreement or instrument of the Company or any of its subsidiaries |
| 8.04(g) ........................ | The Company must deliver an officers' certificate stating that such deposit was not made with the intent of preferring holders of the old notes to other creditors or with the intent of defeating, hindering, delaying or defrauding any creditors of the Company |
| 8.04(h) ........................ | The Company must deliver an opinion of counsel in the United States and Mexico to the effect that on the 123rd day following the deposit, the trust funds will not be subject to the effect of any bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights, generally |
| 8.04(i) ........................ | The Company must deliver an officers' certificate and opinion of counsel stating that all conditions precedent relating to such defeasance have been complied with |

*Other Amendments.*  The proposed amendments would also make certain other changes of a technical or conforming nature to the old notes indenture and the old notes.

In addition to the foregoing, execution and delivery of the consent will constitute an express waiver by a consenting holder of the old notes with respect to all claims against us and the subsidiary guarantors of any breach, default or event of default that may have arisen under the old notes indenture.

In order to be adopted, the proposed amendments must be consented to by the holders of at least a majority of the outstanding aggregate principal amount of the old notes (not including any old notes which are owned by us or our affiliates).  The supplemental indenture reflecting the proposed amendments may be executed promptly following the date on which the requisite consents to the proposed amendments are received, which may be prior to the expiration date.  The supplemental indenture will become effective immediately upon its execution and delivery by the parties thereto; however, the proposed amendments contained therein will not become operative until the acceptance for exchange of old notes upon the terms and subject to the conditions set forth in this statement.

The proposed amendments constitute a single proposal for the consent solicitation, and a consenting holder must consent to the proposed amendments applicable to all old notes tendered by that holder as an entirety and may not consent selectively with respect to certain of the proposed amendments.  If the proposed amendments become operative, all holders who do not validly tender and not withdraw their old notes in the exchange offer and the consent solicitation will be bound by the proposed amendments even though they did not consent to the proposed amendments.  Any eligible holder who exchanges old notes for New Notes pursuant to the exchange offer and the consent solicitation must also deliver its consent to the proposed amendments with respect to the old notes tendered. Eligible holders may not deliver consents in the consent solicitation without exchanging their old notes for the New Notes in the exchange offer and the consent solicitation.

### DESCRIPTION OF THE SENIOR NOTES

You can find the definitions of certain terms used in this description under the subheading "—Certain Definitions." In this Description of the Senior Notes, the word "Company" refers only to Maxcom Telecomunicaciones, S.A.B. de C.V. (a *sociedad anónima bursátil de capital variable* incorporated under the laws of the United Mexican States or Mexico) and not to any of its subsidiaries. All references to "US$" or "dollars" are to U.S. dollars.

The Company will issue the Senior Notes under an indenture among itself, the subsidiary guarantors, U.S. Bank N.A., as trustee, transfer agent, paying agent and registrar, CIBanco, S.A., Institución de Banca Múltiple, as collateral agent, and a Luxembourg sub-paying agent and transfer agent to be named therein. If the Senior Notes are issued in the exchange offer, they will be issued in a private transaction that is not subject to the registration requirements of the Securities Act and will be subject to certain restrictions on transfer. If the Senior Notes are issued under the Plan instead of the exchange offer, they will be issued pursuant to section 1145(a) of the Bankruptcy Code, and therefore will not be deemed restricted securities. Accordingly, such Senior Notes issued under the Plan will be freely tradable by any holder not deemed an underwriter in the public market without restriction or further registration under the Securities Act, subject to applicable law. See "Transfer Restrictions."

The following description is a summary of the material provisions of the indenture. It does not restate the indenture in its entirety. We urge you to read the indenture because it, and not this description, defines your rights as holders of the Senior Notes. Copies of the indenture will be available as set forth below under "—Additional Information." Certain defined terms used in this description but not defined below under "—Certain Definitions" have the meanings assigned to them in the indenture.

The registered holder of a Senior Note will be treated as the owner of it for all purposes. Only registered holders will have rights under the indenture.

**Brief Description of the Senior Notes and the Note Guarantees**

The Senior Notes:

- will be general obligations of the Company;

- will be secured by a first-priority lien on the Collateral;

- will be *pari passu* in right of payment to all senior existing and future Indebtedness of the Company, and junior to certain obligations preferred by statute, such as tax and labor obligations;

- will be effectively junior in right of payment to any secured Indebtedness of the Company to the extent of the assets securing such Indebtedness (subject to "—Security" below);

- will be senior in right of payment to any future subordinated Indebtedness of the Company, including the Junior PIK Notes described elsewhere in this statement;

- will be unconditionally guaranteed by the subsidiary guarantors; and

- will be senior in right of payment to all of the subsidiary guarantors' existing and future subordinated indebtedness.

**Principal, Maturity and Interest**

For every US$1,000 of its old notes, the Company will issue US$550 in aggregate principal amount of Senior Notes, for a maximum of up to US$56,858,270. The Senior Notes and any additional notes subsequently issued under the indenture will be treated as a single class for all purposes under the indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase the Senior Notes. (See "—Additional Notes".)

The Company will issue Senior Notes in denominations of US$1,000 and integral multiples of US$1.00 in excess thereof. The Senior Notes will mature on the fifth anniversary of the Issue Date.

If the Senior Notes are issued through the exchange offer, interest on the Senior Notes will accrue from the Issue Date and will be payable semi-annually in arrears on June 15 and December 15, commencing on December 15, 2019. The Company will make each interest payment to the holders of record on the June 1 and December 1 immediately preceding the applicable interest payment date.

If the Senior Notes are issued through the Plan, interest on the Senior Notes will accrue from the Issue Date and will be payable semi-annually in arrears, commencing on the date that is six months following the Issue Date. The Company will make each interest payment to the holders of record on the date that is 15 calendar days immediately preceding the applicable interest payment date.

The Senior Notes will accrue interest at the rate of 8% per annum. Interest on overdue principal and interest will accrue at a rate that is 2% higher than the interest rate on the Senior Notes.

Interest on the Senior Notes will accrue from the date of original issuance or, if interest has already been paid, from the date it was most recently paid. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

If the due date for payment of any amount in respect of principal or interest on any of the Senior Notes is not a Business Day, the holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day and shall not be entitled to any further interest or other payment in respect of any such delay.

If money for the payment of principal or interest remains unclaimed for two years, the trustee and/or the paying agent will, upon written request therefore from the Company or the applicable subsidiary guarantor, pay the money back to the Company. After that, holders entitled to money must look to the Company for payment as general creditors unless the applicable law designates another person.

**Methods of Receiving Payments on the Senior Notes**

If a holder of Senior Notes has given wire transfer instructions to the Company, the Company will pay or cause to be paid all principal, interest, Additional Amounts and premium, if any, on that holder's Senior Notes in accordance with those instructions. All other payments on the Senior Notes will be made at the office or agency of the paying agent and registrar or other place of payment unless the Company elects to make interest payments by check mailed to the noteholders at their address set forth in the register of holders.

**Paying Agent and Registrar for the Senior Notes**

The trustee will initially act as paying agent and registrar for the Senior Notes. The Company may change the paying agent or registrar without prior notice to the holders of the Senior Notes, and the Company or any of its Subsidiaries may act as paying agent or registrar.

**Transfer and Exchange**

A holder may transfer or exchange Senior Notes in accordance with the provisions of the indenture. The registrar and the trustee may require a holder, among other things, to furnish appropriate endorsements and transfer documents in connection with a transfer of Senior Notes. Holders will be required to pay all taxes due on transfer or other similar governmental charges payable in connection therewith. The Company will not be required to transfer or exchange any Senior Note selected for redemption. Also, the Company will not be required to transfer or exchange any Senior Note for a period of 15 days before a selection of Senior Notes to be redeemed.

**Security**

*Collateral*

The Senior Notes will be secured by first-priority Liens (subject to Collateral Permitted Liens), pursuant to:

(1)       mortgages on certain assets and properties owned by the Company and its Restricted Subsidiaries;

(2)       an intercompany indebtedness pledge and subordination agreement, as well as any ancillary agreements required to implement such intercompany indebtedness pledge and subordination agreement in full; and

(3)       the Intercompany Subordination and Credit Agreement and Intercompany Trust Agreement (including provisions for the subordination of, and a third party beneficiary right (*estipulación a favor de tercero*) in connection with, all Intercompany Indebtedness);

(clauses (1) through (3), collectively, the "Collateral Documents") entered into from time to time by the Company and its Restricted Subsidiaries and CIBanco, S.A., Institución de Banca Múltiple, as collateral agent (the "Collateral Agent") for the benefit of the holders of the Senior Notes from time to time. The Collateral (as defined below) for the Senior Notes will be the same as the collateral for the old notes and will be shared on a *pari passu* basis with any old notes that are not tendered for exchange.

Subject to the existing Lien of any old notes not exchanged, the Company will cause to be created and perfected first-priority Liens on all its existing and future fixed assets which constitute telecommunication network comprised of switches, fiber optic and copper networks, radio and electronic equipment, computers and engineering equipment, transportation equipment and office furniture as set forth on its consolidated balance sheet under "Telephone Network Systems and Equipment", in each case owned by the Company or any Restricted Subsidiary on the Issue Date or acquired by the Company or any Restricted Subsidiary after the Issue Date and all proceeds from the sale of any of the foregoing (collectively, and together with any assets that may be pledged from time to time, the "Collateral").

The Liens created will be governed by Mexican law and remedies including foreclosure will be subject to Mexican law.  Pursuant to the provisions of each mortgage, the Company and its Restricted Subsidiaries will retain possession and use and have the right to exploit and dispose of the Collateral, including proceeds in respect thereof, subject to Liens under such mortgages, in the ordinary course of their business, in each case unless and until the Collateral Agent, upon the occurrence and during the continuance of an Event of Default, instructs otherwise or takes other enforcement action in accordance with the terms of the Collateral Documents.  Prior to an Event of Default, cash constituting Collateral by virtue of being proceeds under any mortgage (other than Net Proceeds from a Collateral Asset Sale or an Event of Loss) may be used or applied as contemplated under "— Use of the Collateral" and upon such use or application such cash shall not be deemed to be collateral.

*Secured Notes Intercreditor Agreement*

If the Senior Notes are issued in the exchange offer, the security over the Collateral and the rights of holders of the Senior Notes and the old notes will be subject to the provisions of a secured notes intercreditor agreement, to be dated as of the Issue Date, among us, the trustee, acting on behalf and for the benefit of the holders of the old notes and the Senior Notes, the Collateral Agent and other agents from time to time party thereto (the "Secured Notes Intercreditor Agreement").

The Secured Notes Intercreditor Agreement will require certain procedures, including certain notices and an intercreditor vote, to be followed to direct the Collateral Agent to commence any enforcement action with respect to the Collateral.

If the Senior Notes are issued under the Plan, there will be no need for such Secured Notes Intercreditor Agreement.

*Use of the Collateral*

Subject to the terms and conditions of the indenture and the Collateral Documents, the Company will be entitled, unless an Event of Default has occurred and is continuing and the Collateral Agent has given contrary instructions in accordance with the terms of the Collateral Documents, to generally remain in possession of and to retain exclusive control over the Collateral (other than any amounts that are the proceeds of a Collateral Asset Sale or an Event of Loss relating to the Collateral), to freely operate the Collateral, to replace the Collateral and to sell or otherwise dispose of Collateral (including, with respect to cash constituting Collateral by virtue of being proceeds under any mortgage), and to collect, invest and dispose of any income in respect of any Collateral, in each case in the ordinary course of the Company's business.  See "Enforcement and Disposition of Collateral" below.

*Termination and Reinstatement of the Collateral*

Upon the full and final payment and performance by the Company and the subsidiary guarantors of the Obligations under the Senior Notes, the indenture and the Collateral Documents will terminate and the Liens on all of the Collateral will be released.  The Collateral Agent will release the Liens in favor of the Collateral Agent in any Collateral to be sold pursuant to a Collateral Asset Sale or, in the case of certain obsolete or other assets, to be disposed of in a transaction not considered a Collateral Asset Sale pursuant to clause (i) of the exclusion to the definition thereof; *provided* that such transaction shall be subject to the provisions under the sub-heading "—Repurchase at the Option of Holders—Asset Sales and Events of Loss".  The Company may use the Net Proceeds of a Collateral Asset Sale to purchase Replacement Collateral to be made part of the Collateral or make an offer to repurchase Senior Notes.

*Enforcement and Disposition of Collateral*

The indenture and the Collateral Documents provide that, upon the occurrence and during the continuation of an Event of Default:

- the Collateral Agent shall be entitled to cancel any lease agreement entered into by each Restricted Subsidiary owning real property subject to a mortgage; and

- the Collateral Agent may, without notice, enter upon all or any portion of the Company's and its Restricted Subsidiaries' premises that comprises the Collateral to inspect the Collateral and may exercise other rights with respect to the Collateral under applicable law.

For so long as an Event of Default has occurred and is continuing, and subject to certain limitations, the Collateral Agent may be directed in writing by the noteholders of the Senior Notes, through the trustee for the Senior Notes, to take (or to refrain from taking) such action or exercise such power only upon the written instruction of the noteholders of at least 25% in aggregate principal amount of the Senior Notes then outstanding and if such holders have offered to the Collateral Agent indemnity or security satisfactory to it against any loss, liability or expense, and provided always that if the Collateral Agent receives conflicting instructions, those supported by noteholders representing a greater aggregate principal amount will prevail.

The cash proceeds of sales of, or collections on, any Collateral received upon the exercise of remedies, including pursuant to a bankruptcy proceeding, will be applied pursuant to the Collateral Documents in the following order of priority:

- *first*, to the payment of all unpaid fees, expenses, reimbursements, indemnifications and advancements of the Collateral Agent and its agents and counsel under the Collateral Documents, to the unpaid fees, expenses, reimbursements and indemnifications of the Collateral Agent, and to the payment of all unpaid fees, expenses, reimbursements, indemnifications and advancements of the trustee and its agents and counsel, to the extent relating to their activities in connection with the Collateral Documents;

- *second*, to the payment of principal under the Senior Notes, excluding any premium, interest, penalty or other amounts in respect thereof, on a pro rata basis and subject to the limitations provided below;

- *third*, to the payment of accrued and unpaid interest under the Senior Notes;

- *fourth*, to the payment of any other obligations under the Senior Notes; and

- *fifth*, to the Company and its Restricted Subsidiaries or to whomever else may lawfully be entitled to receive such proceeds or as a court of competent jurisdiction may direct.

No appraisal of any of the Collateral has been prepared by or on behalf of the Company in connection with the issuance and sale of the Senior Notes or otherwise. There can be no assurance that the proceeds from the sale of the Collateral in whole or in part pursuant to the Collateral Documents would be sufficient to satisfy payments due in respect of the Senior Notes. By its nature, some or all of the Collateral will be illiquid and may have no readily ascertainable market value. The exercise of remedies may be restricted or limited with respect to some or all of the Collateral. In addition, certain of the Collateral may be subject to additional legal or other restrictions that may inhibit or significantly delay its disposition. Accordingly, there can be no assurance that the Collateral can be disposed of in a short period of time, or at all.

### Release of Liens in Respect of Senior Notes

The Collateral Agent's priority Liens upon the Collateral will no longer secure the Senior Notes outstanding under the indenture, the note guarantees or any other Obligations under the indenture, and the right of the Holders of the Senior Notes and such Obligations to the benefits and proceeds of the Collateral Agent's priority Liens on the Collateral will terminate and be discharged, in which case the Collateral Agent shall execute and allow the Company to file all required documents provided to it, at the Company's sole cost and expense, to effectuate the release of the Collateral Agent's Liens upon the Collateral, upon the receipt by the Collateral Agent from the trustee of written notice as to any of the following:

(1)     satisfaction and discharge in accordance with the indenture;

(2)     a Legal Defeasance or Covenant Defeasance of the Senior Notes in accordance with the indenture;

(3)     payment in full and discharge of all Senior Notes outstanding under the indenture and all Obligations that are outstanding, due and payable under the indenture at the time the Senior Notes are paid in full and discharged (other than any obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at such time); or

(4)     such termination or discharge, in whole or in part, with the consent of the holders of the requisite percentage of Senior Notes in accordance with the indenture.

### Note Guarantees

The Senior Notes will be guaranteed by each of the Company's current and future Subsidiaries, other than Unrestricted Subsidiaries. These note guarantees will be unconditional joint and several obligations of the subsidiary guarantors. See "Risk Factors—Risks Related to the New Notes and Our Indebtedness—The guarantees of our subsidiaries under the Senior Notes may not be enforceable."

A subsidiary guarantor may not sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge with or into (whether or not such subsidiary guarantor is the surviving Person) another Person, other than the Company or another subsidiary guarantor, unless:

(1)     immediately after giving effect to that transaction, no Default or Event of Default exists; and

(2)     either:

(a)     the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger assumes all the obligations of that subsidiary guarantor under the indenture and its note guarantee pursuant to a supplemental indenture and appropriate documents satisfactory to the trustee; or

(b)     the Net Proceeds of such sale or other disposition are applied in accordance with the applicable provisions of the indenture.

The Senior Note guarantee of a subsidiary guarantor will be released:

(1)     in connection with any sale or other disposition of all or substantially all of the assets of that subsidiary guarantor (including by way of merger or consolidation) to a Person that is not (either before or after giving effect to such transaction) the Company or a Restricted Subsidiary of the Company otherwise permitted by the indenture;

(2)     in connection with any sale or other disposition of all of the Capital Stock of that subsidiary guarantor owned by the Company and its subsidiaries to a Person that is not (either before or after giving effect to such transaction) the Company or a Restricted Subsidiary of the Company otherwise permitted by the indenture;

(3)     if the Company designates any Restricted Subsidiary that is a subsidiary guarantor to be an Unrestricted Subsidiary in accordance with the applicable provisions of the indenture; or

(4)     upon legal defeasance or satisfaction and discharge of the indenture as provided below under the captions "—Legal Defeasance and Covenant Defeasance" and "—Satisfaction and Discharge."

See "—Repurchase at the Option of Holders—Asset Sales and Events of Loss."

**Additional Notes**

Subject to the covenants described below, the Company may issue Senior Notes under the indenture having the same terms in all respects as the Senior Notes except that interest will accrue on the additional notes from their date of issuance. The Senior Notes offered hereby and any additional notes would be treated as a single class for all purposes under the indenture and will vote together as one class on all matters with respect to the Senior Notes.

However, if additional notes that are treated as part of a single class under the indenture with the Senior Notes offered hereby are not fungible with the Senior Notes offered hereby for U.S. federal income tax purposes such additional notes will be assigned a CUSIP, ISIN and common code different from those assigned to the Senior Notes offered hereby.

**Optional Redemption**

At any time and from time to time, the Company may redeem all or a part of the Senior Notes upon not less than 30 nor more than 60 days' notice, at a redemption price equal to 100% of the principal amount of Senior Notes redeemed plus accrued and unpaid interest and additional interest and Additional Amounts, if any, to the date of redemption (the "Redemption Date"), subject to the rights of holders of Senior Notes on the relevant record date to receive interest due on the relevant interest payment date.

Unless the Company defaults in the payment of the redemption price, interest will cease to accrue on the Senior Notes or portions thereof called for redemption on the applicable redemption date.

**Mandatory Redemption**

The Company is not required to make mandatory redemption or sinking fund payments with respect to the Senior Notes.

The Company may at any time and from time to time purchase Senior Notes in the open market or otherwise.

**Repurchase at the Option of Holders**

*Change of Control*

If a Change of Control occurs, each holder of Senior Notes will have the right to require the Company to repurchase all or any part (in denominations of US$1,000 and integral multiples of US$1.00 in excess thereof) of that holder's Senior Notes pursuant to a Change of Control Offer on the terms set forth in the indenture. In the Change of Control Offer, the Company will offer a Change of Control Payment in cash equal to 101% of the aggregate principal amount of Senior Notes repurchased plus accrued and unpaid interest and Additional Amounts, if any, on the Senior Notes repurchased to the date of purchase, subject to the rights of holders of Senior Notes on the relevant record date to receive interest due on the relevant interest payment date. Within ten days following the date on which a Change of Control occurs, the Company will mail, by first-class mail, a notice to each holder, with a copy to the trustee, describing the transaction or transactions that constitute the Change of Control and offering to repurchase Senior Notes on the Change of Control Payment Date specified in the notice, which date will be no earlier than 30 days and no later than 60 days from the date such notice is mailed, pursuant to the procedures required by the indenture and described in such notice. The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Senior Notes as a result of a Change of Control. To the extent that the provisions of any securities laws or regulations conflict with the Change of Control provisions of the indenture, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Change of Control provisions of the indenture by virtue of such compliance.

On the Change of Control Payment Date, the Company will, to the extent lawful:

(1)     accept for payment all Senior Notes or portions of Senior Notes properly tendered pursuant to the Change of Control Offer;

(2)     deposit with the paying agent an amount equal to the Change of Control Payment in respect of all Senior Notes or portions of Senior Notes properly tendered; and

(3)     deliver or cause to be delivered to the trustee the Senior Notes properly accepted together with an officers' certificate stating the aggregate principal amount of Senior Notes or portions of Senior Notes being purchased by the Company.

The paying agent will promptly mail to each holder of Senior Notes properly tendered the Change of Control Payment for such Senior Notes, and the trustee will promptly authenticate and mail (or cause to be transferred by book entry) to each holder a Senior Note equal in principal amount to any unpurchased portion of the Senior Notes surrendered, if any. The Company will publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

The provisions described above that require the Company to make a Change of Control Offer following a Change of Control will be applicable whether or not any other provisions of the indenture are applicable. Except as described above with respect to a Change of Control, the indenture does not contain provisions that permit the holders of the Senior Notes to require that the Company repurchase or redeem the Senior Notes in the event of a takeover, recapitalization or similar transaction.

The Company will not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the indenture applicable to a Change of Control Offer made by the Company and purchases all Senior Notes properly tendered and not withdrawn under the Change of Control Offer or if a notice of redemption is given pursuant to the provisions under the caption "—Optional Redemption" and the redemption described therein is effected in accordance therewith.

If a Change of Control Offer is required to be made, there can be no assurance that the Company will have available funds sufficient to pay the Change of Control purchase price for all the Senior Notes that might be delivered by holders seeking to accept the Change of Control Offer. In the event the Company is required to purchase outstanding Senior Notes pursuant to a Change of Control Offer, the Company expects that it would seek third party financing to the extent it does not have available funds to meet its purchase obligations. However, there can be no assurance that the Company would be able to obtain such financing.

Neither the Board of Directors of the Company nor the trustee may waive the covenant relating to a holder's right to require the purchase of Senior Notes upon a Change of Control. Restrictions in the indenture described herein on the ability of the Company and the Subsidiaries to incur additional Indebtedness, to grant liens on their property, to make Restricted Payments and to make Asset Sales may also make more difficult or discourage a takeover of the Company, whether favored or opposed by the management of the Company. Consummation of any such transaction in certain circumstances may require the purchase of the Senior Notes, and there can be no assurance that the Company or the acquiring party will have sufficient financial resources to effect such purchase. Such restrictions may, in certain circumstances, make more difficult or discourage any leveraged buyout of the Company or any of its Subsidiaries by the management of the Company. While such restrictions cover a wide variety of arrangements which have traditionally been used to effect highly leveraged transactions, the indenture may not afford the holders protection in all circumstances from the adverse aspects of a highly leveraged transaction, reorganization, restructuring, merger or similar transaction.

The definition of Change of Control includes a phrase relating to the direct or indirect sale, lease, transfer, conveyance or other disposition of "all or substantially all" of the properties or assets of the Company and its Subsidiaries taken as a whole. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, the ability of a holder of Senior Notes to require the Company to repurchase its Senior Notes as a result of a sale, lease, transfer, conveyance or other disposition of less than all of the assets of the Company and its Subsidiaries taken as a whole to another Person or group may be uncertain.

### Asset Sales and Events of Loss

*Non-Collateral Asset Sales.* The Company will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1)      The Company (or the Restricted Subsidiary, as the case may be) receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests issued or sold or otherwise disposed of as determined in good faith by the Company's Board of Directors (including as to the value of all non-cash considerations); and

(2)      at least 75% of the consideration received in the Asset Sale by the Company or such Restricted Subsidiary is in the form of cash and is received at the time of such dispositions. For purposes of this provision, each of the following will be deemed to be cash:

     (a)      Cash Equivalents;

     (b)      any liabilities, as shown on the Company's most recent consolidated balance sheet, of the Company or any Restricted Subsidiary (other than contingent liabilities and liabilities that are by their terms subordinated to the Senior Notes or any note guarantee) that are assumed by the transferee of any such assets pursuant to a customary assumption agreement in which the transferee releases the Company or such Restricted Subsidiary from further liability; and

     (c)      any securities, notes or other obligations received by the Company or any such Restricted Subsidiary from such transferee that are converted by the Company or such Restricted Subsidiary into cash within 30 days following the closing of such Asset Sale, to the extent of the cash received in that conversion; and

(d)     any Designated Non-cash Consideration received by the Company or such Restricted Subsidiary in such Asset Sale having an aggregate fair market value, taken together with all other Designated Non-cash Consideration previously received pursuant to this clause (d), not to exceed 1% of Total Assets at the time of the receipt of such.  Designated Non-cash Consideration, with the fair market value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value.

Within 365 days after the receipt of any Net Proceeds from an Asset Sale, the Company (or the applicable Restricted Subsidiary, as the case may be) may apply such Net Proceeds:

(1)     to permanently repay any Indebtedness, other than subordinated Indebtedness or any Indebtedness of a Subsidiary that is not a subsidiary guarantor and, if the Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto;

(2)     to acquire all or substantially all of the assets of, or any Capital Stock of, another Permitted Business, if, after giving effect to any such acquisition of Capital Stock, the Permitted Business is or becomes a Restricted Subsidiary of the Company; or

(3)     to purchase long-term property or assets or make a capital expenditure used or useful in a Permitted Business.

Pending the final application of any Net Proceeds, the Company may temporarily reduce revolving credit borrowings or otherwise invest the Net Proceeds in any manner that is not prohibited by the indenture.

*Collateral Asset Sales.*  The Company will not, and will not permit any of its Restricted Subsidiaries to, consummate a Collateral Asset Sale, unless:

(a)     the Company or the applicable Restricted Subsidiary, as the case may be, receives consideration at the time of the Collateral Asset Sale at least equal to the Fair Market Value of such Collateral;

(b)     with respect to each such Collateral Asset Sale, the Company delivers an officers' certificate to the trustee dated no more than 15 days prior to the date of consummation of the relevant Collateral Asset Sale, certifying that such sale complies with clause (a) above;

(c)     at least 75% of the consideration received for the Collateral sold by the Company or its Restricted Subsidiaries, as the case may be, shall be in the form of cash or Cash Equivalents received at the time of such Collateral Asset Sale; *provided* that any other consideration received for such Collateral shall constitute Collateral pursuant to appropriate Collateral Documents to which the owner thereof is a party; and

(d)     the Net Proceeds therefrom shall be paid directly by the purchaser thereof to the Collateral Agent, as additional Collateral.

In the case of any Collateral Asset Sale, the Company, within 360 days from the date of consummation of a Collateral Asset Sale, may apply all of the Net Proceeds therefrom to purchase or otherwise invest in Replacement Collateral.  Any such Net Proceeds not so applied will be applied to make an Asset Sale Offer in accordance with the terms described below under "—Asset Sale Offer".  In the case of a Collateral Asset Sale that represents all or substantially all of the Collateral, all of the Net Proceeds therefrom will be immediately applied to make an Asset Sale Offer in accordance with the terms described below under "—Asset Sale Offer".

*Events of Loss.*  If the Company or a Restricted Subsidiary suffers an Event of Loss, the Net Proceeds therefrom will be paid directly by the party providing such Net Proceeds to the Collateral Agent, pursuant to the applicable

Collateral Document, as additional Collateral.  As any portion or all of the Net Proceeds from any such Event of Loss are received by the Collateral Agent, the Company may apply all of such amount or amounts, as received, together with all interest earned thereon, individually or in combination, (1) to purchase or otherwise invest in Replacement Collateral and (2) to restore the relevant Collateral.  In the event that the Company elects to restore the relevant Collateral pursuant to the foregoing clause (2), within 180 days of receipt of such Net Proceeds from an Event of Loss, the Company will:

(1)     give the trustee irrevocable written notice of such election, and

(2)     enter into a binding commitment to restore such Collateral, a copy of which will be supplied to the trustee, and will have 360 days from the date of such binding commitment to complete such restoration, which will be carried out with due diligence.  The Company will take such action, at its sole expense, as may be required to ensure that the Collateral Agent has, from the date of such purchase or investment, a first ranking Lien on such Replacement Collateral.

Any such Net Proceeds that the Company does not elect to apply within such 180 day period or does not actually apply within such 360 day period will be applied to make an Asset Sale Offer in accordance with the terms described below under "—Asset Sale Offer".

*Replacement Collateral*.  Under the terms of the indenture, in the event that the Company decides pursuant to the foregoing provisions to apply any portion of the Net Proceeds from a Collateral Asset Sale or an Event of Loss to purchase or otherwise invest in Replacement Collateral:

(1)     the Company will deliver an officers' certificate to the Collateral Agent and the trustee dated no more than 30 days prior to the date of consummation of the relevant investment in Replacement Collateral, certifying that the purchase price for the amount of the investment in Replacement Collateral does not exceed the Fair Market Value of such Replacement Collateral;

(2)     the Company will deliver an officers' certificate to the Collateral Agent and the trustee certifying compliance with the provisions of the indenture and requesting the release of such certified purchase price to the Company (or the applicable Restricted Subsidiary), free of the Lien of the Collateral Documents; and

(3)     the Company will take such actions, at its sole expense, as may be required to permit the Collateral Agent, pursuant to the applicable Collateral Document, to release such Net Proceeds, together with any interest thereon, from the Lien of the applicable Collateral Document and to ensure that the Collateral Agent has, from the date of such purchase or investment, a first-priority Lien on such Replacement Collateral pursuant to appropriate Collateral Documents.

Notwithstanding anything to the contrary in the foregoing, pending application of such consideration to acquire Replacement Collateral or restore the relevant Collateral in an Event of Loss, any consideration received in connection with a Collateral Asset Sale, an Event of Loss or an investment in Replacement Collateral shall be paid directly by the purchaser thereof to the Collateral Agent or otherwise constitute Collateral subject to a first-priority lien in form and substance satisfactory to the Collateral Agent.

*Asset Sale Offer*.  Any Net Proceeds from Asset Sales that are not applied or invested as provided in the second paragraph of this covenant will constitute "Excess Proceeds."  When the aggregate amount of Excess Proceeds exceeds US$5.0 million, within five days thereof, the Company will be required to make an Asset Sale Offer to all holders of Senior Notes and all holders of other Indebtedness that is *pari passu* with the Senior Notes containing provisions similar to those set forth in the indenture with respect to offers to purchase or redeem with the proceeds of sales of assets to purchase the maximum principal amount of Senior Notes and such other *pari passu* Indebtedness that may be purchased out of the Excess Proceeds at the offer price specified in the next sentence.  The offer price in any Asset Sale Offer will be equal to 100% of the principal amount plus accrued and unpaid interest to

the date of purchase, and will be payable in cash.  If any Excess Proceeds remain after consummation of an Asset Sale Offer, the Company may use those Excess Proceeds for any purpose not otherwise prohibited by the indenture.

If the aggregate principal amount of Senior Notes and other *pari passu* Indebtedness tendered into such Asset Sale Offer exceeds the amount of Excess Proceeds, the trustee will select the Senior Notes and such other *pari passu* Indebtedness to be purchased on a pro rata basis in accordance with applicable depositary procedures.  Upon completion of each Asset Sale Offer, the amount of Excess Proceeds will be reset at zero.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with each repurchase of Senior Notes pursuant to an Asset Sale Offer.  To the extent that the provisions of any securities laws or regulations conflict with the Asset Sale provisions of the indenture, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Asset Sale provisions of the indenture by virtue of such compliance.

The agreements governing the Company's other Indebtedness contain, and future agreements may contain, prohibitions of certain events, including events that would constitute a Change of Control or an Asset Sale.  The exercise by the holders of Senior Notes of their right to require the Company to repurchase the Senior Notes upon a Change of Control or an Asset Sale could cause a default under these other agreements, even if the Change of Control or Asset Sale itself does not, due to, for example, the financial effect of such repurchases on the Company.  In the event a Change of Control or Asset Sale occurs at a time when the Company is prohibited under other agreements from purchasing Senior Notes, the Company could seek the consent of its senior lenders under such other agreements to the purchase of Senior Notes or could attempt to refinance the borrowings that contain such prohibition.  If the Company does not obtain consent or repay those borrowings, the Company will remain prohibited from purchasing Senior Notes.  In that case, the Company's failure to purchase tendered Senior Notes would constitute an Event of Default under the indenture.  Finally, the Company's ability to pay cash to the holders of Senior Notes upon a repurchase may be limited by the Company's then existing financial resources. See "Risk Factors—Risks Related to the New Notes and Our Indebtedness—We may not be able to raise the funds necessary to repurchase the Senior Notes in the event of a change of control."

**Selection and Notice**

If less than all of the Senior Notes are to be redeemed, selection of the Senior Notes for redemption will be made by the trustee in compliance with the requirements of the principal securities exchange, if any, on which the Senior Notes are listed, or if the Senior Notes are not listed on a securities exchange, by lot or by such other method as the trustee in its sole discretion shall deem to be fair and appropriate and in accordance with DTC procedures.  We will redeem Senior Notes of US$150,000 or less in whole and not in part.

Notices of redemption will be mailed by first class mail at least 30 but not more than 60 days before the Redemption Date to each holder of Senior Notes to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a Redemption Date if the notice is issued in connection with a defeasance of the Senior Notes or a satisfaction and discharge of the indenture.  Notices of redemption may not be conditional.

If any Senior Note is to be redeemed in part only, the notice of redemption that relates to that Senior Note will state the portion of the principal amount of that Senior Note that is to be redeemed.  A Senior Note in principal amount equal to the unredeemed portion of the original Senior Note will be issued in the name of the holder of Senior Notes upon cancellation of the original Senior Note.  Senior Notes called for redemption become due on the date fixed for redemption.  On and after the Redemption Date, interest ceases to accrue on Senior Notes or portions of Senior Notes called for redemption.

**Certain Covenants**

*Restricted Payments*

The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly:

(1)    declare or pay any dividend or make any other payment or distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Company's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Company and other than dividends or distributions payable to the Company or a Restricted Subsidiary of the Company);

(2)    purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Company) any Equity Interests (a) of the Company or any direct or indirect parent of the Company or (b) of any Restricted Subsidiary held by an Affiliate of the Company (other than a Restricted Subsidiary), including the exercise of any option to exchange any Equity Interests (other than into Equity Interests of the Company that are not Disqualified Stock);

(3)    make any payment on or with respect to, or purchase, redeem, defease, prepay, decrease or otherwise acquire or retire for value any Indebtedness of the Company or any Restricted Subsidiary that is subordinated in right of payment to the Senior Notes or the applicable Guarantee, except a payment of interest or principal at the Stated Maturity thereof; or

(4)    make any Restricted Investment,

(all such payments and other actions set forth in these clauses (1) through (4) above being collectively referred to as "Restricted Payments"), unless, at the time of and after giving effect to such Restricted Payment:

(1)    no Default or Event of Default has occurred and is continuing or would occur as a consequence of such Restricted Payment;

(2)    the Company would, at the time of such Restricted Payment and after giving pro forma effect thereto as if such Restricted Payment had been made at the beginning of the applicable two- quarter period, have been permitted to incur at least US$1.00 of additional Indebtedness pursuant to the Leverage Ratio test set forth in the first paragraph of the covenant described below under the caption "—Incurrence of Indebtedness and Issuance of Preferred Stock;" and

(3)    such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries since the date of the indenture (excluding Restricted Payments permitted by clauses (2), (3) and (6) of the next succeeding paragraph), is less than the sum, without duplication, of:

(a)    50% of the Consolidated Net Income of the Company for the period (taken as one accounting period) from the beginning of the first fiscal quarter immediately preceding the date of the indenture to the end of the Company's most recently ended fiscal quarter for which financial statements are publicly available at the time of such Restricted Payment (or, if such Consolidated Net Income for such period is a deficit, minus 100% of the amount of such deficit) accrued on a cumulative basis; plus

(b)       100% of the aggregate net cash proceeds received by the Company since the date of the indenture as a contribution to its common equity capital or from the issue or sale of Equity Interests of the Company (other than Disqualified Stock) or from the issue or sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities of the Company that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or debt securities) sold or issued to a Subsidiary of the Company or Equity Interests of the Company sold or issued pursuant to irrevocable commitments made prior to the date of the indenture); plus

(c)       to the extent that one or more Restricted Investments that were made after the date of the indenture is pursuant to this first paragraph are sold or otherwise liquidated or repaid for cash or otherwise results in a return on such Investments in cash, through dividends, interest, distributions or otherwise, the lesser of (i) the cash return of capital with respect to all such Restricted Investments (less the cost of disposition, if any) and (ii) the initial amount of all such Restricted Investments, in each case taken as a whole; plus

(d)       to the extent that any Unrestricted Subsidiary of the Company designated as such after the date of the indenture is redesignated as a Restricted Subsidiary after the date of the indenture, the lesser of (i) the Fair Market Value of the Company's Investment in such Subsidiary as of the date of such redesignation or (ii) such Fair Market Value as of the date on which such Subsidiary was originally designated as an Unrestricted Subsidiary after the date of the indenture, *provided*, *however*, that the foregoing sum shall not exceed, in the case of any such Unrestricted Subsidiary, the amount of Restricted Investments previously made (and treated as a Restricted Payment under this clause (3)) by the Company or any Restricted Subsidiary in such Person.

The preceding provisions will not prohibit:

(1)       the payment of any dividend or the consummation of any irrevocable redemption within 60 days after the date of declaration of the dividend or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend or redemption payment would have complied with the provisions of the indenture;

(2)       so long as no Default has occurred and is continuing or would be caused thereby, the making of any Restricted Payment in exchange for, or out of the net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of, Equity Interests of the Company (other than Disqualified Stock) or from the substantially concurrent contribution of common equity capital to the Company; *provided* that the amount of any such net cash proceeds that are utilized for any such Restricted Payment will be excluded from clause (3)(b) of the preceding paragraph;

(3)       so long as no Default has occurred and is continuing or would be caused thereby, the repurchase, redemption, defeasance or other acquisition or retirement for value of Indebtedness of the Company or any subsidiary guarantor with the net cash proceeds from a substantially concurrent incurrence of Permitted Refinancing Indebtedness;

(4)       (i) to the extent required by law, or by the by-laws of any Restricted Subsidiary in effect on the date of the indenture, or (ii) so long as no Default has occurred and is continuing or would be caused thereby and, in the case of this clause (ii), *provided* that no intercompany notes are outstanding pursuant to clause (1) of the definition of "Permitted Investments," the payment of any dividend (or, in the case of any partnership or limited liability company, any similar distribution) by a Restricted Subsidiary of the Company to the holders of its Equity Interests on a pro rata basis;

(5)     so long as no Default has occurred and is continuing or would be caused thereby, the declaration and payment of regularly scheduled or accrued dividends to holders of any class or series of Disqualified Stock of the Company or any Restricted Subsidiary of the Company issued on or after the date of the indenture in accordance with the Leverage Ratio test described below under the caption "—Incurrence of Indebtedness and Issuance of Preferred Stock";

(6)     so long as no Default has occurred and is continuing or would be caused thereby, the declaration and payment of regularly scheduled or accrued payment-in-kind dividends or distributions to holders of the Junior PIK Notes issued on or after the date of the indenture, and the payment when due of the principal amount of such Junior PIK Notes, including upon redemption in the circumstances set forth under "Description of the Junior PIK Notes— Mandatory Redemption";

(7)     the repurchase of Capital Stock deemed to occur upon the exercise of options or warrants if such Capital Stock represents all or a portion of the exercise price thereof or payments in lieu of the issuance of fractional shares of Capital Stock; and

(8)     other Restricted Payments in an amount not to exceed US$12.5 million since the date of the indenture.

The amount of all Restricted Payments (other than cash and Indebtedness) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Company or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment. The Fair Market Value of any assets or securities that are required to be valued by this covenant will be determined by the Board of Directors of the Company whose resolution with respect thereto will be delivered to the trustee. The Board of Directors' determination must be based upon an opinion or appraisal issued by an accounting, appraisal or investment banking firm of international standing if the Fair Market Value exceeds US$6.0 million.

### Incurrence of Indebtedness and Issuance of Preferred Stock

The Company will not and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "incur") any Indebtedness (including Acquired Debt), and the Company will not issue any Disqualified Stock and will not permit any of its Restricted Subsidiaries to issue any shares of preferred stock; *provided*, *however*, that the Company may incur Indebtedness (including Acquired Debt) or issue Disqualified Stock, and the subsidiary guarantors may incur Indebtedness (including Acquired Debt) or issue preferred stock, if the Leverage Ratio, as of the Calculation Date, would have been no greater than 3.50 to 1, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been incurred or the Disqualified Stock or the preferred stock had been issued, as the case may be, as of the Calculation Date.

The first paragraph of this covenant will not prohibit, so long as no Default or Event of Default has occurred and is continuing, the incurrence of any of the following items of Indebtedness (collectively, "Permitted Debt"):

(1)     the incurrence by the Company and its Restricted Subsidiaries of the Existing Indebtedness;

(2)     the incurrence by (x) the Company and the subsidiary guarantors of Indebtedness represented by the Senior Notes (other than additional notes) and the related note guarantees, and (y) the Company of Indebtedness represented by the Junior PIK Notes, in each case to be issued on the date of the indenture;

(3)     the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness represented by Capital Lease Obligations, financings or purchase money obligations, in each case, incurred for the purpose of financing all or any part of the purchase price (whether in an asset acquisition or acquisition of Equity Interests) or cost of design, construction,

installation or improvement of property, plant or equipment used in the Permitted Business of the Company or any of its Restricted Subsidiaries, in an aggregate principal amount, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (3), not to exceed US$15.0 million at any time outstanding;

(4)     the incurrence by the Company or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge any Indebtedness (other than Intercompany Indebtedness) that was permitted by the indenture to be incurred under the first paragraph of this covenant or clauses (1), (2), or (3) of this paragraph;

(5)     the incurrence by the Company or any of its Wholly-Owned Restricted Subsidiaries of Intercompany Indebtedness between or among the Company and any of its Wholly-Owned Restricted Subsidiaries; *provided*, *however*, that:

    (a)     if the Company or any subsidiary guarantor is the obligor on such Indebtedness, such Indebtedness must be expressly subordinated to the prior payment in full in cash of all obligations with respect to the Senior Notes, in the case of the Company, or the note guarantee, in the case of a subsidiary guarantor;

    (b)     (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Company or a Wholly-Owned Restricted Subsidiary of the Company and (ii) any sale or other transfer of any such Indebtedness to a Person that is not either the Company or a Wholly-Owned Restricted Subsidiary of the Company, will be deemed, in each case, to constitute an incurrence of such Indebtedness by the Company or such Restricted Subsidiary, as the case may be, that was not permitted by this clause (5); and

    (c)     such Indebtedness is otherwise incurred in accordance with the terms of the covenant described under the caption "—Limitation on Intercompany Indebtedness";

(6)     the issuance by any of the Company's Wholly-Owned Restricted Subsidiaries to the Company or to any of its Wholly-Owned Restricted Subsidiaries that is a subsidiary guarantor of shares of preferred stock; *provided*, *however*, that:

    (a)     any subsequent issuance or transfer of Equity Interests that results in any such preferred stock being held by a Person other than the Company or a Wholly-Owned Restricted Subsidiary of the Company that is a subsidiary guarantor, and

    (b)     any sale or other transfer of any such preferred stock to a Person that is not either the Company or a Wholly-Owned Restricted Subsidiary of the Company that is a subsidiary guarantor,

will be deemed, in each case, to constitute an issuance of such preferred stock by such Restricted Subsidiary that was not permitted by this clause (6);

(7)     the incurrence by the Company or any of its Restricted Subsidiaries of Hedging Obligations for the purpose of managing the Company's (or any Restricted Subsidiary's) exposure to fluctuations in interest rates with respect to Indebtedness permitted to be Incurred by the Company pursuant to the indenture or protecting the Company (or its Restricted Subsidiaries) against currency fluctuations in the ordinary course of business and not for speculative purposes;

(8)     the guarantee by the Company or any of the subsidiary guarantors of Indebtedness of the Company or a Restricted Subsidiary of the Company that was permitted to be incurred by another provision of this covenant; *provided* that if the Indebtedness being guaranteed is subordinated to or *pari passu* with the Senior Notes, then the Guarantee shall be subordinated or *pari passu*, as applicable, to the same extent as the Indebtedness guaranteed;

(9)     the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business in respect of workers' compensation claims or self-insurance, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

(10)    the incurrence by the Company or any Restricted Subsidiary of Indebtedness consisting of performance and other similar bonds and reimbursement obligations Incurred by the Company or any Restricted Subsidiary securing the performance of contractual, franchise, concession or license obligations of the Company or a Restricted Subsidiary;

(11)    Attributable Debt with Respect to a Sale and Leaseback Transaction to the extent such Sale and Leaseback Transaction complies with the provisions under "—Sale and Leaseback Transactions";

(12)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business *provided*, *however*, that such Indebtedness is extinguished within five Business Days of incurrence;

(13)    Indebtedness of the Company, to the extent the net proceeds thereof in their entirety are (i) used solely to purchase Senior Notes tendered in a Change of Control Offer or (ii) concurrently deposited to defease the Senior Notes as described under "—Satisfaction and Discharge";

(14)    Indebtedness consisting of (i) the financing of insurance premiums or (ii) take or pay obligations in supply agreements, in each case in the ordinary course of business; and

(15)    the incurrence by the Company or any of its Restricted Subsidiaries of additional Indebtedness in an aggregate principal amount at any time outstanding, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (15), but excluding the indebtedness permitted by clauses (1) through (14), not to exceed US$20.0 million.

The Company will not incur, and will not permit any subsidiary guarantor to incur, any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Company or such subsidiary guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Senior Notes and the applicable note guarantee on substantially identical terms.

For purposes of determining compliance with this "Incurrence of Indebtedness and Issuance of Preferred Stock" covenant, in the event that an item of proposed Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (15) above, or is entitled to be incurred pursuant to the first paragraph of this covenant, the Company will be permitted to classify such item of Indebtedness on the date of its incurrence, or later reclassify all or a portion of such item of Indebtedness, in any manner that complies with this covenant.  The accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, the reclassification of preferred stock as Indebtedness due to a change in accounting principles, the reclassification of accounts payable as Indebtedness, and the payment of dividends on Disqualified Stock or preferred stock of Restricted Subsidiaries in the form of additional shares of the same class of Disqualified Stock or preferred stock of Restricted Subsidiaries will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock or preferred stock of Restricted

Subsidiaries for purposes of this covenant; *provided*, in each such case, that the amount of any such accrual, accretion or payment is included in Consolidated Interest Expense of the Company as accrued. Notwithstanding any other provision of this covenant, the maximum amount of Indebtedness that the Company or any Restricted Subsidiary may incur pursuant to this covenant shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

The amount of any Indebtedness outstanding as of any date will be:

    (1)    the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount;

    (2)    the principal amount of the Indebtedness, in the case of any other Indebtedness; and

    (3)    in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of:

        (a)    the Fair Market Value of such assets at the date of determination; and

        (b)    the amount of the Indebtedness of the other Person.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate determined as the average daily observed currency exchange rates reported by the Federal Reserve Bank of New York for the trailing 30 calendar day period, including the date of incurrence, in the case of term Indebtedness, or first committed, in the case of revolving credit Indebtedness. The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such refinancing indebtedness is denominated calculated based on the relevant currency exchange rates as calculated in the first sentence of this paragraph.

### *Limitation on Intercompany Indebtedness*

    (1)    All existing and future Intercompany Indebtedness (other than Ordinary Course Intercompany Indebtedness) will be subordinated to the Senior Notes pursuant to the terms of a subordination and revolving credit agreement (the "Intercompany Subordination and Credit Agreement"), the terms of which, among other things, will provide that (i) no cash payments will be permitted to be made in respect of such Intercompany Indebtedness while any of the Senior Notes remain outstanding and (ii) all such Intercompany Indebtedness will be subordinated to the Senior Notes in liquidation and in right of payment.

    (2)    All existing and future Ordinary Course Intercompany Indebtedness will be incurred or deemed incurred pursuant to, and in accordance with the terms of, the Intercompany Subordination and Credit Agreement, the terms of which, among other things, will provide that (i) the Company and/or its Subsidiaries will be permitted to incur additional Ordinary Course Intercompany Indebtedness and make and collect payments in respect of such Ordinary Course Intercompany Indebtedness so long as such Ordinary Course Intercompany Indebtedness is incurred, and such payments are made or collected, in the ordinary course of business consistent with past practice and (ii) all such Ordinary Course Intercompany Indebtedness will be subordinated to the Senior Notes in liquidation and in right of payment (subject to the preceding clause (i)).

    (3)    During the pendency of any proceeding filed by or against the Company or any of its Subsidiaries seeking relief as debtor, or seeking to adjudicate the Company or any of its Subsidiaries as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment or composition of the Company or any of its Subsidiaries or its debts under any law relating to bankruptcy, insolvency, reorganization, *concurso mercantil*, *quiebra*, or relief of debtors, or

seeking appointment of a receiver, trustee, assignee, custodian, liquidator or *visitador*, *conciliador* or *síndico* or any other similar official for the Company or for any substantial part of its property, the Company shall, and shall cause each of its Subsidiaries to, vote any claims that the Company or any Subsidiary of the Company might have based on Intercompany Indebtedness in the same manner as the majority of the unaffiliated third-party creditors of the Company and its Subsidiaries pursuant to the terms of the Intercompany Subordination and Credit Agreement and the Intercompany Trust Agreement.

(4)     Neither the Company nor any of its Subsidiaries will (a) enter into or maintain any Intercompany Indebtedness other than Intercompany Indebtedness under the Intercompany Subordination and Credit Agreement in accordance with the terms of this covenant, or (b) amend or waive any part of the documentation with respect to Intercompany Indebtedness in any way that would result in (i) a violation of the indenture or the Collateral Documents or (ii) a change of any kind in the provisions of such documentation relating to the subordination of the Intercompany Indebtedness.

(5)     Upon the occurrence and during the continuation of an Event of Default, the Company will not make any payment to any Subsidiary pursuant to the terms of any Intercompany Indebtedness and will not take any action that could cause or result in such payment being made.

*Liens*

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any asset or property of any character now owned or hereafter acquired by the Company or any of its Restricted Subsidiaries or any proceeds, income or profits therefrom, or assign or convey any right to receive income therefrom, except Permitted Liens.

*Sale and Leaseback Transactions*

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into any Sale and Leaseback Transaction with respect to any property or assets unless:

(1)     the Company or the Restricted Subsidiary, as applicable, would be entitled to:

(a)     incur Indebtedness in an amount equal to the Attributable Debt with respect to such Sale and Leaseback Transaction pursuant to the covenant described under the caption "— Incurrence of Indebtedness and Issuance of Preferred Stock"; and

(b)     create a Lien on such property or assets securing such Attributable Debt pursuant to the covenant described under the caption "—Liens";

in which case, the corresponding Indebtedness and Lien will be deemed incurred pursuant to those provisions, and

(2)     the Company complies with the covenant described under the caption "—Asset Sales and Events of Loss" in respect of such transaction.

*Dividend and Other Payment Restrictions Affecting Subsidiaries*

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Restricted Subsidiary to:

(1)     pay dividends or make any other distributions on its Capital Stock to the Company or any of its Restricted Subsidiaries, or with respect to any other interest or participation in, or

measured by, its profits, or pay any indebtedness owed to the Company or any of its Restricted Subsidiaries;

(2)    make loans or advances to the Company or any of its Restricted Subsidiaries;

(3)    pay any Indebtedness owed to the Company or any Restricted Subsidiary; or

(4)    sell, lease or transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries.

However, the preceding restrictions will not apply to encumbrances or restrictions existing under or by reason of:

(1)    agreements governing Existing Indebtedness as in effect on the date of the indenture and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements; *provided* that the amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in those agreements on the date of the indenture;

(2)    the indenture, the Senior Notes and the note guarantees;

(3)    applicable law, rule, regulation or order or the applicable by-laws of the Company or any of its Restricted Subsidiaries as in effect on the date of the indenture;

(4)    any instrument governing Indebtedness or Capital Stock of a Person acquired by the Company or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness or Capital Stock was incurred in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired; *provided* that, in the case of Indebtedness, such Indebtedness was permitted by the terms of the indenture to be incurred;

(5)    customary non-assignment provisions in contracts and licenses entered into in the ordinary course of business;

(6)    purchase money obligations for property acquired in the ordinary course of business and Capital Lease Obligations that impose restrictions on the property purchased or leased of the nature described in clause (4) of the preceding paragraph;

(7)    any agreement for the sale or other disposition of all or substantially all the stock or assets of a Restricted Subsidiary that restricts distributions by that Restricted Subsidiary pending the sale or other disposition;

(8)    Permitted Refinancing Indebtedness; *provided* that the restrictions contained in the agreements governing such Permitted Refinancing Indebtedness are not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced;

(9)    Liens permitted to be incurred under the provisions of the covenant described above under the caption "—Liens" that limit the right of the debtor to dispose of the assets subject to such Liens;

65

(10)  customary provisions relating to assets or properties in which the Company has Investments in joint ventures, *provided* that the Company was allowed to make such Investment pursuant to the other terms of the indenture; and

(11)  customary provisions existing in the documentation governing any Permitted Securitization.

### *Limitation on the Sale or Issuance of Capital Stock of Restricted Subsidiaries*

The Company:

(1)  will not, and will not permit any Restricted Subsidiary to, sell, lease, transfer or otherwise dispose of any Capital Stock of any Restricted Subsidiary to any Person (other than the Company or a Wholly- Owned Restricted Subsidiary); and

(2)  will not permit any Restricted Subsidiary to issue any of its Capital Stock (other than, if necessary, shares of its Capital Stock constituting directors' or other legally required qualifying shares) to any Person (other than to the Company or a Wholly-Owned Restricted Subsidiary), unless:

    (a)  immediately after giving effect to such issuance, sale or other disposition, neither the Company nor any of its Subsidiaries own any Capital Stock of such Restricted Subsidiary;

    (b)  immediately after giving effect to such issuance, sale or other disposition, such Restricted Subsidiary would no longer constitute a Restricted Subsidiary and any Investment in such Person remaining after giving effect thereto would have been permitted to be made under the covenant described under "—Restricted Payments" if made on the date of such issuance, sale or other disposition; or

    (c)  immediately after giving effect to such issuance, sale or other disposition, such Restricted Subsidiary would continue to constitute a Restricted Subsidiary and the Company or such Restricted Subsidiary applies the Net Proceeds of any such sale in accordance with the "—Asset Sales and Events of Loss" covenant.

### *Merger, Consolidation or Sale of Assets*

The Company will not, directly or indirectly: (1) consolidate, merge or reorganize with or into another Person (whether or not the Company is the surviving corporation); or (2) sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of the properties or assets of the Company and its Restricted Subsidiaries taken as a whole, in one or more related transactions, to another Person, unless:

(1)  either: (a) the Company is the surviving corporation; or (b) the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition has been made is a corporation organized or existing under the laws of Mexico, a member of the European Union or the United States, any state of the United States or the District of Columbia;

(2)  the Person formed by or surviving any such consolidation or merger (if other than the Company) or the Person to which such sale, assignment, transfer, lease, conveyance or other disposition has been made expressly assumes all the obligations of the Company under the Senior Notes and the indenture pursuant to agreements satisfactory to the trustee;

(3)  immediately after such transaction, no Default or Event of Default exists;

(4)  the Company or the Person formed by or surviving any such consolidation or merger (if other than the Company), or to which such sale, assignment, transfer, conveyance or other

disposition has been made would, on the date of such transaction after giving pro forma effect thereto and any related financing transactions as if the same had occurred at the beginning of the applicable two-quarter period, (x) be permitted to incur at least US$1.00 of additional Indebtedness pursuant to the Leverage Ratio test set forth in the first paragraph of the covenant described above under the caption "—Incurrence of Indebtedness and Issuance of Preferred Stock" or (y) have a Leverage Ratio no greater than the Leverage Ratio of the Company immediately prior to giving effect to such transaction; and

(5)     the Company shall have delivered to the trustee an officers' certificate and opinions of counsel in the relevant jurisdictions, each stating, in form and substance satisfactory to the trustee, that such consolidation, merger or transfer and the agreements referred to in clause (2) of this paragraph comply with the indenture (*provided* that such opinions of counsel may assume, among other things, the satisfaction of all financial ratios in connection with such transaction).

In addition, the Company will not, directly or indirectly, lease all or substantially all of the properties and assets of it and its Restricted Subsidiaries taken as a whole, in one or more related transactions, to any other Person.

For the avoidance of doubt, this "Merger, Consolidation or Sale of Assets" covenant will not prohibit the merger of certain subsidiary guarantors with the Company, intended to take place following the date of this statement.

### *Transactions with Affiliates*

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend or permit to exist any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each, an "Affiliate Transaction"), unless:

(1)     the Affiliate Transaction is on terms that are no less favorable to the Company or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person; and

(2)     (a) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of US$2.5 million, (i) the terms of the Affiliate Transaction are set forth in writing; (ii) a majority of the disinterested members of the Board of Directors of the Company have determined in good faith that such Affiliate Transaction complies with this covenant and have approved such Affiliate Transaction; and (iii) the Company delivers to the trustee a resolution of the Board of Directors of the Company set forth in an officers' evidencing the fulfillment of the condition set out in clause (2)(a)(ii); and

(b) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of US$6.0 million, in addition to the conditions set out in clause (2)(a), the Company delivers to the trustee a written opinion to the effect that such Affiliate Transaction is fair, from a financial standpoint, to the Company and its Restricted Subsidiaries issued by an investment banking firm of national standing.

The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisions of the prior paragraph:

(1)     any reasonable and customary employment agreement, employee benefit plan, officer or director indemnification agreement or any similar arrangement entered into by the Company or any of its Restricted Subsidiaries and approved by the Board of Directors;

(2)     transactions exclusively between or among the Company and/or any of its Restricted Subsidiaries or exclusively between or among such Restricted Subsidiaries;

(3)     payment of reasonable directors' fees to directors of the Company and its Restricted Subsidiaries who are not otherwise Affiliates of the Company as determined in good faith by the Company's Board of Directors;

(4)     any issuance of Equity Interests (other than Disqualified Stock) of the Company to Affiliates of the Company;

(5)     Restricted Payments that do not violate the provisions of the indenture described above under the caption "—Restricted Payments";

(6)     loans or advances to employees in the ordinary course of business and in accordance with the past practices of the Company or its Restricted Subsidiaries, but in any event not to exceed US$500,000 in the aggregate at any time outstanding;

(7)     transactions with a Person that is an Affiliate of the Company solely because the Company owns, directly or through a Restricted Subsidiary, an Equity Interest in, or controls, such Person and no Affiliate of the Company (other than a Restricted Subsidiary thereof) owns any Equity Interests in, or controls, such Person except through their ownership of the Company; and

(8)     customary and reasonable transactions in connection with a Permitted Securitization, including Standard Securitization Undertakings.

## No Impairment of Security Interests

Neither the Company nor any of its Restricted Subsidiaries will be permitted to take any action, or knowingly or negligently omit to take any action, which action or omission might or would have the result of materially impairing the security interest with respect to the Collateral for the benefit of the trustee and the holders of the Senior Notes, including the failure to obtain any required approval or any material defect in the creation, perfection or first-priority status of any Lien granted pursuant to the Collateral Documents. The Company will cause the Restricted Subsidiaries to comply with their obligations under the Collateral Documents. The Company shall not amend, modify or supplement, or permit or consent to any amendment, modification or supplement of, the Collateral Documents in any way that would be adverse to the holders of the Senior Notes in any material respect, except as described above under "—Security" or as permitted under "—Amendment, Supplement and Waiver."

## Business Activities

The Company will not, and will not permit any of its Restricted Subsidiaries to, engage, directly or indirectly, in any business other than Permitted Businesses.

## Additional Note Guarantees; Additional Security

If the Company or any of its Restricted Subsidiaries acquires or creates any direct or indirect Subsidiary after the date of the indenture (a "New Subsidiary"), then the Company or such Restricted Subsidiary shall, within ten Business Days after such formation or acquisition, cause such New Subsidiary to:

(1)     become a subsidiary guarantor and deliver to the trustee a duly executed supplemental indenture and an Opinion of Counsel pursuant to which such New Subsidiary will unconditionally and irrevocably guarantee the Company's obligations under the Senior Notes, *provided* that any New Subsidiary that is designated as an Unrestricted Subsidiary need not become a subsidiary guarantor until five Business Days after as it ceases to be an Unrestricted Subsidiary; it being understood that such New Subsidiary shall take all required corporate actions and obtain all necessary authorizations to effect the valid execution and delivery of such supplemental indenture and any related documents; and

(2)      duly execute and deliver to the trustee and the Collateral Agent an Intercompany Subordination and Credit Agreement Supplement and Intercompany Trust Agreement Supplement; it being understood that such New Subsidiary shall take all required corporate actions and obtain all necessary authorizations to effect the valid execution and delivery of such Intercompany Subordination and Credit Agreement Supplement and Intercompany Trust Agreement Supplement.

### Designation of Restricted and Unrestricted Subsidiaries

The Board of Directors of the Company may designate any Restricted Subsidiary to be an Unrestricted Subsidiary if that designation would not cause a Default.  If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate Fair Market Value of all outstanding Investments owned by the Company and its Restricted Subsidiaries in the Subsidiary designated as Unrestricted will be deemed to be an Investment made as of the time of the designation and will reduce the amount available for Restricted Payments under the covenant described above under the caption "—Restricted Payments" or under one or more clauses of the definition of Permitted Investments, as determined by the Company.  That designation will only be permitted if the Investment would be permitted at that time and if the Restricted Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.  The Board of Directors of the Company may redesignate any Unrestricted Subsidiary to be a Restricted Subsidiary if that redesignation would not cause a Default.

Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary will be evidenced to the trustee by filing with the trustee a certified copy of a resolution of the Board of Directors giving effect to such designation and an officers' certificate certifying that such designation complied with the preceding conditions and was permitted by the covenant described above under the caption "—Restricted Payments."  If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of the indenture and any Indebtedness of such Subsidiary will he deemed to be incurred by a Restricted Subsidiary of the Company as of such date and, if such Indebtedness is not permitted to be incurred as of such date under the covenant described under the caption "—Incurrence of Indebtedness and Issuance of Preferred Stock," the Company will be in default of such covenant.  The Board of Directors of the Company may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary of the Company; *provided* that such designation will be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of the Company of any outstanding Indebtedness of such Unrestricted Subsidiary, and such designation will only be permitted if (1) such Indebtedness is permitted under the covenant described under the caption "—Incurrence of Indebtedness and Issuance of Preferred Stock," and, if such Indebtedness is being permitted pursuant to the first paragraph of such covenant, the Leverage Ratio being calculated on a pro forma basis as if such designation had occurred at the beginning of the two-quarter Reference Period; and (2) no Default or Event of Default would be in existence following such designation.

The Company expects to designate Celmax Móvil, S.A. de C.V. as an Unrestricted Subsidiary on the Issue Date.

### Reports

So long as any Senior Notes are outstanding:

(1)      the Company will provide the trustee and the holders of the Senior Notes with annual financial statements audited by an internationally recognized firm of independent public accountants within 120 days after the end of the Company's fiscal year, and unaudited quarterly financial statements (including a balance sheet, income statement and cash flow statement for the fiscal quarter or quarters then ended and the corresponding fiscal quarter or quarters from the prior year) within 60 days of the end of each of the first three fiscal quarters of each fiscal year.  These annual and quarterly financial statements will be prepared in accordance with IFRS and be accompanied by a management discussion and analysis of the results of operation and liquidity and capital resources of the Company and its Subsidiaries for the periods presented in reasonable detail.  English translations will be provided of any of the foregoing documents prepared in another language;

(2)      to the extent not included in clause (1) above, the Company will provide the trustee and the holders of the Senior Notes copies (including English translations or summaries of documents prepared in another language) of all public filings made with any securities exchange or securities regulatory agency or authority within fifteen (15) days of such filing (including, if publicly available in English on the website of the Company, any filings made by the Company to the extent they contain material financial information of or related to the Company); and

(3)      in case the Company is not subject to Section 13 or 15(d) of the Exchange Act or exempt from reporting pursuant to Rule 12g3-2(b) of the Exchange Act, the Company will make available, upon request, to any holder of the Senior Notes and any prospective purchaser of Senior Notes the information required pursuant to Rule 144A(d)(4) under the Securities Act;

*provided* that any financial statements or other information required to be furnished to the trustee and holders of the Senior Notes by the Company under (1) through (3) above shall be deemed furnished if and when the Company posts such reports on the Company's website on the Internet at www.maxcom.com.mx; *provided*, *however*, that the trustee shall have no obligation whatsoever to determine whether or not such information, documents or reports have been posted and *provided*, *further* that the Company shall promptly notify the trustee in writing whenever it shall have so posted such materials.

The Company will make the information and reports available to securities analysts and prospective investors upon request. For so long as the Senior Notes are listed on the Euro MTF, the alternative market of the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, the above information will also be made available in Luxembourg through the offices of the Luxembourg listing agent.

If the Company has designated any of its Subsidiaries as Unrestricted Subsidiaries, then the quarterly and annual financial information required by the preceding paragraphs will include a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, and in management's discussion and analysis of financial condition and results of operations, of the financial condition and results of operations of the Company and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Company.

The Company will deliver to the trustee: (1) within 120 days after the end of each fiscal year a certificate stating that the Company has fulfilled its obligations under the indenture or, if there has been a Default or Event of Default, specifying the Default or Event of Default and its nature and status; and (2) as soon as possible and in any event within 30 days after the Company becomes aware or should reasonably become aware of the occurrence of a Default or an Event of Default, an officers' certificate setting forth the details of the Default or Event of Default, and the action which the Company proposes to take with respect thereto.

Delivery of such reports, information and documents to the trustee is for informational purposes only and the trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants under the indenture (as to which the trustee is entitled to rely exclusively on officers' certificates).

### *Enforceability of Judgments*

Since the Company is organized under the laws of Mexico and the Subsidiaries of the Company may be incorporated in various non-U.S. jurisdictions, including Mexico, and all of their directors and substantially all of their officers and certain of the experts named herein are non-U.S. residents, and all or a significant portion of the assets of those persons may be, and the most significant portion of the Company's and Subsidiaries' assets are, located outside the United States, it may not be possible for investors to effect service of process within the United States upon those persons or to enforce against them or against the Company or the Subsidiaries in U.S. courts judgments predicated upon civil liability provisions of the U.S. federal or state securities laws. See "Service of Process and Enforcement of Civil Liabilities."

An obligation denominated in a currency other than Mexican currency which is payable in Mexico may be satisfied through the payment of Mexican currency at the rate of exchange determined and published by Banco de

México (the Bank of Mexico), or the Central Bank, in effect on the date such payment occurs. Pursuant to the Ley Monetaria de los Estados Unidos Mexicanos (Mexican Monetary Law), in the event that proceedings are brought in Mexico seeking to enforce the obligations of the Company and/or each of the Subsidiaries under the Senior Notes or if payment under the Senior Notes is claimed from the Company or any of the Subsidiaries in Mexico, pursuant to an initial action or in connection with the enforcement of a judgment, the Company or any Subsidiaries would not be required to discharge such obligations in Mexico in a currency other than Mexican currency, and any difference resulting from the conversion of such Mexican currency into U.S. dollars may not be claimed from or enforced against us. The exchange currency rate for the purposes specified herein is currently determined by the Central Bank every business banking day in Mexico, published the second following business banking day in the Official Gazette of the Federation.

**Luxembourg Listing**

Application will be made to list the Senior Notes on the Euro MTF, the alternative market of the Luxembourg Stock Exchange; however, the Company cannot assure the holders of the Senior Notes that they will be accepted for listing. Following the issuance of the Senior Notes, the Company will use its best efforts to obtain and maintain listing of the Senior Notes on the Euro MTF; *provided*, *however*, that if the Company is unable to list the Senior Notes on the Euro MTF, or if the Company is unable maintain its listing on the Euro MTF, it will use its best efforts prior to the delisting of the Senior Notes, list and maintain a listing of the Senior Notes on another internationally recognized stock exchange. In the event that a Restricted Subsidiary provides a Guarantee or is released from its obligations under a Guarantee at a time when the Senior Notes are listed on the Euro MTF, the Company will, to the extent required by the rules of the Luxembourg Stock Exchange, publish notice of the granting or release of such Restricted Subsidiary Guarantee in the d'Wort, send a copy of such notice to the Luxembourg Stock Exchange and, in the case of the granting of a new Restricted Subsidiary Guarantee, deposit a copy of the Restricted Subsidiary Guarantee with the Luxembourg Stock Exchange and the Luxembourg sub-paying agent.

**Luxembourg Listing Agent, Luxembourg Sub-Paying Agent and Luxembourg Transfer Agent**

The Company will maintain a Luxembourg listing agent, Luxembourg sub-paying agent and Luxembourg transfer agent in respect of the Senior Notes so long as the Senior Notes are listed on the Luxembourg Stock Exchange and the rules of the exchange so require.

**Currency Indemnity**

U.S. dollars are the sole currency of account and payment for all sums payable by the Company or the subsidiary guarantors under or in connection with the Senior Notes, including damages. To the greatest extent permitted under applicable law, any amount received or recovered in a currency other than dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding up or dissolution of the Company or the subsidiary guarantors or otherwise) by any holder of a Senior Note in respect of any sum expressed to be due to it from the Company or the subsidiary guarantors shall constitute a discharge to the Company or the subsidiary guarantors only to the extent of the dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that dollar amount is less than the dollar amount expressed to be due to the recipient under any Senior Note, the Company or the subsidiary guarantors shall indemnify the recipient against any loss sustained by it as a result. In any event, the Company or the subsidiary guarantors shall indemnify the recipient against the cost of making any such purchase. For the purposes of this paragraph, it will be sufficient for the holder of a Senior Note to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of dollars been made with the amount so received or recovered in that other currency on the date of receipt or recovery (or, if a purchase of dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date he certified in the manner mentioned above). These indemnities constitute a separate and independent obligation from the other obligations of the Company or the subsidiary guarantors, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any holder of a Senior Note and shall constitute in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Senior Note.

**Additional Amounts**

The Company is required by Mexican law to deduct Mexican withholding taxes, at a rate expected to be 4.9% if the Company satisfies certain conditions required under Mexican law (subject to certain exceptions), from payments of interest or amounts deemed interest to investors who are not residents of Mexico for tax purposes, and the Company (or any relevant subsidiary guarantor, as applicable) will pay additional amounts on those payments (and certain other payments) except as described below.

All payments under or in respect of the Senior Notes or any note guarantee shall be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, levies, imposts, assessments or governmental charges (including penalties, interest and additions related thereto) (collectively, "Taxes") of whatever nature imposed, levied, collected, withheld or assessed unless such withholding or deduction is required by law.  In the event of any such withholding or deduction imposed or levied by a Tax Jurisdiction (as defined below) is required to be made from any payments under or with respect to the Senior Notes or any note guarantee, the Company or the relevant subsidiary guarantor, as applicable, shall pay to holders of the Senior Notes such additional amounts ("Additional Amounts") as will result in the net payment to such holder (including Additional Amounts) of the amount that would otherwise have been receivable by such holder in the absence of such withholding or deduction, except that no such Additional Amounts shall be payable with respect to:

(a)     any Taxes that would not have been so withheld or deducted but for the holder or beneficial owner of the Senior Notes having a present or former connection to the relevant Tax Jurisdiction (including having a permanent establishment for tax purposes in such Tax Jurisdiction, being a citizen or resident or national of, incorporated in or carrying on a business, in the relevant Tax Jurisdiction in which such Taxes are imposed) other than the mere receipt of payments in respect of the Senior Notes or any note guarantee, the mere holding or ownership of such Senior Note or beneficial interest in the Senior Note or the exercise of any rights under the Senior Notes or the indenture;

(b)     where presentation is required for payment on a Senior Note, any Taxes that would not have been so withheld or deducted if the Senior Note had been presented for payment within 30 days after the Relevant Date (as defined below), except to the extent that the holder would have been entitled to Additional Amounts had the Senior Note been presented any day during such 30 day period and there were no additional withholdings or deductions as a result of such late presentment;

(c)     any Taxes that would not have been so withheld or deducted but for the failure by the holder or the beneficial owner of the Senior Note or any payment in respect of such Senior Note, after written request made to that holder or beneficial owner at least 60 days before any such withholding or deduction would be payable, by the Company or the relevant subsidiary guarantor, the trustee or the paying agent, as applicable, to comply with any certification, identification, information, documentation or other similar reporting requirement concerning its nationality, residence, identity or connection with the relevant Tax Jurisdiction, which is required or imposed by a statute, regulation or administrative practice of the relevant Tax Jurisdiction as a precondition to exemption from all or part of such Taxes;

(d)     any estate, inheritance, gift, sales, transfer, personal property or similar Taxes imposed with respect to any Senior Note;

(e)     any Taxes payable other than by withholding or deduction;

(f)     any withholding or deduction imposed on a payment to an individual that is required to be made pursuant to the European Union Directive on the taxation of savings income (the "Directive") implementing the conclusions of the European Council of Economic and Finance Ministers (ECOFIN) meeting on June 3, 2003, or any law implementing or complying with, or introduced in order to conform to, such Directive;

(g)     any Taxes imposed in connection with a Senior Note presented for payment (where presentation is required) by or on behalf of a holder or beneficial owner thereof who would have been able to avoid such tax by presenting the relevant Senior Note to another paying agent; or

(h)     any combination of (a) through (g) above.

Notwithstanding the foregoing, the limitations on the Company's (or any relevant subsidiary guarantor's, as applicable) obligation to pay Additional Amounts set forth in clauses (c) and (h) above shall not apply if (i) the provision of information, documentation or other evidence described in such clauses (c) and (h) would be materially more onerous, in form, in procedure or in the substance of information disclosed, to a holder or beneficial owner of a Senior Note (taking into account any relevant differences between U.S. and Mexican law rules, regulations or administrative practice) than comparable information or other reporting requirements imposed under U.S. tax law, regulation and administrative practice as of the date hereof (such as IRS Forms W-8, W-8BEN and W-9) or (ii) Article 195, Section II of the Mexican Income Tax Law, or a substantially similar successor of such provision is in effect, unless the provision of the information, documentation or other evidence described in clauses (c) and (h) is expressly required by statute, regulation or official administrative practice of general application in order to apply Article 195, Section II of the Mexican Income Tax Law, the Company cannot obtain such information, documentation or other evidence on its own through reasonable diligence and the Company otherwise would meet the requirements for application of Article 195, Section II of the Mexican Income Tax Law.  In addition, such clauses (c) and (h) shall not be construed to require a non-Mexican pension or retirement fund or a non-Mexican financial institution or another holder to register with the Ministry of Finance and Public Credit or the *Servicio de Administración Tributaria* for the purpose of establishing eligibility for an exemption from or reduction of Mexican withholding tax or to require that a holder or beneficial owner certify or provide information concerning whether it is or is not a tax-exempt pension or retirement fund.

If the Directive imposes taxes upon Senior Notes, the Company will use commercially reasonable efforts to maintain a paying agent with a specified office in a member state of the European Union that will not be obligated to withhold or deduct tax pursuant to the Directive or any law implementing or complying with, or introduced in order to conform to, the Directive.

"Tax Jurisdiction" means (1) Mexico or any political subdivision thereof or any authority therein or thereof having the power to tax or (2) any jurisdiction in which the Company or any subsidiary guarantor (including any successor entity) is then incorporated, engaged in business or resident for tax purposes or any political subdivision thereof or therein having the power to tax.

"Relevant Date" means whichever is the later of (i) the date on which such payment first becomes due and (ii) if the full amount payable has not been received by the trustee on or prior to such due date, the date on which, the full amount having been so received, notice to that effect shall have been given to the holders of the Senior Notes in accordance with the indenture.

References to principal, interest or any other amount payable on or in respect of any Senior Note shall be deemed also to refer to any Additional Amounts which may be payable as set forth in the indenture or in the Senior Notes to the extent that Additional Amounts are, were or would be payable in respect thereof.

At least ten Business Days prior to the first interest payment date (and at least 10 Business Days prior to each succeeding interest payment date if there has been any change with respect to the matters set forth in the below-mentioned officers' certificate), the Company or the relevant subsidiary guarantor, as applicable, will furnish to the trustee and the paying agent an officers' certificate instructing the trustee and the paying agent whether payments of principal of or interest on the Senior Notes due on such interest payment date will be made without deduction or withholding for or on account of any Taxes by the Tax Jurisdictions (other than the jurisdiction where the trustee is located or organized).  If any such deduction or withholding shall be required, at least 20 days prior to such interest payment date (unless the obligation to pay Additional Amounts arises after the 20th day prior to the payment date, in which case the Company or the relevant subsidiary guarantor shall notify the trustee and the paying agent promptly thereafter), the Company, or the relevant subsidiary guarantor, as applicable, will furnish the trustee and the paying agent with an officers' certificate that specifies the amount, if any, required to be withheld on such payment to

holders of the Senior Notes.  If the Company or any subsidiary guarantor is obligated to pay Additional Amounts with respect to such payment, the officers' certificate must also set forth any other information reasonably necessary to enable the paying agent to pay Additional Amounts to the holders on the relevant payment date.  For these purposes, any officers' certificate required by the indenture to be provided to the trustee and any paying agent shall be deemed to be duly provided if telecopied to the trustee and such paying agent.

The Company or the relevant subsidiary guarantor, as applicable, will make all withholdings and deductions required by law and will remit the full amount deducted or withheld to the relevant Tax authority in accordance with applicable law.  The Company or the relevant subsidiary guarantor, as applicable, will obtain official receipts from each Tax authority evidencing the payment of any Taxes so deducted or withheld, or, if such receipts are not obtainable, such other documentation reasonably acceptable to the trustee.  The Company, or the relevant subsidiary guarantor, as applicable, shall furnish to the trustee the official receipts (or a certified copy of the official receipts or other such documentation, as applicable) evidencing payment of Taxes.  The Company or the relevant subsidiary guarantor, as applicable, will attach to each certified copy or other such documentation, as applicable, a certificate stating (x) that the amount of such Tax evidenced by the certified copy was paid in connection with payments under or with respect to the Senior Notes then outstanding upon which such Taxes were due and (y) the amount of such withholding tax paid per US$1,000 of principal amount of the Senior Notes.  Copies of such receipts or other such documentation, as applicable, shall be made available to holders of the Senior Notes upon request.

The Company and the relevant subsidiary guarantor, as applicable, shall promptly pay when due, and indemnify the holder for, any present or future stamp, issue, registration, court and/or documentary taxes, and/or any other excise taxes, similar charges or similar levies imposed by the Tax Jurisdictions on the execution, delivery, registration or enforcement of any of the Senior Notes, the indenture, any Guarantee or any other document or instrument referred to herein or therein.

**Events of Default and Remedies**

Each of the following is an "Event of Default":

(1)  default for 30 days in the payment when due of interest (including any Additional Interest) or any Additional Amounts on the Senior Notes;

(2)  default in the payment when due (at maturity, upon redemption or otherwise) of the principal of, or premium, if any, on, the Senior Notes;

(3)  failure by the Company or any of its Restricted Subsidiaries to comply with the provisions described under the captions "—Repurchase at the Option of Holders—Change of Control" or "—Certain Covenants—Merger, Consolidation or Sale of Assets;"

(4)  failure by the Company or any of its Restricted Subsidiaries for 60 days after notice to the Company by the trustee or the holders of at least 25% in aggregate principal amount of the Senior Notes then outstanding voting as a single class to comply with any of the other covenants or agreements in the indenture;

(5)  default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Company or any of its Restricted Subsidiaries (or the payment of which is guaranteed by the Company or any of its Restricted Subsidiaries), whether such Indebtedness or Guarantee now exists, or is created after the date of the indenture, if that default:

(a)  is caused by a failure to pay principal of, or interest or premium, if any, on, such Indebtedness prior to the expiration of the grace period provided in such Indebtedness on the date of such default (a "Payment Default"); or

(b)  results in the acceleration of such Indebtedness prior to its express maturity,

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates US$10.0 million or more;

(6)      failure by the Company or any of its Restricted Subsidiaries to pay final judgments entered by a court or courts of competent jurisdiction aggregating in excess of US$10.0 million, which judgments are not paid, discharged or stayed for a period of 60 days;

(7)      except as permitted by the indenture, any note guarantee is held in any judicial proceeding to be unenforceable or invalid or ceases for any reason to be in full force and effect, or any subsidiary guarantor, or any authorized Person acting on behalf of any subsidiary guarantor, denies or disaffirms its obligations under its note guarantee, or any Collateral Document is held in any judicial proceeding to be unenforceable or invalid or ceases for any reason to be in full force and effect; and

(8)      certain events of bankruptcy, reorganization, *concurso mercantil*, *quiebra*, insolvency or similar laws of Mexico, the U.S. or any other jurisdiction described in the indenture with respect to the Company or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary.

In the case of an Event of Default arising from certain events of bankruptcy or insolvency, with respect to the Company, any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary, all outstanding Senior Notes will become due and payable immediately without further action or notice. If any other Event of Default occurs and is continuing, the trustee or the holders of at least 25% in aggregate principal amount of the then outstanding Senior Notes may declare all the Senior Notes to be due and payable immediately.

Subject to certain limitations, holders of a majority in aggregate principal amount of the then outstanding Senior Notes may direct the trustee in writing in its exercise of any trust or power. The trustee may withhold from holders of the Senior Notes notice of any continuing Default or Event of Default if it determines that withholding notice is in their interest, except a Default or Event of Default relating to the payment of principal, interest or premium, if any or a default pursuant to clause (5) or (6) above. The trustee shall have the right to decline to follow any such direction if the trustee in good faith, by a responsible officer of the trustee, shall determine that the proceeding so directed would involve the trustee in personal liability.

Subject to the provisions of the indenture relating to the duties of the trustee, in case an Event of Default occurs and is continuing, the trustee will be under no obligation to exercise any of the rights or powers under the indenture at the request or direction of any holders of Senior Notes unless such holders have offered to the trustee indemnity or security satisfactory to it against any loss, liability or expense. Except to enforce the right to receive payment of principal, premium, if any, or interest when due, no holder of a Senior Note may pursue any remedy with respect to the indenture or the Senior Notes unless:

(1)      such holder has previously given the trustee written notice that an Event of Default is continuing;

(2)      holders of at least 25% in aggregate principal amount of the then outstanding Senior Notes have requested the trustee to pursue the remedy;

(3)      such holders have offered the trustee security or indemnity satisfactory to it against any loss, liability or expense;

(4)      the trustee has not complied with such written request within 60 days after the receipt of such request and the offer of security or indemnity; and

(5)      holders of a majority in aggregate principal amount of the then outstanding Senior Notes have not given the trustee a direction inconsistent with such request within such 60-day period.

The holders of a majority in aggregate principal amount of the then outstanding Senior Notes by written notice to the trustee may, on behalf of the holders of all of the Senior Notes, rescind an acceleration or waive any existing Default or Event of Default and its consequences under the indenture except a continuing Default or Event of Default in the payment of interest or premium, if any, on, or the principal of, the Senior Notes.

The Company is required to deliver to the trustee annually a statement regarding compliance with the indenture. Upon becoming aware of any Default or Event of Default under the indenture governing the Senior Notes the Company is required to deliver to the trustee a statement specifying such Default or Event of Default.

**No Personal Liability of Directors, Officers, Employees and Stockholders**

No director, officer, employee, incorporator or stockholder of the Company or any subsidiary guarantor, as such, will have any liability for any obligations of the Company or the subsidiary guarantors under the Senior Notes, the indenture, the note guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Senior Notes by accepting a Senior Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Senior Notes. The waiver may not be effective to waive liabilities under the federal securities laws.

**Legal Defeasance and Covenant Defeasance**

The Company may at any time, at the option of its Board of Directors evidenced by a resolution set forth in an officers' certificate, elect to have all of its obligations discharged with respect to the outstanding Senior Notes and all obligations of the subsidiary guarantors discharged with respect to their note guarantees ("Legal Defeasance") except for:

    (1)    the rights of holders of outstanding Senior Notes to receive payments in respect of the principal of, or interest or premium, if any and any Additional Amounts that may be due and payable, if any on such Senior Notes when such payments are due from the trust referred to below;

    (2)    The Company's obligations with respect to the Senior Notes concerning issuing temporary notes, registration of notes, mutilated, destroyed, lost or stolen notes and the maintenance of an office or agency for payment and money for security payments held in trust;

    (3)    the rights, powers, trusts, duties and immunities of the trustee, and the Company's and the subsidiary guarantors' obligations in connection therewith; and

    (4)    the Legal Defeasance and Covenant Defeasance provisions of the indenture.

In addition, the Company may, at its option and at any time, elect to have the obligations of the Company and the subsidiary guarantors released with respect to certain covenants (including its obligation to make Change of Control Offers and Asset Sale Offers) that are described in the indenture ("Covenant Defeasance") and thereafter any omission to comply with those covenants will not constitute a Default or Event of Default with respect to the Senior Notes. In the event Covenant Defeasance occurs, certain events (not including non-payment, bankruptcy, receivership, rehabilitation and insolvency events) described under "—Events of Default and Remedies" will no longer constitute an Event of Default with respect to the Senior Notes.

In order to exercise either Legal Defeasance or Covenant Defeasance:

    (1)    the Company must irrevocably deposit with the trustee, in trust, for the benefit of the holders of the Senior Notes, cash in U.S. dollars, non-callable Government Securities, or a combination of cash in U.S. dollars and non-callable Government Securities, in amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of, or interest and premium, if any and any Additional Amount that may be due and payable, if any on the outstanding Senior Notes on the stated date for payment thereof or on the applicable Redemption Date, as the case may be, and the

Company must specify whether the Senior Notes are being defeased to such stated date for payment or to a particular Redemption Date;

(2)     in the case of Legal Defeasance, the Company must deliver to the trustee an opinion of counsel in the United States reasonably acceptable to the trustee confirming that (a) the Company has received from, or there has been published by, the Internal Revenue Service a ruling or (b) since the date of the indenture, there has been a change in the applicable federal income tax law, in either case to the effect that, and based thereon such opinion of counsel will confirm that the beneficial owners of the outstanding Senior Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)     in the case of Covenant Defeasance, the Company must deliver to the trustee an opinion of counsel in the United States reasonably acceptable to the trustee confirming that the beneficial owners of the outstanding Senior Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)     the Company must deliver to the trustee an opinion of counsel in Mexico to the effect that (A) the beneficial owners of the outstanding Senior Notes will not recognize income, gain or loss for Mexican Tax purposes as a result of such deposit and defeasance and will be subject to Mexican Taxes, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred, and (B) payments from the defeasance trust will be made free and clear of, and without withholding or deduction for or on account of any present or future Taxes imposed, levied, collected, withheld or assessed by Mexico or any political subdivision or governmental authority thereof or therein having power to Tax;

(5)     no Default or Event of Default has occurred and is continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit), and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company or any subsidiary guarantor is a party or by which the Company or any subsidiary guarantor is bound;

(6)     123 days pass after the deposit is made and during the 123-day period no Event of Default under clause (8) under the caption "—Events of Default and Remedies" occurs;

(7)     such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a default under, any material agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound;

(8)     the Company must deliver to the trustee an officers' certificate stating that the deposit was not made by the Company with the intent of preferring the holders of Senior Notes over the other creditors of the Company with the intent of defeating, hindering, delaying or defrauding any creditors of the Company or others;

(9)     the Company must deliver to the trustee and opinion of counsel in the United States and Mexico to the effect that on the 123rd day following the deposit, the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally; and

(10) the Company must deliver to the trustee an officers' certificate and an opinion of counsel, each stating that all conditions precedent relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

**Amendment, Supplement and Waiver**

Except as provided in the next two succeeding paragraphs, the indenture or the Senior Notes or the note guarantees may be amended or supplemented with the consent of the holders of at least a majority in aggregate principal amount of the Senior Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Senior Notes), and any existing Default or Event of Default or compliance with any provision of the indenture or the Senior Notes or the note guarantees may be waived with the consent of the holders of a majority in aggregate principal amount of the then outstanding Senior Notes (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Senior Notes).

Without the consent of each holder of Senior Notes affected, an amendment, supplement or waiver may not (with respect to any Senior Notes held by a non-consenting holder):

(1) reduce the principal amount of Senior Notes whose holders must consent to an amendment, supplement or waiver;

(2) reduce the principal of or change the fixed maturity of any Senior Note or alter the provisions with respect to the redemption of the Senior Notes (other than provisions relating to the covenants described above under the caption "—Repurchase at the Option of Holders");

(3) reduce the rate of or change the time for payment of interest, including default interest or Additional Interest, on any Senior Note;

(4) waive a Default or Event of Default in the payment of principal of, or interest or premium, if any, on, the Senior Notes (except a rescission of acceleration of the Senior Notes by the holders of at least a majority in aggregate principal amount of the then outstanding Senior Notes and a waiver of the Payment Default that resulted from such acceleration);

(5) make any Senior Note payable in money other than that stated in the Senior Notes;

(6) make any change in the provisions of the indenture relating to waivers of past Defaults or the rights of holders of Senior Notes to receive payments of principal of, or interest or premium, if any, on, the Senior Notes;

(7) waive a redemption payment with respect to any Senior Note (other than a payment required by one of the covenants described above under the caption "—Repurchase at the Option of Holders");

(8) release any subsidiary guarantor from any of its obligations under its note guarantee or the indenture, except in accordance with the terms of the indenture;

(9) make any change in the ranking or priority of any Senior Note that would adversely affect the noteholders in any material respect;

(10) impair the right of any holder of the Senior Notes to receive payment of principal of and interest on such holder's Senior Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Senior Notes;

(11) make any change in the provisions of the indenture described under "—Additional Amounts" or "—Optional Tax Redemption" that adversely affects the rights of any holder in any

78

material respect or amend the terms of the Senior Notes or the indenture in a way that would result in the loss of an exemption from any of the Taxes described thereunder or would otherwise adversely affect any noteholder for United States or Mexican tax purposes;

(12)    make any change in the provisions of the Collateral Documents that would adversely affect the holders of the Senior Notes in any material respect; or

(13)    make any change in the preceding amendment and waiver provisions.

Notwithstanding the preceding, without the consent of any holder of Senior Notes, the Company, the subsidiary guarantors and the trustee may amend or supplement the indenture, the Senior Notes or the note guarantees:

(1)    to cure any ambiguity, defect or inconsistency;

(2)    to provide for uncertificated notes in addition to or in place of certificated notes;

(3)    to provide for the assumption of the Company's or a subsidiary guarantor's obligations to holders of Senior Notes and note guarantees in the case of a merger or consolidation or sale of all or substantially all of the Company's or such subsidiary guarantor's assets, as applicable;

(4)    to make any change that would provide any additional rights or benefits to the holders of Senior Notes or that does not adversely affect the legal rights under the indenture of any such holder;

(5)    to comply with requirements of the SEC in order to effect or maintain the qualification of the indenture under the Trust Indenture Act;

(6)    to allow any subsidiary guarantor to execute a supplemental indenture and/or a note guarantee with respect to the Senior Notes;

(7)    conform the text of the indenture to any provisions of this "Description of the Senior Notes" to the extent that a portion of this description of notes was intended to be a verbatim recitation of the indenture or the Senior Notes as evidenced by an officer's certificate;

(8)    provide for the issuance of additional notes under the indenture to the extent otherwise so permitted under the terms of the indenture; or

(9)    evidence and provide for the acceptance of appointment by a successor trustee.

## Satisfaction and Discharge

The indenture will be discharged and will cease to be of further effect as to all Senior Notes issued thereunder, when:

(1)    either:

(a)    all notes that have been authenticated, except lost, stolen or destroyed notes that have been replaced or paid and notes for whose payment money has been deposited in trust and thereafter repaid to the Company, have been delivered to the trustee for cancellation; or

(b)    all notes that have not been delivered to the trustee for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and the Company or any subsidiary

guarantor has irrevocably deposited or caused to be deposited with the trustee as trust funds in trust solely for the benefit of the holders, cash in U.S. dollars, non-callable Government Securities, or a combination of cash in U.S. dollars and non-callable Government Securities, in amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Senior Notes not delivered to the trustee for cancellation for principal, premium, if any, and accrued interest and any Additional Amounts that may be due and payable, if any, to the date of maturity or redemption;

(2)   no Default or Event of Default has occurred and is continuing on the date of the deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company or any subsidiary guarantor is a party or by which the Company or any subsidiary guarantor is bound;

(3)   the Company or any subsidiary guarantor has paid or caused to be paid all sums payable by it under the indenture; and

(4)   the Company has delivered irrevocable written instructions to the trustee under the indenture to apply the deposited money toward the payment of the Senior Notes at maturity or on the Redemption Date, as the case may be.

In addition, the Company must deliver an officers' certificate and an opinion of counsel to the trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

**Concerning the Trustee**

If the trustee becomes a creditor of the Company or any subsidiary guarantor, the indenture limits the right of the trustee to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise.  The trustee will be permitted to engage in other transactions; however, if it acquires any conflicting interest it must eliminate such conflict within 90 days, apply to the SEC for permission to continue as trustee (if the indenture has been qualified under the Trust Indenture Act) or resign.

The holders of a majority in aggregate principal amount of the then outstanding Senior Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the trustee, subject to certain exceptions.  The indenture provides that in case an Event of Default occurs and is continuing, the trustee will be required, in the exercise of its power, to use the degree of care of a prudent person in the conduct of his or her own affairs.  Subject to such provisions, the trustee will be under no obligation to exercise any of its rights or powers under the indenture at the request of any holder of Senior Notes, unless such holder has offered to the trustee security and indemnity satisfactory to it against any loss, liability or expense.

**Additional Information**

For so long as any Senior Notes remain outstanding, the Company will make available to any noteholder or beneficial owner of an interest in the Senior Notes, or to any prospective purchasers designated by such noteholder or beneficial owner, upon request of such noteholder or beneficial owner, and in addition to the information referred to under "—Reports" above, the information required to be delivered under paragraph (d)(4) of Rule 144A unless, at the time of such request the Company is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

**Book-Entry System; Delivery and Form**

Except as set forth below, Senior Notes will be issued in registered, global form without interest coupons, in minimum denominations of US$150,000 and integral multiples of US$1,000 in excess thereof ("Global Notes"). The Global Notes will be deposited upon issuance with the trustee, as custodian for The Depository Trust Company

("DTC"), in New York, New York, and registered in the name of DTC or in the name of Cede & Co., its nominee, in each case for credit to an account of a direct or indirect participant in DTC as described below.

Initially, the trustee will act as paying agent and registrar. The Senior Notes may be presented for registration of transfer and exchange at the offices of the registrar.

Except as set forth below, the global notes may be transferred, in whole and not in part, only to DTC, to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for Senior Notes in certificated form ("Certificated Notes") except in the limited circumstances described below. See "— Exchange of Global Notes for Certificated Notes." Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to receive physical delivery of Certificated Notes. Transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants (including, if applicable, those of Euroclear and Clearstream), which may change from time to time.

If the Senior Notes are issued in the exchange offer, they will be issued in offshore transactions in reliance on Regulation S. Through and including the 40th day after the closing of the exchange offer (such period through and including such 40th day, the "Restricted Period"), beneficial interests in the Regulation S Global Notes may be held only through the Euroclear System ("Euroclear") and Clearstream Banking, S.A. ("Clearstream") (as indirect participants in DTC), unless transferred to a person that takes delivery through a Rule 144A Global Note in accordance with the certification requirements described below. Beneficial interests in the Rule 144A Global Notes may not be exchanged for beneficial interests in the Regulation S Global Notes at any time except in the limited circumstances described below. See "—Exchanges between Regulation S Global Notes and Rule 144A Global Notes." Regulation S Global Notes will be subject to certain restrictions on transfer and will bear a restrictive legend as described under "Transfer Restrictions."

If the Senior Notes are issued under the Plan instead of the exchange offer, they will be issued pursuant to pursuant to section 1145(a) of the Bankruptcy Code, and therefore will not be deemed restricted securities. Accordingly, upon issuance, such Senior Notes issued under the Plan will be freely tradable by any holder not deemed an underwriter in the public market without restriction or further registration under the Securities Act, subject to applicable law. See Annex B – Chapter 11 Plan of Reorganization.

**Depository Procedures**

The following description of the operations and procedures of DTC, the Euroclear System ("Euroclear") and Clearstream Banking S.A. ("Clearstream") are provided solely as a matter of convenience. These operations and procedures are solely within the control of the respective settlement systems and are subject to changes by them. The Company takes no responsibility for these operations and procedures and urges investors to contact the system or their participants directly to discuss these matters.

DTC has advised the Company that DTC is a limited-purpose trust company created to hold securities for its participating organizations (collectively, the "Participants") and to facilitate the clearance and settlement of transactions in those securities between the Participants through electronic book-entry changes in accounts of its Participants. The Participants include securities brokers and dealers (including the initial purchaser), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (collectively, the "Indirect Participants"). Persons who are not Participants may beneficially own securities held by or on behalf of DTC only through the Participants or the Indirect Participants.

DTC has also advised the Company that, pursuant to procedures established by it:

(1)     upon deposit of the Global Notes, DTC will credit the accounts of the Participants designated by the initial purchaser with portions of the principal amount of the Global Notes; and

(2)      ownership of these interests in the Global Notes will be shown on, and the transfer of ownership of these interests will be effected only through, records maintained by DTC (with respect to the Participants) or by the Participants and the Indirect Participants (with respect to other owners of beneficial interest in the Global Notes).

If the Senior Notes are issued in the exchange offer, investors in the Regulation S Global Notes must initially hold their interests therein through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants. After the expiration of the Restricted Period (but not earlier), investors may also hold interests in the Regulation S Global Notes through Participants in the DTC system other than Euroclear and Clearstream. Euroclear and Clearstream will hold interests in the Regulation S Global Notes on behalf of their participants through customers' securities accounts in their respective names on the books of their respective depositories, which are Euroclear Bank S.A./N.V., as operator of Euroclear, and Citibank, N.A., as operator of Clearstream.

All interests in a Global Note, including those held through Euroclear or Clearstream, may be subject to the procedures and requirements of DTC.  Those interests held through Euroclear or Clearstream may also be subject to the procedures and requirements of such systems.  The laws of some states require that certain Persons take physical delivery in definitive form of securities that they own.  Consequently, the ability to transfer beneficial interests in a Global Note to such Persons will be limited to that extent.  Because DTC can act only on behalf of the Participants, which in turn act on behalf of the Indirect Participants, the ability of a Person having beneficial interests in a Global Note to pledge such interests to Persons that do not participate in the DTC system, or otherwise take actions in respect of such interests, may be affected by the lack of a physical certificate evidencing such interests.

**Except as described below, owners of interests in the Global Notes will not have Senior Notes registered in their names, will not receive physical delivery of Senior Notes in certificated form and will not be considered the registered owners or "holders" thereof under the indenture for any purpose.**

Payments in respect of the principal of, and interest and premium, if any, on, a Global Note registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered holder under the indenture. Under the terms of the indenture, the Company and the trustee will treat the Persons in whose names the Senior Notes, including the Global Notes, are registered as the owners of the Senior Notes for the purpose of receiving payments and for all other purposes.  Consequently, neither the Company, the trustee nor any agent of the Company or the trustee has or will have any responsibility or liability for:

(1)      any aspect of DTC's records or any Participant's or Indirect Participant's records relating to or payments made on account of beneficial ownership interest in the Global Notes or for maintaining, supervising or reviewing any of DTC's records or any Participant's or Indirect Participant's records relating to the beneficial ownership interests in the Global Notes; or

(2)      any other matter relating to the actions and practices of DTC or any of its Participants or Indirect Participants.

DTC has advised the Company that its current practice, upon receipt of any payment in respect of securities such as the Senior Notes (including principal and interest), is to credit the accounts of the relevant Participants with the payment on the payment date unless DTC has reason to believe that it will not receive payment on such payment date.  Each relevant Participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC.  Payments by the Participants and the Indirect Participants to the beneficial owners of Senior Notes will be governed by standing instructions and customary practices and will be the responsibility of the Participants or the Indirect Participants and will not be the responsibility of DTC, the trustee or the Company.  Neither the Company nor the trustee will be liable for any delay by DTC or any of the Participants or the Indirect Participants in identifying the beneficial owners of the Senior Notes, and the Company and the trustee may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Subject to the transfer restrictions set forth under "Transfer Restrictions," transfers between the Participants will be effected in accordance with DTC's procedures, and will be settled in same-day funds, and transfers between

participants in Euroclear and Clearstream will be effected in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the Senior Notes described herein, cross-market transfers between the Participants, on the one hand, and Euroclear or Clearstream participants, on the other hand, will be effected through DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, as the case may be, by their respective depositaries; however, such cross-market transactions will require delivery of instructions to Euroclear or Clearstream, as the case may be, by the counterparty in such system in accordance with the rules and procedures and within the established deadlines (Brussels time) of such system. Euroclear or Clearstream, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in the relevant Global Note in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Euroclear participants and Clearstream participants may not deliver instructions directly to the depositories for Euroclear or Clearstream.

DTC has advised the Company that it will take any action permitted to be taken by a holder of Senior Notes only at the direction of one or more Participants to whose account DTC has credited the interests in the Global Notes and only in respect of such portion of the aggregate principal amount of the Senior Notes as to which such Participant or Participants has or have given such direction. However, if there is an Event of Default under the Senior Notes, DTC reserves the right to exchange the Global Notes for legended notes in certificated form, and to distribute such notes to its Participants.

Although DTC, Euroclear and Clearstream have agreed to the foregoing procedures to facilitate transfers of interests in the Global Notes among participants in DTC, Euroclear and Clearstream, they are under no obligation to perform or to continue to perform such procedures, and may discontinue such procedures at any time. None of the Company, the trustee and any of their respective agents will have any responsibility for the performance by DTC, Euroclear or Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

**Exchange of Global Notes for Certificated Notes**

A Global Note is exchangeable for Certificated Notes if:

(1)     DTC (a) notifies the Company that it is unwilling or unable to continue as depositary for the Global Notes or (b) has ceased to be a clearing agency registered under the Exchange Act and, in either case, the Company fails to appoint a successor depositary; or

(2)     there has occurred and is continuing an Event of Default with respect to the Senior Notes.

Beneficial interests in a Global Note may be exchanged for Certificated Notes upon prior written notice given to the trustee by or on behalf of DTC or any successor depositary in accordance with the indenture. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of DTC or any successor depositary (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to in "Transfer Restrictions," unless that legend is not required by applicable law.

**Exchange of Certificated Notes for Global Notes**

Certificated Notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such securities. See "Transfer Restrictions."

**Exchanges between Regulation S Global Notes and Rule 144A Global Notes**

Prior to the expiration of the Restricted Period, beneficial interests in the Regulation S Global Note may be exchanged for beneficial interests in the Rule 144A Global Notes only if:

(1)     such exchange occurs in connection with a transfer of the Senior Notes pursuant to Rule 144A; and

(2)     the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that the Senior Notes are being transferred to a Person:

(a)     who the transferor reasonably believes to be a qualified institutional buyer within the meaning of Rule 144A;

(b)     purchasing for its own account or the account of a qualified institutional buyer in a transaction meeting the requirements of Rule 144A; and

(c)     in accordance with all applicable securities laws of the states of the United States and other jurisdictions.

Beneficial interests in a Rule 144A Global Note may be transferred to a Person who takes delivery in the form of an interest in the Regulation S Global Note, whether before or after the expiration of the Restricted Period, only if the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144 (if available) and that, if such transfer occurs prior to the expiration of the Restricted Period, the interest transferred will be held immediately thereafter through Euroclear or Clearstream.

Transfers involving exchanges of beneficial interests between the Regulation S Global Notes and the Rule 144A Global Notes will be effected by DTC by means of an instruction originated by the trustee through the DTC Deposit/Withdrawal at Custodian system. Accordingly, in connection with any such transfer, appropriate adjustments will be made to reflect a decrease in the principal amount of the Regulation S Global Note and a corresponding increase in the principal amount of the Rule 144A Global Note or vice versa, as applicable. Any beneficial interest in one of the Global Notes that is transferred to a Person who takes delivery in the form of an interest in the other Global Note will, upon transfer, cease to be an interest in such Global Note and will become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Note for so long as it remains such an interest. The policies and practices of DTC may prohibit transfers of beneficial interests in the Regulation S Global Note prior to the expiration of the Restricted Period.

**Same Day Settlement and Payment**

The Company will make payments in respect of the Senior Notes represented, by the Global Notes (including principal, premium, if any, interest) by wire transfer of immediately available funds to the accounts specified by DTC or its nominee.  The Company will make all payments of principal, interest and premium, if any, with respect to Certificated Notes by wire transfer of immediately available funds to the accounts specified by the holders of the Certificated Notes or, if no such account is specified, by mailing a check to each such holder's registered address. The Senior Notes represented by the Global Notes are expected to be eligible to trade in DTC's Same-Day Funds Settlement System, and any permitted secondary market trading activity in such Senior Notes will, therefore, be required by DTC to be settled in immediately available funds.  The Company expects that secondary trading in any Certificated Notes will also be settled in immediately available funds.

Because of time zone differences, the securities account of a Euroclear or Clearstream participant purchasing an interest in a Global Note from a Participant will be credited, and any such crediting will be reported to the relevant Euroclear or Clearstream participant, during the securities settlement processing day (which must be a business day for Euroclear and Clearstream) immediately following the settlement date of DTC.  DTC has advised the Company that cash received in Euroclear or Clearstream as a result of sales of interests in a Global Note by or through a Euroclear or Clearstream participant to a Participant will be received with value on the settlement date of DTC but will be available in the relevant Euroclear or Clearstream cash account only as of the business day for Euroclear or Clearstream following DTC's settlement date.

## Governing Law

The indenture and the Senior Notes will be governed by, and construed in accordance with, the laws of the State of New York without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.  The Collateral Documents will be governed by the laws of Mexico.

As specified above, under Mexican monetary law (*Ley Monetaria de los Estados Unidos Mexicanos*), in the event that proceedings were brought in Mexico seeking to enforce the Company's obligations under the Senior Notes in Mexico, pursuant to an initial action or in connection with the enforcement of a judgment, the Company would not be required to discharge such obligations in Mexico in a currency other than Mexican currency.  According to such law, an obligation in a currency other than Mexican currency, which is payable in Mexico, may be satisfied in pesos at the rate of exchange in effect on the date and in the place payment occurs.  Such rate is currently determined by the Mexican Central Bank (*Banco de México*) every business banking day in Mexico and published the following business banking day in the Official Gazette of the Federation (*Diario Oficial de la Federación*).

## Consent to Jurisdiction and Service

Each of the Company and the subsidiary guarantors will appoint C T Corporation System, 28 Liberty Street, New York, New York 10005 as its agent for actions brought Under Federal or state securities laws brought in any Federal or state court located in the Borough of Manhattan in The City of New York and will submit (together with all other parties to the indenture) to the jurisdiction of such courts.

## Certain Definitions

Set forth below are certain defined terms used in the indenture.  Reference is made to the indenture for a full disclosure of all defined terms used therein, as well as any other capitalized terms used herein for which no definition is provided.

"Acquired Debt" means, with respect to any specified Person:

(1)     Indebtedness of any other Person existing at the time such other Person is merged with or into or becomes a Subsidiary of such specified Person, whether or not such Indebtedness is incurred in connection with, or in contemplation of, such other Person merging with or into, or becoming a Restricted Subsidiary of, such specified Person; and

(2)     Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Asset Sale" means:

(1)     the sale, lease, conveyance or other disposition (including a Sale and Leaseback Transaction) of any assets or rights; *provided* that the sale, lease, conveyance or other disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries taken as a whole will be governed by the provisions of the indenture described above under the caption "—Repurchase at the Option of Holders—Change of Control" and/or the provisions described above under the caption "—Certain Covenants—Merger, Consolidation or Sale of Assets" and not by the provisions of the Asset Sale covenant; and

(2)    the issuance of Equity Interests in any of the Company's Restricted Subsidiaries or the sale of Equity Interests in any of its Subsidiaries.

Notwithstanding the preceding, none of the following items will be deemed to be an Asset Sale:

(1)    any single transaction or series of related transactions that involves assets having a Fair Market Value at the time of such transaction of less than US$5.0 million;

(2)    a transfer of assets by a Restricted Subsidiary to the Company or by the Company or a Restricted Subsidiary to a Wholly-Owned Restricted Subsidiary;

(3)    an issuance of Equity Interests by a Restricted Subsidiary of the Company to the Company or to a Restricted Subsidiary of the Company;

(4)    the sale or lease of products, services or accounts receivable in the ordinary course of business and any sale or other disposition of damaged, worn-out or obsolete assets in the ordinary course of business;

(5)    for purposes of "—Repurchase at the Option of Holders—Asset Sales and Events of Loss," the sale or other disposition of cash or Cash Equivalents;

(6)    for purposes of "—Repurchase at the Option of Holders—Asset Sales and Events of Loss" a Restricted Payment that does not violate the covenant described above under the caption "—Certain Covenants— Restricted Payments" or a Permitted Investment;

(7)    the sale or discount of accounts receivable, but only in connection with the compromise or collection thereof, or the disposition of assets in connection with a foreclosure or transfer in lieu of a foreclosure or other exercise of remedial action;

(8)    any exchange of like property similar to (but not limited to) those allowable under Section 1031 of the Internal Revenue Code; or

(9)    grants of licenses to use the Company's or any Restricted Subsidiary's trade secrets, know-how and other technology or intellectual property in the ordinary course of business to the extent that such license does not prohibit the licensor from using the patent, trade secret, know-how or technology.

"Asset Sale Offer" has the meaning assigned to that term in the indenture governing the Senior Notes.

"Attributable Debt" means, in respect of a Sale and Leaseback Transaction the present value of the total obligations of the lessee for rental payments during the remaining term of the lease in the Sale and Leaseback Transaction. Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with IFRS; *provided*, *however*, that if such sale and leaseback transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligation".

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "Beneficially Owns" and "Beneficially Owned" have a corresponding meaning.

"Board of Directors" means:

(1)     with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2)     with respect to a partnership, the Board of Directors of the general partner of the partnership;

(3)     with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(4)     with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means any day other than a Saturday or Sunday, or a day on which commercial banking institutions in The City of New York or Mexico City or place of payment are authorized or required by law, regulation or executive order to remain closed.

"Capital Lease Obligation" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with IFRS and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"Capital Stock" means:

(1)     in the case of a corporation, corporate stock;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)     any other interest or participation (however designated) that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Cash Equivalents" means:

(1)     United States dollars, Mexican pesos;

(2)     securities issued or directly and fully guaranteed or insured by the United States or Mexican government or any agency or instrumentality of the United States or Mexican government (provided that the full faith and credit of the United States or Mexico is pledged in support of those securities) having maturities of not more than six months from the date of acquisition;

(3)     demand deposits, time deposits, certificates of deposit or Eurodollar deposits with a maturity of 365 days or less from the date of acquisition of any financial institution which at the date of acquisition has outstanding indebtedness rated at least "A-" by S&P or at least A3 by Moody's (or the equivalent of such rating by such rating organization, or, if no rating of S&P or Moody's then exists because neither of the foregoing then rates obligations of the type described in this clause, the equivalent of such rating by any other United States nationally recognized securities rating agency);

87

(4)     repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)     commercial paper having one of the two highest ratings obtainable from Moody's or S&P and, in each case, maturing within six months after the date of acquisition;

(6)     Mexican Peso deposits, with maturities of not more than 12 months from the date of acquisition, in any bank or financial institution incorporated under the laws of Mexico with total assets exceeding the equivalent of US$350 million; *provided* that the aggregate principal amount of any such deposits in banks described in this clause shall not exceed the equivalent of US$20.0 million at any time outstanding;

(7)     repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by Mexico and backed by the full faith and credit of Mexico maturing within one year from the date of acquisition, in each case entered into with any of the Mexican banks specified in the preceding clause (6); *provided* that such agreement with banks described in subclause (6)(B) shall be deemed a deposit for purposes of the US$20.0 million limit in such subclause; and

(8)     money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (1) through (7) of this definition.

"Change of Control" means the occurrence of any of the following:

(1)     the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Company and its Subsidiaries taken as a whole to any Person, if any "person" (as that term is used in Section 13(d) of the Exchange Act) other than the Permitted Holders is the Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock of such Person, measured by voting power rather than number of shares;

(2)     the adoption of a plan relating to the liquidation or dissolution of the Company;

(3)     the consummation of any transaction (including, without limitation, any merger or consolidation), the result of which is that any "person" (as defined above) other than the Permitted Holders becomes the Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock of the Company, measured by voting power rather than number of shares; or

(4)     the first day on which a majority of the members of the Board of Directors of the Company are not Continuing Directors.

"Change of Control Offer" has the meaning assigned to that term in the indenture governing the Senior Notes.

"Collateral" has the meaning set forth under "Security—Collateral."

"Collateral Agent" has the meaning set forth under "Security—Collateral."

"Collateral Asset Sale" means any Asset Sale (*provided however* that any exchange of assets under clause 8 of the definition of Asset Sales shall only be for new assets that immediately thereof constitute Collateral and have been pledged and perfected on a first-priority basis on the date of exchange) of any Collateral, or a series of related Asset Sales by the Company or any of its Subsidiaries involving the Collateral, other than (i) the sale for Fair Market Value of machinery, equipment, furniture or implements or other similar property that may be defective or may have become worn out or obsolete or no longer used or useful in the operations of the Company or (ii) sales of inventory in the ordinary course of business.  A Collateral Asset Sale will not include an Event of Loss.

"Collateral Documents" has the meaning set forth under "Security—Collateral."

"Collateral Permitted Liens" means any of the following:

    (1)    statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by IFRS has been made in respect thereof;

    (2)    Liens for taxes, assessments or governmental charges or levies on the property of the Company or any Restricted Subsidiary if the same shall not at the time be delinquent or thereafter can be paid without penalty, or are being contested in good faith and by appropriate proceedings promptly instituted and diligently concluded; *provided* that any reserve or other appropriate provision that shall be required in conformity with IFRS shall have been made therefor;

    (3)    Liens Incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

    (4)    Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

    (5)    Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Company or a Restricted Subsidiary, including rights of offset and set-off;

    (6)    Liens existing on the Issue Date created before December 20, 2006;

    (7)    zoning restrictions, licenses, easements, servitudes, rights of way, title defects, covenants running with the land and other similar charges or encumbrances or restrictions not interfering in any material respect with the ordinary operation of any Collateral or materially and adversely affecting the value of the Collateral; and

    (8)    Liens created pursuant to the Collateral Documents securing the Senior Notes or any note guarantees.

"Consolidated Interest Expense" means, for any period, the total interest expense of the Company and its consolidated Restricted Subsidiaries, plus, to the extent not included in such total interest expense, and to the extent incurred by the Company or its Restricted Subsidiaries, without duplication:

    (1)    interest expense attributable to Capital Lease Obligations or to leases constituting a part of Sale and Leaseback Transactions;

    (2)    amortization of debt discount;

    (3)    amortization of debt issuance costs;

    (4)    capitalized interest;

(5)    non-cash interest expense;

(6)    commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing;

(7)    net payments pursuant to Hedging Obligations but excluding realized and unrealized foreign exchange gains and losses with respect to Hedging Obligations and unrealized gains and losses associated with interest rate Hedging Obligations in each case in accordance with IFRS, and

(8)    the product of (a) dividends paid or accrued in respect to Disqualified Stock of the Company or in respect of preferred stock of any Restricted Subsidiary, in either case held by Persons other than the Company or a Restricted Subsidiary (other than dividends payable solely in Capital Stock (other than Disqualified Stock) of the Company), times (b) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined tax rate of such Person, expressed as decimal, in each case, on a consolidated basis and in accordance with IFRS.

"Consolidated Net Income" means, for any period, the aggregate amount of net income (or loss) of the Company and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with IFRS.

"Continuing Directors" means, as of any date of determination, any member of the Board of Directors of the Company who:

(1)    was a member of such Board of Directors on the date of the indenture; or

(2)    was nominated for election or elected to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"Designated Non-cash Consideration" means the Fair Market Value of non-cash consideration received by the Company or a Restricted Subsidiary in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an officers' certificate, setting forth the basis of such valuation, executed by the principal financial officer of the Company.

"Disqualified Stock" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, (1) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, (2) is redeemable at the option of the holder of the Capital Stock, in whole or in part, or (3) is convertible or exchangeable for Indebtedness or Disqualified Stock; in each case on or prior to the first anniversary of the Stated Maturity of the Senior Notes. Notwithstanding the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Company to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale will not constitute Disqualified Stock if (A) the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favorable to the holders of such Capital Stock than the terms applicable to the Senior Notes and described under "—Repurchase at the Option of Holders" or "—Certain Covenants—Merger, Consolidation or Sale of Assets"; (B) any such requirement only becomes operative after compliance with such terms applicable to the Senior Notes, including the purchase of any Senior Notes tendered pursuant thereto and (C) the terms of such Capital Stock provide that the Company may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption complies with the covenant described above under the caption "—Certain Covenants— Restricted Payments." The amount of Disqualified Stock deemed to be outstanding at any time for purposes of the indenture will be the maximum amount that the Company and its Restricted Subsidiaries may

become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"EBITDA" means, with respect to any specified Person for any period, the Consolidated Net Income of such Person for such period, plus:

    (1)    Consolidated Interest Expense, to the extent deducted in calculating Consolidated Net Income, plus

    (2)    to the extent deducted in calculating Consolidated Net Income and as determined on a consolidated basis for the Company and its Restricted Subsidiaries in conformity with IFRS:

        (a)    income taxes, other than income taxes or income tax adjustments (whether positive or negative) attributable to Asset Sales or extraordinary and non-recurring gains or losses;

        (b)    depreciation, amortization (including amortization of intangibles and amortization of pre-operating expenses capitalized in accordance with IFRS but excluding amortization of prepaid cash expenses that were paid in a prior period) and all other non-cash items reducing Consolidated Net Income (not including non-cash charges in a period which reflect cash expenses paid or to be paid in another period), less all non-cash items increasing Consolidated Net Income; and

        (c)    all non-cash compensation expense arising out of the issuance of Equity Interests issued to directors, officers or employees of the Company or any of its Restricted Subsidiaries;

*provided* that, with respect to any Restricted Subsidiary, such items will be added only to the extent and in the same proportion that the relevant Restricted Subsidiary's net income was included in calculating Consolidated Net Income,

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Event of Loss" means (i) the loss of, destruction of, or damage to any Collateral; (ii) the condemnation, seizure, confiscation, requisition of the use or taking by exercise of the power of eminent domain or otherwise of any Collateral or (iii) any consensual settlement in lieu of any event listed in clause (ii), in each case whether in a single event or a series of related events, that results in Net Proceeds from all sources in excess of $5.0 million.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Existing Indebtedness" means Indebtedness of the Company and its Subsidiaries in existence on the date of the indenture, until such amounts are repaid.

"Existing Indenture" means the indenture dated as of October 11, 2013, among the Company, the guarantors named therein, Deutsche Bank Trust Company Americas, as indenture trustee, and Deutsche Bank Luxembourg, S.A., as Luxembourg sub-paying agent and transfer agent as amended, supplemented and otherwise modified pursuant to which the Company issued the old notes.

"Fair Market Value" means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Board of Directors of the Company (unless otherwise provided in the indenture).

"Government Securities" means direct obligations of, or obligations guaranteed by, the United States of America (including any agency or instrumentality thereof) and the payment for which the United States pledges its full fault and credit.

"Guarantee" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of

assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"Hedging Obligations" means, with respect to any specified Person, the obligations of such Person under:

    (1)    interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements and interest rate collar agreements;

    (2)    other agreements or arrangements designed to manage interest rates or interest rate risk; and

    (3)    other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.

"IFRS" means International Financial Reporting Standards issued by the International Accounting Standards Board.

"Indebtedness" means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent:

    (1)    in respect of borrowed money;

    (2)    evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

    (3)    in respect of banker's acceptances;

    (4)    representing Capital Lease Obligations;

    (5)    Attributable Debt under Sale and Leaseback Transactions under which such a Person is a lessee;

    (6)    representing the balance deferred and unpaid of the purchase price of any property or services due more than six months after such property is acquired or such services are completed;

    (7)    representing any Hedging Obligations; or

    (8)    all Indebtedness of a Receivables Subsidiary and the net unrecovered purchase price of any receivables in connection with a Permitted Securitization.

if and to the extent any of the preceding items (other than letters of credit, Hedging Obligations and obligations in connection with a Permitted Securitization referred to in clause (8)) would appear as a liability upon a balance sheet of the specified' Person prepared in accordance with IFRS.  In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) and, to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person.

"Intercompany Indebtedness" means any present or future Indebtedness of the Company owing to any of its present or future Subsidiaries, and Indebtedness of any of its present or future Subsidiaries owing to the Company or any of its present or future Subsidiaries.

"Intercompany Lender" means any obligor that is a lender in respect of any Intercompany Indebtedness under the Intercompany Subordination and Credit Agreement.

"Intercompany Subordination and Credit Agreement" has the meaning set forth in clause (1) under "Certain Covenants—Limitation on Intercompany Indebtedness".

"Intercompany Subordination and Credit Agreement Supplement" means a supplement to the Intercompany Subordination and Credit Agreement pursuant to which a New Subsidiary becomes party to the Intercompany Subordination and Credit Agreement, substantially in the form attached to the Intercompany Subordination and Credit Agreement.

"Intercompany Trust Agreement" means the *contrato de fideicomiso irrevocable de administración con derechos de reversión*, dated on or prior to the Issue Date, pursuant to which, to the extent provided therein, the rights and interests of the Intercompany Lenders under the Intercompany Subordination and Credit Agreement shall be transferred by the Intercompany Lenders, as grantors (*fideicomitentes*) and beneficiaries (*fideicomisarios en segundo lugar*), to the Mexican trustee, as trustee, and the Collateral Agent, with the Holders of the Senior Notes designated as beneficiaries in the first place (*fideicomisarios en primer lugar*), in the form to be attached to the indenture.

"Intercompany Trust Agreement Supplement" means a supplement to the Intercompany Trust Agreement pursuant to which a New Subsidiary becomes party to the Intercompany Trust Agreement and the Intercompany Subordination and Credit Agreement, substantially in the form attached to the Intercompany Trust Agreement.

"Investments" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with IFRS.  If the Company or any Restricted Subsidiary of the Company sells or otherwise disposes of any Equity Interests of any direct or indirect Subsidiary of the Company such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of the Company, the Company will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Company's Investments in such Restricted Subsidiary that were not sold or disposed of in an amount determined as provided in the final paragraph of the covenant described above under the caption "—Certain Covenants— Restricted Payments." Except as otherwise provided in the indenture, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"Issue Date" means the date on which the Senior Notes are first issued.

"Leverage Ratio" means as of a specific date (the "Calculation Date"), the ratio of (i) the aggregate principal amount of the Company's outstanding Indebtedness and the Indebtedness of the Restricted Subsidiaries plus the amount of all obligations in respect of the repayment of Disqualified Stock and the liquidation preference of preferred stock of Restricted Subsidiaries, in each case determined as of the Calculation Date and calculated in accordance with IFRS to (ii) the Company's aggregate EBITDA for the period consisting of the last two full fiscal quarters for which financial statements are publicly available (the "Reference Period") multiplied by two.

For purposes of calculating the Leverage Ratio:

    (1)    acquisitions that have been made by the Company or any of its Restricted Subsidiaries, including through mergers or consolidations, or any Person or any of its Restricted Subsidiaries acquired by the Company or any of its Restricted Subsidiaries, and including any related financing transactions and including increases in ownership of Restricted Subsidiaries, during the two-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date will be given pro forma effect (in accordance with IFRS) as if they had occurred on the first day of the Reference Period;

    (2)    the EBITDA attributable to discontinued operations, as determined in accordance with IFRS and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded;

(3)      any Person that is a Restricted Subsidiary on the Calculation Date will be deemed to have been a Restricted Subsidiary at all times during such Reference Period;

(4)      any Person that is not a Restricted Subsidiary on the Calculation Date will be deemed not to have been a Restricted Subsidiary at any time during such Reference Period; and

(5)      if any Indebtedness bears a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligation applicable to such Indebtedness if such Hedging Obligation has a remaining term as at the Calculation Date in excess of 12 months).

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction.

"Mexico" means the United Mexican States (*Estados Unidos Mexicanos*) and any branch of power thereof and any ministry, department, authority or statutory corporation or other entity (including a trust), owned or controlled directly or indirectly by the United Mexican States or any of the foregoing.

"Moody's" means Moody's Investors Service, Inc.

"Net Proceeds" means the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of the direct costs relating to such Asset Sale, including, without limitation, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses incurred as a result of the Asset Sale, taxes paid or payable as a result of the Asset Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, and amounts required to be applied to the repayment of Indebtedness secured by a Lien on the asset or assets that were the subject of such Asset Sale and distributions required to be made under applicable law or the by-laws of a Restricted Subsidiary in effect on the date of the indenture to minority interest holders on account of such Asset Sale, the amount of any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with IFRS and any cash escrows in connection with purchase price adjustments, reserves or indemnities (until released).

"New Subsidiary" has the meaning set forth under "Additional Note Guarantees; Additional Security."

"Non-Recourse Debt" means Indebtedness:

(1)      as to which neither the Company nor any of its Restricted Subsidiaries (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is directly or indirectly liable as a guarantor or otherwise; or (c) constitutes the lender;

(2)      no default with respect to which (including any rights that the holders of the Indebtedness may have to take enforcement action against an Unrestricted Subsidiary) would permit upon notice, lapse of time or both any holder of any other Indebtedness of the Company or any of its Restricted Subsidiaries to declare a default on such other Indebtedness or cause the payment of the Indebtedness to be accelerated or payable prior to its Stated Maturity; and

(3)      as to which the lenders have been notified in writing that they will not have any recourse to the stock or assets of the Company or any of its Restricted Subsidiaries.

"note guarantee" means the Guarantee by each subsidiary guarantor of the Company's obligations under the indenture and the Senior Notes, executed pursuant to the provisions of the indenture.

"Obligations" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"old notes" means the Step-Up Senior Notes due 2020, issued pursuant to the Existing Indenture.

"Ordinary Course Intercompany Indebtedness" means Intercompany Indebtedness issued by the Company or its Subsidiaries to the Company or a Subsidiary of the Company in the ordinary course of business consistent with past practice, including without limitation trade payables and Intercompany Indebtedness issued for treasury management purposes of the Company or such Subsidiary.

"Permitted Business" means the development, ownership and/or operation of one or more telephone, telecommunications, information or data transmission systems or networks and/or the provision of telephony, telecommunications and/or information services and any related, ancillary or complementary business, including, without limitation, local and long distance telephony, telecommunications and other information and transmission services such as the Internet, broadband or cable television.

"Permitted Holders" means Rodrigo Lebois Mateos, Enrique Castillo Sánchez Mejorada, Henry Davis Carstens, Alberto Martin Soberón, Ricardo Guillermo Amtmann Aguilar, Javier Molinar Horcasitas, Wilfrido Castillo Sánchez Mejorada and any Affiliates or immediate family of such persons.

"Permitted Investments" means:

(1)    (a) any Investment in the Company or in a Wholly-Owned Restricted Subsidiary of the Company that is a subsidiary guarantor, (b) any Investment in any other Restricted Subsidiary of the Company that is a subsidiary guarantor, *provided* that such Investment is evidenced by an intercompany note, (c) any Investment in the Equity Interests of a Restricted Subsidiary of the Company that is a subsidiary guarantor (by way of acquisition of Equity Interest or capital contribution) in an amount not to exceed US$5.0 million in the aggregate for all Investments pursuant to this clause 1(c) or (d) any Investment in a Restricted Subsidiary other than a Wholly- Owned Restricted Subsidiary consisting solely of the capitalization of amounts due to the Company in exchange for Equity Interests of such Restricted Subsidiary by such Restricted Subsidiary not to exceed US$5.0 million in the aggregate for all Investments made pursuant to this clause 1(d);

(2)    any Investment in Cash Equivalents;

(3)    any Investment by the Company or any Restricted Subsidiary in a Person in a Related Business if, as a result of such Investment, such Person immediately becomes a Wholly-Owned Restricted Subsidiary that is a subsidiary guarantor of such Person or is immediately merged consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Company or a Wholly-Owned Restricted Subsidiary that is a subsidiary guarantor;

(4)    any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with the covenant described above under the caption "— Repurchase at the Option of Holders—Asset Sales and Events of Loss";

(5)    any Investments received in compromise or resolution of (A) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Company or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes with Persons who are not Affiliates;

(6)     Investments represented by Hedging Obligations permitted to be incurred under "—Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock";

(7)     loans or advances to employees made in the ordinary course of business of the Company or any Restricted Subsidiary of the Company in an aggregate principal amount not to exceed US$500,000 at any one time outstanding;

(8)     repurchases of the Senior Notes;

(9)     Investments in a Receivables Subsidiary or any Investment by a Receivables Subsidiary in any other Person under a Permitted Securitization; that are necessary or advisable to effectuate such Permitted Securitization; *provided* that any Investment in a Receivables Subsidiary is in the form of a Purchase Money Note, contribution of additional receivables and related assets or any Equity Interests;

(10)    Investments to the extent made in exchange for the issuance of Capital Stock (other than Disqualified Stock) of the Company;

(11)    any Investment made within 60 days after the date of the commitment to make the Investment, that when such commitment was made, would have complied with the terms of the indenture; *provided* that such Investment shall be deemed to have made under the provision under which it was intended to have been made; and

(12)    other Investments made since the date of the indenture that do not exceed, at any one time outstanding, US$10.0 million.

"Permitted Liens" means:

(1)     Liens in favor of the Company or the subsidiary guarantors;

(2)     Liens on property of a Person existing at the time such Person is merged with or into or consolidated with the Company or any Subsidiary of the Company; *provided* that such Liens were in existence prior to the contemplation of such merger or consolidation and do not extend to any assets other than those of the Person merged into or consolidated with the Company or the Subsidiary;

(3)     Liens on property (including Capital Stock) existing at the time of acquisition of the property by the Company or any Subsidiary of the Company; *provided* that such Liens were in existence prior to, such acquisition, and not incurred in contemplation of, such acquisition;

(4)     Liens in favor of issuers of surety bonds or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business; *provided*, *however*, that such letters of credit do not constitute Indebtedness;

(5)     Liens to secure Indebtedness (including Capital Lease Obligations) permitted by clause (3) of the second paragraph of the covenant entitled "—Certain Covenants—Incurrence of Indebtedness and Issuance of Preferred Stock" covering only the assets acquired with or financed by such Indebtedness;

(6)     Liens (i) existing on the issue date of the old notes and (ii) any other Liens existing on the date of the indenture, provided that such Liens (a) are incurred not in violation of the Existing Indenture and (b) will not have a material adverse effect on the rights of holders of the Senior Notes with respect to the Collateral or otherwise;

(7)    Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; *provided* that any reserve or other appropriate provision as is required in conformity with IFRS has been made therefor;

(8)    Liens imposed by law, such as carriers', warehousemen's, landlord's and mechanics' Liens, in each case, incurred in the ordinary course of business;

(9)    survey exceptions, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property incidental to the conduct of the business of such Person or to the ownership of its properties that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(10)    Liens on Receivables and related assets granted in connection with a Permitted Securitization, including Liens on Receivables transferred to a Receivables Subsidiary under a Permitted Securitization;

(11)    Liens to secure any Permitted Refinancing Indebtedness permitted to be incurred under the indenture; *provided*, *however*, that:

(a)    the new Lien shall be limited to all or part of the same property and assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the original Lien (plus improvements and accessions to, such property or proceeds or distributions thereof); and

(b)    the Indebtedness secured by the new Lien is not increased to any amount greater than the sum of (x) the outstanding principal amount, or, if greater, committed amount, of the Permitted Refinancing Indebtedness and (y) an amount necessary to pay any fees and expenses, including premiums, related to such renewal, refunding, refinancing, replacement, defeasance or discharge;

(12)    Liens in the ordinary course to secure Hedging Obligations with respect to the Senior Notes permitted by clause (7) of the second paragraph of the covenant entitled "—Certain Covenants— Incurrence of Indebtedness and Issuance of Preferred Stock"; and

(13)    Collateral Permitted Liens.

"Permitted Refinancing Indebtedness" means any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge other Indebtedness of the Company or any of its Restricted Subsidiaries (other than Intercompany Indebtedness); *provided* that:

(1)    the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness renewed, refunded, refinanced, replaced, defeased or discharged (plus all accrued interest on the Indebtedness and the amount of all fees and expenses, including premiums, incurred in connection therewith);

(2)    such Permitted Refinancing Indebtedness has, at the time the Permitted Refinancing Indebtedness is incurred, a final maturity date later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged;

(3)     if the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged is subordinated in right of payment to the Senior Notes, such Permitted, Refinancing Indebtedness has a final maturity date later than the final maturity date of, and is subordinated in right of payment to, the Senior Notes on terms at least as favorable to the holders of Senior Notes as those contained in the documentation governing the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged; and

(4)     such Indebtedness is incurred either by the Company or by the Restricted Subsidiary who is the obligor on the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged.

"Permitted Securitization" means any sale, transfer or other disposition by the Company or any of its Restricted Subsidiaries of Receivables and related collateral, credit support and similar rights and any other assets that are customarily transferred in a securitization of receivables, pursuant to one or more securitization programs, to a Receivables Subsidiary or a Person who is not an Affiliate of the Company; *provided* that (i) the consideration to be received by the Company and its Restricted Subsidiaries other than a Receivables Subsidiary for any such disposition consists of cash, a promissory note or a customary contingent right to receive cash in the nature of a "hold-back" or similar contingent right, (ii) no Default shall have occurred and be continuing or would result therefrom, and (iii) the aggregate outstanding balance of the Indebtedness in respect of all such programs at any point in time is not in excess of US$30.0 million (or US$50.0 million so long as a first, priority security interest for the benefit of the noteholders on the Collateral is in full force and effect).

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"Plan" means the Joint Prepackaged Plan of Reorganization of Maxcom Telecomunicaciones, S.A.B. de C.V. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code in the form set forth in Exhibit B to this statement (including all exhibits annexed thereto and the plan supplement, as it may be modified, amended, or supplemented from time to time).

"Purchase Money Note" means a promissory note evidencing a line of credit, or evidencing other Indebtedness owed to the Company or any Restricted Subsidiary in connection with a Permitted Securitization, which note shall be repaid from cash available to the maker of such note, other than amounts required to be established as reserves, amounts paid to investors in respect of interest, principal and other amounts owing to such investors and amounts paid in connection with the purchase of newly generated accounts receivable.

"Receivable" shall mean a right to receive payment arising from a sale or lease of goods or the performance of services by a Person pursuant to an arrangement with another Person pursuant to which such other Person is obligated to pay for good or services under terms that permit the purchase of such goods and services on credit and shall include, in any event, any items of property that would be classified as an "account," "chattel paper," "payment intangible" or "instrument" under the Uniform Commercial Code and any supporting obligations.

"Receivables Subsidiary" shall mean any Wholly Owned Restricted Subsidiary of the Company (or another Person in which the Company or any Restricted Subsidiary makes an Investment and to which the Company or one or more of its Restricted Subsidiaries transfer Receivables and related assets) which engages in no activities other than in connection with the financing of Receivables and which is designated by the Board of Directors of the applicable Restricted Subsidiary (as provided below) as a Receivables Subsidiary and which meets the following conditions:

(1)     no portion of the Indebtedness or any other obligations (contingent or otherwise) of which:

(a)     is guaranteed by the Company or any Restricted Subsidiary (that is not a Receivables Subsidiary);

(b)     is recourse to or obligates the Company or any Restricted Subsidiary (that is not a Receivables Subsidiary); or

98

(c)    subjects any property or assets of the Company or any Restricted Subsidiary (that is not a Receivables Subsidiary), directly or indirectly, contingently or otherwise, to the satisfaction thereof;

(2)    with which neither the Company nor any Restricted Subsidiary (that is not a Receivables Subsidiary) has any material contract, agreement, arrangement or understanding (other than Standard Securitization Undertakings); and

(3)    to which neither the Company nor any Restricted Subsidiary (that is not a Receivables Subsidiary) has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

Any such designation by the Board of Directors of the applicable Restricted Subsidiary shall be evidenced by a certified copy of the resolution of the Board of Directors of such Restricted Subsidiary giving effect to such designation and an officers' certificate certifying, to the best of such officers' knowledge and belief, that such designation complies with the foregoing conditions.

"Replacement Collateral" means, at any relevant date in connection with a Collateral Asset Sale or Event of Loss, assets to be used in the business of the Company or its Subsidiaries, which on such date (i) constitute assets under "Telephone Network Systems and Equipment" on the Company's consolidated balance sheet, (ii) are to be acquired by the Company at a purchase price that does not exceed the Fair Market Value of such Replacement Collateral, (iii) will be upon purchase free and clear of all Liens other than Collateral Permitted Liens (other than any Lien described under clause (6) of the definition thereof), and (iv) are subject to Collateral Documents to which the owner of the Replacement Collateral is a party.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Subsidiary" of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary.

"S&P" means Standard & Poor's Ratings Group.

"Sale and Leaseback Transaction" means, with respect to any Person, an arrangement whereby such Person enters into a lease of property previously transferred by such Person to the lessor.

"Securities Act" means the Securities Act of 1933, as amended.

"Significant Subsidiary" means any Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such Regulation is in effect on the date of the indenture.

"Standard Securitization Undertakings" means representations, warranties, covenants and indemnities entered into by the Company or any Restricted Subsidiary which are reasonably customary in securitization of accounts receivable transactions.

"Stated Maturity" means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness as of the date of the indenture, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"Subsidiary" means, with respect to any specified Person:

(1)    any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled,

directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

    (2)    any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof).

"subsidiary guarantors" means each of:

    (1)    Outsourcing Operadora de Personal, S.A. de C.V.; *

    (2)    TECBTC Estrategias de Promoción, S.A. de C.V.; *

    (3)    Maxcom SF, S.A. de C.V.; *

    (4)    Maxcom TV, S.A. de C.V.; *

    (5)    Maxcom USA, Inc.;

    (6)    Telereunión, S.A. de C.V.; *

    (7)    Telscape de México, S.A. de C.V.;

    (8)    Sierra Comunicaciones Globales, S.A. de C.V.; *

    (9)    Sierra USA Communications, Inc.;

    (10)    Asesores Telcoop, S.A. de C.V.;

    (11)    Maxcom USA Telecom, Inc.

    (12)    any other Subsidiary of the Company that executes a note guarantee in accordance with the provisions of the indenture; and

    (13)    their respective successors and assigns, in each case, until the note guarantee of such Person has been released in accordance with the provisions of the indenture.

(*) The "subsidiary guarantors" indicated with an asterisk above have no operations and are expected to merge with the Company prior to the Issue Date. If they are so merged, they will no longer be subsidiary guarantors with respect to the Senior Notes.

"Total Assets" means the total consolidated assets of the Company and its Restricted Subsidiaries (excluding the value of any Investments in Persons other than Restricted Subsidiaries), as shown on the most recent balance sheet of the Company delivered to the trustee pursuant to "—Reports."

"Unrestricted Subsidiary" means any Subsidiary of the Company that is designated by the Board of Directors of the Company as an Unrestricted Subsidiary pursuant to a resolution of the Board of Directors, *provided* that such designation maybe only made if such Subsidiary;

    (1)    has no Indebtedness other than Non-Recourse Debt;

    (2)    except as permitted by the covenant described above under the caption "—Certain Covenants—Transactions with Affiliates," is not party to any agreement, contract, arrangement or understanding with the Company or any Restricted Subsidiary of the Company unless the terms of any such agreement, contract, arrangement or understanding

are no less favorable to the Company or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Company;

(3)     is a Person with respect to which neither the Company nor any of its Restricted Subsidiaries has any direct or indirect obligation (a) to subscribe for additional Equity Interests or (b) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results;

(4)     has not guaranteed or otherwise directly or indirectly provided credit support for any Indebtedness of the Company or any of its Restricted Subsidiaries;

(5)     does not own any Capital Stock or Indebtedness of, or holds any Lien on any property of, the Company or any Person other than Unrestricted Subsidiaries of the Subsidiary to be so designated;

(6)     (A) the Subsidiary to be so designated has total assets of US$1,000 or less or (B) if such Subsidiary has assets greater than US$1,000, such designation would be permitted under the covenant described under "—Certain Covenants—Restricted Payments"; and

(7)     immediately after giving effect to such designation no Default shall have occurred and be continuing.

"Voting Stock" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1)     the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of the Indebtedness, by (b) the number of years (calculated to the nearest one- twelfth) that will elapse between such date and the making of such payment; by

(2)     the then outstanding principal amount of such Indebtedness.

"Wholly-Owned Restricted Subsidiary" of any specified Person means a Restricted Subsidiary of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares) will at the time be owned by such Person or by one or more Wholly-Owned Restricted Subsidiaries of such Person.

## DESCRIPTION OF THE JUNIOR PIK NOTES

You can find the definitions of certain terms used in this description under the subheading "—Certain Definitions." In this Description of the Junior PIK Notes, the word "Company" refers only to Maxcom Telecomunicaciones, S.A.B. de C.V. (a *sociedad anónima bursátil de capital variable* incorporated under the laws of the United Mexican States or Mexico) and not to any of its subsidiaries.  All references to "Ps." or "pesos" are to Mexican pesos, and all references to "US$" or "dollars" are to U.S. dollars.

The Company will issue the Junior PIK Notes under an indenture among itself, U.S. Bank N.A., as trustee, transfer agent, paying agent and registrar, and a Luxembourg sub-paying agent and transfer agent to be named therein. If the Junior PIK Notes are issued in the exchange offer, they will be issued in a private transaction that is not subject to the registration requirements of the Securities Act and will be subject to certain restrictions on transfer. If the Junior PIK Notes are issued under the Plan instead of the exchange offer, they will be issued pursuant to section 1145(a) of the Bankruptcy Code, and therefore will not be deemed restricted securities. Accordingly, upon issuance, such Junior PIK Notes issued under the Plan will be freely tradable by any holder not deemed an underwriter in the public market without restriction or further registration under the Securities Act, subject to applicable law. See "Transfer Restrictions."

The following description is a summary of the material provisions of the indenture.  It does not restate the indenture in its entirety.  We urge you to read the indenture because it, and not this description, defines your rights as holders of the Junior PIK Notes.  Copies of the indenture will be available as set forth below under "—Additional Information."  Certain defined terms used in this description but not defined below under "—Certain Definitions" have the meanings assigned to them in the indenture.

The registered holder of a Junior PIK Note will be treated as the owner of it for all purposes.  Only registered holders will have rights under the indenture.

### Brief Description of the Junior PIK Notes

The Junior PIK Notes:

- will be general unsecured obligations of the Company; and

- will be junior in right of payment with all other existing and future Senior Indebtedness of the Company.

### Principal, Maturity and Interest

For every US$1,000 of its old notes, the Company will issue the Peso Equivalent of US$100 in aggregate principal amount of Junior PIK Notes, for a maximum of up to the Peso Equivalent of US$10,337,867.  The Junior PIK Notes and any additional notes ("PIK Interest Notes") issued as PIK Interest (as defined below) will be treated as a single class for all purposes under the indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase the Junior PIK Notes.  (See "—Additional Notes".)  The Company will issue Junior PIK Notes in denominations of Ps.20,000 and integral multiples of Ps.20.00 in excess thereof.

The Junior PIK Notes are perpetual notes with no fixed final maturity date. We may redeem the notes, or be required to redeem the notes, in accordance with the provisions described under "—Optional Redemption" and "—Mandatory Redemption."

There will be no interest paid on the Junior PIK Notes.  The principal amount of the Junior PIK Notes will increase by 15% per annum on each anniversary of the Issue Date. Such increase in principal amount is referred to herein as "PIK Interest."

If the due date for payment of any amount in respect of principal on any of the Junior PIK Notes is not a Business Day, the holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day and shall not be entitled to any further interest or other payment in respect of any such delay.

When PIK Interest is payable, PIK Interest Notes, having the same terms as the Junior PIK Notes, will be issued in a principal amount equal to the amount of such interest payable. PIK Interest payable with respect to Junior PIK Notes represented by Global Notes will be payable by the Company issuing a new Global Note or by increasing the aggregate principal amount of the outstanding Global Notes by an amount equal to the amount of PIK Interest payable. PIK Interest payable with respect to any Junior PIK Notes represented by Certificated Notes will be payable by the Company issuing PIK Interest Notes in certificated form in an aggregate principal amount equal to the amount of PIK Interest payable.

If money for the payment of principal remains unclaimed for two years, the trustee and/or the paying agent will, upon written request therefore from the Company, pay the money back to the Company. After that, holders entitled to money must look to the Company for payment as general creditors unless the applicable law designates another person.

## Methods of Receiving Payments on the Junior PIK Notes

If a holder of Junior PIK Notes has given wire transfer instructions to the Company, the Company will pay or cause to be paid all principal, Additional Amounts and premium, if any, on that holder's Junior PIK Notes in accordance with those instructions. All other payments on the Junior PIK Notes will be made at the office or agency of the paying agent and registrar or other place of payment unless the Company elects to make payments by check mailed to the noteholders at their address set forth in the register of holders.

The method for payment of the Junior PIK Notes will be described in greater detail in the indenture and the Global Notes.

## Paying Agent and Registrar for the Junior PIK Notes

The trustee will initially act as paying agent and registrar for the Junior PIK Notes. The Company may change the paying agent or registrar without prior notice to the holders of the Junior PIK Notes, and the Company or any of its Subsidiaries may act as paying agent or registrar.

## Transfer and Exchange

A holder may transfer or exchange Junior PIK Notes in accordance with the provisions of the indenture. The registrar and the trustee may require a holder, among other things, to furnish appropriate endorsements and transfer documents in connection with a transfer of Junior PIK Notes. Holders will be required to pay all taxes due on transfer or other similar governmental charges payable in connection therewith. The Company will not be required to transfer or exchange any Junior PIK Note selected for redemption. Also, the Company will not be required to transfer or exchange any Junior PIK Note for a period of 15 days before a selection of Junior PIK Notes to be redeemed.

## Additional Notes

The Junior PIK Notes offered hereby and any PIK Interest Notes will be treated as a single class for all purposes under the indenture and will vote together as one class on all matters with respect to the Junior PIK Notes. However, if PIK Interest Notes that are treated as part of a single class under the indenture with the Junior PIK Notes offered hereby are not fungible with the Junior PIK Notes offered hereby for U.S. federal income tax purposes, such PIK Interest Notes will be assigned a CUSIP, ISIN and common code different from those assigned to the Junior PIK Notes offered hereby.

## Optional Redemption

Only if no Senior Notes (as described elsewhere in this statement) are outstanding, on each PIK Interest payment date, the Company may redeem the Junior PIK Notes, in whole and not in part, upon not less than 30 nor more than 60 days' notice, at a redemption price equal to 100% of the principal amount of Junior PIK Notes redeemed and Additional Amounts, if any, to the date of redemption (the "Redemption Date"), subject to the rights of holders of Junior PIK Notes on the relevant record date to receive PIK Interest due on the relevant interest payment date.

**Mandatory Redemption**

*Change of Control*

If a Change of Control occurs, the Company will be required to redeem all outstanding Junior PIK Notes, at an aggregate redemption price of the lesser of (i) the principal amount of the outstanding Junior PIK Notes and (ii) the Applicable Percentage of the Equity Value. For purposes of this paragraph, (x) "Applicable Percentage" means 25% if the sale occurs during the first seven years following the Issue Date, 30% if the sale occurs during the eighth year following the Issue Date, 35% if the sale occurs during the ninth year following the Issue Date, 40% if the sale occurs during the tenth year following the Issue Date or 45% if the sale occurs during the eleventh year or any subsequent year following the Issue Date, and (y) "Equity Value" means the implied market capitalization based on the weighted average prices of shares sold in the Change of Control transaction (if applicable), or if there is no such consideration, the Company's total equity value as reasonably determined by the Company in accordance with market practice.

Within ten days following the date on which a Change of Control occurs, the Company will deliver a notice to each holder, with a copy to the trustee, describing the transaction or transactions that constitute the Change of Control and stating that the Company will redeem the Junior PIK Notes on the Change of Control Payment Date specified in the notice, which date will be no earlier than 30 days and no later than 60 days from the date such notice is delivered, pursuant to the procedures required by the indenture and described in such notice. On the Change of Control Payment Date, the Company will redeem all outstanding Junior PIK Notes.

If the Junior PIK Notes are required to be redeemed upon a Change of Control, there can be no assurance that the Company will have available funds sufficient to pay the Change of Control purchase price for all the Junior PIK Notes. In the event the Company is required to redeem outstanding Junior PIK Notes upon a Change of Control, the Company expects that it would seek third party financing to the extent it does not have available funds to meet its purchase obligations. However, there can be no assurance that the Company would be able to obtain such financing.

Neither the Board of Directors of the Company nor the trustee may waive the covenant relating to the Company's obligation to redeem the Junior PIK Notes upon a Change of Control. Consummation of any such transaction in certain circumstances may require the purchase of the Junior PIK Notes, and there can be no assurance that the Company or the acquiring party will have sufficient financial resources to effect such purchase. Such restriction may, in certain circumstances, make more difficult or discourage any leveraged buyout of the Company or any of its Subsidiaries by the management of the Company. The indenture may not afford the holders protection in all circumstances from the adverse aspects of a highly leveraged transaction, reorganization, restructuring, merger or similar transaction.

The definition of Change of Control includes a phrase relating to the direct or indirect sale, lease, transfer, conveyance or other disposition of "all or substantially all" of the properties or assets of the Company and its Subsidiaries taken as a whole. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, the Company's obligation to redeem the Junior PIK Notes as a result of a sale, lease, transfer, conveyance or other disposition of less than all of the assets of the Company and its Subsidiaries taken as a whole to another Person or group may be uncertain.

*Payment of Dividends*

If the Company makes a payment of any dividend or makes any other payment or distribution on account of the Company's Equity Interests or to the holders of the Company's Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests of the Company and other than dividends or distributions payable to the Company or a Subsidiary of the Company), the Company will be required to redeem all outstanding Junior PIK Notes at a redemption price equal to 100% of the principal amount of Junior PIK Notes redeemed and Additional Amounts, if any, to the date of redemption (the "Redemption Date"), subject to the rights of holders of Junior PIK Notes on the relevant record date to receive PIK Interest due on the relevant interest payment date.

**Open Market Purchases**

The Company may at any time and from time to time purchase Junior PIK Notes in the open market or otherwise.

**Notices to Holders**

Notices of redemption will be mailed by first class mail at least 30 but not more than 60 days before the Redemption Date to each holder of Junior PIK Notes to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a Redemption Date if the notice is issued in connection with a defeasance of the Junior PIK Notes or a satisfaction and discharge of the indenture. Notices of redemption may not be conditional.

**Subordination of the Junior PIK Notes**

The payment by the Company of the principal of, and premium, if any, on the Junior PIK Notes will be subordinated in right of payment to the prior payment in full of all existing and future Senior Indebtedness of the Company. Upon any payment or distribution of the Company's assets of any kind or character, whether in cash, property or securities, to creditors upon any total or partial liquidation, dissolution, winding up, reorganization, assignment for the benefit of creditors or marshaling of the Company's assets or in a bankruptcy, suspension of payments, *concurso mercantil*, *quiebra*, insolvency or other similar proceeding relating to the Company or its property, whether voluntary or involuntary, all principal of, interest on and all other amounts due or to become due will be paid, first, to all Senior Indebtedness in full in cash, or such payment duly provided for to the satisfaction of the holders of Senior Indebtedness, before any payment or distribution of any kind or character is made on account of any principal of or other amounts owing in respect of the Junior PIK Notes (other than in Permitted Junior Securities), or for the acquisition of any of the Junior PIK Notes for cash, property or otherwise.

Substantially all of the operations of the Company are conducted through its Subsidiaries. The Junior PIK Notes will not be guaranteed by any Subsidiaries or other Affiliates of the Company. Accordingly, claims of creditors of each Subsidiary of the Company, including trade creditors, and claims of preferred stockholders (if any) of such Subsidiary generally will have priority with respect to the assets and earnings of such Subsidiary over the claims of creditors of the Company, including holders of Junior PIK Notes, even if such claims do not constitute Senior Indebtedness. The Junior PIK Notes, therefore, are effectively subordinated to creditors (including trade creditors) and preferred stockholders (if any) of Subsidiaries of the Company.

We will not be permitted to make any payment or distribution of any kind or character with respect to the Junior PIK Notes, other than in the form of Permitted Junior Securities, if either of the following occurs (a "Payment Default"):

(1)     any obligation on any Senior Indebtedness is not paid in full in cash when due; or

(2)     any other default on Senior Indebtedness occurs and the maturity of such Senior Indebtedness is accelerated in accordance with its terms;

unless, in either case, the Payment Default has been cured or waived and any such acceleration has been rescinded or such Senior Indebtedness has been paid in full in cash; provided, however, that we will be entitled to make a payment or distribution under the Junior PIK Notes without regard to the foregoing if the Company and the trustee receive written notice approving such payment from the Representatives of all Senior Indebtedness with respect to which the Payment Default has occurred and is continuing.

During the continuance of any default (other than a Payment Default) (a "Non-Payment Default") with respect to any Senior Indebtedness pursuant to which the maturity thereof may be accelerated without further notice (except such notice as may be required to effect such acceleration) or the expiration of any applicable grace periods, we will not be permitted to make any payment or distribution of any kind or character with respect to the Junior PIK Notes (except in the form of Permitted Junior Securities) for a period (a "Payment Blockage Period") commencing upon the receipt by the trustee (with a copy to the Company) of written notice (a "Blockage Notice") of such Non-

Payment Default from the Representative of such Senior Indebtedness specifying an election to effect a Payment Blockage Period and ending 179 days thereafter. The Payment Blockage Period will end earlier if such Payment Blockage Period is terminated:

(1)     by written notice to the trustee and Company from the Person or Persons who gave such Blockage Notice;

(2)     because the default giving rise to such Blockage Notice is cured, waived or otherwise no longer continuing; or

(3)     because such Senior Indebtedness has been discharged or repaid in full in cash.

Notwithstanding the provisions described in the immediately preceding paragraph (but subject to the other provisions contained herein), unless the holders of such Senior Indebtedness or the Representative of such Senior Indebtedness shall have accelerated the maturity of such Senior Indebtedness or a Payment Default has occurred and is continuing, we will be permitted to resume paying the Junior PIK Notes after the end of such Payment Blockage Period. The Junior PIK Notes will not be subject to more than one Payment Blockage Period in any consecutive 360-day period irrespective of the number of Non-Payment Defaults with respect to Senior Indebtedness during such period. However, in no event will the total number of days during which any Payment Blockage Period or Periods on the Junior PIK Notes is in effect exceed 179 days in the aggregate during any consecutive 360-day period, and there must be at least 181 days during any consecutive 360 day period during which no Payment Blockage Period is in effect.

Notwithstanding the foregoing, however, no Non-Payment Default that existed or was continuing on the date of commencement of any Payment Blockage Period with respect to any Senior Indebtedness and that was the basis for the initiation of such Payment Blockage Period will be, or be made, the basis for a subsequent Payment Blockage Period unless such default will have been cured or waived for a period of not less than 90 consecutive days (it being acknowledged that any subsequent action, or any breach of any financial covenants during the period after the date of delivery of such initial Blockage Notice, that, in either case, would give rise to a Non-Payment Default pursuant to any provisions under which a Non-Payment Default previously existed or was continuing will constitute a new Non-Payment Default for this purpose).

Upon any payment or distribution of the assets of the Company to creditors upon a total or partial liquidation or dissolution or reorganization of or similar proceeding relating to the Company or its property:

(1)     the holders of Senior Indebtedness will be entitled to receive payment in full in cash of such Senior Indebtedness before holders of Junior PIK Notes shall be entitled to receive any payment or distribution of any kind or character with respect to any obligations on, or relating to, the Junior PIK Notes;

(2)     until the Senior Indebtedness is paid in full in cash, any payment or distribution to which holders of Junior PIK Notes would be entitled but for these subordination provisions shall be made to holders of such Senior Indebtedness as their interests may appear, except that holders of Junior PIK Notes may receive Permitted Junior Securities; and

(3)     if a distribution is made to holders of the Junior PIK Notes that, due to the subordination provisions, should not have been made to them, holders of the Junior PIK Notes will be required to hold such distribution in trust for the holders of Senior Indebtedness and to pay it over to such holders of Senior Indebtedness as their interests may appear.

The subordination and payment blockage provisions described above will not prevent a Default from occurring under the indenture upon the failure of the Company to pay principal with respect to the Junior PIK Notes when due by their terms.

By reason of the subordination provisions contained in the indenture, in the event of a liquidation or insolvency proceeding, creditors of the Company who are holders of Senior Indebtedness may recover more, ratably, than the

holders of the Junior PIK Notes, and creditors who are not holders of Senior Indebtedness may recover less, ratably, than holders of Senior Indebtedness and may recover more, ratably, than the holders of the Junior PIK Notes.

The indenture will provide that each holder of Junior PIK Notes, by accepting a Junior PIK Note, acknowledges and agrees that the foregoing subordination provisions are, and are intended to be, an inducement and a consideration to each holder of any Senior Indebtedness, whether such Senior Indebtedness was created or acquired before or after the issuance of the Junior PIK Notes, to acquire and continue to hold, or to continue to hold, such Senior Indebtedness, and such holder of such Senior Indebtedness shall be deemed conclusively to have relied on such subordination provisions in acquiring and continuing to hold, or in continuing to hold, such Senior Indebtedness.

The terms of the subordination provisions described above will not apply to payments from money or the proceeds of Government Securities held in trust by the trustee for the payment of principal of the Junior PIK Notes pursuant to the provisions described under "—Legal Defeasance" and "—Satisfaction and Discharge."

**Enforceability of Judgments**

Since the Company is organized under the laws of Mexico and the Subsidiaries of the Company may be incorporated in various non-U.S. jurisdictions, including Mexico, and all of their directors and substantially all of their officers and certain of the experts named herein are non-U.S. residents, and all or a significant portion of the assets of those persons may be, and the most significant portion of the Company's and Subsidiaries' assets are, located outside the United States, it may not be possible for investors to effect service of process within the United States upon those persons or to enforce against them or against the Company or the Subsidiaries in U.S. courts judgments predicated upon civil liability provisions of the U.S. federal or state securities laws. See "Service of Process and Enforcement of Civil Liabilities."

An obligation denominated in a currency other than Mexican currency which is payable in Mexico may be satisfied through the payment of Mexican currency at the rate of exchange determined and published by Banco de México (the Bank of Mexico), or the Central Bank, in effect on the date such payment occurs. Pursuant to the *Ley Monetaria de los Estados Unidos Mexicanos* (Mexican Monetary Law), in the event that proceedings are brought in Mexico seeking to enforce the obligations of the Company and/or each of the Subsidiaries under the Junior PIK Notes or if payment under the Junior PIK Notes is claimed from the Company or any of the Subsidiaries in Mexico, pursuant to an initial action or in connection with the enforcement of a judgment, the Company or any Subsidiaries would not be required to discharge such obligations in Mexico in a currency other than Mexican currency, and any difference resulting from the conversion of such Mexican currency into U.S. dollars may not be claimed from or enforced against us. The exchange currency rate for the purposes specified herein is currently determined by the Central Bank every business banking day in Mexico, published the second following business banking day in the Official Gazette of the Federation.

**Luxembourg Listing**

Application will be made to list the Junior PIK Notes on the Euro MTF, the alternative market of the Luxembourg Stock Exchange; however, the Company cannot assure the holders of the Junior PIK Notes that they will be accepted for listing. Following the issuance of the Junior PIK Notes, the Company will use its best efforts to obtain and maintain listing of the Junior PIK Notes on the Euro MTF; *provided, however*, that if the Company is unable to list the Junior PIK Notes on the Euro MTF, or if the Company is unable maintain its listing on the Euro MTF, it will use its best efforts prior to the delisting of the Junior PIK Notes, list and maintain a listing of the Junior PIK Notes on another internationally recognized stock exchange.

**Luxembourg Listing Agent, Luxembourg Sub-Paying Agent and Luxembourg Transfer Agent**

The Company will maintain a Luxembourg listing agent, Luxembourg sub-paying agent and Luxembourg transfer agent in respect of the Junior PIK Notes so long as the Junior PIK Notes are listed on the Luxembourg Stock Exchange and the rules of the exchange so require.

**Currency Indemnity**

U.S. dollars are the currency of account and payment for certain sums payable by the Company under or in connection with the Junior PIK Notes. To the greatest extent permitted under applicable law, any amount received or recovered in a currency other than dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding up or dissolution of the Company or otherwise) by any holder of a Junior PIK Note in respect of any sum expressed to be due to it from the Company in dollars shall constitute a discharge to the Company only to the extent of the dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that dollar amount is less than the dollar amount expressed to be due to the recipient under any Junior PIK Note, the Company shall indemnify the recipient against any loss sustained by it as a result. In any event, the Company shall indemnify the recipient against the cost of making any such purchase. For the purposes of this paragraph, it will be sufficient for the holder of a Junior PIK Note to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of dollars been made with the amount so received or recovered in that other currency on the date of receipt or recovery (or, if a purchase of dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date he certified in the manner mentioned above). These indemnities constitute a separate and independent obligation from the other obligations of the Company, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any holder of a Junior PIK Note and shall constitute in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Junior PIK Note.

**Additional Amounts**

The Company is required by Mexican law to deduct Mexican withholding taxes, at a rate expected to be 4.9% if the Company satisfies certain conditions required under Mexican law (subject to certain exceptions), from payments of interest or amounts deemed interest to investors who are not residents of Mexico for tax purposes, and the Company will pay additional amounts on those payments (and certain other payments) except as described below.

All payments under or in respect of the Junior PIK Notes shall be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, levies, imposts, assessments or governmental charges (including penalties, interest and additions related thereto) (collectively, "Taxes") of whatever nature imposed, levied, collected, withheld or assessed unless such withholding or deduction is required by law. In the event of any such withholding or deduction imposed or levied by a Tax Jurisdiction (as defined below) is required to be made from any payments under or with respect to the Junior PIK Notes, the Company shall pay to holders of the Junior PIK Notes such additional amounts ("Additional Amounts") as will result in the net payment to such holder (including Additional Amounts) of the amount that would otherwise have been receivable by such holder in the absence of such withholding or deduction, except that no such Additional Amounts shall be payable with respect to:

(a)     any Taxes that would not have been so withheld or deducted but for the holder or beneficial owner of the Junior PIK Notes having a present or former connection to the relevant Tax Jurisdiction (including having a permanent establishment for tax purposes in such Tax Jurisdiction, being a citizen or resident or national of, incorporated in or carrying on a business, in the relevant Tax Jurisdiction in which such Taxes are imposed) other than the mere receipt of payments in respect of the Junior PIK Notes, the mere holding or ownership of such Junior PIK Note or beneficial interest in the Junior PIK Note or the exercise of any rights under the Junior PIK Notes or the indenture;

(b)     where presentation is required for payment on a Junior PIK Note, any Taxes that would not have been so withheld or deducted if the Junior PIK Note had been presented for payment within 30 days after the Relevant Date (as defined below), except to the extent that the holder would have been entitled to Additional Amounts had the Junior PIK Note been presented any day during such 30 day period and there were no additional withholdings or deductions as a result of such late presentment;

(c)    any Taxes that would not have been so withheld or deducted but for the failure by the holder or the beneficial owner of the Junior PIK Note or any payment in respect of such Junior PIK Note, after written request made to that holder or beneficial owner at least 60 days before any such withholding or deduction would be payable, by the Company, the trustee or the paying agent, as applicable, to comply with any certification, identification, information, documentation or other similar reporting requirement concerning its nationality, residence, identity or connection with the relevant Tax Jurisdiction, which is required or imposed by a statute, regulation or administrative practice of the relevant Tax Jurisdiction as a precondition to exemption from all or part of such Taxes;

(d)    any estate, inheritance, gift, sales, transfer, personal property or similar Taxes imposed with respect to any Junior PIK Note;

(e)    any Taxes payable other than by withholding or deduction;

(f)    any withholding or deduction imposed on a payment to an individual that is required to be made pursuant to the European Union Directive on the taxation of savings income (the "Directive") implementing the conclusions of the European Council of Economic and Finance Ministers (ECOFIN) meeting on June 3, 2003, or any law implementing or complying with, or introduced in order to conform to, such Directive;

(g)    any Taxes imposed in connection with a Junior PIK Note presented for payment (where presentation is required) by or on behalf of a holder or beneficial owner thereof who would have been able to avoid such tax by presenting the relevant Junior PIK Note to another paying agent; or

(h)    any combination of (a) through (g) above.

Notwithstanding the foregoing, the limitations on the Company's obligation to pay Additional Amounts set forth in clauses (c) and (h) above shall not apply if (i) the provision of information, documentation or other evidence described in such clauses (c) and (h) would be materially more onerous, in form, in procedure or in the substance of information disclosed, to a holder or beneficial owner of a Junior PIK Note (taking into account any relevant differences between U.S. and Mexican law rules, regulations or administrative practice) than comparable information or other reporting requirements imposed under U.S. tax law, regulation and administrative practice as of the date hereof (such as IRS Forms W-8, W-8BEN and W-9) or (ii) Article 195, Section II of the Mexican Income Tax Law, or a substantially similar successor of such provision is in effect, unless the provision of the information, documentation or other evidence described in clauses (c) and (h) is expressly required by statute, regulation or official administrative practice of general application in order to apply Article 195, Section II of the Mexican Income Tax Law, the Company cannot obtain such information, documentation or other evidence on its own through reasonable diligence and the Company otherwise would meet the requirements for application of Article 195, Section II of the Mexican Income Tax Law.  In addition, such clauses (c) and (h) shall not be construed to require a non-Mexican pension or retirement fund or a non-Mexican financial institution or another holder to register with the Ministry of Finance and Public Credit or the *Servicio de Administración Tributaria* for the purpose of establishing eligibility for an exemption from or reduction of Mexican withholding tax or to require that a holder or beneficial owner certify or provide information concerning whether it is or is not a tax-exempt pension or retirement fund.

If the Directive imposes taxes upon Junior PIK Notes, the Company will use commercially reasonable efforts to maintain a paying agent with a specified office in a member state of the European Union that will not be obligated to withhold or deduct tax pursuant to the Directive or any law implementing or complying with, or introduced in order to conform to, the Directive.

"Tax Jurisdiction" means (1) Mexico or any political subdivision thereof or any authority therein or thereof having the power to tax or (2) any jurisdiction in which the Company (including any successor entity) is then incorporated, engaged in business or resident for tax purposes or any political subdivision thereof or therein having the power to tax.

"Relevant Date" means whichever is the later of (i) the date on which such payment first becomes due and (ii) if the full amount payable has not been received by the trustee on or prior to such due date, the date on which, the full amount having been so received, notice to that effect shall have been given to the holders of the Junior PIK Notes in accordance with the indenture.

References to principal, interest or any other amount payable on or in respect of any Junior PIK Note shall be deemed also to refer to any Additional Amounts which may be payable as set forth in the indenture or in the Junior PIK Notes to the extent that Additional Amounts are, were or would be payable in respect thereof.

At least ten Business Days prior to the first interest payment date (and at least 10 Business Days prior to each succeeding interest payment date if there has been any change with respect to the matters set forth in the below-mentioned officers' certificate), the Company will furnish to the trustee and the paying agent an officers' certificate instructing the trustee and the paying agent whether payments of principal of or interest on the Junior PIK Notes due on such interest payment date will be made without deduction or withholding for or on account of any Taxes by the Tax Jurisdictions (other than the jurisdiction where the trustee is located or organized). If any such deduction or withholding shall be required, at least 20 days prior to such interest payment date (unless the obligation to pay Additional Amounts arises after the 20th day prior to the payment date, in which case the Company shall notify the trustee and the paying agent promptly thereafter), the Company will furnish the trustee and the paying agent with an officers' certificate that specifies the amount, if any, required to be withheld on such payment to holders of the Junior PIK Notes. If the Company is obligated to pay Additional Amounts with respect to such payment, the officers' certificate must also set forth any other information reasonably necessary to enable the paying agent to pay Additional Amounts to the holders on the relevant payment date. For these purposes, any officers' certificate required by the indenture to be provided to the trustee and any paying agent shall be deemed to be duly provided if telecopied to the trustee and such paying agent.

The Company will make all withholdings and deductions required by law and will remit the full amount deducted or withheld to the relevant Tax authority in accordance with applicable law. The Company will obtain official receipts from each Tax authority evidencing the payment of any Taxes so deducted or withheld, or, if such receipts are not obtainable, such other documentation reasonably acceptable to the trustee. The Company shall furnish to the trustee the official receipts (or a certified copy of the official receipts or other such documentation, as applicable) evidencing payment of Taxes. The Company will attach to each certified copy or other such documentation, as applicable, a certificate stating (x) that the amount of such Tax evidenced by the certified copy was paid in connection with payments under or with respect to the Junior PIK Notes then outstanding upon which such Taxes were due and (y) the amount of such withholding tax paid per Ps.20.00 of principal amount of the Junior PIK Notes. Copies of such receipts or other such documentation, as applicable, shall be made available to holders of the Junior PIK Notes upon request.

The Company shall promptly pay when due, and indemnify the holder for, any present or future stamp, issue, registration, court and/or documentary taxes, and/or any other excise taxes, similar charges or similar levies imposed by the Tax Jurisdictions on the execution, delivery, registration or enforcement of any of the Junior PIK Notes, the indenture or any other document or instrument referred to herein or therein.

**Optional Tax Redemption**

The Junior PIK Notes may be redeemed at the Company's election, as a whole, but not in part, by the giving of notice as provided in the indenture, at a price equal to the outstanding principal amount thereof, together with any Additional Amounts then due and that will become due on the Redemption Date as a result of the redemption or otherwise and accrued and unpaid interest to the Redemption Date, if (1) as a result of any change in, or amendment to, the laws (or any regulations promulgated thereunder) of the relevant Tax Jurisdiction, or any change in the official application, administration or interpretation of such laws or regulations in the relevant Tax Jurisdiction, the Company has or will become obligated to pay on the next interest payment date any Additional Amounts on the Junior PIK Notes in excess of the Additional Amounts the Company would be obligated to pay if payments made on the Junior PIK Notes were subject to withholding or deduction of Mexican taxes at a rate in excess of 4.9 percent ("Excess Additional Amounts"), (2) such change or amendment is announced on or after the Issue Date (or, if later, the date a jurisdiction becomes a relevant Tax Jurisdiction), (3) if there has been a further issuance, such obligation would have arisen absent a further issuance of the Junior PIK Notes pursuant to the indenture, and (4) such

obligation cannot be avoided by the Company taking reasonable measures available to it (including, without limitation, changing the jurisdiction from or through which payments are made); *provided*, *however*, that no such notice of redemption shall be given earlier than 60 days prior to the earliest date on which the Company would be obliged to pay such Excess Additional Amounts. Prior to the giving of any notice of redemption of the Junior PIK Notes pursuant to the foregoing, the Company will deliver to the trustee (1) an officers' certificate stating that the conditions precedent to the right of the Company to so redeem have occurred and that the obligation to pay Excess Additional Amounts cannot be avoided by the Company by taking reasonable measures available to it, and (2) a written opinion of independent legal counsel of recognized standing in the relevant Tax Jurisdiction to the effect that the Company has become obligated to pay Excess Additional Amounts as a result of a change or amendment described above.

## Events of Default and Remedies

Each of the following is an "Event of Default":

(1)  default in the payment when due (upon redemption or otherwise) of the principal of, or premium, if any, on, the Junior PIK Notes; and

(2)  certain events of bankruptcy, reorganization, *concurso mercantil*, *quiebra*, insolvency or similar laws of Mexico, the U.S. or any other jurisdiction described in the indenture with respect to the Company or any Significant Subsidiary or any group of Subsidiaries that, taken together, would constitute a Significant Subsidiary (a "Bankruptcy Event of Default").

Upon the occurrence of a Bankruptcy Event of Default, the entire principal amount of all the Junior PIK Notes and any Additional Amounts will be automatically accelerated, without any action by the Trustee or any holder and any principal or Additional Amounts will become immediately due and payable.

If any Event of Default occurs and is continuing, the trustee or the holders of at least 25% in aggregate principal amount of the then outstanding Junior PIK Notes may declare all the Junior PIK Notes to be due and payable immediately.

Subject to certain limitations, holders of a majority in aggregate principal amount of the then outstanding Junior PIK Notes may direct the trustee in writing in its exercise of any trust or power.  The trustee may withhold from holders of the Junior PIK Notes notice of any continuing Default or Event of Default if it determines that withholding notice is in their interest, except a Default or Event of Default relating to the payment of principal or premium, if any.  The trustee shall have the right to decline to follow any such direction if the trustee in good faith, by a responsible officer of the trustee, shall determine that the proceeding so directed would involve the trustee in personal liability.

Subject to the provisions of the indenture relating to the duties of the trustee, in case an Event of Default occurs and is continuing, the trustee will be under no obligation to exercise any of the rights or powers under the indenture at the request or direction of any holders of Junior PIK Notes unless such holders have offered to the trustee indemnity or security satisfactory to it against any loss, liability or expense.  Except to enforce the right to receive payment of principal, premium, if any, or interest when due, no holder of a Junior PIK Note may pursue any remedy with respect to the indenture or the Junior PIK Notes unless:

(1)     such holder has previously given the trustee written notice that an Event of Default is continuing;

(2)     holders of at least 25% in aggregate principal amount of the then outstanding Junior PIK Notes have requested the trustee to pursue the remedy;

(3)     such holders have offered the trustee security or indemnity satisfactory to it against any loss, liability or expense;

(4)     the trustee has not complied with such written request within 60 days after the receipt of such request and the offer of security or indemnity; and

(5)      holders of a majority in aggregate principal amount of the then outstanding Junior PIK Notes
have not given the trustee a direction inconsistent with such request within such 60-day
period.

The holders of a majority in aggregate principal amount of the then outstanding Junior PIK Notes by written
notice to the trustee may, on behalf of the holders of all of the Junior PIK Notes, rescind an acceleration or waive
any existing Default or Event of Default and its consequences under the indenture except a continuing Default or
Event of Default in the payment of interest or premium, if any, on, or the principal of, the Junior PIK Notes.

**No Personal Liability of Directors, Officers, Employees and Stockholders**

No director, officer, employee, incorporator or stockholder of the Company, as such, will have any liability for
any obligations of the Company under the Junior PIK Notes, the indenture or for any claim based on, in respect of,
or by reason of, such obligations or their creation.  Each holder of Junior PIK Notes by accepting a Junior PIK Note
waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Junior
PIK Notes.  The waiver may not be effective to waive liabilities under the federal securities laws.

**Legal Defeasance**

The Company may at any time, at the option of its Board of Directors evidenced by a resolution set forth in an
officers' certificate, elect to have all of its obligations discharged with respect to the outstanding Junior PIK Notes
("Legal Defeasance") except for:

(1)      the rights of holders of outstanding Junior PIK Notes to receive payments in respect of the
principal of, or premium, if any and any Additional Amounts that may be due and payable, if
any on such Junior PIK Notes when such payments are due from the trust referred to below;

(2)      the Company's obligations with respect to the Junior PIK Notes concerning issuing
temporary notes, registration of notes, mutilated, destroyed, lost or stolen notes and the
maintenance of an office or agency for payment and money for security payments held in
trust;

(3)      the rights, powers, trusts, duties and immunities of the trustee, and the Company's
obligations in connection therewith; and

(4)      the Legal Defeasance provisions of the indenture.

In order to exercise Legal Defeasance:

(1)      the Company must irrevocably deposit with the trustee, in trust, for the benefit of the holders
of the Junior PIK Notes, cash in Mexican pesos, non-callable Government Securities, or a
combination of cash in Mexican pesos and non-callable Government Securities, in amounts
as will be sufficient, in the opinion of a nationally recognized firm of independent public
accountants, to pay the principal of, or premium, if any and any Additional Amount that may
be due and payable, if any on the outstanding Junior PIK Notes on the stated date for
payment thereof or on the applicable Redemption Date, as the case may be, and the
Company must specify whether the Junior PIK Notes are being defeased to such stated date
for payment or to a particular Redemption Date;

(2)      in the case of Legal Defeasance, the Company must deliver to the trustee an opinion of
counsel in the United States reasonably acceptable to the trustee confirming that (a) the
Company has received from, or there has been published by, the Internal Revenue Service a
ruling or (b) since the date of the indenture, there has been a change in the applicable federal
income tax law, in either case to the effect that, and based thereon such opinion of counsel
will confirm that the beneficial owners of the outstanding Junior PIK Notes will not
recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal

Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)     the Company must deliver to the trustee an opinion of counsel in Mexico to the effect that (A) the beneficial owners of the outstanding Junior PIK Notes will not recognize income, gain or loss for Mexican Tax purposes as a result of such deposit and defeasance and will be subject to Mexican Taxes, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred, and (B) payments from the defeasance trust will be made free and clear of, and without withholding or deduction for or on account of any present or future Taxes imposed, levied, collected, withheld or assessed by Mexico or any political subdivision or governmental authority thereof or therein having power to Tax;

(4)     no Default or Event of Default has occurred and is continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit), and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company is a party or by which the Company is bound;

(5)     123 days pass after the deposit is made;

(6)     such Legal Defeasance will not result in a breach or violation of, or constitute a default under, any material agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound;

(7)     the Company must deliver to the trustee an officers' certificate stating that the deposit was not made by the Company with the intent of preferring the holders of Junior PIK Notes over the other creditors of the Company with the intent of defeating, hindering, delaying or defrauding any creditors of the Company or others;

(8)     the Company must deliver to the trustee and opinion of counsel in the United States and Mexico to the effect that on the 123rd day following the deposit, the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally; and

(9)     the Company must deliver to the trustee an officers' certificate and an opinion of counsel, each stating that all conditions precedent relating to the Legal Defeasance have been complied with.

## Amendment, Supplement and Waiver

Except as provided in the next two succeeding paragraphs, the indenture or the Junior PIK Notes may be amended or supplemented with the consent of the holders of at least a majority in aggregate principal amount of the Junior PIK Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Junior PIK Notes), and any existing Default or Event of Default or compliance with any provision of the indenture or the Junior PIK Notes may be waived with the consent of the holders of a majority in aggregate principal amount of the then outstanding Junior PIK Notes (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Junior PIK Notes).

Without the consent of each holder of Junior PIK Notes affected, an amendment, supplement or waiver may not (with respect to any Junior PIK Notes held by a non-consenting holder):

(1)     reduce the principal amount of Junior PIK Notes whose holders must consent to an amendment, supplement or waiver;

(2)    reduce the principal of any Junior PIK Note or alter the provisions with respect to the redemption of the Junior PIK Notes;

(3)    reduce the rate of or change the time for payment of PIK Interest on any Junior PIK Note;

(4)    waive a Default or Event of Default in the payment of principal of, or premium, if any, on, the Junior PIK Notes (except a rescission of acceleration of the Junior PIK Notes by the holders of at least a majority in aggregate principal amount of the then outstanding Junior PIK Notes and a waiver of the Payment Default that resulted from such acceleration);

(5)    make any Junior PIK Note payable in money other than that stated in the Junior PIK Notes;

(6)    make any change in the provisions of the indenture relating to waivers of past Defaults or the rights of holders of Junior PIK Notes to receive payments of principal of, or premium, if any, on, the Junior PIK Notes;

(7)    waive a redemption payment with respect to any Junior PIK Note;

(8)    make any change in the ranking or priority of any Junior PIK Note that would adversely affect the noteholders in any material respect;

(9)    impair the right of any holder of the Junior PIK Notes to receive payment of principal of such holder's Junior PIK Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Junior PIK Notes;

(10)    make any change in the provisions of the indenture described under "—Additional Amounts" that adversely affects the rights of any holder in any material respect or amend the terms of the Junior PIK Notes or the indenture in a way that would result in the loss of an exemption from any of the Taxes described thereunder or would otherwise adversely affect any noteholder for United States or Mexican tax purposes;

(11)    make any change in the preceding amendment and waiver provisions.

Notwithstanding the preceding, without the consent of any holder of Junior PIK Notes, the Company and the trustee may amend or supplement the indenture or the Junior PIK Notes:

(1)    to cure any ambiguity, defect or inconsistency;

(2)    to provide for uncertificated notes in addition to or in place of certificated notes;

(3)    to provide for the assumption of the Company's obligations to holders of Junior PIK Notes in the case of a merger or consolidation or sale of all or substantially all of the Company's assets, as applicable;

(4)    to make any change that would provide any additional rights or benefits to the holders of Junior PIK Notes or that does not adversely affect the legal rights under the indenture of any such holder;

(5)    to comply with requirements of the SEC in order to effect or maintain the qualification of the indenture under the Trust Indenture Act;

(6)    conform the text of the indenture to any provisions of this "Description of the Junior PIK Notes" to the extent that a portion of this description of notes was intended to be a verbatim recitation of the indenture or the Junior PIK Notes as evidenced by an officer's certificate;

(7)     provide for the issuance of PIK Interest Notes under the indenture to the extent otherwise so permitted under the terms of the indenture;

(8)     evidence and provide for the acceptance of appointment by a successor trustee; or

(9)     amend the terms of the indenture or the Junior PIK Notes in order to qualify the Junior PIK Notes as equity for accounting purposes, if such change would not have a material adverse effect on the legal rights under the indenture of any holder of the Junior PIK Notes.

**Satisfaction and Discharge**

The indenture will be discharged and will cease to be of further effect as to all Junior PIK Notes issued thereunder, when:

(1)     either:

(a)     all notes that have been authenticated, except lost, stolen or destroyed notes that have been replaced or paid and notes for whose payment money has been deposited in trust and thereafter repaid to the Company, have been delivered to the trustee for cancellation; or

(b)     all notes that have not been delivered to the trustee for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and the Company has irrevocably deposited or caused to be deposited with the trustee as trust funds in trust solely for the benefit of the holders, cash in Mexican pesos, non-callable Government Securities, or a combination of cash in Mexican pesos and non-callable Government Securities, in amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire outstanding principal amount on the Junior PIK Notes not delivered to the trustee for cancellation for principal, premium, if any, and any Additional Amounts that may be due and payable, if any, to the date of redemption;

(2)     no Default or Event of Default has occurred and is continuing on the date of the deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company is a party or by which the Company is bound;

(3)     the Company has paid or caused to be paid all sums payable by it under the indenture; and

(4)     the Company has delivered irrevocable written instructions to the trustee under the indenture to apply the deposited money toward the payment of the Junior PIK Notes on the Redemption Date.

In addition, the Company must deliver an officers' certificate and an opinion of counsel to the trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

**Concerning the Trustee**

If the trustee becomes a creditor of the Company, the indenture limits the right of the trustee to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise. The trustee will be permitted to engage in other transactions; however, if it acquires any conflicting interest it must eliminate such conflict within 90 days, apply to the SEC for permission to continue as trustee (if the indenture has been qualified under the Trust Indenture Act) or resign.

The holders of a majority in aggregate principal amount of the then outstanding Junior PIK Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the trustee, subject to certain exceptions. The indenture provides that in case an Event of Default occurs and is continuing, the trustee will be required, in the exercise of its power, to use the degree of care of a prudent person in the conduct of his or her own affairs. Subject to such provisions, the trustee will be under no obligation to exercise any of its rights or powers under the indenture at the request of any holder of Junior PIK Notes, unless such holder has offered to the trustee security and indemnity satisfactory to it against any loss, liability or expense.

**Additional Information**

For so long as any Junior PIK Notes remain outstanding, the Company will make available to any noteholder or beneficial owner of an interest in the Junior PIK Notes, or to any prospective purchasers designated by such noteholder or beneficial owner, upon request of such noteholder or beneficial owner, the information required to be delivered under paragraph (d)(4) of Rule 144A unless, at the time of such request the Company is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

**Book-Entry System; Delivery and Form**

Except as set forth below, Junior PIK Notes will be issued in registered, global form without interest coupons, in minimum denominations of Ps.20,000 and integral multiples of Ps.20.00 in excess thereof ("Global Notes"). The Global Notes will be deposited with a common depositary for, and registered in the name of a common nominee of, Euroclear Bank S.A./N.V. as operator of the Euroclear System ("Euroclear") and Clearstream Banking, *societe anonyme* ("Clearstream").

Initially, the trustee will act as paying agent and registrar. The Junior PIK Notes may be presented for registration of transfer and exchange at the offices of the registrar.

Beneficial interests in the Global Notes may not be exchanged for Junior PIK Notes in certificated form ("Certificated Notes") except in the limited circumstances described below. See "— Exchange of Global Notes for Certificated Notes." Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to receive physical delivery of Certificated Notes. Transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of Euroclear and Clearstream and their direct or indirect participants (including, if applicable, those of DTC), which may change from time to time.

If the Junior PIK Notes are issued in the exchange offer, they will be issued in offshore transactions in reliance on Regulation S. Through and including the 40th day after the closing of the exchange offer (such period through and including such 40th day, the "Restricted Period"), beneficial interests in the Regulation S Global Notes may be held only through Euroclear and Clearstream, unless transferred to a person that takes delivery through a Rule 144A Global Note in accordance with the certification requirements described below. Beneficial interests in the Rule 144A Global Notes may not be exchanged for beneficial interests in the Regulation S Global Notes at any time except in the limited circumstances described below. See "—Exchanges between Regulation S Global Notes and Rule 144A Global Notes." Regulation S Global Notes will be subject to certain restrictions on transfer and will bear a restrictive legend as described under "Transfer Restrictions."

If the Junior PIK Notes are issued under the Plan instead of the exchange offer, they will be issued pursuant to pursuant to section 1145(a) of the Bankruptcy Code, and therefore will not be deemed restricted securities. Accordingly, upon issuance, such Junior PIK Notes issued under the Plan will be freely tradable by any holder not deemed an underwriter in the public market without restriction or further registration under the Securities Act, subject to applicable law. See Annex B—Chapter 11 Plan of Reorganization.

The method for issuance and payment of the Junior PIK Notes will be described in greater detail in the indenture and the Global Notes.

**Exchange of Global Notes for Certificated Notes**

A Global Note is exchangeable for Certificated Notes if:

(1)     Each of Euroclear and Clearstream (a) notifies the Company that it is unwilling or unable to continue as depositary for the Global Notes or (b) has ceased to be a clearing agency registered under the Exchange Act and, in either case, the Company fails to appoint a successor depositary; or

(2)     there has occurred and is continuing an Event of Default with respect to the Junior PIK Notes.

Beneficial interests in a Global Note may be exchanged for Certificated Notes upon prior written notice given to the trustee by or on behalf of Euroclear and/or Clearstream or any successor depositary in accordance with the indenture. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of Euroclear and/or Clearstream or any successor depositary (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to in "Transfer Restrictions," unless that legend is not required by applicable law.

**Exchange of Certificated Notes for Global Notes**

Certificated Notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such securities. See "Transfer Restrictions."

**Exchanges between Regulation S Global Notes and Rule 144A Global Notes**

Prior to the expiration of the Restricted Period, beneficial interests in the Regulation S Global Note may be exchanged for beneficial interests in the Rule 144A Global Notes only if:

(1)     such exchange occurs in connection with a transfer of the Junior PIK Notes pursuant to Rule 144A; and

(2)     the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that the Junior PIK Notes are being transferred to a Person:

(a)     who the transferor reasonably believes to be a qualified institutional buyer within the meaning of Rule 144A;

(b)     purchasing for its own account or the account of a qualified institutional buyer in a transaction meeting the requirements of Rule 144A; and

(c)     in accordance with all applicable securities laws of the states of the United States and other jurisdictions.

Beneficial interests in a Rule 144A Global Note may be transferred to a Person who takes delivery in the form of an interest in the Regulation S Global Note, whether before or after the expiration of the Restricted Period, only if the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144 (if available) and that, if such transfer occurs prior to the expiration of the Restricted Period, the interest transferred will be held immediately thereafter through Euroclear or Clearstream.

Transfers involving exchanges of beneficial interests between the Regulation S Global Notes and the Rule 144A Global Notes will be effected by Euroclear or Clearstream by means of an instruction originated by the trustee. Accordingly, in connection with any such transfer, appropriate adjustments will be made to reflect a decrease in the

principal amount of the Regulation S Global Note and a corresponding increase in the principal amount of the Rule 144A Global Note or vice versa, as applicable. Any beneficial interest in one of the Global Notes that is transferred to a Person who takes delivery in the form of an interest in the other Global Note will, upon transfer, cease to be an interest in such Global Note and will become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Note for so long as it remains such an interest. The policies and practices of Euroclear or Clearstream may prohibit transfers of beneficial interests in the Regulation S Global Note prior to the expiration of the Restricted Period.

## Governing Law

The indenture and the Junior PIK Notes will be governed by, and construed in accordance with, the laws of the State of New York without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.

As specified above, under Mexican monetary law (*Ley Monetaria de los Estados Unidos Mexicanos*), in the event that proceedings were brought in Mexico seeking to enforce the Company's obligations under the Junior PIK Notes in Mexico, pursuant to an initial action or in connection with the enforcement of a judgment, the Company would not be required to discharge such obligations in Mexico in a currency other than Mexican currency. According to such law, an obligation in a currency other than Mexican currency, which is payable in Mexico, may be satisfied in pesos at the rate of exchange in effect on the date and in the place payment occurs. Such rate is currently determined by the Mexican Central Bank (*Banco de México*) every business banking day in Mexico and published the following business banking day in the Official Gazette of the Federation (*Diario Oficial de la Federación*).

## Consent to Jurisdiction and Service

The Company will appoint C T Corporation System, 28 Liberty Street, New York, New York 10005 as its agent for actions brought Under Federal or state securities laws brought in any Federal or state court located in the Borough of Manhattan in The City of New York and will submit (together with all other parties to the indenture) to the jurisdiction of such courts.

## Certain Definitions

Set forth below are certain defined terms used in the indenture. Reference is made to the indenture for a full disclosure of all defined terms used therein, as well as any other capitalized terms used herein for which no definition is provided.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "Beneficially Owns" and "Beneficially Owned" have a corresponding meaning.

"Board of Directors" means:

    (1)    with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2)     with respect to a partnership, the Board of Directors of the general partner of the partnership;

(3)     with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(4)     with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means any day other than a Saturday or Sunday, or a day on which commercial banking institutions in The City of New York or Mexico City or place of payment are authorized or required by law, regulation or executive order to remain closed.

"Capital Stock" means:

(1)     in the case of a corporation, corporate stock;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)     any other interest or participation (however designated) that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Change of Control" means the occurrence of any of the following:

(1)     the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Company and its Subsidiaries taken as a whole to any Person, if any "person" (as that term is used in Section 13(d) of the Exchange Act) other than the Permitted Holders is the Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock of such Person, measured by voting power rather than number of shares;

(2)     the adoption of a plan relating to the liquidation or dissolution of the Company;

(3)     the consummation of any transaction (including, without limitation, any merger or consolidation), the result of which is that any "person" (as defined above) other than the Permitted Holders becomes the Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock of the Company, measured by voting power rather than number of shares; or

(4)     the first day on which a majority of the members of the Board of Directors of the Company are not Continuing Directors.

"Continuing Directors" means, as of any date of determination, any member of the Board of Directors of the Company who:

(1)     was a member of such Board of Directors on the date of the indenture; or

(2)     was nominated for election or elected to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election.

119

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Existing Indenture" means the indenture dated as of October 11, 2013, among the Company, the guarantors named therein, Deutsche Bank Trust Company Americas, as indenture trustee, and Deutsche Bank Luxembourg, S.A., as Luxembourg sub-paying agent and transfer agent as amended, supplemented and otherwise modified pursuant to which the Company issued the old notes.

"Fair Market Value" means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Board of Directors of the Company (unless otherwise provided in the indenture).

"Government Securities" means direct obligations of, or obligations guaranteed by, Mexico (including any agency or instrumentality thereof) and the payment for which Mexico pledges its full fault and credit.

"Guarantee" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"IFRS" means International Financial Reporting Standards issued by the International Accounting Standards Board.

"Investments" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with IFRS.  Except as otherwise provided in the indenture, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"Issue Date" means the date on which the Junior PIK Notes are first issued.

"Mexico" means the United Mexican States (*Estados Unidos Mexicanos*) and any branch of power thereof and any ministry, department, authority or statutory corporation or other entity (including a trust), owned or controlled directly or indirectly by the United Mexican States or any of the foregoing.

"old notes" means the Step-Up Junior PIK Notes due 2020, issued pursuant to the Existing Indenture.

"Permitted Holders" means Rodrigo Lebois Mateos, Enrique Castillo Sánchez Mejorada, Henry Davis Carstens, Alberto Martín Soberón, Ricardo Guillermo Amtmann Aguilar, Javier Molinar Horcasitas, Wilfrido Castillo Sánchez Mejorada and any Affiliates or immediate family of such persons.

"Permitted Junior Securities" means:

(1)    the Company's capital stock; or

(2)    debt securities issued pursuant to a confirmed plan of reorganization that are subordinated in right of payment to all Senior Indebtedness and any debt securities issued in exchange for Senior Indebtedness to substantially the same extent as, or to a greater extent than, the Junior PIK Notes are subordinated to Senior Indebtedness under the indenture.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"Peso Equivalent" means the equivalent in Mexican pesos of such amount, determined using an exchange rate of Ps.19.1645 per US$1.00, which is the "Exchange rate for settling obligations denominated in U.S. dollars payable in the Mexican Republic" (*Tipo de cambio para solventar obligaciones denominadas en dólares de los EE.UU.A., pagaderas en la República Mexicana*) published by the Bank of Mexico (*Banco de México*) in the Official Gazette (*Diario Oficial de la Federación*) on June 14, 2019.

"Plan" means the Joint Prepackaged Plan of Reorganization of Maxcom Telecomunicaciones, S.A.B. de C.V. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code in the form set forth in Exhibit B to this statement (including all exhibits annexed thereto and the plan supplement, as it may be modified, amended, or supplemented from time to time).

"Representative" means any trustee, agent or representative (if any) for Senior Indebtedness of the Company.

"Securities Act" means the Securities Act of 1933, as amended.

"Senior Indebtedness" means:

(1)     the principal, including redemption payments, premium, if any, interest and other payment obligations in respect of (i) the Company's indebtedness for money borrowed, (ii) the Company's indebtedness evidenced by securities, debentures, bonds, notes or other similar instruments issued by the Company, including any such securities issued under any deed, indenture or other instrument to which the Company is a party (including the Senior Notes described elsewhere in this statement) and (iii) guarantees of any of the foregoing;

(2)     all of the Company's capital lease obligations;

(3)     all of the Company's obligations issued or assumed as the deferred purchase price of property, all of the Company's conditional sale obligations, all of the Company's hedging agreements and agreements of a similar nature thereto and all agreements relating to any such agreements, and all of the Company's obligations under any title retention agreement, but excluding trade accounts payable arising in the ordinary course of business;

(4)     all of the Company's obligations for reimbursement on any letter of credit, banker's acceptance, security purchase facility or similar credit transaction;

(5)     all obligations of the type referred to in clauses (1) through (4) above of other persons for the payment of which the Company is responsible or liable as obligor, guarantor or otherwise;

(6)     all obligations of the type referred to in clauses (1) through (5) above of other persons secured by any lien on any of the Company's property or assets, whether or not such obligation is assumed by the Company; and

(7)     any deferrals, amendments, renewals, extensions, modifications and refundings of all obligations of the type referred to in clauses (1) through (6) above, in each case whether or not contingent and whether outstanding at the date of effectiveness of the applicable indenture or thereafter incurred,

except, in each case, for the Junior PIK Notes and (i) any such other securities to be issued by the Company in the future that contain express terms, or are issued under a deed, indenture or other instrument, which contains express terms, providing that such securities are subordinate to or rank equal with the Junior PIK Notes, (ii) trade accounts payable or accrued liabilities arising in the ordinary course of business, (iii) indebtedness owed by the Company to its Subsidiaries, which also will rank equally in right of payment and upon liquidation to the Junior PIK Notes,

(iv) any liability for Federal, state, local and other taxes owed or owing by the Company or its Subsidiaries and (v) indebtedness owed by the Company to any Permitted Holder or group of Permitted Holders (which indebtedness in the case of clause (v) shall rank junior in right of payment to the Junior PIK Notes).

Such Senior Indebtedness will continue to be Senior Indebtedness and be entitled to the benefits of the subordination provisions of the applicable indenture irrespective of any amendment, modification or waiver of any term of such Senior Indebtedness and notwithstanding that no express written subordination agreement may have been entered into between the holders of such Senior Indebtedness and the trustee or any of the holders.

"Subsidiary" means, with respect to any specified Person:

(1)     any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)     any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof).

"Significant Subsidiary" means any Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such Regulation is in effect on the date of the indenture.

"Voting Stock" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

## DESCRIPTION OF THE PLAN

*Terms not otherwise defined herein shall have the meanings set forth in the Joint Prepackaged Chapter 11 Plan of Maxcom Telecomunicaciones, S.A.B. de C.V. attached as Annex B hereto.*

**WE HAVE NOT COMMENCED A CHAPTER 11 CASE UNDER THE BANKRUPTCY CODE AND HAVE NOT FILED THE PLAN AT THIS TIME. THIS OFFERING MEMORANDUM AND CONSENT SOLICITATION STATEMENT SOLICITS ADVANCE ACCEPTANCE OF THE PLAN IN THE EVENT THAT WE DETERMINE TO COMMENCE THE CHAPTER 11 CASE AND THE PLAN IS FILED WITH THE BANKRUPTCY COURT, AND CONTAINS INFORMATION RELEVANT TO A DECISION TO ACCEPT OR REJECT THE PLAN.**

The following is a summary of the material terms and provisions of the Plan. While we believe this summary covers the material terms and provisions of the Plan, it may not contain all of the information that is important to you. To the extent there is any inconsistency between this Offering Memorandum and Consent Solicitation Statement and the Plan regarding the terms of the Plan, the Plan shall control.

The Plan and this Offering Memorandum and Consent Solicitation Statement should be read and studied in their entirety before voting on the Plan. See "Risk Factors—Risks Related to the Plan of Reorganization" in this Offering Memorandum and Consent Solicitation Statement for a discussion of risks associated with the Plan and the transactions contemplated thereunder. You are urged to consult your counsel about the Plan and its effect on your legal rights before voting.

To allow us to effect a chapter 11 reorganization in the quickest and most cost efficient manner possible, we are soliciting acceptances of the Plan from holders of Impaired Claims and Interests entitled to vote under the Plan. Under the Plan, we expect that the Holders of the old notes will receive the same treatment with respect to their old notes Claims as they would in the exchange offer. We may seek confirmation of the Plan by commencing the Chapter 11 Case in the event that the conditions to the out-of-court Restructuring are not satisfied, but we receive acceptances on the Plan from a sufficient amount and number of holders of the old notes so as to satisfy the Bankruptcy Threshold. The debtor in the Chapter 11 Case would be the Company (collectively, the "Debtor"). We refer to the Debtor, or any successor thereto by merger, consolidation or otherwise after the Effective Date of the Plan as "Reorganized Maxcom."

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, IT WILL BIND ALL HOLDERS OF OUR OLD NOTES, REGARDLESS OF WHETHER THEY VOTED TO ACCEPT OR REJECT THE PLAN, OR DID NOT VOTE AT ALL.

### Solicitations of Acceptances on the Plan

Usually, a plan of reorganization is filed and votes to accept or reject the plan are solicited following such a filing. A debtor may, however, solicit votes before the commencement of a reorganization case in accordance with section 1126(b) of the Bankruptcy Code and Rule 3018(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In accordance with such provisions, we are soliciting acceptances only from holders of the old notes for purposes of seeking confirmation of the Plan in the Chapter 11 Case.

Bankruptcy Rule 3018(b) requires that:

- the plan of reorganization be transmitted to substantially all creditors and interest holders entitled to vote on the plan;

- the time prescribed for voting to reject or accept such plan not be unreasonably short; and

- the solicitation of votes be in compliance with any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in such solicitation or, if no such law, rule or regulation exists, votes be solicited only after the disclosure of adequate information.

Section 1125(a)(1) of the Bankruptcy Code describes "adequate information" as information of a kind and in sufficient detail as would enable a hypothetical reasonable investor typical of holders of Claims and Interests to make an informed judgment about the plan. With regard to a solicitation of votes before the commencement of a reorganization case, Bankruptcy Rule 3018(b) specifically provides that acceptances or rejections of the plan by holders of Claims and Interests before the commencement of a reorganization case will not be deemed acceptances or rejections of the plan if the Bankruptcy Court determines, after notice and a hearing, that the plan was not transmitted to substantially all creditors and equity security holders entitled to vote on the plan, that an unreasonably short time was prescribed for such creditors and equity security holders to vote on the plan, or that the solicitation was not otherwise in compliance with section 1126(b) of the Bankruptcy Code. If, however, the aforementioned conditions of the Bankruptcy Code and Bankruptcy Rules are met, all acceptances and rejections received before the commencement of the reorganization case and within the prescribed solicitation period will be deemed to be acceptances and rejections of the plan for purposes of confirmation under the Bankruptcy Code.

As further described herein, in the event that the conditions to the Exchange Offer are not satisfied or waived by the date on which acceptances are due and we receive from a sufficient number of holders of the old notes holding a sufficient amount of the old notes necessary to satisfy the Bankruptcy Threshold, we may:

- •commence a chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") and file the Plan;

- •file certain first day motions and seek to obtain entry of the orders approving such motions and schedule a hearing in the Bankruptcy Court on the earliest date possible to contemporaneously consider confirmation of the Plan and to approve this Offering Memorandum and Consent Solicitation Statement;

- •send notices to all persons to whom such notices are required to be sent under the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "<u>Local Rules</u>") and to such other persons as ordered by the Bankruptcy Court, as soon as practicable after the commencement of the Plan proceeding;

- •use our reasonable best efforts to obtain confirmation of the Plan by the Bankruptcy Court;

- •use our reasonable best efforts to obtain the dismissal of any and all appeals and motions for reconsideration filed with respect to the Plan; and

- •cause the Plan to become effective and the distributions provided for under the Plan to be commenced as promptly as possible on or following the day on which conditions to effectiveness set forth in the Plan have been satisfied or waived.

There can be no assurance, however, that the Bankruptcy Court will conclude that the requirements of section 1129 of the Bankruptcy Code for confirmation of the Plan have been met. The Bankruptcy Court may find that the Plan solicitation did not comply with all of the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules (including the requirement under section 1126(b) of the Bankruptcy Code that the Plan solicitation comply with any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure or that the Plan solicitation is made after disclosure of adequate information). In such an event, we may be required to resolicit votes on the Plan before seeking confirmation of the Plan, in which case the confirmation of the Plan could be delayed and possibly jeopardized.

Bankruptcy Rule 3016(b) provides that either a disclosure statement under section 1125 of the Bankruptcy Code or evidence showing compliance with section 1126(b) of the Bankruptcy Code must be filed with the Plan or within the time fixed by the court. This Offering Memorandum and Consent Solicitation Statement is presented to holders of our old notes to satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3016(b) and 3018(b). We believe that this Offering Memorandum and Consent Solicitation Statement and the solicitation process we undertake will meet these requirements.

The Plan Solicitation is being conducted at this time to obtain the acceptance of our old notes, the only class of Claims entitled to vote on the Plan. If we commence the Chapter 11 Case, we will promptly seek to obtain an order of the Bankruptcy Court finding that the Plan solicitation was in compliance with section 1126(b) of the Bankruptcy

Code and Bankruptcy Rule 3018(b) and that the acceptance of the class consisting of the old notes can be used for purposes of confirmation of the Plan under chapter 11 of the Bankruptcy Code. We reserve the right to use the acceptances to seek confirmation of any permitted amendment or modification of the Plan, provided that we may not make any amendment or modification to the Plan prohibited by the Plan.

As more fully described below, we are soliciting acceptances of the Plan only from Holders of old notes Claims in Class A (the "Voting Class").

**Summary of Classification and Treatment of Claims and Equity Interest Under the Plan**

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| A | old notes Claims | Impaired | Entitled To Vote |
| B | Other Secured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| C | General Unsecured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| D | Intercompany Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| E | Interests | Unimpaired | Deemed To Accept; Not Entitled To Vote |

_____

Note: This table is only a summary of the classification and treatment of claims and interests under the Plan. Reference should be made to the Plan attached to this statement as Annex B for a complete description of the classification and treatment of claims and interests.

To the extent a Class contains Allowed Claims or Allowed Interests with respect to the Debtor, the treatment provided to each Class for distribution purposes is specified below:

| Class | Claim/Equity Interest | Treatment | Projected Recovery under the Plan |
|-------|----------------------|-----------|-----------------------------------|
| A | old notes Claims | In full and final satisfaction, settlement, release and discharge of and exchange for each Allowed old notes Claim, each Holder of an Allowed old notes Claim shall receive its Pro Rata share of (i) Senior Notes, (ii) Junior PIK Notes, (iii) the Cash Payment and (iv) Cash in an amount equal to the amount of interest accrued on the old notes up to the Effective Date.  In addition, subject to the occurrence of the Effective Date, each Holder of Senior Notes who validly tendered and did not withdraw its old notes in the exchange offer prior to or on the early participation date shall receive the early participation consideration.  For the avoidance of doubt, only Holders of old notes as of the June 14, 2019 Record Date and who validly tendered and did not withdraw its old notes in the exchange offer prior to or on the early participation date shall be eligible to receive the early participation consideration. | 77.4% * |
| B | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall, at the election of Reorganized Maxcom, (i) have the legal, equitable | 100% |

| | | and contractual rights of such Holder Reinstated, or (ii) receive, at the option of Reorganized Maxcom, (A) Cash in an amount equal to such Allowed Other Secured Claim, or (B) such other treatment as renders its Allowed Other Secured Claim Unimpaired. | |
|---|---|---|---|
| C | General Unsecured Claims | Holders of Allowed General Unsecured Claims shall receive Cash in amount equal to such Allowed General Unsecured Claims on the later of the Effective Date or in the ordinary course of business of the Debtor in accordance with the terms of the particular transaction giving rise to such Allowed General Unsecured Claim. | 100% |
| D | Intercompany Claims | Each Allowed Intercompany Claims will remain Unimpaired. | 100% |
| E | Interests | Subject to the Shareholder Contribution, on the Effective Date, the Allowed Interests in the Debtor shall all be reinstated. | 100% |

_____

\* Minimum projected recovery per the Plan, consisting of the Senior Notes, the Junior PIK Notes, the cash portion of the consideration, accrued interest through October 1, 2019, and the early participation consideration, which amounts will be recognized on the Effective Date of the Plan.

**Treatment of Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III of the Plan.

(i)    **Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtor, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (a) on the Effective Date, or as soon as reasonably practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claims.

(ii)    **Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. The Debtor shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows. From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(iii)    **Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Priority

Tax Claim: (a) the treatment provided by section 1129(a)(9)(C) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, equal to the amount of such Allowed Priority Tax Claim; or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the Debtor.  If payment is made in accordance with section 1129(a)(9)(C), installment payments shall be made quarterly and interest shall accrue in accordance with 26 U.S.C. § 6621.  On the Effective Date, Liens securing such Allowed Secured Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim may be paid in full in Cash in accordance with the terms of any agreement between the Debtor and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

(iv)    **Other Priority Claims**

Each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Other Priority Claim: (a) the treatment provided by section 1129(a)(9) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, equal to the amount of such Allowed Other Priority Claim; or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the Debtor.

(v)    **Payment of Statutory Fees**

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.  On and after the Effective Date, Reorganized Maxcom shall pay the applicable U.S. Trustee fees for Reorganized Maxcom until the entry of a Final Decree in each such Debtor's Chapter 11 Case or until each such Chapter 11 Case is converted or dismissed.

(vi)    **Trustee Expenses**

On the Effective Date, Reorganized Maxcom shall pay all reasonable, documented, and unpaid fees, expenses and out-of-pocket costs (including the reasonable and documented fees and expenses of counsel to the Trustee) incurred by the Trustee through the Effective Date or incurred by the Trustee in connection with making distributions pursuant to the Plan, if any, except any such fees, costs and expenses as may be determined to have been caused by the Trustee's gross negligence or willful misconduct.

**Means for Implementation**

A.    *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests.

B.    *Subordination*

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan shall recognize and implement any such rights.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Debtor reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  For the avoidance of doubt, no Claim in Class A shall be subject to subordination.

C.    *Sources of Cash for Plan Distributions*

All Cash consideration necessary for Reorganized Maxcom to make payments or distributions pursuant to this Plan shall be obtained from Cash of Reorganized Maxcom. Further, Reorganized Maxcom and the Non-Debtor Guarantors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable Reorganized Maxcom to satisfy its obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtor's historical intercompany account settlement practices and will not violate the terms of the Plan.

D.    *Issuance of Senior Notes and Junior PIK Notes*

On and after the Effective Date, Reorganized Maxcom is authorized to issue, execute, deliver or otherwise bring into effect, as the case may be, to or for the benefit of the Holders of Allowed old notes Claims, the Senior Notes, the Junior PIK Notes and any other instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to the Plan, and take any other necessary actions in connection with the foregoing, in each case without need for further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity. The issuance of the Senior Notes and the Junior PIK Notes shall be exempt from registration under section 1145 of the Bankruptcy Code and, to the extent applicable, under applicable securities laws. All documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement). On the Effective Date, the guarantees, pledges, liens and other security interests granted pursuant to the Senior Notes indenture and the Collateral Documents have been and are granted in good faith as an inducement to the holders of old notes Claims to agree to the treatment afforded to them under the Plan and shall not be deemed to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the Senior Notes indenture and the Collateral Documents.

E.    *Vesting of Assets in Reorganized Maxcom*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property of the Estate, all Causes of Action, and any property acquired by the Debtor pursuant to the Plan shall vest in Reorganized Maxcom, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, Reorganized Maxcom may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.    *Corporate Existence*

After the Effective Date, except as provided in the Plan, the New Governance Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (as defined below under "—The Solicitation Package"), the Debtor shall continue to exist as of the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which the Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date.

G.    *Vesting of Assets in Reorganized Maxcom*

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in the Estate and all Causes of Action, shall vest in Reorganized Maxcom, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan or any other agreement or document related thereto or entered into in connection therewith, Reorganized Maxcom may operate its business and may use, acquire, or dispose of property and

compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.   *Discharge from Old Notes, Instruments, Certificates, and Other Documents*

On the Effective Date, except as otherwise provided in this Plan,: (1) the old notes indenture, the old notes Guarantees, the Subsidiary Guarantee, the Intercompany Trust Agreement, the Intercompany Subordination Agreement, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Interest (except such certificates, mortgages, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Debtor that are specifically Reinstated or otherwise not Impaired under the Plan) shall be deemed cancelled, discharged, released and extinguished, and neither the Debtor nor the Non-Debtor Guarantors shall have any continuing obligations thereunder; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor (except such agreements, certificates, mortgages, notes, or other instruments evidencing indebtedness or obligations of or ownership interests in the Debtor that are specifically Reinstated or otherwise not Impaired under the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein; provided further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to Reorganized Maxcom, except to the extent set forth in or provided for under this Plan.  Notwithstanding the foregoing and solely for the purpose set forth in this sentence, the following rights of the Collateral Agent and the Trustee shall remain in effect after the Effective Date: (1) rights to payment of fees, expenses and indemnification obligations, including from property distributed hereunder to the Collateral Agent and/or the Trustee, whether pursuant to the exercise of a charging lien or otherwise, (2) rights relating to distributions made to Holders of Allowed old notes Claims by the Collateral Agent and/or the Trustee from any source, including distributions hereunder, (3) rights relating to representation of the interests of the Holders of old notes Claims by the Collateral Agent and the Trustee in the Chapter 11 Case to the extent not discharged or released hereunder or any order of the Bankruptcy Court, and (4) rights relating to participation by the Collateral Agent and the Trustee in any proceedings related to the Plan.  On and after the Effective Date, all duties and responsibilities of the Collateral Agent and the Trustee shall be discharged unless otherwise specifically set forth in or provided for under the Plan.

I.   *Execution of Plan Documents*

Except as otherwise provided herein, on the Effective Date, or as soon as practicable thereafter, Reorganized Maxcom shall be authorized to execute all instruments and other documents required to be executed under the Plan.

J.   *Corporate Action*

The Debtor or Reorganized Maxcom, as applicable, is authorized to take all further corporate actions necessary to effectuate the Plan and authorize each of the matters provided for by the Plan involving the corporate structure of the Debtor or corporate or related actions to be taken by or required of Reorganized Maxcom, whether taken prior to or as of the Effective Date.

K.   *New Corporate Governance Documents*

Solely to the extent required by applicable non-bankruptcy law, on or immediately before the Effective Date, Reorganized Maxcom will file its New Corporate Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation.  The New Corporate Governance Documents will be consistent with the provisions of the Plan and the Bankruptcy Code.  After the Effective Date, Reorganized Maxcom may amend and restate its New Corporate Governance Documents as

permitted by the laws of its respective jurisdiction of formation and its respective New Corporate Governance Documents.

L.  *Effectuating Documents; Further Transactions*

On and after the Effective Date, Reorganized Maxcom, and the officers and/or members of the board of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

M.  *Section 1146(a) Exemption*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

N.  *Managers, Directors and Officers*

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as may otherwise be disclosed in the Disclosure Statement, as of the Effective Date, the directors and officers who are identified in the Plan Supplement shall serve as the initial board of directors and officers of Reorganized Maxcom.  Pursuant to section 1129(a)(5), the Debtor will disclose in the Plan Supplement, on or prior to the Confirmation Date, the identity and affiliations of any Person proposed to serve on Reorganized Maxcom's board of directors and, to the extent such Person is an Insider, the nature of any compensation for such Person. After the Effective Date, the corporate governance and management of Reorganized Maxcom shall be determined by the applicable board of managers or board of directors in accordance with the laws of the applicable state or county of organization.

O.  *Preservation of Rights of Action*

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, Reorganized Maxcom shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and Reorganized Maxcom's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or Reorganized Maxcom will not pursue any and all available Causes of Action against them.  The Debtor and Reorganized Maxcom expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, Reorganized Maxcom expressly reserves all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel, judicial, equitable, or otherwise, or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  From and after the Effective Date, the Debtor or Reorganized Maxcom, as applicable, shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Cause of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Bankruptcy Court.

Notwithstanding any provision in the Plan or any Order entered in the Chapter 11 Case, the Debtor and Reorganized Maxcom forever waive, relinquish, and release any and all Causes of Action the Debtor and its estate had, have, or may have that arise under sections 544, 547, 548 and 549 of the Bankruptcy Code against any Entity

that is being rendered Unimpaired under the Plan and any Entity, including Professionals, with whom the Debtor is conducting and will continue to conduct business on and after the Effective Date.

P.   *Directors and Officers Insurance Policies*

Notwithstanding anything in the Plan to the contrary, Reorganized Maxcom shall be deemed to have assumed all of the Debtor's D&O Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of Reorganized Maxcom's foregoing assumption of each of the unexpired D&O Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be filed. In addition, after the Effective Date, Reorganized Maxcom shall not terminate or otherwise reduce the coverage under any D&O Insurance Policy (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

Q.   *Indemnification Provisions in Organizational Documents*

On and from the Effective Date, and except as prohibited by applicable non-bankruptcy law, Reorganized Maxcom shall assume or reinstate, as applicable, all indemnification obligations in place as of the Effective Date (whether in by- laws, certificates of incorporation, board resolutions, contracts, or otherwise) for the current and former directors, members, officers, managers, employees, attorneys, other professionals and agents of the Debtor; provided, however, such indemnification obligations shall not apply with respect to any act or omission constituting gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction, except to the extent of available insurance.

R.   *Reinstatement of Equity Interests*

On the Effective Date, all equity interests in each Debtor, including Intercompany Interests, shall be deemed reinstated without any additional act on the part of the Debtor or Reorganized Maxcom.

S.   *Exemption from Registration Requirements*

The offering, issuance, and distribution of any Securities, including the Senior Notes and the Junior PIK Notes pursuant to the Plan, and any and all settlement agreements incorporated herein, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, Regulation S of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable.

To the extent that the issuance of the Senior Notes and the Junior PIK Notes is covered by section 1145 of the Bankruptcy Code, except as otherwise provided in the Plan or the governing certificates or instruments, the Senior Notes and the Junior PIK Notes issued under the Plan will be freely tradable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments, including any such restrictions any agreement governing the Senior Notes and the Junior PIK Notes; (b) the restrictions, if any, on the transferability of such securities and instruments; and (c) any other applicable regulatory approval.

## Treatment of Executory Contracts and Unexpired Leases

A.   *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease (1) was assumed or rejected previously by the Debtor, (2) previously expired or terminated pursuant to its own terms; or (3) is the subject of a motion to reject filed on or before the Effective Date, if any. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumption of such Executory Contracts or Unexpired Leases as set forth in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by a Bankruptcy Court order shall re-vest in and be fully enforceable by the applicable contracting Reorganized Maxcom in accordance with its terms notwithstanding any provision in such assumed Executory Contract or Unexpired Lease that prohibits, restricts or conditions such assumption, assignment or transfer. Any provision in the assumed Executory Contracts and Unexpired Leases that purports to declare a breach or default based in whole or in part on the commencement or continuance of the Chapter 11 Case or any successor case is hereby deemed unenforceable.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be classified as a General Unsecured Claim and shall be treated in accordance with Article III of the Plan, as applicable.

C.    *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Claims or defaults arising or becoming due under any assumed Executory Contract or Unexpired Lease after the effective date of assumption of the applicable assumed Executory Contract or Unexpired Lease are to be paid in full in the ordinary course by the applicable Debtor or Reorganized Maxcom, as applicable, subject to the rights of the Debtor or Reorganized Maxcom, as applicable, to assert or apply, as applicable, any defenses, setoffs, credits, or discounts available under the applicable assumed Executory Contract or Unexpired Lease or under applicable non-bankruptcy law, and, for the avoidance of doubt, such Claims or defaults shall not be released, expunged, discharged, or enjoined by the Plan or the Confirmation Order and there shall be no need or requirement for the counterparty to such Executory Contract or Unexpired Lease to file an Administrative Claim for such Claim or default. Nothing in the Plan releases or discharges the applicable Debtor or Reorganized Maxcom from (1) obligations to fully satisfy Cure Claims on the Effective Date, or to the extent a dispute exists regarding the Cure Claim, upon entry of a Final Order resolving the dispute or upon mutual agreement between the applicable Debtor or Reorganized Maxcom and the applicable counterparty, or (2) Claims, defaults or obligations arising or becoming due under any assumed Executory Contract or Unexpired Lease after the effective date of such assumption of the applicable assumed Executory Contract or Unexpired Lease pursuant to the terms thereof. In the event of a dispute regarding (1) the amount of any payment to cure such a default, (2) the ability of the applicable Reorganized Maxcom to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payment, if any, required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. The assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date the applicable Debtor or Reorganized Maxcom assume such Executory Contract or Unexpired Lease. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**Release, Injunction, and Related Provisions**

A.    **Releases by the Debtor**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided for in the Plan, for good and valuable consideration, as of the Effective Date, to the extent permitted by applicable laws, the Released Parties are conclusively, absolutely, unconditionally, irrevocably, and forever deemed released and discharged by the Debtor, Reorganized Maxcom, and the Estate from any and all actions,**

Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether far tort, contract, violations of federal or state securities laws and Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, asserted or that could possibly have been asserted on behalf of the Debtor, that the Debtor, Reorganized Maxcom, or the Estate, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the old notes, the old notes indenture, the old notes Guarantees, the Subsidiary Guarantee, the Intercompany Trust Agreement, the Intercompany Subordination Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or Reorganized Maxcom, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, solicitation, or preparation of the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that the foregoing provisions of Section 8.3 of the Plan shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction; provided further that nothing in Section 8.3 of the Plan shall release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan, including the New Notes and any other agreement or document related thereto or entered into in connection therewith, as applicable.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section 8.3 of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by Section 8.3 of the Plan; (c) in the best interests of the Debtor and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to the Debtor asserting any Claim or Cause of Action released by Section 8.3 of the Plan.

B.  *Releases by the Releasing Parties*

As of the Effective Date, to the extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtor, Reorganized Maxcom, the Estate, the Released Parties and each such Entity's successors and assigns, current and former affiliates, subsidiaries, officers, directors, members, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such, and only if such Persons occupied any such positions at any time on or after the Petition Date, from any and all Claims, Interests, obligations, rights, liabilities, actions, causes of action, choses in action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, contract, violations of federal or state securities laws and Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, release by, or otherwise, that such Entity asserted or that could possibly have been asserted, or would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the old notes, the old notes indenture, the old notes Guarantees, the Subsidiary Guarantee, the Intercompany Trust Agreement, the Intercompany Subordination Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or Reorganized Maxcom, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case,

the negotiation, formulation, solicitation, or preparation of the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that the provisions of Section 8.4 of the Plan shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction; provided further that nothing in Section 8.4 of the Plan shall release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section 8.4 of the Plan, which includes by reference each of the related provisions and definitions contained therein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) important to the Plan; (b) in exchange for the good and valuable consideration provided by the Debtor, Reorganized Maxcom, the Estate and the Released Parties; (b) a good faith settlement and compromise of the Claims released in Section 8.4; (c) in the best interests of the Debtor and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under Section 8.4 of the Plan from asserting any Claim or Cause of Action released by Section 8.4 of the Plan.

C.  *Exculpation*

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; provided, further, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan.  The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

D.  *Injunction*

Except as otherwise provided for in the Plan or for obligations issued pursuant to the Plan, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Section 8.3 or Section 8.4 of the Plan, discharged pursuant to Section 8.2 of the Plan, or are subject to exculpation pursuant to Section 8.5` of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, Reorganized Maxcom, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled pursuant to the Plan.

**The Solicitation Package**

The following materials constitute the solicitation package (collectively, the "Solicitation Package"):

- the appropriate Ballots and applicable voting instructions;

- a pre-addressed, postage pre-paid return envelope; and

- the Offering Memorandum and Consent Solicitation Statement with all exhibits, including the Plan and any other supplements or amendments to these documents.

The Voting Class shall be sent paper copies of the appropriate Ballots and applicable voting instructions and flash drives containing the Offering Memorandum and Consent Solicitation Statement with all exhibits, including the Plan. Any party who desires paper copies of these documents may request copies by writing to the Information Agent and Exchange Agent. Our website and the information contained on our website are not part of this Offering Memorandum and Disclosure Statement. All parties entitled to vote to accept or reject the Plan shall receive a paper copy of each appropriate Ballot.

The plan supplement (the "Plan Supplement") will be filed with the Bankruptcy Court no later than five business days before the hearing to consider confirmation of the Plan or such other date as may be approved by the Bankruptcy Court. The Plan Supplement means the compilation of documents and forms of documents, schedules, and exhibits to be filed on the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, including the following documents: (a) the New Corporate Governance Documents; (b) a list of retained Causes of Action; (c) to the extent known, the identity of the members of the New Board; and (d) any and all other documentation necessary to effectuate the transactions contemplated by the Plan. The Company may subsequently amend, modify or supplement the Plan Supplement in accordance with the terms of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

**Voting Deadline**

The period during which Ballots with respect to the Plan will be accepted by the Information Agent and Exchange Agent will terminate on the Voting Deadline, which is 12:00 midnight (New York City time) on July 15, 2019, unless the Company extends the date until which Ballots will be accepted. Except to the extent the Company so determines or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Company in connection with the Company's request for confirmation of the Plan (or any permitted modification thereof).

The Company reserves the absolute right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received. The Company will give notice of any such extension in a manner deemed reasonable to the Company in its discretion. As of the date of the Exchange Offer, we have no intention of extending such date.

**Voting and Revocation Instructions**

Only the Voting Class is entitled to vote to accept or reject the Plan, and they may do so by following the instructions below and the voting instructions attached to the Ballot. The failure of a Holder of a Claim or Interest in the Voting Class to deliver a duly executed Ballot on or before the Voting Deadline will be deemed to constitute an abstention by such Holder with respect to voting on the Plan, and such abstentions will not be counted as votes for or against the Plan.

We are providing the Solicitation Package to Holders of Claims in the Voting Class whose names (or the names of their nominees) appear as of the voting record date, which was June 14, 2019 in the records maintained by us.

If you hold Claims in the Voting Class that are registered in your own name, including by a participant in DTC whose name appears on a security position listing as the owner of the old notes, you can vote on the Plan by completing the information requested on the appropriate Ballot, signing, dating and indicating your vote on the Ballot, and returning the completed original Ballot in the enclosed, pre-addressed, postage-paid envelope so that it is actually received by the Information Agent and Exchange Agent before the Voting Deadline, 12:00 midnight (New York City time) on July 15, 2019 (unless the Voting Deadline is extended, in which case the Ballots must be

received by the Information Agent and Exchange Agent by any subsequent time or date to which the Voting Deadline is extended).

If you are a beneficial owner holding securities as a record holder in your own name you should complete the information requested on the Ballot, indicate your vote on the Ballot, and return the completed original Ballot in the enclosed, pre-addressed, postage pre-paid envelope so that it is actually received by the Information Agent and Exchange Agent before the Voting Deadline.

If you are a beneficial owner holding securities through a broker, dealer, commercial bank, trust company or other nominee, or your "nominee," you can vote on the Plan in one of the two following ways:

- *If your Ballot has already been signed (or "prevalidated") by your nominee (as described below),* you can vote on the Plan by completing the information requested on the Ballot, indicating your vote on the Ballot, and returning the completed original Ballot in the enclosed, pre-addressed, postage-paid envelope so that it is actually received by the Information Agent and Exchange Agent before the Voting Deadline.

- *If your Ballot has not been signed (or "prevalidated") by your nominee,* you can vote on the Plan by completing the information requested on the Ballot, indicating your vote on the Beneficial Ballot, and returning the completed original Beneficial Ballot to your nominee in sufficient time for your nominee then to process the Ballot, incorporate your vote on a master Ballot, and return the master Ballot to the Information Agent and Exchange Agent so that the master Ballot is actually received by the Information Agent and Exchange Agent before the Voting Deadline. If no self-addressed, postage pre-paid envelope was enclosed for this purpose, the nominee must be contacted for instructions.

Any Ballot returned to a nominee by a beneficial owner will not be counted for purposes of acceptance or rejection of the Plan until such nominee properly completes and delivers to the Information Agent and Exchange Agent that Ballot (properly validated) or a Master Ballot that reflects the vote of such beneficial owner.

If you are a broker, dealer, commercial bank, trust company or other nominee that is the registered holder of securities, please forward a copy of this Offering Memorandum and Disclosure Statement, the appropriate Ballot, and any other enclosed materials to each beneficial owner as of the voting record date and arrange for beneficial owners to vote in accordance with the voting procedures described herein and:

- *If you have signed (or "prevalidated") a Ballot by:* (1) signing the Ballot; (2) indicating on the Ballot the name of the registered holder and the amount of securities held by the nominee; and (3) forwarding such Ballot together with the solicitation package and other materials requested to be forwarded, to the beneficial owner for voting, then the beneficial owner must vote on the Plan by completing the information requested on the Ballot, indicating its vote on the Ballot, and returning the completed original Ballot in the enclosed, pre-addressed, postage pre-paid envelope so that it is actually received by Information Agent and Exchange Agent before the Voting Deadline. A list of the beneficial owners to whom "pre-validated" Ballots were delivered should be maintained by the nominee for inspection for at least one year from the Voting Deadline.

- *If you have not signed (or "prevalidated") the appropriate Ballot, then you, as nominee,* may obtain the votes of beneficial owners by forwarding to the beneficial owners the unsigned Ballots, together with this Offering Memorandum and Disclosure Statement, a return envelope provided by, and addressed to, the nominee, and other materials requested to be forwarded. Each such beneficial owner may vote on the Plan by completing the information requested on the Ballot, indicating its vote on the Ballot, and returning the completed original Ballot to you, as nominee. After collecting the Ballots, you, as nominee, should, in turn, complete a master Ballot compiling the votes and other information from the Ballot, execute the master Ballot, and deliver the master Ballot to the Information Agent and Exchange Agent so that it is actually received by the Information Agent and Exchange Agent before the Voting Deadline. All Ballots returned by beneficial owners should either be forwarded to the Information Agent and Exchange Agent (along with the master Ballot) or be retained by nominees for inspection for at least one year from the Voting Deadline.

Each nominee should advise its beneficial owners to return their Ballots to the nominee by a date calculated by the nominee to allow it to prepare and return the master Ballot to Information Agent and Exchange Agent so that it is actually received by Information Agent and Exchange Agent before the Voting Deadline.

Any Holder of a Claim in the Voting Class that has not received a Ballot should contact its nominee or the Information Agent and Exchange Agent at its address and telephone number on the back cover of this Offering Memorandum and Disclosure Statement.

We have engaged the Information Agent and Exchange Agent as the noticing, claims and balloting agent to assist in the balloting and tabulation process. The Information Agent and Exchange Agent will process and tabulate Ballots for the Voting Classes and will file a voting report as soon as practicable on or after the Petition Date.

Any Ballot that is properly executed by the Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted at all.

Each Holder of a Claim in the Voting Class must vote all of their Claims either to accept or reject the Plan and may not split their votes.

All Ballots are accompanied by a pre-addressed, postage pre-paid envelope. It is important to follow the specific instructions provided on each Ballot.

Acceptances or rejections may be withdrawn or revoked at any time before the Voting Deadline by the beneficial owner on the voting record date who completed the original master Ballot or Ballot, or by the nominee who completed the master Ballot in such beneficial owner's name, as the case may be. However, after commencement of a reorganization case in connection with the Plan, withdrawal or revocation of votes accepting or rejecting the Plan may be effected only with the approval of the Bankruptcy Court.

Acceptances or rejections in regard to the Plan may be withdrawn or revoked before commencement of a reorganization case in connection with the Plan by complying with the following procedures: (a) a Holder of a Claim in the Voting Class should deliver a written notice of withdrawal or revocation to the record holder for endorsement and delivery to the Information Agent and Exchange Agent and (b) a record Holder of a Claim in the Voting Class who voted securities held for their own account should deliver a written notice of withdrawal or revocation to the Information Agent and Exchange Agent.

To be effective, a notice of revocation and withdrawal must:

- be timely received by the Information Agent and Exchange Agent at its address specified on the back cover of this Offering Memorandum and Disclosure Statement;

- specify the name and/or customer account number of the beneficial owner whose vote on the Plan of reorganization is being withdrawn or revoked;

- contain the description of the Claim as to which a vote on the Plan of reorganization is withdrawn or revoked; and

- be signed by the beneficial owner of the Claim who executed the Ballot reflecting the vote being withdrawn or revoked, or by the nominee who executed the master Ballot reflecting the vote being withdrawn or revoked, as applicable, in each case in the same manner as the original signature on the Ballot or master Ballot, as the case may be.

After the commencement of a reorganization case in connection the Plan, a notice of withdrawal of a previously furnished Ballot or master Ballot will not be effective without the approval of the Bankruptcy Court.

**Note to Holders of Claims in the Voting Class**

By signing and returning a Ballot, each Holder of a Claim in the Voting Classes will be certifying to the Bankruptcy Court and us that, among other things:

- the Holder has received and reviewed a copy of the Offering Memorandum and Consent Solicitation Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the Holder has cast the same vote with respect to all Claims, as applicable, in the same respective class; and

- no other Ballots with respect to the same Claim have been cast, or, if any other Ballots have been cast with respect to such Claims, then any such Ballots are thereby revoked.

**Voting Tabulation**

The Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a claim. Only Holders of Claims in the Voting Class shall be entitled to vote with regard to such Claims.

Unless the Company decides otherwise, Ballots received after the Voting Deadline may not be counted. The method of delivery of the Ballots to be sent to the Information Agent and Exchange Agent is at the election and risk of each Holder of a Claim in the Voting Class. Except as otherwise provided herein, or if you have been provided a prevalidated Beneficial Ballot, a prevalidated Ballot will be deemed delivered only when the Information Agent and Exchange Agent actually receives the original executed Ballot. No Ballot should be sent to us or any of our agents (other than the Information Agent and Exchange Agent), or to our financial or legal advisors.

We reserve the right to use the acceptances to seek confirmation of any permitted amendment or modification of the Plan, provided that we may not make any amendment or modification to the Plan prohibited by the Plan.

The Bankruptcy Code may require the Company to disseminate additional solicitation materials if the Company makes material changes to the terms of the Plan or if the Company waives a material condition to confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same Holder with respect to the same Claim in the respective Voting Class, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Holders of a Claim in the Voting Class must vote all of their Claims or Interests, as applicable, either to accept or reject the Plan and may not split their vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims in the same Voting Class, we may, in our discretion, and to the extent possible, aggregate the respective Claims of any particular Holder within the particular class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

To the extent that we commence the Chapter 11 Case, we will file with the Bankruptcy Court, on the Petition Date, or as soon as practicable thereafter, the voting report prepared by the Information Agent and Exchange Agent. We are accepting the Master Ballot via E-mail. The voting report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or damaged. The voting report also shall indicate our intentions with regard to such irregular Ballots. Neither we nor any other person or entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the voting report, nor will any of them incur any liability for failure to provide such notification.

**Confirmation of the Plan**

If we commence the Chapter 11 Case, we will promptly request that the Bankruptcy Court hold a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), including a determination that the Plan Solicitation was in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure or, if there is not any such law, rule or regulation, was made after disclosure of adequate information as defined in the Bankruptcy Code, upon such notice to parties in interest as is required by the Bankruptcy Code and the Bankruptcy Court. Bankruptcy Rule 2002(b) requires no less than 28 days' notice by mail of the time for filing objections to confirmation of the Plan and of the time and place of the confirmation hearing, unless the Bankruptcy Court shortens or lengthens this period. Parties in interest, including all Holders of the old notes, will be provided notice by mail, or by publication if required by the Bankruptcy Court, of the date and time fixed by the Bankruptcy Court for the Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. The Bankruptcy Court will also establish procedures for the filing and service of objections to confirmation of the Plan. Such procedures will be described to parties in interest in the notice informing them of the time for filing objections to confirmation of the Plan.

ANY OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH APPLICABLE BANKRUPTCY RULES AND ANY PROCEDURES ESTABLISHED BY THE BANKRUPTCY COURT.

In order for the Plan to be confirmed, and regardless of whether all impaired classes of Claims and Interests vote to accept the Plan, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the requirements of section 1129 of the Bankruptcy Code. Section 1129 of the Bankruptcy Code sets forth certain requirements that must be met in order for a plan of reorganization to be confirmed including, among other things, that:

- except to the extent the Plan meets the "nonconsensual confirmation" standards, the Plan be accepted by each impaired class of Claims and Interests by the requisite votes of Holders of Claims and Interests in such impaired classes;

- the Plan is feasible (that is, there is a reasonable probability that we will be able to perform our obligations under the Plan and continue to operate our business without the need for further financial reorganization) (see "Feasibility of the Plan" below); and

- the Plan meets the requirements of section 1129(a)(7) of the Bankruptcy Code, which requires that, with respect to each impaired class, each Holder of a Claim or Interest in such class either hypothetically (1) accepts the Plan or (2) receives at least as much pursuant to the Plan as such Holder would receive in a liquidation under chapter 7 of the Bankruptcy Code (see "Best Interests Test" below).

In addition, we must demonstrate in accordance with section 1129 of the Bankruptcy Code that:

- the Plan is proposed in good faith;

- the Plan complies with the Bankruptcy Code;

- payments for services or costs and expenses in or in connection with the case, or in connection with the Plan, have been approved by or are subject to the approval of the Bankruptcy Court;

- the individuals to serve as our officers and directors have been disclosed and their appointment or continuance in such office is consistent with the interests of creditors and interest holders;

- the identity of any insider that will be employed or retained by us is disclosed, as well as any compensation to be paid to such insider;

- all statutory fees have been or will be paid; and

- the Plan provides for the continued maintenance of retiree benefits, if any, at a certain level.

**Acceptance of the Plan**

As a condition to confirmation, the Bankruptcy Code requires that each impaired class of claims or interests accept a plan of reorganization, unless the "cram-down" requirements of section 1129(b) of the Bankruptcy Code are met. Classes of claims or interests that are not "impaired" under a plan are conclusively presumed to have accepted the plan and are not entitled to vote.

**Feasibility of the Plan**

As a condition to plan confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that Confirmation is not likely to be followed by either a liquidation or the need to further reorganize the debtor. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, our management believes that Reorganized Maxcom will possess the ability to meet its obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses.

Thus, we believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of Reorganized Maxcom. In general, as will be illustrated by certain financial projections developed by our management team and which will be filed with the Bankruptcy Court on or before the date for filing the Plan Supplement (the "Projections") illustrated by the Projections, we believe that with a significantly de-leveraged capital structure, Reorganized Maxcom will be viable. We also believe that Reorganized Maxcom will have sufficient liquidity to fund obligations as they arise, thereby maintaining value. Accordingly, we believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. We, together with our advisors, prepared the Projections in good faith, based upon estimates and assumptions developed by our management team.

**Best Interests Test**

As will be further described in the Liquidation Analysis that will be filed with the Bankruptcy Court on or prior to the date for filing the Plan Supplement, even if the Plan is accepted by each impaired class of Claims and Interests, section 1129(a)(7) of the Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must determine that either (i) each member of an impaired class of Claims or Interests has accepted the Plan or (ii) the Plan will provide each *non-accepting* member of an impaired class of Claims or Interests a recovery that has a value at least equal to the value of the distribution that such member would receive if we were liquidated under chapter 7 of the Bankruptcy Code. If all members of an impaired class of Claims or Interests accept the Plan, the best interests test does not apply with respect to that class.

The first step in meeting the best interests test is to determine the dollar amount that would be generated from the liquidation of our assets and properties in the context of a chapter 7 liquidation case. The total amount available would be the sum of the proceeds from the disposition of our assets and the cash held by us at the time of the commencement of the chapter 7 case. The next step is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of our business and the use of chapter 7 for the purposes of liquidation. Finally, the present value of that amount (taking into account the time necessary to accomplish the liquidation) is allocated to creditors and stockholders in the strict order of priority in accordance with section 726 of the Bankruptcy Code, which requires that no junior creditor receive any distribution until all senior creditors are paid in full, and then compared to the value of the property that is proposed to be distributed under the Plan on the date the Plan becomes effective.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including:

- the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee;

- the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail; and

- substantial increases in claims that would be satisfied on a priority basis or on a parity with creditors in a chapter 11 case.

As will be detailed in the Liquidation Analysis that will be attached to the Plan Supplement, we believe that the distributions to be made to Holders of old notes under the Plan will provide each such Holder with a recovery that is not less than it would receive pursuant to our hypothetical liquidation under chapter 7 of the Bankruptcy Code.

**Conditions to the Effective Date**

In addition to all standard conditions to the Plan becoming effective, including without limitation, that the Confirmation Order become a final and non-appealable order, the Plan requires that the Shareholder Contribution Amount shall have been paid as a condition to the Effective Date.

## ANTICIPATED EVENTS IN A CHAPTER 11 CASE

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11, a debtor may remain in possession of its assets, continue to manage its business and attempt to reorganize its business for the benefit of the debtor, its creditors and other parties in interest. The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of a debtor in its property as of the date the petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession," unless the Bankruptcy Court orders the appointment of a trustee. The commencement of a chapter 11 case also triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts to collect prepetition claims from the debtor or otherwise interfere with its property or business. Except as otherwise ordered by the Bankruptcy Court, the automatic stay generally remains in full force and effect until confirmation of a plan of reorganization.

Pursuant to section 1102 of the Bankruptcy Code, upon the commencement of a chapter 11 case, the Office of the United States Trustee (the "U.S. Trustee") is required to appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the U.S. Trustee deems appropriate. However, it is not uncommon for the U.S. Trustee to not appoint a creditors' committee in cases where solicitation of a Plan has been conducted before the Petition Date and the Plan is supported by the impaired class or classes of creditors under the Plan. Should we commence the Chapter 11 Case, we will seek a waiver of this requirement.

Pursuant to section 1103 of the Bankruptcy Code, a committee appointed under section 1102 of the Bankruptcy Code may:

- consult with the trustee or debtor in possession concerning the administration of the chapter 11 case;

- investigate the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business and any other matter relevant to the case or to the formulation of a plan;

- participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated and collect and file with the court acceptances or rejections of a plan;

- request the appointment of a trustee or examiner under section 1104 of the Bankruptcy Code; and

- perform such other services as are in the interest of those represented by the committee.

Furthermore, pursuant to section 1109(b) of the Bankruptcy Code, upon the commencement of the chapter 11 case, any party in interest, including the debtor, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder or any indenture trustee may raise and may appear and be heard on any issue in the chapter 11 case.

The formulation and confirmation of a plan of reorganization is the principal objective of a chapter 11 case. The plan sets forth the means for satisfying the claims against and interests in the debtor. The Plan we propose will pay all administrative and priority claims in full, provide the consideration to holders of the old notes set forth in this Offering Memorandum and Consent Solicitation Statement and leave all other claims and interests unaltered by the Plan.

In order to facilitate the Chapter 11 Case and minimize disruption to our business and maximize the probability of a successful restructuring, we will seek certain relief, including but not limited to, the relief summarized below. The relief sought will facilitate the administration of the Chapter 11 Case; however, there is no guarantee that the Bankruptcy Court will grant any or all of the requested relief.

**Voluntary Petition**

We will file a chapter 11 bankruptcy petition on the Petition Date, which will commence the Chapter 11 Case.

**Expected Timetable of the Chapter 11 Case**

We expect the Chapter 11 Case to proceed quickly, and believe that since the Plan seeks to confirm a prepackaged plan of reorganization where no class of claims or interests is proposed to be crammed down, that we should be able to proceed with confirmation of the Plan quickly.

We cannot assure you, however, that the Bankruptcy Court will approve the Plan on the timetable we will propose. On the Petition Date, we will promptly request the Bankruptcy Court to set a hearing date to approve the Disclosure Statement and to confirm the Plan approximately 30 to 45 days after the Petition Date or even more quickly as the Bankruptcy Court may permit. If the Plan is confirmed, the Effective Date of the Plan is projected to be as soon as practicable after the date the Bankruptcy Court enters the Confirmation Order and the Confirmation Order becomes a Final Order and the other conditions to Consummation of the Plan are satisfied or waived.

**First Day Relief**

In addition to the motion to set a hearing on approval of the Disclosure Statement and the Plan, we intend to file certain motions that we believe will permit the Chapter 11 Case to proceed on an efficient and expedited basis so as to permit us to obtain confirmation of the Plan, including (i) a motion seeking an extension and potential waiver of the requirement to file schedules, (ii) a motion asking the United States Trustee's office to dispense with the requirement of convening a 341 creditors meeting and formation of an unsecured creditors committee (see following paragraph) and (iii) certain procedural and administrative motions, including applications to retain the various Professionals who will be assisting us in the Chapter 11 Case.

Pursuant to section 1102 of the Bankruptcy Code, upon the commencement of a chapter 11 case, the Office of the United States Trustee (the "U.S. Trustee") is required to appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the U.S. Trustee deems appropriate. However, it is not uncommon for the U.S. Trustee to not appoint a creditors' committee in cases where solicitation of a Plan has been conducted before the Petition Date and the Plan is supported by the impaired class of creditors under the Plan.

## TRANSFER RESTRICTIONS

*The following description of transfer restrictions is only applicable to the exchange offer. See "Description of the Plan" for transferability of Senior Notes and Junior PIK Notes issued under the Plan.*

The New Notes and the related guarantees have not been registered, and will not be registered, under the Securities Act or any state securities laws, and the New Notes may not be offered or sold except pursuant to an effective registration statement or pursuant to transactions exempt from, or not subject to, registration under the Securities Act. Accordingly, the New Notes and the related guarantees to be issued in the exchange offer are being offered and issued only outside of the United States, to certain persons, other than U.S. persons, in offshore transactions meeting the requirements of Rule 903 of Regulation S under the Securities Act.

### Purchasers' Representations and Restrictions on Resale and Transfer

By exchanging its old notes for New Notes, each recipient of New Notes will be deemed to have represented and agreed as follows:

(1)  it is obtaining the New Notes and the related guarantees for its own account or an account with respect to which it exercises sole investment discretion and it and any such account is a non-U.S. person that is outside the United States;

(2)  it acknowledges that the New Notes and the related guarantees have not been registered under the Securities Act or with any securities regulatory authority of any state and may not be offered or sold within the United States;

(3)  it understands and agrees that the New Notes will be represented by a global note;

(4)  it will not resell or otherwise transfer any of such New Notes prior to (i) the date which is one year (or such other period of time as permitted by Rule 144(d) under the Securities Act or any successor provision thereunder) after the later of the date of original issuance of the New Notes and (ii) such later date, if any, as may be required by applicable laws, except (a) to us or any of our subsidiaries, (b) within the United States to a qualified institutional buyer in a transaction complying with Rule 144A under the Securities Act, (c) outside the United States in compliance with Rule 903 or 904 under the Securities Act, (d) pursuant to an exemption from registration under the Securities Act (if available) or (e) pursuant to an effective registration statement under the Securities Act;

(5)  it agrees that it will give to each person to whom it transfers the New Notes notice of any restrictions on transfer of such New Notes;

(6)  it acknowledges that prior to any proposed transfer of New Notes (other than pursuant to an effective registration statement or in respect of New Notes sold or transferred either pursuant to (a) Rule 144A or (b) Regulation S) the holder of such New Notes may be required to provide certifications relating to the manner of such transfer as provided in the indenture;

(7)  it acknowledges that the trustee, registrar or transfer agent for the New Notes may not be required to accept for registration or transfer of any New Notes acquired by it, except upon presentation of evidence satisfactory to us that the restrictions set forth herein have been complied with;

(8)  it acknowledges that we, the dealer manager and the solicitation agent and other persons will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements and agrees that if any of the acknowledgements, representations and agreements deemed to have been made by its exchange of the New Notes are no longer accurate, it will promptly notify us and the dealer manager and solicitation agent;

(9)   if it is acquiring the New Notes as a fiduciary or agent for one or more investor accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgements, representations and agreements on behalf of each account; and

(10) the exchange offer is not being made to, and any offers to exchange will not be accepted from, or on behalf of, eligible holders of the old notes in any jurisdiction in which the making of such offer would not be in compliance with the laws and regulations of such jurisdiction.

## Legends

The following is the form of restrictive legend which will appear on the face of the global notes and which will be used to notify transferees of the foregoing restrictions on transfer.  This legend will only be removed with our consent.  If we so consent, it will be deemed to be removed.

THE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE OR OTHER SECURITIES LAWS, AND MAY NOT BE OFFERED, SOLD, PLEDGED, OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE.  BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER OF THIS SECURITY BY ITS ACCEPTANCE HEREOF (1) REPRESENTS THAT IT, AND ANY ACCOUNT FOR WHICH IT IS ACTING, (A) IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) OR (B) IS NOT A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN "OFFSHORE TRANSACTION" PURSUANT TO RULE 903 OR 904 OF REGULATION S AND, WITH RESPECT TO (A) AND (B), EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO SUCH ACCOUNT, (2) AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT (A) (I) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, (II) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, (III) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (IV) IN AN OFFSHORE TRANSACTION COMPLYING WITH THE REQUIREMENTS OF RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, OR (V) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE), AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS, AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.  AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE RESPECTIVE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT.

PRIOR TO EXPIRATION OF THE 40-DAY DISTRIBUTION COMPLIANCE PERIOD (AS DEFINED IN REGULATION S ("REGULATION S") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT")), THIS SECURITY MAY NOT BE REOFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES (AS DEFINED IN REGULATION S) OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, A U.S. PERSON (AS DEFINED IN REGULATION S), EXCEPT TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT IN A TRANSACTION MEETING THE REQUIREMENTS OF THE INDENTURE REFERRED TO HEREIN.

Prior to the registration of any transfer in accordance with clause (2)(A)(V) of the global note legend, we reserve the right to require the delivery of such legal opinions, certifications, or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws.  No representation is made as to the availability of any exemption from the registration requirements of the Securities Act.

The applicable Resale Restriction Period may be extended in our discretion, in the event of one or more issuances of additional notes, as described under "Description of the Senior Notes—Additional Notes" and "Description of the Junior PIK Notes—Additional Notes"

**Notice to Prospective Investors in the European Economic Area**

The New Notes that are the subject of the transactions contemplated by this statement may not be offered, sold or otherwise made available and will not be offered, sold or otherwise made available to any retail investor in the European Economic Area (the "EEA"). For these purposes, a "retail investor" means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU (as amended, "MiFID II"); (ii) a customer within the meaning of the Insurance Mediation Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a "qualified investor" as defined in the Directive 2003/71/EC (as amended or superseded, including by Directive 2010/73/EU) (the "Prospectus Directive"). Consequently no key information document required by Regulation (EU) No. 1286/2014 (the "PRIIPs Regulation") for offering or selling the New Notes or otherwise making them available to retail investors in the EEA has been prepared and therefore offering or selling the New Notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation.

**Notice to Prospective Investors in the United Kingdom**

This statement is only being distributed to, and is only directed at, persons in the United Kingdom that are qualified investors within the meaning of the Prospectus Directive that are also (i) persons who have professional experience in matters relating to investments falling within article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Order") or (ii) high net worth entities falling within Article 49(2)(a) to (d) of the Order, and other persons to whom it may be lawfully communicated (each such person being referred to as a "relevant person"). This statement and its contents are confidential and should not be distributed, published or reproduced (in whole or in part) or disclosed by recipients to any other persons in the United Kingdom. Any investment or investment activity to which this statement relates will be available only to relevant persons and will be engaged in only with relevant persons. Any person in the United Kingdom who is not a relevant person should not act or rely on this document or any of its contents.

**Notice to Prospective Investors in Mexico**

The New Notes have not been registered with the National Securities Registry (*Registro Nacional de Valores*) maintained by the CNBV and may not be publicly offered or sold in Mexico, except that the New Notes may be offered to Mexican institutional and qualified investors solely pursuant to the private placement exemption set forth in Article 8 of the Mexican Securities Market Law (*Ley del Mercado de Valores*).

## TAXATION

The following is a general summary of certain Mexican federal and U.S. federal income tax consequences related to participation in the exchange offer as well as the ownership and disposition of New Notes, but it does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision to exchange old notes for New Notes in the exchange offer or to hold or dispose of the New Notes.  This summary does not describe any tax consequences arising under the laws of any state, locality, municipality or taxing jurisdiction other than the federal income tax laws of the United States and the Mexican Federal Income Tax Law (*Ley del Impuesto Sobre la Renta*, or the "Mexican Income Tax Law").

This summary is for general information only and is based on the federal tax laws of Mexico and federal income tax laws of the United States as in effect on the date of this statement, as well as rules and regulations of Mexico and regulations, rulings and decisions of the United States available on or before this date and now in effect. All of the foregoing are subject to change, possibly with retroactive effect, which could affect the continued validity of this summary.

Holders of old notes should consult their own tax advisors as to the Mexican, U.S. or other tax consequences (including tax consequences under any state or municipal law of Mexico or the United States or under any applicable double taxation treaty which is in effect) of participation in the exchange offer and of the ownership or disposition of the New Notes, including the particular tax consequences to them in light of their particular investment circumstances.

**Certain Mexican Federal Income Tax Considerations**

The summary below does not address all federal, state or municipal Mexican tax considerations that may be relevant to particular investors, nor does it address the special tax rules applicable to certain categories of investors.

The following is a general summary of the principal consequences, under the provisions of the Mexican Income Tax Law, as in effect on the date of this statement and all of which are subject to change or to new or different interpretations, of the ownership and disposition of the New Notes and the exchange of the old notes for New Notes exclusively by a foreign holder.  As used in this statement, a "foreign holder" means a beneficial owner of the New Notes that:

- is not a resident of Mexico for tax purposes; and

- does not hold the New Notes or a beneficial interest in the New Notes through a permanent establishment in Mexico for tax purposes, to which the holding of the New Notes, or the income received from the New Notes or from the exchange of old notes for New Notes, is attributable for tax purposes.

For purposes of Mexican taxation, tax residency is a highly technical definition that involves the application of a number of factors.  Generally:

- an individual is a resident of Mexico if the individual has established his or her home in Mexico. When such individual has a home in another country, the individual will be considered a resident of Mexico for tax purposes if his/her center of vital interest is located in Mexico, which is deemed to occur if (i) more than 50% of such individual total income, in any calendar year, is derived from a Mexican source, or (ii) such individual's principal center of professional activities is located in Mexico.  Mexican nationals that are employed by the Mexican government are deemed to be residents of Mexico, even if his/her center of vital interest is located outside of Mexico.  Unless otherwise proven, Mexican nationals are deemed to be residents of Mexico for tax purposes;

- a legal entity is considered a Mexican tax resident if it maintains the principal administration of its business or the effective location of its management in Mexico; and

- a permanent establishment in Mexico of a foreign person will be treated as a resident of Mexico for tax purposes, and that permanent establishment will be required to pay taxes in Mexico in

147

accordance with applicable Mexican tax laws, in respect of all income attributable to such permanent establishment.

For purposes of Mexican taxation, an individual or corporation that does not satisfy the requirements to be considered a resident of Mexico is deemed a non-resident of Mexico.

*Capital Gains Resulting from the Exchange.*  The exchange of old notes for New Notes by a foreign holder pursuant to the exchange offer will be considered a taxable event for Mexican tax purposes.  As a result of such event, a foreign holder could be subject to income tax on gains obtained on the exchange of the old notes for New Notes pursuant to the exchange offer, as described in the following paragraph.

Gains, if any, obtained by foreign holders on the exchange of old notes for New Notes pursuant to the exchange offer will be considered interest income, and as such are subject to Mexican income tax withholding (as described below).  The foreign holder's basis in the old notes will be the amount originally received by us when such old notes were issued.  The gain or loss obtained by a foreign holder will be determined by subtracting the foreign holder's basis in the old notes from the consideration received by the foreign holder (including the early participation consideration and accrued interest paid).

Subject to the discussion below regarding accrued and unpaid interest, we do not expect the exchange to produce any gain subject to Mexican income tax withholding, and therefore we currently do not intend to withhold any amounts from the consideration paid to a foreign holder pursuant to the exchange offer.  If, contrary to our expectation, a foreign holder recognizes a gain on the exchange offer and is subject to Mexican income tax withholding, we will pay to such foreign holder additional amounts relating to such Mexican withholding taxes as may be necessary so that the payment of consideration to the foreign holder will not be less than the amount provided for to be then due and payable under the exchange offer in the absence of such withholding.

*Accrued and Unpaid Interest.*  Accrued and unpaid interest on the old notes received by the foreign holder will be subject to the Mexican income tax withholding (as described below). Pursuant to the terms of the old notes, subject to specified exceptions and limitations, we are obligated to pay Additional Amounts relating to such Mexican withholding taxes.

*Interest Payments.*  Under the Mexican Income Tax Law, payments of interest on the old notes and New Notes (which interest would be deemed to include payments of principal in excess of the issue price of the New Notes, that under the Mexican Income Tax Law would be deemed interest) made by us or a subsidiary guarantor that is resident in Mexico for tax purposes, to a foreign holder, will generally be subject to a Mexican withholding tax assessed at a rate of 4.9%, if, as expected, the following requirements are met:

- the old notes were, and the New Notes are, placed outside of Mexico in a public offering through banks or brokerage houses, in a country with which Mexico has entered into a treaty for the avoidance of double taxation which is in effect;

- with respect to the New Notes, a notice is filed before the CNBV describing the main characteristics of the New Notes offering pursuant to Article 7 of the Mexican Securities Market Law (*Ley del Mercado de Valores*); and

- with respect to the New Notes, the information requirements specified from time to time by the Mexican Tax Administration Service (*Servicio de Administracion Tributaria*) under its general rules, including, after completion of the offering of the New Notes, the filing of certain information related to the New Notes offering and this statement, are duly and timely complied with.

Payment of interest on the old notes and the New Notes made by us, or any subsidiary guarantor, to non-Mexican pension and retirement funds will be exempt from Mexican withholding tax provided that:

- the applicable fund is duly incorporated pursuant to the laws of its country of residence and is the beneficial owner of the interest payment;

- such income is exempt from taxes in its country of residence; and

- such fund is registered with the Mexican Tax Administration Service (*Servicio de Administratcion Tributaria*) for these purposes.

In the event that any of the foregoing requirements is not met, under the Mexican Income Tax Law, payments of interest on the old notes and the New Notes made by us, or by any subsidiary guarantor that is resident in Mexico for tax purposes, to a foreign holder will be subject to Mexican withholding tax assessed at a rate of 10% or higher. In addition, if the effective beneficiaries, whether directly or indirectly, severally or jointly with related parties, that receive more than 5% of the aggregate amount of each interest payment under the old notes and the New Notes are (i) shareholders holding more than 10% of our voting stock, directly or indirectly, severally or jointly with related parties, or (ii) corporations or other entities having more than 20% of their stock owned, directly or indirectly, jointly or severally, by persons related to us, the Mexican withholding tax will be applied at a higher rate.

Holders or beneficial owners of the New Notes may be requested, subject to specified exceptions and limitations, to provide certain information or documentation necessary to enable us to apply the appropriate Mexican withholding tax rate applicable to such holders or beneficial owners. In the event that the specified information or documentation concerning the holder or beneficial owner, if requested, is not timely provided or not provided completely or at all prior to the payment of any interest to that holder or beneficial owner, we, or the subsidiary guarantors, may withhold Mexican tax from the interest payment on the New Notes to that holder or beneficial owner at the maximum applicable rate, but our obligation to pay Additional Amounts relating to those withholding taxes will be limited as described under "Description of the New Notes—Additional Amounts."

We have agreed, subject to specified exceptions and limitations, to pay Additional Amounts relating to the Mexican withholding taxes to foreign holders of the New Notes. See "Description of the New Notes—Additional Amounts."

*Principal Payments.* Under the Mexican Income Tax Law, payments of principal on the New Notes made by us, or any subsidiary guarantor that is resident in Mexico for tax purposes, to a foreign holder will not be subject to any Mexican withholding taxes.

*Dispositions.* Under the Mexican Income Tax Law, gains resulting from the sale or other disposition of the New Notes by a foreign holder to another foreign holder are not taxable in Mexico. Gains resulting from the sale of the New Notes by a foreign holder to a purchaser who is a Mexican resident for tax purposes or to a foreign holder deemed to have a permanent establishment in Mexico for tax purposes will be subject to Mexican federal income or other taxes pursuant to the rules described above in respect of interest payments. The acquisition of the New Notes at a discount by a foreign holder will be deemed interest income (in respect of such discount) and subject to Mexican withholding taxes if the seller is a Mexican resident for tax purposes or a foreign resident deemed to have a permanent establishment in Mexico for tax purposes.

*Other Taxes.* Under current Mexican tax laws, there are no estate, inheritance, succession or gift taxes generally applicable to the purchase, ownership or disposition of the New Notes by a foreign holder. Gratuitous transfers of the New Notes in certain circumstances may result in the imposition of Mexican income taxes upon the recipient. There are no Mexican stamp, issuer registration or similar taxes or duties payable by foreign holders of the New Notes with respect to the New Notes.

**Certain U.S. Federal Income Taxation Considerations**

The following is a summary of certain U.S. federal income tax consequences of the exchange offer and consent solicitation and the ownership and disposition of the Senior Notes that may be relevant to U.S. holders (as defined below). This discussion does not address the tax consequences of the receipt of Junior PIK Notes or cash pursuant to the exchange offer (the receipt of which can affect this summary) and does not address the tax consequences of the ownership and disposition of the Junior PIK Notes. U.S. holders should consult their own tax advisors regarding the U.S. federal income tax consequences of receipt of Junior PIK Notes or cash pursuant to the exchange offer and of owning and disposing of the Junior PIK Notes.

This discussion assumes that the old notes are held, and the Senior Notes will be held, as capital assets within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "Code"). In addition, this discussion addresses the U.S. federal income tax consequences of owning and disposing of the Senior Notes only in the case of U.S. holders that acquired their Senior Notes in exchange for old notes in the exchange offer.

As used in this statement, a "U.S. holder" means a beneficial owner of an old note or a Senior Note, as applicable, that is, for U.S. federal income tax purposes:

- a citizen or individual resident of the United States;

- a corporation (or entity treated as a corporation for such purposes) created or organized in or under the laws of the United States, or any State thereof or the District of Columbia;

- an estate the income of which is includible in its gross income for U.S. federal income tax purposes without regard to its source; or

- a trust, if either (x) it is subject to the primary supervision of a court within the United States and one or more "United States persons" has the authority to control all substantial decisions of the trust or (y) it has a valid election in effect under applicable U.S. Treasury regulations to be treated as a "United States person."

This summary does not discuss considerations or consequences relevant to persons subject to special provisions of U.S. federal income tax law, such as:

- entities that are tax-exempt for U.S. federal income tax purposes and retirement plans, individual retirement accounts and tax-deferred accounts;

- pass-through entities (including partnerships and entities and arrangements classified as partnerships for U.S. federal income tax purposes) and beneficial owners of pass-through entities;

- real estate investment trusts and regulated investment companies;

- certain U.S. expatriates;

- persons that are subject to the alternative minimum tax;

- banks, financial institutions, insurance companies, and dealers or traders in securities or currencies;

- persons having a "functional currency" other than the U.S. dollar; and

- persons that hold the old notes or that will hold the Senior Notes as part of a constructive sale, wash sale, conversion transaction or other integrated transaction or a straddle, hedge or synthetic security.

If a partnership (or an entity or arrangement classified as a partnership for U.S. federal income tax purposes) holds old notes or Senior Notes, the U.S. federal income tax treatment of a partner in the partnership generally will depend on the status of the partner and the activities of the partnership. If a U.S. holder is a partner in a partnership holding old notes, such U.S. holder should consult their own tax advisors regarding the U.S. federal income tax consequences of participation in the exchange offer and of owning and disposing of Senior Notes.

U.S. holders that use an accrual method of accounting for tax purposes ("accrual method holders") generally are required to include certain amounts in income no later than the time such amounts are reflected on certain financial statements (the "book/tax conformity rule"). The application of the book/tax conformity rule thus may require the accrual of income earlier than would be the case under the general tax rules described below, although it is not entirely clear to what types of income the book/tax conformity rule applies. Accrual method holders should consult with their tax advisors regarding the potential applicability of the book/tax conformity rule to their particular situation.

Finally, this summary does not address the effect of any U.S. state or local tax law or any non-income tax U.S. federal law on a beneficial owner of old notes or Senior Notes. This discussion assumes that each beneficial owner of old notes and Senior Notes will comply with the certification procedures described in "Description of the Senior Notes—Additional Amounts" as may be necessary to obtain a reduced rate of withholding tax under Mexican law.

No ruling from the U.S. Internal Revenue Service ("IRS") has been or will be sought with respect to any of the U.S. federal income tax considerations discussed below, and no assurance can be given that the IRS will not take a position contrary to the discussion below or that any contrary position would not be sustained in court. Each beneficial owner of old notes or Senior Notes should consult a tax advisor as to the particular tax consequences to it of participation in the exchange offer and of owning and disposing of such notes, including the applicability and effect of any state, local or foreign tax laws.

### Consequences of Tendering old notes for Senior Notes

*Early Participation Consideration Received in Connection with the Exchange*. The U.S. federal income tax treatment of the receipt of any early participation consideration received upon the exchange of old notes for Senior Notes is uncertain.

Any early participation consideration received by a U.S. holder in connection with the exchange of old notes for Senior Notes may be treated as additional consideration received by such holder as part of the exchange. In the event that the early participation consideration is not treated as additional consideration received by a U.S. holder as part of the exchange, such payments would likely be treated as a separate payment in the nature of a fee paid for such U.S. holder's early tender of old notes, and a U.S. holder likely would recognize ordinary income in the amount of such early participation consideration. Finally, it is possible that the early participation consideration is treated as a payment on the old note, which may be treated first as a payment of any accrued and unpaid interest on such old note and then as a payment of principal of such old note. Any portion of the early participation consideration treated as a payment of principal on an old note would generally reduce a U.S. Holder's adjusted tax basis in such old note.

The treatment of the early participation consideration as additional consideration, as a separate fee, or as a payment on the old note would also affect the source of such payment and, accordingly, the U.S. holder's ability to credit foreign taxes (if any) imposed on such payment and the U.S. holder's calculation of its foreign tax credit limitation for U.S. federal income tax purposes.

*General Consequences*. The exchange of old notes for Senior Notes will be treated as a disposition of such old notes for U.S. federal income tax purposes. If a U.S. holder validly tenders old notes for Senior Notes pursuant to the exchange offer, the tax treatment of this exchange by a U.S. holder will depend to a significant extent on whether the exchange constitutes a recapitalization for U.S. federal income tax purposes or is a taxable exchange.

The qualification of the exchange by a U.S. holder as a "recapitalization" for U.S. federal income tax purposes depends upon whether both the old notes and the Senior Notes constitute "securities" for purposes of Section 354 of the Code. The term "security" for such purposes is not defined in the Code or the U.S. Treasury regulations. While judicial decisions have held that the determination of whether a particular debt instrument constitutes a "security" depends on all the facts and circumstances and involves an overall evaluation of the nature of the debt instrument, the term of the debt instrument is generally regarded as one of the most significant factors. Debt instruments with a term of ten years or more generally have qualified as securities, debt instruments with a term of between five and ten years often qualify as securities and debt instruments with a term of less than five years often do not qualify as securities. In this regard, the old notes and the Senior Notes should both be treated as issued with maturities of five years or more.

Each U.S. holder is urged to consult its own tax advisor with respect to the U.S. federal income tax consequences of participation in the exchange offer. The U.S. federal income tax consequences of recapitalization and non-recapitalization treatment to U.S. holders are discussed below.

*Recapitalization Treatment.* If the exchange qualifies as a recapitalization, a U.S. holder who elects to exchange old notes for Senior Notes and other applicable consideration will generally (i) not recognize gain realized (determined as described below under "—Non-Recapitalization Treatment") on the exchange, if any (excluding for this purpose, any amounts received in respect of accrued interest on the old notes, which will generally be treated and taxed separately as such, as discussed below under "—Accrued Interest"), and will not recognize loss realized, if any, on the exchange, (ii) have a holding period in the Senior Notes received that includes the holding period of the old notes exchanged therefor, and (iii) have an initial tax basis in the Senior Notes equal to the adjusted tax basis in the old notes tendered in exchange for the Senior Notes. This discussion does not consider the consequences of receiving cash or Junior PIK Notes in exchange for the old notes.

*Non-Recapitalization Treatment.* If the exchange does not qualify as a recapitalization, a U.S. holder will recognize gain or loss in an amount equal to the difference, if any, between (i) the issue price of the Senior Notes (as discussed below under "—Ownership and Disposition of the Senior Notes—Issue Price") and (ii) such U.S. holder's adjusted tax basis in the old notes tendered in exchange therefor. Any amounts received in the exchange with respect to accrued but unpaid interest on the old notes will generally be treated and taxed separately as such, as discussed below under "—Accrued Interest." A U.S. holder's adjusted tax basis in its old notes will generally equal the amount paid therefor, increased by any "market discount," as described below, previously taken into account as income by the U.S. holder and reduced by the amount of payments on the old notes that were not qualified stated interest payments and any amortizable bond premium previously amortized by the U.S. holder. Any such gain or loss recognized on the exchange will be capital gain (except to the extent of any accrued market discount on the old notes not previously included in income by the U.S. holder, which will be treated as ordinary income) or loss, and will be long-term capital gain or loss if the old notes have been held for more than one year at the time of the exchange. In addition, the deduction of capital losses may be subject to limitations. A U.S. holder will be considered to have purchased its old notes at a market discount for U.S. federal income tax purposes if such holder's initial tax basis in its old notes was less than the stated principal amount of such old notes by more than a specified *de minimis* amount. The U.S. holder's holding period for the Senior Notes will begin on the day after the exchange, and such holder's initial tax basis in the Senior Notes generally will equal the issue price of the Senior Notes. This discussion does not consider the consequences of receiving cash or Junior PIK Notes in exchange for the old notes.

*Accrued Interest.* Amounts received by a U.S. holder of old notes exchanging such old notes for Senior Notes that are attributable to accrued but unpaid interest on the old notes will not be considered part of the amount realized in the exchange and instead will be includible in gross income by the U.S. holder as interest income if such accrued interest has not been included previously in the U.S. holder's gross income for U.S. federal income tax purposes.

*Foreign Tax Credits.* Any gain or loss recognized by a U.S. holder on the exchange (if the exchange does not qualify as a recapitalization) generally should be treated as U.S.-source income or loss for U.S. foreign tax credit purposes (as discussed below under "Ownership and Disposition of the Senior Notes - Sale, Exchange, or Other Taxable Disposition"). Accrued interest income with respect to the old notes that is treated as paid as a result of the exchange (including accrued market discount not previously included in income by the U.S. holder) will constitute income from sources outside the United States and generally will constitute "passive category income" for U.S. foreign tax credit purposes. The rules governing U.S. foreign tax credits are complex, and a U.S. holder is urged to consult its tax advisor regarding the application of the rules to your particular circumstances.

*U.S. Holders that Do Not Participate in the Exchange Offer or Consent Solicitation.* The U.S. federal income tax consequences to U.S. holders that do not participate in the exchange offer or consent solicitation will depend on whether the adoption of the proposed amendments results in a deemed exchange of such old notes for U.S. federal income tax purposes. A deemed exchange may occur if the modifications that are effected by the proposed amendments are "significant" within the meaning of applicable Treasury regulations. Under applicable regulations, the modification of a debt instrument generally is a "significant" modification if, based on all the facts and circumstances (aside from certain modifications covered by specific rules), the legal rights or obligations that are altered and the degree to which they are altered is "economically significant." The applicable regulations specifically provide that a modification that adds, deletes or alters customary accounting or financial covenants is not a significant modification.

If the adoption of the proposed amendments does not constitute a "significant modification," a U.S. holder that does not participate in the exchange offer or consent solicitation should not recognize gain or loss in respect of old

notes not tendered pursuant to the exchange offer, and such U.S. holder's adjusted tax basis and holding period in the old notes not tendered should remain unchanged.

There can be no assurance that the IRS will not successfully challenge this position. If the IRS successfully asserted that the adoption of the proposed amendments resulted in a significant modification of the old notes for U.S. federal income tax purposes, U.S. holders of the old notes that do not participate in the exchange offer or consent solicitation would be deemed to have exchanged their old notes for notes bearing the modified note terms, such deemed exchange would be treated as a fully taxable exchange as discussed above (except to the extent any recognized loss may be deferred under the "wash sale" rules of Section 1091 of the Code), unless the deemed exchange qualifies as a "recapitalization" under the Code (as discussed above). Regardless of whether the deemed exchange qualifies as a recapitalization, any accrued and unpaid interest would be taxable as ordinary income at the time of the deemed exchange (to the extent not previously so taxed). U.S. holders should consult their own tax advisors regarding the U.S. federal income tax consequences of not participating in the exchange offer or consent solicitation.

### Ownership and Disposition of the Senior Notes

*Effect of Certain Contingencies.*

Certain debt instruments that provide for one or more contingent payments may be subject to U.S. Treasury regulations governing contingent payment debt instruments. A payment is not treated as a contingent payment under these regulations if, as of the issue date of the debt instrument, the likelihood that such payment will be made is remote and/or the payments are incidental. In certain circumstances as set forth in the "Description of the Senior Notes," we may redeem the Senior Notes in advance of their stated maturity, in which case we may pay amounts on the Senior Notes that are in excess of the stated interest or principal of the Senior Notes. We intend to take the position that the possibility that any such payment will be made is remote and/or the payments are incidental and therefore the Senior Notes are not subject to the rules governing contingent debt instruments.

Our determination that these contingencies are remote and/or incidental is binding on a U.S. holder unless it discloses its contrary position to the IRS in the manner that is required by applicable U.S. Treasury regulations. Our determination is not, however, binding on the IRS. It is possible that the IRS might take a different position from that described above, in which case the timing, character and amount of taxable income in respect of the Senior Notes may differ adversely from that described herein. The remainder of this discussion assumes that the Senior Notes will not be treated as contingent payment debt instruments.

*Stated Interest.* A U.S. holder generally must include in the U.S. holder's gross income all qualified stated interest with respect to the Senior Notes, and Additional Amounts thereon, if any, on account of non-U.S. withholding taxes (in each case, without reduction for any such taxes withheld), at the time they are paid or accrued in accordance with the U.S. holder's usual method of accounting for U.S. federal income tax purposes. Because a U.S. holder's stated interest income will not be reduced by the non-U.S. taxes withheld, a U.S. holder will generally be required to include more interest (or OID) in the U.S. holder's gross income than the U.S. holder actually receives in cash interest.

However, a U.S. holder may, subject to certain limitations, be eligible to claim the Mexican taxes withheld as a credit or deduction for purposes of computing its U.S. federal income tax liability, even though the payment of these taxes will be remitted by us. Interest and Additional Amounts paid on the Senior Notes will constitute income from sources without the United States for U.S. foreign tax credit purposes. This foreign source income generally will constitute "passive category income" for U.S. foreign tax credit purposes. The rules relating to the calculation and timing of foreign tax credits and, in the case of a U.S. holder that elects to deduct foreign taxes, the availability of deductions, involves the application of complex rules that depend upon a U.S. holder's particular circumstances. U.S. holders should consult with their own tax advisors with regard to the availability of a credit or deduction in respect of foreign taxes and, in particular, the application of the foreign tax credit rules to their particular situations.

*Issue Price.* The issue price of the Senior Notes will depend on whether the old notes or the Senior Notes are considered, for U.S. federal income tax purposes, to be traded on an established market. If the Senior Notes are considered to be traded on an established market, the issue price of the Senior Notes would be the fair market value of the Senior Notes on the date of the exchange. If the Senior Notes are not considered to be traded on an

established market but the old notes are considered to be traded on an established market, the issue price of the Senior Notes would be the fair market value of the old notes on the date of the exchange. If neither the Senior Notes nor the old notes are considered to be traded on an established market, the issue price of the Senior Notes would be their stated principal amount. Although not free from doubt, we believe that it is likely that both the Senior Notes and the old notes will be considered to be traded on an established market at the time of the exchange, and, therefore, that the issue price of the Senior Notes will be the fair market value of such notes on the date of the exchange. Our determination of whether the old notes or Senior Notes are considered to be traded on an established market and, if so, the issue price of the Senior Notes is binding on each U.S. holder unless it explicitly discloses to the IRS, on its timely filed U.S. federal income tax return for the taxable year that includes the date of the exchange, that its determination is different from ours, the reason for its different determination, and, if appropriate, how it determined the issue price.

*Original Issue Discount.* A Senior Note will have OID to the extent the issue price of such Senior Note (determined as described above under "—Issue Price") is less than its "stated redemption price at maturity," subject to a statutory de minimis exception. The stated redemption price at maturity of a  Senior Note will equal the sum of all payments required under the Senior Note other than payments of qualified stated interest. A U.S. holder (whether a cash or accrual method taxpayer) generally will be required to include in gross income (as ordinary income) any OID as the OID accrues (on a constant yield to maturity basis), before the holder's receipt of cash payments attributable to such OID.

The amount of OID includible in a U.S. holder's gross income for a taxable year with respect to a Senior Note will be the sum of the "daily portions" of OID with respect to such Senior Note for each day during such taxable year on which such holder held such Senior Note. The daily portion is determined by allocating to each day in any accrual period other than an initial short accrual period and the final accrual period a pro rata portion of the amount equal to the excess, if any, of: (i) the product of a Senior Note's adjusted issue price at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) over (ii) the sum of the amounts payable as qualified stated interest on such Senior Note in respect of such accrual period.

The accrual period for a Senior Note may be of any length and may vary in length over the term of such Senior Note provided that each accrual period is no longer than one year and each scheduled payment of principal or stated interest occurs on the first day or the final day of any accrual period. The amount of OID allocable to the final accrual period is the difference between the amount payable at maturity (other than a payment of qualified stated interest) and the adjusted issue price of the Senior Note at the beginning of the final accrual period. The amount of OID allocable to any initial short accrual period may be computed under any reasonable method. The adjusted issue price of the Senior Note at the start of any accrual period is equal to its issue price increased by the accrued OID for each prior accrual period and reduced by any prior payments with respect to such Senior Note (other than payments of  qualified stated interest).

The "yield to maturity" is the discount rate that, when applied to all interest and principal payments to be made under a Senior Note, results in a present value (as of the issue date) equal to the issue price of such Senior Note. If a U.S. holder has "acquisition premium" with respect to the Senior Notes (i.e., if such holder's adjusted tax basis immediately after the exchange is greater than the Senior Notes' issue price, but less than the Senior Notes "stated redemption price at maturity", the amount of OID that such holder would include in gross income would be reduced to reflect the acquisition premium.

The rules regarding OID are complex. A U.S. holder should consult their own tax advisors regarding the consequences of OID, including the amount of OID that such holder would include in gross income for a taxable year.

*Amortizable Bond Premium.* If a U.S. holder has an adjusted tax basis in its New Notes immediately after the exchange which exceeds the stated principal amount of its Senior Notes, the U.S. holder would be considered to have amortizable bond premium equal to such excess, and such U.S. Holder would not be required to include any OID in gross income in respect of the Senior Notes. In addition, a U.S. holder may elect to amortize this premium using a constant yield method over the term of the Senior Notes. Special rules may apply in the case of notes, like the Senior Notes, that are subject to optional redemption. A U.S. holder who elects to amortize bond premium may offset each interest payment on such Senior Notes by the portion of the bond premium allocable to the payment and

must reduce its tax basis in the Senior Notes by the amount of the premium so amortized.  If a U.S. holder does not elect to amortize any bond premium and holds the Senior Notes to maturity, then, in general, such U.S. holder will recognize a capital loss equal to the amount of such premium when the Senior Notes mature (or, if such U.S. holder disposes of the Senior Note prior to maturity, the amount of the premium will decrease the gain or increased the loss otherwise recognized on the disposition of the Senior Note).  If a U.S. holder makes the election, it generally will apply to all debt instruments that it holds at the time of the election, as well as any debt instruments that such U.S. holder subsequently acquires.  In addition, a U.S. holder may not revoke the election without the consent of the IRS.  U.S. holders should consult their own tax advisor regarding the availability of an election to amortize bond premium for U.S. federal income tax purposes.

*Market Discount.*  In general, a Senior Note will be treated as having been acquired with market discount if the excess of the issue price of the Senior Note over the U.S. holder's initial tax basis therein equals or exceeds a statutorily defined *de minimis* amount.  Upon any disposition (other than certain non-recognition transactions) of Senior Notes treated as acquired with market discount, any gain recognized will be recharacterized as ordinary income to the extent such gain does not exceed the amount of any market discount that accrued from the date that the Senior Notes were issued through the date of disposition, plus any unrecognized accrued market discount carried over from the old notes.

*Sale, Exchange or Other Taxable Disposition.*  Unless a non-recognition provision applies and subject to the discussion below with respect to market discount, upon the sale, exchange or other taxable disposition of its Senior Notes, a U.S. holder will generally recognize taxable gain or loss equal to the difference between the amount realized on the disposition (except amounts attributable to accrued but unpaid interest on Senior Notes, which amounts will be treated as ordinary interest income to the extent not previously included in the U.S. holder's income) and the U.S. holder's adjusted tax basis in the Senior Notes immediately before the disposition.  The adjusted tax basis of the Senior Notes generally will equal the U.S. holder's initial tax basis in the Senior Notes calculated as described above, increased by any market discount and OID includible in income by the U.S. holder with respect to the Senior Notes, and reduced by the amount of any payments previously received on the Senior Notes that are not qualified stated interest payments and any premium amortized by such holder with respect to the Senior Notes.  Except to the extent of any accrued market discount on the Senior Notes not previously included in income by the U.S. holder, with respect to which any gain will be treated as ordinary income, gain or loss realized on the sale, exchange or other taxable disposition of a Senior Note will generally be capital gain or loss and will be long-term capital gain or loss if at the time of the sale, exchange or other taxable disposition the Senior Note has been held by the holder for more than one year.  Certain non-corporate U.S. holders (including individuals) are eligible for reduced rates of taxation on long-term capital gains under current law.  There are limitations on the deductibility of capital losses.

If any foreign income tax is withheld on the sale, exchange or other taxable disposition of a Senior Note, the amount realized by a U.S. holder will include the gross amount of the proceeds of that sale, exchange or other taxable disposition before withholding or deduction of such tax.  Capital gain or loss, if any, realized by a U.S. holder on the sale, exchange or other taxable disposition of a New Note generally will be treated as U.S. source gain or loss for U.S. foreign tax credit purposes (except that accrued interest income with respect to the Senior Notes that is treated as paid as a result of the disposition (including accrued market discount not previously included in income by the U.S. holder) will constitute income from sources outside the United States and generally will constitute "passive category income" for U.S. foreign tax credit purposes).  Consequently, in the case of a gain from the sale, exchange or other taxable disposition of a Senior Note that is subject to foreign income tax, the U.S. holder may not be able to benefit from the foreign tax credit for the tax unless the U.S. holder can apply the credit against U.S. federal income tax payable on other income from foreign sources.  Alternatively, the U.S. holder may take a deduction for the foreign income tax if the U.S. holder elects to deduct (rather than credit) all foreign income taxes paid or accrued during the taxable year.  The rules governing foreign tax credits are complex and, therefore, U.S. holders should consult their tax advisors regarding the availability of foreign tax credits in their particular circumstances.

### Information Reporting and Backup Withholding

In general, information reporting requirements will apply to payments received in the exchange of old notes for Senior Notes, payments of interest on the Senior Notes and payments of the proceeds of the sale or other disposition

of the Senior Notes (including a redemption or retirement), unless the U.S. holder is an exempt recipient (such as a corporation).

In general, backup withholding will also apply to such payments if the U.S. holder:

- fails to furnish its social security or other taxpayer identification number ("TIN") within a reasonable time after a request for such information;

- furnishes an incorrect TIN;

- fails to report interest or dividends properly; or

- fails, under certain circumstances, to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that the U.S. holder is not subject to backup withholding.

Backup withholding is not an additional tax.  Any amount withheld from a payment to a U.S. holder under the backup withholding rules is generally allowable as a credit against such U.S. holder's U.S. federal income tax liability, and may entitle such holder to a refund, provided that the required information is timely furnished to the IRS.  U.S. holders of Senior Notes should consult their tax advisors as to their qualification for exemption from backup withholding and the procedure for obtaining such exemption.

### Net Investment Income Tax

A U.S. holder that is an individual or estate, or a trust that does not fall into a special class of trusts that is exempt from such tax, will be subject to a 3.8% tax on the lesser of (1) the U.S. holder's "net investment income" (in the case of individuals) or "undistributed net investment income" (in the case of estates and trusts) for the relevant taxable year and (2) the excess of the U.S. holder's "modified adjusted gross income" (in the case of individuals) or "adjusted gross income" (in the case of estates and trusts) for the taxable year over a certain threshold (which in the case of individuals will be between $125,000 and $250,000, depending on the individual's circumstances).  A U.S. holder's net investment income generally will include its interest income on the Senior Notes and its net gains from the disposition of the Senior Notes, unless such interest income or net gains are derived in the ordinary course of the conduct of a trade or business (other than a trade or business that consists of certain passive activities or trading in financial instruments or commodities).  U.S. holders that are individuals, estates or trusts should consult their own tax advisors regarding the applicability of the net investment income tax to their income and gains in respect of the Senior Notes.

## LEGAL MATTERS

Certain legal matters in connection with the exchange offer and consent solicitation are being passed upon for us by Paul Hastings LLP, our special U.S. counsel.  Certain matters relating to the validity of the New Notes will be passed upon by Ayala SV Abogados, our special Mexican counsel.

## GENERAL INFORMATION

**Authorization**

We have obtained all necessary consents, approvals and authorizations in connection with the issuance and performance of the New Notes.

**No Material Adverse Change**

Except as disclosed in this statement, there has been no material adverse change in the financial position or prospects of us and our subsidiaries taken as a whole since March 31, 2019.

**Litigation**

We are not involved in any legal or arbitration proceedings (including any such proceedings which are pending or to our knowledge threatened) relating to claims or amounts which may have or have had during the 12 months prior to the date of this statement a material adverse effect on the financial position of us and our subsidiaries taken as a whole.

**ANNEX A**

**INFORMATION ABOUT THE COMPANY**

ANNEX A

**INFORMATION ABOUT THE COMPANY**

**TABLE OF CONTENTS**

**Page**

Available Information..................................................................................................................................2
Cautionary Statement Regarding Forward-Looking Statements ...............................................................3
Presentation of Financial and Other Information .....................................................................................5
Risk Factors ...............................................................................................................................................7
Exchange Rates........................................................................................................................................21
Capitalization...........................................................................................................................................22
Selected Consolidated Financial Information .........................................................................................23
Management's Discussion and Analysis  of Financial Condition and Results of Operations .................28
Industry....................................................................................................................................................51
Business....................................................................................................................................................60
Management..............................................................................................................................................81
Principal Shareholders and Related Party Transactions..........................................................................88
Independent Accountants.........................................................................................................................90
Index to Financial Statements .................................................................................................................91

## AVAILABLE INFORMATION

We are not subject to the reporting requirements of the U.S. Securities Exchange Act of 1934, as amended. We are required to furnish certain information, including periodic information such as quarterly and annual reports, to the CNBV and to the BMV, which will be available in Spanish for inspection through the BMV's website at www.bmv.com.mx.

An application is expected to be made to list the New Notes on the Official List of the Luxembourg Stock Exchange and to trade on the Euro MTF market. This statement forms, in all material respects, the listing memorandum for admission to the Luxembourg Stock Exchange. We will be required to comply with any undertakings given by us from time to time to the Luxembourg Stock Exchange in connection with the New Notes, and to furnish to it all such information as the rules of the Luxembourg Stock Exchange may require in connection with the listing of the New Notes.

Our principal executive offices are located at Avenida Guillermo González Camarena No. 2000, Colonia Santa Fe Centro Ciudad, Mexico City, 01376 and our telephone phone number is (52) 55-5147-1111. Our website is www.maxcom.com. Our website and the information contained on our website are not part of this statement.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This statement contains forward-looking statements.  Forward-looking statements are based on our current expectations and assumptions regarding our business, the economy and other future conditions.  Forward-looking statements are statements related to future, not past, events.  In this context, forward-looking statements often address our expected future prospects, developments, business and financial performance, and often contain words such as "expects," "may," "anticipates," "intends," "plans," "believes," "seeks," "will," "target," "estimate," "project," "predict," "forecast," "guideline," "should," "could" or "would."  Accordingly, our actual results of operations may be different from our current expectations, and the reader should not place undue reliance on these forward-looking statements.  Forward-looking statements speak only as of the date they are made, and we do not undertake any obligation to update them in light of new information or future developments.

These statements are based on management's current expectations, assumptions and beliefs in light of the information currently available to it.  These expectations, assumptions and beliefs also involve risks and uncertainties which may cause the actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.  Potential risks and uncertainties include, without limitation:

- our ability to service our debt;

- our low and diminishing cash balances and increases in our trade payables and other current liabilities;

- our ability to implement our business plan;

- limitations on our access to sources of financing on competitive terms;

- our need for substantial capital;

- competition in local services, data, and Internet services;

- our history of operating losses;

- significant economic or political developments in Mexico and the U.S.;

- changes in technology affecting our ability to provide services or provide services efficiently;

- changes in our regulatory environment, particularly developments affecting the regulation of the telecommunications industry;

- customer attrition;

- interpretation of the terms of our concessions;

- the revocation or termination of our concessions;

- the outcome of our current disputes with Mexican regulatory agencies;

- general economic conditions, including the economic slow–down in the U.S. and Mexico, due to the global financial crisis;

- the global telecommunications downturn;

- performance of financial markets and thus our ability to refinance our financial obligations when they come due;

LEGAL_US_E # 142338261.4

- the risks associated with our ability to implement our strategy;

- technological innovations;

- currency fluctuations and possible high rates of inflation in Mexico;

- currency exchange rates, including the Mexican peso — U.S. dollar exchange rate;

- changes in the policies of central banks and/or foreign governments; and

- other factors described under "Risk Factors" and elsewhere in this statement.

All forward-looking statements and risk factors included in this statement are made as of the date on the front cover of this statement, based on information available to us as of such date, and we assume no obligation to update any forward-looking statement or risk factor, whether as a result of new information or future developments. Factors or events may emerge that could cause our actual results to differ from the forward-looking statements in this statement and it is not possible for us to predict all of them. For all of the reasons above, you are cautioned against placing undue reliance on forward-looking statements.

A-4

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

**Financial Information**

This statement contains our audited consolidated financial statements as of and for the years ended December 31, 2018 and 2017 (the "Annual Audited Financial Statements") and our earnings report attaching unaudited interim condensed consolidated financial statements as of March 31, 2019 for the three months ended March 31, 2018 and March 31, 2019 (the "Interim Unaudited Financial Statements"), prepared in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Boards ("IFRS").

IFRS comprise standards and interpretations approved by the International Accounting Standards Boards ("IASB") as well as Standing Interpretations Committee ("SIC") interpretations approved by the IASC that remain in effect. Generally accepted accounting principles in the United States are referred to as "U.S. GAAP" and consist of accounting rules and guidance established by the Financial Accounting Standards Board and various other regulatory bodies. Unless otherwise indicated, financial information in this statement is presented on a consolidated basis.

**Currency Information**

Unless otherwise specified, references to "US$" and "U.S. dollars" are to the lawful currency of the United States.  References to "Ps." and "pesos" are to Mexican pesos, the lawful currency of Mexico.

This statement contains translations of certain peso amounts into U.S. dollars at specified rates solely for the convenience of the reader.  These convenience translations should not be construed as representations that the peso amounts actually represent such U.S. dollar amounts or could be converted into U.S. dollars at the specified rate or at all.  Furthermore, the exchange rate for purposes of the convenience translation is not necessarily the same rate we used in preparing our financial statements, which means that U.S. dollar-denominated items, including U.S. dollar-denominated expenses and liabilities, may have been translated into Mexican pesos using one exchange rate (or an average exchange rate) and have been retranslated into U.S. dollars for convenience of the reader using the convenience translation exchange rate.

Unless otherwise indicated, the exchange rate used for purposes of convenience translations is the buying rate for pesos reported by the Banco de Mexico on March 31, 2019 of Ps.19.3201 per US$1.00.  See "Exchange Rates."

**Note Regarding Non-GAAP Financial Measures**

A body of generally accepted accounting principles is commonly referred to as "GAAP." A non-GAAP financial measure is generally defined by the SEC as one that purports to measure historical or future financial performance, financial position or cash flows but excludes or includes amounts that would not be so adjusted in the most comparable GAAP measure.  We disclose in this statement certain non-GAAP financial measures, including Adjusted EBITDA. In accordance with our financial statements prepared under IFRS, Adjusted EBITDA is equal to consolidated net income (loss) excluding depreciation and amortization, net finance cost, other (income) expenses, tax and stock option plan cost.  Because Adjusted EBITDA excludes depreciation and amortization, net finance cost, other (income) expenses, tax and stock option plan expense, it provides an indicator of general economic performance similar to EBITDA that is not affected by non-cash compensation items.  Working capital is equal to current assets (excluding cash and cash equivalents) less current liabilities (excluding current installments of obligations under capital leases and accrued interest).  Accordingly, we believe that these types of measurements are useful for comparing general operating performance from period to period and making certain related management decisions.

LEGAL_US_E # 142338261.4

**Rounding Adjustments**

Certain figures included in this statement have been rounded for ease of presentation.  Percentage figures included in this statement have not in all cases been calculated on the basis of such rounded figures but on the basis of such amounts prior to rounding.  For this reason, certain percentage amounts in this statement may vary from those obtained by performing the same calculations using the figures in our financial statements included elsewhere in this statement.  Certain other amounts that appear in this statement may not sum due to rounding.

**Industry and Market Data**

Market data and other statistical information used throughout this statement are generally based on independent industry publications, government publications, reports by market research firms or other published independent sources.  Although we believe these sources are reliable, we have not independently verified the information and cannot guarantee its accuracy or completeness.  We only take responsibility for the correct reproduction and extraction of such information.  Some data are also based on our estimates, which are derived from our review of internal surveys, as well as independent sources.

In addition, in many cases, we have based certain statements contained in this statement regarding our industry and our position in the industry on certain assumptions concerning our customers and competitors.  These assumptions are based on our experience in the industry and our own investigation of market conditions.  We cannot assure you as to the accuracy of any such assumptions, and such assumptions may not be indicative of our position in our industry

A-6

## RISK FACTORS

*Investing in the New Notes involves risk. You should consider carefully the following factors, among others, as well as all other information in this statement, before making a decision whether to participate in the exchange offer and the consent solicitation. The risk factors below describe certain potential risks and uncertainties related to our business and an investment in the New Notes.  The risks described below are not the only risks we face. Additional risks and uncertainties not currently known to us that we currently deem to be immaterial may also materially adversely affect us, which could also result in the loss of all or part of your investment in the New Notes. Realization of these risks could materially adversely affect our business, financial condition and results of operations.*

*This statement also contains forward-looking statements that involve risks and uncertainties.  Our actual results could differ materially from those anticipated in these forward-looking statements as a result of certain factors, including the risks faced by us described below and elsewhere in this statement.  See the "Risk Factors" section in the first part of this statement for a discussion of other risks related to the New Notes.*

**Risks Related to Our Business**

**Because we have a history of losses and may continue to incur significant expenses, we may not be able to generate sufficient cash flows to meet our debt service obligations and implement our business plan.**

We have had a history of negative operating cash flows and could face difficulties in meeting our debt service obligations. We incurred losses of Ps.9.1 million (US$0.5 million) for the three months ended March 31, 2019 as compared to gains of Ps.17.2 million (US$0.9 million) for the three months ended March 31, 2018, and losses of Ps.315.3 (US$16 million) for the year ended December 31, 2018, compared to losses of Ps.15.9 million for the year ended December 31, 2017 and losses of Ps.2,118.2 million (US$102.7 million) recorded in 2016. The losses for the three months ended March 31, 2019 are mainly related to lower operating income primarily due to a decrease in our revenue stream from our residential and wholesale business units when compared to the three months ended March 31, 2018, a decline which we expect to continue as we conclude our intended divestiture of our residential business unit.

As of December 31, 2017, we incurred losses representing more than two-thirds of our capital stock. On January 16, 2018, our shareholders approved a reduction of accumulated losses totaling Ps.6,327.8 million in the variable portion of our capital stock, by way of an extraordinary general shareholders' meeting.  We recorded this capital reduction in our financial statements for the year ended December 31, 2018.

In addition, our business plan, which contemplates the expansion of our network and services, requires significant capital expenditures. Our ability to fund our debt service obligations, our operating expenses, and any intended capital expenditures will depend on our ability to retain our existing customer base, develop a significantly larger customer base and increase our operating cash flows. However, we may not succeed in retaining existing customers and attracting more customers and as a result our business may not generate sufficient operating cash flows to meet our existing debt service obligations or implement our business plan.

In the event we continue to incur significant losses, we may not be able to service all of our debt obligations or fund our capital expenditure plan which could have a material adverse effect on our business, results of operations and financial condition. We recently experienced a credit rating downgrade to "CCC" from Standard & Poor's Rating Service ("S&P") with a negative credit outlook. This negative credit outlook reflects a high likelihood that we will experience a default within the next 12 months in order to address the long-term sustainability of our capital structure. If we cannot service our debt obligations, we may have to take actions such as selling assets, seeking additional equity investments, reducing or delaying capital expenditures, strategic acquisitions, investments and alliances, or restructuring our indebtedness pursuant to in court or out of court procedures, any of which could materially harm our business, results of operations and financial condition.

**We are experiencing low and declining cash balances and increases in our trade accounts payable and other current liabilities, which may result in the lack of sufficient cash to meet our debt service obligations and operating expenses.**

A-7

We have cash balances that have been declining. As of December 31, 2018 and March 31, 2019, our cash and temporary investment balance was Ps.457 million (US$23 million) and Ps.386 million (US$20 million), respectively. In addition, our trade accounts payable and other current liabilities have increased significantly since December 31, 2018. If our trade accounts payable and other current liabilities continue to increase and our cash balances continue to decline, and if we are not able to increase our cash reserves through capital contributions, through asset sales or through the generation of increased operating cash flows, we may not be able to meet our debt service obligations under the old notes, the New Notes and our other liabilities and operating expenses. We may also lack the necessary cash to make the significant capital expenditures required under our business plan for the expansion of our network and services and we may not have sufficient cash to make the capital expenditures required to maintain our network. Unless we are able to increase our cash balances, our business, financial condition and results of operations may be materially adversely affected.

*We may be unable to divest our equity participation in Celmax, which may result in increased risk exposure and inability to shift our financial and operational capabilities to our core business unit.*

We are currently considering a partial or total divestment of our equity participation in Celmax Movil, S.A. de C.V. ("Celmax") due to its negative cash flows for the past three years. We currently hold 51% of Celmax and intend to focus our financial and operational capabilities on strengthening our market share within the commercial business segment. As a result, maintaining our investment in Celmax is no longer strategically feasible. If we are unable to divest our interest in Celmax, this may have a negative impact on our cash flows, which may have a material adverse effect on our overall business performance, financial conditions and results of operations.

*We may be unable to maintain or expand our network in a timely manner or without undue cost.*

Our ability to achieve our strategic objectives will depend in large part upon the successful, timely and cost effective expansion of our network. Factors that could affect such build-out include:

- municipal or regional political events or local rulings;
- our ability to obtain permits to use public rights of way;
- state municipal elections and change of local government administration;
- our ability to generate cash flow or to obtain future financing necessary for such build-out;
- unforeseen delays, costs or impediments relating to the granting of municipal and state permits for our build-out;
- delays or disruptions resulting from physical damage, power loss, defective equipment or the failure of third party suppliers or contractors to meet their obligations in a timely and cost−effective manner; and
- regulatory and political risks relating to Mexico, such as the revocation or termination of our concessions, the temporary seizure or permanent expropriation of assets, import and export controls, political instability, changes in the regulation of telecommunications and any future restrictions or easing of restrictions on the repatriation of profits or on foreign investment.

Although we believe that our cost estimates and expansion schedule are reasonable, we cannot assure you that the actual construction costs or time required to complete the build-out will not substantially exceed our current estimates. Any significant cost overrun or delay could hinder or prevent the successful implementation of our business plan, including the development of a significantly larger customer base, resulting in revenues and net income being less than expected.

*The loss of our key personnel or if we are unable to integrate new personnel in connection with the Recapitalization Transactions, could harm our business, results of operations and financial condition.*

Our operations are managed by a small number of executive officers and key management personnel. Our continued success, including our ability to effectively expand our network, provide existing services and develop and introduce new services, largely depends on the efforts and abilities of our executive officers and other key management employees, as well as our ability to hire and retain highly skilled and qualified management personnel. The competition for highly qualified management personnel in the telecommunications industry is intense and,

LEGAL_US_E # 142338261.4

accordingly, we cannot assure you that we will be able to hire or retain the necessary management personnel. Between 2013 and 2017, we experienced significant turnover in our executive ranks, which adversely affected our ability to develop and execute our business strategies during such period. Our business could be materially and adversely affected if, for any reason, a number of our officers or key employees do not remain with us and we are unable to promptly replace them with qualified personnel.

### *We may not have sufficient personnel to effectively manage and grow our operations.*

We are experiencing a significant strain on our administrative, operational and financial personnel. We anticipate that maintaining our operations and pursuing sustainable growth will require us to recruit and hire a significant number of new non−executive managerial, finance, sales and marketing, accounting and support personnel. If we are unable to attract and retain qualified personnel who can support the implementation of our business plan, the quality of our services may be impaired and we may face difficulties in retaining customers, and may be unable to grow our operations as planned.

### *Our results may be negatively impacted by high levels of churn or decreased revenues from existing customers resulting from efforts to limit churn rates.*

We historically have experienced customer attrition, which we refer to as churn.  Churn results in the loss of future revenue from lost customers as well as the inability to recover the costs incurred to acquire those customers, such as installation costs and commissions. Churn occurs for several reasons which include disconnection of a customer for non−payment, disconnection of a customer who switches to a competing company and disconnection of a customer who requests termination of service. Our average monthly churn rate for the last three years has been 3.1%. Our churn rate for the three months ended March 31, 2019 was 1.6%. An increase in customer churn could have a material adverse impact on our revenue growth and in our results of operations, even if we could replace the customer deactivated with a new customer. Churn may be impacted by:

- customer delinquency;

- our limited coverage area that restricts our ability to continue providing service when a customer moves;

- our failure to meet service levels required by our customers;

- a decline in national or international economic conditions; and

- promotional and pricing strategies of our competitors.


In addition, we may experience decreased revenues from existing customers due to our efforts to limit churn rates, such as offering promotional pricing to maintain existing customers that might otherwise switch carriers or cancel particular services. High levels of churn or decreased revenues as a result of our efforts to combat churn may have a material adverse effect on our financial condition and results of operations.

### *Rapid technological advances may require us to make significant capital expenditures to maintain and improve the competitiveness of our service offerings.*

The telecommunications industry is subject to rapid and significant changes in technology and requires the introduction of new products and services. Like other operators, we cannot predict the effect of technological changes on our business. New services and technological advances may offer additional opportunities for competitors to compete against us on the basis of cost, quality or functionality. In prior years, we were working on installing what we believe to be a technologically advanced fiber optic network with a microwave overlay, however, we cannot assure you that this technology will not be challenged by competition from new or improved digital or other technologies in the near future. In 2018, our capital expenditures were limited primarily to maintaining our existing network. Due to our low cash balance, we may be unable to replace or upgrade our installed technologies in

response to competitors' actions to build up their networks. Our future success depends, in part, on our ability to anticipate and respond in a timely manner to technological changes. This may require us to devote significant capital to the development, procurement or implementation of new technologies and we currently do not have and in the future may not have the resources to implement such technologies.

There can be no assurance as to the nature and extent of the impact of technological change on our viability or competitiveness. If any future technological change places at risk our viability or competitiveness, the cost of upgrading our products and technology to remain competitive could be significant and our ability to fund this upgrading may depend on our capability to obtain additional funding, which may not be available on terms acceptable to us or at all.

### *Our telecommunications network infrastructure has several vulnerabilities and limitations.*

Our telecommunications network is the source of all our revenues, and any damages to or loss of our equipment or any problem with or limitation of our network whether accidental or otherwise, including network, hardware and software failures may result in a reduction in the number of our customers or usage level by our customers, our inability to attract new customers or increased maintenance costs, all of which would have a negative impact on our results of operations. The development and operation of our network is subject to problems and technological risks, including:

- physical damage;

- power surges or outages;

- capacity limitations;

- software defects as well as hardware and software obsolescence;

- breaches of security, whether by computer virus, break−in or otherwise;

- failure to interconnect with carriers linking us with our customers;

- denial of access to our sites for failure to obtain required municipal or other regulatory approvals; and

- other factors which may cause interruptions in service or reduced capacity for our customers.

Our operations also rely on a stable supply of utilities service. We cannot assure you that future supply instability will not impair our ability to procure required utility services in the future, which could adversely impact our business, financial condition and results of operations.

### *We are subject to delinquencies on our accounts receivable. If we are unable to limit payment delinquencies by our customers, or if delinquent payments by our customers increase, our financial condition and results of operations could be adversely affected.*

Our business significantly depends on our customers' ability to pay their bills and fulfill their obligations to us. In the three months ended March 31, 2019, we recorded provisions for doubtful accounts in the amount of Ps.3.5 million. In 2018, we recorded provisions for doubtful accounts in the amount of Ps.33.2 million, including taxes, primarily due to customers' delinquencies. As of March 31, 2019, our provision for doubtful accounts as a percentage of our net revenues was 35.7%. As of December 31, 2018, our provision for doubtful accounts as a percentage of our net revenues was 11.9%.

A-10

If we are unable to successfully implement adequate policies to limit subscriber delinquencies or improve our selection of customers based on their credit records, persistent customer delinquencies and bad debt will continue to adversely affect our operating and financial results.

In addition, if the Mexican economy weakens due to, among other factors, a reduction in the level of economic activity, depreciation of the Mexican peso, an increase in inflation or an increase in domestic interest rates, a greater portion of our customers may not be able to pay their bills on a timely basis, which would require an increase to our provisions for doubtful accounts, thus adversely affecting our financial condition and results of operations.

***Our inability to successfully upgrade our accounting, billing, customer service and management information systems as new technology becomes available could increase our churn rates, inhibit our ability to attract new customers and result in decreased revenue and increased costs.***

Sophisticated information and processing systems are important to our existing operations, growth and our ability to monitor costs, deliver invoices, process customer orders, provide customer service and achieve operating efficiencies. We have upgraded our client support and monitoring systems in order to avoid customer deactivations due to billing and customer service failures. While we have installed systems we deem necessary to conduct our operations efficiently, we intend to upgrade our accounting and processing systems as new and more cost efficient technology becomes available. However, we cannot assure you that we will be able to successfully upgrade such systems as technology advances and any inability to do so could increase our churn rates, inhibit our ability to attract new customers and result in decreased revenue and increased costs and accordingly could materially and adversely affect our business, financial condition and results of operations.

***Service interruptions due to natural disasters or unanticipated problems with our network infrastructure could result in customer loss.***

Natural disasters or unanticipated problems with our network infrastructure could cause interruptions in the services we provide. The failure of a switch and our back-up systems would result in the interruption of service to the customers served by that switch until necessary repairs are completed or replacement equipment is installed. The successful operation of our network and its components is highly dependent upon our ability to maintain the network and its components in reliable enough working order to provide sufficient quality of service to attract and maintain customers. Any damage or failure that causes interruptions in our operations or lack of adequate maintenance of our network could result in the loss of customers and increased maintenance costs that would adversely impact our results of operations and financial condition.

We have backup data for our key information and data processing systems that could be used in the event of a catastrophe or a failure of our primary systems and have established alternative communication networks where available. However, we cannot assure you that our business activities would not be materially disrupted if there were a partial or complete failure of any of these primary information technology systems or communication networks. Such failures could be caused by, among other things, software bugs, computer virus attacks or conversion errors due to system upgrading. In addition, any security breach caused by unauthorized access to information or systems, or intentional malfunctions or loss or corruption of data, software, hardware or other computer equipment, could have a material adverse effect on our business, results of operations and financial condition.

***The intellectual property rights utilized by us, our suppliers or service providers may infringe on intellectual property rights owned by others.***

Some of our products and services use intellectual property that we own or license from others. We also outsource services to service providers, including billing and customer care functions, that incorporate or utilize intellectual property. We and some of our suppliers and service providers have received, and may receive in the future, assertions and claims from third parties that the products or software utilized by us or our suppliers and service providers infringe on the patents or other intellectual property rights of these third parties. These claims could require us or an infringing supplier or service provider to cease engaging in certain activities, including selling, offering and providing the relevant products and services. Such claims and assertions could also make us

A-11

subject to costly litigation and significant liabilities for damages or royalty payments or require us to cease certain activities or to cease selling certain products and services.

***Our insurance coverage may not adequately cover losses resulting from the risks for which we are insured.***

We maintain insurance policies for our network facilities and all of our corporate assets. This insurance coverage protects us in the event we suffer losses resulting from theft, fraud, natural disasters or other similar events or from business interruptions caused by such events. In addition, we maintain insurance policies for our directors and officers. We cannot assure, however, that such insurance will be sufficient or will adequately cover potential losses.

***We could be adversely affected if major suppliers fail to provide needed equipment and services on a timely or cost-efficient basis or are unwilling to provide us credit on favorable terms or at all.***

We rely on a few strategic suppliers and vendors, including Alcatel-Lucent, Microsoft, NEC, HP, Cisco, Oracle, Genband, ZTE and Infinera to provide us with equipment, materials and services that we need in order to expand and to operate our business. There are a limited number of suppliers with the capability of providing the network equipment and platforms that our operations and expansion plans require or the services that we require to maintain our extensive and geographically widespread networks. In addition, because the supply of network equipment and platforms requires detailed supply planning and this equipment is technologically complex, it would be difficult for us to replace the suppliers of this equipment. Suppliers of cables that we need to extend and maintain our networks may suffer capacity constraints or difficulties in obtaining the raw materials required to manufacture these cables.

We also depend on network installation and maintenance services providers, equipment suppliers, call centers, collection agencies and sales agents, for network infrastructure, and services to satisfy our operating needs. Many suppliers rely heavily on labor; therefore, any work stoppage or labor relations problems affecting our suppliers could adversely affect our operations. Suppliers may, among other things, extend delivery times, raise prices and limit supply due to their own shortages and business requirements. Similarly, interruptions in the supply of telecommunications equipment for networks could impede network development and expansion. If these suppliers fail to deliver products and services on a timely and cost-efficient basis that satisfies our demands or are unwilling to sell to us on favorable credit terms or at all, we could experience disruptions, which could have an adverse effect on our business, financial condition and results of operations.

***We are subject to different corporate disclosure and accounting standards than U.S. companies.***

As a non-U.S. issuer, investors may not be able to obtain as much publicly-available information about us as they would about U.S. issuers of publicly traded securities. Therefore, potential investors may not be able to easily ascertain the risks facing us as they would if we were a public U.S. company.

***We may be unable to reach an agreement with Mexican tax authorities, which could result in us having to pay significant back-taxes.***

In February 2019, we were notified by the Mexican Tax Administration Service (*Servicio de Administración Tributaria* or "SAT") of a series of observations made by SAT as part of its 2015 auditing process. In these observations, SAT determined that we did not demonstrate sufficient evidence to meet the "materiality" and "indispensability" elements of interconnection operations with a telecom concessionaire and telecom reseller, both of which provided us with overseas call termination services. This determination puts us at risk of expense deductions incurred in 2015 as well as crediting Value Added Tax (VAT) paid to these suppliers, which could ultimately result in us having to pay significant back-taxes to the SAT. We are currently in the process of disputing these claims and have requested intervention from the Taxpayer Advocacy Office in order to ensure a satisfactory agreement with the SAT. If we are unable to reach an agreement with the SAT, we could be required to pay a significant amount in back-taxes, which could have an adverse effect on our financial condition and results of operations. See "Business—Legal Proceedings—VAT Arbitration".

LEGAL_US_E # 142338261.4

***We may be unable to renew our lease agreement with the Mexican Federal Power Commission.***

We currently have a lease agreement for the installation of fiber optic cables in the Golf Route region with the Mexican Federal Power Commission (*Comision Federal de Electricidad*, or "CFE") that we inherited when we acquired Grupo Telereunion in 2006. The lease agreement has an initial term of 20 years and is expiring on June 23, 2019. The lease agreement provides for automatic renewal of an additional 10-year term, which we are currently negotiating with the CFE. If the CFE imposes new terms and conditions on the lease agreement, we could face negative business consequences such as the potential loss of infrastructure in the Gulf Route and inability to comply with several infrastructure swap and IRU agreements, which could subject us to economic penalties and ultimately impede us from providing services in that area. The risks associated with the possible non-renewal of this lease agreement would have an adverse effect on our financial conditions and results of operations.

***We are currently involved in a litigation dispute with the Federal Institute of Telecommunications arising from a Ps.20 million sanction imposed on us and we may have to pay the full value of the sanction if we lose.***

In 2011, the Federal Institute of Telecommunications (*Instituto Federal de Telecomunicaciones* or "IFT") conducted a monopoly investigation of Grupo Televisa. In connection with its investigation, the IFT requested specific information from us relating to Grupo Televisa's operations and alleged monopoly practices. The IFT claims that we did not respond to their information request in a timely manner and therefore imposed a sanction of approximately Ps.20 million on us. We have challenged the sanction on the basis that the IFT did not comply with the appropriate sanctions procedures. The litigation is still ongoing and we have not had to pay the sanctioned amount as of the date of the officering memorandum and consent solicitation statement. In the event the court rules in favor of the IFT, we will have to pay the Ps.20 million sanction, which would have a significant adverse effect on our financial condition and results of operations.

**Risks Relating to the Mexican Telecommunications Industry**

***The constitutional amendment passed by the Mexican Federal Congress may have adverse effects on our business, results of operations and financial condition.***

Effective June 12, 2013, the Mexican Congress enacted an amendment to the Mexican Constitution in connection with the telecommunications and broadcasting (radio and television) industries. This amendment to the Mexican Constitution (articles 6, 7, 27, 28, 73, 78, 94 and 105) is aimed at strengthening competition and providing the IFT with broader authority to regulate the telecommunication and broadcasting industries.

The amendment provides for a number of regulatory changes to these industries, including eliminating the limit on foreign investment in the telecommunications industry and raising the limit on foreign investment in the broadcasting industry from 49% to 100%. In addition, as a result of the IFT's strengthened regulatory position, we are subject to increased bureaucracy in dispute resolution among carriers that may ultimately require settlement by the IFT. Although the amendment has resulted in a number of positive changes to the telecommunications industry, our business has also been negatively impacted by certain rulings, namely the elimination of domestic long-distance charges. We may continue to face regulatory changes which could adversely impact our financial condition and results of operations.

***The telecommunications industry in Mexico is increasingly competitive, which may result in lower prices for telecommunications services, lower margins and/or a loss of market share.***

The Mexican telecommunications industry is increasingly competitive and rapidly changing. We face significant competition from Telmex (the incumbent wireline telecommunications provider in Mexico) and Axtel-Alestra, as well as other telecommunications providers and new market entrants such as AT&T (which was formed from the merger of Nextel and Iusacell). Telmex is the largest telecommunications service provider in Mexico with a market share of approximately 64.2% in fixed telephone services, according to information provided by the IFT. In addition, cable operators who have substantial coverage of cities we currently serve may offer the same voice and data services we provide at lower prices since telephony income represents incremental revenue to cable operators.

Many of our current and potential competitors have significantly more employees and greater financial, technical, marketing and other resources than we do. Increased competition could result in fewer customers, reduced pricing, reduced gross and operating margins and loss of market share, any of which could harm our business. If we are unable to offer similar products at competitive pricing, we could lose our market share, which could produce significant adverse effects on our business results of operations.

**_Rate pressure could have a material adverse effect on our business, results of operations and our financial condition._**

We expect the Mexican telecommunications market to continue to experience rate pressure, primarily as a result of:

- increased competition and focus by our competitors on increasing market share;

- technological advances that allow higher transmission capacities of both new and existing fiber optic networks, results in better margins and more bandwidth offering;

- increased participation by traditional fixed−line competitors in the provision of data and value-added services;

- the entrance of cable television operators into certain markets that we currently serve and the provision by such operators of services we have historically provided, such as telecommunications and broadband Internet;

- the entrance of new competitors or the Mexican Federal Power Commission (Comisión Federal de Electricidad, or "CFE"); and

- the merger or consolidation of some concessionaires (fixed−mobile−cable), which may affect market penetration.

Continued rate pressure could have a material adverse effect on our business, financial condition and results of operations if we are unable to generate sufficient traffic and increased revenues to offset the impact of decreased rates on our operating margin.

Moreover, these developments may lead to smaller operating margins, greater choices for customers and increasing movement of customers among competitors, which may make it more difficult for us to retain customers or attract new customers. The cost of adding new customers may also continue to increase, reducing profitability. In addition, as the cost of acquiring new customers is higher than the cost of maintaining existing customers, high levels of customer deactivations could have an adverse effect on our results of operations, even if we are able to obtain new customers for each lost customer.

We experience increasing pressure to reduce our rates in response to pricing competition. This pricing competition often takes the form of product bundling. Competing with service plans and promotions offered by our competitors may cause an increase in our marketing expenses and customer acquisition costs, which may adversely affect our results of operations. Our inability to compete effectively could result in loss of market share and could adversely affect our net operating revenue and profitability.

Our ability to compete successfully will depend on our network coverage, the quality of our network and service, our rates, customer service, marketing and our ability to anticipate and respond to various competitive factors affecting the telecommunications industry, including new services and technologies, changes in consumer preferences, demographic trends, economic conditions and discount pricing strategies by competitors. If we are unable to respond to competition and compensate for declining prices by adding new subscribers, increasing usage and offering new services, our business, financial condition and results of operations could be adversely affected.

A-14

***Our fixed-line telecommunications services face increased competition from mobile service providers and other fixed-line service providers, which may adversely affect our revenues and margins.***

Our fixed-line telecommunications services face increasing competition from mobile services as the prices for mobile services decline and approach those of fixed-line services. We expect the number of fixed lines in service to continue to decline or stagnate, as certain customers eliminate their fixed-line services in favor of mobile services, and the use of existing fixed lines to decrease as customers substitute fixed-line calls with calls from mobile telephones as a result of lower mobile rates. The rate at which the number of fixed lines in service in Mexico may decline depends on many factors beyond our control, such as economic, social, technological and other developments in Mexico.

We also compete in the market for fixed-line services with other fixed-line service providers, primarily Telmex, and Axtel-Alestra, MCM, Metrocarrier and Bestel. In addition to direct competition, we also face competition from other providers of value-added services that offer VoIP and other Internet-based telephony. Our loss of a significant number of fixed-line customers would adversely affect our operating revenue and may adversely affect our results of operations.

***If the Mexican government grants more concessions, the value of our concessions could be severely impaired.***

The telecommunications industry is regulated by the Mexican government. Our concessions are not exclusive and the Mexican government may grant concessions covering the same geographic regions and frequency bands to other entrants. We cannot assure that additional concessions granted by the Mexican government to provide similar services to those we provide or plan to provide will not be granted to other competitors and that the value of our concessions will not be adversely affected.

***We could lose our concessions if we do not fully comply with their terms and we may not be able to renew our existing concessions.***

We hold concessions that enable us to provide telecommunications services. Under the terms of our concessions, we are required to meet a number of technical, build-out and financial conditions, such as providing coverage to cities within the scope of our concessions within the time-frame provided for in the concession. We cannot assure you that we will not be fined for our past failures to comply with the terms of our concessions. In addition, any failure to comply with any of the terms of our concessions or to obtain a waiver or modification could result in the termination of those concessions, the imposition of new terms applicable to our concessions, the imposition of fines or the loss of surety bonds that we have issued in favor of the IFT. The IFT regulations also impose a five-year bidding impairment for new concessions in the event that a concession is revoked. The Mexican government is not required to compensate us in the event of such termination.

Furthermore, all of our concessions have a specified duration of 20 to 30 years and are scheduled to expire between 2018 and 2048. Mexican law provides that concessions, except for microwave transmission concessions which will be reauctioned, may be renewed at the IFT's discretion for a period equal to the duration of the original concession if certain conditions are met, including being in compliance with the terms of the concession. As of the date of the statement, the IFT has not notified us of the renewal of two concessions which expired on June 2018.

There can be no assurances that any of our concessions will be renewed or under what terms they would be renewed or that we will successfully bid for and retain microwave transmission concessions.

If any of our key concessions, including our local and long-distance telephony concession, is terminated or not renewed, we would be unable to engage in our business.

***Under Mexican law, our concessions could be expropriated or temporarily seized.***

Holders of concessions to install, operate and develop public telecommunications networks are subject to the provisions of the Federal Telecommunications and Broadcasting Law (*Ley Federal de Telecomunicaciones*) and any other provision contained in the relevant concession grant and other applicable laws. The Mexican government

A-15

(through the IFT) may expropriate any telecommunications concession and claim any related asset for reason of public interest or national security, or may temporarily seize the assets related to the concessions in the event of natural disasters, war, significant public disturbance or threats to internal peace or for other reasons relating to economic or public order.

Mexican law sets forth the process for indemnification for direct damages arising out of the expropriation or temporary seizure of the assets related to the concessions, except in the event of war. However, in the event of expropriation, we cannot assure you that the indemnification will equal the market value of the concessions and related assets or that we will receive such indemnification in a timely manner or at all.

### *Fraudulent use of telecommunications networks increases our expenses.*

The fraudulent use of telecommunications networks imposes a significant cost upon service providers, who must bear the cost of services provided to fraudulent users. We suffer a loss of revenue as a result of fraudulent use and a cash cost due to our obligation to reimburse carriers for the cost of services provided to fraudulent users. These costs also include administrative and capital costs associated with monitoring and preventing the incidence of fraud, as well as raising interconnection costs and capacity costs.  We cannot assure that our efforts to combat fraud will be effective or that fraud will not result in material costs for us in the future. In addition, since we rely on other long−distance carriers for interconnection, some of which do not have anti−fraud technology incorporated in their networks, we are particularly exposed to this risk in our long−distance service and in traffic originating in our network to mobile users under the mode of "calling party pays."

### *"Long−distance Calling Party Pays" system could result in a loss of customer traffic and revenue.*

In 1997, Cofetel implemented the "Calling Party Pays" system, and in 2006 the "Long-distance Calling Party Pays" system, whereby the customer originating a domestic or international call, from either a fixed line or mobile phone to a mobile phone, pays the entire fee for placing the call rather than the mobile telephone subscriber who receives such call, who only pays for outgoing calls. Even though the mobile telephone subscriber receiving the call does not pay to receive the call, the network from which the call originates must still compensate the terminating mobile network.

In 2006, we negotiated with the mobile carriers a provisional "Calling Party Pays" interconnection tariff for local and long−distance calls to be terminated in such mobile operators' network, achieving a significant reduction of the original tariff contemplated by the agreements implementing this system issued by Cofetel, for the period 2006 to 2010.

When the IFT was established in 2013, it implemented new tariffs for interconnection services. As part of its new regulatory framework, the IFT classified Telcel and Telmex as Preponderant Economic Agents (*Agentes Económicos Preponderantes* or "AEP") and allowed these two companies to charge call terminations in network with no tariffs, which benefitted other national operators.  As a result of the IFT's AEP classification, we are now again required to pay call termination fees to Telcel and Telmax, which results in loss of revenue and loss in customer traffic.

### *Foreign ownership competition may limit our ability to grow.*

Restrictions imposed by the Mexican Foreign Investment Law (*Ley Federal de Inversión Extranjera*) and the Mexican Federal Telecommunications Law (*Ley Federal de Telecomunicaciones)* in connection with foreign participation in the telecommunication sector were eliminated by a 2013 amendment to the Mexican Constitution. This amendment could result in increased competition in the sector and thus impair our ability to gain market share.

### *We operate in a highly regulated industry which is currently experiencing broad−based regulatory changes.*

The operation of the telecommunications sector in Mexico, including ours, has been subject to laws and regulations administered by the SCT and the IFT.  In June 11, 2013, the Mexican Congress enacted an amendment to the Mexican Constitution intended to increase participation in the telecommunications industry by restricting

A-16

monopolistic competition. Although the amendment has resulted in a number of positive changes to the telecommunications industry, our business has also been negatively impacted by certain rulings. In addition, there is pending litigation with the IFT in connection with its issued interconnection rates. Although we are not parties to these proceedings, we may face financial consequences in the form of required compensation payment if a judicial ruling modifies previously paid rates. We may continue to face regulatory changes which could adversely impact our financial condition and results of operations.

## Risks Related to Mexico

### *Mexican and global economic conditions may adversely affect us.*

Global and Mexican economic conditions may adversely affect our business, results of operations or financial condition. When economic conditions deteriorate, the financial stability of customers and suppliers may be affected, which could result in lower demand for services and products, delays or cancellations, increases in bad accounts or breaches by customers and suppliers. It could also be more expensive or difficult to obtain financing to fund operations, investment or acquisition opportunities, or to refinance debt. If we are not able to access debt markets at competitive rates or simply cannot access them, our ability to implement our business plan and strategies or to refinance debt could be adversely affected.

Global economic conditions continue to be uncertain, and many companies have experienced limited access to funding. Since 2014, this risk has been exacerbated due to several factors, including, the drop of oil prices, the slowdown of Chinese economy, the strength of the U.S. dollar compared to foreign currencies, geopolitical tensions resulting in a global wave of risk aversion. Amidst this environment, rating agencies have lowered sovereign debt ratings of countries like Brazil and there is latent risk of credit devaluation in other countries. This global economic downturn and any future economic slowdown, including downturns in the United States and Europe, could affect our financial condition and results of operations.

The Mexican economy may be, to varying degrees, affected by economic and market conditions in other countries. Although economic conditions in other countries may differ significantly from economic conditions in Mexico, investors' reactions to adverse developments in other countries may have an adverse effect on the market value of securities of Mexican issuers. In recent years, the prices of both Mexican debt and equity securities decreased substantially as a result of the prolonged decrease in the securities' markets of several European and Asian countries. Despite stable sovereign ratings in the past, S&P recently issued a negative outlook projection for Mexico, as a result the new federal government's policies expected to produce higher contingent liabilities and slowed economic growth.

In addition, economic conditions in Mexico are increasingly correlated with economic conditions in the United States as a result of the North American Free Trade Agreement ("NAFTA") and high levels of economic activity between the two countries. Economic conditions in Mexico are highly correlated with economic conditions in the United States as a result of NAFTA and high levels of economic activity between the two countries. On October 1, 2018, the United States, Canada and Mexico announced that they reached an agreement to modernize their free trade relationship and replace NAFTA. The new agreement, known as USMCA, was signed on November 30, 2018, but has not yet taken effect. It is currently unclear what the results of the USMCA will be. The new terms of the USMCA could have an impact on Mexico's economy generally and job creation in Mexico, which could significantly adversely affect our business, financial performance and results of operations.

### *Mexican federal governmental policies or regulations, as well as economic, political and social developments in Mexico, could adversely affect our business, financial condition, results of operations and prospects.*

We are incorporated in Mexico and substantially all of our assets and operations are located in Mexico. As a result, we are subject to political, legal and regulatory risks specific to Mexico which can have a significant impact on our business, results of operations and financial condition. The Mexican federal government has exercised, and continues to exercise, significant influence over the Mexican economy. Accordingly, Mexican federal governmental actions, fiscal and monetary policy could have an impact on Mexican private sector entities, including our company, and on market conditions, prices and returns on Mexican securities, including the New Notes. We cannot predict the

impact that political conditions will have on the Mexican economy. Furthermore, our business, financial condition, results of operations and prospects may be affected by currency fluctuations, price instability, inflation, interest rates, regulation, taxation, social instability and other political, social and economic developments in or affecting Mexico, over which we have no control. We cannot assure potential investors that changes in Mexican federal governmental policies will not adversely affect our business, financial condition, results of operations and prospects.

Presidential elections in Mexico occur every six years, with the most recent one occurring in July 2018. Andrés Manuel López Obrador, presidential candidate to the National Regeneration Movement party (Movimiento de Regeneración Nacional, or "Morena"), was elected President and assumed office on December 1, 2018. During his presidential campaign, Andrés Manuel López Obrador expressed, among other things, his intentions to modify and/or terminate certain structural reforms. The Mexican government could implement significant changes in laws, policies and regulations, which could affect the economic and political situation in Mexico and generate increased economic uncertainty. We cannot provide any assurances that political developments in Mexico, over which we have no control, will not have an adverse effect on our business, financial condition, results of operations and prospects.

Several years ago, Mexico experienced a significant increase in violence, relating to illegal drug trafficking and organized crime, particularly in Mexico's northern states near the United States border. This increase in violence has had an adverse impact on the economic activity in Mexico. In addition, social instability in Mexico and adverse social or political developments in or affecting Mexico could adversely affect us and our financial performance. Corruption and links between criminal organizations and government authorities also create conditions that affect our business operations, as well as extortion and other acts of intimidation, which may have the effect of limiting the level of action taken by federal and local governments in response to such criminal activity. The social and political situation in Mexico could adversely affect the Mexican economy, which in turn could have a material adverse effect on our business, results of operations and financial condition.

### Political and economic developments in Mexico may adversely affect our business

The majority of our customers are Mexican companies, and all of our operations and the vast majority of our assets are located in Mexico. For these reasons, our operations, results and financial condition are dependent upon the level of economic activity in Mexico. Telecommunications traffic in Mexico and our revenues are highly affected by the level of economic activity in Mexico and the general purchasing power of companies. Accordingly, declines in our customers' spending could have additional negative effects on our revenues. Economic slowdowns in Mexico may have additional consequences that impact our business. We also face risks associated with the impact of economic downturns on third parties, such as suppliers, financial institutions and other parties with which we do business. If these parties experience negative effects on their businesses due to the economic crisis, it could negatively affect our business or operating results.

The Mexican government has exercised, and continues to exercise, significant influence over the Mexican economy. Accordingly, Mexican federal governmental actions and policies concerning the economy could have a significant impact on private sector entities in general and on us in particular and on market conditions, prices and returns on Mexican securities, including the New Notes.

### Changes to Mexican laws, regulations and decrees applicable to us could have a material adverse effect on our business, results of operations and financial condition.

The telecommunications sector in Mexico is subject to numerous laws and extensive regulations by a number of governmental authorities, including the SCT and IFT, which are responsible for, among others, formulating policy, granting licenses, setting tariff schemes, regulating interconnection among providers, levying taxes on services and supervising the provision of services. Laws applicable to our business may be enacted, amended or repealed and governmental agencies may make regulatory interpretations or take regulatory actions that could damage our business, increase competition, increase our costs of operation, decrease our revenues, and limit our ability to grow our operations, or otherwise adversely impact our business.

A-18

***Peso devaluation relative to the U.S. dollar could make it more difficult for us to service our indebtedness and could decrease the value of the New Notes.***

While our revenues are almost entirely denominated in pesos, the majority of our obligations and all of our long−term indebtedness are denominated in U.S. dollars. In addition, most of our capital expenditures are denominated in U.S. dollars. We are, and will continue to be, exposed to peso devaluation risk. The peso has depreciated substantially against the U.S. dollar in the past and may devalue significantly in the future. For example, the noon buying rate rose from Ps.3.45 per US$1.00 on December 19, 1994 to Ps.5.00 per US$1.00 on December 31, 1994 and Ps.7.74 per US$1.00 on December 31, 1995, representing a 124.6% devaluation of the peso relative to the U.S. dollar from December 19, 1994 to December 31, 1995.  At the beginning of 2015, the exchange rate was $ 14.806 per dollar and it depreciated by 16.1%, closing the year at Ps.17.1950 per dollar according to the Federal Reserve Bank of New York. During 2016, the exchange rate depreciated 19.9% and ended at Ps.20.6170 per dollar. As of March 31, 2019, the exchange rate was Ps.19.3980 per dollar, showing a depreciation of 6.34% compared to the same period in 2018, according to the Federal Reserve Bank of New York.

The general economic conditions in Mexico resulting from a Peso devaluation and consequential inflation may have an adverse effect on our results of operation by:

- increasing the peso-carrying costs of our U.S. dollar-denominated debt and capital expenditure requirements;

- decreasing the investment capabilities of Mexican companies, resulting in a decrease in demand for telecommunication services; and

- our inability to maintain competitive prices amidst an environment of higher inflation and sustained peso devaluation.

The peso−to−dollar exchange rate may experience significant devaluations in the future. Further declines in the value of the Peso relative to the U.S. dollar could adversely affect our ability to meet our U.S. dollar−denominated obligations, including the New Notes.  In order to diminish the negative effects of a peso devaluation, we have entered into currency swap transactions (hedges) in the financial markets. In October, 2015 we entered into interest swaps and currencies swaps to cover the interests of the old notes with Credit Suisse and Morgan Stanley for notional amounts of US$45 million dollars and US$35 million dollars, respectively and maturing in December 15, 2017. On December 31, 2017, we entered into additional cross-currency swaps with Credit Suisse to cover the interests of the old notes for a notional amount of US$70 million and maturing on June 15, 2020.

***Mexico may experience high rates of inflation in the future, which could decrease demand for our services while increasing our costs.***

Mexico has a history of high levels of inflation and may experience high inflation in the future. Historically, inflation in Mexico has led to higher interest rates, depreciation of the peso and the imposition of substantial government controls over exchange rates and prices, which at times has adversely affected our operating revenues and margins. The annual rate of inflation, as measured by changes in the National Consumer Price Index (Índice Nacional de Precios al Consumidor), as provided by the National Institute of Statistics and Geography (Instituto Nacional de Estadística y Geografía), was 3.4% in 2016, 6.8% in 2017 and 4.83% in 2018. A high inflation rate can adversely affect us as follows:

- inflation can adversely affect consumer purchasing power, thereby adversely affecting consumer demand for our services and products; and

- to the extent inflation exceeds our price increases, our prices and revenues will be adversely affected in real terms.

A-19

**High interest rates in Mexico could increase our financing costs.**

Mexico has, and is expected to continue to have, high real and nominal interest rates, relative to the United States, its main commercial partner. The interest rates on 28−day Mexican government treasury securities averaged, 7.97% for the three months ended March 31, 2019, 7.38% in 2018, 6.09% in 2017, and 3.44% in 2016. Currently we have peso−denominated debt at a fixed annual rate of 9.86%, and if we need to incur additional indebtedness in the future, it will likely be at high interest rates.

A-20

## EXCHANGE RATES

On December 21, 1994, Banco de Mexico implemented a floating foreign exchange rate regime under which the Mexican peso is allowed to float freely against the U.S. dollar and other foreign currencies. Banco de Mexico typically intervenes directly in the foreign exchange market only to reduce what it deems to be excessive short-term volatility. Since mid-2003, Banco de Mexico has been conducting auctions of U.S. dollars in an attempt to reduce the levels of its foreign reserves. Banco de Mexico conducts open market operations on a regular basis to adjust the size of Mexico's monetary base. Changes in Mexico's monetary base have an impact on the exchange rate. Banco de Mexico may increase or decrease the reserve of funds that financial institutions are required to maintain. If the reserve requirement is increased, financial institutions are required to allocate more funds to their reserves, which will in turn reduce the amount of funds available for operations. This causes the amount of available funds in the market to decrease and the cost, or interest rate, to obtain funds increases. The opposite happens if reserve requirements are lowered. This mechanism, known as "corto" or "largo," as the case may be, or more formally "the daily settlement balance target," represents a mechanism used by Banco de Mexico to adjust the level of interest and net foreign exchange rates.

We cannot assure you that Banco de Mexico will maintain its current policies with respect to the Mexican peso or that the Mexican peso will not depreciate significantly in the future. Additionally, in the event of shortages of foreign currency, we cannot assure you that foreign currency would continue to be available to private-sector companies or that foreign currency needed by us to service foreign currency obligations, if any, would continue to be available without substantial additional cost.

This statement contains translations of certain Mexican peso amounts into U.S. dollars at specified rates solely for the convenience of the reader. These convenience translations should not be construed as representations that the Mexican peso amounts actually represent such U.S. dollar amounts or could be converted into U.S. dollars at the specified rate or at all.

The following table sets forth, for the periods indicated, the high, low, average and period-end exchange rates reported by the Banco de Mexico as its buying rate for pesos, all expressed in nominal Mexican pesos per U.S. dollar.

| | High | Low | Average[1] | Period-End |
|---|---|---|---|---|
| **Year** | | | | |
| 2014 | 14.7853 | 12.8462 | 13.2983 | 14.7180 |
| 2015 | 17.3776 | 14.5559 | 15.8542 | 17.2065 |
| 2016 | 21.0511 | 17.1767 | 18.6567 | 20.7314 |
| 2017 | 21.9076 | 17.4937 | 18.9291 | 19.7867 |
| 2018 | 20.7160 | 17.9787 | 19.2380 | 19.6829 |
| **Month** | | | | |
| November 2018 | 20.5304 | 19.8245 | 20.2550 | 20.4108 |
| December 2018 | 20.5672 | 19.6829 | 20.1529 | 19.6829 |
| January 2019 | 19.6566 | 18.9280 | 19.2274 | 18.9972 |
| February 2019 | 19.4084 | 19.0388 | 19.1833 | 19.1630 |
| March 2019 | 19.5225 | 18.8694 | 19.2488 | 19.3201 |
| April 2019 | 19.3793 | 18.7719 | 19.0163 | 18.9414 |
| May 2019 | 19.2623 | 18.9755 | 19.0919 | 19.2395 |

———————————

(1) The average exchange rate means the daily average of the exchange rates on each day during the relevant period.
Source: Banco de Mexico.

On May 31, 2019, the noon buying rate reported by the Banco de Mexico for pesos was Ps.19.3201 per US$1.00.

LEGAL_US_E # 142338261.4

# CAPITALIZATION

The following table sets forth certain consolidated financial information for us under IFRS as of March 31, 2019, including our cash and cash equivalents, short-term and long-term indebtedness and total capitalization. The table also sets forth such information as adjusted to reflect the consummation of the exchange offer and the consent solicitation, assuming that all old notes are tendered prior to or on the early participation date and we do not round down the amount to be issued to any tendering holder. This table should be read together with the Unaudited Interim Financial Statements and notes thereto included elsewhere in this statement. There has been no material change in our capitalization since March 31, 2019.

| | As of March 31, 2019 | | | |
| | Actual | | As adjusted for the debt exchange offer | |
| | (in millions) | | | |
| | (US$)[1] | (Ps.) | (US$)[1] | (Ps.) |
|---|---|---|---|---|
| Cash and cash equivalents ........................ | 22 | 418 | 23 | 448 |
| Debt: | | | | |
| Step-Up Senior Notes due 2020[3] ...... | 103 | 1,990 | - | - |
| 8% Senior Secured Notes due 2024[3] ............................................. | - | - | 59 | 1,148 |
| Bank Loans....................................... | 2 | 45 | 2 | 45 |
| Leases ............................................. | 28 | 548 | 28 | 548 |
| Total debt.............................................. | 134 | 2,583 | 90 | 1,741 |
| Junior PIK Notes[4] ................................ | - | - | 10 | 198 |
| Total stockholders' equity....................... | 38 | 727 | 53 | 1,027 |
| Total capitalization[2] .............................. | 171 | 3,310 | 154 | 2,967 |

---

(1)    Peso amounts were converted to U.S. dollars at the exchange rate of Ps.19.3201 per US$1.00 reported by the Banco de Mexico as its buying rate for pesos on March 31, 2019. Such conversions are for the convenience of the reader and should not be construed as representations that the peso amounts actually represent such U.S. dollar amounts or could be converted into U.S. dollars at the rate indicated, or at any other rate.

(2)    Total capitalization equals total debt plus total stockholders' equity plus the principal amount of the Junior PIK Notes.

(3)    The amount of Step-Up Senior Notes due 2020 includes Ps.49 million in accrued interest.

(4)    Peso amounts of the Junior PIK Notes were converted to U.S. dollars at the exchange rate of Ps. 19.1645 per US$1.00 reported by the Banco de Mexico as its buying rate for pesos on June 14, 2019.

LEGAL_US_E # 142338261.4

## SELECTED CONSOLIDATED FINANCIAL INFORMATION

You should read the following selected consolidated financial information in conjunction with our Annual Audited Financial Statements and our Interim Unaudited Financial Statements, including the notes thereto, and the information set forth in the sections "Presentation of Financial and Other Information" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing elsewhere in this statement.

The financial information as of and for the years ended December 31, 2018, 2017 and 2016 has been derived from our audited consolidated financial statements prepared in accordance with IFRS. The financial information for the three months ended March 31, 2019 has been derived from our earnings report attaching unaudited condensed consolidated interim financial statements prepared in accordance with IFRS.

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2018[(1)] | 2018 | 2017 | 2016 |
| | (US$) | (Ps.) | (Ps.) | (Ps.) |
| | | (in thousands) | | |
| **Income Statement Data:** | | | | |
| Net revenues | 66,822 | 1,315,245 | 2,255,580 | 2,468,933 |
| Operating costs and expenses: | | | | |
|     Network operating costs | (30,347) | (597,314) | (1,484,938) | (1,643,158) |
|     Selling, general and administrative expenses | (23,853) | (469,489) | (452,475) | (603,379) |
|     Depreciation and amortization | (12,044) | (237,070) | (210,340) | (366,460) |
| Other expenses: | | | | |
|     Restructuring charges | (874) | (17,210) | (62,344) | (323,593) |
|     Impairment of long-lived assets | - | - | - | (1,046,252) |
|     Employee's statutory profit sharing | - | - | (34,035) | (8,010) |
|     Other expenses, net | (3,020) | (59,449) | (4,012) | (38,852) |
|     Total operating costs and expenses | (70,139) | (1,380,532) | (2,248,144) | (4,029,704) |
| Operating (loss) income | (3,317) | (65,287) | 7,436 | (1,560,771) |
| Comprehensive financial results: | | | | |
|     Interest expense and commissions, net | (9,088) | (178,881) | (174,165) | (168,398) |
|     Interest gain | 626 | 12,316 | 32,182 | 38,451 |
|     Exchange (gain) loss, net | (535) | (10,537) | 102,644 | (428,374) |
|     Effects of valuation of financial instruments | (2,249) | (44,270) | (72,788) | (99,289) |
|     Gain on repurchase of senior notes | - | - | 90,206 | 107,211 |
| Total comprehensive financial results | (11,247) | (221,372) | (21,921) | (550,399) |
| Total income taxes | (1,457) | (28,672) | (1,439) | (6,986) |
| Net income (loss) | (16,021) | (315,331) | (15,924) | (2,118,156) |
| Majority net income | (14,233) | (280,151) | 2,272 | (2,118,156) |
| Minority net income | (1,787) | (35,180) | (18,196) | - |
| Loss per share: | | | | |
|     Basic | (0.11) | (2.23) | (0.39) | (18.84) |
|     Diluted | (0.11) | (2.19) | (0.39) | (18.84) |

| | For the Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2019[(1)] | 2019 | 2018 |
| | (US$) | (Ps.) | (Ps.) |
| | | (in thousands) | |
| **Income Statement Data:** | | | |
| Net revenues | 19,534 | 377,404 | 295,670 |
| Operating costs and expenses: | | | |

LEGAL_US_E # 142338261.4

| | For the Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2019[1] | 2019 | 2018 |
| | (US$) | (Ps.) | (Ps.) |
| | | (in thousands) | |
| Network operating costs ..................................................... | (10,682) | (206,370) | (144,945) |
| Selling, general and administrative expenses ........................ | (5,094) | (98,407) | (117,160) |
| Depreciation and amortization............................................. | (5,348) | (103,316) | (52,821) |
| Other expenses | | | |
| Restructuring charges ................................................... | (285) | (5,510) | (5,004) |
| Impairment of long-lived assets...................................... | - | - | - |
| Employee's statutory profit sharing ................................ | - | - | - |
| Other expenses, net....................................................... | (147) | (2,841) | (2,365) |
| Total operating costs and expenses.................................. | (21,555) | (416,444) | (322,295) |
| Operating (loss) income ..................................................... | (2,021) | (39,040) | (26,625) |
| Comprehensive financial results: | | | |
| Interest expense and commissions, net............................... | (3,084) | (59,579) | (39,393) |
| Interest gain................................................................. | (264) | (5,092) | (26,962) |
| Exchange (gain) loss, net ............................................... | 1,867 | 36,075 | 132,252 |
| Effects of valuation of financial instruments ..................... | (589) | (11,388) | (21,402) |
| Gain on monetary position ............................................. | 3,646 | 70,435 | - |
| Total comprehensive financial results.................................. | 1,576 | 30,451 | 44,495 |
| Total income taxes............................................................ | (27) | (527) | (694) |
| Net income (loss).............................................................. | (472) | (9,116) | 17,176 |
| Majority net income........................................................... | 25 | 480 | 23,739 |
| Minority net income .......................................................... | (497) | (9,596) | (6,563) |
| Loss per share: | | | |
| Basic ......................................................................... | 0.00 | 0.00 | 0.17 |
| Diluted ....................................................................... | 0.00 | 0.00 | 0.16 |

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2018[1] | 2018 | 2017 | 2016 |
| | (US$) | (Ps.) | (Ps.) | (Ps.) |
| | | (in millions) | | |
| **Balance Sheet Data** | | | | |
| Assets: | | | | |
| Cash and cash equivalents................................... | 23 | 457 | 585 | 838 |
| Restricted cash .................................................. | - | - | - | - |
| Accounts receivable, net .................................... | 8 | 157 | 254 | 264 |
| Value added tax receivable ................................. | 3 | 55 | 111 | 40 |
| Other accounts receivable ................................... | 1 | 10 | 15 | 26 |
| Inventory........................................................... | - | 2 | 3 | 2 |
| Prepaid expenses ............................................... | 2 | 34 | 37 | 27 |
| Telephone network, systems and equipment, net... | 113 | 2,217 | 2,339 | 2,359 |
| Intangible assets, net.......................................... | 14 | 271 | 264 | 221 |
| Long-term restricted cash.................................... | 2 | 36 | 33 | 25 |
| Deferred taxes ................................................... | - | 6 | 23 | 13 |
| Other assets....................................................... | 2 | 42 | 11 | 33 |
| Total assets ....................................................... | 167 | 3,286 | 3,675 | 3,847 |
| Current Liabilities: | | | | |
| Current step-up senior notes................................ | - | 8 | 7 | 8 |
| Bank loans ........................................................ | 2 | 30 | 30 | 30 |
| Accounts payable ............................................... | 11 | 216 | 318 | 393 |
| Accruals............................................................ | 1 | 19 | 18 | 22 |

LEGAL_US_E # 142338261.4

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2018[1] | 2018 | 2017 | 2016 |
| | (US$) | (Ps.) | (Ps.) | (Ps.) |
| Customer deposits ................................................ | 1 | 22 | 2 | 2 |
| Other taxes payable ............................................. | 1 | 19 | 18 | 36 |
| Provisions ........................................................... | 2 | 35 | 72 | 44 |
| Total current liabilities....................................... | 18 | 348 | 464 | 535 |
| Non-current Liabilities: | | | | |
| Non-current step-up senior notes ....................... | 108 | 2,136 | 2,089 | 2,376 |
| Bank Loans ....................................................... | 1 | 23 | 53 | 83 |
| Derivative financial instruments......................... | 0 | 4 | 5 | - |
| Non-current other accounts payable.................... | 1 | 23 | 17 | 25 |
| Labor obligations upon retirement...................... | 0 | 2 | 2 | 2 |
| Other long term liabilities ................................. | - | - | - | - |
| Non-current provisions ...................................... | 1 | 11 | 23 | 37 |
| Total non-current liabilities............................... | 112 | 2,197 | 2,189 | 2,522 |
| Total liabilities ................................................. | 129 | 2,545 | 2,654 | 3,057 |
| Capital stock ..................................................... | 79 | 1,521 | 1,455 | 7,629 |
| Additional paid-in capital................................... | 3 | 50 | 50 | 41 |
| Accumulated deficit............................................ | (46) | (896) | (591) | (6,921) |
| Other comprehensive income ............................. | 0 | 4 | 9 | 41 |
| Controlling interest ........................................... | 35 | 680 | 924 | 790 |
| Non-controlling interest ..................................... | 3 | 62 | 97 | - |
| Total shareholders' equity.................................. | 38 | 741 | 1,021 | 790 |
| Total number of shares ...................................... | 144,471,081 | 144,471,081 | 140,710,530 | 115,010,530 |

| | As of March 31, | | As of December 31, |
|---|---|---|---|
| | 2019[1] | 2019 | 2018 |
| | (US$) | (Ps.)<br>(in millions) | (Ps.) |
| **Balance Sheet Data** | | | |
| Assets: | | | |
| Cash and cash equivalents................................ | 20 | 386 | 457 |
| Restricted cash ................................................. | - | - | - |
| Accounts receivable, net ................................... | 10 | 200 | 157 |
| Value added tax receivable ............................... | 3 | 58 | 55 |
| Other accounts receivable ................................. | 1 | 10 | 10 |
| Inventory.......................................................... | 0 | 1 | 2 |
| Prepaid expenses .............................................. | 3 | 52 | 34 |
| Telephone network, systems and equipment, net.. | 115 | 2,222 | 2,217 |
| Investment properties, net ................................. | - | - | - |
| Intangible assets, net......................................... | 13 | 254 | 271 |
| Rights of use of leased assets, net...................... | 28 | 543 | - |
| Long-term restricted cash.................................. | 2 | 32 | 36 |
| Deferred taxes .................................................. | 0 | 6 | 6 |
| Other assets...................................................... | 2 | 42 | 42 |
| Total assets ...................................................... | 197 | 3,806 | 3,286 |
| Current Liabilities: | | | |
| Current step-up senior notes ............................. | 3 | 49 | 8 |
| Bank loans ....................................................... | 2 | 30 | 30 |
| Accounts payable .............................................. | 13 | 248 | 216 |
| Leases | 4 | 87 | - |
| Accruals............................................................ | 3 | 54 | 19 |
| Customer deposits ............................................ | 1 | 21 | 22 |

| | | | |
|---|---|---|---|
| Other taxes payable | 1 | 10 | 19 |
| Provisions | 1 | 28 | 35 |
| Total current liabilities | 27 | 527 | 348 |
| Non-current Liabilities: | | | |
| Non-current step-up senior notes | 100 | 1,940 | 2,136 |
| Leases | 24 | 461 | - |
| Bank Loans | 1 | 15 | 23 |
| Derivative financial instruments | 0 | 9 | 4 |
| Non-current other accounts payable | 6 | 114 | 23 |
| Labor obligations upon retirement | 0 | 2 | 2 |
| Other long term liabilities | - | - | - |
| Non-current provision | 1 | 11 | 11 |
| Total non-current liabilities | 132 | 2,552 | 2,197 |
| Total liabilities | 159 | 3,079 | 2,545 |
| Capital stock | 79 | 1,521 | 1,521 |
| Additional paid-in capital | 3 | 50 | 50 |
| Accumulated deficit | (46) | (896) | (896) |
| Repurchase of shares | (0) | (0) | 4 |
| Controlling interest | 35 | 675 | 680 |
| Non-controlling interest | 3 | 52 | 62 |
| Total shareholders' equity | 38 | 727 | 741 |
| Total number of shares | 144,471,081 | 144,471,081 | 144,471,081 |

| | For the Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2018**[1] | **2018** | **2017** | **2016** |
| | (US$) | (Ps.) | (Ps.) | (Ps.) |
| | | (in millions) | | |
| **Other Operational and Financial Data** | | | | |
| Capital expenditures[2] | (10) | (205) | (243) | (478) |
| Resources arising from operating activities | 3 | 50 | 52 | 444 |
| Resources derived from financing activities | (9) | (187) | (94) | (237) |
| Resources used in investing activities | - | 7 | (202) | (201) |
| Adjusted EBITDA[3] | 13 | 248 | 318 | 222 |
| Total debt | 112 | 2,196 | 2,179 | 2,496 |
| Total interest expense | 9 | 179 | 174 | 168 |
| Ratio of debt to EBITDA[3][4] | 8.8 | 8.8 | 6.8 | 11.2 |
| Ratio of EBITDA to interest expense[3][5] | 0.7 | 0.7 | 0.5 | 0.8 |

| | For the Three Months Ended March 31, | | |
|---|---|---|---|
| | **2019**[1] | **2019** | **2018** |
| | (US$) | (Ps.) | (Ps.) |
| | | (in millions) | |
| **Other Operational and Financial Data** | | | |
| Capital expenditures[2] | (3) | (63) | (56) |
| Resources arising from operating activities | 6 | 117 | (101) |
| Resources derived from financing activities | 23 | 440 | 2 |
| Resources used in investing activities | (33) | (635) | (56) |
| Adjusted EBITDA[3] | 4 | 73 | 34 |
| Total debt | 134 | 2,583 | 2,077 |
| Total interest expense | 3 | 60 | 39 |
| Ratio of debt to EBITDA LTM[3][4] | 9.0 | 9.0 | 7.7 |
| Ratio of EBITDA to interest expense[3][5] | 0.8 | 0.8 | 1.2 |

---

(1) Peso amounts were converted to U.S. dollars at the exchange rate of Ps.19.3201 per US$1.00 reported by the Banco de Mexico as its buying rate for pesos on March 31, 2019. Such conversions are for the convenience of the reader and should not be construed as

A-26

representations that the peso amounts actually represent such U.S. dollar amounts or could be converted into U.S. dollars at the rate indicated, or at any other rate.

(2)   Capital expenditures are presented according to the statement of cash flows and only include acquisitions.

(3)   Adjusted EBITDA under IFRS for any period is defined as consolidated net income (loss) excluding depreciation and amortization, net finance cost, other (income) expenses, tax and stock option plan cost. Adjusted EBITDA should not be considered as alternate measures of net income or operating income, as determined on a consolidated basis using amounts derived from statements of operations prepared in accordance with IFRS, or as indicators of operating performance or cash flows from operating activity as measures of liquidity.  The following tables set forth a reconciliation of Adjusted EBITDA to net income (loss) under IFRS for each of the periods presented.

(4)   The ratio of debt to EBITDA LTM is computed by dividing total debt balances (as presented in the financial statements) as of the end of the period by Adjusted EBITDA for the last twelve months.

(5)   The ratio of EBITDA to interest expense is computed by dividing Adjusted EBITDA for the period by interest expense for the period.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| | **(Ps.)** | **(Ps.)** <br> **(in thousands)** | **(Ps.)** |
| **Adjusted EBITDA Reconciliation** | | | |
| Net (loss) income .................................................. | (315,331) | (15,924) | (2,118,156) |
| Total tax ............................................................... | 28,672 | 1,439 | 6,986 |
| Restructuring ........................................................ | 17,210 | 62,344 | 323,593 |
| Other (income) expense ........................................ | 59,448 | 4,012 | 1,085,104 |
| Comprehensive (income) cost of financing............ | 221,371 | 21,921 | 550,399 |
| Depreciation and amortization .............................. | 237,070 | 210,340 | 366,460 |
| Stock option plan expenses .................................. | - | 34,035 | 8,010 |
| Adjusted EBITDA.................................................. | 248,442 | 318,167 | 222,396 |

| | For the Three Months Ended March 31, | |
|---|---|---|
| | **2019** | **2018** |
| | **(Ps.)** | **(Ps.)** |
| **Adjusted EBITDA Reconciliation** | | |
| Net (loss) income .................................................. | (9,116) | 17,176 |
| Total tax ............................................................... | 527 | 694 |
| Restructuring ........................................................ | 5,510 | 5,004 |
| Other (income) expense........................................ | 2,841 | 2,365 |
| Net finance cost.................................................... | (30,451) | (44,495) |
| Depreciation and amortization .............................. | 103,316 | 52,821 |
| Stock option plan expenses .................................. | - | - |
| Adjusted EBITDA .................................................. | 72,627 | 33,565 |

A-27

## MANAGEMENT'S DISCUSSION AND ANALYSIS
## OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this discussion in conjunction with our Annual Audited Financial Statements, our Unaudited Interim Financial Statements and the other financial information included elsewhere in this statement.*

*Our Annual Audited Financial Statements, as well as the other financial information in the statement related to these financial statements, have been prepared in accordance with IFRS. Our Unaudited Interim Financial Statements, as well as the other financial information in the statement related to these financial statements, have been prepared in accordance with IFRS.*

### Overview

We are a facilities-based telecommunications provider using a "smart-build" approach to deliver "last-mile" connectivity to enterprises and residential customers in Mexico. Since our inception in 1996, we have targeted the business and residential customer segments which we believe have been underserved by Telmex, the local telephone incumbent, and other competing telecommunications providers. We provide a wide range of voice and data services on a bundled and unbundled basis, including local and long−distance voice, data, high speed, dedicated Internet access and VoIP telephony.

We operate our own telecommunications network and support infrastructure, including the critical "last mile" or customers' premise level infrastructure (modems, handsets and set-up boxes) for our residential segment, which allows us to control the quality of the user experience and adapt our service offerings to meet market demand. We believe the combination of innovative, bundled offerings, competitive pricing and dedicated customer service provides value for our customers, and has allowed us to maintain 156,571 voice lines in service as of December 31, 2018.

The Mexican telecommunications industry has been undergoing significant change since 1990 due to market liberalization as well as the introduction of new technologies and the construction of additional infrastructure, which together have resulted in increased competition and demand for telecommunications services.

The modernization of the Mexican telecommunications infrastructure began with the privatization of Telmex, the former government-controlled telecommunications monopoly. Since the privatization, Telmex and several concessionaires have begun deploying modern fiber and wireless networks throughout Mexico. To meet the demand for higher volume and higher quality wireline services, new copper cables and wireless networks are being installed and backbones are being replaced largely by fiber optic transmission systems that provide greater capacity at lower cost with higher quality and reliability.

Additionally, technology and service convergence is allowing bundle offers to customers and promoting alliances and synergies among concessionaires of different media and telecommunications services, manufacturers and technology developers.

### Mexican Economic Environment

Mexico is the second largest country in Latin America in terms of population, with approximately 129 million people, a gross domestic product of US$1.2 trillion and a gross domestic product per capita of over US$9,630 as of December 31, 2018, one of the highest GDPs per capita in Latin America.

It is expected that the Mexican telecommunications industry, the second largest in Latin America, will continue its upward trend. The telecommunications industry is classified as a tertiary sector within Mexican GDP, representing 4.62% of the GDP of the tertiary sector and 2.92% of total Mexican GDP. For the third quarter of 2018, there was growth of 4.27% in the GDP of the industry compared to the same period in 2017 and a similar trend in the year-end report. According to estimates from the Competitive Intelligence Unit ("CIU"), a consulting firm

LEGAL_US_E # 142338261.4

specialized in market research in Latin America, at the end of 2018, the telecommunications sector as a whole generated approximately Ps.491.2 billion, an annual growth of 5.0%, compared to the 3.0% in 2017.

The CIU anticipates that the growth of the sector will reach 5.6% in 2019, which is attributable to the reactivation of the Pay TV market, the growth in mobile ARPU derived from increased consumption of mobile data, a drop in fixed revenues and the growing consumption of broadband services, both fixed and mobile.

We anticipate that 2019 will be a year of growing dynamism for the telecommunications industry, resulting from improvements in both private and public infrastructure in Mexico, as well as potential concessions granted through radio spectrum bidding and the effective realization of investment projects of the new federal administration. We expect that these factors will contribute to the growth of the telecommunications industry in the coming years.

## Factors Affecting our Results of Operations

### Devaluation and Inflation

Relative to the U.S. dollar, the peso appreciate 0.3% in 2018, appreciated 4.5% in 2017, depreciated 20.1% in 2016, depreciated 16.9% in 2015 and depreciated 12.6% in 2014. Peso depreciations contribute to increases in inflation. The following table summarizes the general economic conditions and inflation in Mexico for the periods specified below:

| Year ended December 31, | Inflation Rate | Average 28-day Cetes | Mexican GDP Annual Growth Rates | Gross International Reserves as of the End of Each Year (in US$billion) |
|---|---|---|---|---|
| 2018 | 4.83% | 7.62% | 1.71% | 175 |
| 2017 | 6.77% | 6.69% | 1.48% | 173 |
| 2016 | 3.36% | 4.17% | 3.28% | 177 |
| 2015 | 2.13% | 2.98% | 2.71% | 177 |
| 2014 | 4.08% | 3.00% | 3.43% | 193 |

The general economic conditions in Mexico resulting from a peso devaluation and consequential inflation may have a negative impact on our results of operations by:

- increasing the peso-carrying costs of our U.S. dollar-denominated debt and capital expenditure requirements;
- decreasing the purchasing power of Mexican consumers, resulting in a decrease in demand for telephony services; and
- resulting in our inability, due to competitive pressures, to increase our prices in response to such inflation

### Customer attrition (churn)

We historically have experienced customer attrition or churn. Churn results in the loss of future revenue from the customers whose service is disconnected, as well as the inability to recuperate costs incurred in acquiring the customer, such as installation cost and commissions. Churn occurs for several reasons, including disconnection of a customer for non-payment and disconnection by a customer who chooses to switch to a competitor or who terminates a service.

Churn is a measure that we use to identify the percentage of lost revenue from clients who voluntarily or involuntarily are entirely or partially disconnected from service. Churn rate is calculated by dividing revenue lost in a period by the total revenue recorded at the end of the same period. Our average monthly churn rate for the last three years has been 3.1%. Our average monthly churn rates for the year ended December 31, 2018 was 4.5%. An increase in customer churn could have a material adverse impact on our revenue growth and on our results of

LEGAL_US_E # 142338261.4

operations, even after replacing the deactivated customer with a new customer. Churn may be impacted by customer delinquency, a change in customer location to a limited coverage area, failure to meet expected service levels, a decline in national or international economic conditions (which can have a particularly negative impact on our residential customers) and competitive pricing and promotional services offered by our competitors.

The following table summarizes our average monthly churn rates for the periods and segments indicated below:

| Period | Total average monthly churn rate | Residential customer average monthly churn rate | Commercial customer average monthly churn rate |
| --- | --- | --- | --- |
| 2015............................................................ | 2.1% | 3.2% | 0.9% |
| 2016............................................................ | 1.9% | 3.0% | 0.8% |
| 2017............................................................ | 3.0% | 3.4% | 2.6% |
| 2018............................................................ | 4.5% | 8.0% | 1.1% |
| 2019 (through March 31) ............................... | 1.6% | 2.6% | 0.7% |

We attribute the improvement in our average monthly churn rate to fewer service terminations as a result of our strategic focus on customer service, improved customer base knowledge, a multidisciplinary team dedicated to analyzing churn trends and to implementing actions to minimize churn and a retention team that negotiates and offers special plans to customers planning to voluntarily terminate service. We expect that the residential customer average monthly churn rate will remain at the levels of the table above due to the strategic divestiture of the residential business unit, which we expect to conclude by December 2019.

### *Revenues*

Our net revenues primarily include monthly fees, usage fees, installation charges, interconnection fees and the sales of telephone sets net of interconnection fees paid by us to other telecommunications carriers. Our net revenues as composed of:

*Commercial Revenue.* Our commercial revenue includes voice (usage charges of voice lines, which can include a combination of local calls above those already included in the monthly fees, long distance minutes, as well as minutes to mobile numbers under the "Long Distance Calling Party Pays" system) and data (connectivity services, mobile services and cloud-based services). Our commercial revenue also includes charges relating to value-added services such as voice mail, call waiting, call forwarding, three-way calling and caller identification.

*Residential Revenue.* Our residential revenue includes voice (usage charges of voice lines, which can include a combination of local calls above those already included in the monthly fees, long distance minutes, as well as minutes to mobile numbers under the "Long Distance Calling Party Pays" system) and data revenues from internet services.

*Wholesale Revenue.* Our wholesale revenue includes primarily the sale of bulk minutes where the cost of minutes depends on the volume of traffic.

*Average Revenue Per Unit (ARPU).* Average revenue per unit ("ARPU") is used as an industry-standard measurement of the average amount of revenue derived from revenue generating units ("RGUs") from each residential customer. We calculate average revenue per unit by dividing the total residential revenues for a given period by the average number of RGUs in service during such period.

*Average Revenue Per Customer (ARPC).* Average revenue per customer ("ARPC") is used as an industry-standard measurement of the average amount of revenue derived from each commercial customer. We calculate average revenue per customer by dividing the total commercial revenues for a given period by the average number of active commercial customers in that given period.

A-30

*Revenue Generating Units (RGUs)*. RGU's are related to the sources of residential revenue, which may not always be the same as subscriber numbers. One person may subscribe to two different services thereby accounting for only one subscriber but two RGUs.

Revenue Generating Unit is separately a telephone line or broadband internet subscriber. A home may contain one or two RGUs.

### *Operating Costs and Expenses*

Our operating costs and expenses include:

- network operating costs, which include: (i) technical expenses (comprised of electric power, site leases and maintenance of telecommunications equipment); (ii) installation expenses, when applicable; and (iii) disconnection expenses;
- selling, general and administrative expenses, which primarily include: (i) salaries, wages and benefits; (ii) fees, which are primarily related to consulting, legal and accounting services; (iii) leasing costs, which are primarily related to our headquarters, warehouses and other facilities; (iv) marketing expenses, which are primarily related to the implementation of our branding campaign, general advertising and promotions; and (v) allowance for doubtful accounts (related to past due accounts receivable); and
- depreciation and amortization mainly related to pre-operating expenses, frequency rights, telephone network systems and equipment and intangibles.

We anticipate that our operating costs and expenses will generally increase with the size of our network infrastructure and the number of customers served. Our network operating costs, which are composed primarily of interconnection fees, are expected to grow at approximately the same rate as revenues. We expect technical expenses will generally increase as the size and capacity of our network increases. Selling, general and administrative expenses are indirectly related to the number of customers served and some of these expenses are directly related with the acquisition of new customers. Historically, sales commissions, advertising and promotion expenses will increase at approximately the same rate as the number of new customers acquired. Our depreciation and amortization expenses are directly related to our existing fixed assets and to the expansion of our network and acquisition of equipment as well as the increase of intangible assets.

### *Comprehensive Cost of Financing*

For presentation purposes, "comprehensive cost of financing" refers to the combined financial effects of:

- interest expense and interest income;
- effects of valuation of financial instruments; and
- net foreign exchange gains or losses.

## Results of Operations

The following table sets forth, for the periods indicated, selected statement of operations data, derived from our Interim Unaudited Financial Statements, prepared in accordance with IFRS, and expressed as a percentage of net revenue:

|  | For the Three Months Ended March 31, | |
|---|---|---|
|  | **2019** | **2018** |
| Net revenues | 100.0% | 100.0% |
| Operating costs and expenses: | | |
| Network operating costs | 54.7% | 49.0% |
| Selling, general and administrative expenses | 26.1% | 39.6% |
| Depreciation and amortization | 27.4% | 17.9% |
| Total operating costs and expenses | 110.3% | 109.0% |

LEGAL_US_E # 142338261.4

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | **2019** | **2018** |
| Operating profit (loss) | 10.3% | 9.0% |
| Other expenses | 0.8% | 0.8% |
| Restructuring charges | 1.5% | 1.7% |
| Impairment of long-lived assets | 0.0% | 0.0% |
| Comprehensive cost of financing | -8.1% | -15.0% |
| Income tax | 0.1% | 0.2% |
| Net loss (income) for the year | 2.4% | -5.8% |

The following table sets forth, for the periods indicated, selected statement of operations data, derived from our Annual Financial Statements, prepared in accordance with IFRS, and expressed as a percentage of net revenue:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| Net revenues | 100.0% | 100.0% | 100.0% |
| Operating costs and expenses: | | | |
| Network operating costs | 45.4% | 65.8% | 66.6% |
| Selling, general and administrative expenses | 35.7% | 20.1% | 24.4% |
| Depreciation and amortization | 18.0% | 9.3% | 14.8% |
| Total operating costs and expenses | 105.0% | 99.7% | 163.2% |
| Operating profit (loss) | 5.0% | -0.3% | 63.2% |
| Other expenses: | | | |
| Other expenses | 4.5% | 0.2% | 1.6% |
| Restructuring charges | 1.3% | 2.8% | 13.1% |
| Impairment of long-lived assets | 0.0% | 0.0% | 42.4% |
| Comprehensive cost of financing | 16.8% | 1.0% | 22.3% |
| Income tax | 2.2% | 0.1% | 0.3% |
| Net loss (income) for the year | 24.0% | 0.7% | 85.8% |

### *Three Months Ended March 31, 2019 Compared to Three Months Ended March 31, 2018*

#### *Net Revenues*

Our net revenues increased 27.6%, from Ps.295.7 million in the three months ended March 31, 2018 to Ps.377.4 million in the three months ended March 31, 2019. The increase was primarily due to the following factors:

- Commercial revenues represented 61.7% of total revenues during the three months ended March 31, 2019 compared with 63.7% during the three months ended March 31, 2018. Commercial revenues totaled Ps.232.7 million in the three months ended March 31, 2019, an increase of 23.4%, or Ps.44.2 million, from Ps.188.5 million in the three months ended March 31, 2018. The increase is mainly due by the growth in the different product lines: voice revenue by Ps.10.6 million, data services by Ps.5.3 million, non-recurrent revenues by Ps.26.0 million and value added services by Ps.2.3 million.

- Residential revenues represented 7.8% of our total revenue during the three months ended March 31, 2019, compared to 22.3% in the three months ended March 31, 2018. Revenues in the residential business reached Ps.29.4 million in the three months ended March 31, 2019, a decrease of 55.3% or Ps.36.4 million in comparison to Ps.65.8 million in the three months ended March 31, 2018. The effect on revenues is due to a combination of voice service revenues decreased by approximately Ps.9.6 million, a decrease in pay TV by approximately Ps.11.5 million and a decrease in internet services by Ps.15.2 million.

A-32

- In the three months ended March 31, 2019, wholesale revenues totaled Ps.110.8 million, an increase of 185.6% from Ps.38.8 million in the three months ended March 31, 2018. The increase in the wholesale revenues is primarily the result of long distance interconnection traffic coming from the United States for delivery overseas, which is 0% VAT taxable.

- Revenue from other services accounted for 1.2% or Ps.4.5 million of total revenues in the three months ended March 31, 2019, an increase from Ps.2.6 million recorded in the same period last year. Revenues from other services come primarily from mobile services granted by Celmax Movil, S.A. de C.V.

The following table sets forth our revenues by segment for the periods indicated below:

| | For the Three Months Ended March 31, | | |
| | 2019 | 2018 | % Change |
| --- | --- | --- | --- |
| | (in millions, except for percentages) | | |
| Commercial | 232.7 | 188.5 | 23.4% |
| Residential | 29.4 | 65.8 | (55.3)% |
| Wholesale | 110.8 | 38.8 | 185.6% |
| Other revenue | 4.5 | 2.6 | 75.5% |
| Total Revenues | 377.4 | 295.7 | 27.6% |

The following table sets forth a breakdown of our ARPC for commercial customers for the periods indicated below:

| | For the Three Months Ended March 31, | | |
| | 2019 | 2018 | % Change |
| --- | --- | --- | --- |
| Monthly charges | Ps.  45,547 | Ps.  35,369 | 28.8% |
| Usage | 13,167 | 9,325 | 41.2% |
| Subtotal | 58,714 | 44,694 | 31.4% |
| Non-recurring | 10,961 | 282 | 3786.9% |
| Total | Ps.  69,675 | Ps.  44,976 | 54.9% |

Total ARPC (calculated as average revenue per customer by dividing the total commercial revenues for a given period by the average number of active commercial customers in such period) increased 54.9% from Ps.44,976 in the three months ended March 31, 2018 to Ps.69,675 in the three months ended March 31, 2019. The increase in ARPC is primarily the result to the growth of recurrent and non-recurrent charges.

The following table sets forth a breakdown of our ARPU for residential customers for the periods indicated below:

| | For the Three Months Ended March 31, | | |
| | 2019 | 2018 | % Change |
| --- | --- | --- | --- |
| Monthly charges | Ps.  149.6 | Ps.  146.5 | 2.1% |
| Usage | 4.0 | 4.5 | (11.1)% |
| Subtotal | 153.6 | 151.0 | 1.7% |
| Non-recurring | 5.0 | 4.5 | 11.1% |
| Total | Ps.  158.6 | Ps.  155.5 | 2.0% |

Total ARPU (calculated as average revenue per unit by dividing the total residential revenues for a given period by the average number of RGUs in service during such period) increased 2.0% from Ps.155.5 in the three months ended March 31, 2018 to Ps.158.6 in the three months ended March 31, 2019. The increase in ARPU is primarily the result of increased monthly charges.

*Revenue Generating Units*

A-33

The term RGU represents an individual service subscriber who generates recurrent revenue for us. During the three months ended March 31, 2019, we disconnected a total of 46,828 RGUs. As of March 31, 2019, we reported a total of 215,302 RGUs, a decrease of 17.9% in comparison to the same period last year.

The following table sets forth our RGUs by type of customer at March 31, 2019 and 2018 and the percentage variation:

| | At March 31, | | |
| | 2019 | 2018 | % Change |
|---|---|---|---|
| Commercial | 136,465 | 111,772 | 22.1% |
| Residential | 59,885 | 131,346 | (54.4)% |
| Wholesale lines | 18,952 | 19,012 | (0.3)% |
| Total lines | 215,302 | 262,130 | (17.9)% |

*Operating Costs and Expenses*

Our operating costs and expenses increased 29.2% from Ps.322.3 million in the three months ended March 31, 2018 to Ps.416.4 million in the three months ended March 31, 2019. These figures include the effects of the adoption of IFRS 16 in January 2019. Excluding this effect, our operating cost and expenses increased of 31.8% from Ps.322.3 million in the three months ended March 31, 2018 to Ps.424.7 million in the three months ended March 31, 2019. This increase was primarily the result of:

- An increase of Ps.87.0 million, or 93.9% in network operating services primarily due to (i) a Ps.12.8 million decrease in TV content costs, (ii) a Ps 24.0 million increase in network associated costs and (iii) a Ps.72.8 million increase in long-distance interconnection costs;

- A decrease of Ps.3.0 million or 11.6% in technical expenses primarily due to (i) a Ps.3.3 million decrease in network maintenance costs and (ii) a Ps.0.3 million increase in other technical expenses;

- An increase of Ps.21.5 million, or 40.6% in depreciation and amortization expenses; and

- A decrease of Ps.9.8 million, or 7.8% in selling, general and administrative expenses primarily due to (i) a Ps.2.7 million decrease in salaries, wages and benefits, (ii) a Ps.2.4 million decrease in bad debt reserve, (iii) a Ps.3.2 million decrease in other expenses and (iv) a Ps.0.8 million decrease in consultancy fees.

*Net Financing Cost*

Our net financing cost was Ps.30.5 million in the three months ended March 31, 2019, a 31.6% decrease from Ps.44.5 million in the three months ended March 31, 2018, which accounts for the effects from our adoption of IFRS 16. Excluding these effects, our net financing cost was Ps.44.4 million in the three months ended March 31, 2019, a 0.3% decrease compared with to the three months ended March 31, 2018.

The following table sets forth our net financing costs for the periods indicated below:

| | For the Three Months Ended March 31, | | |
| | 2019 | 2018 | % Change |
|---|---|---|---|
| | (in millions, except for percentages) | | |
| Interest expense ...................................................................... | (59.6) | (39.4) | 51.2% |
| Interest income ....................................................................... | 4.6 | 1.8 | 153.1% |
| Foreign currency gain (loss) ................................................... | 36.1 | 132.2 | (72.7)% |
| Effects of valuation of financial instruments ........................... | (21.0) | (50.1) | (58.0)% |
| Gain on repurchase of senior notes ......................................... | 70.4 | - | - |
| Total.......................................................................................... | 30.5 | 44.5 | (31.6)% |

The decrease in comprehensive cost of financing was primarily due to:

- An increase of Ps.6.3 million or 16.0% in interest expense due to the change in the step-up interest rate of the old notes to 8% beginning in the second half of 2018, compared to 7% for the first half of 2018;

- An increase of Ps.2.8 million or 155.6% in interest income for the three months ended March 31, 2019 due to improvements in the Company's cash management;

- A decrease in foreign currency gain of Ps.96.1 million or 72.7% due to an increase in the average exchange rate from Ps.18.7638 during the first quarter of 2018 to Ps.19.2211 in the first quarter 2019;

- A decrease of Ps.29.1 million or 58.1% in valuation effects of financial instruments;

- A gain of Ps.70.4 million due to the repurchase of US$8.9 million principal amount of senior notes; and

- The increase in interest expenses due to the adoption of IFRS 16 by Ps.13.9 million.

*Tax Provisions*

We recorded an income tax debit of Ps.0.5 million during the three months ended March 31, 2019 compared to a tax debit of Ps.0.7 million recorded in the three months ended March 31, 2018, respectively.

***Year Ended December 31, 2018 Compared to Year Ended December 31, 2017***

*Net Revenues*

Our net revenues decreased 41.7%, from Ps.2,255.6 million in 2017 to Ps.1,315.2 million in 2018. The decrease was primarily due to the following factors:

- Commercial revenues represented 78.8% of total revenues during 2018, compared to 33.5% in 2017. Revenues in the commercial business totaled Ps.1,036.6 million in 2018, an increase of 37.2% or Ps.281.1 million compared to Ps.755.5 million in the year ended 2017. This increase in revenue due to an increase in voice revenue by Ps.23.5 million, an increase in data services by Ps.67.3 million, the growth in the non-recurrent revenues by Ps.173.7 million and the increase in value added services by Ps.16.9 million;

- Residential revenues represented 14.4% of total revenues during 2018, compared with 16.2% in the previous year. Revenues in the residential business reached Ps.188.9 million in 2018, a decrease of 48.3% or Ps.176.4 million in comparison to Ps.365.3 million in 2017. The decrease in revenues is due to a decrease of approximately Ps.56.9 million in voice service revenues decrease, a decrease in pay TV by approximately Ps.43.7 million, a decrease in internet services by Ps.73.9 million and a decrease in mobile telephony of Ps.1.8 million;

- In 2018, wholesale revenues totaled Ps.79.1 million, a decrease of 93.0% in comparison to Ps.1,132.1 million in the same period in 2017. The decrease was mainly driven by the termination of international traffic throughout our long distance network; and

- Revenue from other services accounted for 0.8% or Ps.10.6 million of total revenues in 2018, an increase from Ps.2.7 million recorded in the same period last year. Revenues from other services come primarily from mobile services granted by Celmax Movil, S.A. de C.V.

The following table sets forth our revenues for the periods indicated below:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **% Change** |
| | (in millions, except for percentages) | | |
| Commercial | 1,036.6 | 755.5 | 37.2% |
| Residential | 188.9 | 365.3 | -48.3% |
| Wholesale | 79.1 | 1,132.1 | -93.0% |
| Other revenue | 10.6 | 2.7 | 292.6% |
| Total Revenues | Ps.1,315.2 | Ps.2,255.6 | -41.7% |

The following table sets forth a breakdown of our ARPC for commercial customers for the periods indicated below:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **% Change** |
| Monthly charges | Ps.  41,874 | Ps.  29,796 | 40.5% |
| Usage | 11,319 | 10,417 | 8.7% |
| Subtotal | 53,193 | 40,213 | 32.3% |
| Non-recurring | 14,806 | 2,747 | 439.0% |
| Total | Ps.  67,999 | Ps.  42,960 | 58.3% |

Total ARPC (calculated as average revenue per customer by dividing the total commercial revenues for a given period by the average number of active commercial customers in such period) increased 58.3% from Ps.42,960 in the year ended December 31, 2017 to Ps.67,999 in the year ended December 31, 2018 The increase in ARPC is primarily the result to the growth of recurrent and non-recurrent charges.

The following table presents a breakdown of our ARPU for voice lines for the periods indicated below:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **% Change** |
| Monthly charges | Ps.  137.4 | Ps.  155.1 | (11.4)% |
| Usage | 4.5 | 6.8 | (33.8)% |
| Subtotal | 141.9 | 161.9 | (12.4)% |
| Non-recurring | 4.9 | 2.0 | 145.0% |
| Total | Ps.  146.8 | Ps.  163.9 | (10.4)% |

Total ARPU (calculated as average revenue per unit by dividing the total residential revenues for a given period by the average number of RGUs in service during such period) decreased 10.4% from Ps.163.9 in 2017 to Ps.146.8 in 2018. The decrease in ARPU is primarily the result of decreased monthly charges.

*Revenue Generating Units*

A-36

The term RGU represents an individual service subscriber who generates recurrent revenue for us. During 2018, we disconnected a total of 80,772 RGUs. As of December 31, 2018, we reported a total of 213,764 RGUs, a decrease of 27.4% in comparison to the same period last year.

The following table presents a breakdown of our RGUs by type of customer at December 31, 2018 and 2017 and the percentage variation:

|  | At December 31, | | |
|  | **2018** | **2017** | **% Change** |
|---|---|---|---|
| Commercial | 131,038 | 124,674 | 5.1% |
| Residential | 63,774 | 150,790 | 57.7% |
| Wholesale lines | 18,952 | 19,072 | 0.6% |
| Total lines | 213,764 | 294,536 | 27.4% |

*Operating Costs and Expenses*

Our operating costs and expenses decreased 38.6% from Ps.2,248.1 million in 2017 to Ps.1,380.5 million in 2018. This decrease was primarily the result of:

- A decrease of Ps.900.2 million, or 70.7% in network operating services primarily due to (i) a Ps.38.0 million decrease in TV content costs,(ii) a Ps 107.3 million increase in network associated costs, (iii) a Ps.978.2 million decrease in long-distance interconnection costs,(iv) a Ps.1.9 million decrease in local interconnection costs and (iv) a Ps.10.6 million increase in costs related to mobile telephony;

- An increase of Ps 3.0 million, or 3.0% in technical expenses primarily due to (i) a Ps.4.2 million decrease in network maintenance costs and (ii) a Ps.7.2 million increase in other technical expenses;

- A decrease in disconnection expenses in 2018 by Ps.2.6 million;

- Ps.26.7 million, or 12.7% increase in depreciation and amortization expenses; and

- An increase of Ps.17.0 million, or 3.9% in selling, general and administrative expenses mainly due to (i) a Ps.18.0 million increase in salaries, wages and benefits,(ii) a Ps.15.2 million increase in bad debt reserve and (iii) a Ps.16.5 million decrease in leases.

*Comprehensive Cost of Financing*

Our comprehensive cost of financing was Ps.221.4 million in 2018, a 911.0% increase compared to Ps.21.9 million in 2017.

The following table sets forth our comprehensive cost of financing for the periods indicated below:

|  | For the Year Ended December 31, | | |
|  | **2018** | **2017** | **%** |
|  | (in millions, except for percentages) | | |
|---|---|---|---|
| Interest expense | (178.9) | (174.1) | 2.8% |
| Interest income | 12.3 | 32.2 | (61.8)% |
| Foreign currency gain (loss) | (10.5) | 102.6 | (110.2)% |
| Effects of valuation of financial instruments | (44.3) | (72.8) | (39.1)% |
| Gain on repurchase of senior notes | - | 90.2 | (100.0)% |
| Total | Ps.(221.4) | Ps.(21.9) | 911.0% |

A-37

The increase of comprehensive cost of financing was primarily due to:

- An increase of Ps.4.8 million or 2.8% in interest expense due to the change in the step-up interest rate of the old notes to 8% beginning in the second half of 2018, compared to 7% for the first half of 2018 and all of 2017;

- A decrease of Ps.19.9 million or 61.8% in interest income due to reduced cash balances;

- A decrease in foreign currency gain of Ps.113.1 million or 110.2% due to a slight appreciation of 0.3% in the exchange rate in 2018 compared to an appreciation of 4.5% during 2017;

- A decrease of Ps.28.5 million or 39.1% in valuation effects of financial instruments; and

- A decrease of Ps.90.2 million or 100% in gain on the repurchase of senior notes in 2018 compared to 2017. In 2017, we realized a partial cash tender offer and purchased US$13.1 million principal amount of its outstanding senior notes.

*Tax Provisions*

We recorded an expense of Ps.28.7 million in tax provisions during 2018, compared to the expense of Ps.1.4 million recorded in 2017.

*Reconciliation of effective tax rate:*

|  | 2018 | | 2017 | |
|---|---|---|---|---|
|  | % | $ | % | $ |
| Loss before income taxes |  | $ (286,659) |  | $ (14,485) |
| Total tax expense (benefit) using the Company's domestic tax rate | (30) | $ 87,091 | (30) | $ 4,346 |
| Inflationary effect | 10 | (27,514) | (246) | 35,582 |
| Non-deductible expenses | 16 | (45,405) | 2,256 | (326,835) |
| Allowance of doubtful accounts (non-deductible) | 24 | (68,691) | 1 | (177) |
| Anticipated payments | 4 | (12,506) | (31) | 4,530 |
| Financial coverage | (1) | 3,469 | (90) | 13,000 |
| Telecommunications network systems and equipment | (26) | 75,007 | (1,719) | 249,042 |
| Change in valuation reserve | (43) | 122,866 | (204) | 29,577 |
| Tax losses to be amortized | 56 | (161,984) | 95 | (13,711) |
| Employee benefits | 1 | (699) | (25) | 3,553 |
| Paid profits to employees | 1 | (306) | 2 | (346) |
|  | 10 | $ (28,672) | 10 | $ (1,439) |

**Year Ended December 31, 2017 Compared to Year Ended December 31, 2016**

*Net Revenues*

Our net revenues decreased 8.6%, from Ps.2,468.9 million in 2016 to Ps.2,255.6 million in 2017. The decrease was primarily due to the following factors:

LEGAL_US_E # 142338261.4

- Commercial revenues accounted for 33.5% of total revenues in 2017, compared with 27.2% in 2016. Commercial revenues in 2017 totaled Ps.755.5 million, an increase of 12.6%, or Ps.84.8 million compared to Ps.670.7 million in 2016. This increase in revenue is explained by an increase in data services of Ps.41.5 million, an increase in added value services by Ps.8.3 million and a decrease in recurrent revenues by Ps.37.8 million;

- Residential revenues accounted for 16.2% of total revenues in 2017, compared to 23.0% in 2016. Residential revenues totaled Ps.365.3 million, a decrease of 35.6% or Ps.201.8 million compared to PS.567.1 million in 2016. The decrease in revenues is due to a decrease in voice service revenues of Ps.21.0 million, a decrease in pay TV of Ps.66.6 million, a decrease in Internet services of Ps.107.1 million and a decrease in mobile telephony services of Ps.7.1 million;

- Wholesale services revenue totaled Ps.1,132.1 million in 2017, a decrease of 8.0%, compared to PS. 1,231.1 million in 2016; and

- Revenue from other services accounted for 0.1% or Ps.2.7 million of total revenues in 2017. Revenues from other services come primarily from mobile services granted by Celmax Movil, S.A. de C.V.

The following table sets forth our revenues for the periods indicated below:

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2017 | 2016 | % Change |
|  | (in millions, except for percentages) | | |
| Commercial | 755.5 | 670.7 | 12.6% |
| Residential | 365.3 | 567.1 | -35.6% |
| Wholesale | 1,132.1 | 1,231.1 | -8.0% |
| Other revenue | 2.7 | - | - |
| Total Revenues | Ps. 2,255.6 | Ps.2,468.9 | -8.6% |

The following table sets forth a breakdown of our ARPC for commercial customers for the periods indicated below:

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2017 | 2016 | % Change |
| Monthly charges | Ps. 29,796 | Ps. 18,139 | 64.3% |
| Usage | 10,417 | 9,289 | 12.1% |
| Subtotal | 40,213 | 27,428 | 46.6% |
| Non-recurring | 2,747 | 624 | 340.2% |
| Total | Ps. 42,960 | Ps. 28,052 | 53.1% |

Total ARPC (calculated as average revenue per customer by dividing the total commercial revenues for a given period by the average number of active commercial customers in such period) increased 53.1% from Ps.28,052 in 2016 to Ps.42,960 in 2017. The increase in ARPC is primarily the result of the increase in recurrent and non-recurrent charges.

The following table presents a breakdown of our ARPU for voice lines for the periods indicated below:

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2017 | 2016 | % Change |
| Monthly charges | Ps. 155.1 | Ps. 138.5 | 12.0% |
| Usage | 6.8 | 10.1 | (32.7)% |
| Subtotal | 161.9 | 148.6 | 9.0% |

A-39

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | **2017** | **2016** | **% Change** |
| Non-recurring | 2.0 | 1.7 | 17.6% |
| Total | Ps. 163.9 | Ps. 150.3 | 9.0% |

Total ARPU (calculated as average revenue per unit by dividing the total residential revenues for a given period by the average number of RGUs in service during such period) increased 9.0% from Ps.150.3 in 2016 to Ps.163.9 in 2017. The increase in ARPU is primarily due to a combination of the increase in recurrent charges and decrease in usage.

*Revenue Generating Units*

The term RGU represents an individual service subscriber who generates recurrent revenue for us. During 2017, we disconnected a total of 72,752 RGUs. As of December 31, 2017, Maxcom reported a total of 294,536 RGUs, a decrease of 19.8% in comparison to the same period last year.

The following table presents a breakdown of our RGUs by type of customer at December 31, 2017 and 2016 and the percentage variation:

|  | At December 31, | | |
|---|---|---|---|
|  | **2017** | **2016** | **% Change** |
| Commercial | 124,674 | 127,648 | (2.3)% |
| Residential | 150,790 | 220,568 | (31.6)% |
| Wholesale lines | 19,072 | 19,072 | -% |
| Total lines | 294,536 | 367,288 | (19.8)% |

*Operating Costs and Expenses*

Our operating costs and expenses decreased by 44.2% from Ps.4,029.7 million as of December 31, 2016 to Ps.2,248.1 million in 2017. This decrease was mainly due to:

- A decrease of Ps.162.4 million, or 11.3% in network operating services primarily due to (i) a Ps.37.6 million decrease in TV content costs,(ii) a Ps 23.1 million decrease in network associated costs, (iii) a Ps.88.7 million decrease in long-distance interconnection costs,(iv) a Ps.0.8 million decrease in local interconnection costs and (v) a Ps.12.2 million decrease in costs related to mobile telephony;

- A decrease of Ps 7.9 million, or 7.4% in technical expenses primarily due to (i) a Ps.4.4 million decrease in network maintenance costs and (ii) a Ps.3.5 million decrease in other technical expenses;

- A decrease in disconnection expenses in 2017 by Ps.4.6 million;

- A decrease of Ps.156.1 million, or 42.6% in depreciation and amortization expenses;

- During 2016, the Company recorded an impairment to the useful life of certain assets by Ps.1,046.3 million; and

- A decrease of Ps.150.9 million, or 25.3% in selling, general and administrative expenses mainly due to (i) a Ps.62.6 million decrease in salaries, wages and benefits, (ii) a Ps.40.9 million decrease in bad debt reserve and (iii) a Ps.51.6 million decrease in consultancy fees.

*Comprehensive Cost of Financing*

Our comprehensive cost of financing was Ps.21.9 million in 2017, a 96.0% decrease compared to Ps.550.4 million in 2016.

The following table sets forth our comprehensive cost of financing for the periods indicated below:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2017** | **2016** | **% Change** |
| | (in millions, except for percentages) | | |
| Interest expense........................................................ | (174.2) | (168.4) | 3.4% |
| Interest income........................................................ | 32.2 | 38.5 | -16.3% |
| Foreign currency gain (loss) .................................... | 102.6 | (428.4) | -124% |
| Effects of valuation of financial instruments............................. | (72.8) | (99.3) | -26.7% |
| Gain on repurchase of senior notes........................................ | 90.2 | 107.2 | -0.0% |
| Total.................................................................. | Ps.(21.9) | Ps.(550.4) | -96.0% |

The increase of the comprehensive cost of financing was primarily due to:

- An increase of Ps.5.7 million or 3.4% in interest expense due to the change in the step-up interest rate of the old notes to 7% in 2017, compared to 6% in 2016;

- A decrease of Ps.6.3 million or 16.3% in interest income;

- A decrease in foreign currency gain of Ps.531.0 million or 123.9% due to a depreciation of the Mexican peso of 4.5% during 2017. Ps.102.6 million against a loss of Ps.428.4 million registered in the same period of 2016, giving a swing to the loss by Ps.531.0 million or 124%. The effect is explain by the appreciation of 4.5% in the exchange rate during 2017;

- An increase of Ps.26.5 million or 26.7% in valuation effects of financial instruments; and

- A gain on repurchase on senior notes of Ps.90.2 million due to a partial cash tender offer and purchased of US$13.1 million principal amount of senior notes.

*Tax Provisions*

During 2017, we recorded an expense of Ps.1.4 million in tax provisions, compared to a benefit of Ps.7 million recorded in 2016.

LEGAL_US_E # 142338261.4

*Reconciliation of effective tax rate:*

| | 2017 | | 2016 | |
|---|---|---|---|---|
| | % | $ | % | $ |
| Loss before income taxes | | Ps. (14,485) | | Ps. (2,111,170) |
| Total tax expense (benefit) using the Company's domestic tax rate | (30%) | 4,346 | (30%) | 633,351 |
| Inflationary effect | (246%) | 35,582 | 9% | (181,692) |
| Non-deductible employee benefits | (25%) | 3,553 | 0% | 3,299 |
| Unrealized exchange rate loss and doubtful accounts (non-deductible) | 541% | (78,294) | 23% | (478,649) |
| Unrecognized deferred tax assets | (121%) | 17,530 | 1% | 17,279 |
| Other | (109%) | 15,845 | 0% | (574) |
| | 10% | Ps. (1,438) | 0% | Ps. (6,986) |

## Liquidity and Capital Resources

### Overview

Our business is capital intensive. We have historically met our working capital and capital expenditure requirements through our various debt arrangements, vendor financings and the sale of equity to investors. As of December 31, 2018, we had Ps.456.5 million (US$23.6 million) of cash and temporary investments. As of March 31, 2019, we had Ps.386 million (US$19.9 million) of cash and temporary investments.

We maintain the majority of our cash in U.S. dollar currency accounts with financial institutions in the United States. These security accounts bear interest at money market levels. The remainder of our cash is deposited with Mexican and American banks and invested daily in peso-denominated and dollar-denominated interest bearing securities.

Our principal uses of cash have included debt service, capital expenditures and working capital. We expect that these will remain our principal uses of cash in the future. We expect to use approximately Ps.385 million (US$20 million) of cash during 2019 to fund capital expenditures in connection with the acquisition and renewal of equipment and infrastructure growth in our commercial segment. This amount includes the renewal of 15 GHz and 23 GHz frequencies. As of March 31, 2019, we used Ps.68 million (US$4 million) of cash in connection with the construction of last-mile infrastructure, increase in network capacity and renewal of equipment.

### Liquidity

As of December 31, 2018, we had Ps.456.5 million (US$23.6 million) of cash and temporary investments. As of March 31, 2019, we had Ps.386 million (US$19.9 million) of cash and temporary investments.

The following table shows the generation and use of cash in 2016, 2017 and 2018 and in the three months ended March 31, 2018 and 2019.

| | December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | 2019 | 2018 |
| | | | | (Unaudited) | |
| | | | *(in millions of pesos)* | | |
| Net resources provided by (used in) operating activities | 50 | 52 | 444 | 117 | (101) |
| Net resources provided by (used in) investing activities | 7 | (202) | (201) | (635) | (56) |
| Net resources provided by (used in) financing activities | (187) | (94) | (237) | 440 | 2 |

A-42

| | December 31, | | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- | --- |
| | **2018** | **2017** | **2016** | **2019** | **2018** |
| | | | | (Unaudited) | |
| | | | *(in millions of pesos)* | | |
| Cash and cash equivalents at period end .......................................... | 457 | 585 | 838 | 386 | 431 |

*Resources Provided by Operating Activities*

For the three months ended March 31, 2019 resources provided by operating activities increased by Ps.218 million from the same period in 2018. This increase was mainly due to the sale of two optical channels within our long distance backbone routes for US$8.3 million and a Ps.23 million increase due to the adoption of IFRS 16.

For the year ended December 31, 2018, resources provided by operating activities were Ps.2 million, compared to Ps.52 million in 2017. This decrease was mainly due to lower cash generation as a result of contraction of the residential and wholesale business units. We also experienced an increase in net loss of Ps.299.4 million, which was largely due to the effects of foreign exchange gains and profits recorded from the bond repurchase registered in 2017. In addition, in 2018 we experienced an increase in resources as a result of changes in working capital items, such as, (i) an increase of Ps.45.5 million in accounts receivable and (ii) an increase of $ 36.3 million in accounts payable and provisions.

For the year ended December 31, 2017, resources provided by operating activities were Ps.52 million, compared to Ps.444.2 million in 2016. This decrease was mainly due to a decrease of Ps.2,096.7 million in net loss and a decrease of Ps.1,971.7 million in non-cash items included in the net loss. Additionally, in 2017, we recorded a decrease of Ps.168.9 million in resources compared to Ps.346.1 in 2016 was the result of changes in working capital items, primarily due to (i) a decrease of Ps.405.2 million in resources from accounts receivable; (ii) a decrease of Ps.80.2 million in resources from liabilities and (iii) a decrease of Ps.9.6 million in resources from inventory.

*Resources Provided by Financing Activities*

For the three months ended March 31, 2019, net resources used for financing activities increased by Ps.438 million compared to the same period in 2018. This decrease was mainly due to US$8.9 million used to repurchase our senior notes and the effects caused by the Ps.548 million recognition of leases in our balance sheet.

For the year ended December 31, 2018, net resources generated by financing activities decreased by Ps.93 million compared to 2017. This decrease was mainly due to (i) Ps.131.6 million generated from capital stock; (ii) a decrease of Ps.115 million generated by non-controlling interest and (iii) Ps.154 million used to repurchase our senior notes.

For the year ended December 31, 2017, net resources generated by financing activities were Ps.93.7 million compared to Ps.237.1 million in 2016. This difference is primarily due to (i) Ps.54.2 million generated from capital stock, (ii) Ps.8.5 million credit from less interest paid and (iii) a Ps.80.7 million increase in resources provided by other financing activities, mainly related to the repurchase of senior notes, which was partially offset by the credit provided by Bancomext.

*Resources Used for Investing Activities*

For the three months ended March 31, 2019, net resources used for investing activities decreased by Ps.579 million. This increase was mainly attributable to the acquisition of equipment used for the sale of optical channels and the effect caused by the Ps.572 million recognition of the leases in our balance sheet.

For the year ended December 31, 2018, net resources used for investing activities increased by Ps.209.4. This increase is mainly attributed to the Ps.196.6 million received from the sales of communication towers.

A-43

For the year ended December 31, 2017, net resources used for investing activities increased by Ps.1 million. The incremental effect is mainly due to the disbursement of capital investments made per Ps.478 million, which is offset by the inflow of cash from the sale of residential customers to Megacable for Ps.234 million.

### Financing Sources

Our Step-Up Senior Notes due 2020 (the "old notes") are governed by an indenture that Maxcom and its subsidiaries entered into with The Deutsche Bank Trust Company Americas, acting as trustee, on October 11, 2013 (the "old notes indenture"). The old notes indenture contains certain covenants that among other things, limit the ability of the Company and subsidiaries to incur additional indebtedness and issue preferred stock, pay dividends, make other restricted payments and investments, create liens, incur restrictions on the ability of the Company's subsidiaries to pay dividends or other payments to them, sell assets, merge or consolidate with other entities, and enter into transactions with affiliates.

The old notes indenture prohibits us from incurring additional indebtedness (other than permitted indebtedness) unless our leverage coverage ratio would be no greater than (i) 4.25 to 1 in the case of any incurrence or issuance on or before December 31, 2013, (ii) 4.00 to 1 in the case of any incurrence or issuance on or after January 1, 2014 and on or before December 31, 2014 and (iii) 3.50 to 1 in the case of any incurrence or issuance on or after January 1, 2015, determined on a pro forma basis (including a pro forma application of the net proceeds there from). Our leverage ratio as of a specific date is the ratio of (i) the aggregate principal amount of our outstanding indebtedness plus the amount of all obligations in respect of the repayment of certain specified stock and the liquidation preference of preferred stock of our restricted subsidiaries to (ii) our aggregate EBITDA for the period consisting of the last two full fiscal quarters for which financial statements are publicly available multiplied by two. Regardless of our leverage ratio, we may incur permitted indebtedness, which includes, among other things:

- indebtedness, not to exceed US$15.0 million at any time outstanding, represented by capital lease obligations, financings or purchase money obligations, in each case, incurred for the purpose of financing all or any part of the purchase price or cost of design, construction, installation or improvement of property, plant or equipment used in the permitted business of the company, in an aggregate principal amount, including all permitted refinancing indebtedness incurred to renew, refund, refinance, replace, decrease or discharge any such indebtedness;
- hedging obligations for the purpose of managing our exposure to fluctuations in interest rates with respect to indebtedness permitted to be incurred by us pursuant to the old notes indenture or protecting us against currency fluctuations in the ordinary course of business and not for speculative purposes; and
- indebtedness not to exceed US$20.0 million in an aggregate principal amount at any time outstanding, including all permitted refinancing indebtedness incurred to renew, refund, refinance, replace, decrease or discharge such indebtedness.

The old notes indenture contains events of default, including, without limitation, (subject to customary grace periods, cure rights and materiality thresholds) defaults based on (i) the failure to make payments of interest or principal when due, (ii) breaches of covenants, (iii) cross-defaults and cross acceleration to other material indebtedness, (iv) bankruptcy events, (v) material judgments and (vi) the actual or asserted invalidity of any guarantee. If any such event of default occurs, the notes could be declared due and immediately payable. Subject to certain exceptions, the old notes indenture prohibits us and any of our restricted subsidiaries from entering into an affiliate transaction, unless (i) the transaction is on terms no less favorable to us or the relevant restricted subsidiary than those that would have been obtained in a comparable transaction by us or such restricted subsidiary with an unrelated entity; (ii) in transactions involving in excess of US$2.5 million, a majority of the disinterested directors have determined that the transaction complies with (i); and (iii) in transactions involving in excess of US$6.0 million, we deliver to the trustee a fairness opinion from an investment banking firm of national standing.

In addition, on October 14, 2015, we entered into an unsecured loan operating agreement with Banco Nacional de Comercio Exterior, S. N. C., Banca de Desarrollo ("Bancomext") of up to US$150 million for a five-year term with monthly amortizations payments. Simultaneously with the unsecured loan operating agreement, we entered into a trust agreement, whereby we agreed to transfer cash flows from time to time arising from the collection of specific bank accounts and appointing Bancomext as first beneficiary under the trust. The trust is a

liquidity mechanism to be used exclusively as an alternative source for paying the loan. The loan was bears interest at the rate of 9.8% and expires in 2020.

### *Indebtedness*

Our consolidated debt as of March 31, 2019 was Ps.2,583 million (US$134 million), of which Ps.1,955 million (US$101 million) was long-term debt. Our ratio of debt to EBITDA was 9.0 as of March 31, 2019.

The following table presents a breakdown of our consolidated debt as of March 31, 2019:

|  | As of March 31, 2019 [1] | |
| --- | --- | --- |
|  | (pesos and U.S. dollars in thousands) | |
| **Short-term financing:** | | |
| Leases | US$ 4 | Ps.87 |
| Bank Loan | 2 | 30 |
| Accrued interest | 3 | 49 |
| Total short-term financing | 9 | 166 |
| **Long-term payable notes:** | | |
| Bank Loan | 1 | 15 |
| Leases | 24 | 461 |
| Step-Up Senior Notes | 100 | 1,940 |
| Total long-term payable | US$ 125 | Ps.2,417 |
| **Total Indebtedness** | US$ 134 | Ps.2,583 |

(1)   Peso amounts were converted to U.S. dollars at the exchange rate of Ps.19.3201 per US$1.00, as reported by the Federal Reserve Bank of New York as its noon buying rate for pesos on March 31, 2019.  Such conversions are for the convenience of the reader and should not be construed as representations that the peso amounts actually represent such U.S. dollar amounts or could be converted into U.S. dollars at the rate indicated, or at all.

### *Capital Expenditures*

Through March 31, 2019, we have invested Ps.68 million (US$3.5 million) in the build-out of our network operating support system and other capital expenditures, excluding cumulative pre-operating expenses and the expenses related to the issuance of several debt instruments.  Our capital expenditures as of March 31, 2019 amounted to Ps.68 million (US$3.5 million).  The expected capital expenditures required to keep our business operational for 2019 are approximately Ps.360 million (US$18.6 million) which mainly consists of network and information technology infrastructure maintenance and support and renewal of point-to-point microwave concessions for frequency segments in the 15 and 23 GHz bands.

Through December 31, 2018, we had invested Ps.204.6 million in the construction of last-mile connectivity for commercial customers and in the increase of network capacity. During 2017, we invested Ps.243 million in telephone network systems and equipment. In 2016 we invested Ps.477.7 million in the expansion of our operating system network support, excluding cumulative pre-operating expenses and expenses related to the issuance of various debt instruments.

### Tabular Disclosure of Contractual Obligations

The following is a summary of our contractual obligations as of March 31, 2019:

|  | Payments Due By Period | | | | |
| --- | --- | --- | --- | --- | --- |
|  | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|  | *(in millions of pesos)* | | | | |
| Long-term debt obligations | 1,985 | 30 | 1,955 | - | - |

LEGAL_US_E # 142338261.4

| | Payments Due By Period | | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
| Capital lease and vendor financing accrued interest at March 31, 2019..... | 548 | 87 | 461 | - | - |
| Debt obligation interest............................. | 49 | 49 | - | - | - |
| Operating lease obligation ........................ | - | - | - | - | - |
| Total ......................................................... | 2,583 | 166 | 2,417 | - | - |

## Quantitative and Qualitative Disclosure about Market Risk

### *Interest Rate Risk*

We currently believe that increases in interest rates in the international markets will not have a material direct adverse impact on our financial results or cash flows because as of March 31, 2019, all of our debt bears fixed rates of interest. Our results and cash flows could be impacted if additional financing is required in the future and interest rates are higher.

### *Foreign Currency Fluctuation*

Our principal foreign currency fluctuation risk involves changes in the value of the peso relative to the U.S. dollar. Although U.S. dollar-denominated revenues and expenses, including capital expenditures, are exposed to foreign currency fluctuations, our financial debt instruments have greater exposure. As of March 31, 2019, the amount of debt denominated in U.S. dollars was Ps.1,940 million.

Depreciation of the peso against the U.S. dollar results in an increase of our U.S. dollar-denominated revenues from our wholesale commercial segment and expenses as reported in pesos. Conversely, appreciation in the value of the peso against the U.S. dollar results in decreases to U.S. dollar-denominated revenue and expenses as reported in pesos.

Interest expense on our U.S. dollar-denominated debt, as expressed in pesos in our financial statements, varies with exchange rate fluctuations. Depreciation of the peso, results in increases in interest expense on a pesos basis.

We record foreign exchange gains or losses when the peso appreciates or depreciates against the U.S. dollar. Because our U.S. dollar-denominated monetary liabilities have exceeded, and are expected to continue to exceed, our U.S. dollar-denominated monetary assets, depreciation of the peso, against the U.S. dollar will result in foreign exchange losses.

The peso-to-dollar exchange rate may experience significant devaluations in the future. Further declines in the value of the peso relative to the U.S. dollar could adversely affect our ability to meet our U.S. dollar-denominated obligations, including the old notes.

As of the date of this statement, we have terminated our cross-currency swaps, which formerly covered the interest portion of the old notes for a notional amount of US$70 million maturing on June 15, 2020.

## Critical Accounting Policies

We have identified certain key accounting estimates on which our financial condition and results of operations are dependent. These key accounting estimates most often involve complex matters or are based on subjective judgments or decisions that require management to make estimates and assumptions which affected the

LEGAL_US_E # 142338261.4

amounts reported in the financial statements. We base our estimates on historical information, where applicable and other assumptions that we believe are reasonable under the circumstances.

Actual results may differ from our estimates under different assumptions or conditions. In addition, estimates routinely require adjustments based on changing circumstances and the receipt of new or more accurate information. In the opinion of our management, our most critical accounting estimates under IFRS are those that require management to make estimates and assumptions that affect the reported amounts related to the accounting for fair value of derivatives and other financial instruments, valuation of non-current assets, other intangible assets, income taxes and employee benefit obligations, revenue recognition from bundled contracts, estimates related to revenues and determination of allowance for doubtful accounts receivable. For a full description of all of our accounting policies, see our Annual Financial Statements and Interim Unaudited Financial Statements included in this statement.

### *Applications of Critical Accounting Policies and Estimates*

We have identified certain key accounting estimates on which our consolidated financial condition and results of operations are dependent. These key accounting estimates most often involve complex matters or are based on subjective judgments or decisions that require management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. We base our estimates on historical experience, where applicable and other assumptions that we believe are reasonable under the circumstances. Actual results may differ from our estimates under different assumptions or conditions. In addition, estimates routinely require adjustment based on changing circumstances and the receipt of new or better information. In the opinion of our management, our most critical accounting estimates under IFRS are those that require management to make estimates and assumptions that affect the reported amounts related to the carrying amount of telephone network systems and equipment, intangible assets, pre-operating expenses and frequency rights, including depreciation and amortization rates, assumptions made for the calculation of the impairment test to long lived assets, inventories, construction in progress of telephone network systems and equipment and deferred income tax assets; valuation of financial instruments; and obligations related to employee benefits, revenue recognition from bundled contracts, estimates related to revenues and determination of allowance for doubtful accounts receivable. For a full description of all of our accounting policies, see notes 5 and 6 to the consolidated financial statements included herein.

There are certain critical estimates that we believe require significant judgment in the preparation of our consolidated financial statements. We consider an accounting estimate to be critical if:

- it requires us to make assumptions because information was not available at the time or it included matters that were highly uncertain at the time we were making the estimate; and

- changes in the estimate or different estimates that we could have selected would have had a material impact on our financial condition or results of operations.

### *Fair Value of Stock Options and Warrants*

Stock options and warrants granted to members of our board of directors, officers and employees require a fair value-based accounting at the grant date. The total amount of compensation costs recognized for an award of stock based employee compensation is based on the fair value so determined. Fair value is defined as the amount for which an asset could be exchanged, or a liability settled, between knowledgeable willing parties in an arm's-length transaction. We estimate fair values using option pricing models, which require the use of certain assumptions, such as expected term of the option, expected volatility, risk-free interest rate during expected term and expected dividend yield. Those assumptions are subjective and involve management judgment. The imprecision in estimating these factors may affect the amount of compensation cost recorded for stock-based employee compensation.

### *Allowance of Doubtful Accounts Receivable*

The allowance for doubtful receivables is based on the expected credit loss model, which requires us to account for expected credit losses and changes in those expected credit losses on each reporting date so as to reflect the changes in credit risk as of the initial recognition of the financial assets. Unlike the credit loss model required under IAS 39, it is no longer necessary for a credit event to have occurred in order for credit losses to be recognized.

The allowance for doubtful accounts represents our estimate of losses resulting from the failure or inability of our customers to make required payments. Determining our allowance for doubtful accounts receivable requires significant estimates. We believe that our allowance will be sufficient to cover the potential risk of impairment; however, actual results may differ from our estimates, and this discrepancy could result in a significant adjustment to the book values of our receivables for the following year. At December 31, 2018 and March 31, 2019, our provision for bad debt was Ps.156.9 million and Ps.134.8 million, respectively. We consider this provision sufficient to cover the potential risk of uncollectible accounts; however, we cannot assure that we will not be required to increase the amount of this provision in the future.

### *Revenue Recognition under IFRS*

We recognize revenue as each of our performance obligations is completely satisfied, which takes place when our services have been rendered and when control over goods has been transferred.

Generally, installation expenses are charged to our residential customers and related revenues are recognized when installation is complete.

Revenues from public telephony services are recognized based on the cash collected and the estimated uncollected cash from services rendered at the date of the financial statements.

We also have interconnection agreements for long-distance and mobile services with other telephony companies. However, they do not include the clause of the "bill and keep" compensatory agreement.

Revenues from pay television services are recognized as rendered.

Revenues from lease of transmission capacity through the fiber optic ring are recorded in deferred revenue when billed in advance and then recognized ratably into revenue over the term of the contract.

Revenue from bundled services is recognized in the month in which the services are provided. Bundle revenues are distributed among voice, data, pay TV or mobile services.

We record an allowance in the amount of 90% of accounts receivable with balances due over 90 but less than 119 days old, and of 100% of accounts receivable due over 120 days old, except when there is a collection agreement with a client. In such cases, the allowance amount is 30% with balances due over 90 days if there is not a settlement negotiated with the client. Accounts handed over to our legal collection services are reserved up to 100%, or less depending on the success rate indicated by the attorney handling the account.

A-48

*Valuation of Long-Lived Assets*

We review fixed, definite lived intangible and other long-lived assets at least annually under IAS 36. Impairment reviews require a comparison of the estimated future discounted cash flows to the carrying value of the asset. If the total of the discounted cash flows is less than the carrying value, an impairment charge is recorded for the difference between the estimated fair value and the carrying value of the asset. In making such evaluations, we estimated the fair value of the long-lived assets as well as the discounted cash flows. In determining our discounted cash flows, we make significant assumptions and estimates in this process regarding matters that are inherently uncertain, such as estimating remaining useful lives and the possible impact that inflation may have on our ability to generate cash flows, as well as customer growth and the appropriate discount rate. Although we believe that our estimates are reasonable, different assumptions regarding such remaining useful lives or future cash flows could materially affect the valuation of our long-lived assets.

Upon adoption of the ASC Topic 360-10 (formerly Statement of Financial Account Standards (SFAS) No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets") and NIF C-15 and IAS 17 we were required to reassess the useful lives of our intangible assets, which primarily consist of Mexican government telecommunications concessions and infrastructure rights. Upon reassessment, we concluded that our concessions would be definite lived intangibles. We periodically reassess the useful lives of our concessions, in case there is evidence of impairment the value for such assets is adjusted.

We evaluate values of long lived assets when there are events or changes that reveal an indication of potential impairment. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net income expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated net income, an impairment charge is recognized by the amount that the carrying amount of the asset exceeds the fair value of the asset. Given the current adverse economic circumstances we have faced, there have been indicators of potential impairment which have led us to test, our long-lived assets for impairments; involving significant judgment for the determination of fair value.

As of March 31, 2019, and December 31, 2018, 2017 and 2016 no impairment charges were recognized as a result of such impairment test.

*Deferred Taxes*

Deferred income tax is accounted for under the asset and liability method. Deferred income tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and in the case of income taxes, for operating loss and asset tax carry forwards. Deferred income tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred income tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

Significant management judgment is required in determining our provision for income taxes. Under IFRS, no valuation allowance is recognized; instead, deferred tax assets where recoverability is doubtful are not recognized.

| Year of Loss | Amount | Year of Maturity |
|---|---|---|
| 2010……………………………… | 4,605 | 2020 |
| 2011……………………………… | 244,235 | 2021 |
| 2014……………………………… | 12,042 | 2024 |
| 2015……………………………… | 427,784 | 2025 |
| 2016……………………………… | 485,156 | 2026 |
| 2017……………………………… | 92,069 | 2027 |
| 2018……………………………… | 546,770 | 2028 |

A-49

Total…………………………………                    Ps.1,812,661

As of March 31, 2019, we had cumulative tax losses in aggregate of Ps.1,812.7 million that will be carried forward against future taxable income as follows:

## INDUSTRY

Mexico is the second largest country in Latin America in terms of population, with approximately 129 million people, a gross domestic product of US$1.2 trillion and a gross domestic product per capita of over US$9,630 as of December 31, 2018, one of the highest GDPs per capita in Latin America.

It is expected that the Mexican telecommunications industry, the second largest in Latin America, will continue its upward trend. The telecommunications industry is classified as a tertiary sector within Mexican GDP, representing 4.62% of the GDP of the tertiary sector and 2.92% of total Mexican GDP. For the third quarter of 2018, there was growth of 4.27% in the GDP of the industry compared to the same period in 2017 and a similar trend in the year-end report. According to estimates from the Competitive Intelligence Unit ("CIU"), a consulting firm specialized in market research in Latin America, at the end of 2018, the telecommunications sector as a whole generated approximately Ps.491.2 billion, an annual growth of 5.0%, compared to the 3.0% in 2017.

It is anticipated that the growth of the sector will reach 5.6% in 2019, which is attributable to the reactivation of the Pay TV market, the growth in mobile ARPU derived from increased consumption of mobile data, a drop in fixed revenues and the growing consumption of broadband services, both fixed and mobile.

We anticipate that 2019 will be a year of growing dynamism for the telecommunications industry, resulting from improvements in both private and public infrastructure in Mexico, as well as potential concessions granted through radio spectrum bidding and the effective realization of investment projects of the new federal administration. We expect that these factors will contribute to the growth of the telecommunications industry in the coming years.

### Market Liberalization

The Mexican telecommunications market has long been dominated by Telmex, the former government owned telecommunications monopoly. However, since the Mexican government completed the privatization of Telmex in 1990, the Mexican telecommunications sector has become increasingly open to competition which has created an opportunity for competitive carriers to capture market share from Telmex.

On October 4, 2006, the Federal government enacted a new directive known as the "Convergence Regulations," (*Acuerdo de Convergencia de Servicios Fijos de Telefonía Local y Televisión y/o Audio Restringidos que se Proporcionan a través de Redes Públicas Alámbricas e Inalámbricas*). These regulations allow certain concessionaries of media and telecommunication services to provide other services not included in their original concessions through voluntary adherence to the regulations. Upon compliance with certain regulations, cable television providers are now allowed to provide voice and data services. Likewise, voice and data service providers, such as us and Telmex, upon compliance with certain regulations, are now allowed to provide television services. In addition, the Mexican government is allowing cable companies to act as "carriers of carriers" by providing bi-directional data, Internet broadband services and voice services, including VoIP services. As a result, we face significant competition from new entrants providing telephony services, including cable television providers. Several companies without legal authorization have begun to target the Mexican telecommunications market to offer telephone services through the Internet. Moreover, although we provide paid television services in some of our service areas, we are uncertain about our ability to provide these new services profitably due to the market penetration of current competitors providing similar services in such areas.

Number portability came into effect in Mexico enabling Mexican consumers and businesses to benefit from the added choice and convenience that number portability provides, allowing subscribers to easily switch communications providers without the time, inconvenience and expense associated with changing phone numbers. Portability is currently only possible from one fixed line network to another and from one mobile network to another, but the transfer between fixed and mobile networks is still not possible.

LEGAL_US_E # 142338261.4

On June 12, 2013 the Mexican Congress passed a bill to amend the Mexican Constitution in connection with the telecommunications and broadcasting (radio and television) industries. This amendment to the Mexican Constitution (articles 6, 7, 27, 28, 73, 78, 94 and 105) is aimed at strengthening competition and providing Federal Institute of Telecommunications (*Instituto Federal de Telecomunicaciones* or "IFT"), with broader capabilities to regulate the telecommunication and broadcasting industries. The enacted bill provides for a number of measures that include eliminating the limit on foreign investment in the telecommunications industry (including satellite operations) and raising the limit on foreign investment in the broadcasting industry to 49%. Additionally, the enacted bill provided for the issuance of two new broadcasting licenses to be awarded by public auction. The new bill also imposed "must carry" and "must offer" obligations on television companies. On a yearly basis, IFT publishes interconnection rates applicable for the next year.

In March 2014, IFT issued rulings declaring America Móvil and Grupo Televisa and certain of its respective subsidiaries AEPs in the telecommunications and broadcasting industries and imposing on these companies asymmetrical regulations compared to other telecommunications providers. It is still uncertain what the impact of such asymmetrical regulations in the telecommunications and broadcasting industries will mean for us.

On October 9, 2018, our shareholders approved a modification to our bylaws allowing up to 100% direct foreign investment in the Company pursuant to the changes adopted by the IFT's regulation (*Ley Federal de Telecomunicaciones y Radiodifusión* or "LFTR").

## Local Telephony Market

In connection with the privatization of Telmex, the Mexican government granted Telmex a six-year implied monopoly over local telephony services, which was eliminated in mid-1996 when the SCT published regulations governing the licensing of local services on a competitive basis. In order to promote competition in the local telephony market, the Mexican government auctioned several concessions in 1996, including the regional concession awarded to us for wireline local telephony service which was later expanded to a nationwide concession.

Each wireline local telephony concession granted by the Mexican government generally has a 30-year term and can be extended at the request of the concessionaire, subject to the approval of the SCT. Each concession authorizes, among others, the provision of local telephony services and value-added services such as voice mail, call hold, call forwarding, three-way calling and caller identification, in specified regions of the country.

The Mexican government also conducted auctions of the following spectrum frequencies:

- 450 MHz, 1.9 GHz (Personal Communications Services), or PCS, and 3.4-3.7 GHz (fixed wireless local loop) nationwide and regional frequency bands;

- 7, 15, 23 and 38 GHz frequency bands for nationwide point-to-point microwave transmission links; and

- 10.5 GHz frequency band for regional point-to-multipoint microwave transmission service.

In 1998, three companies won nationwide concessions for fixed wireless local loop frequencies, although one later forfeited its right for failure to pay concession fees. In addition, in 1997 six companies won concessions in the 1.9 GHz (Personal Communications Services) frequencies on either a nationwide or regional basis, although one also forfeited its right for failure to pay concession fees. See "—Mobile Telephony Market".

A-52

**Long-Distance Telephony Market**

In connection with the privatization of Telmex, the Mexican government granted Telmex an exclusivity period of 6 years for long-distance telephony services. In August 1996, the exclusivity period expired and competition commenced in January 1997. In order to promote competition among domestic and international long distance providers, the Mexican government granted several concessions, including the national concession awarded to us, for domestic and international long-distance services, as well as value-added services. Each concession generally has a nationwide scope and a 30 year term that can be extended at the request of the concessionary, subject to the approval of the IFT.

Other long-distance concessionaires include, among others, (i) Axtel, (ii) Alestra, (iii) Bestel, S.A. de C.V. ("Bestel"), (iv) Iusatel, S.A. de C.V. and (v) Marcatel, S.A. de C.V. ("Marcatel"). International liberalization trends will likely continue to impact the flow of long-distance telephone traffic to and from Mexico. In particular, demand for long-distance services may be inhibited by the increasing use of VoIP.

**Mobile Telephony Market**

The Mexican mobile telephony market is divided into nine regions. The SCT divided the cellular telephony system in each region into the cellular A-Band and cellular B-Band. Today, cellular A-Band concessions are owned by Telefonica Móviles, in cellular regions 1, 2, 3 and 4, and by Iusacell in cellular regions 5, 6, 7, 8 and 9. The main mobile telephony carriers in Mexico include:

- Telcel with nationwide Personal Communications Services and cellular concessions;

- Telefonica Móvistar with nationwide Personal Communications Services and regional cellular (regions 1 through 4) concessions;

- AT&T (which acquired Iusacell, Nextel and Unefon) with nationwide Personal Communications Services concessions; and

- Mobile Virtual Network Operators ("MVNOs"). On March 2016, the IFT issued an Administrative Disposition for MVNO authorizations in order to regulate the mobile services provided by these operators. As of today, some MVNOs are implemented in Mexico.

**Competition**

We primarily compete on the basis of customer service, value-added products and price in the local telecommunications market. Our main competitors are wireline and fixed wireless local telephone operators, although we also face competition from mobile wireless operators, cable television providers and Internet service providers.

Our core strategy is to focus on underserved markets by targeting new customers that do not currently receive the type of products and services we offer. In particular, our intention is to service markets with lower teledensity rates that are also underserved by Telmex.

LEGAL_US_E # 142338261.4

Although we provide long-distance service, we position such service as an integrated value-added service for our local telephony customers. As a result, in the residential market we do not offer our long-distance service separately from our local telephone service.

### Telmex

Our main local telephone competitor is Telmex, the incumbent carrier and former government-owned telecommunications monopoly. Telmex has significantly greater financial and other resources than those available to us. In addition, Telmex has an established customer base, which represents approximately 60% of the telephone service and broadband internet access in Mexico. Telmex customers still represent the main destination of outgoing calls from our network; therefore, local interconnection with Telmex is critical to our operations.

Telmex is a subsidiary of América Móvil, the leading provider of telecommunications services in Latin America, which ranks first in the sector for mobile, fixed, broadband and pay TV in terms of number of cash-generating units. América Móvil provides mobile services in Mexico through Telcel, which is the largest provider of mobile telecommunications services in the country in terms of number of users and operates networks with 3G technology and 4G technology with LTE protocol. América Móvil modernized a significant part of its network with advanced technology and continues to expand its 4G LTE network throughout the country and to invest in fiber optic cables. Currently, América Móvil has more than 213,000 kilometers of fiber optic cables.

## Other Competitors

We also face competition in local telephone from companies that were awarded concessions since the opening of the Mexican wireline telecommunications market in 1997. The most relevant competitors are Axtel-Alestra, Megacable, Grupo Televisa, Totalplay, Telefónica-Movistar and AT&T.

### Axtel-Alestra

Axtel was founded in July 1994 and began commercial operations in 1999 after winning several radio electric spectrum auctions. Axtel offers services of fixed and mobile telephony, pay TV, Internet, data, networks, integrated services and equipment sales. It serves the business, government, small businesses and residential markets in about 39 metropolitan areas including Mexico City, Monterrey, Guadalajara, Morelia, Acapulco and Matamoros.

Axtel has had notable growth in the broadband segment. Its world-class network consists of different access technologies including optic fiber, fixed wireless access, and point-to-point and point-to-multipoint links.

Alestra is a subsidiary of Alfa Group and was established in 1995 through an agreement between AT&T and BBVA Bancomer. Alestra began commercial operations in 1997 in the long distance business in Mexico. In 2011, Alfa became the sole shareholder of Alestra.

Alestra focuses on the commercial segment, including multinational companies, institutional clients, and small and medium enterprises. Alestra offers an extensive fiber optic network and data centers providing managed network services, IT, data, Internet and local telephony, as well as long distance services in main Mexican cities. Alestra has recently refocused its business strategy with more emphasis on the segment of value-added services. In 2015, Alestra reported revenues of Ps.6,163 million. As of December 31, 2018 access circuits provided to customers totaled 2.7 million, while the capacity at its five data centers reached 3,500 square meters.

In December 2015, Alestra and Axtel entered into merger agreement. This transaction became effective on February 15, 2016, on which date Axtel became a subsidiary of Alfa Group, who now owns a 51% stake of the combined entity, while the remaining 49% of Axtel-Alestra is owned by Axtel's existing shareholders. As a result of the merger, Axtel-Alestra has a strong competitive position, which includes the ability to provide services of information and communications technology to companies and triple play based on fiber optics to the high residential segment.

*Megacable*

Megacable was founded in 1978 to serve the markets of Sonora and Sinaloa. Currently Megacable is one of the largest cable operators in Mexico based on number of subscribers. It offers cable television services, Internet, fixed telephony (Megacable was one of the first cable operators to offer this service), integrated services, equipment, production and distribution of content. It serves the business market (from government to small and medium business) through its subsidiaries: Metrocarrier, MCM, HO1A and PCTV, as well as the residential segment. It has the largest extension of kilometers of optic fiber network and coaxial of the country.

*Grupo Televisa*

Televisa is the largest media company in the Spanish-speaking world and is one of the major players in the entertainment industry worldwide. Televisa is also an active participant in the telecommunications industry in Mexico. Televisa is the majority shareholder of Sky, a provider of satellite television services in Mexico. It also participates in the cable and telecommunications industry by offering services such as IP telephony, broadband Internet, cable television, value-added services and virtual networks in many regions of the country. It also provides transnational services to U.S. corporations and high-capacity connectivity between the United States and Mexico. Televisa is shareholder of several telecommunications companies in Mexico including Cablevision (which under the trademark Izzi Telecom), TVI, Cablecom, Cablemás, Telecable and Bestel.

*Totalplay*

Totalplay is a telecommunications company that was wholly acquired by Grupo Salinas in 2014. It offers a variety of Triple and Double Play services on an optic fiber network provided directly to customers' homes (FTTH). It began trial operations in September 2010 and launched its commercial operations in May 2011. It currently has coverage in 20 cities including Mexico City and Metropolitan Area, Monterrey, Guadalajara, Queretaro, Toluca, Puebla and San Luis Potosi. It offers interactive services such as pay TV, Internet and fixed telephony, through fiber optics, both for individuals and businesses.

*Telefónica Movistar*

Telefónica Movistar is a subsidiary of Grupo Telefónica that provides mobile telephony services. It is the second largest mobile phone company in Mexico by number of users and by nationwide coverage. It also offers fixed telephony services, mobile Internet, satellite Internet, public telephony, support services in the cloud, among others. By the end of 2015, Telefónica Movistar had an extensive national coverage of more than 93,000 localities, 81,000 highway kilometers and more than 26.3 million customers. They offer 3.5G technology in 40 thousand localities in Mexico, which is equivalent to 88.5% of the urban population, and they have recently launched their new 4G LTE network.

*AT&T*

In 2015, AT&T introduced a new competitor in the mobile telecommunications market in Mexico with the acquisition of Iusacell-Unefon for US$2,500 million and Nextel for US$1,875 million, positioning itself as the third largest company by users in the Mexico.

AT&T's strategy is to integrate Iusacell and Nextel to form a company focused on generating more choices, better service of mobile telephony and high-speed mobile internet to more places in Mexico. AT&T has the most reliable 4G LTE network in the United States and the strongest LTE signal of any US provider, the company intends to provide the same level of service in Mexico.

**Industry Regulation**

The telecommunications industry in Mexico is subject to the 2013 Federal Telecommunications and Broadcasting Law (*Ley Federal de Telecomunicaciones)* as well as any rulings and decisions issued by the IFT.

On June 12, 2013 the Mexican Congress passed a bill to amend the Mexican Constitution in connection with the telecommunications and broadcasting (radio and television) industries. This amendment to the Mexican Constitution (articles 6, 7, 27, 28, 73, 78, 94 and 105) is aimed at strengthening competition and providing the IFT with broader capabilities to regulate the telecommunication and broadcasting industries. The enacted bill provides for a number of measures that include eliminating the limit on foreign investment in the telecommunications industry (including satellite operations) and raising the limit on foreign investment in the broadcasting industry to 49%.

IFT has the authority to grant all concessions and permits, allocate spectrum frequencies, grant, and transfer, renew or revoke concessions and apply penalties for violations of provisions contained in the concession titles.

The terms of our concessions require us to satisfy a number of technical, build-out and financial conditions. A failure to comply with any of the terms of our concessions or to obtain the waiver or modification could result in the revocation or termination of any of our concessions, the imposition of new terms applicable to our concessions or imposition of fines. The Mexican government would not be required to indemnify us in case of such revocation or termination. See "—Concessions and Permits - Termination" below. A failure to comply with any of the terms of our concessions could also result in the loss of surety bonds (*fianzas*) that we were required to issue in favor of the IFT. We have issued surety bonds in the amount of Ps.0.52 million with respect to our local telephony and long-distance concessions, Ps.1.81 million with respect to all seven of our point-to-point microwave concessions and Ps.0.26 million with respect to all three of our point-to-multipoint microwave concessions.

## Concessions and Permits

The IFT grants concessions to operators of public telecommunications networks to provide specific telecommunications services in designated areas of Mexico or nationwide. In accordance with the amendments to the Mexican Constitution and the Federal Telecommunications and Broadcasting Law, telecommunications operators can apply for single concessions, for commercial, public, private or social use, which cover all the telecommunication services. For such effect, it is necessary to fulfill all the requirement pointed out in our legislation, among which are, complying with all and each one of the obligations derived from our current concession titles.

To provide telephony services in Mexico through a public network, a service provider must first obtain a concession from the IFT. Pursuant to the Federal Telecommunications and Broadcasting Law, concessions for public telephone networks may not exceed a term of 30 years and concessions for spectrum frequencies may not exceed a term of 20 years. Generally, concessions for public telephone networks may be extended for a term equivalent to the term for which the concession was originally granted if the concessionaire is in compliance with the terms of the concession and has filed an extension request in a timely manner prior to the expiration of the concession.

In addition to concessions, the IFT may also grant permits for installing, operating or exploiting transmission-ground stations and providing telecommunications services as a reseller. Under the Federal Telecommunications and Broadcasting Law, a company needs to notify the IFT through its electronic registration system, of the rates for telecommunication services it wishes to provide to be permitted to charge them to the public and, thereafter, such rates are made public information by the IFT.

## *Transfer*

Concessions are transferable if the IFT approves the transfer of the concession title, the assignee agrees to comply with the terms of the concession and such transfer does not violate the foreign ownership requirements of the Federal Telecommunications and Broadcasting Law.

A-56

*Termination*

A concession or a permit may be terminated pursuant to the Federal Telecommunications and Broadcasting Law upon the occurrence of any of the following events:

- expiration of its term;

- resignation by the concession holder or the permit holder;

- revocation; or

- dissolution or bankruptcy of the concession holder or the permit holder.

A concession or a permit may be revoked prior to the end of its term under certain circumstances, including:

- failure to exercise the rights of the concession within 180 days of the grant;

- failure to provide interconnection services to other holders of telecommunications concessions and permits without reason;

- loss of the concession or permit holder's Mexican nationality;

- unauthorized assignment, transfer or encumbrance of the concession or permit;

- unauthorized interruption of service;

- taking any action that impairs the rights of other concessionaires or permit holders;

- failure to comply with the obligations or conditions specified in the concession or permit (including making any necessary investments and capital expenditures); and

- failure to pay to the Mexican government its fee for the concession or, where applicable, its participation in the revenues of the holder of the concession.

The IFT may revoke a concession for violations in any of the circumstances referred to in the first four events described above. Under the last four events described above, the IFT would have to fine the concessionaire at least three times for the same failure before moving to revoke a concession. No indemnification may be claimed or paid in the event of revocation.

*Temporary Seizure*

LEGAL_US_E # 142338261.4

The Mexican government may also temporarily seize all assets related to a telecommunications concession or permit in the event of a natural disaster, war, significant public disturbance, threats to international peace or for economic reasons or for other reasons related to national security. If the Mexican government temporarily seizes such assets, it must indemnify the concession holder for all losses and damages, including lost revenues, except in the event of war where no payments are made. We are not aware of any instance in which the Mexican government has exercised its temporary seizure powers in connection with a telecommunications company; however, should this be the case, there is uncertainty as to when this indemnification would be paid and as to the actual amount payable.

### *Expropriation*

Pursuant to applicable law, the Mexican government has the statutory right to expropriate any telecommunications concession and claim any related assets for reasons of public interest or national security. Under Mexican law, the Mexican government is obligated to compensate the concession holder, considering any investments made and the depreciation of such assets, to the owner of such assets in the case of a statutory expropriation.

The amount of the compensation is determined by appraisers. If the party affected by the expropriation disagrees with the appraisal amount, such party may initiate judicial action against the government and require a judicial authority to determine such compensation amount. In such a case, the relevant judicial authority will determine the appropriate amount of compensation to be paid. We are not aware of any instance in which the Mexican government has exercised its expropriation rights in connection with a telecommunications company.

In the event of compensation for the temporary seizure or expropriation of a concession or a related asset, there can be no assurances that any such compensation paid by the government will be adequate or that the affected concessionaire will receive any such compensation in a timely manner.

### Rates for Telecommunications Services

Under the Federal Telecommunications and Broadcasting Law, rates for telecommunications services (including local, mobile and long-distance services) are freely determined by the providers of such services, except that such rates may not be set below a service provider's long-term incremental cost. All rates for telecommunications services (other than value-added services) must be registered with IFT before being applied to users.

In addition, the IFT is authorized to impose specific rates, quality and service requirements on those companies determined by IFT's Economic Competition Unit (*Unidad de Competencia Económica*) to have substantial market power pursuant to the provisions of Mexico's antitrust statute. The Federal Telecommunications and Broadcasting Law also prohibits telecommunications providers from cross subsidizing among their services and requires that they keep separate accounting for each of their services.

### Material Ongoing Obligations Relating to Our Concessions

Each concession title sets forth the ongoing obligations that we must meet on a monthly, quarterly or annual basis in relation to the IFT. Our principal ongoing obligations include the following:

- File information related to each concessionaire's shareholders on the first quarter of every year;

- Prepare a monthly report on any failures and interruptions of the services;

- Prepare quarterly quality of services reports which shall be filed before the IFT if required;

- Prepare commercial practices guidelines which shall be available for review by any third party;

- Prepare an emergency response plan which shall be filed before the IFT during the following six months after the relevant concession granting date;

- Notify the IFT of any relevant event that could affect the provision of the services or the performance of the network;

- Register its service fees with the IFT each time they are modified;

- File within the following 150 days after the last day of the preceding fiscal year (i) the corresponding audited financial statements, (ii) a description of the principal assets of the network, and (iii) a report on the employee training and teaching programs that are being implemented;

- Prepare a quarterly report on the status of the expansion and coverage of the network;

- Make available the internal statistics on traffic, routing and performance of the network;

- Grant a surety bond in favor of the IFT to guarantee its obligations under the concession;

- File with the IFT within the following 60 days after the concession granting date a plan describing the coverage and extension of the network; and

- File with the IFT the form of agreement to be entered with the concessionaire's subscribers.

Failure to comply with the above-mentioned obligations usually entails penalties investigated and proposed by the IFT.  In certain cases, failure to comply with these obligations may result in revocation of the relevant concession.

**Administrative Dispositions for Telecommunications Services Providers for the access to the National Electric System.**

On October 29, 2018, the Energy Regulatory Commission issued an Administrative Disposition for Telecommunications Services Providers in order to correctly access the infrastructure of CFE through the National Electric System. The Administrative Disposition include rules for Access Providers from CFE as well as for Telecommunications Services Providers, in order for the implementation of the National Electronic System. The Disposition became fully in effect on January 1, 2019 and as of that date, the Telecommunications Service Providers needs to report in the following 12 months all of CFE´s electric infrastructure in use and furthermore, comply with all regulatory matters in the following 24 months. It is important to consider that all of the equipment and cables using CFE´s electric infrastructure that is not reported during this period will be dismantled by the Access Providers from CFE.

**Municipal and Other Regulatory Approvals**

Our transmission antennas and telecommunication sites are located in sites that may require municipal and federal approvals to operate. See "Risk Factors—Risks Related to Our Business—Our telecommunications network infrastructure has several vulnerabilities and limitations".

# BUSINESS

## Overview

We are a facilities-based telecommunications provider using a "smart-build" approach to deliver "last-mile" connectivity to enterprises and residential customers in Mexico. Since our inception in 1996, we have targeted the business and residential customer segments which we believe have been underserved by Telmex, the local telephone incumbent, and other competing telecommunications providers. We provide a wide range of voice and data services on a bundled and unbundled basis, including local and long−distance voice, data, high speed, dedicated access and VoIP telephony.

We operate our own telecommunications network and support infrastructure, including the critical "last-mile" or customers' premise level infrastructure (modems, handsets and set-up boxes) for our residential segment, which allows us to control the quality of the user experience and adapt our service offerings to meet market demand. We believe the combination of innovative, bundled offerings, competitive pricing and dedicated customer service provides value for our customers, and has allowed us to maintain 156,571 voice lines in service as of December 31, 2018. We have a history of being the first provider in Mexico to introduce new services, including:

- the first commercial digital subscriber line broadband offering in 2005,

- the first "triple−play" (or cable, voice and broadband) offering to residential customers through a revenue−sharing agreement with cable television companies in 2005, and

- the first unbundled "quadruple−play" by adding mobile services to our bundled "triple−play" offering as a MVNO with Pegaso PCS, S.A. de C.V. on September 5, 2007.

- In addition, in August 2007, we launched paid TV services over our copper network using IP, representing the first IPTV offering in Mexico.

We operate in selected metropolitan areas that we believe offer opportunities for growth in telecommunications use through a combination of a concentrated population, low subscriber line penetration, potential expenditure in telecom services per customer and economic growth. We currently offer residential and business services in the cities of Puebla, Mexico City, Queretaro, San Luis Potosi, Guadalajara, Monterrey, Veracruz, Toluca, León, Aguascalientes, among others. We focus our development efforts on a small number of large cities where we seek to achieve strong penetration to capture operating efficiencies through a combination of network density and economies of scale. As of December 31, 2018, our network encompasses 1,393 kilometers of metropolitan fiber optic cable in 16 cities and over 504 kilometers of high-quality copper loops capable of high-speed data transmission in San Luis Potosi. We have three state-of-the-art Lucent Technologies 5ESS switches in service, located in Mexico City and Queretaro, one Georedundant IMS platform of high availability scheme between Mexico City and Queretaro, one Genband platform located in Mexico City and one Nortel CS2K located in Monterrey. We also operate a 155−kilometer fiber optic link connecting Puebla and Mexico City and a 6,382 kilometer long haul fiber optic backbone connecting Mexico City and Laredo, Texas, allowing us to have points of presence in the United States that allow us to sell data solutions to customers, thereby reducing their cost of Internet services. We have a point−to−point concession in the 15 GHz and 23 GHz frequency bands forming a complex microwave network through the cities of Mexico City, Puebla, Queretaro, San Luis Potosi and Veracruz in which we currently operate. This complex microwave network also passes through the cities of Aguascalientes, Guadalajara, Leon, Monterrey and Toluca, in which we intend to expand our offering and footprint to allow us to obtain additional customers. Additionally, we have recently upgraded our long-distance network data transport equipment, increasing our fiber optic network capacity to 200 GB.

For the year ended December 31, 2018, we invested Ps.205 million (US$10 million) in capital expenditures, primarily to develop last-mile connectivity for commercial clients and to increase our network capacity.

We manage all aspects of our services, including installation, provisioning, network monitoring and management, proactive trouble ticket management and billing. Because we control our network and are not dependent on local telephone providers for local loops, we are able to manage the speed of our service initiation and ensure the quality of our service offerings. We have a customer retention program that includes customer service call centers and a customer retention team dedicated to round-the-clock customer service. We believe our customers place high value on competitive pricing, quality of service and accurate billing.

We believe that our ability to offer high-quality bundled products at competitive prices, our customer service-oriented model, our locally focused modular network construction strategy, our focus on quality and reliability, and our state-of-the-art network and systems will allow us to benefit from the expected growth of the Mexican telecommunications industry.

## Competitive Strengths

We are an integrated services operator with the ability to manage information and communication technologies focusing on businesses, carriers and government customers. We offer local and long-distance voice services through our integrated cloud platforms into our high capacity backbone network, as well as Internet access through our state-of-the-art network. In addition to these services, we have added value services which minimize risk, increase productivity and strengthen security for our customers, allowing for automation of operations and the digitalization of their processes. All of our services are operated through our own network and interconnection agreements with other carriers.

### *Cost Efficient and Flexible, Reliable Technology.*

We deploy our network and service our customers' needs in a cost−efficient manner. We combine fiber optic, copper lines and microwave technology which we deploy for specific customers or areas based on customer requirements, deployment cost, time to market, time to revenue and profitability potential. Our network uses fiber optic trunks and heavy gauge copper loops, most of which do not exceed 3 kilometers in length, which provide us with the capability to deliver broadband data at speeds of up to 20 Mbps. The flexibility of our network allows us to provide value−added services such as video without major investments in its network. We use reliable and widely used technology for voice, data and IPTV services such as Centrex, and Asymmetric Digital Subscriber Line ("ADSL"), Very High Speed Digital Subscriber Line ("VDSL") and Gigabit-capable Passive Optical Network, ("GPON"), which we believe, ensures the reliability of our network. We intend to invest in and expand our network, improving its reliability and performance. We believe our network approach allows us to reach a much broader customer base than fiber−only networks and to provide voice and data services to commercial customers at lower cost than some competitors who only use wireless technology.

### *Valuable Last-Mile Ownership.*

We built our own last-mile infrastructure and own in excess of 504 kilometers of broadband-capable copper wire that passes by approximately 95,000 homes, connecting a majority of our end users to our fiber network and switches. As a result, we are not dependent on other telecommunications carriers for last-mile connectivity to reach our residential customers. Our broadband−capable last−mile infrastructure provides flexibility to offer additional value−added services in certain clusters and we expect this will enable our product offerings to develop with future market evolution and technology trends.

### *Recognized Brand Name and Customer Perception for Quality Services.*

Because we control the entire process of network provisioning, service implementation and initiation, we are able to ensure the quality of our service and maintain customer loyalty. We believe we have been able to achieve high customer satisfaction that has allowed us to gain new customers and retain our existing customers.

A-61

We constantly monitor our customer satisfaction levels through surveys and utilize this information to enhance the quality of our services and the experience for our customers.

### History of Developing Strategic Alliances.

We have a track record of developing strategic alliances through revenue sharing agreements, capacity leasing, resale arrangements and business relationships with mobile wireless operators, technology suppliers and real estate developers that allow us to expand our product offerings, ensure compatible network technologies and gain access to new customers.

## Business Strategy

Our business strategy includes the following components:

### Increase Penetration of Niche Markets with Unmet Demand for Telecommunication Services

We are focused on the development of the business market, by targeting our services to areas that offer potential growth in telecommunications derived from economic development and increased demand in transformation and digitalization. We believe that there is an opportunity to meet the demands of fixed line, telephony, broadband, Internet and above all value-added services in the Mexican market, which we offer through a personalized customer experience at competitive prices.

### Improve Our Specialized Customer Support

As part of our continued effort to improve service to our commercial segment, we intend to continue providing specialized customer support. We have created several commercial teams focused on specialized business verticals. These teams improve our attention to and understanding of our business customer's specific demands and help us provide customers with targeted service solutions. We have implemented commercial teams in the following business verticals: (i) education and professional services; (ii) finance, corporate and retail; (iii) hospitality and health and (iv) manufacturing and automotive. In addition, as an ongoing effort to provide quality customer support, we have established a number of call centers offering round-the-clock personalized assistance.

### Expand Our Network on a Disciplined Demand−Driven, Modular Basis

As part of our growth strategy, we intend to continue building our network on a carefully targeted, modular basis with a rigorous focus on return on investment. We expand our networks in each city based on identified customer demand in specific local areas, which we refer as "clusters." We execute network build-out in tandem with sales and promotional efforts targeted at customers in the "cluster". We also construct our network on a customer demand basis to support commercial customers in buildings or locations other than "clusters". We refer to these locations as "single sites." The "clusters", single sites and potential build-outs we identify compete internally for capital expenditure funds based on expected profitability and return on investment.

### Maintain Our Service Quality Differentiation and Focus

We provide a differentiated customer experience based on high-quality service and customer-focused product offerings. Key elements of our differentiation strategy include (i) proactive marketing efforts with door-to-door personal sales and promotions, (ii) competitive pricing, (iii) fast and affordable installation and (iv) tailor-made solutions for commercial customers. We also differentiate our services by providing accurate and timely billing, minimizing activation errors and delivering near real-time activations and disconnections. Our billing system allows us to combine all of the services provided to our customers into a convenient single invoice.

## Corporate Structure and Executive Office

Maxcom Telecomunicaciones, S.A.B. de C.V. is a limited liability public stock corporation (*sociedad anónima bursátil de capital variable*), organized under the laws of Mexico and incorporated on February 28, 1996.

A-62

We were originally organized under the name "Amaritel, S.A. de C.V." We changed our corporate name to "Maxcom Telecomunicaciones, S.A. de C.V." on February 9, 1999. In connection with our initial public offering, our corporate name was changed to "Maxcom Telecomunicaciones, S.A.B. de C.V." on October 19, 2007, when we adopted the form of a public company or limited liability public stock corporation (*sociedad anónima bursátil de capital variable*). Our corporate name is also our commercial name.

Our principal executive offices are located at Avenida Guillermo González Camarena No. 2000, Colonia Santa Fe Centro Ciudad, Mexico City, 01376 and our telephone phone number is (52) 55-5147-1111. Our website is www.maxcom.com. Our website and the information contained on our website are not part of this statement.

The following chart summarizes our current corporate structure:



### History and Development

In February 1997, we were awarded Mexico's first competitive wireline local and long-distance telephony concession, covering the Federal District of Mexico and over 100 cities and towns in the Gulf region for local service and the whole nation for long-distance service. This concession has a term of 30 years. The local telephony portion of our concession was expanded in September 1999 to cover most of the Greater Mexico City area and a wider area within the Gulf of Mexico region. In September 2001, our concession was further expanded to allow us to provide nationwide wireline local telephony service. In October 1997, the former Mexican Federal Telecommunications Commission (*Comisión Federal de Telecomunicaciones*, or "Cofetel") awarded us seven nationwide point-to-point and three regional point-to-multipoint microwave concessions. Each of these has a term of 20 years.

We commenced commercial operations on May 1, 1999. We are currently offering local and long-distance voice telephony, Internet, VoIP services, mobile services, other value-added services and data services in the cities of Mexico City, Puebla, Queretaro, San Luis Potosi, Guadalajara, Monterrey, Veracruz, Toluca, León, Aguascalientes, among others. In October 2015, we divested our public telephony services. We are currently in the process of divesting our residential business until, which we expect to conclude by December 2019. See "—— Divestiture of Residential Segment".

In September 2007, we entered into a MVNO agreement with Pegaso PCS, S.A. de C.V. (currently Telefónica-Movistar). Through this agreement, we launched our "quadruple play" services, adding mobile services to our "triple play" services.

LEGAL_US_E # 142338261.4

On October 24, 2007, we completed a global initial public offering of 12,296,970 ADSs in the United States and 16,969,697 CPOs in Mexico. Approximately 16% of the ADSs and the CPOs were sold by our existing shareholders. Each ADS represents seven CPOs, while each CPO represents three Series "A" common shares. The CPOs are listed in the Mexican Stock Exchange (*Bolsa Mexicana de Valores, S.A.B. de C.V*) under the ticker symbol "MAXCOM CPO". On November 14, 2014, the ADSs were delisted from the New York Stock Exchange in order to be traded in the United States in the over-the-counter ("OTC") market, at level OTCQX under the ticker symbol "MXMTY".

In September 2013, Ventura Capital Privado, S.A. de C.V. ("Ventura Capital") completed an equity tender offer of our outstanding Series "A" common shares, pursuant to a recapitalization agreement entered into in 2012. As a result of this transaction, Ventura's investors became Maxcom's principal shareholders. See "2013 Recapitalization and Debt Restructuring". Subsequent to the equity tender offer, in 2014 we launched an ambitious restructuring program aimed at, among other things, creating an organizational culture focused on the client, improving our offering of products and services, increasing the capacity of our infrastructure network, and to strengthening sales areas.

At the end of 2014, we implemented a sales force dedicated to the government sector with executives that have actively participated in auction processes of public entities. The target of this sales force is to serve the entities in the mid and low-layers of federal government, as well as states and municipalities.

On October 26, 2015, we announced the divestiture of our public telephony business, which will allow us to focus on our commercial segments that generate more value for the Company.

On September 30, 2016, we stopped providing voice, data and video services to residential customers located in the cities of Queretaro, Tehuacan, and Puebla. In order to ensure continued contracted service to these customers, we entered into an agreement with telephony by Cable, S. A. de C. V. (Megacable) to enable this provider to continue to render services offered by us.

On January 16, 2018, our shareholders approved Maxcom's merger with M*axcom Servicios Administrativos, S. A. de C. V.*, *Corporativo Telecomunicaciones, S. A. de C. V.* and *Servicios MSF, S. A. de C. V.* As a result of this merger, the aforementioned merged companies will be terminated.

On April 6, 2018, Maxcom signed an agreement to sell 72 telecommunications towers to the corporate group MXT ("MXT") at a price of Ps.196.6 million. Simultaneously, Maxcom entered into a master lease-back agreement for the aforementioned towers with a 20-year term.

As of December 31, 2018, our outstanding capital stock was comprised of 144,471,081 Series "A" shares, of which 36,400 shares represent the fixed portion of Maxcom's capital stock and 144,434,681 shares represent the variable portion.

**2013 Recapitalization and Debt Restructuring**

On December 4, 2012, Maxcom entered into a recapitalization agreement (the "Recapitalization Agreement") with Ventura Capital Privado, S.A. de C.V., a sociedad anónima de capital variable, organized and existing under the laws of the United Mexican States ("Ventura Capital").  Pursuant to the Recapitalization Agreement, Ventura would make a capital contribution to Maxcom of approximately US$45.0 million. In addition, Venture offered to purchase for cash any and all of Maxcom's outstanding Series A Common Stock (the "Shares") at a price of Ps.0.9666 per Share, Ordinary Participation Certificates ("CPOs") at a price of Ps.2.90 per CPO and American Depository Shares ("ADSs") and, together with the Shares and the CPOs, the "Maxcom Securities") at a price of Ps.20.30 per ADS (the "Equity Tender Offer").  Ventura's obligation to consummate the Equity Tender Offer was subject to (i) acquiring more than 50% of all shares outstanding on a fully diluted basis and (ii) a successful completion of an offer to exchange Maxcom's then outstanding 11% Senior Notes due 2014.

On February 20, 2013 Maxcom commenced an offer to exchange all of its then outstanding 11% Senior Notes due 2014 for new Step-Up Notes due 2020. On the same date, Ventura initiated an equity tender offer to acquire 100% of the issued and outstanding shares of Maxcom. After several attempts, Maxcom announced on April

24, 2013 that, since the conditions for the consummation of the exchange offer were not satisfied, the exchange offer was not consummated. In light of this outcome, Maxcom considered all of its alternatives including, but not limited to, commencement of a Chapter 11 case or other restructuring proceeding.

On June 18, 2013 Maxcom announced its intention to use a 30-day grace period with respect to its scheduled interest payment of approximately US$11 million on its 11% Senior Notes due 2014 to implement a comprehensive plan of recapitalization. Shortly thereafter, Maxcom, Ventura, an ad hoc group of bondholders (the "Ad Hoc Group") holding an aggregate amount of approximately US$84 million of Maxcom's Senior Notes due 2014, and certain of its current equity holders reached an agreement on the terms of a restructuring and support agreement. In connection with this comprehensive restructuring process, Maxcom entered into a recapitalization agreement with Ventura and certain related shareholders, pursuant to which Ventura also agreed to make a capital contribution of at least US$45 million dollars and conduct a tender offer to acquire for cash, at a price equal to Ps.2.90 per CPO, up to 100% of the issued and outstanding shares of Maxcom.

On July 23, 2013, the Company initiated proceedings under Chapter 11 of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to commence the restructuring as set forth in its plan of reorganization, including the issuance of new step-up senior notes by the Company (the "2013 Chapter 11 Case").

On September 10, 2013, the Bankruptcy Court confirmed the Company's prepackaged Chapter 11 plan of reorganization (the "2013 Plan"). The only class of creditors entitled to vote, voted in favor of the Plan and no party objected to confirmation of the Plan.

Pursuant to the terms of the 2013 Plan, all classes of creditors were unimpaired and their payments were not affected, except for the holders of Maxcom's Senior Notes 2014, which received (i) the old notes (which included the capitalized interest amount for unpaid interest accrued on the Senior Notes 2014 from (and including) April 15, 2013 through (and excluding) June 15, 2013, at the rate of 11% per annum), (ii) cash in the amount of unpaid interest accrued on the Senior Notes 2014 (A) from (and including) December 15, 2012 through (and excluding) April 15, 2013, at the rate of 11% per annum, and (B) from (and including) June 15, 2013 through (and excluding) the effective date of the 2013 Plan at the rate of 6% per annum, and (iii) rights to purchase equity that is unsubscribed by the Company's current equity holders pursuant to the terms of the 2013 Plan.

On September 27, 2013 a group of investors that are beneficiaries of Ventura completed the Equity Tender Offer, acting through a trust held by Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, a banking institution organized and existing under the laws of the United Mexican States and other investors. As part of this transaction, Ventura investors became Maxcom's principal shareholders.

According to the terms of the 2013 Plan, Maxcom issued new old notes (the "old notes") in an aggregate principal amount of US$180.4 million, which reflects the amount of the Senior Notes 2014 less the amount of Senior Notes 2014 held in treasury by the Company plus the capitalized interest amount. The terms of the old notes are governed by the Indenture entered into on October 11, 2013 among Maxcom, its subsidiaries and Deutsche Bank Trust Company Americas, as trustee.

Pursuant to the terms of the old notes indenture, Maxcom used 50% of the capital contribution made by Ventura investors to make an offer to repurchase old notes, but only to the extent such capital contribution exceeded US$5 million, at a price equal to 85% of the principal amount of the notes, in cash. This repurchase offer was initiated on November 8, 2013 and consummated on December 12, 2013, resulting in the purchase and payment of U.S$2.5 million to investors who validly tendered old notes.

During the repurchase offer, some of Maxcom's old notes bondholders exercised their equity purchase rights, and the Maxcom thereby exchanged bonds totaling Ps.23.3 million (U.S$1.8 million) at book value, for 22,655,679 Series "A" common stock shares.  The rest of the equity purchase rights held by the old notes bondholders were extinguished, as the right to convert them had expired in December 2013.  As a result of the aforementioned events, Maxcom decreased its fair value liability by Ps.33.4 million (U.S$2.6 million). The shares issued were recognized as an increase of Maxcom's capital stock of Ps.22.1 (US$1.7 million) and additional paid-in-capital of Ps.34.6 million (US$27 million).

LEGAL_US_E # 142338261.4

On April 25, 2017, the Company announced a public offer to repurchase Ps.466.5 million (US$25 million) of its old notes(the "Repurchase Offer"). On May 25, 2017, the Company closed the Repurchase Offer after accepting to repurchase Ps.244.5 million (US$13.1 million) of the principal amount outstanding of old notes. The total amount paid for the aforementioned repurchase was Ps.154.3 million, which resulted in cancellation of US$244.5 million of old notes and a total gain of Ps.90.2. The repurchase was made at the average price of Ps.1, 105.11 per each US$100 of old notes. After the cancellation takes effect, the amount outstanding of old notes will be Ps.2, 209 million.

According to the report issued by the Bank of New York on March 31, 2019, 512,302 ADSs are listed in the OTC market, being equivalent 1 to 1 to the series A shares listed in BMV.

## Merger of Subsidiaries

We are currently in the process of merging six of our subsidiaries, TECBTC Estrategias de Promoción, S.A. de C.V., Telereunión, S.A. de C.V., Sierra Comunicaciones Globales, S.A. de C.V., Outsourcing Operadora de Personal, S.A. de C.V., Maxcom SF, S.A. de C.V.  and Maxcom TV, S.A. de C.V. with our holding companies. These mergers are projected to result in a combined savings of approximately Ps.4 million per month. In addition, these mergers will allow us to streamline our corporate structure and eliminate a number of intercompany liabilities. As of December 31, 2018 and March 31, 2019, these subsidiaries represented 4% and 3%, respectively, of our consolidated total assets.

## Divestiture of Residential Segment

We are undergoing the winding down of our residential segment, which involves the gradual closure of residential clusters and mass disconnection of residential customers. In addition to allowing us to focus on profitable sectors of the Company, this divesture offers us a strong possibility of asset sales and increase in overall revenue. We plan to conclude the divestiture of the residential segment by December 2019.  For the year ended December 31, 2018 and the three months ended March 31, 2019, our residential segment generated 8% and 14%, respectively, of our total consolidated revenues.

## Deconsolidation of Celmax

We are currently considering a partial or total divestment of our equity participation in Celmax, due to its negative cash flows for the past three years.  We currently hold 51% of Celmax and intend to focus our financial and operational capabilities on strengthening our market share within the commercial business segment. As a result, maintaining our investment in Celmax is no longer strategically feasible.  For the year ended December 31, 2018 and the three months ended March 31, 2019, Celmax represented 3% and 2%, respectively, of our total assets. For the year ended December 31, 2018 and the three months ended March 31, 2019, Celmax generated 1% of our total revenues for both periods.

## Our Products

In addition to our innovative reliable product offering and high quality customer service, our pricing is typically at a modest discount to the levels charged by Telmex and other competitors for comparable services.  The following are the service products we currently offer to our customers.

For the commercial market, our product portfolio includes:

- *LíneaMax Comercial.* This service provides a high-quality wireline telephone line with value added functions available, including voice mail, call hold, call forwarding, three-way calling, call blocking, speed dial, private numbers and multiline search.

LEGAL_US_E # 142338261.4

- *CentralMax.* This service provides business customers with all of the functions of a private branch exchange using Centrex technology, without having to acquire and maintain equipment. The features offered under this product include four-digit internal calling, call hold, call forwarding, three-way calling, direct inward dialing, direct outward dialing, intercom dialing, call transfer, speed dialing, call pick up, outgoing call blocking, single digit access to attendant and distinctive ringing. Optional solutions include voice mail, music-on-hold, multi-line hunting and operator services.

- *TroncalMax Digital.* This service provides digital trunks links for business customers that need highly reliable access to and from the public telephone network through their existing private branch exchange. This service is sold in groups of 10, 20 or 30 trunk links. The groups can be configured with direct inward dial, direct outward dial, caller identification or main telephone number assignments.

- *TroncalMax Analogic.* This service provides business customers with connectivity to their analog private branch exchange or key systems. The features available with this product are multi-line hunting, caller identification and call barring.

- *TroncalSip.* This service provides SIP trunks (Session IP) for business customers that need highly reliable access to and from the public telephone network through their existing IP private branch exchange. This service can be delivered through our Internet Dedicated Access or a third-party provider.

- *Hosted IP PBX.* This service provides our business customers with all of the functions of an IP private branch exchange using VoIP technology, without having to acquire and maintain expensive equipment. The features offered under this service include those of CentralMax as well as other IP enhanced services such as web portal setup, "click to dial," hosted directory and Microsoft Outlook integration.

- *1-800 Numbers.* This service is available to our customers interested in receiving toll-free calls, domestic and international, into their call centers or businesses.

- *SpeediMax.* This is our broadband Internet access service for small businesses with speeds of 128Kbps, 256Kbps, 512Kbps, 1Mbps, 2Mbps, 4Mbps and 8Mbps using ADSL transmission technology over ordinary telephone lines. An ADSL provides a secure, dedicated link to the Internet or a company's internal data network.

- *Dedicated Internet.* This service offers Internet access at high speed with a clear channel access to the Internet backbone.

- *Private links.* This service provides highly reliable dedicated circuits between two or more physical locations.

- *E-Security.* This service provides managed security including perimetral anti-virus, content filter and spyware solutions. We supply all of the software and hardware equipment as an integrated solution for our customers.

A-67

- *Bulk Short Message Service (SMS)*. This service is a web-based service for bulk-messaging to mobile phones via short message service ("SMS"), allowing our customers to upload and distribute mass SMS marketing messages for texting to mobile users.

Due to the anticipated divestiture of our residential segment, we currently do not offer residential services to new customers. As of the date of this statement, our residential services are offered to existing customers in Mexico City and San Luis Potosí. See "—Divestiture of Residential Segment".

For the residential market, our product portfolio includes:

- *LineaMax Residencial*. This service provides a high-quality telephone line with added value functions available, including voicemail, call waiting, call forwarding, three-way calling, call blocking, speed dialing and unlisted numbers.

- *Larga Distancia Max*. This product provides national and international long-distance services to our local telephony customers that require a long-distance service. Approximately 97% of our local telephony customers also subscribe to Larga Distancia Max. We do not offer our long-distance service separately from our local telephone service.

- *SpeediMax (ADSL)*. This is our broadband Internet access service with speeds of 128, 256, 512 Kbps, 1Mbps, 2 Mbps, 4Mbps and 8Mbps using ADSL transmission technology through common telephone lines.

- *AsistelMax*. This service provides basic medical and home care by telephone to our residential customers in case of emergency.

## Pricing

We seek to maintain competitive prices by offering pricing plans and bundling options that are simple in order to assure customers the integrity of our billing process. Our pricing variations reflect the range of standard to "tailor-made" offerings in order to provide comprehensive customer solutions that reflect their specific demands. Our pricing ranges allow us to strengthen our medium and long-term fixed revenue.

## Revenue Composition

Our management uses information such as revenue by division to evaluate performance, make general operating decisions and allocate resources. The following table sets forth our revenues for the periods indicated below. No interdivision revenues are applicable for the periods presented herein.

| Divisions[1] | For the Three Months Ended March 31, | | For the Year Ended December 31, | | |
| | 2019 | | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|
| Residential | Ps. | 29,411 | 188,930 | 365,249 | 567,072 |
| Commercial | | 232,678 | 1,036,593 | 755,509 | 670,723 |
| Wholesale | | 110,817 | 79,110 | 1,132,114 | 1,231,138 |
| Other revenue | | 4,498 | 10,612 | 2,708 | - |
| Total Revenues | Ps. | 377,404 | Ps. 1,315,245 | Ps.2,255,580 | Ps.2,468,933 |

LEGAL_US_E # 142338261.4

Due to the anticipated divestiture of our residential segment, we currently do not offer residential services to new customers. As of the date of this statement, our residential services are offered to existing customers in Mexico City and San Luis Potosí. See "—Divestiture of Residential Segment".

The distribution by geographical location of revenue for the three months ended March 31, 2018 and the years ended December 31, 2018, 2017 and 2016 is as follows:

| For the Three Months Ended March 31, 2019 | Metropolitan Area | Central South | North | Total |
|---|---|---|---|---|
| Local | Ps.  219,630 | Ps. 125,273 | Ps. 2,701 | Ps.  347,604 |
| Long distance | - | - | - | - |
| Rent of dedicated links | 8,466 | - | - | 8,466 |
| Sale of equipment to customers | 62 | 31 | 1 | 94 |
| Capacity leasing | 21,240 | - | - | 21,240 |
| Total Revenues | Ps.  249,398 | Ps. 125,304 | Ps. 2,702 | Ps.  377,404 |

| For the Year Ended December 31, 2018 | Metropolitan Area | Central South | North | Total |
|---|---|---|---|---|
| Local | Ps.723,267 | Ps.   436,539 | Ps.   9,907 | Ps. 1,169,712 |
| Long distance | - | - | - | - |
| Rent of dedicated links | 328 | - | - | 328 |
| Sale of equipment to customers | 129 | - | - | 129 |
| Capacity leasing | 145,076 | - | - | 145,076 |
| Total Revenues | Ps. 868,800 | Ps.436,539 | Ps.9,907 | Ps.1,315,245 |

| For the Year Ended December 31, 2017 | Metropolitan Area | Central South | North | Total |
|---|---|---|---|---|
| Local | Ps.1,442,260 | Ps.748,344 | Ps.16,367 | Ps.2,206,971 |
| Long distance | 817 | 410 | - | 1,227 |
| Rent of dedicated links | 169 | - | - | 169 |
| Sale of equipment to customers | 129 | - | - | 129 |
| Capacity leasing | 47,084 | - | - | 47,084 |
| Total Revenues | Ps. 1,490,459 | Ps.748,754 | Ps.16,367 | Ps.2,255,580 |

| For the Year Ended December 31, 2016 | Metropolitan Area | Central South | North | Total |
|---|---|---|---|---|
| Local | Ps.1,562,028 | Ps.845,581 | Ps.20,390 | Ps.2,427,999 |
| Long distance | 3,361 | 1,689 | - | 5,050 |
| Rent of dedicated links | 161 | - | - | 161 |
| Sale of equipment to customers | 129 | - | - | 129 |
| Capacity leasing | 35,594 | - | - | 35,594 |
| Total Revenues | Ps. 1,601,273 | Ps.847,270 | Ps.20,390 | Ps.2,468,933 |

## Our Markets

### Concession Areas

Our operations take place in two markets in Mexico: Mexico City and San Luis Potosí.  We offer our full range of products and services to existing customers in these two areas.  In addition, our concessions allow us to charge a different rate for our services in different cities, giving us an advantage over our competitors.

### Mexico City

LEGAL_US_E # 142338261.4

We commenced commercial operations in Mexico City in May 1999. Mexico City has the nation's greatest concentration of service and manufacturing industries, is the center of Mexico's public and financial services sectors and has a population of approximately 20.9 million people. Although the Federal District, which covers most of the metropolitan area, has the highest teledensity rate in Mexico, we believe that significant unmet demand for high-quality local telephony services in Mexico City remains. As of December 31, 2018, we had 51,351 lines in service in Mexico City and its surrounding metropolitan area.

### San Luis Potosi

We commenced commercial operations in the city of San Luis Potosi in May 2008, with a "quadruple play" strategy. The city of San Luis Potosi has a population of approximately 2.7 million people. As of December 31, 2018, we had 12,423 residential lines in service.

### Clusters and Single Sites

We have developed a comprehensive marketing strategy that starts by identifying a number of under-penetrated city areas with the largest potential for new lines, which we refer to as "clusters." We use a variety of techniques to identify potential clusters, including canvassing, plotting of potential clusters and database marketing. Once a cluster is identified, a map of the geographic area is produced and the cluster is defined. The cluster becomes the basis for network design and deployment.

We also build our network on a customer demand basis to support business customers in buildings or locations other than clusters. We refer to these locations as "single sites." When our corporate sales personnel identify a potential opportunity, we analyze its technical feasibility, the costs associated with providing the service within such locations and the potential revenues, in order to determine whether it is economically attractive to offer our services in that particular location. We expect to further build out our network on a customer demand basis, and as a result we believe that single sites for commercial customers could be a significant business opportunity.

## Our Concessions

We currently have public telecommunications network concessions to provide the services described below. Each of our public telecommunications network concessions contain one or more specific exhibits that describe the telecommunications services that we are allowed to provide under such concession. In order to broaden the scope of the services we are allowed to offer under our concessions, we must undergo an authorization process before the IFT for each concession. Our concessions have various term periods and may be subject to renewal pursuant to each concession's individual terms.

### Single Concession

On June 14, 2018, we were awarded a single concession to provide telecommunications and broadcasting services at a national level. This new type of concession is intended to concentrate all telecommunications and broadcasting services under a single framework in order to consolidate updates required by the new regulation. As a result of this concentrated framework, we have fewer regulatory obligations.

### Network Concession

On 20 December 1996, SCT granted us a concession to install and operate a public network of telecommunications nationwide. The initial term of the concession is 30 years.

Our concession expressly permits us to provide the following services:
- basic local telephony;

- basic national and international long-distance telephony;

A-70

- the sale or rental of network capacity for the generation, transmission, or reception of signals, documents, images, voice, sounds or other information of any nature;

- the purchase and lease of network capacity from other providers, including the lease of digital circuits;

- marketing of network capacity of other concessionaires of public telecommunications networks;

- value-added services, including data, video, audio, and video conferencing services (excluding television by cable or other type of paid television, streaming music or digital audio); and

- operator services.

The concession does not impose any limitations on our ability to set rates, provided that we file with IFT a notification of any rate change prior to it becoming effective. We are currently in compliance with all material obligations under the terms of the concession.

## Microwave Transmissions

### Point-to-point

In October 1997, we were awarded seven nationwide point-to-point microwave concessions. These concessions cover:

- two consecutive frequency segments in the 15 GHz band, with a 56 MHz bandwidth;

- three consecutive frequency segments in the 23 GHz band, with a 56 MHz bandwidth; and

- two consecutive frequency segments in the 23 GHz band, with a 100 MHz bandwidth.

These concessions, which were issued in June 1998, have a term of 20 years, which expired on June 3, 2018. We applied for renewal of the concessions within the appropriate time and form and they remain in full force, pending a decision by the IFT. The concessions do not impose any limitations on the setting of our rates other than the requirement that we file with IFT a notification of any rate change prior to it becoming effective. We are currently in compliance with all material obligations under the terms of the concessions.

### Point-to-multipoint

In October 1997, we were awarded three regional point-to-multipoint microwave concessions covering telecommunications regions 3, 5 and 8, which include states in the north and southeast of Mexico's Gulf region, in the 10.5 GHz frequency band with a 60MHz bandwidth. These concessions, which were issued in April 1998, have a term of 20 years. Cofetel will re-auction the frequencies covered by the concessions at least three years before the expiration date of the concessions. These concessions originally required us to install a network and offer service to at least 30% of the population in each concessioned region by the end of the second year after the issuance of the concession.

A-71

The expiration date of these concessions was originally April 1, 2018. However, because the IFT resolved not to re-auction the frequencies covered by the concessions, we are currently in compliance with our coverage obligations.


*Cable Television*

On August 4, 2006, the SCT granted one of our subsidiaries, Maxcom TV, S.A. de C.V a traditional cable concession to provide cable TV and radio services in the city of Puebla.  This cable television concession has a term of 10 years and may be renewed for up to an additional 10-year period.  Shortly thereafter, the SCT filed its Convergence Regulations through which certain licensees of telecommunications services could be authorized to provide additional services to those included in their original concessions.  On October 13, 2006, we notified the SCT of our compliance and voluntary affiliation with the Convergence Regulations and, as a result, the SCT authorized us to provide paid TV services in addition to those services already granted in our original public telecommunication network concession.

Our concession expired on August 4, 2014 and we applied for renewal within the required time and form. On November 3, 2017, we withdrew our renewal application for the concession title because we are authorized to provide paid TV services without the network concession. In 2018, as a result of decreased customer demand, we notified the IFT that we would no longer provide paid TV services.

*Mobile Network Operation*

On January 17, 2007, Cofetel granted us authorization to provide MVNO services based on our 1996 concession.  This authorization enabled us to provide mobile service nationwide under its own brand by acquiring capacity from other mobile telephony concessionaires in Mexico.  As a result of this authorization, we were the first and only telecommunications concessionaire to offer unbundled "quadruple-play" services exclusively under its own brand name.

The terms of both the cable TV and radio and MVNO authorizations match our 1996 concession term of 30 years (expiring in 2026) and do not impose any additional obligations, including minimum coverage or investment commitments, upon us.

On January 30, 2017, the IFT authorized us to provide local mobile services through a concession title granted to our subsidiary company, Celmax.  As a result, we intend to transfer all MVNO operations entirely to Celmax.


## Interconnection

*Fixed Interconnection*

All of our fixed interconnection contracts with local and mobile telephone providers have expired. Last year  we executed various amendments to renew these agreements as well as to negotiate reciprocal rate provisions adopted by the IFT.

*Mobile Interconnection*

We have signed reciprocal interconnection agreements with several network carriers to provide cellular phone usage, text messaging, data usage and MVNO services.

*Interconnection Rates*

LEGAL_US_E # 142338261.4

Telcel and Telmex have been authorized to charge higher interconnection rates than those imposed on other telecommunications service providers; as a result, we have filed interconnection rates disputes with the IFT against Telcel and Telmex. These disputed rates are notably higher than those we normally offer, which has a negatively impacted our operations.

Through IFT's implementation of its Electronic System of Interconnection Requests (*Sistema Electrónico de Solicitudes de Interconexión*), operators can initiate negotiations to determine interconnection rates and resolve rates disputes. In the event that we are unable to reach an agreement on interconnection rates, the IFT must resolve these according to its previously published resolution regarding interconnection rates disputes, which would affirm its asymmetrical rate regulation and negatively impact our income derived from interconnection rates.

### "By-pass" international traffic

Pursuant to Mexican telecommunication regulations, international long−distance traffic in Mexico must be routed and terminated through authorized international gateways at established international settlement rates. However, less expensive alternatives which by-pass authorized gateways exist, particularly in the case of countries with whom Mexico exchanges a significant amount of traffic. Given the disparity between the government authorized and alternative long-distance interconnection and termination rates through local service routes and/or IP services, an increasing portion of the long−distance market between Mexico and the United States is served by entities that circumvent or "by-pass" the international long-distance interconnection system. This practice is illegal under applicable law.

We cannot confirm whether any of our high-volume customers are engaging in "by-pass" activities. There is no requirement to make such a determination under Mexican regulations and we have not implemented a system to detect such activity. We are required, however, to comply with any order from competent regulatory authorities to disconnect a customer deemed to be engaged in "by-pass" activities.

## Property, plant and equipment

We currently lease the buildings and land where our operations are carried out and where our microwave transmission equipment and switching centers are located. We lease space for administrative offices in Mexico City and in the cities of Puebla, Queretaro and San Luis Potosi. Our main headquarters are located in Santa Fe, Mexico City in a building leased for a 5-year term that expires on December 31, 2017 and is renewable for a similar term that will conclude on December 31, 2022. The Santa Fe lease area is comprised of 5,711 square meters.

Our lease area in the city of Puebla expires on March 31, 2021. This area is comprised of 900 square meters to hold one of our Lucent Technologies 5ESS switches.

On April 1, 2013, we leased a warehouse comprised of 1,176 square meters which expired on October 31, 2017, in the city of San Luis Potosi. On August 1, 2016, we renewed the lease of two cellars in the Mexico City, which together have an area comprised of 2,658 square meters for 3-year term and will expire on July 31, 2019. We intend to renew this lease. In addition, we lease approximately 200 other sites that are used as walk-in centers, hosts or single-site buildings and are located in the cities of Mexico, Puebla, Queretaro, San Luis Potosí and Tehuacán. Additionally, we own 22 properties in the cities of Puebla, San Luis Potosí, Veracruz, Mexico City and State of Mexico that are used as part of our infrastructure.

## Our Network

### Build-out Strategy

We build our network on a modular basis. In each city where we operate, we initially install a digital switch and obtain a metropolitan fiber optic network backbone which form the core of the network in that city. Our outside plant development is then executed in a modular and scalable fashion based on individual network clusters that

target specifically identified areas of the city. Once our marketing, engineering and sales departments have identified a "cluster", we build our network in clusters varying from 1,500 to 6,000 lines. This strategy allows us to match capital expenditure to customer opportunity and to concentrate our sales efforts in a timely fashion to match the in-service dates of new "clusters".

To ensure quality service to our customer, we install 24-gauge copper wire and limit the distance between our backbone network and the customer premises to three kilometers. These attributes also allow us to provide to our customers voice (including VoIP services) and data services, as services through DSL with broadband of up to 20 Mbps.

We have standardized our network design using Alcatel-Lucent, Huawei, ZTE, NEC, Cisco and Juniper equipment. We believe this equipment suite represents best-of-breed technologies that integrate well to assure consistent, cost efficient and high-quality service. By standardizing the equipment throughout our networks and using a small number of suppliers who provide industry-leading vendor support and technology innovation, we increase our purchasing effectiveness and minimize our cost of network capital expenditures.

### Network Backbone

We own and operate 6,382.25 route-kilometers of long-haul fiber connecting 23 of Mexico's largest cities and Laredo, Texas. We have a 24-strand fiber optic link between the cities of Mexico City and Puebla and two strands of fiber throughout the rest of this network. The cities that have access to this network include Nuevo Laredo, Monterrey, Saltillo, San Luis Potosi, Aguascalientes, Leon, Irapuato, Guadalajara, Celaya, Queretaro, Mexico City, Toluca, Tehuacán, Cordoba, Orizaba, Jalapa, Poza Rica, Tampico, Cd. Victoria, Matamoros, Reynosa and Matehuala. We have installed dense wavelength division multiplexing, or dense wavelength division multiplexing ("DWDM"), with a maximum growth capacity of up to 80 wavelengths, each with 2.5, 10 and 100 Gbps capacity.

We own and operate three Lucent Technologies 5ESS digital switches, two in Mexico City and one Queretaro with a total capacity of 228,150 trunk links. Our three softswitches: Genband and Nortel CS2K provide class 4 and class 5 VoIP and Session Initiation Protocol Trunking or SIP trunking services to commercial clients. Our Alcatel-Lucent IMS platform has one class 4 tandem softswitch with an actual capacity of 3 GW 7510, with a total of 12 STM1, providing the interconnection to the PSTN with full capacity. This switch also provides the connection to the commercial market through SIP Protocol using carrier class SBC on high availability configuration The Alcatel 5060 provide class 5 to the residential and commercial markets. We switch our Toluca telephone traffic using our Mexico City softswitch. All of our switches are connected to the public switched telephone network through multiple dedicated fiber connections.

We have four 72-strand, 159-kilometer fiber optic ring in the city of Puebla. We also have indefeasible rights of use ("IRU") for 299 route-kilometers of metropolitan fiber in the Mexico City area. We have a wavelength division multiplexing ("DWDM") equipment in our Mexico City metro fiber network, providing a maximum growth capacity of 40 wavelengths, each one with up to 100 Gbps capacity. We have one Lambda already installed and we will install more Lambdas as needed to meet our customers' requirements. In addition, we have the infrastructure in place to provide local telephony service to three towns - San Martín Texmelucan, Huejotzingo and Rio Frio - located along the fiber optic link between Mexico City and Puebla.

We use our own fiber optic rings to connect our microwave nodes, to provide backhaul to our switches and to connect to the public switched telephone network. We also use this fiber to connect directly to the premises of some of our high-volume business customers for voice and data services and private line service.

We implemented our multiservice network with Cisco MPLS technology in 2015, servicing our core data to three main cities, Monterrey, Queretaro and Mexico City. We have distribution centers in the cities of Puebla, San Luis Potosí, Aguascalientes and an alternate center in Mexico City. We expect this infrastructure to result in a future capacity of up to 440 Gbps. Currently we have a capacity of 80 Gbps, which can support transportation of VPNs layer 2 and layer 3, with the capacity of providing service qualities for voice, data and video transportation.

### Last-mile Connectivity

A-74

The last-mile connectivity portion of our network is comprised of a mix of wireline and wireless access technologies. We use copper feeder wire and distribution facilities to connect the majority of our end users to our fiber network and switches. Our copper feeder wire is installed with a mix of aerial and underground construction. Aerial is our preferred and most used method because of its lower cost and faster speed of deployment. For aerial deployment, we typically use electricity poles we lease from the CFE. We integrate fiber optic and Digital Subscriber Line Access Multiplexer ("DSLAM") facilities in the distribution plant to allow us to provide broadband services.

Our copper feeder wire is designed to provide copper twisted pair loop lengths of no more than three kilometers. With these loop lengths and our use of broadband-capable copper wire, we are capable of achieving up to 20 Mbps downstream data transmission speed to customers on our copper network using our currently installed ADSL technology. As of 2015, we have reduced the copper twisted pair loop lengths to no more than 1 kilometer and included new VDSL access technologies, enabling us to provide new broadband speeds of up to 40 Mbps using the same copper network.  We also implemented a GPON fiber optic access network that allows us to provide bandwidths of 200 Gbps.

We use point-to-point microwave transmission technology to provide rapid turn-up of service connecting newly built network clusters and single site locations to our fiber backbone. We have point-to-point frequencies in the 15 GHz and 23 GHz bands forming a complex microwave network throughout the cities of Mexico City, Puebla, Queretaro, San Luis Potosi, Aguascalientes, Guadalajara, Leon, Monterrey and Toluca. We also use microwave links to connect customers directly to our own fiber network in situations where a fiber connection is not practical and microwave provides the most cost-efficient means of providing a high speed connection.

We have three Lucent Technologies 5ESS digital switches, two in Mexico City and one Queretaro. Our two switches in Mexico City are equipped for 183,390 trunk links, our switch in the city of Queretaro is equipped for 44,760 trunk links. Each trunk can generally support between one and three access lines, depending on whether it serves a residential or a business customer. Our equipment capacity is scalable at incremental costs according to customer demand. These switches are capable of providing analog lines, E1 digital lines, digital high-speed data services, centrex services and operator-assisted services. In addition, they can provide private analog lines, private clear-channel digital lines, data transmission and value-added services.

We also have one state-of-the-art softswitch (Genband) that provides VoIP and Session Initiation Protocol Trunking or SIP trunking services to the residential market. Our platform is fully IP integrated with additional services including class 5 services like voice mail, call hold and IP centrex features such as hunting group, call transfer and 3-way conference call. Our SIP trunking solution fully complies with IP trunking technology in the market.

Additionally, we have a Nortel CS2K softswitch Class 5 located in Monterrey with the following interconnection capacity:  Class 5 functionalities for 22,000 SIP trunks/lines, 488 ETSI CC S7 E1s, 63 ANSI C7 T1s, 32 R2M E1s and 32 PRI E1s.

We count on the Georedundant IMS platform for our core data (Alcatel-Lucent softswitch Plexus) and our softswitch A5060 to provide the class 5 features, the softswitch Plexus to provide VoIP, Session Initiation Protocol Trunking or SIP trunking services for strategic commercial clients, as well as SS7 interconnection with the PSTN and the other internal switches with 2.268 ETSI CC S7 E1s or ISDN distributed in 3 Gateways, and 16 STM1 to provide ISDN services harbored in 3 Gateways M8K from Audio codes provider. The A5060 softswitch has a capacity to manage 22,000 VoIP simultaneous calls and is interconnected to the public switched telecommunications network through the Alcatel-lucent IMS Plexus.

We also own and operate one pair of Tekelec SS7 Signaling Transfer Points (STP) in Mexico City and one in the city of Monterrey, to manage our interconnection with all other carriers using N7 ISUP signaling.

***Operational support systems***

LEGAL_US_E # 142338261.4

We have two network operations and control centers in Mexico City which oversee, administer and provide technical support to all of our service areas. Our centers, which use Hewlett Packard and Sun Microsystems hardware, and Lucent Technologies, Huawei and Cisco software, among other systems, control and monitor all of our network, microwave, fiber, access equipment, data equipment, synchrony, signaling and energy systems. Our centers allow us to manage a multi-vendor network with the greatest efficiency possible and to identify problems early in order to utilize available redundancy and repair the damaged part of our network.

Our operational support systems are designed to allow us to differentiate ourselves from our competitors by enabling us to:

- offer a flexible, large selection of services;

- provide tailored service packages;

- quickly introduce products and services;

- deliver near real-time activation and disconnection;

- deliver a high quality of service;

- minimize activation errors; and

- provide accurate and timely billing services.

Our information technology strategy is to continue to improve our operational support systems in order to provide a high level of functionality and flexibility from the service order to the delivery of customer invoices. The systems include the following functional features:

- Spanish language support for invoices and documentation;

- a high degree of integration among all operational support systems components;

- flow-through of information, provisioning and service activation;

- capabilities to monitor, manage and resolve network problems;

- allowance for growth on a modular scalable basis; and

- support of administrative operations for financial controls.

A-76

The data centers group all information technology infrastructures (hardware and software) to support the current and future business processes that our organization demands. The data centers contain solutions from leading companies in the IT industry, including Hewlett Packard, IBM, Microsoft, Oracle, Alcatel-Lucent and Cisco. We have the EMC Vmax storage solution that offers a highly virtualized solution with solid state disks and the highest availability rate in the market. Likewise, we have acquired and implemented VDI, or Virtual Desktop Infrastructure technology, supported on last generation Blade HP servers, VMware and last generation storage on solid state discs EMC ExtreamIO, which have allowed us to reduce costs in aspects of technological renovation of personal computer equipment, maintenance and operation, strengthening matters of information security. Our remaining infrastructure operates with Solid State technology, a cutting-edge technology which will help us reduce operating costs.

In addition, we acquired the backup solutions of EMC AVAMAR, Data Domain and Spectra Logic, leading companies in the IT industry, which combine disk backups with data duplication and backup library. This has improved our information backup capacity and recovery times. Our data centers utilize centralized heating and cooling systems that include regulated energy, cooling, illumination and fire prevention.

We collect, format and process call records using a mediation system provided by Mediation Zone and marketed by Digital Route. The customer account and its associated products are managed in a "telecommunication business system" or TBS by Oracle, which handles order management and service provisioning, workflow management, network inventory and design management and trouble ticketing.

We use a billing system that is highly flexible and equipped to bill all commercial products that we offer, both to residential and commercial customers. It is also fully capable of bundled billing for multiple service bundles, including "double-play", "triple-play" and "quadruple-play" for tariff plan subscribers.

We use Settler by Intec Company to manage reconciliation, settlement and revenue assurance of call records and intercarrier compensation with all of the carriers with which we have interconnection agreements. We use Siebel Customer Relationship Management ("CRM") by Oracle for our customer relationship management and for our contact center areas, including call center, post-sales and collections. Siebel concentrates all historical information of customers, including contacts, products, service requests, invoicing, payments, balance due, commitments, credit limit and network status.  We use a sales management platform for our commercial segment, "*Agenda Comercial*" which makes acquisition processes more efficient and helps sales executives improve their prospect-to-client conversion rates.

 In 2018, we also implemented a new Inconcert Contact Center that improves client support quality, availability and speed.

## Suppliers of Materials and Equipment

We use reliable technology from world-class suppliers, mainly Alcatel -Lucent, NEC, Cisco, ZTE, Huawei, Oracle, Genband, Infinera and Juniper which provide us with the equipment, materials and services we require to expand and operate our business. Because of the complexity of network equipment and platforms that our operations require, as well as our detailed supply planning, it would be difficult to replace our main suppliers. Additionally, the equipment, materials and services we require are denominated in dollars, which exposes us to risk of devaluation of the Peso against the dollar. See "Risk Factors —Risks Related to Maxcom and Risks Related to Mexico".

## Strategic Alliances

### *Joint Venture with Soriana, S.A.B. de C.V.*

On October 23, 2015, we announced the signing of a joint venture agreement with Soriana to develop and operate an MVNO in order to provide mobile telecommunication services to Soriana's customers, using the mobile services platform Maxcom and Telcel's mobile's network. This joint venture was carried out through Celmax, and as a result of our intended divestment of Celmax, we intend to terminate this joint venture. See "——Deconsolidation of Celmax."

## Marketing and Sales

### General

We seek to develop brand name recognition by using our corporate name, logo and product names to portray a unified image. We conduct sales efforts within target clusters to residential and commercial customers. We seek to differentiate ourselves from our competitors by our pricing, consistent quality and reliability of first-to-market technology, one-stop shopping, comprehensive billing and speed of line activation.

As a result, we believe we have positioned ourselves as an excellent quality service provider as a result of a sustained growth of our customer satisfaction level on year by year comparisons.

### Sales and Distribution Channels

We assign our sales force based on territory, product or market segment, depending on their background and experience. The compensation structure for our sales force is tailored to attract and retain high achievers by providing a base salary and a bonus component. Sales commissions are paid once the services have been installed.

Candidates for our sales force undergo extensive training that covers the industry of telecommunications, our products and our internal marketing and sales procedures. In its sales effort, our sale force vendors use, among other things, multimedia presentations and corporate and product videos and brochures.

In addition to our sales force, we have developed other distribution channels, including store fronts, agents and telemarketing.

### Customer Service

We seek to differentiate ourselves by providing superior and consistent customer service, which is one of the main components of our business plan.

Our customer service group is divided into three areas:

*Centralized Call Center.* This call center, located in Mexico City, responds to calls to our customer attention telephone numbers in the cities of Mexico City, Puebla, Queretaro, San Luis Potosi and Tehuacán, Monday through Friday from 8 am to 10 pm, Saturday & holidays from 9 am to 9 pm. Many prospective and existing customers use our centralized call center for all types of queries, including queries regarding billing, new services or products, area codes, rates, and line installation changes. Prior to being connected to one of our customer service agents, we have an interactive voice response system ("IVR") that allows customers to consult their bill balance, payment and customer service locations, among other information. By offering customer self-service of information, we increase satisfaction and reduce the number of calls that have to be attended by an agent. The IVR then allows the customer to direct his call to the Centralized Call center, Centralized Trouble shooting Center or Collections.

*Centralized Trouble-Shooting Center.* This call center, located in Mexico City, responds to calls in the cities of Mexico City, Puebla, Queretaro, Tehuacán and San Luis Potosi. This center is available 24 hours a day, seven days a week and handles technical problems and inquiries. This group includes specialized services for our business customers in the Platinum and Elite categories, ensuring an excellent service level and timely follow-up of technical problems and requisitions.

*Centralized Customer Retention Center ("Telecare").* This call center, located in Mexico City, receives calls transferred from any of the other call centers or even Walk-In Centers. Its role is to enforce customer retention programs both proactively and reactively. The proactive effort is based on customer life cycle and a specific customer loyalty program designed to increase customer satisfaction, loyalty, and reduce churn rate. This center is available from Monday through Friday from 8:00 am to 6:00 pm.

LEGAL_US_E # 142338261.4

*Corporate Customer Service Group.* We have a specialized group of customer service executives whose mission is to maintain high satisfaction levels in selected corporate customers. The group consists of 14 people in Mexico City and one person in Puebla.

Customers may access their billing statements through our website. We have also installed an IVR that allows customers to consult their balance, payment and customer service locations, among other information. In addition, customers may pay their bills through monthly direct deposit, cash payments at four of the largest Mexican banks, and several large chain of stores (*Farmacias del Ahorro, Elektra and Tiendas Extra*). We also assist our customers with new service requests and product information.

## Credit, Billing and Collection

We perform credit checks using a leading Mexican credit bureau on all of our potential business customers. Depending on the result of the credit check, we may request financial statements in order to analyze if a deposit, promissory note, third-party guarantee or standby letter of credit is necessary.  For business customers with an imperfect credit history we require two months deposit, which is calculated based on the estimated average billing. For call centers and other high-usage customers we may require higher deposits, collect on a prepaid or weekly basis and undertake a closer monitoring of call activity.

We invoice customers monthly on a staggered basis, we have four commercial billing cycles and four billing cycles in the case of residential customers. We process and print our bills within seven days after the end of each cycle. Customers then have an approximate of 20 to 23 days to pay the bill (depending on their billing cycle). We have implemented for commercial customers on our current systems a paper-less billing strategy, which allows us to reduce billing expenses, invoice delivery times, waste and simplifies the billing information management for our customers.

For commercial and residential customers with one or up to six lines, if they do not pay their bill on time, service is completely restricted on the second day of delinquency, not allowing to receive calls or make calls, not allowing use of the Internet and not allowing them to watch television. The customer can only receive calls from our collection area. If payment is not received after 90 days of delinquency, the line is disconnected and the account receivable are referred to collection agencies.

For commercial and residential customers with more than 6 lines, the same procedure described above is used, except that a personalized approach attempted to negotiate payment terms before imposing any restriction, suspension or disconnection of service is used.

We use our Siebel customer relationship management tool to manage our relationships with customers. This application works on a service request registration basis, where our representatives register all contacts with our customers to track customer history, to solve inquires and performs quality service, to support our business growth, collections and training of our sales force and to enhance marketing.

## Employees

As of December 31, 2018, Maxcom had 361 employees, a decrease of 18% compared to 441 employees as of December 31, 2017. This reduction in the number of employees is mainly attributed to the gradual process of divestiture of the residential business. Of the total employees, 295 or 82% are non-unionized and 18% are unionized and covered by the terms of a collective labor agreement which the company held with the *Sindicato Nacional de Trabajadores de Telecomunicaciones, Telefonía, Comunicaciones, Cibernética, Productos Eléctricos, Electrónicos, Similares y Conexos de la República Mexicana.* Maxcom has not had any strikes or stoppages and we believe we have a satisfactory relationship with our employees and the union representing them.

We also has 28 sales representatives as of December 31, 2018 and 31 sales representatives as of December 31, 2017.

**Legal Proceedings**

*IFT Resolution*

Pursuant to an IFT resolution, (Agreement P/IFT/100715/276) adopted in its XV regular meeting held on July 10, 2015, Maxcom was denied extension to the terms of three of its concessions to make use, bring to bear and exploit frequency bands of the radio electric spectrum to provide point-to-multipoint microwave links in Regions 3, 5 and 8 of the national territory. These concessions were granted on April 1, 1998 by the Communications and Transportation Ministry (*Secretaría de Comunicaciones y Transportes*) and expired on April 1, 2018.

According to the IFT's resolution, our extension request was refused because we did not meet the admissibility requirements established in Article 19 of the Federal Telecommunications Law (*Ley Federal de Telecomunicaciones*). This resolution was complied with and the frequency bands were cleared, notifying the IFT of said compliance on April 10, 2018.

It is important to note that these concessions do not affect the validity and operation of the other concessions granted in our favor and therefore there is no effect to the services we provide to our customers or to our revenues.

*VAT Arbitration*

In February 2019, we were notified by the SAT that we failed to demonstrate the necessary interconnection operations required of international telecommunication providers for operations during the 2015 fiscal year, associated with a series of observations performed by SAT of its 2015 auditing process. In these observations, SAT determined that we did not demonstrate sufficient evidence to meet the "materiality" and "indispensability" elements of interconnection operations with a telecom concessionaire and telecom reseller, both of which provided us with overseas call termination services. This determination puts us at risk of expense deductions incurred in 2015 as well as crediting Value Added Tax (VAT) paid to these suppliers, which could ultimately result in us having to pay significant back-taxes to the SAT. We are currently in the process of disputing these claims and have requested intervention from the Taxpayer Advocacy Office in order to ensure a satisfactory agreement with the SAT. Although we believe it is unlikely that we will lose this dispute, this proceeding could materially affect our consolidated financial position and results of operations. See "Risk Factors—Risks Related to Our Business—We may be unable to reach an agreement with Mexican tax authorities, which could result in us having to pay significant back-taxes".

*Other Matters*

In addition to the matters described above, we are involved in various claims and legal actions arising in the ordinary course of business. In addition, from time to time, we become aware of potential non-compliance with applicable regulations, which have either been identified by us (through our internal compliance auditing program) or through notice from a governmental entity. In some instances, these matters could potentially become the subject of an administrative or judicial proceeding and could potentially involve monetary sanctions. Other than as described above, we believe, after considering a number of factors, including, but not limited to, the opinion of legal counsel, our prior experience and the nature of existing claims and proceedings to which we are currently subject, that the ultimate disposition of these claims and proceedings should not materially affect our consolidated financial position or results of operations.

# MANAGEMENT

## *Our Board of Directors*

Our board of directors is responsible for the management of our business. The board of directors is comprised of nine members and their corresponding alternate members, each of whom is elected annually at our general shareholders' meeting. All board members hold their positions for one year and may be reelected. The current members of the board of directors were appointed at the general annual ordinary shareholders' meeting held on April 30, 2019.

Our bylaws provide that the board of directors be comprised of at least five and no more than 21 members and their corresponding alternates, in which at least 25% of the members and their corresponding alternates are independent pursuant to Mexican law.

Meetings of the board of directors are validly convened and held if a majority of the members are present. Resolutions passed at these meetings will be valid if approved by a majority of the members of the board of directors present at the meeting. If required, the chairman of the board of directors may cast a tie−breaking vote.

The following table sets forth the composition of our board of directors:

| Name | Age | Position |
|------|-----|----------|
| Enrique Castillo Sánchez Mejorada** | 62 | Chairman |
| Javier Molinar Horcasitas** | 59 | Vice Chairman |
| Henry Davis Carstens** | 53 | Counselor |
| Alberto Martín Soberón | 59 | Counselor |
| Arturo Monroy Ballesteros | 46 | Counselor |
| Rodrigo Lebois Mateos ** | 55 | Counselor |
| Ricardo Guillermo Amtmann Aguilar | 64 | Counselor |
| Héctor Olavarría Tapia* | 45 | Counselor |
| Carlos Muriel Gaxiola * | 58 | Counselor |

(*)  Independent director in accordance with the Mexican Securities Market Law (*Ley del Mercado de Valores*, or "LMV")
(**)  Individual shares held is greater than 1% of our capital stock. See "Main Shareholders"

Héctor Olavarría Tapia and Carlos Muriel Gaxiola are independent directors.

Fernando Castillo Badía, Manuel Papayanopulos Thomas, Paul Davis Carstens, Gerardo Martín Bello, Almudena Lebois Ocejo, Ricardo Amtmann López, Héctor Marcelo Antonio Escobar Flores, Ana Buch Torres and Patricia Ferro Bertolo serve as alternate directors during the absence of  Enrique Castillo Sánchez Mejorada, Javier Molinar Horcasitas, Henry Davis Carstens, Alberto Martín Soberón, Arturo Monroy Ballesteros, Rodrigo Lebois Mateos, Ricardo Guillermo Amtmann Aguilar, Héctor Olavarría Tapia and Carlos Muriel Gaxiola, respectively. Fernando de Ovando Pacheco is the non-member secretary of the board of directors. Armando Jorge Rivero Laing serves as alternate secretary of the board of directors.

Set forth below is a brief biographical description of each of our directors:

***Enrique Castillo Sánchez Mejorada*** has been President of our board of directors since October 2013. He started his professional career in Banco Nacional de México, where he served as a director.  Afterwards he held several executive positions in the following institutions: Nacional Financiera, Casa de Bolsa Inverlat, Seguros América, InverMéxico Banco Mexicano, Credit Suisse México, and was President of the board of directors of Ixe Grupo Financiero. He was also Vice-President and President of Asociación de Bancos de México.  He is currently an Independent Director in Organización Cultiba, S.A.B. de C.V., Grupo Herdez, S.A. de C.V., Grupo Alfa, S.A.B.

LEGAL_US_E # 142338261.4

de C.V., Médica Sur, S.A.B. de C.V., Banco Nacional de México, S.A., Unifin Financiera, SAPI de C.V. and Southern Copper Corporation. He holds a bachelor's degree in business administration from Universidad Anahuac.

*Javier Molinar Horcasitas* has been Vice-President of our board of directors since October 2013. He served as Corporate and Subsidiaries Promotion Officer and a member of the board of directors at Casa de Bolsa Inverlat, as well as Executive Vice-President at Grupo Financiero Santander Mexicano. In 2000, he joined Ixe Grupo Financiero where he was responsible for the business, administration, and finance areas. He was CEO of Ixe Banco and of Ixe Grupo Financiero. In July 2011, he joined the board of directors of Grupo Financiero Banorte, where he lead the integration process after the merger of Grupo Financiero Banorte and Ixe Grupo Financiero. Currently he is Senior Partner of Ventura Capital Privado, S.A. de C.V., President of the board of directors of Ventura Entertainment, S.A.P.I. de C.V., and IRL Holding, S.A.P.I. de C.V. He is also member of the board of directors of Grupo Gigante, S. A. de C. V., where he is the head of the Finance and Planning Committee and is member of the board of directors of Grupo Porres. He holds a bachelor's degree in business administration from Universidad La Salle.

*Henry Davis Carstens* has been member of our board of directors since October 2013. He held several positions in financial institutions, such as Inverlat, Chase Manhattan Bank and Banco Mexicano. He was CEO of Midas Franchise System in Mexico, as well as President and CEO of Grupo Probelco and was member of the Credit, Risk and Executive Committees and a member of the board of directors of Ixe Grupo Financiero. He was also Vice-President and a board member of the Cámara Nacional de la Industria de Perfumería y Cosmética. Currently, he participates as a board member of Grupo Financiero Aserta, Afianzadora Aserta, S.A. de C.V., Afianzadora Insurgentes, S.A. de C.V., Corporativo DAC, S.A. de C.V. and Ventura Entertainment, S.A. de C.V. He holds a bachelor's degree in economics by Instituto Tecnológico Autónomo de México and a master's degree from the J.L. Kellogg Graduate School of Management at Northwestern University.

*Alberto Martín Soberón* has been member of our board of directors since October 2013. Mr. Martín is a member of the board of directors of Soriana, Ixe Grupo Financiero, and Grupo Inmex, amongst others. He served as CEO at Tiendas de Descuento del Nazas, which later merged with Tiendas de Descuento del Norte to become Soriana. He was a director at Grupo Financiero InverMéxico. He has bachelor's degree in public accounting and technologies engineering from Instituto Tecnológico y de Estudios Superiores de Monterrey.

*Arturo Monroy Ballesteros* has been member of our board of directors since October of 2013. He served as Deputy Director of Financial Engineering at the Public Credit General Office. He was Advisor of the C. Secretary of Communications and Transportation and Deputy Director of Investment Banking and Corporate Financing at Nafin. He currently serves as Deputy CEO of Investment Banking and Structured Financing at Grupo Financiero Banorte and CEO of Sólida Administradora de Portafolios, which is a subsidiary of this latter financial group. He holds a bachelor's degree in actuarial science from Universidad Anáhuac, and a master's degree in finance from the same university. Mr. Ballesteros has participated of several programs in investment banking and risk management in New York and Rio de Janeiro.

*Rodrigo Lebois Mateos* was appointed member of our board of directors in April 2016. He is the Founding Shareholder and Chairman of Unifin Financiera. Prior to the formation of Unifin in 1993, he held several positions with car dealers, including General Manager and a member of the board of directors of Grupo Ford Satélite. He also served as President of the National Association of Nissan Car Dealers, and a board member of Sistema de Crédito Automotriz (SICREA) and ArrendadoraNimex. Mr. Lebois is the President of Fundación Unifin and Chairman of the board of directors of Unifin Capital, Unifin Credit, Unifin Autos and Unifin Agente de Seguros y Fianzas. He holds a bachelor's degree in business administration from Universidad Anahuac and has participated in several executive programs.

*Ricardo Guillermo Amtmann Aguilar* has been member of our board of directors since October 2013. Mr. Amtmann is currently President and CEO of Laboratorios Sanfer, S.A. de C. V. He also serves on the board of directors of Banamex (Consejos Consultivos), Almacenadora del Valle de México and Hospital Bite Medical. He was a member of the boards of Acciones Bursátiles, Allergan, Casa de Bolsa Bancomer, Arrendadora Chapultepec, Arrendadora Monterrey, Berol, and Ixe Grupo Financiero, among others. He holds a bachelor's degree in business administration from Universidad Anáhuac in México and a master's degree from the same university.

*Héctor Olavarría Tapia* has been an independent member of our board of directors since April 2015 and Chairman of our Audit Committee since April 2016. He has more than seventeen years experience in the telecommunications sector. He has held several positions in the Public Federal Administration, all of them linked to the opening and penetration of information and communication technologies. Mr. Tapia started as an analyst at Comisión Federal de Telecomunicaciones and became Deputy Secretary for Communications of the Ministry of Communications and Transportation. In January 2013, he was recognized as Senior Telecommunications Expert by the International Telecommunications Union, the highest international body in the field of telecommunications and information and communication technologies, where he was invited to work as an expert in two programs of wireless terrestrial and satellite technology to be applied worldwide. Currently, he is a founding partner of the firm Olavarria & Alfaro, SC, specialists in telecommunications, administrative and constitutional law and the financial sector. He holds a master's degree in international economic law from the University of Warwick, UK.

*Carlos Muriel Gaxiola* has been an independent member of our board of directors since October 2013 and Chairman of our Corporate Practices Committee since April 2016. He held various executive positions in Banco del Sureste, Inverlat International, Inc. and Casa de Bolsa Inverlat. He then served as CEO of Afore Santander-Serfin and Bursamex, Casa de Bolsa, and held several positions in Grupo ING until becoming CEO and Chairman of the board of directors of ING Latin America and ING Mexico. He is currently an independent board member and advisor of several entities. Additionally, he serves as Chairman of the board of directors of Virtual Market Ventures; a member of the board of directors and member of the Executive Committee of Kubo-Financiero; a member of the board of directors and member of the Audit Committee of Grupo Financiero Actinver, a member of the board of directors of Christel House Mexico and Advisor of Happy Hearts Fund USA. He holds a bachelor's degree in industrial engineering from Universidad Iberoamericana and holds a master's degree in economics and business administration from the University of Texas in Austin.

## Our Main Executive Officers

Our executive officers are appointed by the board of directors for an indefinite term and may be removed by the board of directors at will, provided the corresponding severance payments are made in accordance with Mexican labor law and the applicable labor contract.

The following table lists the names, ages, and positions of our current main executive officers:

| Name | Age | Position |
|---|---|---|
| Lauro Cantu Frias | 50 | Chief Executive Officer |
| Erik Gonzalez Laureano | 42 | Chief Financial Officer |

Set forth below is a brief biographical description of each of our executive officers:

*Lauro Cantu Frias* has been our chief executive officer since October 2016. He has more than 15 years of experience in senior management positions in different companies in the telecommunications industry, which include Gartner, RedIT, Axtel and Marcatel. He holds a degree in administrative computer systems from the Instituto Tecnológico y de Estudios Superiores de Monterrey, and a master's degree in business administration from the same institution.

*Erik González Laureano* has been our chief financial officer since April 2017. Mr. González Laureano has over 19 years of experience in high managerial positions in different companies in the real state, housing, banking and private equity sectors, such as Consorcio Hogar, Enesa Energia, Banorte-Ixe Tarjetas, Ixe Grupo Financiero, Banco del Ahorro Nacional y Servicios Financieros (BANSEFI). He holds a bachelor's degree in accounting and business administration from Instituto Tecnologico Autonomo de Mexico and a master's degree in business administration from Alliance Manchester Business School in the United Kingdom.

## *Authority of the Board of Directors*

Our company is managed by the board of directors and the executive officers appointed by the board of directors. The board of directors sets forth the guidelines and general strategy for the conduct of our business and supervises the execution thereof.

Pursuant to the LMV, the board of directors must approve, among other matters, the following actions:

- our general strategy;

- guidelines for the use of corporate assets;

- on an individual basis, any transactions with related parties, subject to certain limited exceptions;

- unusual or non-recurrent transactions and any transactions that involve the acquisition or sale of assets with a value equal to or exceeding 5% of our consolidated assets, or the assumption of liabilities or granting of collateral or guarantees with a value equal to or exceeding 5% of our consolidated assets;

- the appointment or removal of the chief executive officer;

- accounting and internal control policies; and

- policies for disclosure of information.

The LMV also imposes duties of care and of loyalty on our directors.

### Committees of the Board

Our board of directors has established an Audit Committee and a Corporate Practices Committee to assist in the management of our business.

While carrying out its surveillance activities, the Board of directors is assisted by the Audit and Corporate Practices Committees. The chairmen of these committees were appointed by the Shareholders' Annual Ordinary General Meeting held on April 30, 2019.

Our board of directors has established an audit committee and a corporate practices committee responsible for advising the board on, and overseeing, our financial condition and matters regarding accounting, taxation and release of financial information, as well as to oversee and mitigate the risks of doing business in general and with related parties such as our shareholders, and to supervise the compliance of laws and securities regulations that apply to us. The charter of our audit commitee and corporate practices committee contains the rules of operation of each committee. Under the charter, the audit commitee and corporate practices committee must be composed of at least three members. Each member of the audit committee and corporate practices committee (including its president) must be independent under the rules of the Mexican Securities Market Law. Both commitees have at least one member that serves as a financial advisor.

The audit committee is comprised of Héctor Olavarría Tapia (who acts as President of the audit committee), Fernando de Ovando and Carlos Muriel Gaxiola. The corporate practices committee is comprised of Carlos Muriel Gaxiola (who acts as President of the corporate practices committee), Hector Olavarria and Fernando de Ovando all of whom are independent under the rules of the Mexican Securities Market Law. If requested, our external independent auditor and certain of our executives, including our vice-president of administration, finance and legal, will be required to participate in each meeting, although they are not formal members of the committee.

### Audit Commitee

The function of the audit committee is to monitor and supervise the integrity of financial information, processes and accounting systems, control and records of the Company and of the entities it controls, monitor technical ability, independence and function of the firm performing our external audit, as well as the efficiency of the internal controls of the Company and valuation of financial risks. Our Audit Committee performs the following functions, among others:

- advise the board of directors with respect to matters assigned to it under the Mexican Securities Market Law, including: (a) our internal control and internal audit guidelines, (b) our accounting policies by referenced to financial reporting standards, (c) our financial statements, (d) the appointment of our external auditors, and (e) transactions that either are outside the ordinary course of our business or, in relation to the results of the immediately preceding fiscal quarter, constitute (i) the acquisition or disposition of assets or (ii) the provision of guaranties or the assumption of liabilities, in each case, equal to or greater than 5% of our consolidated assets;

- evaluate, analyze and supervise the work performed by our external auditors, including (a) review with them our annual and interim financial statements; (b) approve non−audit services provided by them; (c) resolve any disagreements between them and management; and (d) ensure their independence and objectivity;

- discuss our financial statements with the persons responsible for their preparation and review, and issue a recommendation to the board of directors with respect to committee's approval;

- inform the board of directors of the status of the internal control and internal audit system of the Company or of the entities it controls, including any detected irregularities;

- prepare the opinion referred to in Article 28, section IV, paragraph c of the LMV and submit it for consideration by the board of directors for its presentation to the general ordinary shareholders' meeting; based upon the opinions of the external auditor, certifying: (i) the policies and accounting information criteria followed by the Company are adequate and sufficient, (ii) such policies and criteria have been applied consistently to the information presented by the CEO and (iii) the information presented by the CEO reasonably reflects the condition of the financial position and results of the Company;

- support the board of directors in preparing the reports referred to in Article 28, section IV, paragraphs d and e of the LMV;

- ensure that the operations referred to in Article 28, section III and Article 47 of the LMV, are conducted in compliance with such provisions;

- seek the opinion of independent experts and other advisors when required or deemed necessary for the proper performance of their duties or in accordance with the provisions of the LMV;

- require relevant officers and other employees of the Company, or officers and employees of the entities it controls, to provide reports regarding the preparation of financial information and any other information deemed necessary for the exercise of their functions;

- investigate possible violations of operational guidelines and policies, internal controls, internal audit systems and accounting records;

- review observations made by shareholders, directors, executive officers, employees or any third party, regarding the matters referred to in the previous paragraph, as well as perform the actions which they consider necessary with respect to such observations;

- request periodic meetings with relevant officers, as well as deliver of any information related to internal control and internal audit of the Company or the entities it controls;

A-85

- report to the board of directors any significant irregularities detected in the performance of its duties and, if applicable, irregularities in the amendments adopted and propose actions to correct such irregularities;

- call a shareholders' meeting and request the inclusion of matters it considers appropriate in the agenda;

- ensure that the CEO fulfills the resolutions passed by the shareholders' meetings and the board of directors' meetings; and

- ensure that there are mechanisms and internal controls established to verify that the operations of the Company, and of the entities it controls, adhere to the applicable regulations, as well as implement methodologies to ensure such compliance.

### Corporate Practices Committee

The function of the corporate practices committee is to monitor and mitigate risks for the benefit of the shareholders, subject to the authorizations or policies issued by the board of directors, ensure compliance with the applicable laws and stock exchange regulations. The corporate practices committee performs the following functions, among others:

- inform the board of directors on matters of its concern, in accordance with the LMV;

- request the opinion of independent experts, if necessary, for the proper performance of its duties or in accordance with the LMV;

- call a shareholders' meeting and request the inclusion of matters it considers appropriate in the agenda;

- assist the board of directors in preparing the reports referred to in Article 28, section IV, paragraphs d and e of the LMV.

### Compensation

Members of our board of directors appointed by the ordinary general meeting of shareholders' held on April 30, 2019 will receive a compensation of Ps.30,000 for each board of directors meeting and committee meeting they attend.

Any director that is a related party may not receive any compensation or benefits from us or from our subsidiaries.

### Shareholdings

As of April 30, 2019, Rodrigo Lebois Mateos held 12.67% of Maxcom's outstanding capital stock; while Enrique Castillo Sánchez Mejorada held 9.09%; Javier Molinar Horcasitas 5.19%; Henry Davis Carstens 2.88%, Alberto Martin Soberon 2.10% and Ricardo Guillermo Amtmann Aguilar 1.53%.

### Director and Officer Indemnification and Limitation on Liability

Our bylaws provide that none of our directors, members of committees of our board of directors or officers shall be liable to us or our stockholders for (1) any action taken or failure to act which was in good faith and was not a violation of a material provision of our bylaws and which was not grossly negligent, willfully malfeasant or knowingly in violation of the Mexican Securities Market Law, (2) if applicable, any action or inaction that is based upon the opinion or advice as to legal matters of legal counsel or as to accounting matters of accountants selected by any of them with reasonable care the competence of which is not the subject of a reasonable doubt and (3) any action or omission that was, to the best knowledge of the board member, committee member or officer, the most adequate choice or where the adverse effects of such action or omission were not foreseeable, in each case based

A-86

upon the information available at the time of the decision.  To the extent a director, committee member or officer is found to have acted in bad faith, with gross negligence or with willful malfeasance in connection with an action or failure to act in good faith which is not a violation of the material provisions of the bylaws, such director, committee member or officer may be liable for damages and losses arising under Mexican law.

Our bylaws also provide that each director, member of a committee of the board of directors and officer who is made or threatened to be made a party to a proceeding as a result of his or her provision of services to us will be indemnified and held harmless by us to the fullest extent permitted by Mexican law against all expenses and liabilities incurred in connection with service for or on behalf of us.  There is doubt as to whether, under Mexican law, this indemnification will be enforceable in respect of the breach of the duty of loyalty.  However, in the event that a director, officer or committee member initiated a proceeding, they will only be indemnified in connection with such proceeding if it was authorized by our board of directors.

We may maintain insurance policies under which our directors and certain officers are insured, subject to the limitations of such policies, against certain expenses in connection with the defense of, and certain liabilities which might be imposed as a result of, actions, suits or proceedings to which they are parties by reason of being or having been such directors or officers.

Unless otherwise determined by our board of directors, expenses incurred by any of our directors, members of a committee or officers in defending a proceeding shall be paid by us in advance of such proceeding's final disposition subject to our receipt of an undertaking, in form and substance satisfactory to our board of directors, to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by us. Persons which are not covered by the foregoing indemnification rights and who are or were our employees or agents, or who are or were serving at our request as employees or agents of another corporation, partnership, joint venture, trust or other enterprise, may also be indemnified to the extent authorized at any time or from time to time by our board of directors.  Such expenses related to a proceeding incurred by such other employees and agents may also be paid in advance of a proceeding's final disposition, subject to any terms and conditions on such payment as our board of directors deems appropriate.

A-87

## PRINCIPAL SHAREHOLDERS AND RELATED PARTY TRANSACTIONS

### Principal Shareholders

The table below sets forth information concerning the percentage of our voting capital stock owned by any person known to us to be the owner of 5% or more of any class of our voting securities as of April 30, 2019. There is no group of shareholders that holds control of the Company.

| Shareholder | Series A Common Stock | |
| --- | --- | --- |
| | Number of Shares | % |
| Rodrigo Lebois Mateos ................................ | 18,296,269 | 12.67% |
| Trust 744869 of Banco Mercantil del Norte, S.A. | 10,214,981 | 7.07% |
| Enrique Castillo Sánchez Mejorada ........... | 13,138,802 | 9.09% |
| Javier Molinar Horcasitas........................... | 7,504,466 | 5.19% |
| Investing Public .......................................... | 95,316,563 | 65.98% |
| Total ....................................................... | 144,471,081 | 100.00% |

### Significant Changes in Share Ownership

On September 27, 2013 Maxcom completed a comprehensive plan of recapitalization and an equity tender offer initiated by Ventura, acting through the Trust 1387 held by Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, a banking institution organized and existing under the laws of the United Mexican States and other investors. For more information, see "2013 Recapitalization and Debt Restructure".

### Differences in Voting Rights

In relation to any particular class of our securities, the voting rights of majority shareholders, directors and officers do not differ from the voting rights of other holders of the same class of securities.

### Limitations on the Participation in Share Ownership by Foreign Shareholders

The participation of foreign investors in Mexican companies, and in certain industries including telecommunications, is regulated by the Foreign Investment Law (Ley de Inversión Extranjera) since 1993 and by the Regulation of Foreign Investment Law (Reglamento de Ley de Inversión Extranjera) and the National Registry of Foreign Investment (Registro Nacional de Inversión Extranjera) since 1998. The Ministry of Economy (Secretaría de Economía), through the Mexican Foreign Investment Bureau (Dirección General de Inversión Extranjera), applies the mandates of the Foreign Investment Law and the Regulation of Foreign Investment Law. Mexican companies involved in certain sectors of the economy must comply with the existing restrictions on the percentage of participation of foreign investment in their capital stock. Until the reforms mentioned in the following paragraph, this regulation included companies in the telecommunications industry. Mexican companies usually set limits to the holdings on some type of shares of its capital stock, so that certain types of shares are held only by Mexican shareholders.

By virtue of the constitutional and legal reforms published in: (I) the Decree whereby amendments and additions are made to various provisions of Articles 6, 7, 27, 28, 73, 78, 94 and 105 of the Constitution of the United Mexican States, on telecommunications matters dated June 11, 2013, and (ii) the Decree whereby the Federal Telecommunications and Broadcasting Act and the Public Broadcasting System of the Mexican State are issued; and certain provisions in telecommunications and broadcasting are modified, added or derogated, dated July 14 2014, the restriction on companies in the telecommunications industry from allowing foreign participation in share

LEGAL_US_E # 142338261.4

ownership was lifted.

In addition to the restrictions relating to share ownership, the terms and conditions of concessions for telecommunications networks that were granted to the Company, establish that Mexican shareholders must have control of the management and appoint the executive body.

The Foreign Investment Law requires the Company to enroll foreign shareholders in the National Registry of Foreign Investment. In case of breach of this law, the Company could be required to pay a penalty in an amount determined by the Ministry of Economy, through the Mexican Foreign Investment Bureau.

According to the bylaws of the Company, the Federal Telecommunications Law (Ley Federal de Telecomunicaciones), the Foreign Investment Law and the terms and conditions ruling on public telecommunications network concessions, foreign countries may not be directly or indirectly holders of the Series "A " shares. Notwithstanding the foregoing, the Federal Telecommunications Law and the terms and conditions ruling on public telecommunications network concessions require that companies owned by foreign countries incorporated as independent companies holders of their own assets, may hold a minority interest or any number of limited voting shares of the Company. The holdings of shares of Series "A" common stock by companies owned by foreign countries, or by retirement funds incorporated for the benefit of employees of states, municipalities or other government entities will not be considered either directly, or indirectly owned by foreign countries in accordance with the provisions of the bylaws of the Company, Federal Telecommunications Law and the Foreign Investment Law.

According to Mexican law, the terms and conditions of the telecommunications networks concessions, the bylaws of the Company, foreign investors that hold Series "A" shares and ADSs are forced to give up the protection of their government. This obligation also stipulates that foreign investors that hold Series "A" shares and ADSs may not ask their government to file a complaint against the Mexican government regarding their shareholders' rights on Series "A" shares or ADSs. If foreign investors contravene this provision of the bylaws of the Company, they will lose their Series "A" shares ownership, underlying their Series "A" shares or ADSs, in favor of Mexico. Mexican law states that all Mexican companies must include in their bylaws this prohibition, except for companies that establish the foreigners or foreign investment exclusion clause.

LEGAL_US_E # 142338261.4

**INDEPENDENT ACCOUNTANTS**

The Annual Audited Financial Statements included in this statement have been audited by Deloitte Touche Tohmatsu Limited, independent accountants, as stated in their report appearing herein.

## INDEX TO FINANCIAL STATEMENTS

**Audited Consolidated Financial Statements**

Independent Auditors' Report............................................................................................................F-3
Consolidated statements of financial position at December 31, 2018 and 2017....................................F-8
Consolidated income statements for the years ended December 31, 2018 and 2017.............................F-9
Consolidated statements of changes in stockholders' equity for the years ended
    December 31, 2018 and 2017........................................................................................................F-10
Consolidated statements of cash flows for the years ended December 31, 2018 and 2017..................F-11
Notes to the consolidated financial statements...................................................................................F-13

**Earnings Report Attaching Interim Unaudited Financial Statements**

Earnings Report for the three months ended March 31, 2019 ...........................................................F-67
Unaudited consolidated statement of financial position at March 31, 2019 and year ended December 31, 2018 ...F-78
Unaudited consolidated statements of comprehensive loss for the three months ended March 31,
    2019 and 2018............................................................................................................................F-79
Unaudited consolidated statements of changes in stockholders' equity for the three months ended March
    31, 2019 and year ended December 31, 2018...............................................................................F-80
Unaudited consolidated statements of cash flows for the three months ended March
    31, 2019 and 2018 .....................................................................................................................F-81

**Maxcom Telecomunicaciones, S. A. B. de C. V. and Subsidiaries**

Consolidated Financial Statements for the Years Ended December 31, 2018, and 2017, and Independent Auditors' Report Dated April 11, 2019



## Maxcom Telecomunicaciones, S. A. B. de C. V. and Subsidiaries

# Independent Auditors' Report and Consolidated Financial Statements for 2018, and 2017

| Table of contents | Page |
| --- | --- |
| Independent Auditors' Report | 1 |
| Consolidated Statements of Financial Position | 5 |
| Consolidated Statements of Loss and Other Comprehensive Income | 6 |
| Consolidated Statements of Changes in Stockholders' Equity | 7 |
| Consolidated Statements of Cash Flows | 8 |
| Notes to the consolidated Financial Statements | 10 |





Galaz, Yamazaki,
Ruiz Urquiza, S.C.
Paseo de la Reforma 505, piso 28
Colonia Cuauhtémoc
06500  Ciudad de México
México

Tel: +52 (55) 5080 6000
www.deloitte.com/mx

## Independent Auditors' Report to the Board of Directors and Stockholders of Maxcom Telecomunicaciones, S. A. B. de C. V. and Subsidiaries

### Opinion

We have audited the consolidated financial statements of Maxcom Telecomunicaciones, S. A. B. de C. V. and Subsidiaries (the Entity), which comprise the statements the consolidated statements of financial position as of December 31, 2018, and the consolidated statements of Loss and Other Comprehensive Income, consolidated statements of changes in equity and consolidated statements of cash flows for the years then ended, and notes to the consolidated financial statements, including a summary of significant accounting policies.

In our opinion, the Entity consolidated financial statements present fairly, in all material respects, the consolidated financial position of Maxcom Telecomunicaciones, S. A. B. de C. V. and Subsidiaries as of December 31, 2018, and its consolidated financial performance and its consolidated cash flows for the years then ended in accordance with International Financial Reporting Standards (IFRSs), issued by the International Accounting Standards Board.

### Basis for Opinion

We conducted our audit in accordance with International Standards on Auditing (ISA). Our responsibilities under those standards are further described in the *Auditor's responsibilities for the audit of the* consolidated *financial statements* section of our report. We are independent of the Entity and subsidiaries in accordance with the *International Ethics Standards Board for Accountants' Code of Ethics for Professional Accountants* (IESBA Code) together with the Code of Ethics issued by the Mexican Institute of Public Accountants (IMCP Code), and we have fulfilled our other ethical responsibilities in accordance with the IESBA Code and with the IMCP Code. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

### Other Matters

The consolidated financial statements of the Entity for the year ended as of December 31, 2017 was audit for others auditors, they manifest an opinion without qualified for the consolidated financial statements on April 23, 2018.

### Key Audit Matters

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements of the current period. Key audit matters were selected from those reported to Management and Audit Committee of the Entity. These matters were addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters. We have determined that the matters described below are the key audit matters which should be communicated in our report.

### Impairment analysis of long lived assets

As describe in Note 9 to the consolidated financial statements, the Entity will be tested for impairment of long lived assets that have a defined life, when there are signs of impairment.



Deloitte se refiere a Deloitte Touche Tohmatsu Limited, sociedad privada de responsabilidad limitada en el Reino Unido, y a su red de firmas miembro, cada una de ellas como una entidad legal única e independiente. Conozca en www.deloitte.com/mx/conozcanos a descripción detallada de la estructura legal de Deloitte Touche Tohmatsu Limited y sus firmas miembro.

# Deloitte.

The tested for impairment involve application of significant judgments by the Entity management  they determining the assumptions and premises related to estimate the value recovery of the cash-generating units.

As part of our audit, we performed procedures on the following significant assumptions that the Entity considered when estimate future projections to evaluate the recoverability of long lived assets: growth industry rate , new projects and significant customers, estimate revenues, discount rate, expected gross profit margin and projected cash flows. With the support of our valuation experts, our procedures, among others, included:

- We reviewed models applied to determination the value recovery of asset, are methods used and recognized to value assets with similar characteristics.

- We challenge financial projections, comparing with the performance and historical trends of the business, be corroborated the explanations of variations with the administration. Also, we evaluate the internal processes carried out by the administration to make the projections, including them timely supervision and analysis by the Board of Directors and if the projections are consistent with budgets approved by the Board.

- We analyze the assumptions used in the impairment model, specifically including cash flow projections, EBITDA multiple and long term growth. The key assumptions used to estimate cash flows in the Entity impairment tests are those related to revenue growth and operating margin.

- Independent evaluation of the discount rates used and the methodology used in the preparation of the impairment test model. We have also tested the Completeness and accuracy of the impairment model.

- We discussed with the administration the sensitivity calculations calculating the degree of the assumptions used would need to be modified and the probability of these modifications are presented.

Results of our procedures were satisfactory and we agree that the assumptions used, including the discount rate, are appropriate.

### *Operating Entity*

As mentioned in Note 1 to the consolidated financial statements, the Entity has incurred recurrent net losses during a few years, which could raise questions about its ability to continue operating as an Entity. In the process of preparation of the consolidated financial statements, the Entity management carried out an competence of its working capital adequacy and, with the support of cash flow projections for the 15 months period ended on March 31, 2020, it has concluded that the Entity has competence working capital to finance its operations and to meet its financial obligations on the due dates that will be presented in the 12 months period following the date of this report.

Consequently, the consolidated financial statements have been prepared considering the Entity as an operating Entity.

The evaluation of the operating Entity was based on cash flow projections that require significant judgments when determining assumptions about events as future conditions that inherently have certain uncertainty.

Our procedures related to the evaluation carried out by the Entity management on its own ability to continue operating as an Entity, included, with the support of our valuation specialists, the evaluation of the reasonableness of the key assumptions used by the Entity . Administration in the preparation of cash flow projections and the reasonableness of such assumptions, based on our knowledge of the business, industry and historical information. We also consider the reasonable impact of events that could adversely affect these cash flow projections and the actions proposed by the administration for mitigation.

The results of our procedures were satisfactory and we agree with the conclusion of the Entity's management on the preparation of the consolidated financial statements considering the Entity as a functioning Entity.



2

# Deloitte.

*Annual Report presented to the Mexican Stock Exchange (BMV, by its acronym in Spanish)*

The Administration is responsible for the annual report that is presented in accordance with the general provisions applicable to issuing of securities in Mexico, and that will include the consolidated financial statements and our audit report. The annual report will be provided to us after the date of this report.

Our responsibility is to read the information contained in the annual report when it is available, and in doing so, consider if it is materially consistent with the consolidated financial statements and with our knowledge obtained in the audit. We based on this reading, if we conclude that there is a material inconsistency in the annual report, we are required to notify the fact.

*Responsibilities of Management and Those Charged with Governance for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with IFRSs, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error. In preparing the consolidated financial statements, management is responsible for assessing the Entity's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless management either intends to liquidate the Entity or to cease operations, or has no realistic alternative but to do so.

Those charged with governance are responsible for overseeing the Entity's financial reporting process as review the content of the consolidated financial statements and submit them for approval by the Entity's Board of Directors.

*Auditor's Responsibilities for the Audit of the Consolidated Financial Statements*

Our objectives are to obtain reasonable assurance about the consolidated the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements.

As part of an audit in accordance with ISAs, we exercise professional judgment and maintain professional skepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Entity's internal control.



3

# Deloitte.

- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by management.

- Conclude on the appropriateness of management's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Entity's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditor's report to the related disclosures in the financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditor's report. However, future events or conditions may cause the Entity to cease to continue as a going concern.

- Evaluate the overall presentation, structure and content of the consolidated financial statements, including the disclosures, and whether the consolidated financial statements represent the underlying transactions and events in a manner that achieves fair presentation.

- Obtain sufficient appropriate audit evidence regarding the financial information of the entities or business activities within the Entity to express an opinion on the consolidated financial statements. We are responsible for the direction, supervision and performance of the group audit. We remain solely responsible for our audit opinion.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

We also provide those charged with governance with a statement that we have complied with relevant ethical requirements regarding independence, and to communicate with them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, related safeguards.

From the matters communicated with those charged with governance, we determine those matters that were of most significance in the audit of the consolidated financial statements of the current period and are therefore the key audit matters. We describe these matters in our auditor's report unless law or regulation precludes public disclosure about the matter or when, in extremely rare circumstances, we determine that a matter should not be communicated in our report because the adverse consequences of doing so would reasonably be expected to outweigh the public interest benefits of such communication.

Galaz, Yamazaki, Ruiz Urquiza, S. C.
Member of Deloitte Touche Tohmatsu Limited

C. P. C. Luis Roberto Martínez Del Barrio
Mexico City, Mexico
April 11, 2018



Maxcom Telecomunicaciones, S. A. B. de C. V. and Subsidiaries

# Consolidated Statement of Financial Position

**As of December 31, 2018 and 2017**
(In thousands of Mexican pesos)

## Assets

| Assets | Notes | 2018 | 2017 |
|---|---|---|---|
| **Current assets:** | | | |
| Cash and cash equivalents | 7 | $ 456,544 | $ 585,271 |
| Accounts receivables - Net | 8 | 157,289 | 253,674 |
| Value added tax | | 54,522 | 110,502 |
| Other accounts receivable | | 10,091 | 14,857 |
| Inventories | | 1,874 | 3,404 |
| Prepayments | | 34,306 | 37,153 |
| Total current assets | | 714,626 | 1,004,861 |
| | | | |
| **Non-current assets:** | | | |
| Telecommunications network systems and equipment - Net | 9 | 2,180,446 | 2,304,597 |
| Investment property - Net | 9 | 36,191 | 34,009 |
| Intangible assets - Net | 10 | 271,125 | 264,307 |
| Restricted long-term cash | | 35,791 | 33,145 |
| Deferred income taxes | 13 | 6,033 | 22,710 |
| Other assets | | 42,029 | 10,955 |
| Total non-current assets | | 2,571,615 | 2,669,723 |
| | | | |
| **Total assets** | | $ 3,286,241 | $ 3,674,584 |

## Equity and liabilities

| Equity and liabilities | Notes | 2018 | 2017 |
|---|---|---|---|
| **Current liabilities:** | | | |
| Short-term portion of new notes payable | 11 | $ 8,428 | $ 6,801 |
| Bank loan | 12 | 30,000 | 30,000 |
| Trade payable | | 215,513 | 317,642 |
| Short-term portion of other accounts payable | 26c | 18,840 | 17,620 |
| Client deposits | | 21,692 | 2,157 |
| Other taxes payable | | 18,960 | 18,463 |
| Provisions | 14 | 34,648 | 71,612 |
| Total current liabilities | | 348,081 | 464,295 |
| | | | |
| **Non-current liabilities:** | | | |
| Long-term portion of new notes payable | 11 | 2,135,562 | 2,089,402 |
| Bank loan | 12 | 22,500 | 52,500 |
| Derivate financial instruments | 15 | 3,542 | 4,784 |
| Long-term portion of other trade payable | 26c | 22,880 | 17,390 |
| Retirement employee benefits | 16 | 1,625 | 1,898 |
| Long-term provisions | 14 | 10,843 | 23,426 |
| Total non-current liabilities | | 2,196,952 | 2,189,400 |
| | | | |
| **Total liabilities** | | 2,545,033 | 2,653,695 |
| | | | |
| **Stockholders' equity** | 18 and 20 | | |
| Capital stock | | 1,533,254 | 1,455,066 |
| Capital stock not exhibited | | (12,300) | - |
| Share premium | | 38,570 | 38,570 |
| Other capital accounts | | 11,600 | 11,600 |
| Accrued losses | | (896,015) | (590,647) |
| Other items of comprehensive income | | 4,475 | 9,496 |
| | | 679,584 | 924,085 |
| | | | |
| Non-controlling interest | | 61,624 | 96,804 |
| Total stockholders' equity | | 741,208 | 1,020,889 |
| | | | |
| **Total stockholders' equity and liabilities** | | $ 3,286,241 | $ 3,674,584 |

See accompanying notes to consolidated financial statements.

The accompanying notes are an integral part of these consolidated financial statements, which were authorized by the undersigned officers for issuance on April 11, 2019.

_____
Lauro Cantú Frías
General Director

_____
Erik González Laureano
Financial Vice President



5

**Maxcom Telecomunicaciones, S. A. B. de C. V. and Subsidiaries**

# Consolidated Statements of Loss and Other Comprehensive Income

For the years ended December 31, 2018 and 2017
(In thousands of Mexican pesos, except information on shares)

| | Notes | 2018 | 2017 |
|---|---|---|---|
| Continuing operations: | | | |
| Net income | 24 | $ 1,315,245 | $ 2,255,580 |
| | | | |
| Operating costs and expenses: | | | |
| Network operating expenses | 21 | $ 827,272 | $ 1,688,969 |
| Selling, overhead and administrative expenses | 21 | 476,601 | 458,784 |
| Other expenses | 21 | 76,659 | 100,391 |
| Total operating costs and expenses | | 1,380,532 | 2,248,144 |
| | | | |
| Operating (loss) income | | (65,287) | 7,436 |
| | | | |
| Financial costs | 22 | (582,992) | (258,119) |
| Financial income | 22 | 361,620 | 236,198 |
| Financing costs | 22 | (221,372) | (21,921) |
| | | | |
| Loss before income tax | | (286,659) | (14,485) |
| Income tax expense | 13 | 28,672 | 1,439 |
| Net loss for the year | | (315,331) | (15,924) |
| | | | |
| Other comprehensive income | | | |
| Items that will not be reclassified subsequently to loss: | | | |
| Effective portion generated by financial instruments | | (5,021) | (31,748) |
| | | (5,021) | (31,748) |
| | | | |
| Comprehensive loss for the year | | $ (320,352) | $ (47,672) |
| | | | |
| Controlling interest | | $ (280,151) | $ 2,272 |
| Non-controlling interest | | (35,180) | (18,196) |
| | | | |
| Comprehensive net loss | | $ (315,331) | $ (15,924) |
| | | | |
| Comprehensive loss per share: | | | |
| Loss per basic common share (pesos) | 19 | (2.23) | (0.39) |
| Loss per diluted common share (pesos) | | (2.19) | (0.39) |
| Basic shares weighted average (in thousands) | | 143,541 | 121,214 |
| | | | |
| Diluted shares weighted average (in thousands) | | 146,521 | 121,214 |

The accompanying notes are an integral part of these consolidated financial statements, which were authorized by the undersigned officers for issuance on April 11, 2019.

_____
Lauro Cantú Frías
General Director

_____
Erik González Laureano
Financial Vice President



6

Maxcom Telecomunicaciones, S. A. B. de C. V. and Subsidiaries

# Consolidated Statements of Changes in Stockholders' Equity

For the years ended December 31, 2018 and 2017
(In thousands of Mexican pesos)

| | Note | Capital Stock | Capital Stock not exhibited | Premium on Share subscription** | Accrued Losses | Other comprehensive income* | Stockholders' investment in controlling | Non-controlling interests | Total |
|---|---|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2017 | | $ 7,628,698 | $ - | $ 41,113 | $ (6,920,751) | $ 41,244 | $ 790,304 | $ - | $ 790,304 |
| Capital stock increase | 18 | 154,200 | - | - | - | - | 154,200 | - | 154,200 |
| Non-controlling interest stock Increase | 18 | - | - | - | - | - | - | 115,000 | 115,000 |
| Share option plan | 18 | - | - | 9,057 | - | - | 9,057 | - | 9,057 |
| Accumulated losses absorption | 18 | (6,327,832) | - | - | 6,327,832 | - | - | - | - |
| Comprehensive net loss | | - | - | - | 2,272 | (31,748) | (29,476) | (18,196) | (47,672) |
| Balances as of December 31, 2017 | | 1,455,066 | - | 50,170 | (590,647) | 9,496 | 924,085 | 96,804 | 1,020,889 |
| Initial effect of adoption of IFRS 9 | 4f | - | - | - | (25,217) | - | (25,217) | - | (25,217) |
| Issuance of ordinary shares under the employee share option plan | 18 and 20 | 78,188 | (12,300) | - | - | - | 65,888 | - | 65,888 |
| Comprehensive net loss | | - | - | - | (280,151) | (5,021) | (285,172) | (35,180) | (320,352) |
| Balances as of December 31, 2018 | | $ 1,533,254 | $ (12,300) | $ 50,170 | $ (896,015) | $ 4,475 | $ 679,584 | $ 61,624 | $ 741,208 |

\*   This amount is comprised of $38,570 of share premium and $11,600 of other capital accounts.

The accompanying notes are an integral part of these consolidated financial statements, which were authorized by the undersigned officers for issuance on April 11, 2019.



| | |
|---|---|
| Lauro Cantú Frías | Erik González Laureano |
| General Director | Financial Vice President |



7

## Maxcom Telecomunicaciones, S. A. B. de C. V. and Subsidiaries

# Consolidated Statements of Cash Flows

**For the years ended December 31, 2018 and 2017**
**(In thousands of Mexican pesos)**

| | Note | 2018 | 2017 |
|---|---|---|---|
| Cash flows from operating activities | | | |
| Loss before income taxes | | $ (286,659) | $ (14,485) |
| Adjustments for: | | | |
| Depreciation and amortization | 21 | 237,069 | 210,341 |
| Profit on sale of fixed assets and other assets | 21 | (280) | (239) |
| Profit on income sale towers telecommunications | 2 | (160,871) | - |
| Low intangible assets | | 43,252 | - |
| Unrealized exchange loss – Net | | (4,373) | (118,321) |
| Gain on settlement of debt | 22 | - | (90,206) |
| Interest payable | 22 | 222,270 | 245,344 |
| Interest receivable | 22 | (11,435) | (30,574) |
| Derivate financial instruments | 15 | 882 | (6,924) |
| Labor obligations at retirement | 16 | (273) | (343) |
| Provisions | 14 | (49,547) | 14,691 |
| Fair value of the share option | 20 | - | 9,057 |
| Impairment of accounts receivable | 8 and 21 | 33,235 | 18,023 |
| Subtotal | | 23,270 | 236,364 |
| | | | |
| Cash flows from operating activities: | | | |
| Accounts receivable | | 37,933 | (7,519) |
| Value added tax recoverable | | 55,980 | (70,296) |
| Other assets and account receivable | | 17,017 | 13,283 |
| Inventories | | 1,530 | (1,890) |
| Prepayments | | 2,847 | (10,147) |
| Accounts payable and provisions | | (102,898) | (66,629) |
| Client deposits | | 19,535 | (327) |
| Other taxes payable | | (7,164) | (13,384) |
| Short-term portion of other accounts payable | | 6,325 | (11,966) |
| Income taxes paid | | (4,334) | (15,627) |
| | | | |
| Net cash (used in) generated by operating activities | | 50,041 | 51,862 |
| | | | |
| Cash flows from investing activities: | | | |
| Interest collected | | 11,435 | 30,574 |
| Purchase of telecommunications network systems and equipment | 9 and 10 | (204,637) | (242,967) |
| Income from sale to power sale | 2 | 196,560 | - |
| Resources arising from sale of telecommunications network systems and equipment | | 3,778 | 10,131 |
| | | | |
| Cash flows from utilized in investing activities | | 7,136 | (202,262) |



8

| | Note | | 2018 | | 2017 |
|---|---|---|---|---|---|
| Cash flows from financing activities: | | | | | |
| Capital stock increase | 18 | $ | 22,563 | $ | 154,200 |
| Non-controlling interest stock increase | 18 | | - | | 115,000 |
| Bank loan | 12 | | (30,000) | | (30,000) |
| Interest paid | 22 | | (176,870) | | (169,911) |
| Restricted cash | | | (2,646) | | (8,637) |
| Repurchase of notes payable | 11 | | - | | (154,328) |
| Net cash used in financing activities | | | (186,953) | | (93,676) |
| | | | | | |
| Net (decrease) in cash and cash equivalents | | | (129,776) | | (244,076) |
| | | | | | |
| Cash and cash equivalents at the beginning of the year | | | 585,271 | | 837,608 |
| Exchange gain (loss) in cash and cash equivalents | | | 1,049 | | (8,261) |
| | | | | | |
| Cash and cash equivalents at the end of the year | | $ | 456,544 | $ | 585,271 |

The accompanying notes are an integral part of these consolidated financial statements, which were authorized by the undersigned officers for issuance on April 11, 2019.


Lauro Cantú Frías
General Director

Erik González Laureano
Financial Vice President



**Maxcom Telecomunicaciones, S. A. B. de C. V. and Subsidiaries**

# Notes to the Consolidated Financial Statements

**For the years ended December 31, 2018 and 2017**
**(In thousands of Mexican pesos, except earnings per share data)**

I.    General Information

Maxcom Telecomunicaciones, S. A. B. de C. V. and subsidiaries (Maxcom, Compañía or Group) is a variable income stock Entity incorporated on February 28, 1996.  The Entity is engaged in the construction and operation of a telecommunications public network to provide local, national long-distance and international telephone services, voice over IP services, data transfer services, internet, cable TV (until on June 2018) and private virtual network services, as other value-added services in Mexico. The Entity also offers telephone services as the operator of a virtual mobile network. The Entity began operations on May 1999.

Further to the resolutions approved by the shareholders on September 13, 2007 Extraordinary and Ordinary General Stockholders' meeting, and in light of the public share offer carried out by the Entity in Mexico, Maxcom became a variable income stock Entity (S. A. B. de C. V.).  The Entity's series "A" shares [formerly Ordinary Certificates of Participation (OCP)] are quoted and traded on the Mexican Stock Exchange (BMV, by its acronym in Spanish).  The Entity is subject to the applicable provisions of the Corporations Law and to the stock regulations contained in the Mexican Securities Market laws, as well as to supervision by the National Banking and Securities Commission (CNBV, by its acronym in Spanish).  The Entity has complied with the entirety of its social by-laws in accordance with the Securities Market Law (LMV from Spanish) and the related provisions.

The Group's direct and ultimate controlling entity is Maxcom Telecomunicaciones, S.A. de C.V..  The Entity's domicile is Guillermo González Camarena No. 2000, Col.  Santa Fe Centro, C. P. 01346, in Mexico City.

2.    **Relevant events**

2018

Strengthening of the balance sheet

During the year 2018, the Entity carried out different strategic operations to strengthen the balance sheet. As detailed below, on April 2018 Maxcom signed a *sales & leaseback* contract that generated cash flows of $196,560 for the Entity. Furthermore, in the third quarter of 2018 the Entity renewed the connection use contract of the 23 GHz spectrum band for $185,000, please see Note 26c.

Furthermore, while Maxcom has suffered a substantial reduction in its revenue flows due the termination of the international traffic through its long-distance network, this reduction follows the Entity's strategic decisions based on the low margin of this wholesale business unit (8.3%), as well from the uncertainty about the status of the refunds of recoverable balances of Value Added Tax (IVA) from the Tax Administration Service (SAT). This decision will remain in effect until there is a change in the SAT's position on IVA refunds as a result of our involvement in this segment. For the year 2019 Maxcom is evaluating the possibility of taking part in the international traffic business from the US, with the alternative that the delivery will also be abroad, which would have no effect for IVA purposes.

In respect to bonds payable, in the last few months the Entity has been analyzing different refinancing options which will help create a competitive financial structure.



In terms of costs and expenses, Maxcom continues with its transformation process, generating significant efficiencies mainly in payrolls and rentals. However, apart from the aforementioned efforts, the Entity has enhanced a number of savings initiatives such as the consolidation of current sites and telephone exchanges, infrastructure, software contracts, and the resizing of central spending.

Additionally, the lease agreement for the optical channels and sale of optic fibers was signed during the first quarter of 2019, please see Note 27.

Pursuant to the foregoing, the Entity has no doubt that it will continue to operate as a going concern for the next 12 months.

Telecommunication towers sale

On April 6, 2018, the Entity entered into a "Purchase agreement of 72 telecommunication towers" in which it sells, transfers, give and delivers to the buyer all rights, titles and interests in the assets acquired. The sales price was by $196,560 ($2,730 for each tower) plus the Value Added Tax (VAT), being paid on the date of signing the contract. On the other hand, Maxcom registered a decrease in fixed assets by $35,689 and expenses for fees by $12,923; therefore, the net effect of the transaction for the Entity was a profit by $147,948. Simultaneously, Maxcom entered into a master lease contract on said towers for a term of up to twenty years, the annual rent per tower will be by $300.

Merger of subsidiaries

In order to achieve savings and efficiencies in business administration, on January 16, 2018 through the Extraordinary General Shareholders' Meeting, the Entity approved the merger of Maxcom Servicios Administrativos, S. A. de C. V., Corporativo Telecomunicaciones, S. A. de C. V. and Servicios MSF, S. A. de C. V. with Maxcom Telecomunicaciones, S. A. B. de C. V., as a result of this merger Maxcom Telecomunicaciones, S. A. B. de C. V. will subsist as a merging Entity and the aforementioned merged companies will be terminated.

Losses Offset

On January 16, 2018, through the Extraordinary General Meeting, the Entity approved to absorb the accumulated losses of previous years in the amount by $6,327,832, due to the decrease in share capital in its variable portion. In accordance with the accounting standard, the Entity register the effect at the end of 2018, because it was a subsequent event.

2017

Repurchase of notes

On April 25, 2017, the Entity announced a public offering (the "Public Offer"), to conduct purchases for a nominal $466.5 million or the equivalent of Dls.25 million US dollars of staggered bonds known as Step-up Senior Notes 2020, issued by Maxcom (the "Bonds"). On May 25, 2017, the Entity closed the public offering for the acquisition of the Bonds, accepting to purchase $ 244.5 million equivalent to Dls.13.1 million of the principal amount of the Bonds.

Those purchases were made at the average price of $1,105.11 (one thousand one hundred five pesos 11/100) per each Dls.100.00 (one hundred dollars 00/100), nominal value. After the cancellation takes effect, the amount outstanding of the *Step-up Senior Notes 2020* will be $2,209 million (nominal).

The total amount paid for the aforementioned repurchases was $154,328, cancelling notes for $244,534, which resulted in $90,206 gain. See Note 11



3.    Concessions, frequency rights and interconnection agreements:

Concessions

Maxcom has concessions that allow it to provide telecommunications services. Each of its telecommunications public network concessions has one or more specific exhibits describing the telecommunications services that Maxcom is authorized to render under each concession.

The concession titles held by Maxcom (Network, Point to Point, Point to Multipoint, Restricted TV) have different expiration dates and can be extended in the terms of those titles and of the provisions of Chapter VI of the Telecommunications and Broadcasting Law, in the same way the exclusive commercial concession, expected on 2048.

Local telephone

On December 20, 1996, the Department of Communications and Transportation (SCT, by its acronym in Spanish) granted Maxcom a nationwide concession to install and operate a telecommunications public network in Mexico, in order to supply local and long-distance telephone services. The initial term of the concession is 30 years.

The concession expressly allows the Entity to provide the following services, among others:

Basic local and long distance telephone:

- Basic domestic and international long-distance telephone.
- Sale or rent of network capacity to generate, transfer or receive signals, documents, images, voice, sounds or any other type of information.
- Purchase and lease of network capacity from other telecommunications service providers, including leasing of digital circuits.
- Sale of network capacity acquired from other concessionaires of telecommunications public networks.
- Sale or lease of network capacity to generate, transfer or receive signals, documents, images, voice, sounds or any other type of information.
- Purchase and lease of network capacity from other telecommunications and long-distance domestic and international service providers.
- Added value services.
- Operator services.
- Data, video, audio and videoconference services, except for cable TV or other types of restricted TV, continuous or digital audio services.

According to current legislation, Maxcom may freely establish rates for its end users, provided they are presented to the Federal Telecommunications Institute (IFT, by its acronym in Spanish). The concession binds the Entity to comply with a number of obligations, with which the Entity is currently in compliance.

Microwave transmission

Point to Point (Frequency rights)

On June 4, 1998, the SCT granted the Entity, seven domestic point-to-point microwave concessions for an initial term of 20 years. Those concessions cover:

- Two frequency segments in the 15 GHz band, with a band width of 56 MHz.
- Three frequency segments in the 23 GHz band, with a band width of 56 MHz.
- Two frequency segments in the 23 GHz band, with a band width of 100 MHz.



12

Those concessions are for a period of 20 years. The termination of the concessions was originally expected on June 3, 2018, however, the extend is being held with the IFT, the concessions still current and the current situation for the others concessionaries under the same concept.

According to current legislation, Maxcom may freely establish rates for its end users, provided they are presented to the IFT. The concession binds the Entity to comply with a number of obligations, with which the Entity is currently in compliance.

Point to Multipoint (Frequency rights)

The SCT granted the Entity three point-to-multiple point microwave regional concessions that cover telecommunications regions of 3, 5 and 8, which include different states in the North and Southeast of the Gulf of Mexico, at the 10.5 GHz frequency band with a 60 MHz width. Those concessions, issued on April 1998, are for a 20-year period. Originally, the concessions forced the Entity to install a network and offer services to at least 30% of the population in each under concession region by the end of the second year after the concession was issued.

The termination of concessions for regions 3, 5 and 8 was originally scheduled for April 1, 2018; however, due the IFT determined not to extend the validity of these concession titles, in compliance with this resolution, the frequency bands have been cleared.

Exclusive commercial concession

On June 14, 2018, the IFT granted to the Entity an exclusive commercial concession to supply any type of public services of telecommunications and broadcasting with national coverage that is technically feasible to be borrowed. That concession is for a period of 30 years.

Virtual mobile network operations

Under the concession title issued in 1996, Maxcom is authorized to provide mobile local telephone services through the capacity acquired from other telecommunications public network concessionaires, which matter was confirmed by the IFT on January 17, 2007.

On June 15, 2016, Maxcom once again signed a Sale or Resale of Virtual Mobile Operator Services Agreement (MVNO) with Radiomóvil Dipsa, S. A. de C. V. (Telcel), for which purpose consideration is being given to launching a mobile prepayment arrangement under the MVNO.

On April 12, 2018, an application for an Exclusive Commercial Concession was submitted to the IFT in favor of Celmax Móvil, S. A. de C. V. (subsidiary of the Entity), to provide all kind of telecommunications services and broadcasting, that concession is for a period of 30 years, which will allow it to lend independently the mobile service as Mobile Virtual Network Operator.

Interconnection agreements

The Entity has signed interconnection agreements with other local telephone, long distance and mobile telephone companies and the end of short message (SMS). The Entity has signed different amending agreements to guarantee the continuity of the original agreements and set reciprocal rates in line with the rates of the telecommunications market, or otherwise apply the rates established by the IFT.

Annually, the IFT publishes the interconnection rates that shall be applied between the operators for the next year. With the implementation of the IFT's Interconnection Request Electronic System, operators can open negotiations to determine interconnection rates; however, in the event that applicable rates cannot be agreed, the IFT must decide those rates based on the rates published previously to resolve interconnection disagreements, which rates have been markedly lower than those offered by us in normal circumstances, and which would have a negative effect on income from those services.



13

The Entity, at the same time, has interconnection agreements with the Preponderant Economic Agent (AEP, by its acronym in Spanish) for the fixed local calls termination service, which stipulates an asymmetrical lower tariff which is paid to the other operators. Nevertheless, upon January 1, 2019 the zero cost tariff will be removed, in accordance with the decision issued by the IFT, in compliance with the judgment issued by the Supreme Court of Justice of the Nation, which will generate an increase in our rates or a modification of the profit margin for the Entity.

The Entity also has interconnection agreements with Preponderant Economic Agent, for the local mobile services (including termination of the local service in mobile users under the modality "El que llama paga" *(Who calls, pays)* and termination of short messages (SMS) in mobile users of the AEP, as January 1, 2018, the Entity began to pay tariffs to AEP, also due a judgment issued by the Supreme Court of Justice of the Nation, which generated an increase in our rates or a modification of the profit margin for the Entity.

4.    **Adoption of new and revised International Financial Reporting Standards**

   a.    *Application of new and revised International Financing Reporting Standards ("IFRSs" or "IAS") that are mandatorily effective for the current year*

   In the current year, the Entity has applied a number of amendments to IFRSs issued by the International Accounting Standards Board ("IASB") that are mandatorily effective for an accounting period that begins on or after January 1, 2018.

   *New and amended IFRS Standards that are effective for the current year*

   *Impact of initial application of IFRS 9 Financial Instruments*

   In the current year, the Entity has applied IFRS 9 Financial Instruments (as revised on July 2014) and the related consequential amendments to other IFRS Standards that are effective for an annual period that begins on or after January, 1st 2018. The transition provisions of IFRS 9 allow an entity not to restate comparatives.

   IFRS 9 introduced new requirements for:

   1.    The classification and measurement of financial assets and financial liabilities,
   2.    Impairment of financial assets, and
   3.    General hedge accounting

   Details of these new requirements as well as their impact on the Entity's consolidated financial statements are described below.

   The Entity has applied IFRS 9 in accordance with the transition provisions set out in IFRS 9.

   (a)    **Classification and measurement of financial assets**

   The date of initial application (i.e. the date on which the Entity has assessed its existing financial assets and financial liabilities in terms of the requirements of IFRS 9) on January 1st 2018.

   All recognized financial assets that are within the scope of IFRS 9 are required to be measured subsequently at amortized cost or fair value on the basis of the entity's business model for managing the financial assets and the contractual cash flow characteristics of the financial assets.



14

(b)   *Impairment of financial assets*

In relation to the impairment of financial assets, IFRS 9 requires an expected credit loss model as opposed to an incurred credit loss model under IAS 39. The expected credit loss model requires the Entity to account for expected credit losses and changes in those expected credit losses at each reporting date to reflect changes in credit risk since initial recognition of the financial assets. In other words, it is no longer necessary for a credit event to have occurred before credit losses are recognized.

(c)   *Classification and measurement of financial liabilities*

A significant change introduced by IFRS 9 in the classification and measurement of financial liabilities relates to the accounting for changes in the fair value of a financial liability designated as at fair value to profit or loss attributable to changes in the credit risk of the issuer

Specifically, IFRS 9 requires that the changes in the fair value of the financial liability that is attributable to changes in the credit risk of that liability be presented in other comprehensive income, unless the recognition of the effects of changes in the liability's credit risk in other comprehensive income would create or enlarge an accounting mismatch in profit or loss. Changes in fair value attributable to a financial liability's credit risk are not subsequently reclassified to profit or loss, but are instead transferred to retained earnings when the financial liability is derecognized. Previously, under IAS 39, the entire amount of the change in the fair value of the financial liability designated as at fair value to profit or loss was presented in profit or loss.

(d)   *General hedge accounting*

The new general hedge accounting requirements retain the three types of hedge accounting. However, greater flexibility has been introduced to the types of transactions eligible for hedge accounting, specifically broadening the types of instruments that qualify for hedging instruments and the types of risk components of non-financial items that are eligible for hedge accounting. In addition, the effectiveness test has been replaced with the principle of an 'economic relationship'. Retrospective assessment of hedge effectiveness is also no longer required. Enhanced disclosure requirements about the Entity's risk management activities have also been introduced.

In accordance with IFRS 9's transition provisions for hedge accounting, the Entity has applied the IFRS 9 hedge accounting requirements prospectively from the date of initial application on January, 1st 2018. The Entity's qualifying hedging relationships in place as at 1st January 2018 also qualify for hedge accounting in accordance with IFRS 9 and were therefore regarded as continuing hedging relationships. No rebalancing of any of the hedging relationships was necessary on January, 1st 2018. As the critical terms of the hedging instruments match those of their corresponding hedged items, all hedging relationships continue to be effective under IFRS 9's effectiveness assessment requirements.

(e)   *Disclosures in relation to the initial application of IFRS 9*

There were no financial assets or financial liabilities which the Entity had previously designated as at fair value to profit or loss under IAS 39 that were subject to reclassification or which the Entity has elected to reclassify upon the application of IFRS 9. There were no financial assets or financial liabilities which the Entity has elected to designate as at fair value to profit or loss at the date of initial application of IFRS 9.



15

(f)   *Impact of initial application of IFRS 9 on financial performance*

The tables below show the amount of adjustment for each financial statement line item affected by the application of IFRS 9 for the prior year.

| Impact on assets, or liabilities and patrimony on January 1st 2018 | As previously reported | | IFRS 9 adjustments | | As restated | |
|---|---|---|---|---|---|---|
| Accounts receivable – Net | $ | 253,674 | $ | (30,008) | $ | 223,666 |
| Other taxes payable | | (18,463) | | 4,791 | | (13,672) |
| Total effect on net assets | | | $ | (25,217) | | |
| Accrue loss | $ | (590,647) | | (25,217) | $ | (615,864) |
| Total effect on equity | | | $ | (25,217) | | |

The application of IFRS 9 has had no impact on the consolidated cash flows of the Entity

### Impact of application of IFRS 15 Revenue from Contracts with Customers

In the current year, the Entity has applied IFRS 15 Revenue from Contracts with Customers (as amended on April 2016) which is effective for an annual period that begins on or after January, 1st 2018. IFRS 15 introduced a 5 steps approach to revenue recognition. For more prescriptive guidance has been added in IFRS 15 to deal with specific scenarios. Details of the new requirements as well as their impact on the Entity's consolidated financial statements are described below.

The Entity has applied IFRS 15 in accordance with the fully retrospective transitional approach without using the practical expedients for completed contracts in this standard for the initial application, on January 1st, 2018. The Entity decided used the expedient in IFRS 15:C5(c) for all contracts modifications presented before the date of initial application.

IFRS 15 uses the terms 'contract asset' and 'contract liability' to describe what might more commonly be known as 'accrued revenue' and 'deferred revenue', however the Standard does not prohibit an entity from using alternative descriptions in the statement of financial position. The Entity has decided to use the same terminology used in other periods to describe such balances.

The Entity's accounting policies for its revenue streams are disclosed in detail in note 5p below. Apart from providing more extensive disclosures for the Entity's revenue transactions, the application of IFRS 15 has not had a significant impact on the financial position and/or financial performance of the Entity. This was concluded, after documenting such information, where the Entity identified if the recognition model used under IAS 18 differed from what is established in IFRS 15. It was determined that there is no significant difference between the standards.

### New and revised IFRS Standards in issue but not yet effective

At the date of authorization of these financial statements, the Entity has not applied the following new and revised IFRS Standards that have been issued but are not yet effective

IFRS 16 Leases

IFRS for the 2015-2017 cycle Amendments to IFRS 3 Business combinations, IFRS 11 Joint Arrangements, IAS 12 Income Taxes and IAS 23 Loan costs



16

Modifications to IAS 19 Labor Benefits Modification, reduction or liquidation of the plan IFRS 10 Consolidated Financial Statements and IAS 28 (modifications) Sale or contribution of assets between an investor and its associate or joint venture

IFRIC 23 Uncertainty over Income Tax Treatments

The directors do not expect that the adoption of the Standards listed above will have a material impact on the financial statements of the Entity in future periods, except as noted below:

### *IFRS 16 Leases*

#### General impact of application of IFRS 16 Leases

IFRS 16 provides a comprehensive model for the identification of lease arrangements and their treatment in the financial statements for both lessors and lessees. IFRS 16 will supersede the current lease guidance including IAS 17 Leases and the related Interpretations when it becomes effective for accounting periods beginning on or after January, 1st 2019. The date of initial application of IFRS 16 for the Entity will be January, 1st 2019.

The Entity has chosen the retrospectively method with the cumulative effect of initially applying the Standard recognized at January 1st, 2019, in accordance with IFRS 16. The Entity will not restate comparative information.

In contrast to lessee accounting, IFRS 16 substantially carries forward the lessor accounting requirements in IAS 17.

#### *Impact of the new definition of a lease*

The Entity will make use of the practical expedient available on transition to IFRS 16 not to reassess whether a contract is or contains a lease. Accordingly, the definition of a lease in accordance with IAS 17 and IFRIC 4 will continue to apply to those leases entered or modified before on January, 1st 2019.

The change in definition of a lease mainly relates to the concept of control. IFRS 16 distinguishes between leases and service contracts on the basis of whether the use of an identified asset is controlled by the customer. Control is considered to exist if the lessee has:

* The right to obtain substantially all of the economic benefits from the use of an identified asset; and

* The right to direct the use of that asset.

The Entity will apply the definition of a lease and related guidance set out in IFRS 16 to all lease contracts entered into or modified on or after January, 1st 2019 (whether it is a lessor or a lessee in the lease contract). In preparation for the first-time application of IFRS 16, the Entity has carried out an implementation project. The project has shown that the new definition in IFRS 16 will not change significantly the scope of contracts that meet the definition of a lease for the Entity.

#### *Impact on Lessee Accounting*

#### *Operating leases*

IFRS 16 will change how the Entity accounts for leases previously classified as operating leases under IAS 17, which were off-balance sheet.



17

On initial application of IFRS 16, for all leases (except as noted below), the Entity will:

a)    Recognize right-of-use assets and lease liabilities in the consolidated statement of financial
       position, initially measured at the present value of the future lease payments;

b)    Recognize depreciation of right-of-use assets and interest on lease liabilities in the consolidated
       statement of profit or loss;

c)    Separate the total amount of cash paid into a principal portion (presented within financing
       activities) and interest (presented within operating activities) in the consolidated cash flow
       statement

Lease incentives (e.g. rent-free period) will be recognized as part of the measurement of the right-of-
use assets and lease liabilities whereas under IAS 17 they resulted in the recognition of a lease liability
incentive, amortized as a reduction of rental expenses on a straight-line basis.

Under IFRS 16, right-of-use assets will be tested for impairment in accordance with IAS 36
Impairment of Assets. This will replace the previous requirement to recognize a provision for onerous
lease contracts.

For short-term leases (lease term of 12 months or less) and leases of low-value assets (such as personal
computers and office furniture), the Entity will opt to recognize a lease expense on a straight-line basis
as permitted by IFRS 16.

The Entity has different leases as lessee of different assets; mainly telecommunications towers, sites,
posts and equipment, office furniture and fixtures and land where the towers themselves are located.
Under current regulations, a significant portion of these agreement is classified as an operating lease,
generally recording the respective payments by the straight line method over the lease term.

The Entity is currently estimating the impact of this new standard in such contracts. This analysis
includes the estimate of the lease term, based on the non-cancelable period and the periods covered by
the renewal options, which are discretionary for the Entity and considered reasonably accurate, and
will largely depend on specific events and circumstances by class of assets. Furthermore, hypotheses
are used to calculate the discount rate, which will mainly depend on the incremental financing rate for
the estimated terms.

Apart from the above estimates, the standard allows for two transition methods: one retroactive for
each comparative period presented, and another retroactively with the accumulated effect of the initial
application of the standard, recognized on the date of the first application. The Entity has tentatively
decided to adopt this second transition method, on which basis it would recognize the accumulated
effect of the initial application of the new criteria as an adjustment to retained earnings in the first year
of adoption of IFRS 16. Also, the new standard allows companies to choose specific practical solutions
at the time of the first application, regarding the valuation of the asset, discount rate, impairment,
leases which end within the 12 months after the first application, initial direct costs and lease term. The
Entity is evaluating which of these practical solutions will be adopted in each case.

Given the different options available, and the complexity of the estimates and the number of contracts,
the Entity has not yet completed the implementation process; consequently, at the current date it is
impossible to make a reasonable estimate of the effect of applying this standard. Nevertheless,
considering the volume of contracts involved, and the size of the payments committed for operating
leases, the Entity estimates that the amendments introduced by IFRS 16 will have a significant impact
on the Entity's consolidated financial statements since the adoption date, including the recognition in
the consolidated statement of financial position of the right of use assets and the respective obligations
for the majority of the contracts which under current regulations are classified as operating leases. By
the same token, the payments of the right to use the assets and the recognition of interest on the leasing
obligation will replace a significant part of the amount recognized in the profit and loss account as an
operating lease expense under current regulations. Furthermore, the classification of the lease
payments in the statement of cash flows will be affected by the introduction of this new regulation.



18

*Impact on Lessor Accounting*

Under IFRS 16, a lessor continues to classify leases as either finance leases or operating leases and account for those two types of leases differently. However, IFRS 16 has changed and expanded the disclosures required, in particular regarding how a lessor manages the risks arising from its residual interest in leased assets.

Under IFRS 16, an intermediate lessor accounts for the head lease and the sublease as two separate contracts. The intermediate lessor is required to classify the sublease as a finance or operating lease by reference to the right-of-use asset arising from the head lease (and not by reference to the underlying asset as was the case under IAS 17).

Because of this change the Entity will reclassify certain of its sublease agreements as finance leases. As required by IFRS 9, an allowance for expected credit losses will be recognized on the finance lease receivables. The leased assets will be derecognized and finance lease asset receivables recognized. This change in accounting will change the timing of recognition of the related revenue (recognized in finance income).

**Annual Improvements to IFRS Standards 2015–2017 Cycle Amendments to IFRS 3 Business Combinations, IFRS 11 Joint Arrangements, IAS 12 Income Taxes and IAS**

IAS 23 *Borrowing Costs*
*The Annual Improvements include amendments to 4 Standards.*
*IAS 12 Income Taxes*

The amendments clarify that an entity should recognize the income tax consequences of dividends in profit or loss, other comprehensive income or equity according to where the entity originally recognized the transactions that generated the distributable profits. This is the case irrespective of whether different tax rates apply to distributed and undistributed profits.

IAS 23 *Borrowing Costs*

The amendments clarify that if any specific borrowing remains outstanding after the related asset is ready for its intended use or sale, that borrowing becomes part of the funds that an entity borrows generally when calculating the capitalization rate on general borrowings.

IFRS 3 *Business Combinations*

The amendments to IFRS 3 clarify that when an entity obtains control of a business that is a joint operation, the entity applies the requirements for a business combination achieved in stages, including remeasuring its previously held interest (PHI) in the joint operation at fair value. The PHI to be remeasured includes any unrecognized assets, liabilities and goodwill relating to the joint operation.

IFRS 11 *Joint Arrangements*

The amendments to IFRS 11 clarify that when a party that participates in, but does not have joint control of, a joint operation that is a business obtains joint control of such a joint operation, the entity does not remeasure its PHI in the joint operation.

All the amendments are effective for annual periods beginning on or after 1 January 2019 and generally require prospective application. Earlier application is permitted.

The directors of the Entity do not anticipate that the application of the amendments in the future will have an impact on the Entity's consolidated financial statements.



19

*Amendments to IAS 19 Employee Benefits Plan Amendment, Curtailment or Settlement*

The amendments clarify that the past service cost (or of the gain or loss on settlement) is calculated by measuring the defined benefit liability (asset) using updated assumptions and comparing benefits offered and plan assets before and after the plan amendment (or curtailment or settlement) but ignoring the effect of the asset ceiling (that may arise when the defined benefit plan is in a surplus position). IAS 19 is now clear that the change in the effect of the asset ceiling that may result from the plan amendment (or curtailment or settlement) is determined in a second step and is recognized in the normal manner in other comprehensive income.

The paragraphs that relate to measuring the current service cost and the net interest on the net defined benefit liability (asset) have also been amended. An entity will now be required to use the updated assumptions from this remeasurement to determine current service cost and net interest for the remainder of the reporting period after the change to the plan. In the case of the net interest, the amendments make it clear that for the period post plan amendment, the net interest is calculated by multiplying the net defined benefit liability (asset) as remeasured under IAS 19.99 with the discount rate used in the remeasurement (also taking into account the effect of contributions and benefit payments on the net defined benefit liability (asset)).

The amendments are applied prospectively. They apply only to plan amendments, curtailments or settlements that occur on or after the beginning of the annual period in which the amendments to IAS 19 are first applied. The amendments to IAS 19 must be applied to annual periods beginning on or after January, 1st 2019, but they can be applied earlier if an entity elects to do so.

The directors of the Entity do not anticipate that the application of the amendments in the future will have an impact on the Entity's consolidated financial statements.

**IFRS 10 Consolidated Financial Statements and IAS 28 (amendments)**

Sale or Contribution of Assets between an Investor and its Associate or Joint Venture

The amendments to IFRS 10 and IAS 28 deal with situations where there is a sale or contribution of assets between an investor and its associate or joint venture. Specifically, the amendments state that gains or losses resulting from the loss of control of a subsidiary that does not contain a business in a transaction with an associate or a joint venture that is accounted for using the equity method, are recognized in the parent's profit or loss only to the extent of the unrelated investors' interests in that associate or joint venture. Similarly, gains and losses resulting from the remeasurement of investments retained in any former subsidiary (that has become an associate or a joint venture that is accounted for using the equity method) to fair value are recognized in the former parent's profit or loss only to the extent of the unrelated investors' interests in the new associate or joint venture.

The effective date of the amendments has yet to be set by the IASB; however, earlier application of the amendments is permitted. The directors of the Entity anticipate that the application of these amendments may have an impact on the Entity's consolidated financial statements in future periods should such transactions arise.

The directors of the Entity do not anticipate that the application of the amendments in the future will have an impact on the Entity's consolidated financial statements.

*IFRIC 23 Uncertainty over Income Tax Treatments*

IFRIC 23 sets out how to determine the accounting tax position when there is uncertainty over income tax treatments. The Interpretation requires an entity to:

- Determine whether uncertain tax positions are assessed separately or as an entity; and



20

• Assess whether it is probable that a tax authority will accept an uncertain tax treatment used, or proposed to be used, by an entity in its income tax filings:

   o    If yes, the entity should determine its accounting tax position consistently with the tax treatment used or planned to be used in its income tax filings.

   o    If no, the entity should reflect the effect of uncertainty in determining its accounting tax position.

The Interpretation is effective for annual periods beginning on or after January, 1st 2019. Entities can apply the Interpretation with either full retrospective application or modified retrospective application without restatement of comparatives retrospectively or prospectively.

The directors of the Entity do not anticipate that the application of the amendments in the future will have an impact on the Entity's consolidated financial statements.

5.    **Significant accounting polices**

The consolidated financial statements have been prepared in accordance with IFRS issued by the International Accounting Standards Board.

a.    *Explanation for translation into English*

The accompanying financial statements have been translated from Spanish into English for use outside of Mexico. These financial statements are presented on the basis of Mexican Financial Reporting Standards ("MFRS"), which are comprised of accounting standards that are individually referred to as International Financial Reporting Standards (IFRSs). Certain accounting practices applied by the Entity that conform with MFRS may not conform with accounting principles generally accepted in the country of use.

b.    *Statement of compliance*

The consolidated financial statements have been prepared in accordance with International Financial Reporting Standards released (IFRS) and the International Accounting Standards Board (IASB).

c.    *Basis of preparation*

The consolidated financial statements have been prepared on the historical cost basis, modify by the financial instruments that are measured and revalued and designated as cash flow hedges, that recognized as a part of comprehensive income.

d.    *Basis for consolidation financial statements*

   i.    *Subsidiaries*

   Subsidiaries are all entities over which the Group has control. The Group is considered to control an entity when it is exposed, or has rights, to variable yields due to its involvement in the entity and it has the capacity to affect such yields through its power over the entity. Subsidiaries are consolidated in full as from the date on which control is transferred to the Group. They are deconsolidated from the time that control ceases to exist.

   ii.    *Eliminated transaction in consolidation*

   The related party transactions, the balances and the unrealized profits involved in transactions between companies of Maxcom are eliminated. Unrealized losses are also eliminated. When so required, the amounts reported by the subsidiaries are adjusted to meet Maxcom's accounting policies.



21

The consolidated financial statements include the accounts of Maxcom and of the subsidiaries that it controls and in which it holds almost 100% of the voting shares:

| Subsidiary | 2018 and 2017 % | Operations | Country |
|---|---|---|---|
| Asesores Telcoop, S. A. de C. V. [i] | 99.9 | Business advisory services | Mexico |
| Celmax Móvil, S. A. de C. V. | 51.0 | Telecommunications services | Mexico |
| Fundación Maxcom, A. C. [i] | 99.9 | Entity authorized to receive donations | Mexico |
| Maxcom SF, S. A. de C. V. | 99.9 | Financial services | Mexico |
| Maxcom TV, S. A. de C. V. [i] | 99.9 | Cable TV services | Mexico |
| Maxcom USA, Inc. [i] | 100.0 | International telecommunications services | US |
| Outsourcing Operadora de Personal, S. A. de C. V. | 99.9 | Technical personnel services | Mexico |
| Sierra Comunicaciones Globales, S. A. de C. V. | 99.9 | Leasing of infrastructure | Mexico |
| Sierra USA Communications, Inc. [i] | 100.0 | International telecommunications services | US |
| TECBTC Estrategias de Promoción, S. A. de C. V. | 99.9 | Technical personnel services | Mexico |
| Telereunión, S. A. de C. V. | 99.9 | Long distance and infrastructure leasing services | Mexico |
| Telscape de México, S. A. de C. V. | 99.9 | Real estate services | Mexico |

(i)     These Entities are non-operational.

e.   *Foreign currency conversion*

i.   Functional currency and reporting currency

The items included in the financial statements of each of the Entity's entities are stated in the currency of the primary economic environment in which the entity operates (functional currency). The consolidated financial statements are presented in Mexican pesos, which is the Entity's reporting currency. All financial information presented in pesos has been rounded off to the nearest thousand, unless otherwise specified.

ii.   Transactions and balances

Operations carried out in a foreign currency are converted to the functional currency using the exchange rates in effect at the transaction date or the exchange rate in effect at the valuation date when items are revalued. Gains and losses from exchange rate fluctuations that arise either due to the settlement of those operations or to the conversion of monetary assets and liabilities expressed in a foreign currency at the exchange rates in effect at the year-end closing are recognized in the statement of income, except when it is necessary to include them in Other Comprehensive Income (OCI), as in the case of transactions qualifying as cash flow hedges and net investment hedges.

Gains and losses from exchange rate fluctuations associated to loans, cash and cash equivalents are shown in the statement of income under "Financial costs and income".



22

f.    Financial instruments

   i.    Financial assets

The Entity initially recognizes the loans and accounts receivable on the date on which they originate. Any other financial services (including assets expressed at fair value through profit or loss) are initially recorded at the date that hedging is contracted or negotiated, which is the date on which the Entity becomes part of the contractual provisions of the instrument.

The Entity eliminates a financial asset when the contractual rights to cash flows provided by the asset expire, or when it transfers the rights to receive the contractual cash flows from the financial asset in a transaction in which all risks and benefits from ownership of the financial asset are substantially transferred. Any interest in the financial assets transferred created or conserved by the Entity is recognized as an asset or liability separately.

The Entity classifies its non-derivative financial assets in the following categories: loans and accounts receivable. Said classification depends on the purpose for which those financial assets were acquired. Management determines the classification of its financial assets at the date of their initial recognition.

*Cash and cash equivalents*

The cash and cash equivalents caption of the consolidated statement of cash flows includes cash on hand, bank deposits on demand and other highly-liquid short-term investments with original maturities of three months or less, all subject to immaterial risk of change in value.

Cash equivalents are mainly represented by investments in government instruments.

*Restricted cash*

Cash whose restrictions result in non-compliance with the definition of cash and cash equivalents described above are shown in a separate caption in the statement of financial position and is excluded from cash and cash equivalents in the statement of cash flows.

*Loans and accounts receivable*

The Entity has segmented their accounts receivable commercial, wholesale and resitential.

Loans and accounts receivable are financial assets with fixed or determinable payments that are not traded in a deep market. Said assets are initially recognized at fair value, plus costs directly attributable to the transaction. After their initial recognition, loans and accounts receivable are measured at their amortized cost by the effective interest method, less impairment losses. Accounts receivable are amounts owed by clients for services rendered or merchandise sold in the regular course of business.

Assets in this category are classified as current assets, except if they are expected to be collected in the year following the closing date, in which case, they are classified as non-current. Loans and accounts receivable are shown in the following captions of the statement of financial position: "Accounts receivable", "Other accounts receivable" and "Cash and cash equivalents". See Notes 7 and 8.

*Financial assets carried at fair value through profit or loss.*

Those assets are acquired to be traded, i.e., sold over the short term. Derivative financial instruments are classified in that category, except when they are designated for hedge purposes. This type of assets are classified as current assets if they are expected to be realized in a 12-month period; otherwise, they are classified as non-current.



23

ii.   Financial liabilities

*Accounts payable*

Accounts payable are obligations for the purchase of goods or services acquired in the normal course of Entity operations. When said obligations are expected to be paid in a period of one year or less as of the closing date (or the regular cycle of operations when said cycle exceeds that period), they are shown as current liabilities. Otherwise, they are shown as non-current liabilities.

Accounts payable are initially recorded at fair value.

*Loans*

Loans are initially recognized at fair value, net of transaction costs incurred. Loans are subsequently carried at amortized cost; any difference between the proceeds (net of transaction costs) and the redemption value is recognized in the statement of income over the period of the loans by the effective interest method.

*Cost of loans*

The cost of specific loans directly attributable to the acquisition, construction or production of rated assets, i.e., assets that require a substantial period of time to be ready for their expected use, is added to the cost of those assets until the time the assets are substantially ready for use.

All other interest costs are accounted for as expenses for the period in which they are incurred.

g.   **Capital stock**

*Ordinary shares*

Common shares are shown under stockholders' equity. Incremental costs directly attributable to the issue of new shares or options are shown in stockholders' equity as a deduction of the amount received, net of income taxes.

When capital stock recognized as stockholders' equity is repurchased, the consideration paid, which includes directly attributable costs, net of tax effects, is recognized as a stockholders' equity reduction. Repurchased stock is classified as treasury stock and is shown in the reserve for repurchase of shares. Treasury stock is sold or subsequently reissued; the amount received is recognized as an increase in capital and the resulting surplus or deficit is shown as capital premium.

h.   **Derivative financial instruments**

The Entity uses cross currency swaps to manage its exposure to the risk of volatility in its interest rates and exchange rates. Note 15 includes a more thorough explanation of derivative financial instruments.

Derivatives are recognized initially at fair value at the date a derivative contract is entered into and are subsequently remeasured to their fair value at each reporting date. The resulting gain or loss is recognized in profit or loss immediately unless the derivative is designated and effective as a hedging instrument, in which event the timing of the recognition in profit or loss depends on the nature of the hedge relationship.

A derivative with a positive fair value is recognized as a financial asset whereas a derivative with a negative fair value is recognized as a financial liability. Derivatives are not offset in the financial statements unless the Entity has both legal right and intention to offset. A derivative is presented as a non-current asset or a non-current liability if the remaining maturity of the instrument is more than 12 months and it is not expected to be realized or settled within 12 months. Other derivatives are presented as current assets or current liabilities.



24

*Embedded derivatives*

An embedded derivative is a component of a hybrid contract that also includes a non-derivative host — with the effect that some of the cash flows of the combined instrument vary in a way similar to a stand-alone derivative.

Derivatives embedded in hybrid contracts with a financial asset host within the scope of IFRS 9 are not separated. The entire hybrid contract is classified and subsequently measured as either amortized cost or fair value as appropriate.

Derivatives embedded in hybrid contracts with hosts that are not financial assets within the scope of IFRS 9 (e.g. financial liabilities) are treated as separate derivatives when they meet the definition of a derivative, their risks and characteristics are not closely related to those of the host contracts and the host contracts are not measured at FVTPL.

If the hybrid contract is a quoted financial liability, instead of separating the embedded derivative, the Entity generally designates the whole hybrid contract at FVTPL.

An embedded derivative is presented as a non-current asset or non-current liability if the remaining maturity of the hybrid instrument to which the embedded derivative relates is more than 12 months and is not expected to be realized or settled within 12 months.

*Hedge accounting*

The Entity designates certain instruments as hedges, which include derivatives, embedded derivatives and non-derivative instruments for foreign currency risk, either as fair value hedges, cash flow hedges, or hedges of the net investment in a foreign transaction.  Foreign currency risk hedging of a firm commitment is accounted for as a cash flow hedge.

At the outset of the hedge, the Entity documents the relationship between hedge instruments and the items hedged, as well as the risk management objectives and the strategy to conduct hedge operations. Additionally, at the outset of the hedge and afterwards on a continuous basis, the Entity documents whether the hedge instrument is highly effective to offset its exposure to changes in fair value or changes in the cash flows of the hedged item.

- there is an economic relationship between the hedged item and the hedging instrument;

- the effect of credit risk does not dominate the value changes that result from that economic relationship; and

- the hedge ratio of the hedging relationship is the same as that resulting from the quantity of the hedged item that the Entity actually hedges and the quantity of the hedging instrument that the Entity actually uses to hedge that quantity of hedged item.

If a hedging relationship ceases to meet the hedge effectiveness requirement relating to the hedge ratio but the risk management objective for that designated hedging relationship remains the same, the Entity adjusts the hedge ratio of the hedging relationship (i.e. rebalances the hedge) so that it meets the qualifying criteria again.

Note 15 includes details on the fair value of derivative financial instruments used for hedge purposes.

*Fair value hedges*

The fair value change on qualifying hedging instruments is recognized in profit or loss except when the hedging instrument hedges an equity instrument designated at FVTOCI in which case it is recognized in other comprehensive income.



25

The carrying amount of a hedged item not already measured at fair value is adjusted for the fair value change attributable to the hedged risk with a corresponding entry in profit or loss. For debt instruments measured at FVTOCI, the carrying amount is not adjusted as it is already at fair value, but the hedging gain or loss is recognized in profit or loss instead of other comprehensive income. When the hedged item is an equity instrument designated at FVTOCI, the hedging gain or loss remains in other comprehensive income to match that of the hedging instrument.

Where hedging gains or losses are recognized in profit or loss, they are recognized in the same line as the hedged item.

The Entity discontinues hedge accounting only when the hedging relationship (or a part thereof) ceases to meet the qualifying criteria (after rebalancing, if applicable). This includes instances when the hedging instrument expires or is sold, terminated or exercised. The discontinuation is accounted for prospectively. The fair value adjustment to the carrying amount of the hedged item arising from the hedged risk is amortized to profit or loss from that date.

*Cash flow coverage*

The effective portion of changes in the fair value of derivatives and other qualifying hedging instruments that are designated and qualify as cash flow hedges is recognized in other comprehensive income and accumulated under the heading of cash flow hedging reserve, limited to the cumulative change in fair value of the hedged item from inception of the hedge. The gain or loss relating to the ineffective portion is recognized immediately in profit or loss, and is included in the 'other gains and losses' line item.

Amounts previously recognized in other comprehensive income and accumulated in equity are reclassified to profit or loss in the periods when the hedged item affects profit or loss, in the same line as the recognized hedged item. However, when the hedged forecast transaction results in the recognition of a non-financial asset or a non-financial liability, the gains and losses previously recognized in other comprehensive income and accumulated in equity are removed from equity and included in the initial measurement of the cost of the non-financial asset or non-financial liability. This transfer does not affect other comprehensive income. Furthermore, if the Entity expects that some or all of the loss accumulated in the cash flow hedging reserve will not be recovered in the future, that amount is immediately reclassified to profit or loss.

The Entity discontinues hedge accounting only when the hedging relationship (or a part thereof) ceases to meet the qualifying criteria (after rebalancing, if applicable). This includes instances when the hedging instrument expires or is sold, terminated or exercised. The discontinuation is accounted for prospectively. Any gain or loss recognized in other comprehensive income and accumulated in cash flow hedge reserve at that time remains in equity and is reclassified to profit or loss when the forecast transaction occurs. When a forecast transaction is no longer expected to occur, the gain or loss accumulated in cash flow hedge reserve is reclassified immediately to profit or loss.

*Hedges of a net investment in foreign operations*

Hedges of net investments in foreign operations are accounted for similarly to cash flow hedges. Any gain or loss on the foreign currency forward contracts relating to the effective portion of the hedge is recognized in other comprehensive income and accumulated in the foreign currency translation reserve. The gain or loss relating to the ineffective portion is recognized immediately in profit or loss, and is included in the 'other gains and losses' line item.

Gains and losses on the hedging instrument accumulated in the foreign currency translation reserve are reclassified to profit or loss on the disposal or partial disposal of the foreign operation



26

i.  *Inventories*

Inventories consist of the material used to install telephone lines and the expansion of networks, and are measured at what is lower between the cost and the net realization value. Cost is calculated using the weighted average cost method. Net realizable value represents the estimated selling price less all estimated costs of completion and costs to be incurred in marketing, selling and distribution.

The net realizable value is the estimated sale price in the normal course of operations, less applicable selling expenses.

j.  *Telecommunications network systems and equipment - Net*

i.  Recognition and measurement

Items of telecommunications network equipment and systems are measured at cost, less accrued depreciation and the accumulated loss for impairment.

The cost includes expenses directly attributable to the asset acquisition. The Entity constructs part of its own network systems as the related installations. The cost of self-constructed assets includes the cost of materials and direct labor, any other costs directly attributable costs necessary to get the assets in working condition for the intended use, and the costs of loans for ratable assets.

When the components of telecommunications network systems and equipment have different useful lives, they are accounted for as separate items (major components) of telecommunications network systems and equipment.

The gain or loss on the sale of a component of telecommunications network systems and equipment is determined by comparing the income arising from the sale against the book value of said systems and equipment.

Maintenance and minor repair costs are charged to income as they are incurred; replacement and improvement costs are capitalized. The cost and reserves of assets sold or disposed of are eliminated from the accounts and any resulting profit or loss is reflected in consolidated statement of comprehensive income in "Other income and expenses".

All installation costs are capitalized. The useful life of installation costs of the residential line is five years, as that is our clients' average life. Capitalized installation costs are recorded as an expense upon termination of the client relationship. No installation costs are charged to our clients, and instead they are capitalized and amortized on a linear basis over a five-year period.

ii.  Subsequent costs

Subsequent costs are included in the asset's carrying amount or recognized as a separate asset, as appropriate, only when it is probable that future economic benefits associated with the item will flow to the Entity and the cost of the item can be measured reliably.

The book value of replaced components is canceled. The remaining repairs and maintenance work are recorded in the statement of comprehensive income over the period in which they are incurred, including costs related to daily maintenance of systems and equipment.

iii.  Depreciation

Depreciation is based on the cost of an asset, less its residual value.



27

Depreciation is recognized applying the straight-line method, in order to distribute the cost over the estimated useful life of each component of telecommunications network systems and equipment. Leased assets and leasehold improvements are depreciated at the lower of the lease term and their useful lives, unless it is reasonably certain that the Entity will obtain ownership before the lease term expires. Land is not being depreciated.

The estimated useful lives for current and comparative periods are as follows:

|  | Years |
|---|---|
| Telecommunications network and equipment | Between 23 and 24 |
| Leasehold improvements and external plant | Between 2 and 20 |
| Radio equipment | 30 |
| Cost of line installation | 5 |
| Electronic equipment | 25 |
| Computer equipment | 5 |
| Transportation equipment | 4 |
| Office furniture | 10 |
| Other | 10 |
| Engineering equipment | 10 |

The depreciation methods, useful lives and residual values are reviewed on each the annual reporting dates and are adjusted accordingly.

An asset's carrying amount is written down immediately to its recoverable amount if the asset's carrying amount is greater than its estimated recoverable amount.

When the book value of an asset exceeds its estimated recoverable value, an impairment loss is recorded to reduce the book value to recoverable value. See Note 9.

k.    *Investment properties*

Investment properties comprised are a land and a building owned by the Entity, whose are held to obtain income from operating lease contracts, and are not being used by the companies of the group. Investment properties are recorded in the consolidated statement of financial position at acquisition cost.

The land is not depreciated. Depreciation of the remaining items of investment property is calculated by the straight-line method, which is applied to the cost of the asset without including its residual value and considering its estimated useful life.

l.    *Intangible assets*

Intangible assets acquired by the Entity have defined useful lifes and are measured at cost less accumulated amortization and impairment losses.

As mentioned in Note 3, the SCT assigned the Entity a cost-free concession to install and operate a telecommunications public network for a 30 years period. The concession as the related assignment, were initially recognized at nominal value; therefore, there is no recorded value for financial reporting purposes, instead, they are merely disclosed in a note to these consolidated financial statements.

Frequency rights assets are recognized at acquisition cost:

i.    Subsequent expenses

Subsequent expenses are capitalized as part of that item or a separate item, as appropriate, only when they are likely to generate future economic benefits for the Entity and the related expense can be reliably measured. The book value of replaced components is canceled. Expenses are charged to the statement of comprehensive income in the period in which they are incurred.



28

ii.   Amortization

Amortization is based on the cost of an asset, less its residual value. Amortization is recognized
in profit and loss by the straight-line method over the estimated useful lives of the intangible
assets, as from the date on which they are available for use. The estimated useful lives for the
current and comparative periods are as follows:

|  | Years |
|---|---|
| Infrastructure rights | 30 and 15 |
| Software licenses | 3.3 |
| Frequency rights | 20* |

*   Frequency rights are amortized over their respective terms.

The amortization methods, useful lives and residual values are reviewed at each period-closing
and are adjusted accordingly.

m.   *Leases*

Leases are classified as finance leases whenever the terms of the lease transfer substantially all the
risks and rewards of ownership to the lessee. All other leases are classified as operating leases.

–   The Entity as lessor

Amounts due from lessees under finance leases are recognized as receivables at the amount of
the Entity's net investment in the leases. Finance lease income is allocated to accounting
periods so as to reflect a constant periodic rate of return on the Entity's net investment
outstanding in respect of the leases.

–   The Entity as lessee

Assets held under finance leases are initially recognized as assets of the Entity at their fair value
at the inception of the lease or, if lower, at the present value of the minimum lease payments.
The corresponding liability to the lessor is included in the consolidated statement of financial
position as a finance lease obligation.

Lease payments are apportioned between finance expenses and reduction of the lease obligation
so as to achieve a constant rate of interest on the remaining balance of the liability. Finance
expenses are recognized immediately in profit or loss, unless they are directly attributable to
qualifying assets, in which case they are capitalized in accordance with the Entity's general
policy on borrowing costs. Contingent rentals are recognized as expenses in the periods in
which they are incurred.

n:   *Impairment of financial assets*

i.   *Assets valued at amortized cost*

At the end of each year, the Entity determines whether or not there is any objective evidence of
impairment in each financial asset or group of financial assets. An impairment loss is
recognized if there is objective evidence of impairment as a result of one or more events
occurring after initial recognition of the asset, provided that effect of the loss event can be
reliably calculated based on estimated future cash flows derived from the financial asset or
group of financial assets.



29

Evidence of impairment can include indication that the debtors or group of debtors are undergoing significant financial difficulties, they are experiencing lack of payment or delays in the payment of interest or principal, there is the probability of filing for bankruptcy or they are going through a financial reorganization, as well as when the observable data indicates that there is a measurable decrease in future estimated cash flows, such as changes in the economic conditions associated to the lack of payment.

*Accounts receivable*

IFRS 9 replaces the "incurred loss" model under IAS 39 with an "expected credit loss" model (PCE). The new impairment model applies to financial assets measured at amortized cost, the contract assets and the debt investments at VRCORI, but not to investments in equity instruments.

Under IFRS 9, the provisions for losses will be measured by using one of the following bases:

General Model - Is recognized in three stages which reflect the potential variance in the credit status of the assets, bearing in mind the significant increase in the credit risk, as well as objective evidence of impairment.

Simplified Model - The expected loss over the life of the instrument is recognized if it contains a significant financing component, instead of the three stages.

The measurement of the PCE during its life applies if the credit risk of a financial asset at the presentation date has significantly increased as of the initial recognition and the measurement of the expected credit losses for 12 months applies if this risk has not increased. The Entity may determine that the credit risk of a financial asset has not significantly increased if the asset has a low credit risk at the presentation date. Nevertheless, the measurement of expected credit losses during their life always applies for commercial accounts receivable and contract assets without a significant financing component. The Entity has elected to apply this policy for the commercial accounts receivable and contract assets with a significant financing component.

The Entity always measures the estimates of losses on accounts receivable for an amount equal to that of the expected credit losses during their life. The Entity also considers reasonable and sustainable information which is relevant and is available without undue costs or efforts. This includes quantitative and qualitative information and analyses based on the Entity's historical experience and an informed credit assessment, including that related to the future.

*Measurement of expected credit losses-*

The expected credit losses are the result of multiplying an amount of exposure by a probability of default and a loss given default.

The expected credit losses are not discounted using the effective interest rate of the financial asset, because generally the accounts receivable are short-term and do not collect interest. Be advised that the maximum term considered when estimating expected credit losses is the maximum contractual term for which the Entity is exposed

*Financial assets with credit impairment*

The Entity considers there is evidence that a financial asset has credit impairment when it includes the following observable data:

- Significant financial difficulties observed in the groups with high delinquency rates (210 days);
- Several terms of nonpayment and delinquency identified for more than 360 days.



30

The loss estimates for financial assets measured at amortized cost are deducted from the gross book amount of the assets. Whereas, in the case of debt instruments at fair value through other comprehensive income or loss, the loss estimate is charged to results and is recognized in other comprehensive income or loss.

*Punishment*

The gross book amount of a financial asset is written off (partially or totally) when there is no realistic possibility of recovery. This is generally the case when the Entity has exhausted all internal and external collection options, and has determined that the written off debts cannot be recovered. Nevertheless, financial assets that are written off could have been subject to legal action for purposes of compliance with the Entity's established procedures for recovering debts.

To obtain an explanation of how the Entity estimated the impact of the value impairment under IFRS 9, where the credit losses are recognized before under IAS 39, please see Note 4B.

*Credit risk*

Credit risk is the risk that one of the counterparties of the financial instrument will cause a financial loss to the other Entity by not fulfilling an obligation. The Entity is subject to credit risk mainly for the financial instruments referenced to cash and temporary investments, loans and accounts receivable and financial derivatives. To minimize credit risk in cash, temporary investments and financial derivatives, the Entity only becomes involved with solvent counterparties and always obtains sufficient sureties.

To manage credit risk, for commercial and significant receivables the Entity considers that the risk is limited. The Entity provisions an allowance for bad debts under the expected losses model in compliance with IFRS 9.

ii.     Non-financial assets

Telecommunications network equipment and systems and intangible assets subject to depreciation and amortization, respectively, are reviewed for impairment when events or changes in the circumstances indicate that the book value may not be recoverable.

An impairment loss is recognized as the difference between the book value of an asset over its recoverable value. The recoverable value is the higher of the fair value less the disposal cost and the use value. For the purpose of assessing impairment, assets are grouped at the lowest levels for which there are largely independent treasury cash inflows (cash-generating units or CGUs). Previous changes in non-financial assets are reviewed for possible reversal at each reporting date.

When an impairment loss is reversed, the value of the asset or the respective CGU is increased, without exceeding the book value that would have been determined had said loss not been recorded in prior periods. Reversal of impairment losses is immediately recorded in the statement of income.

o.     *Employee benefits*

i.     Seniority premium

A seniority premium is recognized as a defined benefit plan. Such plans establish the amount of benefits expected to be received by an employee upon voluntary retirement after at least 15 years of service; in the case of dismissal, death or disability, the benefit depends on one or more factors, such as the employee's age, years of service and compensation.



31

The liability recognized in the statement of financial position for defined benefit plans is the present value of the obligation for defined benefits at the date of the statement of financial position, less the fair value of the plan's assets. Obligations for defined benefits are calculated annually by independent actuaries using the projected unit cost method. The present value of defined benefit obligations is determined by discounting estimated future cash flows using the interest rates for government bonds, or the rates for top credit rating corporate bonds in countries in which there is a market for those bonds, such as the US, that are denominated in the same currency as that in which the benefits are to be paid, and that have maturities that approximate the maturities of the pension obligation.

The cost of present services under the defined benefit plan is recognized in the statement of income as an employee-benefit expense, unless it is included in the cost of an asset, and reflects the increase in the defined benefit obligation stemming from the employee's service during the year, changes in the benefit and severance payments.

The cost of past services is recognized immediately in income.

The net interest cost is calculated applying the discount rates to the net balance of the defined benefit obligation and the fair value of plan assets. This cost is included in the employee benefit expense in the statement of income.

Actuarial gains and losses arising from experience adjustments and changes in actuarial assumptions are charged or credited to equity in other comprehensive income in the period in which they arise.

ii.     Termination benefits

Termination benefits are payable when the employment relationship concludes before the regular retirement date or when an employee voluntarily accepts termination in exchange for those benefits. The Entity recognizes termination benefits at the earliest of the following dates: a) when it is committed to end the employment relationship of an employee further to a detailed formal plan without the possibility to elude its obligation and b) when it recognizes restructuring costs as per the provisions of International Accounting Standard (IAS) 37 and that involves the payment of termination benefits. In the event of an offer that encourages an employee's resignation, termination benefits are valued based on the number of employees expected to accept the offer. Benefits expiring 12 months after the reporting date are discounted at their present value.

iii.    Profit-sharing and bonus plans

The Entity recognizes a liability and an expense for bonuses and profit-sharing, based on a formula that takes into consideration the profit attributable to the Entity's shareholders after certain adjustments. The Entity recognizes a provision when it is contractually obligated or when there is a past practice that generates an assumed obligation.

p.      *Provisions*

Provisions are recognized when the Entity has a legal obligation, present or constructive, as a result of past events, that is likely to require the use of cash flows to settle the obligation and the amount thereof can be reliably estimated.

When there are similar obligations, the probability of requiring cash outflows to cover those obligations is determined considering the type of obligation as a whole. The provision is recorded even when the likelihood of cash outflows to cover a specific item included in the same type of obligations is very small.



Provisions are recognized at the present value of the disbursements expected to be required to cancel the obligation using a pre-tax rate that reflects current market conditions with respect to the value of money over time and of the specific risks of said obligation.

q.   *Revenue Recognition*

The Entity recognizes revenue when (or as) each of the performance obligations is completely satisfied, which takes place when the services have been rendered and/or control over the goods has been transferred.

As already noted, revenues are recognized in the accounting period in which the services are rendered. Consequently, at the close of each year, because the Entity has different invoice cycles, it determines the portion of the services that has not invoice but had been rendered in December, based on the traffic and type of service for each period, as on the specific terms of each contract.

Revenues from the transmission capacity sale across a fiber optic ring are recognized on a straight line basis over the lease term. The selling price contracted is mainly paid in advance and the revenues are recognized as long-term deferred revenues in other accounts payable and other short-term accounts payable, respectively, in the consolidated statement of financial position.

The entity offer telecommunications serviced based on the different market types, divided on: commercial, residential, wholesaler, and other services.

The Entity recognizes revenue from the following major sources:

- Data and fixed telephony, and up to June 2018, television. The Entity has different commercial offerings, mainly based on the combination of broadband and traffic handled. The Entity recognizes revenue for these concepts month to month for month that the Entity has right to invoice The contract terms are between one to three years, with a renovation option.

- Backbone and frequencies. Revenues are evaluated under the consideration which the Entity expects to receive for a contract with a customer The Entity records as deferred revenue for the total contract value at the beginning, and such revenues are carried on a straight line basis to results over the contract term.

- Connections. Revenues are evaluated in consideration to which the Entity expects to have a contract with a client. The Entity recognizes revenue at the fixed amount established with the contract term.

- Collocations. The Entity records an income for the fixed monthly amount agreed with the client during the life of the contract for the co-location services.

- *Powersale*. The Entity realize equipment or infrastructures sales related to the client's needs. The performance obligation will depend of the telecommunication services established in the contract. Revenues from services are assessed under the consideration which the Entity expects to receive. The Entity recognizes revenues for the equipment sales over time at the amount which the Entity has the right to invoice.

- SAVI is the IP voice management service which can be attributed for equipment, licenses, etc. These services are rendered with a third party. The Entity renders services to the customer using the third's party technological infrastructure. Such revenues are evaluated in the consideration which the Entity expects to receive. The Entity recognizes revenue month by month, at the amount which it has the right to invoice.



33

● OTC The Entity takes part as intermediary in these OTC transactions; therefore, it recognizes revenue for the commissions generated in the course of the transaction.

The Entity acts as an agent in these transactions

● MVNO and MVNA. (Mobile Virtual Network Operator). A MVNO renders mobile services to its customers. MVNO and MVNA services are rendered according to the requirements and needs established with each customer. Revenues are assessed in the consideration which the Entity expects to receive under a contract with a customer. The Entity recognizes revenue at the amount it has the right to invoice.

The Entity has decided to use the practical expedient in IFRS 15: C5 (d) of not disclosing the remnant of the contracts which recognizes revenue at the amount it has the right to invoice.

r.  *Financing income and financing costs*

Financing income includes income from interest accrued on investment funds and fair value gains on financial assets recorded at fair value through of statement of comprehensive income.  Interest income is applied to income as it is earned, using the effective interest method.

Financing costs include interest on loans, reversals of discounts on provisions, and fair value losses over financial assets recorded at fair value through of statement of comprehensive income.

Costs of loans not directly attributable to the acquisition, construction or production of a ratable asset are recognized in profit or loss by the effective interest method.

s.  *Deferred and payable income taxes*

The income tax expense for the period includes incurred and deferred income taxes.  The tax is recognized in the statement of income, except when it relates to items recognized under other comprehensive income or directly in stockholders' equity.

The charge for income tax payable is calculated as per the tax laws approved or substantially approved at the balance sheet date, in the countries in which the Entity and its subsidiaries operate and generate a tax base.  Management periodically evaluates the position assumed with respect to tax declared as they relate to situations in which the tax laws are subject to interpretation.  When applicable, the Entity records provisions for amounts it expects to pay over to the tax authorities.

Deferred income tax is provided in full, using the liability method, on temporary differences arising between the tax bases of assets and liabilities and their carrying amounts in the consolidated financial statements.  However, deferred tax liabilities are not recognized if they arise from the initial recognition of goodwill.  Deferred income tax is also not accounted for if it arises from initial recognition of an asset or liability in a transaction other than a business combination that at the time of the transaction affects neither accounting nor taxable profit or loss. Deferred income tax is determined using tax rates (and laws) that have been enacted or substantially enacted by the end of the reporting period and are expected to apply when the related deferred income tax asset is realized or the deferred income tax liability is settled.

A deferred income tax asset is only recognized to the extent future tax benefits are likely to be obtained against which temporary difference liabilities can be used.

The deferred income asset and liabilities, compensate when exist a legal right for compensate the deferred income asset and liabilities and when the balance of deferred income have the same authority tribute. The income tax assets and the deferred tax are compensate when the Entity have a legal right and have the intention to pay off on a net basis, or to realize the asset and settle the liability, simultaneously.



34

A deferred income tax asset is recognized on deductible temporary differences only to the extent that it is probable the temporary differences will reverse in the future and there is sufficient taxable income available against which the temporary differences can be offset.

The carrying amount of a deferred tax asset must be reviewed at the end of each reporting period and reduced to the extent that it is considered probable that there will not be sufficient taxable profits to allow full recovery or part of the asset.

Deferred tax is recognized in income, except to the extent that it relates to items recognized in OCI or directly in the capital. In this case, the tax is also recognized in OCI or directly in the capital, respectively.

t.   *Earnings per share*

　　i.   Basic

　　　　The basic profit per share is calculated by dividing the profit attributable to Entity stockholders by the weighted average of common shares outstanding in the accounting period, excluding common shares acquired by the Entity and held as treasury shares. See Note 19.

　　ii.   Diluted shares

　　　　Profits on diluted shares are determined adjusting the profit or loss attributable to the shareholders and the weighted average number of common shares outstanding, adjusted by the number of own shares, to reflect the effects of all possible dilutive common shares, which includes share options granted to employees.

　　　　Basic earnings are the same as diluted earnings due to the fact that there are no transactions that could potentially dilute earnings.

u.   *Information by segments.*

An operating segment is an Entity component that carries out business activities that can potentially generate income and expenses; this includes income and expenses related to operations conducted with any of the other Entity components, which are periodically reviewed by the Entity's General Director in order to make decisions about the resources to be assigned to the segment and assess its performance, for which purpose there is specific financial information available.

The Entity has determined that it has only one operating segment: telecommunications. The segment offers different products to its clients based on the type of market, which are divided as follows: commercial, residential, wholesaler, public telephone and other services. The financial information reviewed by the person charged with making operating decisions includes income per market; however, operating expenses and assets are reported for the entire operating unit. The Entity also divided its operating segment into the following geographic areas: Metropolitan, Central-Southern and Northern (all within the Mexican territory).

v.   *Share-based compensation*

The fair value of share-based payments is calculated considering that at the *Grant Date* those shares were acquired to comply with obligations to the employees. According to IFRS 2 "Share-based payments", the resulting cost is recorded as personnel expenses in the statement of income over the period of the respective concession. That book entry is modified to consider changes in the number of equity instruments expected to be granted as a result of changes in the projected yields.



35

w.   *Repurchase of Notes*

In the event of changes in indebtedness, the Entity analyses whether changes are substantial and result in the extinction of the debt and recognition of a new debt, or whether changes are not substantial, in which case it records them as a renegotiation of the original debt. In the case of extinction or renegotiation of debt, transaction costs are given a different treatment. Costs incurred due to the extinction of the debt are recorded in income for the period; if they relate to a renegotiation they are accounted for on prospective bases. Any gains or losses on repurchase of notes arising from the difference between the par value and the value paid are recorded in financial costs.

x.   *Non-recurring items*

y.

Non-recurring items are significant income or expenses that have been disclosed separately due to their relevance, or to provide better information on the Entity's financial performance.

Those items are disclosed in the consolidated statement of income and in Note 21. Non-recurring items arose from restructurings.

6.   **Accounting estimates and judgments:**

IFRS require certain critical accounting estimations to be made when preparing a set of financial statements. They also require management to apply judgment in determining the accounting policies to be applied by the Entity. The items involving a greater degree of judgment or complexity and those with assumptions and estimations that are significant for financial statement purposes are described below:

a.   *Judgment critical when applying accounting policies*

The key judgments used when applying the accounting policies that have had the most significant effect on the amounts recognized in these consolidated financial statements are as follows:

*Judgment in determining the recognition of income as an agent.*

The Entity has concluded that it is an agent for the revenue recognized under OTC contracts using the methodology included in IFRS 15. Under such contracts the Entity does not obtain control over the goods it transfers to the customer at any time in the transaction, so there is no inventory risk. Furthermore, it is not responsible for ensuring that the goods agreed comply with the specifications required by the customer.

*Concession and frequency right renewals.*

Under Mexican laws, Maxcom is subject to renewal of its concession and frequency rights as established in the Federal Telecommunications and Broadcasting Law in force (see Notes 26a. and 26b). The Entity's continuity is subject to the renewal of its concession and frequency titles; renewals are not automatic. The expiration dates are as follows:

| Term of concession/frequency | Expiration date |
| --- | --- |
| Telecommunications public network in Mexico | 2026 |
| Restricted cable TV and radio | 2026 |
| Frequency rights | 2018 |
| Exclusive commercial concession | 2042 |
| Exclusive commercial concession for MVNO (Celmax) | 2042 |



36

The Law establishes that concessions may be extended by the IFT, provided that: a) concessionaires request said extension in the year prior to the beginning of the last fifth portion of the term of the concession, b) the are in compliance with the obligations established in the Law and other applicable provisions and with their concession titles, and c) they previously accept the new conditions established, if any. To date, the Entity has complied with all established requirements.

### *Installation costs*

The Entity amortizes installation costs in the period in which the respective services are rendered. Once the client terminates those services, the Entity considers no added value in relation to the installation costs. The Entity conducts impairment reviews with no effects to report. See Note 9.

Installation costs of $53,658 and $56,828 were recorded in 2018 and 2017 respectively as a result of applying the amortization rate.

### *Tax loss amortization*

The Entity does not recognize deferred tax assets arising from unamortized tax losses or tax credits due to the uncertainty of whether the Entity and its subsidiaries have taxable temporary differences or any other convincing evidence that they will generate sufficient taxable income against which to apply unamortized losses.

b.   ***Estimates***

### *Derivative financial instruments*

The fair value of derivative financial instruments is defined as the price receivable from the sale of an asset, or payable on the transfer of a liability in an orderly transaction between market participants at valuation date, irrespectively of whether that price is observable or is estimated by directly using another valuation technique. When estimating the fair value of an asset or liability, the Entity takes into consideration the features of the asset or liability, only if the market participants would consider those features when setting the prices of the asset or liability at the measurement date.

### *Sensitivity analysis*

The Entity has contracted derivative financial instruments exclusively for hedging purposes. All financial instruments held by the Entity are aimed at controlling the risk for which they are contracted. It should be mentioned that hedging derivative financial instruments held by the Entity do not lose their hedging effectiveness at any point of variation, any change in the fair value of contracted instruments does not give rise to changes in their nature, use or level of effectiveness.

In determining the fair value of derivative financial instruments, the Entity uses models developed in specialized literature that comply with standard industry assumptions. The valuation models used are of known use and do not contemplate any special adjustments. Additionally, the risk factors used are those used in the industry to value this type of instruments.

### *Useful lives*

As described in Notes 5i. and 5k., the Entity reviews its depreciation and amortization methods, as well as the useful life estimates and the residual value of long-lived assets (telecommunications network systems and equipment, as well as its intangible assets and frequency rights) at each annual reporting date and adjusts them accordingly.



37

*Valuation of long-lived assets*

In conducting impairment tests, assets are grouped in CGUs, i.e., the smallest group of assets that generate cash inflows due to continuous use and that do not depend largely on cash flows from other assets.

The recovery value of an asset or CGU is the greater of its value in use and its fair value, less sales costs. To calculate the in-use value of an asset, the future estimated cash flows are discounted at their present value using a pretax discount rate that reflects the current market evaluations of the value of money through time and the specific risks associated to the asset. The key assumptions used in calculating recoverable amounts are the discount rate and recovery values of the asset.

For the year ended December 31, 2018 and 2017, the Entity had incurred an impairment loss.

*Impairment sensitivity analysis*

The Entity checks its telecommunications network systems and equipment for sings of impairment when events or changes in circumstances indicate that the book value of those assets may not be recoverable. When signs of impairment are identified, tests are conducted on the bases of each CGU. The CGUs identified by the Entity are mainly telecommunications services, and to a lesser extent cable TV (impaired) and public telephone (PT) (sold). The carrying value of telecommunication services is compared to the recoverable amount, which is the higher of value in use and the fair value less costs to sell.

At December 31, 2018 and 2017, the impairment analysis was carried out using the 12.90% and 12.80% rates, respectively. For the purpose of the sensitivity measurement in both years, a 100 base point increase or decrease in the discount rate does not give rise to a significant impact in the impairment analysis.

*Allowance for doubtful accounts*

The allowance for impaired receivables is based on the expected credit loss model, which requires the Entity to account for expected credit losses and changes in those expected credit losses on each reporting date so as to reflect the changes in credit risk as of the initial recognition of the financial assets; unlike a credit loss model required under IAS 39, it is no longer necessary for a credit event to have occurred in order for credit losses to be recognized.

Management believes that the allowance will be sufficient to cover the potential risk of impairment; however, actual results may differ from such estimates, resulting in a significant adjustment to the book values of the receivables in the following year.

*Estimations related to installation services*

Installation expenses are not charged to commercial clients and the related costs are capitalized and amortized on linear bases over a five-year period. Capitalized installation costs are recorded as an expense upon termination of the client relationship. In 2018 and 2017, the useful life of installation costs was for five years.

7.   **Cash and cash equivalents**

Cash and cash equivalent balances are as follows:

|  | 2018 | 2017 |
|---|---|---|
| Cash | $       30,371 | $      395,988 |
| Cash equivalents | 426,173 | 189,283 |
| Total | $      456,544 | $      585,271 |



38

8.    Accounts receivable

The balance of this caption is composed as follows:

|  | 2018 | 2017 |
|---|---|---|
| Accounts receivable: | | |
| Commercial | $ 204,153 | $ 217,614 |
| Residential | 101,600 | 296,729 |
| Wholesalers | 2,663 | 68,895 |
| MVNO | 5,790 | 2,289 |
| | 314,206 | 585,527 |
| Less: Impairment provision: | | |
| Commercial | (61,700) | (44,675) |
| Residential | (92,861) | (282,356) |
| Wholesalers | (2,356) | (4,822) |
| MVNO | - | - |
| | (156,917) | (331,853) |
| Account receivable – Net | $ 157,289 | $ 253,674 |

The credit term is generally 30 days as of the invoice date. No collection is made for interest on accounts receivable, apart from customer delinquencies. The Entity has recognized an allowance for doubtful accounts based on the expected credit loss model established in IFRS 9 for all customers, regardless of delinquency. This allowance does not include customers identified as "special", who, because of a specific situation, do not represent a collection risk.

Changes in the allowance for accounts receivable

|  | 2018 | 2017 |
|---|---|---|
| Balance at the beginning of the year | $ 331,853 | $ 316,535 |
| Allowance increases | 33,235 | 18,023 |
| Applications to the allowance | (208,171) | (2,705) |
| Balance at the end of the year | $ 156,917 | $ 331,853 |

Evaluation of expected credit loss for commercial, wholesale and residential customers as of January 1st and December 31, 2018.

The model used to determine the risk ratios of commercial and wholesale customers consists of analyzing an invoice at a specific date, and revising the status of that same invoice in a 12-month period. After this term, in which the total amount of debt in the invoice would expect to have been collected, any remnant may be considered a "loss". This process is repeated for all the invoices, and subsequently for different monthly dates, in order to reflect the expected behaviors of different risk subsegments.

Finally, the Risk Ratio (RR) will be the percentage of the debt expected to be lost based on the portfolio's historical behavior

For the residential segment, the Entity is engaged in a wind down process; i.e., the gradual closure of clusters and mass disconnection of customers, with very good possibilities of asset sales. The Entity plans to end this process in June 2019.



39

As this segment is not considered crucial for the Entity's growth and consolidation, management decided to gradually reserve the missing balance, which would be approximately 8%, until closure of the residential business.

For the disputed portfolio, the Entity reserves the difference between the total contractual flow and total expected flows carried to present value, using the historical average funding rate obtained from Banxico

As of 2018 y 2017 applied $208,171 y $2,705, respectively.

Antiquity of financial assets

| | December 31 | | | December 31 | |
|---|---|---|---|---|---|
| | 2018 | % | | 2017 | % |
| (ᵃ) Up to date | $ 48,377 | 31 | $ | 96,604 | 38 |
| (ᵇ) Past due from 0 to 360 days | 64,213 | 41 | | 99,897 | 40 |
| (ᶜ) Past due more than 360 days | 44,699 | 28 | | 57,163 | 22 |
| Total | $ 157,289 | 100 | $ | 253,674 | 100 |

(ᵃ)  Minimum credit risk.
(ᵇ)  Low credit risk with a recovery success rate of 48.6%.
(ᶜ)  High credit risk with a recovery success rate of 12.3%.

| | 2018 | 2017 |
|---|---|---|
| Cash and cash equivalents | | |
| AAA | $ 456,544 | $ 585,271 |
| Total | $ 456,544 | $ 585,271 |

9.   Telecommunications network systems and equipment - Net

| Cost | Cost of line installation | Telecommunications networks and-equipment | Computer equipment | Engineering equipment | Radio equipment | Transportation equipment | Leasehold improvements | Office furniture | Investment properties | Other | Constructions in progress | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance at January 1st, 2017 | $ 267,353 | $ 3,818,564 | $ 102,668 | $ 23,798 | $ 586,646 | $ 31,202 | $ 287,857 | $ 32,308 | $ 53,052 | $ 251,151 | $ 353,427 | $ 5,808,026 |
| Additions | 96,835 | 158,497 | 6,006 | 149 | 15,319 | 1,047 | 43,829 | 59 | - | 986 | (171,062) | 151,665 |
| Disposals | - | (38,659) | (47) | - | - | (13,167) | (387) | (4) | (528) | - | - | (52,792) |
| Balance at December 31, 2017 | 364,188 | 3,938,402 | 108,627 | 23,947 | 601,965 | 19,082 | 331,299 | 32,363 | 52,524 | 252,137 | 182,365 | 5,906,899 |
| Additions | 59,494 | 42,232 | 3,036 | 3,042 | 7,414 | - | 59,535 | 933 | 3,553 | 433 | (91,952) | 87,720 |
| Disposals | (3,881) | (32,731) | (1,299) | (35) | (681) | (5,757) | (50,224) | (243) | - | (34) | - | (94,885) |
| Balance at December 31, 2018 | $ 419,801 | $ 3,947,903 | $ 110,364 | $ 26,954 | $ 608,698 | $ 13,325 | $ 340,610 | $ 33,053 | $ 56,077 | $ 252,536 | $ 90,413 | $ 5,899,734 |



40

| | Cost of line installation | Telecommunications networks and equipment | Computer equipment | Engineering equipment | Radio equipment | Transportation equipment | Leasehold improvements | Office furniture | Investment properties | Other | Constructions in progress | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Accrued depreciation** | | | | | | | | | | | | |
| Balance at January 1st, 2017 | $ (154,664) | $ (2,384,010) | $ (76,776) | $ (19,196) | $ (370,288) | $ (24,240) | $ (151,346) | $ (19,291) | $ (17,616) | $ (234,148) | $ - | $ (3,451,575) |
| Additions | (56,828) | (60,947) | (4,550) | (723) | (4,525) | (1,818) | (19,802) | (1,778) | (1,148) | (3,280) | | (155,499) |
| Disposals | - | 26,466 | 25 | - | - | 12,032 | 8 | 1 | 249 | - | - | 38,781 |
| Balance at December 31, 2017 | (211,492) | (2,418,491) | (81,401) | (19,919) | (374,813) | (14,026) | (171,140) | (21,068) | (18,515) | (237,428) | - | (3,568,293) |
| Additions | (53,658) | (87,028) | (5,245) | (781) | (6,173) | (1,773) | (20,902) | (1,852) | (1,450) | (2,109) | - | (180,971) |
| Disposals | 2,395 | 24,886 | 492 | 24 | 517 | 5,391 | 32,161 | 184 | 79 | 38 | | 66,167 |
| Balance at December 31, 2018 | $ (262,755) | $ (2,480,633) | $ (86,154) | $ (20,676) | $ (380,469) | $ (10,408) | $ (159,881) | $ (22,736) | $ (19,886) | $ (239,499) | $ - | $ (3,683,097) |
| **Book value** | | | | | | | | | | | | |
| At January 1st, 2017 | $ 112,689 | $ 1,434,554 | $ 25,892 | $ 4,602 | $ 216,358 | $ 6,962 | $ 136,511 | $ 13,017 | $ 35,436 | $ 17,003 | $ 353,427 | $ 2,356,451 |
| At December 31, 2017 | $ 152,696 | $ 1,519,911 | $ 27,226 | $ 4,028 | $ 227,152 | $ 5,056 | $ 160,159 | $ 11,295 | $ 34,009 | $ 14,709 | $ 182,365 | $ 2,338,606 |
| At December 31, 2018 | $ 157,046 | $ 1,467,270 | $ 24,210 | $ 6,278 | $ 228,229 | $ 2,917 | $ 180,729 | $ 10,317 | $ 36,191 | $ 13,037 | $ 90,413 | $ 2,216,637 |

At December 31, 2018, the Entity had investment properties in the amount of $56,077. Amortizations totaled $1,450 and $1,148 in 2018 and 2017, respectively. Accumulated amortizations totaled $19,886 and $18,515 in 2018 and 2017, respectively.

Investment properties are valued at the cost model. Those investment properties gave rise to the following income and expenses at December 31, 2018 and 2017:

| | 2018 | 2017 |
|---|---|---|
| Income | $ 6,144 | $ 6,646 |
| Expenses | (3,582) | (2,109) |
| Profit | $ 2,562 | $ 4,537 |

Investment properties have no restrictions.

Construction in progress is mainly made up of telecommunications networks and equipment.

At December 31, 2018 and 2017, the contractual commitments to acquire telecommunications network systems and equipment amounted to $22,221 and $86,696, respectively.

As part of the agreements signed with the holders of the new notes and previous notes payable, as mentioned in Note 11, the Entity committed the entirety of the telecommunications network systems and equipment of Maxcom as a guarantee payable to said holders of notes, without establishing specific amounts

Despite the fact that the aforementioned assets have been pledged in favor of the holders of notes payable, the Entity may use those assets provided that the requirements and conditions established in the instruments governing the issue of the notes are met.



41

*Impairment tests*

The Entity tests its telecommunications network systems and equipment for impairment when events or changes in circumstances indicate that the book value of those assets may not be recoverable.

When an indicator of impairment is identified, the Entity applies impairment tests to the CGU supplying the telecommunications services. The book value of other telecommunications services is compared to the in-use value.

The Entity conducts an annual assessment to determine whether long-lived assets have suffered impairment, as per the accounting policy described in Note 5m. The amount recoverable from the telecommunications services CGU has been determined on the basis of the calculation of in-use values. Those calculations require the use of estimates. See Note 6b.

The key assumptions used in calculating the value in use at December 31, 2018 and 2017 are as follows:

| Telecommunications services | 2018 | 2017 |
|---|---|---|
| Mixed annual growth rate | 5.5% | 5.0% |
| Discount rate | 7.0% | 7.4% |

Entity Management determined the mixed annual growth rate for the volume of income that the CGU covers in the projected key period of three years. The volume of income received in each period is the main motor behind income and expenses. The mixed annual volume growth rate is based on management's market development expectations and on past performance. The long-term growth rates used are consistent with the projections included in reports in the industry. The discounts rates used are pretax rates and reflect specific risks associated to the respective CGU.

*Impairment sensitivity analysis*

As of December 31, 2018 and 2017, based on Entity's impairment tests, no impairment loss was recognized.

10.  **Intangible assets - Net**

The balance of this caption is comprised as follows:

|  | Frequency rights | Software licenses | Infrastructure rights | | Brand rights | Total |
|---|---|---|---|---|---|---|
|  |  |  | Duct rights | Fiber rights |  |  |
| **Cost** |  |  |  |  |  |  |
| Balances at January 1st, 2017 | $ 80,200 | $ 758,509 | $ 49,284 | $ 101,156 | $ 372 | $ 989,521 |
| Additions | - | 94,518 | - | - | - | 94,518 |
| Disposals | - | (2,732) | - | - | - | (2,732) |
| Balances at December 31, 2017 | 80,200 | 850,295 | 49,284 | 101,156 | 372 | 1,081,307 |
| Additions | - | 116,917 | - | - | - | 116,917 |
| Disposals | - | (87,716) | - | - | - | (87,716) |
| Balances at December 31, 2018 | $ 80,200 | $ 879,496 | $ 49,284 | $ 101,156 | $ 372 | $ 1,110,508 |



42

|  | Frequency rights | Software licenses | Infrastructure rights | | | Total |
|  |  |  | Duct rights | Fiber rights | Brand rights |  |
| **Accrued amortization** |  |  |  |  |  |  |
| Balances at January 1st, 2017 | $ (76,592) | $ (575,585) | $ (44,179) | $ (66,758) | $ - | $ (763,114) |
| Additions | (3,608) | (47,848) | (3,386) | - | - | (54,842) |
| Disposals | - | 956 | - | - | - | 956 |
| Balances at December 31, 2017 | (80,200) | (622,477) | (47,565) | (66,758) | - | (817,000) |
| Additions | - | (53,796) | (630) | (1,672) | - | (56,098) |
| Disposals | - | 33,713 | 2 | - | - | 33,715 |
| Balances at December 31, 2018 | $ (80,200) | $ (642,560) | $ (48,193) | $ (68,430) | $ - | $ (839,383) |
| At January 1st, 2017 | $ 3,608 | $ 182,924 | $ 5,105 | $ 34,398 | $ 372 | $ 226,407 |
| At December 31, 2017 | $ - | $ 227,818 | $ 1,719 | $ 34,398 | $ 372 | $ 264,307 |
| At December 31, 2018 | $ - | $ 236,936 | $ 1,091 | $ 32,726 | $ 372 | $ 271,125 |

\*.    Mainly SAP license.

11.  Notes payable:

At December 31, 2018 and 2017, notes payable are comprised as follows.

|  | 2018 | 2017 |
|  |  |  |
| Long term: |  |  |
| Notes payable maturing on June 15, 2020. | $ 2,135,562 | $ 2,089,402 |

Notes payable as of October 11, 2013 are subject to a fixed annual interest rate of 6% until June 14, 2016, 7% as of June 15, 2016 until June 14, 2018, and 8% as of June 15, 2018 until June 15, 2020, payable biannually. The effective interest rate was 11.18%.

At December 31, 2018 and 2017, interest accrued payable on those notes totaled $8,428 and $6,801, respectively.

12.  Bank loan

As of December 31, 2018 and 2017, the bank loans caption was made up as follows:

|  | 2018 | 2017 |
|  |  |  |
| Short term | $ 30,000 | $ 30,000 |
| Long term | 22,500 | 52,500 |
|  | $ 52,500 | $ 82,500 |



43

At December 31, 2018, interest earned and paid totaled $6,870. At December 31, 2017, interest accrued and paid on the loan contracted in October of that year at the 9.8% rate amounted to $9,869. Interest is payable on a monthly basis.

The agreement establishes the guarantees that must be offered and certain restrictions that must be made, as well as specific limitations to contract additional indebtedness, all of which have been complied with at the date of the statement of financial position. Restricted cash related to this loan totals $6,050. The bank loan expires in 2020.

13. **Income taxes**

   a.   ISR

      i.   In 2018, the Entity determined a tax profit of $497,396 (tax profit of $45,718 in 2017). Book and tax results differ mainly due to items taxed or deducted differently over time for book and tax purposes, to recognition of the effects of inflation, and to items only affecting either book or tax results.

      ii.   The Income Tax Law establishes that income tax is 30% of taxable profit.

   b.   Income taxes are comprised as follows:

| | | 2018 | | 2017 |
|---|---|---|---|---|
| Income taxes payable | $ | 11,995 | $ | 11,228 |
| Deferred income taxes | | 16,677 | | (9,789) |
| | $ | 28,672 | $ | 1,439 |

   c.   Following is the analysis of deferred tax assets and liabilities:

| | | 2018 | | 2017 |
|---|---|---|---|---|
| Deferred tax asset | | | | |
| Deferred tax asset recoverable in no more than 12 months | $ | 687 | $ | 302 |
| Deferred tax asset recoverable in more than 12 months | | 5,346 | | 22,408 |
| Deferred tax asset | $ | 6,033 | $ | 22,710 |

Net changes in deferred taxes are explained as follows:

| | Employee benefits | | Provisions | | Unamortized tax losses | | Total | |
|---|---|---|---|---|---|---|---|---|
| At January 1st, 2018 | $ | 302 | $ | 9,853 | $ | 12,555 | $ | 22,710 |
| Charge for income taxes | | 385 | | (4,507) | | (12,555) | | (16,677) |
| At December 31, 2018 | $ | 687 | $ | 5,346 | $ | - | $ | 6,033 |

| | Employee benefits | | Provisions | | Unamortized tax losses | | Total | |
|---|---|---|---|---|---|---|---|---|
| At January 1 st, 2017 | $ | 416 | $ | 12,505 | $ | - | $ | 12,921 |
| Charge for income taxes | | (114) | | (2,652) | | 12,555 | | 9,789 |
| At December 31, 2017 | $ | 302 | $ | 9,853 | $ | 12,555 | $ | 22,710 |



44

d. Following are the tax effects of temporary differences giving rise to significant portions of deferred tax assets and liabilities at December 31, 2018 and 2017:

|  | 2018 | 2017 |
|---|---|---|
| Employee benefits | $ 687 | $ 302 |
| Tax losses | - | 12,555 |
| Provisions | 5,346 | 9,853 |
| Deferred tax assets | $ 6,033 | $ 22,710 |

Deferred tax assets are recognized on all temporary differences to the extent that it is probable that future taxable profit will be available against which to offset temporary differences. In evaluating the recoverability of deferred tax assets, Management considers whether it is very likely that a portion or the entirety of deferred tax assets will not be realized. Final realization of deferred tax assets depends on the generation of future taxable income in the periods in which those temporary differences become deductible.

The deferred income tax asset not yet recognized is as follows:

|  | 2018 | 2017 |
|---|---|---|
| Tax losses | $ 543,798 | $ 535,596 |
| Telecommunications network systems and equipment | 970,199 | 1,013,681 |
| Allowance for doubtful accounts | 54,396 | 113,306 |
| Provisions and others | 38,595 | 75,092 |
| Deferred income tax asset | $ 1,606,988 | $ 1,737,675 |

At December 31, 2018, the Entity has unamortized tax losses of $1,812,661 expiring as follows:

| Year of loss | Amount | Expiration year |
|---|---|---|
| 2010 | $ 4,605 | 2020 |
| 2011 | 244,235 | 2021 |
| 2014 | 12,042 | 2024 |
| 2015 | 427,784 | 2025 |
| 2016 | 485,156 | 2026 |
| 2017 | 92,069 | 2027 |
| 2018 | 546,770 | 2028 |
|  | $ 1,812,661 |  |

e. Reconciliation of effective tax rate:

|  | 2018 | | 2017 | |
|---|---|---|---|---|
|  | % |  | % |  |
| Loss before income tax |  | $ (286,659) |  | $ (14,485) |
| Expenses on income taxes at the legal rate | (30) | $ 87,091 | (30) | $ 4,346 |
| Effect due to inflation | 10 | (27,514) | (246) | 35,582 |
| Non-deductible expenses | 16 | (45,405) | 2,256 | (326,835) |
| Estimates impairment of doubtful accounts | 24 | (68,691) | 1 | (177) |
| Advance payments | 4 | (12,506) | (31) | 4,530 |
| Financial hedged | (1) | 3,469 | (90) | 13,000 |



45

|  | 2018 | | 2017 | |
|  | % |  | % |  |
| Telecommunication network systems and equipment | (26) | 75,007 | (1,719) | 249,042 |
| Change in the valuation reserve | (43) | 122,866 | (204) | 29,577 |
| Loss to be amortized | 56 | (161,984) | 95 | (13,711) |
| Benefits to employees | 1 | (699) | (25) | 3,553 |
| PTU paid | 1 | (306) | 2 | (346) |
|  | 10 | $ (28,672) | 10 | $ (1,439) |

### 14.  Provisions

As of December 31, 2018 and 2017, provisions are made up as follows:

| Short-term provisions: | Lawsuits legales[1] | | Notes[2] | | Total | |
|---|---|---|---|---|---|---|
| Balance as of January 1st, 2018 | $ | 60,011 | $ | 11,601 | $ | 71,612 |
| Charge to income: | | | | | | |
| Applications | | (39,715) | | (13,735) | | (53,450) |
| Increase | | 6,286 | | 10,200 | | 16,486 |
| At December 31, 2018 | $ | 26,582 | $ | 8,066 | $ | 34,648 |

| Long-term provisions: | | Labor suits[3] | | Total | |
|---|---|---|---|---|---|
| Balance as of January 1st, 2018 | | $ | 23,426 | $ | 23,426 |
| Charge to income: | | | | | |
| Applications | | | (24,017) | | (24,017) |
| Disposals | | | (2,205) | | (2,205) |
| Increase | | | 13,639 | | 13,639 |
| At December 31, 2018 | | $ | 10,843 | $ | 10,843 |

| Short-term provisions: | Lawsuits legales[1] | | Notes[2] | | Total | |
|---|---|---|---|---|---|---|
| At January 1, 2017 | $ | 40,375 | $ | 3,218 | $ | 43,593 |
| Charge to income: | | | | | | |
| Applications | | (28,072) | | | | (28,072) |
| Cancellations | | (12,307) | | (3,218) | | (15,525) |
| Increments | | 60,015 | | 11,601 | | 71,616 |
| At December 31, 2017 | $ | 60,011 | $ | 11,601 | $ | 71,612 |

| Long-term provisions: | | Labor suits[3] | | Total | |
|---|---|---|---|---|---|
| At January 1, 2017 | | $ | 36,754 | $ | 36,754 |
| Charge to income: | | | | | |
| Applications | | | (41,060) | | (41,060) |
| Increments | | | 27,732 | | 27,732 |
| At December 31, 2017 | | $ | 23,426 | $ | 23,426 |

[1]  Lawsuits (except for labor suits).
[2]  Notes according to the employee compensation program.
[3]  Applicable in cases in which there is high probability of losing, including the provision for restructurings.



46

15. **Derivative financial instruments:**

As of December 31, 2018 and 2017, the fair value of the derivative represents a deficit of $3,542 and 4,784, respectively. As of December 31, 2018 and 2017 there are no ineffective portions which should be recognized in results for the period.

The effect recorded as of December 2018 and 2017 for net interest earned from currency swaps was $310, as financial income, and $834 as financial income, respectively.

The Entity has signed offsetting master agreements with Credit Suisse. The derivatives subject to offsetting, offsetting master agreements and any surety pledged or received are presented below.

|  | As of December 31, | | |
|---|---|---|---|
|  | 2018 | | 2017 |
| Credit Suisse: | | | |
| Assets derivative | $ 160,834 | $ | 261,056 |
| Liabilities derivative | (164,376) | | (265,840) |
| Net amounts of financial (assets / liabilities) presented in the statement of financial position | (3,542) | | (4,784) |
| Collateral paid | 22,883 | | 25,396 |
| Total net | $ 19,341 | $ | 20,612 |

16. **Employee benefits**

The Entity has obligations and seniority premium costs payable to employees that are recognized based on actuarial studies prepared by independent experts. The next chart constitute the determination of the liabilities for profit benefits:

|  | 2018 | | 2017 |
|---|---|---|---|
| Balance at the beginning of the year | $ 1,898 | $ | 2,241 |
| Labor cost | 308 | | 314 |
| Financial cost | 144 | | 174 |
| Premeasurements | (725) | | (831) |
| Net cost for the period | (273) | | (343) |
| Balance at the end of the year | $ 1,625 | $ | 1,898 |

The economic assumptions in nominal and real terms used were as follows:

|  | 2018 (%) | 2017 (%) |
|---|---|---|
| Economic: | | |
| Discount rate | 9.06 | 7.77 |
| Salary increase rate | 5.00 | 5.00 |
| Minimum wage increase rate | 4.00 | 4.00 |
| Demographic (active employees): | | |
| Number | 361 | 432 |
| Average age | 39 | 38 |
| Average years of service | 6.20 | 5.70 |
| Average monthly salary | $ 33,543 | $ 27,978 |



47

Sensitivity analysis

| | + 1 Base point | - 1 Base point |
|---|---|---|
| Present value of obligations for defined benefits | | |
| Discount rate: | 1,624 | 1,896 |

| | + 50 Base points | - 50 Base points |
|---|---|---|
| Discount rate: | 1,624 | 1,896 |

| | + 50 Base points | - 50 Base points |
|---|---|---|
| Interest cost: | 1,624 | 1,896 |

17. **Financial instruments**

(a)    *Classes and categories of financial instruments and their fair values*

*Fair value of financial instruments recognized at amortized cost.*

With the exception of the matters described in the following table, the advisors consider that the book values of financial assets and liabilities outstanding recognized in the consolidated financial statements of the periods ending on December 31, 2018 and 2017 approximate their fair values.

| | | December 31, 2018 | | | December 31, 2017 | |
|---|---|---|---|---|---|---|
| | Level | Book value | Fair value | Level | Book value | Fair value |
| New notes payable and accrued interest (pesos) | 2 | $ 2,143,831 | $ 1,524,377 | 2 | $ 2,096,203 | $ 2,214,832 |
| New notes payable and accrued interest (Dls.) | 2 | Dls.108,926 | Dls. 79,890 | 2 | Dls.106,215 | Dls.112,226 |

The fair values of financial liabilities are determined in accordance with generally accepted price-determination models based on an analysis of discounted cash flows that uses market information available at valuation date, as well as the contractual conditions.

The following inputs were used in conducting the fair value review, as required by IFRS 13:

- B Rating Curve.
- IMPTO Cetes Curve
- Libor Curve
- USD/Peso Spot exchange rate.

No transfers were made between levels in 2018 and 2017.

*Determination of fair value*

Some of the Entity's accounting policies and disclosures make it necessary to determine the fair value of financial assets and liabilities. Fair values have been determined for measurement and/or disclosure purposes based on the following methods. Where applicable, additional information is disclosed on the assumptions used in determining fair values based on the specific notes of that asset or liability.



48

*Financial instruments recognized at amortized cost.*

The fair values of financial instruments recorded at amortized cost are estimated as the present value of future flows, discounted at market interest rates in effect at the reporting date. The fair value is determined for disclosure purposes.

*Operations with stock-based compensation*

The fair value of share-based payments is calculated considering that at the grant date those shares were acquired to comply with obligations to the employees. According to IFRS 2 "Share-based payments", the resulting cost is recorded as personnel expenses in the statement of income over the period of the respective concession. That book entry is modified to consider changes in the number of equity instruments expected to be granted as a result of changes in the projected yields.

*Fair value hierarchy*

The different levels have been determined as shown below:

- Level 1: quoted prices (unadjusted) in active markets for identical assets or liabilities.
- Level 2: inputs different from the quoted prices included in Level 1 that are observable for the respective asset or liability, either directly (i.e., such as prices) or indirectly (i.e., such as price derivatives).
- Level 3: inputs for the respective asset or liability not based on observable market data (unobservable inputs).

Level 2 financial Instruments

The fair value of financial instruments that are not traded in an active market is determined using valuation methods. Those valuation techniques maximize the use of observable market data where it is available and rely as little as possible on Entity-specific estimates. If all relevant data required for establishing the fair value of a financial instrument are observable, the instrument is included in level 2. If one or more significant inputs are not based on observable market data, the instrument is included in level 3.

The specific methods used to value financial instruments include:

- Quotation prices or quotations for similar instruments.

- The fair value of interest rate swaps is calculated as the present value of future cash flows estimated on the basis of observable yield curves.

- The fair value of foreign currency forwards is determined using exchange rates prevailing at the balance sheet date, discounting the value determined at present value.

Other techniques, such as the analysis of discounted cash flows, are used to determine the fair value of the remaining financial instruments.

| | As of December 31, 2018 | | | | |
|---|---|---|---|---|---|
| | | | December 31, 2018 Assets at fair value measured through profit or loss | | |
| | Loans and accounts receivable | | | | Total |
| Assets in statement of financial position | | | | | |
| Cash and cash equivalents | $ | 456,544 | $ | – | $ | 456,544 |
| Accounts receivable | | 157,289 | | – | | 157,289 |
| Other accounts receivable (sundry debtors) | | 10,091 | | – | | 10,091 |



| | As of December 31, 2018 | | |
|---|---|---|---|
| | Other financial liabilities at amortized cost | December 31, 2018 Fair value liabilities measured through profit or loss | Total |
| **Liabilities in statement of financial position** | | | |
| Accounts payable | $ 215,513 | $ – | $ 215,513 |
| Short-term portion of new notes | 8,428 | – | 8,428 |
| Other accounts payable in the short term | 18,840 | – | 18,840 |
| Client deposits | 21,692 | – | 21,692 |
| Other accounts payable in the long term | 22,880 | – | 22,880 |
| Loan | 52,500 | – | 52,500 |
| Notes payable | 2,135,562 | – | 2,135,562 |
| Derivative financial instruments | – | 3,542 | 3,542 |

| | As of December 31, 2017 | | |
|---|---|---|---|
| | Loans and accounts receivable | December 31, 2017 Assets at fair value measured through profit or loss | Total |
| **Assets in statement of financial position** | | | |
| Cash and cash equivalents | $ 585,271 | $ – | $ 585,271 |
| Accounts receivable | 253,674 | – | 253,674 |
| Other accounts receivable (sundry debtors) | 14,057 | – | 14,057 |

| | As of December 31, 2017 | | |
|---|---|---|---|
| | Other financial liabilities at amortized cost | December 31, 2017 Fair value liabilities measured through profit or loss | Total |
| **Liabilities in statement of financial position** | | | |
| Accounts payable | $ 317,642 | $ – | $ 317,642 |
| Short-term portion of new notes | 6,801 | – | 6,801 |
| Other accounts payable in the short term | 17,620 | – | 17,620 |
| Client deposits | 2,157 | – | 2,157 |
| Other accounts payable in the long term | 17,390 | – | 17,390 |
| Loan | 82,500 | – | 82,500 |
| Notes payable | 2,089,402 | – | 2,089,402 |
| Derivative financial instruments | – | 4,784 | 4,784 |

(b)   *Financial Risk Management*

The Board of Directors is responsible for establishing and supervising the Entity's risk Management framework. The Board has assigned Management and the Audit Committee to oversee the execution and monitoring of the Entity's risk management practices. The Audit Committee and Management periodically report on their activities to the Board of Directors.

The Entity's risk Management practices are designed to identify and analyze the risks to which the Entity is exposed and to monitor such risks. The purpose behind the Entity's standards and Management and training procedures is to develop a constructive and disciplined control environment in which all employees understand their roles and obligations.



50

The Audit Committee supervises the way in which Management oversees compliance with the Entity's risk Management policies and procedures and verifies that it is in line with its risk exposure.

(c)    *Market Risk*

The Entity's operations expose it mainly to financial risks associated to exchange rates and interest rates. The Entity contracts currency swaps to manage its exposure to exchange risk. The purpose of risk Management is to manage and control exposure to market risks within acceptable parameters, while at the same time optimizing yields. Such operations are conducted within the parameters established by the Board of Directors and the Audit Committee.

There have been no changes in the Entity's exposure to market risks or in the way in which those risks are managed and valued.

(d)    **Exchange rate risk**

With regard to other monetary assets and liabilities expressed in a foreign currency, the Entity's policy is to guarantee that its net exposure remains at an acceptable level by purchasing or selling currencies at spot rates when it becomes necessary to address short-term imbalances.

The figures included in this note are expressed in thousands of US dollars, except for the exchange rate, which is in pesos. The Entity's foreign currency position (not including foreign exchange swaps) was as follows:

|  | | As of December 31 | | |
|  | | 2018 | | 2017 |
| --- | --- | --- | --- | --- |
| Assets | | | | |
| Current | Dls. | 1,680 | Dls. | 17,690 |
| Non-current | | 9,689 | | 1,679 |
| | | 11,369 | | 19,369 |
| Liabilities | | | | |
| Non-current | | 108,167 | | 105,871 |
| Net liabilities - In dollars | | | | |
| Exchange rate to the dollar at the end of the period | Dls. | (96,798) | Dls. | (86,502) |
| Final exchange for the year per dollar | | 19.68 | | 19.74 |

The Entity has *"Cross-Currency Swaps"* to hedge its exposure to peso-Dls. exchange risks associated to its foreign currency debt coupons, through which it pays amounts estimated on the basis of fixed interest rates in pesos and receives amounts estimated on the basis of fixed interest rates in US dollars.

The current amount of derivative financial instrument contracts signed to hedge exchange risk is Dls.70 million, to be applied on different dates over the term of the Step Up Senior Notes maturing in June 2020. The purpose of the hedge is to set an exchange rate that allows the Entity to mitigate the volatility of the peso/dollar exchange rate up to 62% in relation to payment of coupons of the dollar bond issue maturing in June 2020.

The following table identifies the different risk factors considered in determining the fair value of derivative financial instruments.

| Counterparty | Peso rate | Dls. rate | Start date | Expiration date | Pesos/Dls. |
| --- | --- | --- | --- | --- | --- |
| Credit Suisse | 7.30% | 7.0% | Dec 15 2018 | Jun 15 2020 | 16.73 |



*Sensitivity analysis in foreign currency*

Given that acquired derivatives have the same features as those of the primary position subject to
hedging, the effectiveness ratio will always be 100%, irrespectively of the sensitivity or stress scenario
used, since the changes in the fair value of derivatives will be offset against the changes in the cash
flow presented by the primary position subject to hedging.

| Type | Input | Parameter | Parameter type | Counterpart | VR scenario base | Stress Scenario | Sensibility |
|---|---|---|---|---|---|---|---|
| Exchange Rate | Dls./MXN | + 5 | Percentage (%) | Credit Suisse | $(3,539) | $4,503 | $8,042 |
| Exchange Rate | Dls/MXN | + 10 | Percentage (%) | Credit Suisse | (3,539) | 12,544 | 16,083 |
| Exchange Rate | Dls/MXN | + 20 | Percentage (%) | Credit Suisse | (3,539) | 28,628 | 32,167 |

As the derivatives acquired have the same characteristics as the primary position hedged, the effectiveness
ratio will always be 100%, regardless of the sensitivity or stress scenario used, because the changes presented
in the fair value of the derivatives will be offset with the change in cash flow presented by the primary
position hedged.

*Foreign currency swap contracts -*

The Entity has a general policy of contracting financial derivatives (IFD) only for hedging purposes, with the
aim of reducing risks for its financial liabilities in foreign currency. Also, it has contracted foreign currency
swaps to cover its exposure to the peso-dollar exchange rate of the coupons of its foreign currency debt, in
which it pays amounts calculated with fixed interest rates in pesos and receives amounts calculated with fixed
interest rates in US dollars. These instruments are recognized in the consolidated statements of financial
position as fair value assets and/or liabilities.

During the first quarter of 2017 the Entity completed a new Only Coupon Swaps transaction with Credit
Suisse, which replaces the two derivatives in effect in December 2016 with this counterparty. This new
derivative has the same characteristics as the two previous ones and has a notional value equal to the total of
the previous real derivatives; i.e. US $45 million. However, now the maturity of this derivative was extended
to June 15, 2020, thus expanding the term of the hedge. This derivative was modified on November 27, 2017,
whereby for the period from December 15, 2017 until maturity of the swap, the notional amount in dollars is
increased up to US $70 million. Compared to the previous notional, it increased by US $10 million.

The value of the derivatives held by Maxcom is reported to it by the institutions or counterparties with which
the contracts are made, because they are the calculation agents designated according to the ISDA contract
signed. This valuation is determined according to proprietary methodologies and using recognized and
reasonable valuation procedures, techniques and models. As a control measure, every quarter the Entity
ascertains the fair value of such instruments with the help of independent experts.

Maxcom has designated these derivatives as cash flow hedges, under the terms permitted by international
accounting standards, because the aim of the hedge with the CCS is to set the exchange rate so as to mitigate
variability in the peso/dollar exchange rate by up to 62% associated with the issue of the dollar bond that
matures in June 2020, only with regard to payment of the coupons.

This hedge classifies as critical the terms (in other words, the notional amount, the maturity, the underlying
assets and the payments) of the currency swap and its respective item hedged are the same. The Entity makes
a qualitative evaluation and the value of the swap and the value of the respective hedged item are expected to
change systematically in opposite directions to reflect the movements in the underlying exchange rates.



52

The primary source of hedging efficiency in these hedge relationships is the counterparty effect and the credit risk of the Entity itself regarding the fair value of the futures contracts, which is not shown in the fair value of the hedged item attributable to exchange rate changes. No other source of inefficiency arose from these hedge relationships. As of December 31, 2018 there are no ineffective portions which should be recognized in results of the period.

Table one
summary of derivative financial instruments
In thousands pesos as of 31 of December 2018

| Type of derivative, value or contract | Purposes of coverage or other purposes such as negotiation coverage | counterpart | Type of position | expiration | MN (thousands MXN/Nominal value (Thousands USD) | underlying asset value | | reasonable value (in thousands mxn) | | values of maturity per year | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | current quarter | previous quarter | current quarter | previous quarter | | |
| currency swap | | Credit Suisse | USD | 15/06/2020 | 1,298,150/700,000 | 19.6504 | 18.7183 | -3,538 | -17,302 | 70,000 | 2,018 |

Maxcom does not expect changes in its financial position or in the exposure to risks due to financial derivatives. There are no eventualities whereby the use of hedge derivatives would significantly modify the respective scheme or generate a partial or total loss.

(e)   *Interest rate risk management*

The Entity is exposed to interest rate risks because it obtains fixed and variable interest rate loans. The Entity manages this risk by maintaining an appropriate combination of fixed and variable rate loans. Hedging activities are regularly evaluated to ensure they are in line with interest rates and the risk appetite defined, thus ensuring that more profitable hedging strategies are applied.

The Entity's exposures to the interest rates of the financial assets and liabilities are detailed in the following liquidity risk management section of this note

*Interest rate sensitive analysis*

The interest rate risk is the risk of fluctuations in the fair value or in future cash flows of a financial instrument as a result of changes in the market interest rates.  The 2020 Notes payable substantially constitute the entire debt of the Entity and are subject to fixed-rate interest.  See Note 11.

(f)   *Credit risk management*

Credit risk represents the risk of financial loss for the Entity if a customer or counterparty of a financial instrument defaults on its contractual obligations, and arises in relation to accounts receivable from the Entity's clients.

*Accounts receivable*

Entity exposure to credit risk is principally influenced by the individual features of each client. The Entity supplies services to a broad range of clients, avoiding dependence on a single client. Therefore, there is no credit risk concentration.  Accounts receivable from clients relate to a large number of clients, dispersed among different industries and geographic areas.

The Entity has implemented the policy of only dealing with solvent counterparties and demanding sufficient collateral, when applicable, as a way of reducing to a minimum the risk of financial loss due to non-compliance.  The Entity investigates the credit history of its clients. That information is supplied by independent rating agencies (Dun & Bradstreet de México, the Credit Bureau or the Credit Circle), where available, or otherwise it relies on other public financial information and on its own commercial records to rate its main clients. If it deems it necessary, it demands payment of guarantees (actual deposits). The Entity's exposure to counterparty risk (clients) is monitored continuously to reflect the exposure to the inherent risk of non-compliance.



**18.  Stockholders' equity**

**a.  Capital stock structure**

On August 21, 2017, Maxcom held an Ordinary General
approved a capital increase in its variable portion up to th
25,700,000 shares. In this regard: i) Maxcom shareholde
preemptive right granted to them under Article 132 of the
subscribed and paid 12,758,195 shares, at a price by $6.0
$76,549, and ii) in accordance with the faculty granted b
of Directors, 12,941,805 shares were subscribed and pai
equivalent to an amount by $77,651. With the foregoing
subscribed a total of 25,700,000 shares, the Entity receiv

On June 30, 2017, Celmax Móvil, S. A. de C. V. (a subs
General Meeting, approved the increase of the capital sto
$175,000, through the issuance of 1,750,000 shares in th
shares a subscription price by $67.2454 per share throug
$60,000, and b) the intention of the new investors to sub
contribution of counted by $115,000

On April 2018, 3,760,551 treasury shares were subscribe
See Note 20.

After the aforementioned movements, the capital stock a
follows:

| Series and class of shares | January |
|---|---|
| Series A, Class I (fixed portion) | $ |
| Series A, Class II (variable portion) | 114,9 |
| Subtotal | 115,0 |
| Movement of authorized shares | 16,2 |
| Total authorized shares | 131,2 |
| Capital stock | $ 7,2 |

**b.  Absorption losses**

At December 31, 2017, the Entity has lost more than tw
for dissolution, which any interested party may request i
through the Extraordinary General Meeting, the Entity a
previous years in the amount by $6,327,832, through a r
which eliminates the situation mentioned. Likewise, the
has no doubt that the Entity will continue to operate as a

Following are the maturities at December 31, 2018 and 2017, including estimated interest payments:

| December 31, 2018 | Less than 1 year | From 1 year to 2 years | More than 3 years | Total |
|---|---|---|---|---|
| New notes payable and interest payable, payable biannually | $ 192,466 | $ 2,343,483 | $ - | $ 2,535,949 |
| Bank loan | 36,870 | 27,653 | - | 64,523 |
| Accounts payable | 215,513 | - | - | 215,513 |
| Client deposits | 21,692 | - | - | 21,692 |
| Long-term portion of other accounts payable * | 18,840 | 22,880 | - | 41,720 |

| December 31, 2017 | Less than 1 year | From 1 year to 2 years | More than 3 years | Total |
|---|---|---|---|---|
| New notes payable and interest payable, payable biannually | $ 161,860 | $ 173,453 | $ 2,558,330 | $ 2,893,643 |
| Bank loan | 39,869 | 69,771 | - | 109,640 |
| Accounts payable | 317,642 | - | - | 317,642 |
| Financial derivative instruments | 4,784 | - | - | 4,784 |
| Client deposits | 2,157 | - | - | 2,157 |
| Long-term portion of other accounts payable * | 17,620 | 17,390 | - | 35,010 |

\*  Includes mainly deferred income.

As the Entity maintains a collateral amount much greater than the fair value of the foreign currency swap reported as of December 31, 2018, there is no liquidity risk from derivatives.

**(h)  *Capital management risk***

The Board's policy is to keep a solid capital base to ensure the trust of investors, creditors and market participants, while at the same time strengthening the future development of the business. The elements comprising the Entity's capital are the capital stock, the repurchase of the share reserve, the premium on share issue and the retained earnings.

At any given moment, the Entity may purchase its own shares in the market; the timing of said purchases depends on the market prices. The main objective is to use those shares to issue new shares under the Entity's share option program. The decisions to purchase and sell are made by the CEO based on specific transactions; the Entity has no defined share repurchase plan.

*Leverage Level*

Leverage ratios at December 31, 2018 and 2017 are as follows:

| | 2018 | 2017 |
|---|---|---|
| Total new notes payable | $ 2,135,562 | $ 2,089,402 |
| Total bank loans payable | 52,500 | 82,500 |
| Interest | 8,428 | 6,801 |
| Less: cash and cash equivalents (Note 7) | (456,544) | (585,271) |
| Net debt | 1,739,946 | 1,593,432 |
| Total stockholders' equity (Note 18) | 741,208 | 1,020,889 |
| Leverage ratio | 235% | 156% |




55

The Entity's current framework for credit risk classification includes the following categories:

| Category | Description | Bases for recognition of expected credit classes |
|---|---|---|
| Realizable | The counterparty has a low default risk and has no amounts that are 12 months overdue | 12-months. Expected credit loss |
| Impairment | The amount is overdue by more than 30 days or there has been a significant increase in credit risk since the initial recognition. | Expected credit loss over its life – with no credit impairment. |
| Breach | The amount is overdue by more than 90 days or there is evidence that the asset has credit impairment. | Expected credit loss over its life - with credit impairment. |
| Low | There is evidence that the debtor is in serious financial distress and that the Entity does not have a realistic outlook for recovery | The amount is canceled. |

*Investments*

The Entity limits its exposure to credit risk by investing only in 24-hour government bonds exclusively with good standing banks. Management does not expect its counterparties to fail to comply with their obligations.

*Derivative financial instruments*

The financial markets in which the Entity conducts its derivative financial operations are known as Over The Counter (OTC) markets. The Entity uses only derivative financial instruments commonly traded in OTC markets, which can be quoted with two or more financial entities to ensure ideal transaction conditions. The Entity only contracts the aforementioned instruments with banks and counterparties of good standing, mainly those with which it has a reciprocal business relationship, which makes it possible to balance its risk position with that of its counterparties. As of December 31, 2018 and 2017, the counterparty's credit risk is $3 and 24. At the same time, the Entity has delivered as collateral the amount of $22,883 and $25,396 to its counterpart.

Margin, collateral and credit line policies are determined by the Entity on the basis of the applicable policies and procedures manuals. Additionally, the Entity adheres to the guidelines, terms and conditions of the master agreements, which specify guarantees for payment of the considerations established therein.

It is worth mentioning that there have been no contingencies nor events, such as changes in the value of the underlying asset or in reference variables that would cause the DFIs contracted by the Entity to: a) differ from the situation under which they were originally contracted; b) significantly change the original arrangement or imply the partial or total loss of the hedges, and c) that require the contracting parties to take on new obligations, commitments or changes in their cash flows that could negatively affect their liquidity (e.g., due to margin calls).

(g)   *Liquidity risk*

Liquidity risk represents the possibility of the Entity facing difficulties in complying with its obligations related to financial liabilities settled through delivery of cash or other financial assets. The Entity's approach in managing liquidity risk is to ensure, to the degree possible, that it always has sufficient liquidity to comply with its obligations when they come due, either in regular conditions and under stress, without incurring in unacceptable losses or damages that pose a risk for the Entity's reputation.

The Entity monitors cash flow requirements and streamlines the yield of invested cash. The Entity ensures that it has sufficient cash on hand to meet its operating expenses, which includes settlement of financial obligations. This does not include the effect of potential unforeseeable extreme circumstances, such as natural disasters.

The following table shows an analysis of non-derivative financial liabilities grouped per maturity date at December 31, 2018 and 2017. Significant amounts shown are undiscounted contractual cash flows.



54

c.    *Legal reserve*

The profit for the year is subject to the legal provision requiring that at least 5% of the profit be set aside to increase the legal reserve until it reaches one fifth of the capital stock. As of December 31, 2018 and 2017 such reserve has not been created.

d.    |*Stockholder restrictions*

Dividends to be paid will be free from income tax if they come from Net Tax Profit Account (CUFIN, by its Spanish acronym). Any dividends paid in excess of CUFIN and reinvested in CUFIN will cause a tax equivalent to 42.86% if they are paid on 2019. The current tax is payable by the Entity and may be credited against its income tax of the year or for the following two years. Dividends paid from profit previously taxed by income tax are not subject to tax withholding or additional tax payment. As of 2014, Income Tax Law sets the obligation of keeping CUFIN with profit generated up to December 31, 2013, and starting another CUFIN with profit generated from January 1st, 2014.

In 2018 and 2017, the Entity distributed no dividends.

At December 31, 2018 and 2017, the capital contributions account balance was $12,925,655 and $12,330,111, respectively.

19.    **Earnings per share**

*Basic*

The basic profit per share is calculated by dividing the profit attributable to Entity stockholders by the weighted average of common shares outstanding in the accounting period, excluding common shares acquired by the Entity and held as treasury shares. *

|  | As of December 31, 2018 |  | 2017 |
|---|---|---|---|
|  | 2018 |  |  |
| Comprehensive loss for the period | $ (320,352) | $ | (47,672) |
| Weighted average of basic shares (thousands) | 143,531 |  | 121,214 |
| Comprehensive loss per share: Basic loss per common share (pesos) | $ (2.23) | $ | (0.39) |

20.    **Share-based payments**

The objective of the share option plan, which can be offered to Entity officers related to their responsibilities, performance and results qualify as key elements by the Corporate Practices Committee, is to enable them to participate in the capital stock of the key officers and promote profitability.

On August 21, 2017 Maxcom held a Stockholders' Ordinary General Meeting which approved, among others, a cancellation of all the Treasury stock assigned to the Stock Plan, which were 16,304,570 shares. It also approved an increase in capital of $34,863 through issuance of 5,810,526 shares for the Stock Plan.

On April 2018, the Entity ended this plan's modification, resulting in an increase in common stock of $78,188, of which $65,888 was paid, leaving $12,300 to be paid afterwards. As part of this increase, 3,760,551 Treasury shares were subscribed. See Note 18.



57

The executives will have the right to pay the shares assigned to them at the price determined by the Entity Practices Committee, upon the allocation date of the shares, based on the following:

* At the end of the first year, 20% of the shares assigned.

* At the end of the second year, 30% of the shares assigned.

* At the end of the third year, 50% of the shares assigned.

At December 31, 2018, the Entity has recognized an expense by $11,600, in relation to Share-based compensation in capital.

21. **Operating costs and expenses:**

|  | | 2018 | | 2017 |
|---|---|---|---|---|
| Network operating expenses: | | | | |
| Interconnection | $ | 61,554 | $ | 1,181,103 |
| Leases per circuit | | 108,636 | | 44,034 |
| Voice | | 166,089 | | 40,810 |
| Cost of sale of optic fiber | | 37,441 | | 7,945 |
| | | 373,720 | | 1,273,892 |
| | | | | |
| Depreciation and amortization | | 229,958 | | 204,031 |
| Maintenance | | 100,826 | | 97,859 |
| Site leases | | 69,478 | | 53,110 |
| Services - Power and water | | 34,768 | | 38,190 |
| Other | | 13,108 | | 13,836 |
| Disconnection costs | | 5,414 | | 8,051 |
| | $ | 827,272 | $ | 1,688,969 |
| | | | | |
| Sales, administration and overhead expenses | | | | |
| Wages and salaries | $ | 307,399 | $ | 289,371 |
| Impairment of accounts receivable | | 33,235 | | 18,023 |
| Leasing | | 38,670 | | 55,180 |
| Services - Power and water | | 9,963 | | 10,085 |
| Other | | 76,926 | | 76,828 |
| Consulting | | 3,297 | | 2,987 |
| Depreciation and amortization | | 7,111 | | 6,310 |
| | $ | 476,601 | $ | 458,784 |
| | | | | |
| Other expenses: | | | | |
| Loss on sales of telephone network systems and equipment | $ | (280) | $ | (239) |
| Other | | 50,388 | | 26,813 |
| Legal contingencies | | 9,341 | | 11,473 |
| Restructuring expenses | | 17,210 | | 62,344 |
| | $ | 76,659 | $ | 100,391 |



58

22.  Financial costs

|  | | 2018 | | 2017 |
|---|---|---|---|---|
| Financial expenses | | | | |
| New notes payable (Note 11) | $ | (171,627) | $ | (158,889) |
| Loss in foreign currency | | (360,722) | | (12,774) |
| Other interest | | (7,255) | | (9,870) |
| Financial charges | | (43,388) | | (76,586) |
| Total financial costs | $ | (582,992) | $ | (258,119) |
| Financial income: | | | | |
| Interest income on short-term bank deposits | $ | 11,435 | $ | 27,429 |
| Other interest | | - | | 3,145 |
| Gain on partial settlement of debt (Notes 2 and 11) | | - | | 90,206 |
| Gain in foreign currency | | 350,185 | | 115,418 |
| Total financing income | | 361,620 | | 236,198 |
| Net financing costs | $ | (221,372) | $ | (21,921) |

23.  Balances and transactions with related parties:

The Group is controlled by the shareholders that are advised by Ventura, which holds close to 75% of the Entity's shares.  The remaining 25% of the shares is diversified.

For years ended on December 31, 2018 and 2017, the operations with the aforementioned shareholders are as follows:

|  | | 2018 | | 2017 |
|---|---|---|---|---|
| Expenses paid to: | | | | |
| Ventura* - Shareholder | $ | 9,657 | $ | 9,709 |
| Total | $ | 9,657 | $ | 9,709 |

*  Corresponds to payments for financial consulting services.

Key management compensation

|  | | 2018 | | 2017 |
|---|---|---|---|---|
| Short-term employee benefits | $ | 15,979 | $ | 19,901 |

24.  Operating segments:

The Entity operates in the telecommunications sector and has only one reportable segment.  The segment offers different products to its clients based on the type of market, which are divided as follows: commercial, residential, wholesaler, and others.  However, most of the Entity's infrastructure is usually used by the different service products in all markets alike and by the specific telecommunications services, such as local services, long-distance calls and "el que llama paga" (CPP, caller pays), which can be supplied in one or more markets.  Therefore, there is no different financial information available because the Entity does not measure the profit or loss per segment for each market.  The financial information reviewed by the person charged with making operating decisions, specifically the CEO, includes income per market; however, operating expenses and assets are reported jointly for the entire operating unit.



59

*Information on products and services*

*Market:*

|  | 2018 |
|---|---|
| Commercial | $ 1,036,593 |
| Residential | 188,930 |
| Wholesalers | 79,110 |
| MVNO | 10,612 |
| Total income | $ 1,315,245 |

Commercial - This type of client belongs to the business sector.
Residential - These clients are individuals, mainly of the C- and D income levels.
Wholesalers - These clients transfer large volumes of data.
MVNO - Mobile Virtual Network Operator, these clients are individuals.

Each of the aforementioned markets is constituted from similar clients.

The Entity recognizes revenues from the transfer of goods and services over time, and at a point in time, according to the following product lines.

*Revenue recognition in accordance to IFRS 15:*

|  | 2018 |
|---|---|
| *At a point in time:* |  |
| Powersale | $ 211,456 |
| OTC | 6,554 |
|  | 218,010 |

|  | 2018 |
|---|---|
| *Over time:* |  |
| Voice and data | 871,057 |
| Backbone and frequency | 117,112 |
| Connections | 71,496 |
| Collocations | 15,276 |
| SAVI | 11,682 |
| MVNO / MVNA | 10,612 |
|  | 1,097,235 |
| Total revenue | $ 1,315,245 |

Maxcom expects that 40% of the transaction price hosted in partially satisfied contracts will be recognized as of December 31, 2019, and of the remnant, 35% in 2020, and 25% in 2021

According to the practical expedient permitted under IFRS 15 of recognizing revenue on the amount the Entity has the right to invoice, the Entity does not disclose the amount of performance obligations not satisfied as of December 31, 2018.

Information by geographical location (all inside Mexico), including revenues, total assets and additions to the telephone network systems and equipment for the year ended December 31, 2018, is presented below:



60

Information on geographic areas:

| | Metropolitan area[1] | | Central-Southern[2] | | Northern[3] | | Total | |
|---|---|---|---|---|---|---|---|---|
| Local | $ | 723,267 | $ | 436,539 | $ | 9,907 | $ | 1,169,712 |
| Long distance | | 328 | | – | | – | | 328 |
| Leasing of dedicated links | | 129 | | – | | – | | 129 |
| Equipment sales to clients | | 145,076 | | – | | – | | 145,076 |
| Capacity leasing | | | | | | | | |
| Total income | $ | 868,800 | $ | 436,539 | $ | 9,907 | $ | 1,315,245 |
| Total assets at December 31, 2018 | $ | 2,170,763 | $ | 1,190,725 | $ | 24,752 | $ | 3,286,241 |

[1]   Includes Mexico City and the Metropolitan area
[2]   Includes certain cities in the states of Puebla, Querétaro and San Luis Potosí.
[3]   Cities in the state of Nuevo León.

The amounts provided for total assets are measured consistently with the procedure used to measure those amounts when preparing the financial statements. Those assets are assigned on the basis of the operations of each segment and the physical location of the assets.

Information on the main clients

There are no clients whose payments to the Entity exceed 10% of the Entity's total income.

## 25.   Lease agreements

### a.   *Straight-lease agreements*

The Entity holds straight leases for buildings, sites, posts and office equipment. The Entity recorded leasing expenses of $77,049 and $56,126, for periods ended in December 2018 and 2017, respectively. In the case of leases for certain sites, the agreements have been set in dollars and the rest were set in pesos.

The program for minimum future "Straight lease" payments is as follows:

| | As of December, 31 | | | |
|---|---|---|---|---|
| | 2018 | | 2017 | |
| Up to one year | $ | 77,049 | $ | 59,779 |
| More than one year and up to 5 years | | 531,981 | | 273,568 |
| | $ | 609,030 | $ | 333,347 |

### b.   *Lease agreement for the building currently housing the Entity's corporate offices.*

On January 1st, 2013, the Entity renewed its corporate lease agreement (Agreement 1) expiring on December 31, 2017. The leased surface covers 7,586 m². 

On June 1st, 2015, the Entity signed a corporate lease agreement (Agreement 2) corresponding to level 1 of the building, expiring on May 31, 2018. The leased surface covers 245.53 m².



61

On January 1st, 2015, the Entity renewed the corporate lease agreement (Agreement 3) corresponding to the level between the ground floor and the cashier's office, dated December 31, 2017. The leased surface covers 21.19 m².

On September 4, 2017, the Entity renewed its corporate lease agreement (Contract 1) with effect from January 1, 2018, with an expiration date on December 31, 2022. The leased surface covers 5,711 m².

The total leased surface on December 31, 2018 and 2017 covers 5,956.53 m² and 7,852.72 m², respectively. The Entity recorded leasing expenses of $31,098 and $52,164 for the periods ended in December 2018 and 2017, respectively. Those leases were contracted in dollars.

|  | As of December 31 | | |
|  | 2018 | | 2017 |
|---|---|---|---|
| Up to 1 year | $ | 31,098 | $ | 32,954 |
| More than 1 year and up to 5 years | | 184,836 | | 149,997 |
|  | $ | 215,934 | $ | 182,951 |

## 26. Commitments and contingencies:

At December 31, 2018, the Entity carried out the following operations:

Commitments

### a. *Geographic expansion commitment*

As of December 31, 2018 and 2017, the Entity is complying with its obligations derived from its concession titles, obligations that must continue to be fulfilled during the term of its concessions.

### b. *Commitment in relation to frequency rights*

At December 31, 2018 and 2017, the Entity failed to comply with the obligation to supply the IFT the renewal of bonds for those years, as well as with the commitments and obligations set forth in those concessions.

### c. *Capacity sale commitments*

i. On December 2008, the Entity signed a $36.2 million agreement for the sale of optic fiber capacity with Megacable, of which $10.6 million were recorded in the moment of the sale as revenue from infrastructure implementation and $25.6 million were deferred for pending services. Amortization began in April 2009, as when the transport agent began using the services. The agreement is for a 10-year term. As of December 31, 2018 and 2017, the deferred revenue amounted is up to $0.6 and $3.2 million, respectively.

ii. On September 2013, the Entity signed a $24.9 million agreement for sale of optic fiber capacity with Grupo de Telecomunicaciones Mexicanas, of which $7.9 million were recorded in the moment of the sale as revenue from infrastructure implementation and $17.0 million were deferred for pending services. Amortization began in November 2013, as when the transport agent began using the services. The agreement is for a 10-year term. As of December 31, 2018 and 2017, the deferred revenue amounted is up to $8.2 and $9.9 million, respectively.



62

iii.   On October 2013, the Entity signed an $11.8 million agreement for sale of optic fiber capacity with Cablevisión, of which $7.3 million were recorded in the moment of the sale as revenue from infrastructure implementation and $4.4 million were deferred from pending services. Amortization began on November 2013, as when the transport agent began using the services. The agreement is for a 10-year term. As of December 31, 2018 and 2017, the deferred amounted to up to $2.1 and $2.6 million, respectively.

iv.   On January 2014, the Entity signed an $119.5 million agreement for use of a point-to-point link of 23GHz frequencies with Pegaso PCS, of which $40 million were recorded in the moment of the sale as income from infrastructure implementation and $79.5 million were deferred from pending services. Amortization began on January 2014; the agreement is for a term of 4.5 years ended on June,2018. As of December 31, 2018 and 2017, the deferred amounted is up to $0 and $8.8 million, respectively.

v.   On May 2018, the Entity signed an agreement for sale of optic fiber capacity with Pegaso PCS by $23.6 million, of which $5.6 million were recorded in the moment of the sale as income from infrastructure implementation and $18.0 million the deferred from pending services. Amortization began in November 2017. The agreement is for a 13-year term. As of December 31, 2018 and 2017, the deferred amounted is up to $15.6 and $10.5 million.

vi.   On January 2018 the Entity entered into a capacity sale contract for a 10 GBPS LAMDA with TV Rey Occidente for $1,237, of which $395 was received as revenue and $842 was recognized as deferred revenue generated from the pending services. Amortization began on March 2018 and the contract term is 10 years. As of December 31, 2018 the deferred revenues were $898.

vii.   In June 2018 the Entity entered into a connection use contract in the 23 GHz spectrum band with Pegaso PCS for $185,000, which will be recognized monthly during the six-year contract. As of December 31, 2018, the deferred revenues were $14,123, because only $29,549 has been collected from the transaction total.

| Transport agent | Agreed sales amount | Prepaid charge | Income to be deferred | (millions) Deferred income at December 31 | |
|---|---|---|---|---|---|
| | | | | 2018 | 2017 |
| i. Megacable | $ 36,230 | $ 10,596 | $ 25,634 | $ 641 | $ 3,204 |
| ii. Grupo de Telecomunicaciones Mexicanas | 24,958 | 7,916 | 17,042 | 8,237 | 9,941 |
| iii. Cablevisión | 11,848 | 7,355 | 4,493 | 2,171 | 2,621 |
| iv. Pegaso PCS | 119,496 | 40,016 | 79,480 | - | 8,831 |
| v. Pegaso PCS | 23,627 | 5,612 | 18,015 | 15,640 | 10,413 |
| vi. TV Rey | 1,237 | 395 | 842 | 898 | - |
| vii.Pegaso PCS | 185,000 | - | 185,000 | 14,133 | - |
| Total | $ 402,396 | $ 71,890 | $ 330,506 | $ 41,720 | $ 35,010 |

d.   **Contingencies**

As of December 31, 2018 the Entity has the following contingencies:

a.   The Entity is involved in a number of trials and lawsuits arising in the regular course of operations. The final rulings on those matters are not expected to have significant negative effects on the Entity's financial situation and operating results.

b.   The previously reported contingency was eliminated notified the Administrative Sanctions Imposition Procedure against Maxcom TV, S. A. de C. V. registered under file number E-IFT.UC.DG-SAN.IV.0291/2018



63

c.  On 2013, identify credit fiscal, for $20,786, by concept measure of contrail issued on 2013, derivate for a process of economic competence by IFT (its acronym in Spanish) we get accredited for the act on January, 2019. We present an against shelter, pending for resolution at Juzgado Primero de Distrito in Mater Administrative Specialist in Economic Competence, Telecommunicacion and Broadcasting, in Mexico City and nationwide Jurisdicion.

## 27.  Subsequent events

In the preparation of the financial statements, the Entity has evaluated the events and transactions for recognition or disclosure subsequent to December 31, 2018, and until April 11, 2019 (date of issuance of the consolidated financial statements), and has concluded that subsequent events were the following.

a.  Leases of optical channels

On January 10, 2019 the Entity entered into a "Contract of irrevocable right to use optic channels". The revenue will be recognized by the straight-line method until expiration, which is in 10 years.

b.  Sales of fiber optic

On December 10, 2018, Maxcom entered into a contract of purchase and sale of fiber-optic threads". The revenue will be recognized at the time of delivery and with the complete acceptance of the counterparty.

c.  Repurchase of bonds

On March 11 and 18, 2019, the Entity made open market purchases of staggered bonds known as Step-up Senior Notes which mature on June 15, 2020, for a nominal value of $162,392 and $12,601, equivalent to US $8.3 million and US $651 thousand, respectively, of the principal amount of the bonds.

Such purchases were made at an average price of US $59.75 for each US $100 of nominal value. The amount paid for the aforementioned repurchases was $97,029 and $7,529, generating a gain of $65,363 and $5,072, respectively.

Also, Maxcom carried out administrative procedures to cancel the Repurchased Notes. As a result of such cancellation, the amount outstanding of the Step-up Senior Notes 2020 is MX $1,997,286 equivalent to US $103.4 million (nominal).

At the date of issuance, the estimated fair value of the bonds is US $71,597 and MX $1,366,150.

## 28.  Financial statement authorization

The Entity consolidated financial statements and the notes thereto were authorized for issuance on April 11, 2019 by Lauro Cantú Frías, General Director, and Erik González Laureano, Vice President, who is empowered to authorize them. Therefore, they do not reflect events occurred after that date.

|  |  |
|---|---|
| Lauro Cantú Frías<br>General Director | Erik González Laureano<br>Financial Vice President |

\* \* \* \* \*



64



# Maxcom Telecomunicaciones, S.A.B de C.V.

## First Quarter Results 2019

# Content

- Earnings Results Summary and Relevant Events

- IFRS 16 Adoption

- Commercial Business Unit

- Residential Business Unit

- Wholesale Business Unit

- Consolidated Revenue

- Costs, Expenses and Other Items
  - Network Operation Costs
  - SG & A
  - EBITDA & Operating Income (Loss)
  - Comprehensive Financing Result
  - Taxes
  - Net Income (Loss)
  - CAPEX
  - Indebtedness
  - Stockholders' Equity

- Celmax Summary

- Exhibits – Non-Audited Financial Statements



# First Quarter 2019 Results

## Earnings Results Summary and Relevant Events

**Maxcom's 1Q19 Performance**

TOTAL REVENUE
Ps.377 million

NETWORK OPERATION COST
Ps.206 million
42% vs 1Q18

GROSS PROFIT MARGIN
45%
vs 51% 1Q18

EBITDA
Ps.73 million
116% vs 1Q18

OPERATING INCOME (LOSS)
Ps.-39 million
vs Ps.-27 million 1Q18

NET INCOME
Ps.-9 million

The EBITDA for the quarter amounted to Ps.73 million on a consolidated basis, representing a variation of 116% with respect to 1Q18. Excluding the accounting effect of Ps.37 million in the way operating leases are recorded under new accounting standard IFRS 16 as of January 1, 2019, the consolidated EBITDA was Ps. 35 million and Ps.52 million excluding Celmax operations, representing an increase of Ps.2 million and Ps.18 million compared to 1Q18, respectively. The main factors that explain the variation were:

- The decrease in revenues from the Residential segment as a result of the progressive execution of wind down plan
- Reactivation of the Wholesale business unit, which generated revenues of Ps. 111 million with a 3.2% margin
- Strategic sales of surplus capacity of our fiber optic infrastructure through both an IRU and a direct sale
- Continuous efforts for improving operational efficiency and overall profitability

The Company keeps generating efficiencies mainly in payroll, network maintenance, electricity and sites maintenance. As a result of the foregoing and excluding new lease accounting effects, Maxcom presented an 8% decrease in expenses compared to the same quarter of 2018. With respect to operating cost, the Company presents an increase in cost of Ps. 75 million or 81%, mainly explained by the increase in costs associated with the reactivation of wholesale operations.

The decrease in Company's margins is a consequence of the reactivation of Wholesale operation and the impact that it represents in the revenue mix. This business unit reflects an increase in its participation, going from 6% in 4Q18 to 30% in this reported quarter. The Commercial business unit reduced its participation to 55% in this quarter, against 80% in 4Q18.



**WEIGHT (%) 1Q19**

Wholesale 30%
Commercial 62%
Residential 8%

### Relevant Events

As mentioned in the previous quarter, Maxcom successfully concluded the negotiation of an IRU on two of the long distance backbone routes for a period of 10 years, as well as a transaction for the sale of excess fiber optic capacity. Both transactions generated USD. 8.1 million in cash.

On March 18, the Company successfully concluded the repurchase of Bonds through the open market for a face value of USD. 8.9 million. These repurchases were made at an average price of USD. 59.75 per USD.100 face value. After this transaction, the outstanding principal amount of the bonds is USD. 103.4 million.

As of today, the Company has made repurchases and canceled a total of USD. 72.3 million of the face value of the Step-up Senior Notes 2020 using cash for USD. 45.6 million, which has generated a profit by reducing debt of USD. 26.7 million. These actions have allowed the Company to mitigate significantly the negative effects that the depreciation of the peso has had on the dollar denominated debt. The company has formally begun aprocess to analyze the refinancing alternatives for this debt considering its maturity in June 2020.



**GROSS MARGIN**

| 2Q17 | 3Q17 | 4Q17 | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 |
|------|------|------|------|------|------|------|------|
| 30%  | 43%  | 44%  | 51%  | 64%  | 50%  | 47%  | 45%  |



# First Quarter 2019 Results

## IFRS 16 Adoption

- In January 2016, the IASB (International Accounting Standard Board) issued a new accounting standard for lease contracts called International Financial Reporting Standard ("IFRS") 16, which replaces the current International Accounting Standard ("IAS") 17.

- IFRS 16 changes the accounting model that tenants applied until the end of 2018. Under this standard, the distinction between financial and operating leases disappears and practically all leases (of any type of good) will follow the same model and will be recognized in the balance sheet at their present value, except for short-term contracts or low-value goods.

- Until 2018, financial leases were recognized on the balance sheet, but operating leases were recorded as "off-balance sheet" operations. The new recording model involves recognition, for each object of leasing for an asset (right of use from the asset) and liability (future installments payable). Therefore, the financial statements for 1Q19 will be different from those reported until the end of 2018. A summary of balance sheet and profit a loss account effects is presented:

| Concept | 1Q19 |
|---|---|
| **Balance Sheet Effects** | |
| Right of Use of Leased Assets | 571,658 |
| Accrued Amortization from Right of Use | (29,037) |
| Assets, Net | 542,621 |
| | |
| Short Term Leases | 86,747 |
| Long Term Leases | 461,493 |
| Liabilities, Net | 548,240 |
| | |
| **P&L Effects** | |
| EBITDA Benefits by Costs and Expenses Reduction | 37,333 |
| Depreciation and Interest Increase | (42,952) |
| Net Effects | (5,619) |

**MAXCOM TELECOMUNICACIONES, S.A.B. DE C.V. AND SUBSIDIARIES**
**FINANCIAL AND OPERATING HIGHLIGHTS**
Figures in millions of pesos, except operating data

| Item | 1Q19 | 4Q18 | % var |
|---|---|---|---|
| Total Revenues | 377 | 269 | 40% |
| EBITDA | 73 | 21 | 248% |
| EBITDA margin (%) | 19% | 8% | |
| Net income (loss) | (9) | (244) | 96% |
| Net margin (%) | (2%) | (91%) | |
| | | | |
| Cash and financial instruments [1] | 418 | 492 | (15%) |
| CAPEX | 63 | 19 | 232% |
| Debt [2] | 2,640 | 2,270 | 16% |
| Net debt / LTM EBITDA (X) | 7.7 | 7.2 | 7% |
| | | | |
| Customers | 35,865 | 39,472 | (9%) |
| Commercial | 1,108 | 1,128 | (2%) |
| Residential | 34,757 | 38,344 | (9%) |
| RGUs [3] | 217,191 | 214,405 | 1% |

[1] Includes long-term restricted cash.

[2] Debt is considered at face value and includes interest payable as of the end of the period. As of January 1, 2019, this amount includes IFRS 16 effects.

[3] Revenue generating units

# maxcom

## First Quarter 2019 Results

## Commercial Business Unit

- As we have mentioned previously, the Company has focused in consolidating this business unit. Although the participation in the income mix had a decrease of 25 percentage points compared to the previous quarter due to the increase in wholesale revenues, we have had a sustained growth in the income along previous quarters.

- Commercial revenue totaled Ps. 233 million, representing an increase of 23% or Ps. 44 million compared to Ps. 188 million registered during 1Q18.

- On a sequential basis, revenue grew Ps. 14 million or 6% compared with 4Q18.

- The average revenue per customer (ARPC) of the Commercial business segment during 1Q19 was Ps. 63 thousand, 50% higher than the Ps. 42 thousand registered in 1Q18, maintaining the level sequentially.



- In March, the Company registered a non recurrent sale of excess capacity of our fiber optic infrastructure for a total amount of Ps. 18 million.

- In addition to this income, Maxcom registed Ps. 7 million corresponding to the revenue recognition associated to the sale of two optical channels within our long distance backbone routes. This transaction totaled USD. 7.3 million over a period of 10 years.

## Residential Business Unit

- The Company continues to execute its wind down process, however, management has decided to extend the closure of the 32 remaining clusters and conclude the process in December 2019. As already mentioned, on a cumulative basis 22 clusters have been closed during 2018.

- The income generated by the segment was Ps. 29 million, which represented 8% of all revenues recorded during 1Q19. This decrease is mainly due to the increase in income generated in the wholesale segment. This participation will continue to decrease in the following quarters as the Company grows its commercial and wholesale segment operations and continues to close clusters.

- Compared to 1Q18, Residential revenue decreased 55% or Ps. 36 million. This reduction is mainly explained by the programmed shutdown of

both non profitable clusters and the TV services, which were suspended in July 2018.

Sequentially, the decrease was 6% or Ps. 2 million.



- The contribution margin for this business unit was 57% or Ps. 17 million generated by a customer base at the end of the period of 36 thousand. The ARPU of residential customers was Ps. 159 in 1Q19, 1% above the ARPU of Ps. 157 reported in 1Q18 and 3% above Ps. 155 registered in 4Q18.



# First Quarter 2019 Results

## Wholesale Business Unit

- During this quarter, the revenue in this business unit was Ps. 111 million, a significant increase of 186% compared to the same period of 2018 and 583% above the reported income during 4Q18. These increases are a direct consequence of the reactivation of this business unit.

- On February 5th, 2019 Maxcom received a series of observations associated to the 2015 audit process being performed by the Servicio de Administracion Tributaria (SAT). In these observations the authority determined that Maxcom did not provide sufficient elements to demonstrate the materiality and indispensability of the interconnection operations carried out with a telecom concessionary and a telecom reseller, both of which provided the Company overseas call termination services. These companies were authorized by the competent authority to provide such services. This determination puts at risk the deductibility of the expenses incurred as well as the crediting of the Value Added Tax (VAT) paid to these suppliers. Maxcom has provided all the elements to detract these observations, technically demonstrating the existence of all the international long distance calls linked to the services received by both companies, as well as its direct relationship with the revenue that Maxcom generated from its international traffic operations. Maxcom has requested the intervention of the Procuraduría de la Defensa del Contribuyente (PRODECON) to reach a conclusive agreement ratifying the Company's position.

## Consolidated Revenue

- On a consolidated basis, total revenues reported in 1Q19 amounted to Ps. 377 million, an increase of 28% when compared to 1Q18, mainly explained by the reactivation of the wholesale business and the increase in the Commercial business segment.





- Sequentially, the income registered an increase of 40% or Ps.108 million.

- The recurrent Commercial revenue continues to gain strength and participates in 55% of the Company's total revenues. However, compared to 1Q18, there was a decrease in the revenue mix of 9 percentage points due to the increase in Wholesale revenues.

**RECURRENT COMMERCIAL REVENUE**



| | | 1Q19 | 4Q18 | QoQ Δ% | | 1Q18 | YoY Δ% |
|---|---|---|---|---|---|---|---|
| Commercial | Ps. | 233 | 219 | 6% | Ps. | 188 | 24% |
| Wholesale | | 111 | 16 | 594% | | 39 | 185% |
| Residential | | 29 | 31 | (6%) | | 66 | (56%) |
| Others | | 4 | 3 | 33% | | 3 | 33% |
| Total | Ps. | 377 | Ps. 269 | 40% | Ps. | 296 | 27% |



# First Quarter 2019 Results

## Network Operating Cost

- Network operating cost in 1Q19 increased 42% to reach Ps. 206 million compared to Ps. 145 million reported in 1Q18. The increase is a consequence of the net effect between the increase in the cost of traffic due to the Wholesale operations and the favorable reclassification of operating leases under new IFRS 16 accounting standard.

- Excluding this effect, the increase in cost compared to 1Q18 is 62% totaling Ps. 235 million.

- Gross profit is also affected mainly by the cost of the Wholesale business unit and the adoption of IFRS 16, resulting in an increase of 13% or Ps. 20 million compared to 1Q18. On a sequential basis, it registered an increase of Ps. 45 million or 36%.

- As a result of the sale of optical fiber registered in this period, Maxcom recorded a non recurrent cost of sales of Ps. 6 million, which represents 3% of total operating cost.

## SG&A Expenses

- During 1Q19, the Company reported a total Sale and Administration Expenses of Ps. 98 million, 16% less than the Ps. 117 million in 1Q18. On a sequential basis, total expenses decreased 6% or Ps. 7 million.

- Excluding the effect of IFRS 16, Sale and Administration Expenses decreased by Ps. 10 million or 8% compared to 1Q18. On a sequential basis it had an increase of 2% or Ps. 2 million.

- The decrease in expenses is mainly due to the efficiency effort that has been executed during previous quarters, mainly in payroll, consultants and fees, electricity expenditure and software maintenance.

- The headcount at the end of the period was 339 employees, a decrease of 19% compared to the same period of 2018 and a decrease of 6% on a sequential basis.

**EBITDA**

- During 1Q19 the EBITDA was Ps. 73 million, which compares favorably against the Ps.34 million recorded during 1Q18. The increase is a direct consequence of the aforementioned effects of the accounting standard IFRS 16, which represented Ps. 37 million of the Ps. 73 million reported. Discounting this effect, the EBITDA presented an increase of 5% or Ps. 2 million, mainly due to the change in Commercial and Residential revenue mix and the reactivation of the Wholesale business unit.

- On a cumulative basis, EBITDA shows an increase of 246% or Ps. 52 million, mainly derived from the accounting effects of the IFRS 16 adoption and the sale of optic fiber registered in the quarter. Excluding the accounting effects, the sequential increase was 68% or Ps. 14 million.

- Maxcom's quarterly EBITDA without Celmax operations was Ps. 89 million, this amount compares favorably with the Ps. 46 million reported in 1Q18. Without lease effects, the EBITDA excluding Celmax in the quarter was Ps. 52 million.



# First Quarter 2019 Results



**EBITDA & EBITDA Margin**

**Operating Income (Loss)**

- The Company recorded an operating loss of Ps. 31 million in 1Q19, which is compared with an operating loss of Ps. 19 million reported in the same period of 2018. The variation is a direct consequence of the adoption effects of IFRS 16, which generated an increase in the depreciation expense of Ps. 29 million in the quarter.

- On a sequential basis, operating income improved by Ps. 14 million or 31% due to the improvement in EBITDA.

**Comprehensive Financing Result**

- During 1Q19, the Company recorded an integrating financing gain of Ps. 30 million, 32% less compared to the income of Ps. 44 million reported in the same period of 2018. This is mainly due to a lower cash position in dollars with a higher effect of exchange rate depreciation in 2018.

- In addition to these effects, there was an increase in interest payments for the quarter caused by the increase in the interest rate of the Step-Up Senior Notes from 7% to 8% as of the second half of 2018, as well as an negative effect of the reclassification of the leases under IFRS 16 for Ps. 14 million.

- As compensation for the increase in expenses generated by foreing exchange and interest payments, a profit was recorded for the repurchase of USD. 8.9 million of the Step-Up Senior Notes for a total of Ps. 70 million during the quarter.

| | 1Q19 | 1Q18 | ΔPs. | Δ% |
|---|---|---|---|---|
| Interest Expense | 60 | 39 | 21 | 51% |
| Interest (Income) | (65) | 27 | (92) | (342%) |
| Valuation Effects – Net | 11 | 21 | (10) | (47%) |
| Exchange Rate (Gain) Loss – Net | (36) | (132) | 96 | (73%) |
| Total | (30) | (45) | 15 | (32%) |



# First Quarter 2019 Results

**Taxes**

- During 1Q19, taxes were recorded for Ps.1 million of ISR.

**Net Income (Loss)**

- During 1Q19, the Company recorded a net loss of Ps. 9 million, compared to a net income of Ps. 17 million registered in the same period of 2018.

- Excluding the results of Celmax, Maxcom generated a net income of Ps. 10 million, 65% less than the net income registered during 1Q18.

**Capital Expenditure**

| Million Pesos | First Quarter of 2019 | First Quarter of 2018 |
|---|---|---|
| Operating Activities | 124 | (101) |
| CAPEX | (63) | (56) |
| Financing Activities | (131) | 2 |
| Increase (Decrease) in Cash and Financial Instruments | (71) | (154) |
| Cash and Financial Instruments at Beginning of Period | 457 | 585 |
| Cash and Financial Instruments at End of Period | 386 | 431 |

**Indebtedness**

- As of March 31, 2019, the Company reported an indebtedness of 2,640 million (the debt is valued at face value and includes interest payable at the end of the period). The Company's leverage ratio measured through the Debt to EBITDA ratio was 9.18 times, while the Net Debt to EBITDA indicator was 7.73 times (for these calculations, is used the EBITDA of the last twelve months). It is worth mentioning that the calculations consider the effects of adoption of the IFRS 16 accounting standard both in EBITDA and in total indebtedness.

**Maxcom Financial Liabilities at March 31, 2019**

| Figures in Millions | Face Value | | Total Pesos[1] | Due date | Rate |
|---|---|---|---|---|---|
| | Pesos | Dollars | | | |
| Step-Up Senior Notes 2020 | - | 103.4 | 1,997.3 | June, 2020 | 6%, 7% y 8%[2] |
| Bancomext | 45.0 | - | 45.0 | September, 2020 | 9.86%[3] |
| Total financial debt | 45.0 | 103.4 | 2,042.3 | | |

1 Considers the FIX exchange rate at March 29, 2019: Ps$ 19.3201 per dollar
2 The Step-Up Senior Notes bear interest (i) from the date of issuance (October 2013) until June 14, 2016, at the annual fixed rate of 6% per annum, (ii) from June 15, 2016 until June 14, 2018, at the annual fixed rate of 7% per annum, and (iii) from June 15, 2018 until the maturity date, at the annual fixed rate of 8% per annum; have a maturity date of June 15, 2020
3 This loan was signed on October 2015 at 9.86% fixed interest rate

| | 1Q19 | 4Q18 | 3Q18 | 2Q18 |
|---|---|---|---|---|
| Net Debt/LTM EBITDA | 7.73 | 7.15 | 5.23 | 4.42 |

- As of March 31, 2018, Maxcom maintains cross currency swaps to cover the interests of the Step-Up Senior Notes 2020 for a notional amount of USD$70 million maturing on June 15, 2020.



# First Quarter 2019 Results

**Stockholders´ Equity**

- At the end of 1Q19, the Company reported a total shareholder´s equity of Ps. 727 million.

| Capital Structure | 1Q19 | 1Q18 |
|---|---|---|
| Subscribed and paid shares | 144,471,081 | 140,710,530 |

# Celmax Summary

- Revenues from this unit came from Ps.3 million in 1Q18 to Ps.5 million in the first quarter of 2019. The variation is due to the increase in recharges and the implementation of integrators to the MVNA operation platform.

- Subscribers at the end of 1Q19 amounted to 32,000, which represents an increase of 237% compared to the same period of the previous year, and a 20% reduction sequentially. Sequential reductions in prepaid top-ups and subscriber base were due to the expected subscriber rotation for the end-of-year season.

- Regarding the operational metrics of the aggregator (MVNA), our first MVNO customer launched its commercial operations in April. During the same period, the implementations of our second MVNO client were also concluded. The Company is in the process to start the implementation for a third customer in the second quarter of this year.

- The cost reached Ps. 6 million during this quarter, 54% above the Ps.4 million reported in the same quarter of the previous year. The increase is mainly explained by the growth in traffic, the cost of SIMs and the costs of implementation.

- Total expenses recorded an increase of Ps.4 million versus 1Q18, totaling Ps.16 million at the end of the quarter. The main factors of this increase were the commercial sales force increase and software maintenance expenses associated with the business transaction platform. Sequentially, expenses decreased by Ps. 4 million or 19% mostly due to a decrease in total sales force.

- As a result of the above, the negative EBITDA of the business was Ps.17 million, which represents an increase in the loss of Ps.4 million compared to 1Q18. Sequentially, an improvement of 22% was recorded, going from a loss of Ps. 21 million to Ps. 17 million registered in this period.



# First Quarter 2019 Results

**About MAXCOM**

MAXCOM Telecomunicaciones, S.A.B. de C.V., headquartered in Mexico City, is a facilities-based telecommunications provider using a "smart-build" approach to deliver "last-mile" connectivity to enterprises and residential customers in the Mexican territory. MAXCOM launched its commercial operations in May 1999 and is currently offering local and long distance telephony services; wired, wireless and cellular data transmission; IP-based TV services and value-added services in Mexico City metropolitan area, Monterrey, Puebla, Querétaro, León, Guadalajara, San Luis Potosí, Tehuacán and Toluca, and on a selected basis in several cities in Mexico. The information contained in this press release is the exclusive responsibility of Maxcom Telecomunicaciones, S.A.B. de C.V. and has not been reviewed by the Mexican National Banking and Securities Commission (CNBV) or any other authority. The registration of the securities described in this press release before the National Registry of Securities (Registro Nacional de Valores) held by the CNBV, shall it be the case, does not imply any certification as to the investment quality of the securities or of Maxcom's solvency. The trading of these securities by an investor will be made under such investor's own responsibility.

For more information contact:

Rodrigo Wright

México, D.F., México

(52 55) 4770-1170

rodrigo.wright@maxcom.com

This document may include forward-looking statements that are subject to risks, uncertainties and other factors which could cause real results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. Words such as "estimate," "project," "plan," "believe," "expect," "anticipate," "intend," and similar expressions may identify such forward-looking statements. Maxcom cautions readers that any forward-looking statement in this press release or made by the Company's management involves risks and uncertainties that may change based on various important factors not under Maxcom's control. These forward-looking statements represent Maxcom's judgment as of the date of this press release. Maxcom disclaims any intent or obligation to update these forward-looking statements.

Unless otherwise specified, all references to "USD$" are to United States dollars and references to "Ps." are to Mexican pesos. Amounts presented in this quarterly report may not add up or may be slightly inconsistent due to rounding.



# First Quarter 2019 Results

**MAXCOM TELECOMUNICACIONES, S.A.B. DE C.V. AND SUBSIDIARIES**
**UNAUDITED CONSOLIDATED STATEMENT OF FINANCIAL POSITION (IFRS)**
Thousands of Mexican Pesos ("Ps.")

| | | As of March 31, 2019 | | As of December 31, 2018 | | Var $ | | Var % |
|---|---|---|---|---|---|---|---|---|
| **ASSETS:** | | | | | | | | |
| CURRENT ASSETS: | | | | | | | | |
| Cash and financial instruments | Ps. | 386,035 | Ps. | 456,544 | Ps. | (70,509) | (15%) |
| | | 386,035 | | 456,544 | | (70,509) | (15%) |
| Accounts receivable: | | | | | | | | |
| Customers, net of allowance | | 200,241 | | 157,289 | | 42,952 | 27% |
| Recoverable value added tax | | 58,223 | | 54,522 | | 3,701 | 7% |
| Other sundry debtors | | 9,957 | | 10,091 | | (134) | (1%) |
| | | 268,421 | | 221,902 | | 46,519 | 21% |
| Inventory | | 1,422 | | 1,874 | | (452) | (24%) |
| Prepaid expenses | | 52,016 | | 34,306 | | 17,710 | 52% |
| Total current assets | | 707,894 | | 714,626 | | (6,732) | (1%) |
| Telephone network systems and equipment, net | | 2,221,893 | | 2,216,637 | | 5,256 | 0% |
| Intangible assets, net | | 254,270 | | 271,125 | | (16,855) | (6%) |
| Rights of use of leased assets, net | | 542,622 | | - | | 542,622 | 100% |
| Long-term restricted cash | | 31,575 | | 35,791 | | (4,216) | (12%) |
| Deposits in guarantee | | 9,061 | | 9,129 | | (68) | (1%) |
| Deferred taxes | | 6,033 | | 6,033 | | - | - |
| Other accounts receivable of long term | | 32,899 | | 32,899 | | - | - |
| **Total assets** | Ps. | **3,806,247** | Ps. | **3,286,240** | Ps. | **520,007** | **16%** |
| **LIABILITIES** | | | | | | | | |
| CURRENT LIABILITIES: | | | | | | | | |
| Bank loans | Ps. | 30,000 | Ps. | 30,000 | Ps. | - | - |
| Interest payable | | 49,397 | | 8,428 | | 40,969 | 486% |
| Accounts payable and accrued expenses | | 247,552 | | 215,509 | | 32,043 | 15% |
| Leases | | 86,747 | | - | | 86,747 | 100% |
| Customer deposits | | 21,092 | | 21,692 | | (600) | (3%) |
| Derivative financial instruments | | 8,698 | | 3,542 | | 5,156 | 146% |
| Other taxes payable | | 9,740 | | 18,960 | | (9,220) | (49%) |
| Total current liabilities | | 453,226 | | 298,131 | | 155,095 | 52% |
| LONG-TERM LIABILITIES: | | | | | | | | |
| Step-up senior notes | | 1,940,103 | | 2,135,562 | | (195,459) | (9%) |
| Leases | | 461,494 | | - | | 461,494 | 100% |
| Bank loans | | 15,000 | | 22,500 | | (7,500) | (33%) |
| Deferred income | | 168,042 | | 41,720 | | 126,322 | 303% |
| Labor obligations | | 1,723 | | 1,625 | | 98 | 6% |
| Other long-term liabilities | | 39,170 | | 45,491 | | (6,321) | (14%) |
| Long-term liabilities | | 2,625,532 | | 2,246,898 | | 378,634 | 17% |
| **Total liabilities** | Ps. | **3,078,758** | Ps. | **2,545,029** | Ps. | **533,729** | **21%** |
| **SHAREHOLDERS' EQUITY** | | | | | | | | |
| Capital stock | Ps. | 1,533,254 | Ps. | 1,533,254 | Ps. | - | - |
| Capital stock subscribed not exhibited | | (12,300) | | (12,300) | | - | - |
| Additional paid-in capital | | 50,170 | | 50,170 | | - | - |
| Accumulated losses | | (896,012) | | (615,864) | | (280,148) | 45% |
| Net income (loss) for the period | | 479 | | (280,148) | | 280,627 | (100%) |
| Other comprehensive income | | (130) | | 4,475 | | (4,605) | (103%) |
| **Controlling interest** | | **675,461** | | **679,587** | | **(4,126)** | **(1%)** |
| Non-controlling interest | | 52,028 | | 61,624 | | (9,596) | (16%) |
| **Total shareholders' equity** | Ps. | **727,489** | Ps. | **741,211** | Ps. | **(13,722)** | **(2%)** |
| **Total liabilities and shareholders' equity** | Ps. | **3,806,247** | Ps. | **3,286,240** | Ps. | **520,007** | **16%** |



# First Quarter 2019 Results

**MAXCOM TELECOMUNICACIONES, S.A.B. DE C.V. AND SUBSIDIARIES**
**UNAUDITED CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME (IFRS)**
Thousands of Mexican Pesos ("Ps.")

| | | 3 months ended March 31 | | | | | vs 3M 2019 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | **2019** | **%** | | **2018** | **%** | **$ var** | **% var** |
| **TOTAL REVENUES** | Ps. | **377,404** | 100% | Ps. | **295,670** | 100% | Ps. **81,734** | **28%** |
| Network operating services | | 167,720 | 44% | | 92,645 | 31% | 75,075 | 81% |
| Technical expenses | | 38,460 | 10% | | 52,175 | 18% | (13,715) | (26%) |
| Installation expenses | | 190 | 0% | | 125 | 0% | 65 | 52% |
| **Network operation cost** | | **206,370** | **55%** | | **144,945** | **49%** | **61,425** | **42%** |
| **GROSS PROFIT** | | **171,034** | **45%** | | **150,725** | **51%** | **20,309** | **13%** |
| Selling, general and administrative expenses | | 98,407 | 26% | | 117,160 | 40% | (18,753) | (16%) |
| **EBITDA** | | **72,627** | **19%** | | **33,565** | **11%** | **39,062** | **116%** |
| Depreciation and amortization | | 103,316 | | | 52,821 | | 50,495 | 96% |
| Other (income) expense | | 8,351 | | | 7,369 | | 982 | 13% |
| **Operating income (loss)** | | **(39,040)** | | | **(26,625)** | | **(12,415)** | **47%** |
| **Comprehensive (income) cost of financing:** | | | | | | | | |
| Interest expense | | 59,579 | | | 39,393 | | 20,186 | 51% |
| Interest (income) loss, net | | (65,343) | | | 26,962 | | (92,305) | (342%) |
| Valuation effects, net | | 11,388 | | | 21,402 | | (10,014) | (47%) |
| Exchange (income) loss, net | | (36,075) | | | (132,252) | | 96,177 | (73%) |
| | | **(30,451)** | | | **(44,495)** | | **14,044** | **(32%)** |
| **INCOME (LOSS) BEFORE TAXES** | | **(8,589)** | | | **17,870** | | **(26,459)** | **(148%)** |
| Taxes: | | | | | | | | |
| Income taxes | | 527 | | | 694 | | (167) | (24%) |
| **Total taxes** | | 527 | | | 694 | | (167) | (24%) |
| **NET INCOME (LOSS)** | Ps. | **(9,116)** | | Ps. | **17,176** | | Ps. **(26,292)** | **(153%)** |
| Other comprehensive result | | (4,605) | | | (18,712) | | 14,107 | (75%) |
| **COMPREHENSIVE NET INCOME (LOSS)** | Ps. | **(13,721)** | | Ps. | **(1,536)** | | Ps. **(12,185)** | **793%** |
| Controlling interest | | 480 | | | 23,739 | | (23,259) | (98%) |
| Non-controlling interest | | (9,596) | | | (6,563) | | (3,033) | 46% |
| **NET INCOME (LOSS)** | Ps. | **(9,116)** | | Ps. | **17,176** | | Ps. **(26,292)** | **(153%)** |
| Average basic shares | | 144,471 | | | 140,711 | | | |
| Average diluted shares | | 146,521 | | | 140,711 | | | |
| Earnings per basic share | | 0.00 | | | 0.17 | | | |
| Earnings per diluted share | | 0.00 | | | 0.16 | | | |



# First Quarter 2019 Results

**MAXCOM TELECOMUNICACIONES, S.A.B. DE C.V. AND SUBSIDIARIES**
**UNAUDITED CONSOLIDATED STATEMENT OF CHANGES IN SHAREHOLDERS' EQUITY (IFRS)**
Thousands of Mexican Pesos ("Ps.")

| | Capital stock | | Capital stock not exhibited | | Additional paid-in capital | | Accumulated losses | | Other comprehensive income | | Controlling interest | | Non-controlling interest | | Total shareholders' equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balances as of December 31, 2017 | Ps. | 1,455,066 | Ps. | - | Ps. | 50,170 | | (590,647) | Ps. | 9,496 | Ps. | 924,085 | Ps. | 96,804 | Ps. | 1,020,889 |
| Comprehensive net income | - | | - | | - | | 23,739 | | (18,712) | | 5,027 | | (6,563) | | (1,536) |
| **Balances as of March 31, 2018** | **Ps.** | **1,455,066** | **Ps.** | **-** | **Ps.** | **50,170** | **Ps.** | **(566,908)** | **Ps.** | **(9,216)** | **Ps.** | **929,112** | **Ps.** | **90,241** | **Ps.** | **1,019,353** |

| | Capital stock | | Capital stock not exhibited | | Additional paid-in capital | | Accumulated losses | | Other comprehensive income | | Controlling interest | | Non-controlling interest | | Total shareholders' equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balances as of December 31, 2018 | Ps. | 1,533,254 | Ps. | (12,300) | Ps. | 50,170 | | (896,013) | Ps. | 4,475 | Ps. | 679,586 | Ps. | 61,624 | Ps. | 741,210 |
| Comprehensive net income (loss) | - | | - | | - | | 480 | | (4,605) | | (4,125) | | (9,596) | | (13,721) |
| **Balances as of March 31, 2019** | **Ps.** | **1,533,254** | **Ps.** | **(12,300)** | **Ps.** | **50,170** | **Ps.** | **(895,533)** | **Ps.** | **(130)** | **Ps.** | **675,461** | **Ps.** | **52,028** | **Ps.** | **727,489** |



# First Quarter 2019 Results

**MAXCOM TELECOMUNICACIONES, S.A.B. DE C.V. AND SUBSIDIARIES**
**UNAUDITED CONSOLIDATED STATEMENT OF CASH FLOW (IFRS)**
Thousands of Mexican Pesos ("Ps.")

| | 3 months ended March 31 | | vs 3M 2018 | |
| | 2019 | 2018 | $ var | % var |
|---|---|---|---|---|
| **Operating Activities:** | | | | |
| Income (loss) before taxes | Ps.     (8,590) | Ps.     17,870 | Ps.     (26,460) | (148%) |
| Items not requiring the use of cash | 57,554 | (28,720) | 86,274 | (300%) |
| Cash flow form income (loss) before taxes | 48,964 | (10,850) | 59,814 | (551%) |
| Cash flow from: | | | | |
| Accounts receivable | (46,402) | (23,786) | (22,616) | 95% |
| Inventory | 452 | 1,294 | (842) | (65%) |
| Accounts payable | 32,043 | (44,554) | 76,597 | (172%) |
| Other assets and liabilities | 88,543 | (22,641) | 111,184 | (491%) |
| Income taxes | - | - | - | - |
| Cash flow from operating activities | 74,636 | (89,687) | 164,323 | (183%) |
| **Net cash flow from operating activities** | **123,600** | **(100,537)** | **224,137** | **(223%)** |
| **Investing Activities:** | | | | |
| Telephone network systems and equipment, net | (62,849) | (55,784) | (7,065) | 13% |
| Leases | (571,658) | - | (571,658) | - |
| **Net cash flow used in investing activities** | **(634,507)** | **(55,784)** | **(578,723)** | **1,037%** |
| **Financing Activities:** | | | | |
| Bank loans | (7,500) | (7,500) | - | - |
| Senior notes | (104,559) | - | (104,559) | - |
| Leases | 548,241 | - | 548,241 | - |
| Increase of non-controlling interest | - | - | - | - |
| Capital  stock | - | - | - | - |
| Additional paid-in capital | - | - | - | - |
| Other financing activities | 4,216 | 9,502 | (5,286) | (56%) |
| **Net cash flow from financing activities** | **440,398** | **2,002** | **438,396** | **21,898%** |
| **Increase (decrease) in cash and financial instruments** | **(70,509)** | **(154,319)** | **83,810** | **(54%)** |
| Cash and financial instruments at beginning of period | 456,544 | 585,271 | (128,727) | (22%) |
| **Cash and financial instruments at end of period** | **Ps.     386,035** | **Ps.     430,952** | **Ps.     (44,917)** | **(10%)** |

- **Important notice:** In compliance with provision 4.033.01 and other applicable provisions of the internal regulations of the Mexican Stock Exchange ("MSE"), regarding the "Independent Analyst", Maxcom Telecomunicaciones S.A.B. de C.V. attests that its share, which is listed on the MSE (Maxcom A) and on the OTCQX (MXMTY), is being covered by more than two financial institutions, thus the Company will not request nor has requested registration to the program "Independent Analyst", likewise Maxcom complies with all applicable regulations of the MSE and the National Banking and Securities Commission.

**ANNEX B**

**CHAPTER 11 PLAN OF REORGANIZATION**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAXCOM TELECOMUNICACIONES, S.A.B. DE C.V., et al.,[1] | ) | Case No. 19-[___] ([___]) |
| | ) | |
| | ) | (Joint Administration Requested) |
| | ) | |
| Debtors. | ) | |

---

**JOINT PREPACKAGED CHAPTER 11 PLAN**

---

PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 303-7070

*Proposed Counsel to the Debtors and Debtors-in-Possession*

Dated: June 17, 2019

---

[1] The Debtors are Maxcom Telecomunicaciones, S.A.B. de C.V. and Maxcom USA Telecom, Inc.  The address for Maxcom is Av. Guillermo González Camarena 2000 Col. Santa Fe Centro Ciudad de México CP 01376, Del. Álvaro Obregón.  The address for Maxcom USA Telecom, Inc. is Ten Bank Street, Suite 560, White Plains, NY 10606.

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
    GOVERNING LAW, AND OTHER REFERENCES................................................................. 1

    1.1    Defined Terms ................................................................................................ 1
    1.2    Rules of Interpretation ................................................................................... 7
    1.3    Computation of Time ..................................................................................... 7
    1.4    Governing Law ............................................................................................... 8
    1.5    Reference to Monetary Figures ..................................................................... 8

ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS ................................................ 8

    2.1    Administrative Claims ................................................................................... 8
    2.2    Professional Claims ....................................................................................... 8
    2.3    Priority Tax Claims ........................................................................................ 8
    2.4    Other Priority Claims ..................................................................................... 9
    2.5    Payment of Statutory Fees ............................................................................. 9
    2.6    Trustee Expenses ........................................................................................... 9

ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ................. 9

    3.1    Classification of Claims and Interests .......................................................... 9
    3.2    Treatment of Classes of Claims and Interests ............................................. 10
    3.3    Special Provision Governing Unimpaired Claims....................................... 12
    3.4    Elimination of Vacant Classes .................................................................... 12

ARTICLE IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN ............................. 12

    4.1    General Settlement of Claims ...................................................................... 12
    4.2    Subordination .............................................................................................. 12
    4.3    Sources of Cash for Plan Distributions....................................................... 12
    4.4    Issuance of the Senior Notes and Junior PIK Notes ................................... 12
    4.5    Vesting of Assets in the Reorganized Debtors ........................................... 13
    4.6    Discharge from Old Notes, Instruments, Certificates, and Other Documents............ 13
    4.7    Restructuring Transactions .......................................................................... 14
    4.8    Corporate Action.......................................................................................... 14
    4.9    New Corporate Governance Documents ..................................................... 14
    4.10   Effectuating Documents; Further Transactions........................................... 14
    4.11   Section 1146(a) Exemption .......................................................................... 14
    4.12   Managers, Directors and Officers ............................................................... 14
    4.13   Preservation of Rights of Action ................................................................. 15
    4.14   Directors and Officers Insurance Policies................................................... 15
    4.15   Indemnification Provisions in Organizational Documents ......................... 15
    4.16   Reinstatement of Equity Interests ............................................................... 16
    4.17   Exemption from Registration Requirements................................................ 16

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............. 16

    5.1    Assumption and Rejection of Executory Contracts and Unexpired Leases ............. 16
    5.2    Claims Based on Rejection of Executory Contracts or Unexpired Leases ............. 16
    5.3    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed............ 16
    5.4    Insurance Policies ........................................................................................ 17

**TABLE OF CONTENTS**
(continued)

**Page**

5.5     Indemnification Provisions ................................................................................. 17
5.6     Benefit Programs .............................................................................................. 17
5.7     Modifications, Amendments, Supplements, Restatements or Other Agreements ......... 18
5.8     Reservation of Rights ........................................................................................ 18
5.9     Nonoccurrence of the Effective Date .................................................................. 18
5.10    Contracts and Leases Entered into After the Petition Date .................................... 18

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS .......................................... 18

6.1     Distributions on Account of Claims Allowed as of the Effective Date .................... 18
6.2     Special Rules for Distributions to Holders of Disputed Claims ............................. 18
6.3     Disbursing Agent .............................................................................................. 19
6.4     Distributions on Account of Old Notes Claims ................................................... 19
6.5     Delivery of Distributions and Undeliverable or Unclaimed Distributions ............... 19
6.6     Setoffs ............................................................................................................. 21
6.7     Allocation Between Principal and Accrued Interest .............................................. 21

ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS ............................. 22

7.1     Disputed Claims ............................................................................................... 22
7.2     Resolution of Disputed Claims .......................................................................... 22
7.3     Estimation of Claims ........................................................................................ 22
7.4     No Interest ....................................................................................................... 22
7.5     No Distributions Pending Allowance .................................................................. 22
7.6     Disallowance of Claims and Interests ................................................................. 23

ARTICLE VIII EFFECT OF CONFIRMATION OF THE PLAN ........................................ 23

8.1     Compromise and Settlement of Claims, Interests, and Controversies ..................... 23
8.2     Discharge of Claims and Termination of Interests ............................................... 23
8.3     Releases by the Debtors ..................................................................................... 23
8.4     Releases by the Releasing Parties ....................................................................... 24
8.5     Exculpation ...................................................................................................... 25
8.6     Injunction ........................................................................................................ 25
8.7     Protection Against Discriminatory Treatment ..................................................... 25
8.8     Recoupment ..................................................................................................... 26
8.9     Release of Liens ............................................................................................... 26
8.10    Reimbursement or Contribution ......................................................................... 26

ARTICLE IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ........................... 26

9.1     Conditions Precedent to the Effective Date. ........................................................ 26
9.2     Waiver of Conditions Precedent ......................................................................... 27
9.3     Effect of Non-Occurrence of Conditions to Consummation ................................... 27

ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ............ 27

10.1    Modification of Plan ......................................................................................... 27
10.2    Revocation or Withdrawal of Plan ..................................................................... 27

LEGAL_US_E # 141303171.6

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| **ARTICLE XI RETENTION OF JURISDICTION** | | 28 |
| 11.1 | Jurisdiction | 28 |
| **ARTICLE XII MISCELLANEOUS PROVISIONS** | | 29 |
| 12.1 | Additional Documents | 29 |
| 12.2 | Reservation of Rights | 29 |
| 12.3 | Successors and Assigns | 29 |
| 12.4 | Service of Documents | 29 |
| 12.5 | Term of Injunctions or Stays | 30 |
| 12.6 | Entire Agreement | 30 |
| 12.7 | Plan Supplement Exhibits | 30 |
| 12.8 | Non-Severability | 30 |
| EXHIBIT A | List of Non-Debtor Guarantors | |

LEGAL_US_E # 141303171.6

**INTRODUCTION**

Maxcom Telecomunicaciones, S.A.B. de C.V. ("Maxcom") and its debtor affiliates listed herein, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") propose this plan of reorganization (the "Plan"). Reference is made to the Disclosure Statement for a discussion of the history, businesses, properties and operations, projections and risk factors related to the Debtors, as well as a summary and analysis of this Plan and certain related matters. Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

**ARTICLE I**

**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF
TIME, GOVERNING LAW, AND OTHER REFERENCES**

1.1    **Defined Terms**

1.      "*Administrative Claim*" means any Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2.      "*Affiliate*" means affiliate as such term is defined in section 101(2) of the Bankruptcy Code.

3.      "*Allowed*" means, with reference to any Claim or Interest, or any portion thereof, that is (a) specifically allowed under this Plan, (b) allowed under the Bankruptcy Code, or (c) allowed by a Final Order.

4.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of any Debtor or its Estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

5.      "*Ballot*" means the form or forms distributed to certain Holders of Claims that are entitled to vote on the Plan by which such parties may indicate acceptance or rejection of the Plan and includes both the form distributed for use by the actual beneficial owners of the Old Notes and the form distributed for use by the bank, broker, or other financial institution that holds the Old Notes in "street name" on behalf of one or more beneficial owners.

6.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as may be amended from time to time.

7.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Chapter 11 Cases.

8.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

9.      "*Business Day*" means any day, other than (a) a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)), or (b) any other day on which banks are legally permitted to be closed in New York or Mexico.

10.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

11.     "*Cash Payment*" means Cash in an amount of US$100 for each US$1,000 of principal amount of Old Notes.

12.     "*Causes of Action*" means any and all claims, actions, causes of action, choses in action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and any avoidance, recovery, subordination, or other actions against Insiders and/or any other Entities under the Bankruptcy Code, including Avoidance Actions) of the Debtors, the debtors in possession, and/or the Estates, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date or commenced by the Reorganized Debtors after the Effective Date against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

13.     "*Chapter 11 Cases*" means the cases pending for the Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

14.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

15.     "*Claims and Solicitation Agent*" means the claims, noticing, and/or solicitation agent the Debtors will retain in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court.

16.     "*Claims Register*" means the official register of Claims maintained by the Claims and Solicitation Agent.

17.     "*Class*" means a category of Holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

18.     "*Collateral Documents*" means all of the documents and instruments that secure the Old Notes and Old Notes Indenture, including without limitation: (a) mortgages on the assets and properties owned by the Debtors and the Non-Debtor Guarantors as set forth more fully in that mortgage dated October 11, 2013 and recorded at Book 1664, Document 77,168 (as same may be amended, the "Mortgage"); (b) that certain Intercompany Subordination and Credit Agreement dated as of October 13, 2013 by and among Maxcom and certain of Maxcom's subsidiaries as set forth therein (the "Intercompany Subordination Agreement"); (c) that certain Notation of Guarantee executed by certain of Maxcom's subsidiaries set forth therein (the "Subsidiary Guarantee"); and (d) that certain Irrevocable Administration Trust Agreement with Reversion Rights and entered into between and among Grupo Financiero Banorte, as trustee, Deutsche Bank Trust Company Americas, as beneficiary on behalf of certain lender parties, Maxcom and certain of Maxcom's subsidiaries set forth therein, as settlors (the "Intercompany Trust Agreement").

19.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

20.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

21.     "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

22.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and approving the Disclosure Statement.

23.     "*Consummation*" means the occurrence of the Effective Date.

24.     "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

25.      "*Debtors*" has the meaning set forth in the introductory paragraph of this Plan.

26.      "*Description of Junior PIK Notes*" means the Description of the Junior PIK Notes set forth in the Disclosure Statement.

27.      "*Description of Senior Notes*" means the Description of the Senior Notes set forth in the Disclosure Statement.

28.      "*Disbursing Agent*" means the Reorganized Debtors or any Entity selected by the Debtors or Reorganized Debtors and identified in the Plan Supplement, as applicable, to make or facilitate distributions contemplated under the Plan.

29.      "*Disclosure Statement*" means that certain Offering Memorandum and Consent Solicitation Statement dated as of June 17, 2019, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, to be approved by the Bankruptcy Court.

30.      "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors, on or after the Effective Date, upon which the Reorganized Debtors or the Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

31.      "*DTC*" means the Depository Trust Company.

32.      "*Early Participation Consideration*" means Cash in an amount of $10 for each $1,000 of principal amount of Old Notes validly tendered in the Exchange Offer by an Old Notes Creditor and not withdrawn prior to or on the Early Participation Date, with such Cash to be paid by Reorganized Maxcom subject to the occurrence of the Effective Date.

33.      "*Early Participation Date*" means for purposes of being eligible to receive the Early Participation Consideration, the date that is on or before 5:00 p.m. (New York City time) on June 28, 2019.

34.      "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in <u>Section 9.1</u> have been satisfied or waived in accordance with <u>Section 9.2</u>.

35.      "*Entity*" has the meaning set forth in section 101 (15) of the Bankruptcy Code.

36.      "*Estate*" means the bankruptcy estate of each Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

37.      "*Exchange Offer*" means the out-of-court process conducted by Maxcom for the exchange of the Old Notes for the Senior Notes and the Junior PIK Notes.

38.      "*Exculpated Claim*" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' and Non-Debtor Guarantors' in-court or out-of-court efforts to negotiate, enter into or implement the Chapter 11 Cases, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, or the distribution of property under the Plan.

39.      "*Exculpated Party*" means each of the following in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Non-Debtor Guarantors; (d) the Trustee; (e) the Existing Equityholders; and (f) with respect to each of the foregoing Entities in clauses (a) through (e) such Entity's predecessors, successors and assigns and current and former Affiliates, subsidiaries, officers, directors, members, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals.

LEGAL_US_E # 141303171.6

40.    "*Existing Equityholders*" means, collectively, the existing Holders of Interests in Maxcom who pay the Shareholder Contribution Amount.

41.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

42.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction entered on the docket of such court that has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, seek to review or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or review or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for certiorari or review, reargue or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors, or, in the event that an appeal, writ of certiorari or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari or review, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari or review or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

43.    "*General Unsecured Claim*" means any Claim against a Debtor other than an Administrative Claim, a Professional Claim, a Senior Secured Notes Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim or an Intercompany Claim.

44.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

45.    "*Holder*" means an entity holding a Claim or Interest.

46.    "*Impaired*" means a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

47.    "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

48.    "*Intercompany Claim*" means any account reflecting intercompany book entries or a Claim by one Debtor against another Debtor or by a Non-Debtor Guarantor against a Debtor.

49.    "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

50.    "*Interest*" means any membership, stock or other equity ownership interest in a Debtor and all dividends and distributions with respect to such membership, stock or other equity ownership interest and all rights, options, warrants (regardless of when exercised), other rights to acquire any membership, stock or other equity ownership interest in a Debtor existing immediately prior to the Effective Date.

51.    "*Junior PIK Notes*" means the Peso denominated Junior PIK Notes that Reorganized Maxcom will issue as part of the Senior Notes Distribution in full satisfaction of the Old Notes Claims on the terms set forth in the Description of Junior PIK Notes in an aggregate principal amount of US$100 per US$1,000 of Old Notes.

52.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

53.    "*Mexico*" means the United Mexican States.

54.    "*New Board*" means, collectively, the initial board of directors or members, as the case may be, of the Reorganized Debtors.

LEGAL_US_E # 141303171.6

55.     "*New Corporate Governance Documents*" means the form of the articles of incorporation and bylaws, or other similar organizational and constituent documents, as may be required under applicable law, for the Reorganized Debtors, and which forms shall be included in the Plan Supplement.

56.     "*Non-Debtor Guarantors*" means those certain companies affiliated with the Debtors and which are listed on Exhibit A to the Plan.

57.     "*Old Notes*" means those certain Step-Up Senior Notes due 2020, issued by Debtor Maxcom pursuant to the Old Notes Indenture.

58.     "*Old Notes Claim*" means any and all Claims of an Old Notes Creditor against the Debtors arising under or in connection with the Old Notes Indenture, the Old Notes, the Collateral Documents and all other financing, security and related documents executed in furtherance of the issuance of the Old Notes, including for the avoidance of doubt, accrued and unpaid interest on the Old Notes up to the Petition Date.

59.     "*Old Notes Creditors*" means Holders of the Old Notes.

60.     "*Old Notes Guarantees*" means those guarantees provided by the Non-Debtor Guarantors pursuant to which the Non-Debtor Guarantors guaranteed Debtor Maxcom's obligations under the Old Notes.

61.     "*Old Notes Indenture*" means that certain Indenture, by and among Debtor Maxcom, as issuer, the Guarantors (as such term is defined in the Old Notes Indenture), Deutsche Bank Trust Company Americas, as trustee and collateral agent, and Deutsche Bank Luxembourg S.A., as Luxembourg sub-paying agent and transfer agent.

62.     "*Other Priority Claim*" means any Claim against the Debtors other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

63.     "*Other Secured Claim*" means any Secured Claim against the Debtors other than an Old Notes Claim.

64.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

65.     "*Peso*" or "*Ps$*" means pesos, the legal tender of Mexico.

66.     "*Petition Date*" means the date on which the Debtors filed their petition for relief commencing the Chapter 11 Cases.

67.     "*Plan*" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time, including the Plan Supplement and all exhibits, supplements, appendices, and schedules.

68.     "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtors no later than five (5) Business Days prior to the date first scheduled for the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

69.     "*Priority Tax Claim*" means any Claim of a Governmental Unit against the Debtors of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code, including a Secured Tax Claim.

70.     "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

5

71.     "*Professional Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of costs, expenses or other charges incurred under sections 330, 331, or 503(b) of the Bankruptcy Code after the Petition Date and prior to and including the Effective Date.

72.     "*Proof of Claim*" means a proof of Claim filed against the Debtors in the Chapter 11 Cases.

73.     "*Pro Rata*" means the proportion of an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

74.     "*Record Date*" means (i) for purposes of making distributions under the Plan on account of Allowed Claims, the Confirmation Date, and (ii) for purposes of casting Ballots on the Plan, June 14, 2019. Notwithstanding the foregoing, the Record Date in (i) herein shall not apply to publicly held securities, the holders of which shall receive their distribution via a mandatory exchange in accordance with the customary procedures of DTC.

75.     "*Reinstated*" means, with respect to Claims and Interests, treated in accordance with section 1124 of the Bankruptcy Code.

76.     "*Released Party*" means each of the following: (a) the Debtors; (b) the Non-Debtor Guarantors; (c) the Trustee; (d) the Existing Equityholders; and (e) with respect to each of the foregoing Entities in clauses (a) through (d), such Entity's successors and assigns, and current and former Affiliates, subsidiaries, officers, directors, members, stockholders, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such.

77.     "*Releasing Party*" means each of the following: (a) the Holders of Impaired Claims or Interests that (i) affirmatively vote to accept the Plan or (ii) abstain from voting on the Plan; (b) to the fullest extent permissible under applicable law, the Holders of Unimpaired Claims or Interests; (c) the Trustee; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entity's successors and assigns, and current and former Affiliates, subsidiaries, officers, directors, members, stockholders, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such.

78.     "*Reorganized Debtor*" means, with respect to any Debtor, any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

79.     "*Reorganized Maxcom*" means Maxcom, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, it being understood that, as of the Effective Date, Reorganized Maxcom shall be a corporation organized under the laws of Mexico.

80.     "*Secured Claim*" means a Claim against the Debtors: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

81.     "*Secured Tax Claim*" means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

82.     "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, or any similar federal, state or local law.

83.     "*Senior Notes*" means the Senior Notes due 2024 that Reorganized Maxcom will issue as part of the Senior Notes Distribution in full satisfaction of the Old Notes Claims on the terms set forth in the Description of Senior Notes in an aggregate principal amount of US$550 per US$1,000 of Old Notes.

84.      "*Senior Notes Collateral Documents*" means the collateral documents to be executed in connection with the issuance of the Senior Notes and the execution of the Senior Notes Indenture, including: (a) mortgages on certain assets and properties owned by the Debtors and certain of the Non-Debtor Guarantors such that the Senior Notes will be secured by same collateral securing the Old Notes and (b) guarantees of Reorganized Maxcom's obligations under the Senior Notes Indenture by certain of the Debtors and Non-Debtor Guarantors, all as provided for in the Senior Notes Indenture.

85.      "*Senior Notes Distribution*" means, collectively, the Senior Notes, the Junior PIK Notes, the Cash Payment, Cash in an amount equal to the amount of interest accrued on the Old Notes up to the Effective Date and, for those Old Notes Creditors who validly tender and not withdraw their Old Notes prior to or on the Early Participation Date, the Early Participation Consideration.

86.      "*Senior Notes Indenture*" means the indenture governing the Senior Notes, which shall be consistent with the Description of Senior Notes in all respects.

87.      "*Shareholder Contribution Amount*" means, subject to the occurrence of the Effective Date, the capital contribution that will be made by one or more Existing Equityholders on or as soon as reasonably practicable after the Effective Date in an amount not to exceed Ps. 300 million.

88.      "*Trustee*" means Deutsche Bank Trust Company Americas, in its capacity as trustee and collateral agent under the Old Notes Indenture.

89.      "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to a Debtor's or Reorganized Debtor's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

90.      "*Unimpaired*" means, with respect to a Claim, Interest or Class of Claims or Interests, a Claim, Interest or Class of Claims or Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

## 1.2      **Rules of Interpretation**

For purposes of the Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

## 1.3      **Computation of Time**

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

1.4    **Governing Law**

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

1.5    **Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in <u>ARTICLE III</u>.

2.1    **Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (a) on the Effective Date, or as soon as reasonably practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claims.

2.2    **Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows.  From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

2.3    **Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Priority Tax Claim: (a) the treatment provided by section 1129(a)(9)(C) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, equal to the amount of such Allowed Priority Tax Claim; or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the Debtors.  If payment is made in accordance with section 1129(a)(9)(C), installment

8

payments shall be made quarterly and interest shall accrue in accordance with 26 U.S.C. § 6621. On the Effective Date, Liens securing such Allowed Secured Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim may be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

2.4     **Other Priority Claims**

Each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Other Priority Claim: (a) the treatment provided by section 1129(a)(9) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, equal to the amount of such Allowed Other Priority Claim; or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the Debtors.

2.5     **Payment of Statutory Fees**

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. On and after the Effective Date, Reorganized Maxcom shall pay the applicable U.S. Trustee fees for each of the Reorganized Debtors until the entry of a Final Decree in each such Debtor's Chapter 11 Case or until each such Chapter 11 Case is converted or dismissed.

2.6     **Trustee Expenses**

On the Effective Date, Reorganized Maxcom shall pay all reasonable, documented, and unpaid fees, expenses and out-of-pocket costs (including the reasonable and documented fees and expenses of counsel to the Trustee) incurred by the Trustee through the Effective Date in connection with making distributions pursuant to the Plan, if any, except any such fees, costs and expenses as may be attributable to the Trustee's gross negligence or willful misconduct.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

Except for the Claims addressed in ARTICLE II, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. For the avoidance of doubt, Secured Tax Claims are being addressed under Section 2.3 of the Plan.

3.1     **Classification of Claims and Interests**

Claims against and Interests in the Debtors are divided into the following lettered Classes:

| Letter | Class |
|--------|-------|
|        |       |

Class A        Class A consists of the Old Notes Claims.

Class B        Class B consists of all Other Secured Claims.

Class C        Class C consists of all General Unsecured Claims.

Class D        Class D consists of all Intercompany Claims.

Class E        Class E consists of all Interests.

## 3.2    <u>Treatment of Classes of Claims and Interests</u>

The following chart designates the Class of Claims against and Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan. The Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in <u>Section 3.4</u> of the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| A | Old Notes Claims | Impaired | Entitled To Vote |
| B | Other Secured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| C | General Unsecured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| D | Intercompany Claims | Unimpaired | Deemed To Accept; Not Entitled to Vote |
| E | Interests | Unimpaired | Deemed To Accept; Not Entitled To Vote |

Except to the extent that a Holder of an Allowed Claim against or Interest in the Debtors as applicable, agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as reasonably practicable thereafter:

**Class A (Old Notes Claims) NOTE: NEED TO DETERMINE WHAT WE ARE DOING WITH REGARDS TO ACCRUED AND UNPAID INTEREST**

*(1) Classification*: Class A consists of the Old Notes Claims against each of the Debtors.

*(2) Allowance*: On the *Effective* Date, the Old Notes Claims shall be Allowed in the principal amount of US$103,338,674 plus interest accrued up to the Effective Date, and shall not be subject to avoidance, subordination, setoff, offset, deduction, objection, challenge, recharacterization, surcharge under section 506(c) of the Bankruptcy Code or any other claim or defense.

*(3) Treatment*: In full and *final* satisfaction, settlement, release, and discharge of and exchange for each Allowed Old Notes Claim, each Holder of an Allowed Old Notes Claim shall receive its Pro Rata share of (i) Senior Notes, (ii) Junior PIK Notes, (iii) the Cash Payment and (iv) Cash in an amount equal to the

10

amount of interest accrued on the Old Notes up to the Effective Date.  In addition, subject to the occurrence of the Effective Date, each Holder of an Allowed Old Notes Claim who validly tendered and did not withdraw its Old Notes in the Exchange Offer prior to or on the Early Participation Date shall receive the Early Participation Consideration.  For the avoidance of doubt, only Holders of Old Notes as of the June 14, 2019 Record Date who were eligible to participate in the Exchange Offer and who validly tendered and did not withdraw its Old Notes in the Exchange Offer prior to or on the Early Participation Date shall be eligible to receive the Early Participation Consideration.

*(4)* *Voting*: Class A is *Impaired*.  Holders of Old Notes Claims are entitled to vote to accept or reject the Plan.

## Class B (Other Secured Claims)

*(1)* *Classification*: Class B consists of all Allowed Other Secured Claims against the Debtors.

*(2)* *Treatment*: Each holder of *an* Allowed Other Secured Claim shall, at the election of the Reorganized Debtors, (i) have the legal, equitable and contractual rights of such Holder Reinstated, or (ii) receive, at the option of the Debtors, (A) Cash in an amount equal to such Allowed Other Secured Claim or (B) such other treatment as renders its Allowed Other Secured Claim Unimpaired.

*(3)* *Voting*: Class B is Unimpaired.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

## Class C (General Unsecured Claims)

*(1)* *Classification*:  Class C consists of all Allowed General Unsecured Claims against the Debtors.

*(2)* *Treatment*:  Holders of Allowed Unsecured Claims shall receive Cash in an amount equal to such Allowed General Unsecured Claims on the later of the Effective Date or in the ordinary course of business of the Debtors in accordance with the terms of the particular transaction giving rise to such Allowed General Unsecured Claim.

*(3)* *Voting*:  Class C is unimpaired.  Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

## Class D (Intercompany Claims)

*(1)* *Classification*: Class D consists of all Allowed Intercompany Claims against the Debtors.

*(2)* *Treatment*: Each *Allowed* Intercompany Claim will remain Unimpaired.

*(3)* *Voting*: Class D is Unimpaired.  Holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

## Class E (Interests)

*(1)* *Classification*: Class E consists of all Allowed Interests in the Debtors, including without limitation, Intercompany Interests.

*(2)* *Treatment*: Subject to the Shareholder Contribution Amount, on the Effective Date, the Allowed Interests in the Debtors shall all be Reinstated.

(3) *Voting*: Class E is Unimpaired. Holders of Allowed Interests in the Debtors are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Interests are not entitled to vote to accept or reject the Plan.

3.3     **Special Provision Governing Unimpaired Claims**

Nothing under the Plan shall affect the Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

3.4     **Elimination of Vacant Classes**

Any Class of Claims or Interests that (a) does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing or (b) is entitled to vote on the Plan but with respect to which no Ballots are cast or no Ballots are deemed to be cast, shall be deemed eliminated from the Plan for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE IV

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

4.1     **General Settlement of Claims**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests.

4.2     **Subordination**

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan shall recognize and implement any such rights. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto. For the avoidance of doubt, no Claim in Class A shall be subject to subordination.

4.3     **Sources of Cash for Plan Distributions**

All Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant to this Plan shall be obtained from Cash of the Reorganized Debtors. Further, the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable them to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

4.4     **Issuance of the Senior Notes and Junior PIK Notes**

On and after the Effective Date, Reorganized Maxcom is authorized to issue, execute, deliver or otherwise bring into effect, as the case may be, to or for the benefit of the Holders of Allowed Old Notes Claims, the Senior Notes and the Junior PIK Notes and any other instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to the Plan, and take any other necessary actions in connection with the foregoing, in each case without need for further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity. The issuance of the Senior Notes and Junior PIK Notes shall be exempt from registration under section 1145 of the Bankruptcy Code and, to the extent applicable, under applicable securities laws. All documents, agreements and instruments

12

entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement). On the Effective Date, the guarantees, pledges, liens and other security interests granted pursuant to the Senior Notes Indenture and the Senior Notes Collateral Documents have been and are granted in good faith as an inducement to the holders of the Old Notes Claims to agree to the treatment afforded to them under the Plan and shall not be deemed to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such liens and security interests shall be as set forth in the Senior Notes Indenture and Senior Notes Collateral Documents.

4.5     **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in the Estate and all Causes of Action, shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan or any other agreement or document related thereto or entered into in connection therewith, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.6     **Discharge from Old Notes, Instruments, Certificates, and Other Documents**

On the Effective Date, except as otherwise provided in this Plan: (1) the Mortgage, the Old Notes Indenture, the Old Notes Guarantees, the Subsidiary Guarantee, the Intercompany Trust Agreement, the Intercompany Subordination Agreement, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, mortgages, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically Reinstated or otherwise not Impaired under the Plan) shall be deemed cancelled, discharged, released and extinguished, and neither the Debtors nor the Non-Debtor Guarantors shall have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, mortgages, notes, or other instruments evidencing indebtedness or obligations of or ownership interests in the Debtors that are specifically Reinstated or otherwise not Impaired under the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein; provided further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan. Notwithstanding the foregoing and solely for the purpose set forth in this sentence, the following rights of the Trustee shall remain in effect after the Effective Date: (1) rights to payment of fees, expenses and indemnification obligations, including from property distributed hereunder to the Trustee, whether pursuant to the exercise of a charging lien or otherwise, (2) rights relating to distributions made to Holders of Allowed Old Notes Claims by the Trustee from any source, including distributions hereunder, (3) rights relating to representation of the interests of the Holders of Old Notes Claims by the Trustee in the Chapter 11 Cases to the extent not discharged or released hereunder or any order of the Bankruptcy Court, and (4) rights relating to participation by the Trustee in any proceedings related to the Plan. On and after the Effective Date, all duties and responsibilities of the Trustee shall be discharged unless otherwise specifically set forth in or provided for under the Plan.

LEGAL_US_E # 141303171.6

4.7    **Restructuring Transactions**

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

4.8    **Corporate Action**

The Debtors or the Reorganized Debtors, as applicable, are authorized to take all further corporate actions necessary to effectuate the Plan and authorize each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors, whether taken prior to or as of the Effective Date.

4.9    **New Corporate Governance Documents**

Solely to the extent required by applicable non-bankruptcy law, on or immediately before the Effective Date, the Reorganized Debtors will file their New Corporate Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. The New Corporate Governance Documents will be consistent with the provisions of the Plan and the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their New Corporate Governance Documents as permitted by the laws of their respective jurisdiction of formation and their respective New Corporate Governance Documents.

4.10    **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the officers and/or members of the board of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

4.11    **Section 1146(a) Exemption**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

4.12    **Managers, Directors and Officers**

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as may otherwise be disclosed in the Disclosure Statement, as of the Effective Date, the directors and officers who are identified in the Plan Supplement shall serve as the initial board of directors and officers of the Reorganized Debtors. Pursuant to section 1129(a)(5), the Debtors will disclose in the Plan Supplement, on or prior

14

to the Confirmation Date, the identity and affiliations of any Person proposed to serve on the Reorganized Debtors' boards of directors and, to the extent such Person is an Insider, the nature of any compensation for such Person. After the Effective Date, the corporate governance and management of the Reorganized Debtors shall be determined by the applicable board of managers or board of directors in accordance with the laws of the applicable state or county of organization.

## 4.13    Preservation of Rights of Action

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel, judicial, equitable, or otherwise, or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. From and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Cause of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Bankruptcy Court.

Notwithstanding any provision in the Plan or any Order entered in the Chapter 11 Cases, the Debtors and Reorganized Debtors forever waive, relinquish, and release any and all Causes of Action the Debtors and their estates had, have, or may have that arise under sections 544, 547, 548 and 549 of the Bankruptcy Code against any Entity that is being rendered Unimpaired under the Plan and any Entity, including Professionals, with whom the Debtor is conducting and will continue to conduct business on and after the Effective Date.

## 4.14    Directors and Officers Insurance Policies

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of their D&O Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed. In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Insurance Policy (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

## 4.15    Indemnification Provisions in Organizational Documents

On and from the Effective Date, and except as prohibited by applicable non-bankruptcy law, the Reorganized Debtors shall assume or reinstate, as applicable, all indemnification obligations in place as of the Effective Date (whether in by-laws, certificates of incorporation, board resolutions, contracts, or otherwise) for the current and former directors, members, officers, managers, employees, attorneys, other professionals and agents of

15

the Debtors; provided, however, such indemnification obligations shall not apply with respect to any act or omission constituting gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction, except to the extent of available insurance.

### 4.16    Reinstatement of Equity Interests

On the Effective Date, all equity interests in each Debtor, including Intercompany Interests, shall be deemed reinstated without any additional act on the part of such Debtor or such Reorganized Debtor.

### 4.17    Exemption from Registration Requirements

The offering, issuance, and distribution of any Securities, including the Senior Notes and Junior PIK Notes pursuant to the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, Regulation S of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable. To the extent that the issuance of the Senior Notes and the Junior PIK Notes is covered by section 1145 of the Bankruptcy Code, except as otherwise provided in the Plan or the governing certificates or instruments, the Senior Notes and the Junior PIK Notes issued under the Plan will be freely tradable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments, including any such restrictions any agreement governing the Senior Notes and the Junior PIK Notes; (b) the restrictions, if any, on the transferability of such securities and instruments; and (c) any other applicable regulatory approval.

### ARTICLE V

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 5.1    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease (1) was assumed or rejected previously by the Debtors, (2) previously expired or terminated pursuant to its own terms; or (3) is the subject of a motion to reject filed on or before the Effective Date, if any.  Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumption of such Executory Contracts or Unexpired Leases as set forth in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by a Bankruptcy Court order shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms notwithstanding any provision in such assumed Executory Contract or Unexpired Lease that prohibits, restricts or conditions such assumption, assignment or transfer.  Any provision in the assumed Executory Contracts and Unexpired Leases that purports to declare a breach or default based in whole or in part on the commencement or continuance of these Chapter 11 Cases or any successor cases is hereby deemed unenforceable.

### 5.2    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be classified as a General Unsecured Claim and shall be treated in accordance with Article III, as applicable.

### 5.3    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.

Claims or defaults arising or becoming due under any assumed Executory Contract or Unexpired Lease after the effective date of assumption of the applicable assumed Executory Contract or Unexpired Lease are to be

paid in full in the ordinary course by the applicable Debtor or Reorganized Debtor, as applicable, subject to the rights of the Debtors or Reorganized Debtors, as applicable, to assert or apply, as applicable, any defenses, setoffs, credits, or discounts available under the applicable assumed Executory Contract or Unexpired Lease or under applicable non-bankruptcy law, and, for the avoidance of doubt, such Claims or defaults shall not be released, expunged, discharged, or enjoined by the Plan or the Confirmation Order and there shall be no need or requirement for the counterparty to such Executory Contract or Unexpired Lease to file an Administrative Claim for such Claim or default.  Nothing in the Plan releases or discharges the applicable Debtor or Reorganized Debtor from (1) obligations to fully satisfy Cure Claims on the Effective Date, or to the extent a dispute exists regarding the Cure Claim, upon entry of a Final Order resolving the dispute or upon mutual agreement between the applicable Debtor or Reorganized Debtor and the applicable counterparty, or (2) Claims, defaults or obligations arising or becoming due under any assumed Executory Contract or Unexpired Lease after the effective date of such assumption of the applicable assumed Executory Contract or Unexpired Lease pursuant to the terms thereof.

In the event of a dispute regarding (1) the amount of any payment to cure such a default, (2) the ability of the applicable Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payment, if any, required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

The assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date the applicable Debtor or Reorganized Debtor assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

5.4   **Insurance Policies**

All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, including the D&O Insurance Policies, shall be treated as and deemed to be Executory Contracts under the Plan.  As of the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

5.5   **Indemnification Provisions**

As of the Effective Date, the Debtors and Reorganized Debtors, as applicable, shall be deemed to have assumed all of the Indemnification Provisions in place on or before the Effective Date for Claims related to or in connection with any actions, omissions, or transactions occurring before the Effective Date.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the Indemnification Provisions.  Notwithstanding anything to the contrary contained herein, (1) Confirmation shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the Indemnification Provisions, (2) each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan and as to which no Proof of Claim need be filed, and (3) as of the Effective Date, the Indemnification Provisions shall be binding and enforceable against the Reorganized Debtors.

5.6   **Benefit Programs**

As of the Effective Date, all employee compensation and benefit programs of the Debtors, including programs subject to section 1114 and 1129(a)(13) of the Bankruptcy Code, if any, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, Executory Contracts that are assumed under the Article VI, but only to the extent that rights under such programs are held by the Debtors or Persons who are employees of the Debtors as of the Confirmation Date; provided, however, that nothing herein shall extend or otherwise modify the duration of any such program or prohibit the Debtors or the

LEGAL_US_E # 141303171.6

Reorganized Debtors from modifying the terms and conditions of any such program or benefits as otherwise permitted by such program and applicable nonbankruptcy law.

## 5.7 Modifications, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided for in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## 5.8 Reservation of Rights

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of such assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 28 calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by assuming or rejecting such contract or lease.

## 5.9 Nonoccurrence of the Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## 5.10 Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition by any Debtor will be performed by such Debtor or Reorganized Debtor liable thereunder in the ordinary course of such Debtor's business. Accordingly, such contracts and leases will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

## 6.1 Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors (as the case may be) and the Holder of the applicable Allowed Claim, on the Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date, subject to the Debtors' and Reorganized Debtors' right to object to Claims; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (2) Allowed Priority Tax Claims shall be paid in accordance with Section 2.3. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim may be paid in full in Cash in accordance with the terms of any agreement between the particular Debtor or the Reorganized Debtor (as the case may be) and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

## 6.2 Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision to the contrary in the Plan and except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all

such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claim has been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall be paid also, in the applicable amounts, to any Holder of a Disputed Claim, as applicable, in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

6.3    **Disbursing Agent**

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on or as soon as practicable after the Effective Date. To the extent the Disbursing Agent are the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement, the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent may be paid in Cash by the Reorganized Debtors.

6.4    **Distributions on Account of Old Notes Claims**

On or as soon as is reasonably practicable after the Effective Date, the Reorganized Debtors or the Disbursing Agent shall distribute the Senior Notes Distribution in accordance with the terms of this Article VI and the Plan Supplement. Instructions on how holders of Old Notes will receive their pro rata share of the Senior Notes Distribution will be provided in the Plan Supplement. As a condition to receiving its pro rata share of the Senior Notes Distribution, the Debtors or the Reorganized Debtors may require an Old Notes Creditor to surrender its Old Notes by completing the procedures to be described in the Plan Supplement. The method for issuance of the Senior Notes and Junior PIK Notes will be described in greater detail in the Plan Supplement.

Holders of Old Notes who do not fulfill the requirements noted above and in the Plan Supplement for the receipt of their pro rata share of the Senior Notes Distribution within one hundred and eighty (180) days after the Effective Date shall forfeit their entitlement to a distribution under the Plan, shall not participate in any distribution under the Plan, and shall have their Claims on account of the Old Notes and Collateral Documents discharged. Any property in respect of such forfeited Old Notes Claims would revert to Reorganized Maxcom.

6.5    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

(a)    Delivery of Distributions

Except as otherwise provided in the Plan (including in Section 6.4 above), distributions to Holders of Allowed Claims shall be made to Holders of record as of the Record Date by the Reorganized Debtors or the Disbursing Agent, as appropriate: (a) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate or (b) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Record Date; provided, however, that distributions on account of the Old Notes Claims shall be made in accordance with Section 6.4 above. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the

manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

(b)      Minimum; *De Minimis* Distributions.

Notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent shall not be required to distribute Cash or other property to the Holder of any Allowed Claim or Allowed Interest if the amount of Cash or other property to be distributed on account of such Allowed Claim or Allowed Interest is less than $50. Any Holder of an Allowed Claim or Allowed Interest on account of which the amount of Cash or other property to be distributed is less than such amount shall have such Claim or Interest, as applicable, discharged and shall be forever barred from asserting such Claim or Interest against the Debtors, the Reorganized Debtors, or their respective property. Any Cash or other property not distributed pursuant to this provision shall be the property of Reorganized Maxcom.

(c)      Fractional Senior Notes and Junior PIK Notes or Amounts Less than Integral Multiples

The Senior Notes will be issued in minimum denominations of US$1,000 and integral multiples of $1 in excess thereof. The Junior PIK Notes will be issued in minimum denominations of Ps 20,000 and integral multiples of Ps. 20 in excess thereof. Notwithstanding any other provision in the Plan to the contrary, no fractional amounts of Senior Notes or Junior PIK Notes shall be issued or distributed pursuant to the Plan. Whenever any distribution under the Plan would yield a distribution of Senior Notes or Junior PIK Notes below the integral requirement, the actual distribution shall reflect a rounding of such amount down to the nearest $1 in the case of Senior Notes and down to the nearest Ps. 20 in the case of Junior PIK Notes. Upon the allocation of all of the whole Senior Notes and Junior PIK Notes authorized under the Plan, all remaining portions of the entitlements shall be canceled and shall be of no further force and effect. For distribution and rounding purposes, DTC will be considered a single holder.

(d)      Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of this Plan to the contrary, (a) each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations.

(e)      Cash Payments

Except as otherwise set forth in this Section 6.5(e), distributions of Cash under the Plan shall be made by the Reorganized Debtors or the Disbursing Agent on behalf of the Debtors in U.S. dollars. At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements. Cash payments to creditors outside of the United States of America may be made, at the option of the Reorganized Debtors or the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(f)        Undeliverable and Unclaimed Distributions

(1)        *Undeliverable Distributions.*  If any distribution to a Holder of an Allowed Claim is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent are notified in writing of such Holder's then-current address or other necessary information for delivery.  Subject to the succeeding sentence, the Reorganized Debtors or their duly appointed disbursing agent shall retain undeliverable distributions until such time as a distribution becomes deliverable.  Each Holder of an Allowed Claim whose distribution remains (i) undeliverable for one hundred and eighty (180) days after the distribution is returned as undeliverable or (ii) otherwise has not been deposited, endorsed or negotiated within one hundred and eighty (180) days of the date of issuance shall have no claim to or interest in such distribution and shall be forever barred from receiving any distribution under the Plan.  Nothing contained in this Plan shall require the Debtors, the Reorganized Debtors or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

(2)        *Reversion.*  Any distribution under the Plan that is an Unclaimed Distribution for a period of one hundred and eighty (180) days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in Reorganized Maxcom.  Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

6.6      **Setoffs**

Except as otherwise expressly provided herein, the Reorganized Debtors, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtors of any such Claims, rights, and Causes of Action that the Reorganized Debtors may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or Reorganized Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.  For the avoidance of doubt, no Claim in Class A shall be subject to setoff.

6.7      **Allocation Between Principal and Accrued Interest**

Except as otherwise provided in the Plan and to the extent permitted by applicable law, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan for income tax purposes as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest accrued through and including the Effective Date.

LEGAL_US_E # 141303171.6

# ARTICLE VII

# PROCEDURES FOR RESOLVING DISPUTED CLAIMS

7.1     **Disputed Claims**

In the event that the Debtors dispute a Claim, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this ARTICLE VII. Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be expunged without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtor may settle any Claims for which a Proof of Claim has been filed or for which a Proof of Claim has not been filed, without further notice to or approval of the Bankruptcy Court, the Claims and Solicitation Agent, or any other party.

7.2     **Resolution of Disputed Claims**

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to object to the Claim. Any objections to Claims shall be served and filed on or before the 120th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder thereof if service is effected in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; or (b) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases. The Debtors and the Reorganized Debtors shall be authorized to, and shall resolve all Disputed Claims or Interests by withdrawing or settling such objections thereto, or by litigating to Final Order in the Bankruptcy Court the validity, nature and/or amount thereof. All Claims not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to Section 4.13.

7.3     **Estimation of Claims**

The Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated in accordance with section 502(c) of the Bankruptcy Code for any reason, regardless of whether any Entity previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, the estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

7.4     **No Interest**

Unless otherwise expressly provided in the Plan or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

7.5     **No Distributions Pending Allowance**

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim has

become an Allowed Claim.  Distributions on account of Disputed Claims that become Allowed Claims shall be made pursuant to Section 6.2.

7.6     **Disallowance of Claims and Interests**

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE VIII

## EFFECT OF CONFIRMATION OF THE PLAN

8.1     **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

8.2     **Discharge of Claims and Termination of Interests**

**Except as otherwise provided for herein and effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estate; (b) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.**

8.3     **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided herein, for good and valuable consideration, as of the Effective Date, to the extent permitted by applicable laws, the Released Parties are conclusively, absolutely, unconditionally, irrevocably, and forever deemed released and discharged by each Debtor, each Reorganized Debtor, and each such Debtor's Estate from any and all actions, Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether far tort, contract, violations of federal or state securities laws and Avoidance Actions, including any derivative Claims, asserted on behalf of each Debtor, whether known or unknown,**

23

foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, asserted or that could possibly have been asserted on behalf of each Debtor, that each Debtor, each Reorganized Debtor, or each such Debtor's Estate, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Old Notes, the Old Notes Indenture, the Old Notes Guarantees, the Subsidiary Guarantee, the Intercompany Trust Agreement, the Intercompany Subordination Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation of the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that the foregoing provisions of this <u>Section 8.3</u> shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction; provided further that nothing in this <u>Section 8.3</u> shall release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan, including the Senior Notes and Junior PIK Notes and any other agreement or document related thereto or entered into in connection therewith, as applicable.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this <u>Section 8.3</u>, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by this <u>Section 8.3</u>; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to the Debtors asserting any Claim or Cause of Action released by this <u>Section 8.3</u>.

8.4    <u>Releases by the Releasing Parties</u>

As of the Effective Date, to the extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, the Estates, the Released Parties and each such Entity's successors and assigns, current and former affiliates, subsidiaries, officers, directors, members, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such, and only if such Persons occupied any such positions at any time on or after the Petition Date, from any and all Claims, Interests, obligations, rights, liabilities, actions, causes of action, choses in action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, contract, violations of federal or state securities laws and Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity asserted or that could possibly have been asserted, or would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Old Notes, the Old Notes Indenture, the Old Notes Guarantees, the Subsidiary Guarantee, the Intercompany Trust Agreement, the Intercompany Subordination Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Releasing Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, solicitation, or preparation of the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any

LEGAL_US_E # 141303171.6

act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; **provided**, **however**, that the foregoing provisions of this **Section 8.4** shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction; **provided further** that nothing in this **Section 8.4** shall release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this **Section 8.4**, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) important to the Plan; (b) in exchange for the good and valuable consideration provided by the Debtors, the Reorganized Debtors, the Estates and the Released Parties; (b) a good faith settlement and compromise of the Claims released by this **Section 8.4**; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under this **Section 8.4** from asserting any Claim or Cause of Action released by this **Section 8.4**.

8.5    **Exculpation**

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; **provided**, **however**, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; **provided**, **further**, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan.  The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

8.6    **Injunction**

Except as otherwise provided herein or for obligations issued pursuant hereto, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to **Section 8.3** or **Section 8.4**, discharged pursuant to **Section 8.2**, or are subject to exculpation pursuant to **Section 8.5** are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled pursuant to the Plan.

8.7    **Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors, or any Entity with which the Reorganized Debtors have been or are associated, solely because the Reorganized Debtors

LEGAL_US_E # 141303171.6

were a debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors were granted or denied a discharge), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

**8.8    Recoupment**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**8.9    Release of Liens**

Except as other provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, and except with respect to the Liens securing Other Secured Claims or Secured Tax Claims (depending on the treatment of such Claims), all mortgages, deeds of trust, Liens, pledges, or other security interests relating to or arising from the Old Notes shall be fully released and discharged simultaneously with the execution of the Collateral Documents in connection with the execution of the Senior Notes Indenture and issuance of the Senior Notes as contemplated by Section 4.4 hereof, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall vest and revert to the Reorganized Maxcom and its successors and assigns once the Senior Notes Collateral Documents are fully executed and the security interests created thereby are valid and perfected.  In addition, the Trustee shall execute and deliver all documents to evidence the release of mortgages, deeds of trust, Liens, pledges, and other security interests related to the Old Notes and shall authorize Reorganized Maxcom to file UCC-3 termination statements or their equivalent (to the extent applicable) with respect thereto.

**8.10    Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

**ARTICLE IX**

**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

**9.1    Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.2 of the Plan:

(a)    the Confirmation Order shall have been entered and become a Final Order, and such Final Order shall not have been stayed, modified, or vacated on appeal;

(b)    simultaneously with the Effective Date, (i) the Shareholder Contribution Amount, if any, shall have been consummated and (ii) the Early Participation Consideration, if any, shall have been paid to the Reorganized Debtors in accordance with the terms of the Plan;

(c)    no Governmental Authority shall have issued any ruling or order enjoining the consummation of the Plan in a way that cannot be reasonably remedied by the Debtors or the Reorganized Debtors;

(d)        all necessary consents, approvals and actions of, filings with and notices to any governmental or regulatory authority necessary to permit the Debtors to consummate the Plan shall have been duly obtained, made or given and shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the Plan shall have occurred; and

(e)        this Plan and all documents and agreements necessary to implement the Plan, including the New Corporate Governance Documents, the Senior Notes Collateral Documents and any other agreement or document related to the foregoing or entered into in connection therewith (including documents effectuating affiliate guaranties or asset pledges), shall have: (i) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (ii) been tendered for delivery to the required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (iii) been effected or executed.

## 9.2    <u>Waiver of Conditions Precedent</u>

The Debtors may amend, modify, supplement or waive any of the conditions to the Effective Date set forth in <u>Section 9.1</u> at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

## 9.3    <u>Effect of Non-Occurrence of Conditions to Consummation</u>

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE X

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

## 10.1    <u>Modification of Plan</u>

Effective as of the date hereof: (a) the Debtors, in accordance with the Bankruptcy Code and the Bankruptcy Rules, may amend or modify the Plan before the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, subject to the limitations set forth herein.

## 10.2    <u>Revocation or Withdrawal of Plan</u>

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any allowance of a Claim or any other settlement or compromise embodied in the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of the Debtors or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI

## RETENTION OF JURISDICTION

11.1    **Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under and/or related to the Chapter 11 Cases and the Plan to the fullest extent permitted by applicable law, including jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(b)    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(d)    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(e)    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan or the Confirmation Order, including contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement or the Disclosure Statement;

(f)    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

(g)    hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Section 6.5(a); (b) with respect to the releases, injunctions, and other provisions contained in ARTICLE VIII, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan or the Confirmation Order, or any Entity's rights arising from or obligations incurred in connection with the Plan or the Confirmation Order, including those arising under agreements, documents, or instruments executed in connection with the Plan; (d) related to section 1141 of the Bankruptcy Code; or (e) with respect to any Claims arising under or in connection with the Old Notes asserted by any current or former Holder of Old Notes against the Reorganized Debtors and Non-Debtor Guarantors;

(h)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(i)    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(j)    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, or the Confirmation Order;

(k)       hear and determine matters concerning U.S. state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(l)       enter an order or Final Decree concluding or closing the Chapter 11 Cases;

(m)       adjudicate any and all disputes arising from or relating to distributions under the Plan;

(n)       hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

(o)       enforce all orders previously entered by the Bankruptcy Court; and

(p)       hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1    **Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

12.2    **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

12.3    **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

12.4    **Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

LEGAL_US_E # 141303171.6

| | |
|---|---|
| Reorganized Debtors: | **Maxcom Telecomunicaciones S.A.B. de C.V.** |
| | Av. Guillermo González Camarena 2000 |
| | Col. Santa Fe Centro Ciudad de México |
| | CP 01376, Del. Álvaro Obregón |
| | Attn:    Erik Gonzalez, Chief Financial Officer |

| | |
|---|---|
| Counsel to Reorganized Debtors: | **Paul Hastings LLP** |
| | 200 Park Avenue |
| | New York, New York 10166 |
| | Attn:    Pedro A. Jimenez, Esq. |

## 12.5    Term of Injunctions or Stays

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## 12.6    Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## 12.7    Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Bankruptcy Court's website at www.nysb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

## 12.8    Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Reorganized Debtors; and (c) nonseverable and mutually dependent.

[*The remainder of this page is intentionally left blank.*]

Dated: June 17, 2019

Respectfully Submitted,


**MAXCOM TELECOMUNICACIONES S.A.B. de C.V.,**
**on behalf of itself and each of the other Debtors**


_____

Name:    Erik Gonzalez
Title:    Chief Financial Officer

## EXHIBIT A

### NON-DEBTOR GUARANTORS

Outsourcing Operadora de Personal, S.A. de C.V.
TECBTC Estrategias de Promocion, S.A. de C.V.
Maxcom SF, S.A. de C.V.
Maxcom TV, S.A. de C.V.
Telereunion, S.A. de C.V.
Telscape de Mexico, S.A. de C.V.
Sierra Comunicaciones Globales, S.A. de C.V.
Asesores Telcoop, S.A. de C.V.
Celmax Movil, S.A. de C.V.
Maxcom USA, Inc.
Sierra USA Communications, Inc.

*The Exchange Agent and Information Agent for the Exchange Offer and the Consent Solicitation is:*

**Prime Clerk, LLC**
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, New York 10165
(844) 234-1694 (domestic, toll-free)
+1 (917) 942-6396 (international, toll)
maxcomballots@primeclerk.com
http://cases.primeclerk.com/maxcom

*The Dealer Manager for the Exchange Offer and the Solicitation Agent for the Consent Solicitation is:*

**BCP Securities, LLC**
289 Greenwich Avenue
Greenwich, CT 06830
United States



# Maxcom Telecomunicaciones S.A.B. de C.V.

**Offer to Exchange any and all of its outstanding Step-Up Senior Notes due 2020
for its 8% Senior Secured Notes due 2024, its Junior PIK Notes and Cash**

**Solicitation of Consents to Proposed Amendments to Related Indenture**

**Disclosure Statement for Solicitation of Votes on a Prepackaged Plan of Reorganization**

———————

**OFFERING MEMORANDUM AND CONSENT SOLICITATION STATEMENT**

June 17, 2019

———————

*Dealer Manager and Solicitation Agent*
**BCP Securities, LLC**