**DRINKER BIDDLE & REATH LLP**
James H. Millar
Frank F. Velocci
Brian P. Morgan
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714
Telephone: (212) 248-3140 (Main)
Facsimile: (212) 248-3141
Email:  james.millar@dbr.com
           frank.velocci@dbr.com
           brian.morgan@dbr.com

*Attorneys for the Ad Hoc Group of Noteholders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MAXCOM USA TELECOM, INC.,<br>*et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-23489 (RDD)<br><br>(Jointly Administered) |

**OBJECTION OF THE AD HOC GROUP OF NOTEHOLDERS TO
CONFIRMATION OF DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN**

The Ad Hoc Group of Noteholders, by and through their undersigned counsel, hereby submit the following objection ("Objection") to confirmation of the Debtors' Joint Prepackaged Chapter 11 Plan [Docket No. 12] (the "Plan"), filed by Maxcom USA Telecom, Inc. ("Maxcom USA") and Maxcom Telecomunicaciones, S.A.B. DE C.V. ("Maxcom Parent," and together with Maxcom USA, the "Debtors"). In support of this Objection, the Ad Hoc Group of Noteholders respectfully represents as follows:

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, Maxcom USA Telecom, Inc. (7220) and Maxcom Telecommunicaciones, S.A.B. de C.V. (8KTO). The location of Debtor Maxcom Telecomunicaciones, S.A.B. de C.V.'s corporate headquarters and service address are: Guillermo Gonzàlez Camarena, 2000, Centro Ciudad, Santa Fé, Mexico, CDMX. The service address for Debtor Maxcom Telecom USA Inc. is c/o United Corporate Services, Inc., Ten Bank Street, Suite 560, White Plains, NY 10606.

120359678.1

## INTRODUCTION

1. The Ad Hoc Group of Noteholders formed in order to address noteholders' concerns with the way the Debtors solicited the Plan and abruptly terminated the voting period. The Ad Hoc Group of Noteholders feared that the solicitation process was wrongfully contrived to assure confirmation of the Plan and the documents produced to date have revealed that such fears were well taken. To be clear, the Debtors' production of documents is not yet complete and depositions remain to be taken. However, as of the date of this Objection, the Ad Hoc Group of Noteholders is unable to reconcile the ballots it reviewed with the tabulation summary filed by the Debtors purportedly showing noteholders' acceptance of the Plan. More troubling, communications between the Debtors' solicitation agents and noteholders show that noteholders and/or their custodians had difficulty following the Debtors' solicitation procedures and, in many instances, did not realize they had to submit a separate ballot to vote on the Plan. While the Debtors' agents bent over backwards to ensure that noteholders who were likely to support the Plan were aware of the need to submit a ballot and the procedure for doing so, the Debtors did not make the same extraordinary efforts to ensure that noteholders who may be opposed to the Plan understood the voting procedures or even confirm that they received the solicitation materials.

2. According to the Debtors, the Plan was approved by a razor-thin margin—a mere .06%. The Debtors have the burden of proving the accuracy of this tabulation and that no insiders or affiliates were included in final tally, a burden they have thus far failed to meet. Even if the Debtors' tabulation is correct, the flawed and one-sided solicitation process suggests that a number of votes were solicited or procured in bad faith, which would support the designation of votes pursuant to 11 U.S.C. § 1126(e). Similarly, the Debtors' wrongful

manipulation of the solicitation and voting process warrants a finding that the Plan was not proposed in good faith, contrary to the requirements of 11 U.S.C. § 1129(a)(3).

3. For these reasons and those set forth below, the Court should deny confirmation of the Plan.

## BACKGROUND

4. Maxcom Parent issued Step-Up Senior Notes due 2020 (the "Old Notes"), in the aggregrate principal amount of $180.4 million, pursuant to a pre-packaged plan of reorganization confirmed by the United States Bankruptcy Court for the District of Delaware on September 10, 2013. As of August 19, 2019 (the "Petition Date"), the amount outstanding on the Old Notes was $103,378,674, plus estimated accrued interest through August 18, 2019 of $5.6 million.

5. The members of the Ad Hoc Group of Noteholders are holders, or manage the accounts of holders, of Old Notes exceeding one-third of the Old Notes outstanding.

6. On June 17, 2019, Maxcom Parent commenced an offer to eligible, i.e., non-U.S., holders of the Old Notes to exchange the Old Notes (the "Exchange Offer") for: (a) new 8.00% senior secured notes due 2024 (the "Senior Notes"); (b) junior payment-in-kind notes (the "Junior PIK Notes" and together with the Senior Notes, the "New Notes"); and (c) $100 in cash per $1,000 principal amount of Old Notes. As set forth above, the outstanding principal amount of the Old Notes is $103,378,674. The maximum aggregate principal amounts of the Senior Notes and the Junior PIK Notes are $56,858,270 and $10,337,867, respectively. In addition to the Senior Notes and the Junior PIK Notes, eligible holders that tendered their Old Notes by a certain date were entitled to a payment of $10 in cash per $1,000 principal amount of Old Notes tendered (the "Early Participation Payment"). However, the Early Participation Payment is only payable in the event the Plan is confirmed by the Bankruptcy Court and becomes effective.

7. Concurrently with the Exchange Offer, the Debtors solicited votes from holders of the Old Notes to approve the Plan (the "Plan Solicitation") that would effectuate the financial restructuring, i.e., the exchange of the Old Notes for the New Notes and the cash consideration, on essentially the same terms as the Exchange Offer.

8. The Debtors engaged BCP Securities, LLC ("BCP") as administrator for the Exchange Offer and Plan Solicitation

9. The Debtors retained Prime Clerk, LLC ("Prime Clerk") to assist them in connection with the Exchange Offer and Plan Solicitation. Specifically, the Debtors appointed Prime Clerk as their solicitation and tabulation agent to assist with, among other things: (a) service of solicitation materials to the parties entitled to vote to accept or reject the Prepackaged Plan; and (b) tabulation of votes cast with respect thereto.

10. The Debtors established June 14, 2019 as the record date (the "Voting Record Date") for determining which creditors were entitled to vote on the Prepackaged Plan. Only holders of the Old Notes as of the Voting Record Date were entitled to vote to accept or reject the Plan ("Voting Noteholders").

11. Pursuant to the Offering Memorandum and Consent Solicitation Statement (the "Disclosure Statement"), in order to participate in the Exchange Offer, eligible holders of Old Notes were initially required to tender their Old Notes and submit a ballot in favor of the Plan by July 15, 2019 at 5:00 p.m., New York City time (the "Exchange Offer Deadline"). Holders of Old Notes who tendered their Old Notes by June 28, 2019 at 5:00 p.m., New York City time would be entitled to receive also the Early Participation Payment (the "Early Participation Payment Deadline").

12. The Disclosure Statement further provided that votes to accept or reject the Plan must be received no later than 12:00 midnight, New York City time, on July 15, 2019 (the

- 4 -

"Voting Deadline" and, together with the Exchange Offer Deadline and the Early Participation Payment Deadline, the "Deadlines").

13. On June 28, 2019, the Debtors announced that the deadline for earning the Early Participation Payment would be extended to 12:00 midnight, New York City time, on July 15, 2019 (the "Early Participation Payment Extension"). In announcing the Early Participation Payment Extension, the Debtors conceded that "it has taken considerable time for holders and beneficial owners of old notes to receive the exchange offer, consent solicitation and plan materials initially published on June 17, 2019, and some holders and beneficial owners may not have received such materials yet."

14. On July 15, 2019, the Debtors announced an extension of the Deadlines to July 30, 2019 at 5:00 p.m., New York City time (the "First Solicitation Extension"). In connection with the First Solicitation Extension, the Debtors also announced purported improvements to the Junior PIK Notes. At the time of the First Solicitation Extension, 34.4% of Old Notes had been tendered and not withdrawn in the Exchange Offer.

15. On July 30, 2019, after the expiration of the Deadlines, as extended, the Debtors announced a second extension of the Deadlines (including the Early Participation Payment Deadline) to August 14, 2019 at 5:00 p.m., New York City time (the "Second Solicitation Extension"). At the time of the Second Solicitation Extension, 45.4% of Old Notes had been tendered and not withdrawn in the Exchange Offer.

16. On August 15, 2019, the Debtors announced a third solicitation extension of the Deadlines (including the Early Participation Payment Deadline) to August 28, 2019 at 5:00 p.m., New York City time (the "Third Solicitation Extension"). As with the Second Solicitation Extension, the Third Solicitation Extension was announced after the Deadlines expired.

17. On August 16, 2019, notwithstanding their announcement only one day prior that the Deadlines were extended to August 28, 2019, the Debtors terminated the Exchange Offer because the requisite number of eligible noteholders did not tender their Old Notes and announced their intention to file and prosecute the Plan.

18. On the Petition Date, each of the Debtors filed a voluntary petition for Chapter 11 relief in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

19. On August 19, 2019, the Debtors filed the Declaration of Craig E. Johnson of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Joint Prepackaged Chapter 11 Plan [Docket No. 3] (the "Prime Clerk Declaration"). Mr. Johnson is a Director of Solicitation & Public Securities at Prime Clerk.

20. In the Prime Clerk Declaration, Mr. Johnson states that all valid ballots cast by Voting Noteholders or their authorized representative and received by Prime Clerk on or before August 14, 2019 at 5:00 p.m. (prevailing Eastern time) were tabulated. Prime Clerk Declaration ¶ 8.

21. Exhibit A to the Prime Clerk Declaration (the "Prime Clerk Tabulation") purports to be "[t]he final tabulation of votes cast by timely and properly completed ballots received by Prime Clerk." Prime Clerk Declaration ¶ 9. According to the Prime Clerk Tabulation, 100 holders of Old Notes, representing 66.73% of the amount outstanding among noteholders who voted, voted to accept the Plan. However, because the holders who ostensibly voted on a timely basis held only 60.3% of the Old Notes, the Plan was effectively supported by a mere 40.2% of holders of the Old Notes.

**OBJECTION**

22. A chapter 11 plan cannot be confirmed unless either: (i) it meets all of the requirements of 11 U.S.C. § 1129(a); or (ii) at least one impaired class approves it and the debtor fulfills the "cramdown" requirements of section 1129(b). 11 U.S.C. 1129(a), (b). The burden of proof rests squarely on the plan's proponent—in this case, the Debtors. *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310 n.582 (Bankr. S.D.N.Y. 2016) (citation omitted).

23. Section 1129(a)(10) states that a plan can be accepted only "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including the acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). The term "insider" includes, in addition to the debtor's directors, officers, persons in control and relatives of such persons, affiliates of the debtor and insiders of such affiliates. 11 U.S.C. § 101(31).

24. Acceptance of a chapter 11 plan is governed by 11 U.S.C. § 1126. Section 1126(c) provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

25. Here, the only class that is impaired under the Plan consists of claims held by holders of the Old Notes (the "Old Notes Class"). Plan § 3.2. Thus, the Plan cannot be confirmed under section 1129(a) as a matter of law unless the requisite number of holders of the Old Notes, excluding insiders, voted to accept the Plan. As of the date of this Objection, the Debtors have not met their burden of demonstrating that the Old Notes Class accepted the Plan pursuant to section 1126(c).

- 7 -

26. The Prime Clerk Tabulation states that 66.73% of the amount of claims in the Old Notes Class voted to accept the Plan, which would satisfy section 1126(c)'s requirement of two-thirds in amount by a mere .06%. The Ad Hoc Group of Noteholders cannot reconcile the ballots provided by the Debtors with the Prime Clerk Tabulation. The Ad Hoc Group of Noteholders is unable to determine, from the face of the ballots, whether they were included in the Prime Clerk Tabulation, how they were counted or even, in a number of cases, the beneficial owner on whose behalf the vote was cast.

27. In addition, despite requests, the Debtors have failed to provide the Ad Hoc Group of Noteholders with any documents sufficient to allow it to determine whether any insiders or affiliates voted to accept the Plan and whether those votes were included in the Prime Clerk Tabulation. This failure is particularly concerning given the Debtors' concession that members of its board of directors participated in "unusual movements" with the respect to the Debtors' [equity] securities on August 19, 2019, i.e., the Petition Date. *See* Exhibit A (Maxcom Telecomunicaciones Announcement).

28. Until the Debtors or Prime Clerk produce documents supporting Prime Clerk's Tabulation, including spreadsheets identifying who voted on the Plan, how they voted and in what amount, the Court should not accept Prime Clerk's Tabulation and find that no impaired class has accepted the Plan, precluding confirmation under section 1129(a)(10) or 1129(b)(1).

29. Even if a sufficient number of holders of Old Notes voted to accept the Plan, there is evidence suggesting a number of votes were solicited in bad faith so as to create an accepting impaired class. In such cases, section 1126(e) authorizes the Bankruptcy Court to "designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title." 11 U.S.C. § 1126(e). The bankruptcy court's authority to designate a vote under section 1126(e) is not limited to

instances where the voting creditor acted in bad faith. Rather, "[section 1126(e)] provides a basis to designate, without regard to the creditor's motive, where the vote is 'solicited or procured' in bad faith." *In re Quigley Co., Inc.*, 437 B.R. 102, 130-131 (Bankr. S.D.N.Y. 2010)

30.     Here, the Plan Solicitation was flawed from the start. The creation of separate voting procedures for the Exchange Offer and the Plan, coupled with different deadlines, created widespread confusion among holders of the Old Notes. A significant number of noteholders initially responded only to the Exchange Offer but not the Plan, which was surprising given the similarity in terms. When the Debtors and their agents realized that the number of the ballots they received on the Plan did not correspond to the number of the holders who either tendered or withheld their Old Notes, Prime Clerk and BCP began reaching out to noteholders to encourage them to vote on the Plan and walk them through the process. However, it appears that, based on the documents produced to date, Prime Clerk and BCP contacted directly only noteholders that they believed would vote in favor of the plan (based on their support of the Exchange Offer). Noteholders who rejected the Exchange Offer and/or communicated their opposition to the Plan were left to their own devices.

31.     In other words, when the Debtors learned that their Plan Solicitation process was flawed, they limited their efforts to assist noteholders with voting to those noteholders most likely to support the Plan. The Debtors' efforts to solicit votes of acceptance from such noteholders continued up until and, ostensibly in at least one case *past*, the Second Solicitation Extension's August 14, 2019 Deadline, which the Debtors retroactively determined would be the final Voting Deadline. Where, as here, the solicitation "taints the free-election process of creditor voting," designation under 11 U.S.C. § 1126(e) is appropriate. *In re Sandia Resorts, Inc.*, No. 11–15–11532, 2016 WL 6879249, at *6 (Bankr. D.N.M. Nov. 4, 2016); *see also Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 97 (3d Cir. 1988) (Section

1126(e) "grants the bankruptcy court discretion to sanction any conduct that taints the voting process, whether it violates a specific provision or is in 'bad faith.'").

32.     Further, the existence of the Early Participation Payment raises the spectre of vote buying.  While, initially, noteholders were only eligible to receive the Early Participation Payment if they tendered their Notes by the initial Early Participation Payment Deadline, as the Debtors extended the Deadlines so that they could solicit additional support, they set identical deadlines for the Early Participation Payment Deadline and the Voting Deadline.  Up until the date of the Second Solicitation Extension, the Debtors, through their agents, were contacting friendly holders to remind them that they could only receive the Early Participation Payment if the Plan was confirmed and therefore they were strongly encouraged to submit their ballot in favor of the Plan.

33.     Section 1129(a)(3) of the Bankruptcy Code permits confirmation of a plan only if it is "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Where, as here, a debtor makes payments to a creditor in exchange for its vote in favor of the Plan, the Plan violates section 1129(a)(3) and the vote cast by the creditor who received payment is deemed to have been procured in bad faith in violation of section 1126(e).  The payment of the Early Participation Payment to certain members of the Old Notes Class but not others also violates section 1123(a)(4)'s requirement of "the same treatment for each claim or interest of a particular class." 11 U.S.C. § 1123(a)(4).

34.     At the very least, the totality of the circumstances, as set forth herein, suggest that the Plan was not proposed in good faith, in violation of section 1129(a)(3).  *See Quigley*, 437 B.R. at 129 (finding that plan was proposed in bad faith where the voting process was manipulated and tainted).

35.     Finally, the Debtors' distribution of solicitation materials did not comply with

Rule 3017(e) or Rule 3018(b) of the Federal Rules of Bankruptcy Procedure. Rule 3017(e) ("Transmission to beneficial holders of securities") requires that beneficial owners, not merely the record holders, receive the disclosure statement, plan and ballot. Fed. R. Bankr. P. 3017(e) ("[T]he court shall consider the procedures for transmitting the documents and information required by subdivision (d) of this rule to beneficial holders of stock, bonds, debentures, notes, and other securities, determine the adequacy of the procedures, and enter any orders the court deems appropriate."). Rule 3018(b) provides that "[a] holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Code shall not be deemed to have accepted or rejected the plan if the court finds after notice and hearing that the plan was not transmitted to substantially all creditors and equity security holders of the same class[.]" Fed. R. Bankr. P. 3018(b). "A pre-petition solicitation process is invalid where there is no evidence that the solicitation has been sent to beneficial bondholders." *In re Pioneer Finance Corp.*, 246 B.R. 626, 635 (Bankr. D. Nev. 2000); *see also City of Colorado Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 691-2 (Bankr. D. Colo. 1995) (denying confirmation where debtor failed to show that plan, disclosure statement and ballot were received by all beneficial holders in prepetition solicitation process).

36.     Here, in violation of Rule 3017(e), the Debtors did not distribute the solicitation materials, including the Disclosure Statement, Plan and Ballot to each beneficial owner of the Old Notes. Rather, it appears as if, in most instances, the solicitation materials were only sent to the record holders of the Old Notes. *See* Affidavit of Service of Solicitation Materials [Docket No. 19]. In a few cases, the Debtors, through Prime Clerk or BCP, followed up to ensure the materials had reached the beneficial owner, but again only when the Debtors had reason to believe the owner would vote to accept the Plan. In contrast, where the Debtors suspected the owner would not support the Plan (based on its non-participation in the Exchange Offer or vote

to reject the Plan through a different record holder or custodian), the Debtors made no effort to confirm receipt or understanding of the solicitation materials.

37. With respect to the Ad Hoc Group of Noteholders, Fratelli Investments Ltd. ("Fratelli") did not receive a ballot to vote on the Plan. While the Debtors may have sent a ballot to the record holder of Fratelli's notes, neither the Debtors nor their agents made any effort to confirm that the ballot was forwarded to Fratelli, likely because Fratelli had elected to take no action on (i.e., not accept) the Exchange Offer and (as discussed below) expressly opposed the Plan. Moneda Latin Amercian Corporate Debt ("Moneda") received a ballot for its position held with the Depository Trust Company but did not receive a ballot for its position held with Euroclear. As a result, Moneda was only able to vote a portion of its Old Notes against the Plan. Had the Debtors reached out to facilitate Moneda's submission of a ballot on the unvoted portion, as they did with friendly noteholders, the amount (approximately $2.7 million) would have been sufficient to defeat the Plan. Instead, because the Debtors knew that Moneda expressly opposed the Plan, they relied on the deficiencies in the solicitation process to thwart Moneda's will.

38. On August 12, 2019, just two days before the date the Debtors would retroactively deem to be the final Voting Deadline, the Ad Hoc Group of Noteholders (which includes Fratelli and Moneda), by way of letter through their financial advisor, expressly informed the Debtors that it "has not tendered its consents and Notes in favor of your proposal and formally declines to support Maxcom's currently proposed exchange offer and terms for a restructuring" (*see* Exhibit B). Unsurprisingly, the Debtors did not offer the Ad Hoc Group (again comprising more than one-third of the Old Notes outstanding) the same assistance it extended to supportive noteholders in confirming their receipt or understanding of how to submit a ballot.

39. The Debtors' failure to comply with Rule 3017(e) and Rule 3018(b) requires denial of confirmation. *See Pioneer Finance*, 246 B.R. at 635; *City of Colorado Springs*, 177 B.R. at 691-2.

## RESERVATION OF RIGHTS

40. The Ad Hoc Group of Noteholders reserve the right to supplement or amend this Objection based upon information acquired by *Ad Hoc Group of Noteholders* subsequent to its filing and to introduce evidence at any hearing related to the Plan and /or this Objection.

## CONCLUSION

For the foregoing reasons, the Ad Hoc Group of Noteholders object to confirmation of the Plan and request that the Court deny confirmation of the Plan.

Dated: September 6, 2019
New York, New York

**DRINKER BIDDLE & REATH LLP**

/s/ James H. Millar
James H. Millar, Esq.
Frank F. Velocci, Esq.
Brian P. Morgan, Esq.
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714
Telephone: (212) 248-3140 (Main)
Facsimile: (212) 248-3141
james.millar@dbr.com
frank.velocci@dbr.com
brian.morgan@dbr.com

*Counsel to the Ad Hoc Group of Noteholders*

**EXHIBIT A**

**Maxcom Telecomunicaciones**

En relación al evento relevante publicado el día de hoy referente a los movimientos inusitados presentados en la operación de los valores identificados con clave de cotización "MAXCOM A", la emisora informa que, después de hacer una revisión más exhaustiva, en dichos movimientos tuvieron participación, algunos miembros de su consejo de administración.

Esta aclaración se realiza a solicitud de la Bolsa Mexicana de Valores, con fundamento en lo establecido en el artículo 106 de la Ley del Mercado de Valores y el artículo 50, último párrafo, de las Disposiciones de Carácter General aplicables a las emisoras de valores y a otros participantes del mercado de valores.

**Sobre Maxcom**

Maxcom Telecomunicaciones, S.A.B. de C.V. tiene sus oficinas corporativas en la Ciudad de México y es un prestador de servicios integrados de telecomunicaciones utilizando una estrategia de "construcción inteligente" para proporcionar servicios de conexión de "última milla" al mercado empresarial y clientes residenciales en México.

Maxcom inició sus operaciones comerciales en mayo de 1999 y actualmente ofrece servicios de telefonía local, larga distancia, transmisión de datos alámbricos, inalámbricos, celulares, servicios de televisión basados en tecnología IP y servicios de valor agregado en el área metropolitana de la ciudad de México, Monterrey, Puebla, Querétaro, León, Guadalajara, San Luis Potosí, Tehuacán y Toluca, así como en otras ciudades de México. La información contenida en este comunicado de prensa es responsabilidad exclusiva de Maxcom Telecomunicaciones, S.A.B. de C.V. y no ha sido revisada por la Comisión Nacional Bancaria y de Valores (CNBV) o cualquier otra autoridad.

La negociación de estos valores por un inversionista es responsabilidad exclusiva de dichos inversionistas.

Para mayor información contactar a:
Rodrigo Wright
México, D.F., México
(52 55) 4770-1170
rodrigo.wright@maxcom.com

**EXHIBIT B**



Cicerone Advisers LLC
140 Broadway
46th Floor
New York, NY 10005
Tel +1 212 371 9115
Fax +1 212 371 9113

August 12, 2019

**MAXCOM TELECOMUNICACIONES, S.A.B. DE C.V.**
Guillermo González Camarena No. 2000 – P.H.
Col. Centro de Ciudad Santa Fe
01376 Mexico, D.F.

**BCP SECURITIES LLC**
289 Greenwich Avenue
Greenwich, CT 06830

Dear Enrique and Jim,

We appreciate the opportunity to have discussed initially with you the key terms for restructuring Maxcom's Step-Up Senior Notes due 2020 (the "Senior Notes"). As you know, beneficial owners representing more than one-third (the "*ad hoc* committee") of the Senior Notes outstanding have retained Ronald R. Jewell as United States legal counsel, Alejandro Sainz as Mexican legal counsel and Cicerone as financial adviser.

The goal of any consensual restructuring should be to put Maxcom on a path to financial stability while undertaking material changes to promote operating efficiency, repositioning the business to support growth and to maximize value for all stakeholders. Over the past five years, Maxcom has consistently underperformed against the guidance provided by Maxcom to investors. The *ad hoc* committee does not believe that Maxcom's currently proposed exchange offer and terms for restructuring will achieve that goal. Accordingly, the *ad hoc* committee has not tendered its consents and Notes in favor of your proposal and formally declines to support Maxcom's currently proposed exchange offer and terms for a restructuring.

We believe that any restructuring must not only effect a meaningful reduction in Maxcom's debt and reschedule remaining debt in a manner that can be sustained but restructure its entire capital structure, and the *ad hoc* committee wants to work proactively with you to achieve those goals. However, to the extent that holders of the Senior Notes make concessions to restructure the Senior Notes, they expect ultimately that holders of the Senior Notes could recover fully their investment in Maxcom and be compensated for extending the payment obligations of Maxcom.

Our objective is consistent with what Jim expressed; that the intent of the restructuring is to help Maxcom and not to effect a transfer of wealth to the shareholders. To that end, we exchanged ideas with you to accomplish our clients' goals: a willingness to de-lever Maxcom; a willingness to exchange into a quasi-equity but with strong governance; and a willingness to roll a portion of Senior Notes into a new senior note. However, we remain apart on our approach and material terms. We need to start focusing on the details of the *ad hoc* committee's global restructuring proposal as a package, and avoid attempts to chip away at it one item at a time. We need your commitment to work with us in good faith towards an agreement in an attempt to fashion workable restructuring terms.



Cicerone Advisers LLC
140 Broadway
46th Floor
New York, NY 10005
Tel +1 212 371 9115
Fax +1 212 371 9113

We have prepared a draft of restructuring terms that we would like to share with you. However, prior to doing so, we need your commitment to keep our proposed terms and discussions confidential, unless and until we have final agreed terms that would be announced and incorporated in offering documents and/or a Chapter 11 plan. Selective disclosure or use of our proposed terms to advance a different restructuring agenda would materially impair any prospect of collaboration with the *ad hoc* committee.

While we are working with you, the *ad hoc* committee expects that Maxcom will pay all of their professional advisers' fees and expenses. All of the advisers to the *ad hoc* committee have made significant fee concessions for the *ad hoc* committee well below what is customary in these types of transactions, in a show of good faith and in order to advance swiftly.

Accordingly, the *ad hoc* committee requests that Maxcom agree to pay from time to time, as invoiced, the legal fees (net of any withholding taxes) and expenses of the *ad hoc* committees' United States and Mexico counsel, including as incurred to date. Assuming that we have a mutual good faith and efficient effort to reach agreeable final restructuring terms, the *ad hoc* committee would accept a tentative limit on their legal fees of US$250,000 plus expenses (with initial retainers of US$35,000 each, subject to replenishing and invoicing as required by counsel).

The *ad hoc* committee requests also that Maxcom agree to pay, in accordance with our engagement agreement with the *ad hoc* committee, Cicerone's fees (net of any withholding taxes) plus expenses. Maxcom would agree to reimburse the *ad hoc* committee for fees paid to date (US$90,000) and agree also to pay Cicerone its fixed fees (US$210,000 at the signing of a definitive term sheet with the *ad hoc* committee, and US$200,000 at the closing of the exchange offer), and out of pocket expenses accrued from time to time.

**Nothing contained herein shall effect or imply any waiver by the *ad hoc* committee of any claims or Events of Default under the Senior Notes, the Indenture, the Collateral Documents or otherwise, and all rights of holders are reserved.**

If Maxcom agrees to the above, we will then share with you our draft term sheet and meet as soon as convenient for you.

Sincerely,

CICERONE ADVISERS LLC

By: _____
Name: Zain A. Manekia
Title: Managing Principal

Accepted and agreed as of August _____, 2019

MAXCOM TELECOMUNICACIONES, S.A.B. DE C.V.

By: _____
Name:
Title:

19-23489-rdd    Doc 41    Filed 09/06/19    Entered 09/06/19 15:56:04    Main Document
Pg 19 of 19



Cicerone Advisers LLC
140 Broadway
46th Floor
New York, NY 10005
Tel +1 212 371 9115
Fax +1 212 371 9113

CC:  Alejandro Sainz
Ronald R. Jewell
Ignacio Fernández
Patrick Kiblisky
Andrés Segú